IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | No.  22-cv-651 |
| GENERAL MEDICINE, P.C.,<br>GENERAL MEDICINE OF ILLINOIS PHYSICIANS, P.C.,<br>GENERAL MEDICINE OF NORTH CAROLINA, P.C.,<br>ADVANCED MEDICAL HAGGERTY PARTNERS, P.A.,<br>BOROUGH MEDICAL PARTNERS, P.A.,<br>CENTRO MEDICAL PARTNERS, P.A.,<br>CITY MEDICAL PARTNERS, P.A.,<br>INTEGRATED MEDICAL PARTNERS, P.A.,<br>METRO MEDICAL HAGGERTY PARTNERS, P.A.,<br>METROPOLIS MEDICAL PARTNERS, P.A.,<br>NATIONAL MEDICAL PARTNERS, P.A.,<br>NEW CASTLE HAGGERTY MEDICAL PARTNERS, P.A.,<br>REGIONAL MEDICAL PARTNERS, P.A.,<br>SIGMA HAGGERTY MEDICAL, P.A.,<br>SILVERTON MEDICAL PARTNERS, P.A.,<br>STATEWIDE MEDICAL PARTNERS, P.A.,<br>VICINITY MEDICAL PARTNERS, P.A.,<br>WESTCO HAGGERTY MEDICAL PARTNERS, P.A., and<br>THOMAS M. PROSE, | |
| Defendants. | |

## PLAINTIFF UNITED STATES OF AMERICA'S COMPLAINT

## TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................... 1

II. JURISDICTION AND VENUE ............................................................................. 1

III. PARTIES .............................................................................................................. 2

IV. THE FEDERAL FALSE CLAIMS ACT ............................................................. 9

V. GOVERNMENT HEALTH CARE PROGRAMS .............................................. 10

    A. Medicare ........................................................................................................ 10

    B. Medicaid ........................................................................................................ 11

VI. MEDICARE'S COVERAGE OF HEALTH CARE SERVICES IN NURSING
FACILITIES AND ASSISTED LIVING FACILITIES ......................................... 12

    A. Overview of Facilities .................................................................................. 12

    B. Medicare Only Covered Medically Necessary Physician and Nurse Practitioner
       Visits with Facility Residents ...................................................................... 14

    C. Billing and Payment for Physician and Nurse Practitioner Visits with Facility
       Residents ....................................................................................................... 15

        1. Billing Codes for Subsequent E/M Visits in Nursing Homes ............... 18

        2. Billing Codes for Subsequent E/M Visits in Assisted Living Facilities ........... 20

VII. DEFENDANTS' HEALTH CARE FRAUD SCHEME ................................... 21

    A. Defendants Adopted Policies and Practices Designed to Increase
       Reimbursement Without Regard to Medical Necessity ............................... 23

        1. Care Plan Reviews ("CPRs") ................................................................ 24

        2. Monthly Medication Reviews ("MMRs") ............................................ 26

        3. Other "Regulatory" Visits Required by GM ......................................... 29

            a. PQRS Visits .................................................................................... 29

            b. PHQ-9 Visits ................................................................................... 30

            c. Annual Nursing Facility Assessment Visits ................................... 31

    B. GM Incentivized Clinicians to Perform Visits by Establishing Quotas and
       Compensation Structures Based on Visit Numbers ..................................... 32

    C. GM Closely Tracked the Number of Billable Visits and Directed Clinicians to
       Perform More Visits When Numbers Were Low ......................................... 34

    D. GM Billed Medicare for Services that Were Not Rendered or Not Performed
       as Documented .............................................................................................. 36

    E. GM Controlled the Billing Process in a Centralized Corporate Office and
       Submitted False Claims for Services to Medicare ....................................... 39

        1. GM Billed for Duplicative Services and Manipulated Patient Records to
           Maximize Revenue .............................................................................. 39

        2. GM Systematically Upcoded Claims to Medicare ............................... 42

    F. Defendants Knowingly Submitted and Caused the Submission of False Claims
       to Medicare ................................................................................................... 44

        1. Clinicians Complained About GM's Excessive and Unnecessary Visits ........ 46

        2. Patient Families Complained About GM's Excessive and Unnecessary
           Visits ..................................................................................................... 48

        3. Nursing Facilities Complained About GM's Excessive and Unnecessary
           Visits ..................................................................................................... 49

4. Medicare Contractors Denied and Downcoded Claims Billed by General
   Medicine and the GM Shell Entities .................................................50
5. The Medicare Appeals Council Denied and Downcoded Claims Billed
   by General Medicine, P.C. ................................................................52
6. GM's Own Internal Audits Showed that Services Rendered by GM
   Clinicians Were Not Medically Necessary and Upcoded ...............56
G. GM Knew Medical Necessity and Proper Coding Were Conditions of Payment
   and Material to Medicare ..........................................................................57
   1. Alteration of Progress Notes .........................................................58
   2. The 35-Visit Rule ...........................................................................60
   3. The GM Shell Entities ....................................................................62
VIII. EXAMPLES OF FALSE CLAIMS .................................................................65
IX. PROSE ORCHESTRATED GM'S FRAUDULENT POLICIES AND PROFITED
   FROM THE RESULTS ..................................................................................82
COUNT I: PRESENTING AND CAUSING FALSE CLAIMS ..................................83
COUNT II: MAKING OR USING A FALSE RECORD OR STATEMENT .............85
COUNT III: CONSPIRACY ...................................................................................86
COUNT IV: CONCEALING AND AVOIDING AN OBLIGATION TO PAY .........87
COUNT V: COMMON LAW FRAUD.....................................................................89
COUNT VI: PAYMENT BY MISTAKE OF FACT .................................................90
COUNT VII: UNJUST ENRICHMENT ..................................................................90
PRAYER FOR RELIEF AND JURY DEMAND ....................................................91

## I.  INTRODUCTION

1.      The United States of America brings this action under the False Claims Act, 31 U.S.C. § 3729, *et seq*. ("FCA"), and common law theories of fraud, payment by mistake, and unjust enrichment against General Medicine, P.C.; General Medicine of Illinois Physicians, P.C.; General Medicine of North Carolina, P.C.; Advanced Medical Haggerty Partners, P.A.; Borough Medical Partners, P.A.; Centro Medical Partners, P.A; City Medical Partners, P.A.; Integrated Medical Partners, P.A.; Metro Medical Haggerty Partners, P.A.; Metropolis Medical Partners, P.A.; National Medical Partners, P.A.; New Castle Haggerty Medical Partners, P.A.; Regional Medical Partners, P.A.; Sigma Haggerty Medical, P.A.; Silverton Medical Partners, P.A.; Statewide Medical Partners, P.A.; Vicinity Medical Partners, P.A.; Westco Haggerty Medical Partners, P.A.; and Thomas M. Prose (collectively, "Defendants").

2.      Defendants have engaged in a years-long, wide-ranging health care fraud scheme that involved billing Medicare for thousands of false claims for visits with nursing home and assisted living facility residents. These claims were false because the associated patient visits were either not performed, not medically necessary, or insufficient to meet the requirements of the billing code for which reimbursement was received. Defendants' unlawful scheme netted tens of millions of dollars in payments, with American taxpayers footing the bill.

## II.  JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345 because the United States is the Plaintiff. In addition, the Court has subject matter jurisdiction over the FCA causes of action under 28 U.S.C. § 1331 and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

4.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, transacts business in, or has committed the alleged acts in the Southern District of Illinois.

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, or transacts business in the Southern District of Illinois, and a substantial part of the events giving rise to the claims occurred in this District.

## III.   PARTIES

6.     The United States brings this action on behalf of the United States Department of Health and Human Services ("HHS"), which through the Centers for Medicare and Medicaid Services ("CMS") administers the Medicare program.

7.     Defendant General Medicine, P.C. is a Michigan corporation formed on January 22, 1985. General Medicine, P.C.'s principal place of business is located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Defendant Thomas M. Prose ("Prose") was the sole shareholder and officer of General Medicine, P.C. At all times relevant to this Complaint, Prose was the President and Senior Medical Director of General Medicine, P.C.

8.     Defendant General Medicine of Illinois Physicians, P.C. ("General Medicine of Illinois") is an Illinois corporation formed on October 12, 2005. General Medicine of Illinois's principal place of business is located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Prose was the sole shareholder and officer of GM of Illinois.

9.     Defendant General Medicine of North Carolina, P.C. ("GM of North Carolina") is a North Carolina corporation formed on November 21, 2016. GM of North Carolina's principal place of business is located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Prose was the sole shareholder and officer of GM of North Carolina.

10.     Defendant Advanced Medical Haggerty Partners, P.A. ("Advanced Medical") is a Delaware corporation formed on February 26, 2016. Advanced Medical's principal place of business is located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Prose was the sole shareholder and officer of Advanced Medical.

11.     Defendant Borough Medical Partners, P.A. ("Borough Medical") was a Delaware corporation formed on February 26, 2016. Borough Medical's principal place of business was located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Prose was the sole shareholder and officer of Borough Medical. On December 12, 2019, Borough Medical's corporate charter was forfeited. The United States brings this action against Borough Medical pursuant to 8 Del.C. § 278.

12.     Defendant Centro Medical Partners, P.A. ("Centro Medical") was a Delaware corporation formed on February 26, 2016. Centro Medical's principal place of business was located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Prose was the sole shareholder and officer of Centro Medical. On December 12, 2019, Centro Medical's corporate charter was forfeited. The United States brings this action against Centro pursuant to 8 Del.C. § 278.

13.     Defendant City Medical Partners, P.A. ("City Medical") is a Delaware corporation formed on February 26, 2016. City Medical's principal place of business is located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Prose was the sole shareholder and officer of City Medical.

14.     Defendant Integrated Medical Partners, P.A. ("Integrated Medical") is a Delaware corporation formed on February 26, 2016. Integrated Medical's principal place of business is

located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Prose was the sole shareholder and officer of Integrated Medical.

15.     Defendant Metro Medical Haggerty Partners, P.A. ("Metro Medical") was a Delaware corporation formed on February 26, 2016. Metro Medical's principal place of business was located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Prose was the sole shareholder and officer of Metro Medical. On December 12, 2019, Metro Medical's corporate charter was forfeited. The United States brings this action against Metro Medical pursuant to 8 Del.C. § 278.

16.     Defendant Metropolis Medical Partners, P.A. ("Metropolis Medical") is a Delaware corporation formed on February 26, 2016. Metropolis Medical's principal place of business is located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Prose was the sole shareholder and officer of Metropolis Medical.

17.     Defendant National Medical Partners, P.A. ("National Medical") is a Delaware corporation formed on February 26, 2016. National Medical's principal place of business is located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Prose was the sole shareholder and officer of National Medical.

18.     Defendant New Castle Haggerty Medical Partners, P.A. ("New Castle Medical") was a Delaware corporation formed on February 26, 2016. New Castle Medical's principal place of business was located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Prose was the sole shareholder and officer of New Castle Medical. On December 12, 2019, New Castle Medical's corporate charter was forfeited. The United States brings this action against New Castle Medical pursuant to 8 Del.C. § 278.

19.     Defendant Regional Medical Partners, P.A. ("Regional Medical") is a Delaware corporation formed on February 26, 2016. Regional Medical's principal place of business is located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Prose was the sole shareholder and officer of Regional Medical.

20.     Defendant Sigma Haggerty Medical, P.A. ("Sigma Haggerty Medical") is a Delaware corporation formed on February 26, 2016. Sigma Haggerty Medical's principal place of business is located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Prose was the sole shareholder and officer of Sigma Haggerty Medical.

21.     Defendant Silverton Medical Partners, P.A. ("Silverton Medical") was a Delaware corporation formed on February 26, 2016. Silverton Medical's principal place of business was located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Prose was the sole shareholder and officer of Silverton Medical. On December 12, 2019, Silverton Medical's corporate charter was forfeited. The United States brings this action against Silverton Medical pursuant to 8 Del.C. § 278.

22.     Defendant Statewide Medical Partners, P.A. ("Statewide Medical") was a Delaware corporation formed on February 26, 2016. Statewide Medical's principal place of business was located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Prose was the sole shareholder and officer of Statewide Medical. On December 12, 2019, Statewide Medical's corporate charter was forfeited. The United States brings this action against Statewide Medical pursuant to 8 Del.C. § 278.

23.     Defendant Vicinity Medical Partners, P.A. ("Vicinity Medical") was a Delaware corporation formed on February 26, 2016. Vicinity Medical's principal place of business was located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this

Complaint, Prose was the sole shareholder and officer of Vicinity Medical. On December 12, 2019, Vicinity Medical's corporate charter was forfeited. The United States brings this action against Vicinity Medical pursuant to 8 Del.C. § 278.

24.     Westco Haggerty Medical Partners, P.A. ("Westco Haggerty Medical") was a Delaware corporation formed on February 26, 2016. Westco Haggerty Medical's principal place of business was located at 21333 Haggerty Road, Suite 150, Novi, Michigan. At all times relevant to this Complaint, Prose was the sole shareholder and officer of Westco Haggerty Medical. On December 12, 2019, Vicinity Medical's corporate charter was forfeited. The United States brings this action against Vicinity Medical pursuant to 8 Del.C. § 278.

25.     Defendant Thomas M. Prose is a licensed physician who resides in Michigan.

26.     In addition to the defendant entities described in paragraphs 7 through 24, Prose owned and operated numerous other entities affiliated with General Medicine, P.C., including but not limited to General Medicine Management Services, Inc.; The Post Hospitalist Company, P.C.; General Medicine P.C., Inc.; General Medicine of Illinois Nurse Practitioners, P.C.; General Medicine of Kansas, P.A.; General Medicine of Kansas City, P.C.; General Medicine of Louisiana Nurse Practitioners, P.C.; General Medicine of Louisiana Physicians, P.C.; General Medicine of Michigan Nurse Practitioners, P.C.; General Medicine of Michigan, P.C.; General Medicine of Michigan Physicians, P.C.; General Medicine of Missouri Nurse Practitioners, P.C.; General Medicine of Missouri Physicians, P.C.; General Medicine of North Carolina, P.C.; General Medicine of Ohio Nurse Practitioners, P.C.; General Medicine of Oklahoma Physicians East, P.C.; General Medicine of Oklahoma Physicians West, P.C.; General Medicine of Virginia Nurse Practitioners, P.C.; and General Medicine of Virginia Physicians, P.C.

27.     The entities listed in paragraph 26 were used in furtherance of the health care fraud scheme to employ clinicians in various states or for other business, but most did not bill claims to Medicare.

28.     Collectively, the entities listed in paragraphs 8 through 26 above are referred to herein as the "GM Shell Entities."

29.     Prose and employees of General Medicine, P.C. organized the web of GM Shell Entities under the laws of various states.

30.     The GM Shell Entities and General Medicine, P.C. agreed to work together to execute the health care fraud scheme. General Medicine, P.C. served as the dominant, public front of the company. The GM Shell Entities were used to employ clinicians in various states or to bill Medicare for services performed by employees of General Medicine, P.C. or the other GM Shell Entities.

31.     At all times relevant to this Complaint, General Medicine, P.C. and the GM Shell Entities operated and managed all medical services and business out of the same office in Novi, Michigan.

32.     Upon information and belief, the GM Shell Entities did not have their own administrative employees. Functions such as human resources, billing, accounting, business development, and clinical operations were all performed by employees of General Medicine, P.C.

33.     The GM Shell Entities followed General Medicine, P.C.'s corporate manuals and policies.

34.     The GM Shell Entities utilized the phone numbers, email addresses, and websites of General Medicine, P.C.

35.     Correspondence on behalf of the GM Shell Entities was conducted on General Medicine, P.C. letterhead.

36.     When dealing with the public, nursing facilities, assisted living facilities, and patients, employees of the GM Shell Entities held themselves out as employees of General Medicine, P.C.

37.     Patient visits performed by employees of the GM Shell Entities were documented on progress notes identifying the medical provider as General Medicine, P.C.

38.     Nursing homes and assisted living facilities often were not aware the GM Shell Entities existed and believed all services were performed by employees of General Medicine, P.C.

39.     Nurse practitioners and physicians employed by General Medicine, P.C. or the GM Shell Entities were often not aware of the numerous GM Shell Entities or that multiple GM Shell Entities billed for their services.

40.     Some nurse practitioners and physicians entered into an employment agreement with General Medicine, P.C. or one of the GM Shell Entities but would be paid by multiple other GM Shell Entities with no explanation or change in employment.

41.     General Medicine, P.C. and the GM Shell Entities commingled funds, business transactions, functions, property, employees, records, and corporate names.

42.     General Medicine, P.C. controlled the manner in which employees of the GM Shell Entities performed their job duties, and the employees of the GM Shell Entities acted as agents of General Medicine, P.C. when providing and billing for health care services to residents of nursing homes and assisted living facilities.

43.     General Medicine, P.C. and the GM Shell Entities all followed the same practices and policies and, therefore, consistently performed and billed for the same types of visits with nursing home and assisted living facility residents across the country.

44.     General Medicine, P.C. and the GM Shell Entities worked closely together under the control of Prose and General Medicine, P.C. to execute their health care fraud scheme.

45.     General Medicine, P.C. and the GM Shell Entities are collectively referred to as simply "GM" throughout this Complaint.

## IV.     THE FEDERAL FALSE CLAIMS ACT

46.     The FCA provides for the award of treble damages and civil penalties for (a) knowingly presenting or causing to be presented false or fraudulent claims for payment to the United States; (b) knowingly making or using, or causing to be made or used, false records or statements material to false or fraudulent claims presented to an employee or agent of the United States; or (c) conspiring to commit either of the acts described in (a) or (b). 31 U.S.C. §§ 3729(a)(1)(A)-(C). Knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay money to the United States is also a violation of the FCA. 31 U.S.C. § 3729(a)(1)(G).

47.     To show a defendant acted "knowingly" under the FCA, the United States must prove the defendant: (1) had actual knowledge of the information; (2) acted in deliberate ignorance of the truth or falsity of the information; or (3) acted in reckless disregard of the truth or falsity of the information. The United States does not have to prove the defendant had the specific intent to defraud the United States. 31 U.S.C. § 3729(b).

## V.     GOVERNMENT HEALTH CARE PROGRAMS

### A.     Medicare

48.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1, established the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (or "Medicare").

49.     At all times relevant to this Complaint, Medicare was a federally funded health insurance program for qualified individuals over age 65 and people with certain disabilities. *See* 42 U.S.C. §§ 426, 426A. Medicare was administered by CMS, a component of HHS.

50.     Persons eligible for Medicare-reimbursed services were referred to as "beneficiaries."

51.     Medicare was comprised of four parts: Part A, which provided Hospital Insurance Benefits; Part B, which provided Medical Insurance Benefits; Part C, which established Medicare Advantage (or managed care) Plans; and Part D, which provided for Prescription Drug Benefits. *See* 42 U.S.C. § 1395k.

     a.     The benefits covered by Medicare Part A included inpatient hospital care and other institutional care, including care provided by a skilled nursing facility. *See* 42 U.S.C. §§ 1395c –1395i-5.

     b.     Medicare Part B established a voluntary supplemental insurance program that paid for various medical and other health services and supplies, including physician services, therapy services, and hospital outpatient services. *See* 42 U.S.C. §§ 1395k, 1395m, 1395x.

     c.     Medicare Part C established Medicare Advantage Plans ("MA Plans"), which were offered by private organizations approved by Medicare.

10

     d.     Medicare Part D established Prescription Drug Plans, which were offered by insurance companies and other private companies approved by Medicare.

52.     As alleged herein, Defendants submitted or caused the submission of false claims under Medicare Part B.

53.     At all times relevant to this Complaint, the Secretary of HHS had broad statutory authority to "prescribe such regulations as may be necessary to carry out the administration of the [Medicare] insurance programs . . . ." 42 U.S.C. § 1395hh(a)(1). In addition to promulgating regulations, the Secretary had the power to formulate rules for the administration of the Medicare Program through the issuance of manual instructions, interpretative rules, statements of policy, and guidelines of general applicability. 42 U.S.C. § 1395hh(c)(1).

54.     CMS contracted with private companies referred to as "carriers" and Medicare Administrative Contractors ("MACs") to act as agents in reviewing and paying claims submitted by health care providers under Medicare Part B. *See* 42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, 421.100.

55.     Medicare Part B payments were funded through a trust fund held by the United States Treasury. *See* 42 U.S.C. §§ 1395l, 1395t.

**B.    Medicaid**

56.     Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, established the Grants to States for Medical Assistance Programs, commonly known as the Medicaid Program (or, "Medicaid"). Medicaid was a joint federal–state health care program. 42 U.S.C. § 1396b.

57.     At all times relevant to this Complaint, Medicaid provided funding for medical and health-related services for certain individuals and families with low incomes and virtually no financial resources. 42 U.S.C. § 1396, *et seq.*

## VI.    MEDICARE'S COVERAGE OF HEALH CARE SERVICES IN NURSING FACILITIES AND ASSISTED LIVING FACILITIES

### A.    Overview of Facilities

58.    At all times relevant to this Complaint, GM performed patient visits with residents of nursing facilities and assisted living facilities.

59.    Some nursing facilities served as a Medicare-certified skilled nursing facility ("SNF") as well as offering long-term care services. 42 U.S.C. § 1396r(a).

60.    SNFs provided skilled nursing services and therapy to Medicare beneficiaries and were reimbursed by Medicare for the beneficiary's care.

61.    SNF benefits were covered under Medicare Part A for a limited period, usually up to 100 days after a qualifying hospital stay. If a resident exhausted the available Medicare Part A SNF benefits, or if the resident did not qualify for such services, many nursing homes offered long-term care to residents.

62.    Long-term care was defined as health-related care and services (above the level of room and board) not available in the community, needed regularly due to a mental or physical condition. *See Nursing Facilities*, https://www.medicaid.gov/medicaid/long-term-services-supports/institutional-long-term-care/nursing-facilities/index.html (last visited March 28, 2022).

63.    A resident's long-term care by a nursing facility was not covered by Medicare and was usually funded by private insurance, the patient, or Medicaid. *Id*.

64.    To participate and receive payment under the Medicare or Medicaid Programs, SNFs and long-term care nursing facilities were required to comply with CMS conditions of participation found in 42 C.F.R. Part 483, Subpart B.

65.    One of those conditions was that the medical care of each resident had to be supervised by a physician. 42 C.F.R. § 483.30(a).

66.     Another condition was that the resident had to be seen by a physician at least once every 30 days for the first 90 days after admission, and at least once every 60 days thereafter. 42 C.F.R. § 483.30(c).

67.     At each federally mandated visit, the physician was required to review the resident's total program of care, including medications and treatments. 42 C.F.R. § 483.30(b).

68.     At the option of each state, any required physician task in a nursing facility could also be satisfied when performed by a nurse practitioner, clinical nurse specialist, or physician assistant who was not an employee of the facility if the work was performed in collaboration with a physician. 42 C.F.R. § 483.30(f).

69.     An assisted living facility ("ALF") offered housing and limited care for individuals who did not require the higher level of care provided in a long-term care nursing facility or SNF. ALFs varied in the services offered, but many ALFs provided residents some assistance with daily activities, such as bathing, dressing, meal preparation, and taking medication.

70.     At all times relevant to this Complaint, HHS did not regulate ALFs. Rather, state governments had jurisdiction over regulating ALFs and oversaw ALFs' compliance with state law.

71.     Requirements for ALFs differed by state. In Illinois, ALF residents had to receive at least one comprehensive assessment by a physician each year, as well as additional physician assessments upon identification of a significant change in the resident's condition. 77 ILL. ADMIN. CODE. § 295.4000(b)-(c).

72.     Medicare Parts A and B did not cover the services and care provided by ALFs.

**B.** **Medicare Only Covered Medically Necessary Physician and Nurse Practitioner Visits with Facility Residents.**

73.     At all times relevant to this Complaint, services provided by a physician or nurse practitioner to Medicare beneficiaries residing in nursing facilities and ALFs were covered by Medicare under Medicare Part B or Part C, depending on the resident's chosen plan.

74.     The overarching criterion for reimbursement under Medicare was that the service provided had to be "reasonable and necessary for the diagnosis or treatment of illness or injury...." 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1); 42 C.F.R. § 424.5(a)(1)(i).

75.     To qualify for Medicare reimbursement, the health care provider was required to ensure services were "provided economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1), (3).

76.     Under CMS regulations, participating providers were required to prepare and sign progress notes documenting the service or procedure performed at each visit. 42 C.F.R. § 483.30(b)(2). Providers were also obligated to ensure the services were "[s]upported by evidence of medical necessity." 42 U.S.C. § 1320c-5(a)(1), (3).

77.     Not all medical services that could benefit the patient were medically necessary and covered by Medicare.

78.     Medicare excluded coverage for "routine physical checkups such as ... [e]xaminations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury," unless the service was one of several specialized screening tests and exams specifically described in 42 C.F.R. § 411.15(a).

79.     Likewise, Medicare did not pay for additional visits that might be required by state law or to satisfy facility or other administrative purposes. CMS Internet Only Manual Publication 100-04, *Medicare Claims Processing Manual*, Ch. 12, § 30.6.13.

14

80.     Care plan oversight services for patients residing in a SNF or long-term care nursing facility were not covered by Medicare. CMS Internet Only Manual Publication 100-02, *Medicare Benefit Policy Manual*, Ch. 15, § 30.G.

81.     The requirement that services be medically necessary and reasonable was critical to ensuring the integrity of the Medicare Program, especially in the nursing home setting.

82.     Residents of nursing facilities and ALFs are a "captive" patient population. They all have a health condition necessitating their stay, and physicians and nurse practitioners often travel to visit them in the facilities, generally choosing which residents to see and how frequently to see them, with little input from the facility or even the resident. This environment is ripe for fraud and abuse.

**C.     Billing and Payment for Physician and Nurse Practitioner Visits with Facility Residents**

83.     At all times relevant to this Complaint, a health care provider was required to enroll in the Medicare program to obtain reimbursement for services furnished to Medicare beneficiaries. *See* 42 C.F.R. § 424.510.

84.     As part of the enrollment process, the provider had to certify the provider was aware of, and abided by, all applicable statutes, regulations, and program instructions, including the provisions of Section 1862 of the Social Security Act and Title 42 of the Code of Federal Regulations. *See* 42 C.F.R. § 424.510(d)(3).

85.     The Medicare Enrollment Application for group practices contained the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions . . ., and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Form CMS-855B.

86.     General Medicine, P.C. and the Defendant GM Shell Entities in this Complaint all submitted Medicare Enrollment Applications to CMS and were enrolled in the Medicare Program.

87.     Defendant Prose signed all the Medicare Enrollment Applications submitted to CMS by General Medicine, P.C. and the Defendant GM Shell Entities.

88.     Enrolled providers had a duty to be knowledgeable of and comply with the statutes, regulations, and program instructions and conditions regarding coverage of services for which they sought reimbursement. 42 C.F.R. § 424.516(a)(1)-(a)(2).

89.     Once enrolled in the Medicare program, providers could submit bills, referred to as "claims," to Medicare seeking payment for covered services rendered to beneficiaries.

90.     General Medicine, P.C. and the Defendant GM Shell Entities all submitted claims for payment to CMS for services purportedly rendered to Medicare beneficiaries.

91.     General Medicine, P.C. and the Defendant GM Shell Entities submitted claims electronically by sending the electronic equivalent of a Medicare Health Insurance Claim Form ("CMS Form 1500") to the appropriate MAC, who on behalf of CMS, paid a portion of the claim.

92.     By electronically signing and submitting a claim for payment, a medical provider expressly certified that:

> 1) the information on this form is true, accurate, and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment . . . 5) the services on this form were medically necessary . . . .

93.     Providers who submitted claims electronically were required to execute an Electronic Data Interchange ("EDI") Enrollment Form with CMS.

94.     As part of a provider's EDI application, the provider agreed (i) "[t]hat it will submit claims that are accurate, complete, and truthful"; (ii) "[t]hat it will retain all original source documentation and medical records pertaining to any such particular Medicare claim for a period of at least 6 years, 3 months after the bill is paid"; and (iii) "[t]hat the CMS-assigned unique identifier number (submitter identifier) or [National Provider Identifier] constitutes the provider's legal electronic signature and constitutes an assurance by the provider that services were performed as billed."

95.     General Medicine, P.C. and the Defendant GM Shell Entities all submitted EDI applications to CMS and submitted claims to Medicare contractors electronically.

96.     Claim submissions to CMS included certain five-digit codes, referred to as Current Procedural Terminology ("CPT") and Healthcare Common Procedure Coding System ("HCPCS") codes, that identified the relevant diagnosis and services rendered. 45 C.F.R. § 162.1002(a)-(b); Medicare Claims Processing Manual, Chapter 23, § 20.7 *et seq*.

97.     CMS assigned reimbursement amounts to the various billing codes in the Physician's Fee Schedule.

98.     To qualify for reimbursement from Medicare, services had to meet the requirements of the particular code billed.

99.     Providing accurate CPT and HCPCS codes on claims submission forms was always material to and a condition of payment for Medicare. *See, e.g.*, Medicare Learning Network Fact Sheet, Medicare Billing: 837P and Form CMS-1500.

100.    Physician and nurse practitioners' visits with residents in nursing facilities and ALFs were considered evaluation and management ("E/M") services in the CMS Physician Fee Schedule.

17

101.    The proper CPT code for an E/M nursing facility or ALF visit depended on several factors, including the reason for the visit, the seriousness of the patient's problem, the number of body systems that needed to be reviewed, the relative complexity of the required medical decision-making, and the time necessary to complete the visit.

102.    When deciding which CPT code to bill Medicare, providers were required to consider only the medically necessary services they provided for the condition of the patient at the time of the visit.

103.    Because it was not feasible for Medicare to review every patient's medical records for each of the millions of claims for payments they received from providers, Medicare relied on providers to comply with requirements and submit truthful and accurate certifications and claims.

104.    Generally, once a provider submitted a claim to Medicare, the claim was paid directly to the provider without any review of medical records or other supporting documentation.

### 1. Billing Codes for Subsequent E/M Visits in Nursing Homes

105.    Providers seeking reimbursement from Medicare for a subsequent nursing facility visit (*i.e.*, a visit that occurred after the patient's initial visit with a physician) were required to report one of four possible CPT codes: 99307, 99308, 99309, or 99310.

106.    At all times relevant to this Complaint, CPT 99307 had the lowest reimbursement rate for a subsequent nursing home E/M visit. Usually, the patient receiving a visit billed at CPT 99307 was stable, recovering, or improving. To obtain reimbursement for a visit at CPT 99307, the provider must have conducted a face-to-face visit with the patient containing at least two of the following three components: (a) a problem-focused interval history; (b) a problem-focused examination of the patient; and (c) straightforward medical decision-making. For CPT 99307, these tasks, as well as time spent coordinating the patient's care with other medical service providers, were estimated to take approximately 10 minutes.

18

107.    CPT 99308 had the next highest reimbursement rate for a subsequent nursing home E/M visit. Usually, the patient receiving a visit billed at CPT 99308 was responding inadequately to therapy or had developed a minor complication. To obtain reimbursement for a visit at CPT 99308, the provider must have conducted a face-to-face visit with the patient containing at least two of the following three components: (a) an expanded, problem-focused interval history; (b) an expanded, problem-focused examination of the patient; and (c) medical decision-making of low complexity. For CPT 99308, these tasks, as well as time spent coordinating the patient's care with other medical service providers, were estimated to take approximately 15 minutes.

108.    CPT 99309 had the second highest reimbursement rate for a subsequent nursing home E/M visit. Usually, the patient receiving a visit billed at CPT 99309 had developed a significant complication or a significant new problem. To obtain reimbursement for a visit at CPT 99309, the provider must have conducted a face-to-face visit with the patient containing at least two of the following three components: (a) a detailed interval history; (b) a detailed examination of the patient; and (c) medical decision-making of moderate complexity. For CPT 99309, these tasks, as well as time spent coordinating the patient's care with other medical service providers, were estimated to take approximately 25 minutes.

109.    At all times relevant to this Complaint, CPT 99310 had the highest reimbursement rate for a subsequent nursing home E/M visit. Usually, the patient receiving a visit billed at CPT 99310 was unstable or developed a significant new problem requiring immediate physician attention. To obtain reimbursement for a visit billed at CPT 99310, the provider must have conducted a face-to-face visit with the patient containing at least two of the following three components: (a) a comprehensive interval history, including an extended history of present illness, a complete past, family, and social history, and a complete review of at least ten body systems

19

directly related to the identified problems; (b) a comprehensive physical examination of the patient; and (c) medical decision-making of high complexity. For CPT 99310, these tasks, as well as time spent coordinating the patient's care with other medical service providers, were estimated to take approximately 35 minutes.

### 2. Billing Codes for Subsequent E/M Visits in Assisted Living Facilities

110.     Providers seeking reimbursement from Medicare for a subsequent ALF visit (a visit that occurred after the patient's initial visit with a physician) were required to report one of four possible CPT codes: 99334, 99335, 99336, or 99337.

111.     At all times relevant to this Complaint, CPT 99334 had the lowest reimbursement rate for a subsequent ALF E/M visit. Usually, the presenting problems for a visit billed at CPT 99334 were self-limited or minor. To obtain reimbursement for a visit at CPT 99334, the provider must have conducted a face-to-face visit with the patient containing at least two of the following three components: (a) a problem-focused interval history; (b) a problem-focused examination of the patient; and (c) straightforward medical decision-making. For CPT 99334, these tasks, as well as time spent coordinating the patient's care with other medical service providers, were estimated to take approximately 15 minutes.

112.     CPT 99335 had the next highest reimbursement rate for a subsequent ALF E/M visit. Usually, the presenting problems for a visit billed at CPT 99335 were of low to moderate severity. To obtain reimbursement for a visit at CPT 99335, the provider must have conducted a face-to-face visit with the patient containing at least two of the following three components: (a) an expanded, problem-focused interval history; (b) an expanded, problem-focused examination of the patient; and (c) medical decision-making of low complexity. For CPT 99335, these tasks, as well as time spent coordinating the patient's care with other medical service providers, were estimated to take approximately 25 minutes.

20

113.    CPT 99336 had the second highest reimbursement rate for an ALF E/M visit. Usually, the presenting problems for a visit billed at CPT 99336 were of moderate to high severity. To obtain reimbursement for a visit at CPT 99336, the provider must have conducted a face-to-face visit with the patient containing at least two of the following three components: (a) a detailed interval history; (b) a detailed examination of the patient; and (c) medical decision-making of moderate complexity. For CPT 99336, these tasks, as well as time spent coordinating the patient's care with other medical service providers, were estimated to take approximately 40 minutes.

114.    At all times relevant to this Complaint, CPT 99337 had the highest reimbursement rate for an ALF E/M visit. Usually, the presenting problems for a visit billed at CPT 99337 were of moderate to high severity and the patient may have been unstable or developed a significant new problem requiring immediate physician attention. To obtain reimbursement for a visit billed at CPT 99337, the provider must have conducted a face-to-face visit with the patient containing at least two of the following three components: (a) a comprehensive interval history, including an extended history of present illness, a complete past, family, and social history, and a complete review of at least ten body systems directly related to the identified problems; (b) a comprehensive physical examination of the patient; and (c) medical decision-making of moderate to high complexity. For CPT 99337, these tasks, as well as time spent coordinating the patient's care with other medical service providers, were estimated to take approximately 60 minutes.

## VII.    DEFENDANTS' HEALTH CARE FRAUD SCHEME

115.    Beginning on an unknown date, but at least as early as January 1, 2013, and continuing until the date of this Complaint, Defendants engaged in a multi-million-dollar scheme to defraud Medicare through the billing of visits with nursing facility and assisted living facility residents.

21

116.     Rather than focusing on caring for the vulnerable patient population they served and treating each resident based on their individualized needs, Defendants played a numbers game designed to bill as many patient visits as possible, regardless of whether those visits were actually performed as documented or medically necessary. As one GM clinician put it: Defendants preferred quantity over quality.

117.     To generate even more revenue, Defendants caused the submission of inflated claims for these visits to Medicare, seeking payment at the highest possible rates when the services provided did not meet the requirements for those billing codes.

118.     Defendants implemented their fraudulent practices in all regions where GM clinicians practiced and caused the submission of false claims for services performed in multiple states, including Illinois, Kansas, Missouri, Michigan, Louisiana, Iowa, Ohio, and North Carolina.

119.     Despite receiving numerous warnings since at least 2013 that GM's visits were excessive, medically unnecessary, and did not meet the requirements for the codes that were billed, the only changes Defendants made to their scheme were designed to further conceal their fraudulent practices from Medicare.

120.     Since at least 2013, Defendants knowingly submitted and caused the submission of thousands of false claims to Medicare for services that (a) were not reasonable and necessary; (b) were not performed as documented; and (c) did not meet the requirements of the CPT codes billed. Defendants also knowingly concealed and avoided obligations to pay back the money they fraudulently received from the Government.

121.     Defendants' widespread scheme proved very costly for the Medicare Program. From April 1, 2016 through March 31, 2021, Medicare Part B alone paid GM over $40 million, much of which resulted from Defendants' submission of false and fraudulent claims.

### A. Defendants Adopted Policies and Practices Designed to Increase Reimbursement Without Regard to Medical Necessity.

122.    Most of the patient visits performed by GM clinicians and billed to Medicare were dictated by GM policy, not medical need.

123.    GM invented several so-called "regulatory" visits and required GM clinicians to perform them at regular intervals, either weekly, bi-weekly, monthly, quarterly, or annually.

124.    GM called these visits "regulatory" or "mandated" visits as part of an effort to convince its employees, facilities, patient families, and others that these various visits (and their frequency) were required by Medicare regulations, when in fact they were not.

125.    In addition, Defendants instructed their clinicians to perform more face-to-face visits with nursing home residents for other identified situations, such as reviewing the results of a routine lab test or signing a form, regardless of whether the patient's medical condition necessitated a visit. These visits were a product of GM policy rather than any demonstrated medical need. They are accordingly referred to hereinafter as "company" visits.

126.    Combined, these two policies – "regulatory" visits and "company" visits – resulted in GM excessively billing Medicare for medically unnecessary, duplicative, and unreasonable patient visits each month.

127.    The number of "regulatory" visits required for each patient depended on the patient's insurer.

128.    Medicare patients were lucrative, and GM instructed its providers to perform at least two separate "regulatory" visits for each Medicare patient each month, regardless of the patient's condition or whether the patient had been recently seen by a GM practitioner or another medical provider.

129.    Medicaid Programs typically paid providers much less per visit than Medicare, and Defendants instructed clinicians that only one "regulatory" visit should be performed for Medicaid patients per month.

130.    GM required clinicians to perform more "regulatory" visits with Medicare beneficiaries than Medicaid beneficiaries, even though the same CMS regulations applied to the treatment of long-term care residents whether they were insured by Medicare or Medicaid. *See* 42 C.F.R. Part 483, Subpart B.

131.    The main "regulatory" visits created and billed by Defendants were called Care Plan Reviews ("CPRs") and Monthly Medication Reviews ("MMRs").

### 1. Care Plan Reviews ("CPRs")

132.    GM instructed its clinicians to perform a CPR visit with each Medicare patient every month without any consideration of whether the patient's medical condition necessitated a visit or whether the patient had recently been seen by a GM clinician.

133.    GM's internal guidance described the CPR as an "[e]valuation of the resident's condition and a review of and decision about the continued appropriateness of the resident's current medical regime."

134.    According to GM's manual, the purpose of the CPR was to "[r]eview the resident's total program of care, including medications and treatments." Usually, GM clinicians did not perform CPR visits to treat or diagnose a specific illness or injury on the date of the visit.

135.    Performing a separate CPR visit each month for all Medicare patients was not mandated by CMS and was not medically necessary or reasonable.

136.    CMS regulations required only one physician visit per month for the beneficiary's first 90 days following admission into a nursing facility; after that time, a visit was required only once every 60 days. 42 C.F.R. § 483.30(c).

24

137.    In most cases when a CPR was performed, the patient had already been seen by a GM clinician multiple times within the last month and had no medical condition requiring attention on the day of the CPR.

138.    Sometimes, CPRs were performed just a day or two after the patient's last visit by a GM clinician.

139.    When questioned about the need for CPRs, GM falsely represented to its employees, facilities, and Medicare contractors that monthly CPRs were necessary to complete Medicare certifications for the resident's continued placement in the nursing facility and to receive other services, such as therapy.

140.    Most of the patients seen by GM, however, were long-term residents who did not receive any services requiring a Medicare certification, so there was no documentation to complete.

141.    For those patients who did receive services requiring Medicare certifications, a separate face-to-face CPR visit was not necessary to sign the documentation, especially when GM had already recently examined the patient. As GM knew, Medicare did not cover a separate visit to simply sign a certification, fill out paperwork, or perform other administrative tasks.

142.    Monthly CPRs typically provided little to no benefit to the resident.

143.    Contrary to GM's written description of a CPR, clinicians usually did not review all care the facility provided to the resident. CPR progress notes generally contained minimal information about the patient's condition and little, if any, description or analysis of the overall care provided by the facility. Most CPRs recommended no changes to the patient's current plan of care.

144.    Monthly CPRs typically provided no value for facilities. Per CMS regulations, nursing facilities created and regularly updated their own care plans for each resident outlining the services and interventions that were to be provided based on the resident's individualized needs. 42 C.F.R. § 483.21. Nursing facilities were further required by CMS regulations to regularly assess residents in several specified categories. 42 C.F.R. § 483.20. Nursing facilities usually did not rely on GM's CPRs when preparing their own patient care plans.

145.    Likewise, GM clinicians typically did not review the nursing facility's care plans when performing CPR visits.

146.    GM management often instructed its clinicians to document in CPR progress notes that the CPR lasted 35 to 40 minutes, even though most clinicians spent far less time on the visits.

147.    GM further instructed clinicians to document a full physical examination of the patient during each CPR, even if such an exam was not medically necessary. Moreover, on many occasions, GM clinicians did not perform the full physical examinations they documented in progress notes.

148.    This additional documentation was intended to support GM's decision to bill CPRs as a reimbursable E/M service, typically using the highest available billing codes.

### 2. Monthly Medication Reviews ("MMRs")

149.    Even though GM practitioners were supposedly reviewing each patient's entire plan of care and medications during their monthly CPRs, GM instructed its clinicians to perform another separate monthly visit to purportedly complete another review of each Medicare patient's medications. GM referred to these visits as monthly medication reviews, or "MMRs."

150.    CMS regulations required physicians to review a patient's medications during each federally mandated visit. 42 C.F.R. § 483.30(b). Medicare did not mandate separate monthly physician or nurse practitioner visits solely to review a resident's medications.

26

151.    Billing MMRs separately from the monthly CPRs was a form of unbundling, which is the practice of billing multiple procedure codes for a group of procedures that are covered by a single comprehensive code.

152.    CMS and HHS-OIG have warned medical providers against unbundling and have identified such conduct as fraudulent when the purpose was to increase reimbursement.

153.    GM's policy of unbundling medication reviews from the care plan reviews did not benefit the patient and was driven by a desire to generate additional revenue for GM.

154.    This is demonstrated by GM's different practices for Medicare patients and non-Medicare patients, namely those covered by Medicaid.

155.    As shown below in GM's "Charting Cheat Sheet" provided to new clinicians, GM instructed its clinicians to combine the CPR and MMR into one "combo" or "CAID" visit for nursing home residents insured through Medicaid, but required clinicians to perform separate CPR and MMR visits each month for its more lucrative Medicare patients:

<u>Medicare Patients</u>

| WHO | WHAT | WHEN | The Fine Print |
|---|---|---|---|
| Nursing Home Medicare | Care Plan Review (CPR) | Monthly | Combine with MMR for combo visits (HMO) |
| Nursing Home Medicare | Monthly Medication Review (MMR) | Monthly | Combine with CPR for combo visits (HMO) |

| WHO | WHAT | WHEN | The Fine Print |
|---|---|---|---|
| Nursing Home Medicaid (CAID) | Care Plan Review/Monthly Medication Review (CAID) | Monthly | |

156.    MMRs were also duplicative of the federally mandated drug regimen reviews regularly performed by licensed pharmacists.

157.     Pursuant to 42 C.F.R. § 483.45(c), nursing facilities were required to ensure that residents' medications and medical charts were reviewed each month by a licensed pharmacist. The pharmacist was then required to prepare a report for the patient's physician, noting any irregularities in the patient's medication regimen. *Id*. The patient's physician was to review the pharmacist's comments and decide whether any changes to the patient's medications were needed. *Id*.

158.     GM established a policy instructing clinicians to perform yet another visit simply to review the pharmacist's report. That visit was separate from the MMR.

159.     The MMRs provided by GM were usually worthless to patients and facilities.

160.     MMR progress notes frequently contained outdated and inaccurate lists of patient medications, making any attempted medication review impracticable and unreliable.

161.     MMR progress notes typically demonstrated no analysis of patient medications.

162.     As a result, and because GM clinicians were already visiting the patient frequently, MMRs rarely resulted in any changes to the patient's medications.

163.     Recognizing the lack of value offered by MMRs, GM clinicians and facilities repeatedly questioned the purpose of MMR visits and whether they needed to be performed at all. GM typically responded that the MMR visits were required by Medicare.

164.     GM knew or should have known that Medicare did not mandate separate monthly physician or nurse practitioner visits to review a resident's medications.

165.     GM's practice of conducting separate MMR visits with each Medicare patient each month regardless of the patient's condition was not medically necessary or reasonable.

28

166.    Moreover, GM instructed clinicians to perform a full physical examination of the patient during each MMR, regardless of when the patient was last examined and regardless of whether it was medically necessary for the visit.

167.    GM clinicians also often documented in progress notes that the MMR visits took 35 to 45 minutes to complete, though in practice most clinicians spent far less time on the visit.

168.    These steps were intended to support GM's decision to bill MMRs as a reimbursable E/M service, typically using the highest available billing codes.

### 3. Other "Regulatory" Visits Required by GM

169.    In addition to CPRs and MMRs, GM required its clinicians to perform other unnecessary and duplicative "regulatory" visits with Medicare patients, including Physician Quality Reporting System ("PQRS") visits, Patient Health Questionnaire-9 ("PHQ-9") visits, and annual nursing facility assessments.

### a. PQRS Visits

170.    At all times relevant to this Complaint, the PQRS was a CMS program that encouraged eligible health care professionals, through incentive payments and payment adjustments, to report on specific quality measures.

171.    The purpose of the PQRS was to give participating providers the opportunity to assess the quality of their care, quantify how often they were meeting a particular quality metric, and compare their performance on a given metric to their peers.

172.    Participation in the PQRS program was voluntary and open to providers who furnished certain services to Medicare Part B fee-for-service beneficiaries.

173.    GM chose to participate in the PQRS program and reported select metrics to CMS.

174.    Although the PQRS program was simply a reporting initiative aimed to improve performance and quality of care, GM used it as an impetus for more visits to Medicare beneficiaries.

175.    GM instructed its clinicians to perform a separate visit solely to document the PQRS metrics and billed that visit to Medicare, typically using CPT code 99308.

176.    A physician visit solely to fill out a simple PQRS form was not medically necessary, especially when GM was already visiting the beneficiaries regularly.

177.    Completing a PQRS form was not an evaluation and management service covered by Medicare.

### b. PHQ-9 Visits

178.    GM employed a similar practice for PHQ-9 depression screenings.

179.    CMS required nursing facilities to complete periodic assessments of residents using the minimum data set ("MDS") established by CMS. MDS assessments were required for residents upon admission to the nursing facility, as well as quarterly, annually, whenever the resident experienced a significant change in status, and whenever the facility identified a significant error in a prior assessment. 42 C.F.R. § 483.20(b)(2). One aspect of the MDS required assessment of a resident's mood, which was evaluated using the PHQ-9, a nine-question survey copyrighted by Pfizer, Inc. *See* 42 C.F.R. § 483.20(b); *CMS Long-Term Care Facility Resident Assessment Instrument (RAI) User's Manual*, Appx. E.

180.    Although nursing facilities conducted their own MDS assessments, including PHQ-9 interviews, pursuant to the schedule established by CMS, GM used this CMS nursing facility requirement to create another "regulatory" visit for its clinicians to perform: the PHQ-9 visit.

181.    GM instructed clinicians to perform PHQ-9 visits with Medicare patients quarterly, and GM's PHQ-9 visits were conducted separately from its other "regulatory" visits, even though the questionnaire was duplicative of services provided by both GM and the facility.

182.    GM's PHQ-9 visits were not medically necessary or reasonable and were not a payable evaluation and management service covered by Medicare.

### c. Annual Nursing Facility Assessment Visits

183.    Medicare allowed health care providers to perform an annual assessment visit for beneficiaries in nursing homes and to seek reimbursement for the visit using CPT 99318.

184.    Performing both an annual assessment visit and a federally mandated visit in a particular month was duplicative and not medically necessary.

185.    CMS guidance warned providers that the annual nursing facility assessment visit "shall not be performed in addition to the required number of federally mandated physician visits" and that the annual assessment billed at CPT 99318 should be "in lieu of reporting a subsequent nursing facility care code," such as CPT 99310. Medicare Claims Processing Manual, Ch. 12 § 30.6.13.B. According to CMS, the annual assessment code, CPT 99318, "does not represent a new benefit service for Medicare Part B physician services." *Id*.

186.    GM ignored this CMS instruction and performed annual nursing facility assessments for residents under their care, in addition to the monthly CPRs, monthly MMRs, PHQ-9 visits, and PQRS visits.

187.    GM referred to the annual nursing facility assessments as annual history and physical ("H&P Annual") visits. GM billed the H&P Annual visits using CPT 99318.

188.    This practice contributed to the billing of more medically unnecessary "regulatory" visits to Medicare.

31

**B. GM Incentivized Clinicians to Perform Visits by Establishing Quotas and Compensation Structures Based on Visit Numbers.**

189.    When clinicians were hired by GM, their employment contracts typically included a compensation structure that tied their pay to the number of visits they performed.

190.    Initially, GM's employment contracts required clinicians to agree to a minimum quota of visits per day. If a clinician performed fewer than the daily quota, the contract established that the clinician's pay could be reduced. If a clinician performed more than the daily quota, the clinician could receive a bonus for each additional visit.

191.    GM later changed its compensation structure from a daily quota to payment on a simple per-visit basis.

192.    Regardless of which structure was utilized, GM incentivized its clinicians through compensation to perform as many patient visits as possible.

193.    GM clinicians sometimes struggled to meet their quotas or perform enough visits to maintain their level of compensation, causing them to conduct additional medically unnecessary visits with their patients.

194.    In November 2016, two GM nurse practitioners, Rita Tucker and Kelly Whitaker, commiserated via text about the difficulty of finding enough visits to meet their quotas.

195.    Whitaker noted she "[did] not need to be [at a nursing facility] more than once a week" and she "only had 11 visits [t]here on Thursday" while another clinician "had nothing really on Monday either[.]"

196.    Whitaker added: "there's been a lot of questions here on why there's so many of us here each week???  These facilities r [sic] going to start getting pissed!  I don't know what to do!"

197.    Tucker agreed: "Me either...I have one home I regularly visit[.]  [I don't know] what's going to happen."

198.    Whitaker wrote back: "I can't afford the cut in pay. I have no idea what I am going to do?"

199.    GM management knew that its practices caused clinicians to perform unnecessary visits to meet quotas.

200.    In August 2017, GM nurse practitioner Tamika Bunch complained to GM management that she felt like she had to make up reasons to see the patients to meet her quota of 18 visits per day, even after she had gone through all of the therapies, wounds, labs and "regulatory" visits that she could.

201.    Instead of changing its compensation structure or considering ways to adjust its fraudulent business model, GM management responded by simply telling Bunch she should not make up reasons to see patients unnecessarily. GM then documented that response in a self-serving, internal "compliance file."

202.    While some clinicians struggled to find enough visits, less scrupulous GM providers reaped the financial benefits of this structure by performing "gang visits" with large numbers of nursing facility residents in one day.

203.    In a text exchange between multiple GM clinicians on August 26, 2014, GM nurse practitioner Jami Mayhew reflected the GM culture of treating patients as opportunities to make more money: "It's the last week of the month. Getting my visits in. Make up for vacay last month!"

204.    In another exchange on December 3, 2015, Whitaker asked Mayhew if she could bill for seeing a patient who died during her visit.

205.    Whitaker was referring to E.V., a Southern Illinois nursing home resident who died during Whitaker's visit on December 1, 2015.

33

206.    Mayhew responded, "Yes level 3 that shit."[1]

207.    Defendant General Medicine, P.C. billed Medicare for Whitaker's December 1, 2015 visit with E.V. using CPT 99309 – a Level 2 visit according to GM's guidelines.

208.    Medicare paid General Medicine, P.C. $61.76 for the December 1, 2015 visit.

209.    While Whitaker's visit was not billed to Medicare as a Level 3 "regulatory" visit, General Medicine, P.C. and the Defendant GM Shell Entities repeatedly billed Medicare for "regulatory visits" performed on the same day the patient died. Performing "regulatory" visits to fulfill GM quotas was especially unnecessary when the patients died the same day.

**C. GM Closely Tracked the Number of Billable Visits and Directed Clinicians to Perform More Visits When Numbers Were Low.**

210.    GM corporate management closely monitored the number of billable visits performed by its clinicians.

211.    GM management held weekly operations meetings with its Directors of Clinical Operations for each region. Before these operations meetings, the Directors of Clinical Operations prepared a weekly report, sometimes referred to as the "Clinical Ops Report," that was distributed to members of the management team, including Prose.

212.    The Clinical Ops Report focused on the number of patient visits completed and displayed visit metrics in two ways. First, the Clinical Ops Report often contained a chart that tracked the number of "regulatory" visits completed that month compared to the total patient census of each region, including separate breakouts for Medicare patients and "1 X/mo" (one visit per month) patients, *e.g.*, Medicaid patients, and how many of each type of visit still had to be

---

[1] As explained below, GM often referred to its visits as Level 1, 2, or 3, which corresponded to CPT codes 99308, 99309, and 99310, respectively.

completed. Second, the Clinical Ops Report contained the weekly average number of daily visits performed by each clinician in the Director's region.

213.     At Prose's direction, and to meet the number of required visits established by GM's management, the Directors of Clinical Operations pushed down marching orders to the GM clinicians in each region with the number of visits to be performed.

214.     Target visit numbers for each nursing facility were established by GM corporate leadership, not patient needs.

215.     For example, on September 23, 2016, Rebecca Coccia, a GM Director of Clinical Operations, sent out a group email to the clinicians in the Southern Illinois region informing them that there were 654 required visits to be completed in the next week. Coccia did not, and could not have, considered the patients' medical conditions when directing clinicians to perform 654 visits. This number also did not include "company" visits or visits that may be needed to address a patient's medical problem; instead, it represented only the "regulatory" visits GM falsely claimed were required by Medicare.

216.     Similarly, on November 27, 2017, an email from Coccia to the Southern Illinois clinicians informed them 500 patient visits needed to be completed in the last few days before the end of the month.

217.     On December 28, 2017, Coccia sent another email to every clinician in the Southern Illinois region informing them that she had "reviewed data and multiple reports with Dr. Prose and we agree that there are required visits each month that have not been completed as well as follow up visits, pain/anxiety assessments every two weeks, PQH-9 screenings and [annual wellness visits]." She also reminded them that a billable face-to-face patient visit should be performed every time a form required a signature, such as telephone orders, therapy orders, or prescriptions.

35

218.    GM management not only established the number of visits to be performed without considering patients' medical conditions, they also pressured all employees to meet the company's expectations.

219.    For instance, on June 27, 2016, Kathy Stieb, GM's Clinical Coordinator for the Southern Illinois region, sent a message conveying orders from Prose and Coccia that clinicians must complete MMRs on all patients as a separate visit and bill as a Level 3 at 99310. She urged that "[t]his is a high priority this week, since we are behind the other areas, dr prose has singled us out!" Again, Dr. Prose's and GM's focus was on numbers, without regard to whether the patients required the services.

220.    On July 17, 2017, GM nurse practitioner Cara Lowrance sent an email to her supervisor, Carol Dickerson, complaining about GM's fraudulent practices. Specifically, she noted it was "really sad that Dr. Prose is only worried about the numbers" and "he would prefer[] quantity over quality[.]"

**D. GM Billed Medicare for Services that Were Not Rendered or Not Performed as Documented.**

221.    GM's pressure to meet visit quotas and see patients more frequently than necessary created a culture in which many GM clinicians spent minimal time with patients and did not perform the comprehensive visits documented in progress notes. In the most egregious instances, GM billed Medicare for visits that were not performed at all.

222.    On numerous occasions, General Medicine, P.C. or the Defendant GM Shell Entities billed for more visits than could properly be completed by a single practitioner in one day. The following are examples of this fraudulent conduct:

a. General Medicine, P.C. and National Medical Partners billed Medicare for 75 patient visits, all at CPT code 99310, allegedly performed by GM nurse practitioner Elanor

Sigalas in Louisiana over a two-day period from July 3-4, 2017. When considering the estimated time to complete each visit based on the CPT codes billed, it would have taken 43 hours over a 48-hour period to perform those services.

b. General Medicine, P.C. billed Medicare for 41 patient visits, including 8 CPRs and 26 MMRs, allegedly performed by GM physician James Matrisciano in Louisiana on September 2, 2016. When considering the estimated time to complete each visit based on the CPT codes billed, it would have taken 25 hours in a single day to perform those services.

c. General Medicine, P.C. billed Medicare for 47 visits at CPT code 99310 that were allegedly performed by GM nurse practitioner Christina Aplin-Snider in Michigan on October 15, 2016. If each 99310 visit took 35 minutes, which is the estimated time to perform a visit billed at CPT code 99310 – and less than the 40 minutes often documented by GM in its CPR and MMR progress notes – it would have taken over 27 hours in a single day to complete 52 CPRs. On 12 other instances in October 2016, General Medicine, P.C. similarly billed Medicare for high numbers of daily visits that should have taken the rendering providers over 19 hours to complete.

d. General Medicine, P.C. billed Medicare for 44 patient visits, including 13 MMRs, allegedly performed by GM physician Stephen Harrison in Northern Illinois on November 24, 2016. When considering the estimated time to complete each visit based on the CPT codes billed, it would have taken over 25 hours in a single day to perform those services.

223.   GM's charting further demonstrates that GM was not performing the comprehensive visits billed to the government. On multiple occasions, GM clinicians incorrectly

recorded patients' physical condition, medications, or history in progress notes purporting to document comprehensive visits billed to the government at the highest CPT codes.

224.    For example, on June 4, 2018, GM nurse practitioner Lauren Range spent less than three hours in one Southern Illinois nursing facility and generated 18 progress notes. According to Range's progress notes, 17 of the visits were MMRs, which were to be billed at CPT 99310. Five of Range's MMR progress notes listed inaccurate medications or medication dosages. Multiple progress notes listed vital signs that were identical to vital signs documented in nurse's notes from previous days, suggesting they had just been copied from the chart.

225.    Two weeks later, on June 18, 2018, GM nurse practitioner Blair Bone completed progress notes for at least 21 patients in the same Southern Illinois nursing facility. For four of the patients, Bone documented on her progress notes that she spent approximately 40 minutes on the visit, even though Bone spent a total of only 2 hours and 5 minutes inside the building that day. Bone's progress note for patient G.K. stated she performed an MMR, but patient G.K. had already received an MMR just five days prior. Bone's progress note for patient G.K. was also inaccurate, as it listed nine medications that had been discontinued.

226.    Multiple progress notes generated by Bone for her June 18, 2018 visits listed vital signs (heart rate, blood pressure, temperature) that were identical to vital signs documented by the nursing home in the patient's chart on previous days, suggesting Bone had simply copied the vitals from the chart.

227.    Two weeks later, on July 2, 2018, Bone visited at least 24 residents in the same Southern Illinois nursing facility, and 18 of the progress notes completed for those visits contained inaccurate or incomplete medication information. In one progress note, Bone claimed to have

performed a comprehensive physical examination of the patient, but the note failed to document that the patient had a significant skin tear with treatment orders in place.

228.    GM clinicians recognized that some of their fellow GM practitioners did not spend enough time with patients or even billed for patient visits they did not perform.

229.    In a group text between multiple Southern Illinois GM nurse practitioners on August 14, 2014, Kristi Arnolds complained that GM physician Michael Mandis allegedly "saw 12 [patients] and was [at the facility] less than an hour!" Mayhew said she "wonder[ed] if they have a class in med school for super speed" because it "[s]eems they all can see a lot of [patients] in a hour[.]" Arnolds added that she bet if she "went and asked half of them . . . they would say they hadn't seen him."

### E. GM Controlled the Billing Process and Submitted False Claims for Services to Medicare.

230.    GM employed physicians and nurse practitioners in multiple states, but the General Medicine, P.C. corporate office in Novi, Michigan, controlled the billing of claims for services provided by the clinicians.

231.    Each clinician employed by GM was assigned to a GM corporate biller.

232.    The clinician reported to the GM biller the number and types of visits performed, identifying visits by a level ranging from one to three and/or listing whether visits were CPRs, MMRs, or other types of visits.

233.    The GM biller then submitted claims for the services to the appropriate payors.

### 1. GM Billed for Duplicative Services and Manipulated Patient Records to Maximize Revenue.

234.    Even though GM clinicians often worked in the same facilities seeing the same patients on different days, the nurse practitioners and the physicians rarely coordinated with each other about the various services they were supposedly providing. This regularly and predictably

resulted in situations where the clinicians performed the same "regulatory" visit for the same patient just days apart.

235.    When that happened, GM billers were charged with noticing the problem and changing one of the visits to something else, so both could be billed.

236.    Because CPRs, MMRs, and other "regulatory" visits were duplicative and medically unnecessary, GM often treated them interchangeably to accomplish the goal of billing as many visits as possible.

237.    For example, on May 12, 2016, GM physician Phillip Greene reported performing both a history and physical ("H&P") visit – the resident's initial assessment billed under CPT 99306 – and a CPR for the same resident on the same day.

238.    This posed a problem, because Medicare would only pay for one of the two services on a particular day, not both.

239.    Coccia advised Greene that GM should bill the H&P visit because it had to be done when the resident first arrived at the nursing home. Coccia told Greene that the CPR he had supposedly just performed "can be completed at another time by you or the [nurse practitioner]."

240.    GM never questioned Greene about which service, if any, he actually provided during his visit.

241.    Apparently believing both the H&P and the CPR to have been performed, Coccia nevertheless instructed Greene or another GM clinician to perform the duplicative CPR again some other day so it could also be billed to Medicare.

242.    On October 11, 2016, GM biller Kathy Cavender informed Greene he had reportedly conducted a new patient visit the day before on S.C., a resident of a Southern Illinois

ALF, but a new patient visit had already been done for S.C. on October 5. "So, what do you want this changed to?" Cavender asked.

243.    Greene instructed Cavender to change the visit to an MMR.

244.    General Medicine, P.C. billed Medicare for the medically unnecessary, duplicative visit with S.C. on October 10, 2016 using CPT 99337.

245.    Medicare paid General Medicine, P.C. $155.41 for that false claim.

246.    Cavender wrote back a little while later about three other patients for whom Greene reportedly conducted an MMR visit on October 10, 2016. "Sorry," she wrote, "but I just saw that [another GM clinician] did mmr's on [those three patients], so these need to be changed to something else. Please advise, thanks."

247.    On September 19, 2018, multiple GM practitioners visited the same patients at a Southern Illinois nursing facility at different times of the day, resulting in duplicative visits.

248.    GM nurse practitioner Lyndsie Muyleart spent approximately 80 minutes in the facility that day and reportedly completed 12 patient visits.

249.    Knowing Medicare would not pay for multiple visits with the same resident on the same day, GM instructed Muyleart to go back to the facility the very next day and change the dates of service on her progress notes to September 20, 2018, so her visits could also be billed.

250.    Muyleart did as she was instructed. She went back to the facility on September 20, 2018 and spent 20 minutes inside without seeing any patients. She then changed the dates of service on her progress notes.

251.    Medicare paid National Medical Partners over $1,000 for Muyleart's services.

### 2. GM Systematically Upcoded Claims to Medicare.

252.    In addition to its widespread practice of billing Medicare for services that were unreasonable and medically unnecessary, General Medicine, P.C. and the Defendant GM Shell Entities submitted inflated claims for reimbursement – a fraudulent practice known as "upcoding."

253.    At all times relevant to this Complaint, there were four available CPT codes for subsequent E/M patient visits in a nursing home setting: CPT 99307, 99308, 99309, and 99310. There were also four available CPT codes for subsequent E/M patients visits in an ALF setting: CPT 99334, 99335, 99336, and 99337.

254.    CPT codes 99307 and 99334 were the codes with the lowest reimbursement rate for a subsequent E/M visit. These codes were used to represent simple visits lasting approximately 10 minutes in a nursing facility setting or 15 minutes in an ALF setting. Both codes required only medical decision-making of low or straightforward complexity.

255.    As part of its upcoding scheme, GM never billed CPT 99307 or 99334 for its visits. In fact, CPT codes 99307 or 99334 were not even selectable options on GM's progress note forms. Instead, GM told the clinicians to label each visit "Level 1," "Level 2," or "Level 3," which were billed to Medicare using nursing facility CPT codes 99308, 99309, and 99310 or ALF codes 99335, 99336, and 99337, respectively.

256.    As part of its upcoding scheme, General Medicine, P.C. and the Defendant GM Shell Entities routinely billed Medicare for MMRs and CPRs using the highest billing codes available, CPT 99310 and 99337, even though GM knew that the purported services being provided did not meet the codes' requirements and should have been billed, if at all, using a lower code for a less complex visit.

257.    GM's upcoding scheme resulted in significant overpayments by Medicare and substantial profits for Defendants.

42

258.     The 2017 national Medicare reimbursement rates for subsequent nursing home visits are listed below. Upcoding a claim that should have been billed at CPT 99307 to CPT 99310 resulted in over triple the payment.

| CPT Code | Description | Medicare Reimbursement Rate (2017) |
|---|---|---|
| 99307 | Subsequent nursing home visit – 10 minutes | $45.22 |
| 99308 | Subsequent nursing home visit – 15 minutes | $69.98 |
| 99309 | Subsequent nursing home visit – 25 minutes | $92.59 |
| 99310 | Subsequent nursing home visit – 35 minutes | $137.81 |

259.     Through its company policies and guidance, GM instructed its clinicians that CPRs and MMRs were "Level 3" visits and should always be billed at CPT 99310 or 99337, depending on the facility setting.

260.     This blanket instruction failed to consider the patient's condition, the medical necessity of the services being provided, or the complexity of the medical decision-making involved in any given visit.

261.     Although GM clinicians selected the level of service provided when reporting the visit to GM, GM checked what they reported, and if a CPR or MMR was marked as a Level 1 or a Level 2 visit, GM would pressure the clinician to change it to a Level 3.

262.     If GM was unable to convince the clinician to upcode a "regulatory" visit to CPT 99310, GM would simply call the visit something else so it could bill Medicare for another visit with the same patient by another GM clinician.

263.     For example, on July 19, 2017, Southern Illinois GM nurse practitioner Tracy Dietz sent a text message to Stieb with a question about a visit performed by GM physician D'Andrienne Jones.

43

264.    According to Dietz, the Jones "clicked MMR" as the reason for the visit but only billed it at "L[evel ]2" (CPT 99309), rather than CPT 99310. "Do we count that as [the] MMR then?" she asked.

265.    Stieb responded, "Does her reason for visit say MMR?  If so then you cannot bill for an [MMR] in the same month."

266.    Dietz checked with her biller and reported back to Stieb: "So FYI according to my biller they will bill how she billed [CPT 99309] but have her correct her note and take out MMR."

267.    Even though Jones had reportedly completed an MMR with the patient, the GM biller instructed her to change her progress note to remove any reference to an MMR.

268.    The purpose of that change was to allow GM to bill for the physician's MMR using CPT 99309 and to allow Dietz to bill for another MMR for the same patient in the same month using CPT 99310.

## F. Defendants Knowingly Submitted and Caused the Submission of False Claims to Medicare.

269.    Defendants knowingly submitted and caused the submission of false claims to Medicare for services that were not performed, not medically necessary, and upcoded.

270.    At all relevant times, Defendants were aware of the relevant statutes, regulations, and CMS guidance regarding the medical necessity of visits to nursing home and assisted living facility residents and the requirements for coding visits.

271.    The relevant Medicare statutes and CMS regulations cannot reasonably be interpreted to require separate monthly CPR and MMR visits for all Medicare patients, especially considering the other frequent visits performed by GM clinicians.

272.    CMS regulations also cannot be reasonably interpreted to require GM's other "regulatory" or "company" visits.

273.    The relevant Medicare statutes and CMS do not govern the care of ALF residents and cannot reasonably be interpreted to mandate any specific types of visits for ALF residents.

274.    With the majority of GM's "regulatory" and "company" visits not mandated by statute or CMS regulations, the services must be "reasonable and necessary for the diagnosis or treatment of illness or injury" to be covered by Medicare.

275.    While the definition of medical necessity is inherently broad to encompass the variety of services provided to Medicare beneficiaries, it is not ambiguous. A visit is only medically necessary when it is needed to treat a resident's illness or injury, and CMS does not cover most preventative services or routine check-ups. 42 C.F.R. § 411.15.

276.    To further elucidate the medical necessity standard in nursing homes, CMS contractors have also issued guidance, such as Local Coverage Determinations, on the subject. *See, e.g., Evaluation and Management Services Provided in a Nursing Home*, Local Coverage Determination L35068 (applicable to Part B services provided in Louisiana). This guidance, which was provided repeatedly to GM during numerous Medicare medical reviews and audits, makes clear that frequent visits by a physician to nursing home residents are generally "unnecessary, particularly if the patient is medically stable."

277.    Contrary to Medicare requirements, GM's "regulatory" visits to complete CPRs, MMRs, PQRS, PHQ-9 and annual assessments were not performed because residents suffered from a specific injury or medical condition requiring that particular service. Instead, GM established policies directing clinicians to go into nursing homes and ALFs across the country and perform hundreds of these visits each month without any consideration as to whether the residents needed to be seen.

45

278. GM then knowingly submitted false claims to Medicare for these unnecessary services, many of which were not performed as documented or represented in the claim forms.

279. Defendants also subjectively knew, should have known, and acted with reckless disregard as to the information establishing that GM was submitting false claims to Medicare.

280. Over the years, Defendants received numerous warnings – from GM clinicians, patient families, nursing facilities, CMS contractors, and HHS – that their patient visits were medically unnecessary, excessive, upcoded, and often not performed as documented in progress notes.

281. Defendants ignored these complaints, however, and continued the fraudulent scheme to bill Medicare for as many visits as possible and upcoding those visits to obtain more revenue.

### 1. Clinicians Complained About GM's Excessive and Unnecessary Visits.

282. Clinicians employed by Defendants repeatedly questioned GM's numerous "regulatory" visits, which they knew were not medically necessary.

283. Many GM clinicians recognized nursing home residents were being seen too frequently and GM required visits regardless of whether the patients actually needed to be seen for any medical reason.

284. Many GM clinicians noticed that, instead of improving the lives of nursing home residents, the GM business model focused on quotas and filling out paperwork for billing purposes.

285. Many GM clinicians further recognized it was unnecessary to examine a resident within days of another GM clinician's visit when there were no changes in the resident's condition.

286. These GM clinicians believed the so-called "regulatory" visits required by GM were repetitive and not medically necessary.

287.    The "regulatory" visits were mostly chart reviews, and clinicians used the diagnoses from previous visits and simply added to the forms.

288.    On June 29, 2016, in the following text message exchange, two Southern Illinois nurse practitioners expressed concern and frustration at GM's policies, which required them to perform unnecessary "regulatory" visits:

> Whitaker: I have a real problem with what we r doing here!  We r doing these visits just for more $$ for gen med and this [is] not right or fair to our pts or our facilities!

> Mayhew: Just like I have to tell [Nursing Home] that I won't be there today after I haven't been there for 2 weeks, and why?  Because I'm going to [another] facility essentially to [perform] "extra visits!"

> Whitaker: That whole 35 pts [rule] must be just a # they came up with too b/c they obviously aren't worried about Medicare noticing[.]

289.    On February 1, 2017, in another text message exchange, the same two GM nurse practitioners openly discussed how the visits GM required them to perform were not medically necessary:

> Mayhew: I thought it was funny when she said only do visits that are medically necessary then [the] next sentence is we are doing these New visits and [they're] required.

> * * *

> Whitaker: * * *  Oh yeah, and how medically necessary was it when they pulled me to [nursing home] a couple months ago to do cprs!!  They r rediculous [sic]!!

290.    That same month, a Missouri-based GM physician, Amy Puderbaugh, told another GM employee, "I feel like I'm committing [M]edicare fraud every day." The employee later conveyed the physician's statement to Prose in an e-mail.

291.    When clinicians raised their concerns with GM or questioned the medical necessity of these "regulatory" visits, GM management falsely assured them the visits were necessary and required by Medicare.

**2. Patient Families Complained About GM's Excessive and Unnecessary Visits.**

292.    GM's medically unnecessary and upcoded visits not only caused a financial loss to Medicare, they also caused financial harm to patients and their families who were responsible for copays and deductibles related to these visits. As a result, patient family members sometimes complained to GM about the frequency of the visits.

293.    For example, on June 25, 2013, the son of a GM patient sent an email to Prose and others in GM management complaining about the repeated visits to his mother, who was on hospice care. The son, who was also a physician, stated that he could "somewhat understand the monthly (30) day visit, although probably unnecessary, but two to three times a week is unusual." He then added:

> The issue that I am raising to medicare is the necessity of this many visits for a patient on hospice who is receiving comfort care. There was not going to be any admissions to the hospital and she was not going to receive any medicine errors since mainly comfort medications were being dispensed. . . . The frequent visits did not prevent the heel ulcer and gangrene and did not lengthen or make a difference in her death.

294.    Another example occurred on April 6, 2014, when GM received an email complaint from a nursing facility on behalf of a patient's wife. The email was sent to Coccia and conveyed that the wife was very involved in her husband's care and at the facility every day. She did not know why he was being seen so often, around five to seven times per month, and was "very concerned that [GM was] fraudulent[ly] billing."

295.    On January 18, 2016, GM billing employee Linda Trzeciak emailed GM management that she received a complaint from another patient's wife about the account balance and asking why GM had seen her husband so many times. Stieb called the wife back and explained that some of the visits were to meet Medicare requirements and to simply monitor her husband's health.

296.    Some family members of GM patients went a step further and demanded that GM either stop visiting their family member or implemented a limit on the number of visits that GM could perform.

297.    For example, in August 2016, Dietz emailed her supervisor stating two separate families of residents at an Illinois nursing facility had requested that GM see their family members no more than once per month, unless there was an acute issue.

### 3. Nursing Facilities Complained About GM's Excessive and Unnecessary Visits.

298.    Many nursing facilities where the Defendants practiced also questioned why GM performed such frequent visits, especially MMRs and CPRs.

299.    For instance, on November 3, 2017, Whitaker emailed Coccia to convey that one facility's Director of Nursing ("DON") had asked why GM clinicians were in the facility when the patients were all caught up on visits. The DON specifically wanted to know what the MMR visits were and why they were performed. After Whitaker told the DON that MMRs and CPRs were required Medicare visits, the DON asked for her to cite the source of the requirement because the facility "never had any of the other groups of providers perform these visits."

300.    This complaint followed another concern raised by Whitaker on July 17, 2017, regarding a different facility. In an email to Coccia, Whitaker wrote:

> As you know my facilities have had multiple complaints about [Greene] here recently in regards to the number of visits, how many times he's seeing the residents, and [how] long he is spending in the facilities and with the pts.

301.    Coccia responded to this concern by admitting that GM's patient visits "do[] not take much time" and, when medical records were maintained in hard copy, "most of the time was spent going through the paperwork and charting in the facility." She added: "Now that the facilities and General Medicine have EMR [electronic medical record] documentations and clinicians have

remote access, the clinicians may review information and document outside the facility; therefore less time in the buildings is now the norm . . . ."

302.    In 2018, the Alverno, a nursing facility in Iowa, received multiple complaints from patient family members or legal guardians about GM performing an excessive number of visits with its residents, prompting the facility's management to send a letter to Prose.

303.    The letter, dated December 19, 2018, warned Prose that "all services provided to residents must be reasonable and necessary" and the facility management "expect[ed] that General Medicine is providing appropriate education and auditing to its employees and contractors to ensure that all treatment provided to residents . . . is in full compliance with the laws and regulations."

304.    GM and Prose did not implement any changes in response to the letter, while the facility continued to receive more complaints about the excessive frequency of GM's visits.

**4. Medicare Contractors Denied and Downcoded Claims Billed by General Medicine, P.C. and the GM Shell Entities.**

305.    Given the significant number of claims billed to Medicare by GM each year, GM's claims were often reviewed by Medicare contractors, including MACs and Zone Program Integrity Contractors (ZPICs).

306.    On at least 18 different occasions between 2013 and 2017, five separate Medicare contractors reviewing GM's claims warned GM that it was performing medically unnecessary visits, performing visits that did not meet the requirements of the CPT codes billed, and billing for visits with insufficient medical documentation.

307.    For example, in a June 21, 2013 letter from AdvanceMed, a CMS ZPIC at the time, specifically instructed GM that it saw nursing home residents multiple times in a month without a reasonable and necessary cause and rejected GM's argument that a CPR was necessary for

Medicare certification/recertification. AdvanceMed's letter further informed GM that federally mandated visits were required only once every 60 days for established nursing facility patients.

308.    GM ignored this and other similar guidance, however, and continued performing its medically unnecessary, duplicative visits. As a result, Medicare contractors denied hundreds of claims submitted by GM for lack of medical necessity and reduced hundreds more to a lower level of payment.

309.    While several Medicare contractors performed isolated post-payment reviews of GM's claims, in June 2015, Medicare contractor Novitas Solutions, Inc. ("Novitas") placed GM on a pre-payment review of certain claims billed at CPT code 99310 because of the high rate of billing errors in previous audits.

310.    For the nearly two years Novitas conducted this prepayment review, Novitas regularly sent GM the results of its findings as well as educational material on how to properly bill services to nursing facility residents. Novitas explained to GM that frequent visits to stable nursing facility residents were unnecessary because the residents were in a controlled environment under the close supervision and care of trained medical professionals.

311.    Overall, Novitas downcoded or denied most of GM's 99310 claims it reviewed, with many denials due to the frequency of GM's visits and lack of medical necessity.

312.    In another Medicare contractor review, National Government Services, Inc. (NGS), analyzed 1,076 GM claims submitted at CPT code 99310 in a widespread audit completed in September 2017. NGS denied 512 of those claims and downcoded 556 claims to a lower billing code, leaving only eight of 1,076 claims billed correctly.

313.    Finally, in 2018, after five years of Medicare contractors repeatedly denying and downcoding GM's claims, CMS's review of GM's claims slowed down. This was due in part to

Medicare revoking General Medicine, P.C.'s enrollment in 2017, as well as GM spreading its billings across the GM Shell Entities, both of which are described in more detail below.

### 5. The Medicare Appeals Council Denied and Downcoded Claims Billed by General Medicine, P.C.

314.    With Medicare contractors constantly denying and downcoding GM's claims, GM challenged many of those decisions through the HHS administrative appeals process.

315.    HHS established multiple levels of review following a Medicare contractor's decision to downcode or deny a provider's claim for payment. After a Medicare contractor's unfavorable initial determination on Medicare Part B coverage and payment, the provider could seek redetermination from the contractor. If the redetermination was also unfavorable, the provider could then seek review from a Qualified Independent Contractor ("QIC"). After receipt of an unfavorable QIC decision, the provider was entitled to a review from an Administrative Law Judge ("ALJ").

316.    If dissatisfied with an ALJ decision or dismissal regarding Medicare coverage, the parties to the ALJ proceeding could request review by the Medicare Appeals Council ("Council"). The Council was the highest level of review within HHS. Final Council decisions could be appealed to federal court if amount in controversy requirements were met.

317.    The Council issued two key decisions finding many of GM's services medically unnecessary and upcoded.

318.    The first Council decision was issued on November 17, 2016, in Docket Number E-15-73. In this 2016 decision, the Council reviewed 223 GM claims for CPRs provided to 83 Medicare Part B beneficiaries in 2013. GM billed the CPRs at CPT 99310, but the QIC had either denied the claims or downcoded them to CPT 99307, leading to the appeal before the Council.

319.    The 2016 Council decision affirmed the QIC's denial of numerous CPRs for lack of medical necessity. For example, the Council reviewed three claims for CPRs performed on beneficiary N.L.2 on April 9, 2013, May 12, 2013, and June 6, 2013. The Council denied coverage for the May 12 and June 6 visits, finding that GM had not shown "it was medically reasonable and necessary to perform care plan review[s] on a stable beneficiary more frequently than the minimum required." The Council rejected GM's argument that "the service was a CPR based on CMS instructions . . . ."

320.    The 2016 Council decision also affirmed the QIC's downcoding of certain CPR visits to CPT code 99307, the lowest code for nursing home visits. The Council found that GM's progress notes did not establish a comprehensive review of systems or past/family/social history but sometimes cross-referenced unidentified history and physicals taken in prior visits. The Council further found that GM records failed to establish medical decision-making of a high complexity, as the plan of care identified in the CPRs was "generally to review the medical records, discuss the beneficiary with staff, and continue current treatment, all supporting that beneficiaries' conditions were chronic and stable."

321.    Throughout the appeal process, GM asserted several arguments why the CPRs should be covered, including assertions that Medicare regulations required monthly CPRs, CPRs included necessary Medicare certification/recertification, care plan oversight was required to be billed at CPT code 99310, and CPRs met the requirements of CPT code 99310.

322.    The Council disagreed, rejecting GM's arguments that a patient's care plan should be reviewed more often than required by the regulations and that GM's CPRs satisfied the elements of CPT 99310. The Council summarized its view of GM's CPRs as follows (emphasis added):

> In general the medical records indicate that the beneficiaries examined were stable. The medical evidence indicates that they

were seen for the care plan review required by the SNF conditions of participation, and not for any particular problem. Few or no changes in the plans of care were ordered. As the QIC found, [GM] does not identify, provide, or cite the CMS authority or instructions that it argues supports billing for all CPRs using CPT code 99310. While [GM] seems to argue that it should be permitted to bill at the highest coding level for monthly or bi-monthly physician visits required by federal SNF conditions of participation, SNF participation compliance standards do not also establish coverage standards for Medicare services. Medicare does not pay for otherwise covered services that are not 'reasonable and necessary' to treat a beneficiary in a particular case, and the billing party is required to provide sufficient information to establish payment. Further, *[GM] has not submitted any persuasive evidence that it was medically reasonable and necessary to perform care plan reviews on stable beneficiaries more frequently than the minimum required.*

323.    Although this ruling from the highest level within the Medicare appeals process directly contradicted GM's policy of conducting monthly CPRs on all patients, GM ignored it and continued its pattern of medically unnecessary visits.

324.    The Council issued a second decision regarding GM's services less than one year later, on June 21, 2017. This action, docketed as M-12-655, arose from a 2007 AdvanceMed review of numerous GM claims for a variety of services, including CPRs, MMRs, new patient visits, and low-level acute visits.

325.    The Council once again considered GM's visits to be excessive, finding GM conducted several patient visits per month even though there were no new complaints indicated and the reasons for the visits were not clearly documented.

326.    While the Council did not deny any claims based on frequency of visits alone, the Council agreed with the Medicare contractor that "the frequency of visits was excessive" when the residents were not experiencing any new complaints and the treatment notes did not document a clear purpose for the visits.

54

327.    The 2017 Council decision also denied numerous CPRs as not medically necessary and downcoded others.

328.    The Council noted GM's CPR forms "had nothing indicating a plan of care for the conditions checked on the assessment form."

329.    The Council further held "[t]here was no documentation of any decision making, let alone that of moderate to high complexity" and was again unpersuaded by GM's attempts to justify the billings by claiming CPRs provide Medicare "care plan oversight" and "Medicare certification/recertification."

330.    In one example, the Council denied coverage for a CPR when the patient had no active complaints or problems and had been seen five days prior. The Council also mentioned that the progress note merely listed the medications the beneficiary was taking and completed check-box entries with little substantive medical information. The Council considered the patient's history and multiple chronic conditions, and it considered GM's argument that the visit included Medicare certification/recertification and Medicare-required care plan oversight, but none of this information established Medicare coverage.

331.    Despite these decisions from the Council specifically finding Medicare did not require monthly CPRs, Medicare certification/recertification did not establish coverage for a visit, GM's visits were too frequent, and CPRs did not meet the requirements for CPT 99310, GM continued to bill Medicare for monthly CPRs and MMRs using CPT 99310.

332.    GM also continued to assert the same faulty reasons for its excessive visits, even though the Council had already rejected those arguments.

### 6. GM's Own Internal Audits Showed that Services Rendered by GM Clinicians Were Not Medically Necessary, Upcoded, and Not Performed as Documented.

333.    At various times, GM conducted internal audits or reviews of the services being reported by GM clinicians.

334.    These reviews sometimes revealed instances when GM clinicians reported performing visits that were not rendered, such as preparing progress notes documenting visits that allegedly occurred while the resident was hospitalized or deceased. On at least one occasion, GM continued to employ the clinician who reported such phantom visits.

335.    More widespread reviews revealed the unnecessary and duplicative services billed by the GM Defendants.

336.    For instance, in February 2019, GM's clinical applications specialist, Eileen Thompson, created a spreadsheet titled "duplicateCPRMMR.xlsx." The spreadsheet listed 16 patients in Southern Illinois and indicated that during the previous month, nine of the patients had received two CPRs and the other seven patients had received two MMRs.

337.    GM discovered more duplicative regulatory visits in June 2019. This review was documented in a spreadsheet created by GM's internal medical biller and auditor, Elisabeth Poma, and identified at least 20 patients who received "duplicate" CPRs in May 2019.

338.    The June 2019 spreadsheet of duplicative CPRs also contained comments that numerous GM progress notes should be changed to remove the references to a CPR and indicate a different type of visit, such as an acute visit or H&P visit, was performed instead.

339.    In February and June 2019, Defendants knew that it was not medically necessary or reasonable to conduct multiple CPRs or MMRs for the same patient in a single month. Defendants also knew that medically unnecessary services were not covered by Medicare.

340. Nevertheless, Defendants never notified Medicare that the duplicative visits flagged in their audits should not have been billed. Likewise, Defendants never returned any of the $1,060.57 they received from Medicare for the duplicative visits performed in January 2019 or the $1,781.40 for the 20 duplicative CPR visits performed in May 2019.

341. In another spreadsheet created in June 2019, Poma reviewed 166 visits reportedly performed by several GM clinicians during the previous month for 15 Medicare patients in Southern Illinois. In a document titled "freq SIL.xlsx," E.P. concluded that at least 28 of those visits were not medically necessary.

342. Poma further noted the progress notes from another 36 visits were missing necessary information, such as the patient's history or review of symptoms, and at least two more visits should have been billed at a lower CPT code.

343. In June 2019, Defendants knew that the 28 visits identified in Poma's review of frequent visits were not medically necessary, and that medically unnecessary services were not reimbursable by Medicare. Nevertheless, Defendants never notified Medicare that the visits flagged by Poma should not have been billed. Defendants also never returned any of the $1,754.35 they received from Medicare for the 28 visits Poma concluded were medically unnecessary.

344. As a result of these internal audits, Defendants knew or should have known that they were submitting and causing the submission of claims to Medicare for excessive, medically unnecessary, and upcoded patient visits.

**G. GM Knew Medical Necessity and Proper Coding Were Conditions of Payment and Material to Medicare.**

345. General Medicine, P.C. and the Defendant GM Shell Entities submitted claims to Medicare certifying the services for which reimbursement was sought were reasonable and necessary for the health of the patient.

57

346.     The claims submitted by General Medicine, P.C. and the Defendant GM Shell Entities further represented the services performed by listing a CPT code.

347.     Defendants knew that, to be paid, the services had to be reasonable and necessary and meet the requirements of the CPT code listed on the claim form.

348.     Defendants also knew these requirements were material to Medicare's decision to pay the claims.

349.     If Medicare had known certain visits were not medically necessary, they would have denied payment for those claims.

350.     If Medicare had known certain visits did not satisfy the requirements of the CPT codes billed on the claim forms, they would not have paid the visits at the rates billed.

351.     As explained above, CMS, through Medicare contractors, continually reviewed claims submitted by General Medicine, P.C. and the Defendant GM Shell Entities to determine if the services were medically necessary and properly coded.

352.     These efforts resulted in recouping hundreds of thousands of dollars in overpayments to GM.

353.     Sometimes, however, Defendants' practices and policies thwarted attempts to review GM's services.

### 1. Alteration of Progress Notes

354.     One method Defendants used to circumvent Medicare's scrutiny was to embellish progress notes to make it appear services were more comprehensive than those actually performed.

355.     Prose told clinicians that when completing progress notes, they should always list multiple diagnoses as the reason necessitating the visit.

356.     Prose specifically explained the reason to do this was to avoid denial of the claims.

357.    GM also instructed some clinicians to write in CPR progress notes that they spent 35 or 40 minutes on the visit.

358.    GM even altered medical records that would be reviewed by Medicare contractors.

359.    Although GM already instructed clinicians how much time spent should be listed on progress notes, some clinicians apparently failed to falsify their records. In those instances, GM management would simply change the time listed on the notes before providing them to the auditor.

360.    One instance of this practice was discussed in an email between Prose and Coccia on March 21, 2014. After GM was contacted by a Medicare contractor performing an audit of GM services, Coccia asked Prose how to "correct the clinicians' documentation for those examples/visits that we have audited." Specifically, Coccia wanted "the level of care for a [date of service] to be corrected so it correlated with the billed level."

361.    In other words, Coccia wanted to alter the documentation to make it support the CPT code billed.

362.    Coccia then stated, "As for the CPR and the length of time, the audited documentation will be corrected to meet the required time allotment of at least 35 minutes."

363.    Prose agreed with this approach of changing the documentation of the time spent on the patient visits for the audited records.

364.    Similarly, on January 26, 2016, GM assistant office manager Ryanne Thomas emailed GM physician Greene and instructed him to add information to the physical exam, review of systems, and other portions of a November 2015 progress note under Medicare audit "before we send it over."

365.    GM's practice of altering records was still ongoing in March 2017 when GM assistant office manager Thomas emailed Jones asking her to make "corrections" and

modifications to progress notes requested in a Medicare audit. In this communication, Thomas directed Jones to alter her progress notes to include a chief complaint, review of systems, and vital signs for visits that occurred over a month before the email. When the physician did not respond, the GM assistant office manager followed up, asking her to "update" the notes so they could be produced to the Medicare contractor for review.

### 2. The 35-Visit Rule

366. In September 2014, Southern Illinois GM nurse practitioner Arnolds reported performing 60 patient visits in one day.

367. Prose refused to bill Medicare for all 60 visits at once. "That's excessive," he told Coccia. "No one will believe ... she worked 18 hours without a meal break or a bathroom break." Prose later added, "[i]f Medicare audits it will be denied."

368. Prose said that 35 patient visits in a day was reasonable and instructed Arnolds to "redo" the other 25 patient visits on another day.

369. Arnolds responded that it was "unethical to see patients on a different date for the same issue" and when GM refused to pay her for all 60 visits, she resigned.

370. GM management knew that billing for high numbers of patient visits conducted by a single clinician in one day was a red flag for Medicare contractor audits.

371. Yet, GM did not change its troublesome policies, such as quotas and mandatory visits, causing providers to report an excessive number of visits.

372. Instead, GM management implemented a new rule in or about September 2014 that no more than 35 patient visits should be billed for a single practitioner in a single day.

373. The purpose of this rule was not to decrease the number of needless patient visits but simply to decrease the risk of a Medicare audit by spreading those visits out over more days.

GM itself did nothing to determine how much time its clinicians were spending with their patients or whether they were actually performing the services according to the CPT codes being billed.

374.    MMRs, CPRs, and other visits billed at CPT 99310 involved comprehensive physical examinations of the patient and should have taken much longer to perform than a simple patient visit billed at CPT 99307 or 99308. But the 35-visit rule did not take that time difference into account.

375.    Since GM paid its clinicians a flat rate per patient visit rather than an hourly wage, GM clinicians were financially incentivized to see as many patients as they could in the shortest amount of time possible.

376.    GM nurse practitioner Mayhew immediately recognized that the 35-visit rule focused on avoiding audits, not preventing fraud. On September 26, 2014, in a text message exchange with other GM employees, she wrote, "I think I'm gonna start seeing 35 pts in 2 hrs so I can have the rest of my days to do what I want since they don't care how long u take to see pts just as long as it's not more than 35." And from that point forward, that is exactly what Mayhew did.[2]

377.    Other GM clinicians followed suit.

378.    Although GM leadership reiterated the 35-visit rule to its employees in June 2016 and June 2017, the rule was not always followed, and GM continued occasionally to bill for more than 35 patient visits in one day.

379.    For example, on August 4, 2017, Defendant City Medical billed Medicare for 40 patient visits allegedly performed by Greene in Southern Illinois using CPT 99310. When

---

[2] On September 8, 2020, Jami Mayhew pleaded guilty to one count of health care fraud related to GM's submission of 251 false claims to Medicare using CPT code 99310. *See United States v. Mayhew*, Case No. 20-cr-30132-SMY (S.D. Ill.).

considering the estimated time of 35 minutes to complete each visit, it should have taken over 23 hours in a single day to complete those services.

380.    Likewise, Defendant National Medical billed Medicare for 36 visits allegedly performed by GM nurse practitioner Sigalas in Louisiana on September 27, 2017. Thirty-six visits barely exceeded the GM limit, but because 33 of those visits were MMRs, it should have taken roughly 20 hours in a single day to complete those services.

### 3. The GM Shell Entities

381.    When embellishing and falsifying progress notes failed to avoid continued payment denials and downcoding by CMS contractors, Prose employed a new strategy.

382.    To reduce the number of claims billed by General Medicine, P.C. and, as a result, the number of Medicare audits, Prose created the following 15 GM Shell Entities in February 2016:

- Advanced Medical Haggerty Partners, P.A.;
- Borough Medical Partners, P.A.;
- Centro Medical Partners, P.A.;
- City Medical Partners, P.A.;
- Integrated Medical Partners, P.A.;
- Metro Medical Haggerty Partners, P.A.;
- Metropolis Medical Partners, P.A.;
- National Medical Partners, P.A.;
- New Castle Haggerty Medical Partners, P.A.;
- Regional Medical Partners, P.A.;
- Sigma Haggerty Medical, P.A.;
- Silverton Medical Partners, P.A.;
- Statewide Medical Partners, P.A.;
- Vicinity Medical Partners, P.A.; and
- Westco Haggerty Medical Partners, P.A.

383.    The principal place of business for these 15 corporate entities was General Medicine, P.C.'s corporate headquarters at 21333 Haggerty Road, Suite 150, Novi, Michigan.

384.    Prose was the sole shareholder, officer, and registered agent of all 15 newly formed entities.

385.    Prose enrolled the new entities in the Medicare Program.

386.     Prose's plan to funnel General Medicine, P.C.'s billing through the numerous GM Shell Entities proved successful. Spreading the claims across multiple GM Shell Entities not only reduced the chance of an audit, it also allowed General Medicine, P.C. and the GM Shell Entities to escape a CMS contractor's medical review by stopping the submission of claims under the audited entity and billing the claims instead through a different GM Shell Entity not under review. This cat and mouse game helped GM circumvent at least two audits by Medicare contractors.

387.     Not long after Prose created the GM Shell Entities, their purpose changed from strategic to essential.

388.     In October 2016, Missouri Medicaid Audit and Compliance ("MMAC") initiated an action to terminate General Medicine, P.C.'s Missouri Medicaid enrollment.

389.     In an October 24, 2016 letter addressed to Prose, the MMAC explained it had completed a post-payment review of General Medicine, P.C.'s Medicaid claims and found the documentation was inadequate to support the CPT codes billed. The letter further noted patient records were created after the MMAC requested them for review.

390.     The MMAC's October 24, 2016 letter informed Prose its investigation had revealed several concerning results, including: (1) 100% of the initial nursing facility visits were billed by General Medicine, P.C. using the highest possible code; (2) subsequent nursing facility visits were billed by General Medicine, P.C. at a rate 14 times that of its peer group; (3) nurse practitioners received commission-based payments from GM depending upon the number of patients seen per day; and (4) the billing indicated providers spent an unlikely number of hours per day providing services based on the average time CPT assigns to the codes. As a result of this conduct, MMAC determined the facts "clearly show[ed] that serious abuse or harm may result from [General Medicine, P.C.'s] continued participation in the Medicaid program."

391.    On January 10, 2017, to avoid being sanctioned by the State of Missouri, General Medicine, P.C. agreed to voluntarily surrender its Title XIX Missouri HealthNet provider agreement, effectively terminating its ability to receive payments from Missouri Medicaid.

392.    Shortly thereafter, in February 2017, General Medicine, P.C. failed to report the Missouri termination action to CMS in a Medicare revalidation application.

393.    On July 24, 2017, Louisiana Medicaid revoked General Medicine, P.C.'s enrollment pursuant to 42 C.F.R. § 455.416(c), which required a State Medicaid agency to terminate the enrollment of any provider that was terminated under the Medicaid program of any other State. This termination meant General Medicine, P.C. could no longer receive payments from Louisiana Medicaid.

394.    On July 21, 2017, because of the Missouri Medicaid termination and the submission of false or misleading information in the CMS enrollment document, CMS revoked General Medicine, P.C.'s Medicare enrollment pursuant to 42 C.F.R. § 424.535(a)(12) and (a)(4). This meant General Medicine, P.C. was no longer permitted to receive any payments from Medicare effective August 20, 2017.

395.    Because Prose had already established the GM Shell Entities, the actions by CMS, Missouri Medicaid, and Louisiana Medicaid failed to slow Defendants' health care fraud scheme. Defendants simply continued billing Medicare for the same medically unnecessary and upcoded services through the numerous GM Shell Entities.

396.    In fact, GM submitted a revised application for Defendant Regional Medical's enrollment in the Missouri Medicaid program just one day after signing the agreement to surrender General Medicine, P.C.'s Missouri Medicaid enrollment, flouting the entire purpose of the MMAC investigation and termination action.

64

## VIII.   EXAMPLES OF FALSE CLAIMS

397.     Through GM's health care fraud scheme, Defendants submitted thousands of false claims to Medicare for services that were not provided, not medically unnecessary, and upcoded. In addition to the examples above, some specific false claims are described below.

**Example 1 – Nursing Home Resident L.C.**

398.     Defendant Metropolis Medical knowingly submitted a false claim for payment to Medicare Part B for a comprehensive subsequent nursing home visit (CPT 99310) with L.C, a Southern Illinois nursing home resident, on July 7, 2016.

399.     The associated progress note documented the July 7, 2016 visit as a "[r]outine 30 day exam" and neither the patient nor the staff had concerns to be addressed.

400.     The day before this July 7, 2016 visit, another GM clinician had visited L.C. and completed a CPR progress note.

401.     L.C.'s medical condition did not require another visit on July 7, 2016, and no "30-day exam" was needed.

402.     The July 7, 2016 progress note did not even mention L.C.'s medications, even though GM's internal records described the visit as an MMR.

403.     The July 7, 2016 visit with L.C. was not medically necessary or reasonable.

404.     GM knew or should have known the July 7, 2016 visit with L.C. was not medically necessary or reasonable, and thus not reimbursable by Medicare.

405.     Metropolis Medical nevertheless billed Medicare for this July 7, 2016 visit using CPT 99310.

406.     This July 7, 2016 visit was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310.

407.     Medicare paid GM $108.78 for this July 7, 2016 visit with L.C.

**Example 2 – Nursing Home Resident J.C.1.**

408.    Defendant Sigma Haggerty knowingly submitted a false claim for payment to Medicare Part B for a comprehensive subsequent nursing home visit (CPT 99310) with J.C.1, a Louisiana nursing home resident, on March 2, 2017.

409.    This was an MMR visit; however, J.C.1.'s ongoing urinary tract infection was not mentioned in the March 2, 2017 progress note, and the GM clinician who performed the MMR failed to include in her medication list the antibiotic J.C.1 was taking to treat the infection.

410.    A GM clinician had already seen J.C.1. for a CPR on February 21, 2017.

411.    Sigma Haggerty Medical also billed Medicare for patient visits with J.C.1 on February 24 and 28, 2017.

412.    J.C.1. had no new complications necessitating an MMR on March 2, 2017.

413.    No changes were made to J.C.1.'s plan of care as a result of this March 2, 2017 visit.

414.    The March 2, 2017 MMR with J.C.1. was not medically necessary or reasonable.

415.    GM knew or should have known the March 2, 2017 MMR visit with J.C.1 was not medically necessary or reasonable, and thus not reimbursable by Medicare.

416.    Sigma Haggerty nevertheless billed Medicare for this March 2, 2017 MMR visit using CPT 99310.

417.    This visit was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310.

418.    Medicare paid Sigma Haggerty $89.01 for this March 2, 2017 visit with J.C.1.

**Examples 3, 4, and 5 – Nursing Home Resident J.C.2.**

419.    J.C.2. was admitted to a Michigan SNF on March 21, 2017, following a surgery.

420.   General Medicine, P.C. billed Medicare Part B for 11 visits with J.C.2. in the 26-day period between March 23, 2017 and April 18, 2017.

421.   All 11 visits were billed at CPT 99310, except for one billed at CPT 99309 and the initial visit with J.C.2., which was billed at CPT 99306 – the code with the highest Medicare reimbursement rate for any nursing home patient visit.

422.   Nearly all of these 11 visits were medically unnecessary.

423.   For example, Defendant General Medicine, P.C. knowingly submitted a false claim for payment to Medicare Part B for a comprehensive subsequent nursing home visit (CPT 99310) with J.C.2 on March 24, 2017.

424.   The March 24, 2017 progress note documents a CPR, but General Medicine, P.C. also billed Medicare for a comprehensive initial nursing facility visit with J.C.2. on March 23, 2017, just one day earlier.

425.   There was no significant change to J.C.2's condition to justify the March 24, 2017 CPR.

426.   No changes were ordered to J.C.2's plan of care in the March 24, 2017 CPR progress note.

427.   The CPR for J.C.2 on March 24, 2017, was not medically necessary or reasonable.

428.   GM knew or should have known the March 24, 2017 CPR visit with J.C.2 was not medically necessary or reasonable, and thus not reimbursable by Medicare.

429.   General Medicine, P.C.  nevertheless billed Medicare for this March 24, 2017 CPR visit using CPT 99310.

430.   This March 24, 2017 visit was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310.

431.   Medicare paid General Medicine, P.C. $104.99 for this March 24, 2017 visit with J.C.2.

432.   Defendant General Medicine, P.C. also knowingly submitted a false claim for payment to Medicare Part B for a comprehensive subsequent nursing home visit (CPT 99310) with J.C.2 on March 31, 2017.

433.   This visit on March 31, 2017 was an MMR visit; it was also GM's fifth visit to J.C.2. that week.

434.   All four of the other visits were billed at either CPT 99306 or CPT 99310, codes for comprehensive visits with the highest Medicare reimbursement rates.

435.   A GM clinician had seen J.C.2. the day before this visit, on March 30, 2017.

436.   J.C.2. was not experiencing any new issues on March 31, 2017 requiring another visit.

437.   The chief complaint listed on the March 31, 2017 progress note was J.C.2.'s surgical incision, but the clinician's evaluation of this condition was copied verbatim from a prior note, including the same typographical error.

438.   The March 31 progress note reflected no changes to J.C.2's plan of care.

439.   Although a review of medications was supposedly performed, the March 31 note contained no analysis of any medications.

440.   On March 31, 2017, J.C.2. had been a resident at the facility for only ten days, and there was no medical need to perform a monthly review of her medications, especially considering the other recent visits completed by GM.

441.   The MMR for J.C.2 on March 31, 2017 was not medically necessary or reasonable.

68

442.    GM knew or should have known the March 31, 2017 MMR visit with J.C.2 was not medically necessary or reasonable, and thus not reimbursable by Medicare.

443.    General Medicine, P.C. nevertheless billed Medicare for this March 31, 2017 MMR visit using CPT 99310.

444.    This March 31, 2017 visit was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310.

445.    Medicare paid General Medicine, P.C. $104.99 for this March 31, 2017 visit with J.C.2.

446.    Defendant General Medicine, P.C. knowingly submitted another false claim for payment to Medicare Part B for a comprehensive subsequent nursing home visit (CPT 99310) with J.C.2 on April 10, 2017.

447.    This was purportedly a CPR visit, and the associated progress note copied and pasted the same assessment of J.C.2.'s surgical incision as the March 24 and March 31, 2017 notes.

448.    The note stated a medical necessity form was completed, but the order for J.C.2.'s stay in the SNF had been signed one week earlier, on April 3, 2017. GM had also just billed Medicare for a comprehensive visit with J.C.2. on April 6, 2017.

449.    The April 10, 2017 progress note reflected no changes to J.C.2.'s plan of care.

450.    The CPR for J.C.2 on April 10, 2017, was not medically necessary or reasonable.

451.    GM knew or should have known the April 10, 2017 CPR visit with J.C.2 was not medically necessary or reasonable, and thus not reimbursable by Medicare.

452.    General Medicine, P.C. nevertheless billed Medicare for this April 10, 2017 MMR visit using CPT 99310.

69

453.    This April 10, 2017 visit was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310.

454.    Medicare paid General Medicine, P.C. $104.99 for this April 10, 2017 visit with J.C.2.

**Example 6 – Nursing Home Resident B.S.**

455.    Defendant Sigma Haggerty knowingly submitted a false claim for payment to Medicare Part B for a comprehensive subsequent nursing home visit (CPT 99310) with B.S., a Missouri nursing home resident, on May 16, 2017.

456.    According to Medicare billing records, GM had already performed an MMR visit with B.S. earlier that month on May 2, 2017, and visited B.S. again on May 11, 2017 to review a lab test result.

457.    B.S. was not experiencing any new issues requiring another visit on May 16, 2017.

458.    CMS regulations did not require GM to complete a CPR for B.S. at that time.

459.    No orders were written during the CPR visit on May 16, 2017; the GM progress note indicated that the plan was to "[c]ontinue plan of care and monitoring."

460.    In addition to the MMR, CPR, and lab test review visit performed in the month of May 2017, GM visited B.S. again on May 25, 2017 to perform an annual assessment and billed the visit to Medicare using CPT 99318.

461.    GM knew or should have known the May 16, 2017 CPR visit with B.S. was not medically necessary or reasonable, and thus was not reimbursable by Medicare.

462.    Sigma Haggerty nevertheless billed Medicare for this May 16, 2017 visit using CPT 99310.

463.    Medicare paid Sigma Haggerty $87.14 for this May 25, 2017 visit with B.S.

70

**Example 7 – Nursing Home Resident K.H.**

464.     Defendant General Medicine, P.C. knowingly submitted a false claim for payment to Medicare Part B for a comprehensive subsequent nursing home visit (CPT 99310) with K.H, a Northern Illinois nursing home resident, on July 19, 2017.

465.     GM's progress note identifies this July 19, 2017 visit as a CPR visit.

466.     GM clinicians had already seen K.H. on July 5, 2017 for a patient visit billed at CPT 99308, on July 6, 2017 for a PHQ-9 depression screening billed at CPT 99308, and again on July 7, 2017 for an alleged complex visit billed at CPT code 99310.

467.     K.H. had no acute complaints or symptoms requiring a visit on July 19, 2017.

468.     GM made no changes to her plan of care during the July 19, 2017 CPR.

469.     The July 19, 2017 CPR visit with K.H. was not medically necessary or reasonable.

470.     GM knew or should have known the July 19, 2017 visit with K.H. was not medically necessary or reasonable, and thus not reimbursable by Medicare.

471.     General Medicine, P.C. nevertheless billed Medicare for this July 19, 2017 CPR visit using CPT 99310.

472.     This July 19, 2017 visit was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310.

473.     Medicare paid General Medicine, P.C. $89.98 for this July 19, 2017 visit with K.H.

**Example 8 – Nursing Home Resident E.S.**

474.     Defendant General Medicine, P.C. knowingly submitted a false claim for payment to Medicare Part B for a complex subsequent nursing home visit (CPT 99310) with E.S., a Southern Illinois nursing home resident, on July 20, 2017.

475.     This was an MMR visit reportedly performed by Greene at E.S.'s nursing home.

71

476.    Greene generated a progress note for the visit that showed he performed a comprehensive physical examination of E.S. on July 20, 2017, including inspection of her head and face, neck, breasts, and abdomen, and concluded E.S. was medically stable.

477.    Greene's progress note was a false record, because on July 20, 2017, E.S. was not present at the nursing home.

478.    From July 19-25, 2017, E.S. was being treated for an incarcerated umbilical hernia at a hospital in Southern Illinois.

479.    GM nurse practitioner Whitaker approved the order to send E.S. to the hospital on July 19, 2017.

480.    GM knew or should have known Greene did not actually examine E.S. on July 20, 2017.

481.    General Medicine, P.C. nevertheless billed Medicare for this visit on July 20, 2017 using CPT 99310.

482.    Medicare paid General Medicine, P.C. $109.37 for this July 20, 2017 visit.

**Examples 9 and 10 – Nursing Home Resident D.C.**

483.    Defendant City Medical knowingly submitted a false claim for payment to Medicare Part B for a comprehensive subsequent nursing home visit (CPT 99310) with D.C., a Louisiana nursing home resident, on August 4, 2017.

484.    This August 4, 2017 visit was an MMR, but one of the medications listed on the associated progress note had been discontinued by another GM clinician on July 28, 2017. The August 4, 2017 MMR progress note prepared by GM made no mention of the medication change or any effect it may have had on D.C.'s health.

485.    The August 4, 2017 visit resulted in no changes to D.C.'s care.

486.    GM had already performed MMR visits with D.C. on July 7 and July 14, 2017, as well as a CPR visit on July 21, 2017, and another patient visit on July 28, 2017.

487.    The MMR for D.C. on August 4, 2017, was not medically necessary or reasonable.

488.    GM knew or should have known the August 4, 2017 MMR visit with D.C. was not medically necessary or reasonable, and thus not reimbursable by Medicare.

489.    City Medical nevertheless billed Medicare for this August 4, 2017 MMR visit using CPT 99310.

490.    This August 4, 2017 visit was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310.

491.    Medicare paid City Medical $89.01 for this August 4, 2017 visit with D.C.

492.    Defendant City Medical knowingly submitted another false claim for payment to Medicare Part B for a subsequent nursing home visit (CPT 99308) with D.C. two weeks later, on August 18, 2017.

493.    This August 18, 2017 visit was a PHQ-9 depression screening visit, and the associated progress note prepared by GM contained the nine standard PHQ-9 screening questions and listed negative responses for all.

494.    The progress note documenting GM's August 18, 2017 visit also incorrectly listed the same medication that had been discontinued on July 28, 2017.

495.    Staff at the nursing facility had recently completed a PHQ-9 assessment with D.C. on August 7, 2017.

496.    GM had also completed a check-box assessment of D.C.'s depression and mood during a CPR visit it performed with D.C. on July 21, 2017.

73

497.     Conducting a separate patient visit with D.C. on August 18, 2017 solely to perform the PHQ-9 depression screening was not medically necessary or reasonable.

498.     GM knew or should have known the August 18, 2017 PHQ-9 visit with D.C. was not medically necessary or reasonable, and thus not reimbursable by Medicare.

499.     City Medical nevertheless billed Medicare for this August 18, 2017 PHQ-9 visit using CPT 99308.

500.     Medicare paid City Medical $45.10 for this August 18, 2017 visit with D.C.

**Example 11 – Nursing Home Resident R.T.**

501.     Defendant General Medicine, P.C. knowingly submitted a false claim for payment to Medicare Part B for a comprehensive subsequent nursing home visit (CPT 99310) with R.T, a Michigan nursing home resident, on August 6, 2017.

502.     This August 6, 2017 visit with R.T. was purportedly a CPR visit.

503.     According to Medicare billing records, a GM clinician had just performed an annual wellness visit with R.T. on July 24, 2017, as well as another visit on July 31, 2017.

504.     The August 6, 2017 CPR visit with R.T. was not medically necessary or reasonable.

505.     GM knew or should have known the August 6, 2017 CPR visit with R.T. was not medically necessary or reasonable, and thus not reimbursable by Medicare.

506.     General Medicine, P.C. nevertheless billed Medicare for this August 6, 2017 CPR visit using CPT 99310.

507.     This August 6, 2017 visit was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310.

508.     Medicare paid General Medicine, P.C. $104.99 for this August 6, 2017 visit with R.T.

**Examples 12 and 13 – Nursing Home Resident T.B.**

509.    Defendant Metropolis Medical knowingly submitted a false claim for payment to Medicare Part B for a subsequent nursing home visit (CPT code 99308) performed on August 9, 2017.

510.    This August 9, 2017 visit was a PHQ-9 depression screening visit, and the associated progress note prepared by GM contained the nine standard PHQ-9 screening questions.

511.    Staff at the nursing facility had recently completed a PHQ-9 assessment with D.C. on August 2, 2017.

512.    GM had also recently seen T.B. on August 3, 2017, where a different GM clinician allegedly performed a comprehensive MMR visit billed at CPT code 99310.

513.    Six days later, GM's progress note documenting GM's August 9, 2017 PHQ-9 visit indicated that the patient was already diagnosed with depression and being treated for the condition by a psychiatrist. Indeed, the note's treatment plan was simply to document that the patient was followed by the psychiatrist.

514.    Conducting a separate patient visit with D.C. on August 9, 2017 to perform the PHQ-9 depression screening was not medically necessary or reasonable.

515.    GM knew or should have known the August 9, 2017 PHQ-9 visit with T.B. was not medically necessary or reasonable, and thus not reimbursable by Medicare.

516.    Metropolis Medical nevertheless billed Medicare for this August 9, 2017 PHQ-9 visit using CPT 99308.

517.    Medicare paid Metropolis Medical $47.13 for this August 9, 2017 visit with T.B.

518.    Defendant Metropolis Medical knowingly submitted another false claim for payment to Medicare Part B for a comprehensive subsequent nursing home visit (CPT 99310) with T.B. on August 21, 2017.

75

519.     This August 21, 2017 visit was a CPR.

520.     The August 21, 2017 visit resulted in no changes to T.B.'s care.

521.     GM had already performed an MMR visit with T.B., a hospice patient, on August 3, 2017, a PHQ-9 depression screening visit on August 9, 2017, and T.B's psychiatrist visited him on August 18, 2021.

522.     The CPR for T.B. on August 21, 2017 was not medically necessary or reasonable.

523.     GM knew or should have known the August 21, 2017 CPR visit with T.B. was not medically necessary or reasonable, and thus not reimbursable by Medicare.

524.     Metropolis Medical nevertheless billed Medicare for this August 21, 2017 CPR visit using CPT 99310.

525.     This August 21, 2017 visit was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310.

526.     Medicare paid Metropolis Medical $92.96 for this August 21, 2017 visit with T.B.

**Example 14 – Nursing Home Resident R.V.**

527.     Defendant National Medical knowingly submitted a false claim for payment to Medicare Part B for a comprehensive subsequent nursing home visit (CPT 99310) with R.V, a Northern Illinois nursing home resident, on November 2, 2017.

528.     This November 2, 2017 was an MMR visit, but the associated progress note did not contain any discussion of R.V.'s medications, and GM did not order any changes to R.V.'s medication after the visit.

529.     GM had just visited R.V. the day before, on November 1, 2017, purportedly for a CPR visit.

530.     The November 1, 2017 CPR should have included a review of R.V.'s medications.

76

531.    According to Medicare billing records, GM had also visited R.V. on October 3, October 13, October 19, October 25, October 26, and October 27, 2017.

532.    The November 2, 2017 MMR progress note was identical to the progress note for another MMR visit with R.V. only a few weeks earlier, on October 19, 2017.

533.    The November 2, 2017 MMR visit with R.V. was not medically necessary or reasonable.

534.    GM knew or should have known the November 2, 2017 MMR visit with R.V. was not medically necessary or reasonable, and thus not reimbursable by Medicare.

535.    National Medical nevertheless billed Medicare for this November 2, 2017 MMR visit using CPT 99310.

536.    This November 2, 2017 visit was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310.

537.    Medicare paid National Medical $105.86 for this November 2, 2017 visit with R.V.

**Examples 15 and 16 – Nursing Home Resident G.B.**

538.    Defendant National Medical knowingly submitted a false claim for payment to Medicare Part B for a comprehensive subsequent nursing home visit (CPT 99310) with G.B., a Southern Illinois nursing home resident, on June 13, 2018.

539.    Although this was an MMR visit, the associated progress note failed to list three over-the-counter medications ordered the previous month and contained several other medication errors, including an incorrect dosage for one medication and incorrectly listing a medication that had been discontinued for over a week.

540.    GM had already completed an MMR visit with G.B. on June 4, 2018.

541.    GM had also just completed a CPR visit with G.B. on June 11, 2018.

542.    The MMR visit for G.B. on June 13, 2018, was not medically necessary or reasonable.

543.    GM knew or should have known the June 13, 2018 MMR visit with G.B. was not medically necessary or reasonable, and thus not reimbursable by Medicare.

544.    National Medical nevertheless billed Medicare for this June 13, 2018 MMR visit using CPT 99310.

545.    This June 13, 2018 visit was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310.

546.    Medicare paid GM $109.78 for the June 13, 2018 visit with G.B.

547.    Defendant National Medical knowingly submitted another false claim for payment to Medicare Part B for a comprehensive subsequent nursing home visit (CPT 99310) with G.B. on July 2, 2018.

548.    This was another MMR visit, and the associated progress note contained the same medication errors as the progress note from June 13.

549.    This was the fifth time in 30 days that National Medical billed Medicare for visiting G.B. at her nursing home. In addition to the June 4 MMR visit, the June 11 CPR visit, and the June 13 MMR visit, GM had also seen G.B. on June 18, 2018, as a follow-up to a normal lab result.

550.    The MMR for G.B. on July 2, 2018, was not medically necessary or reasonable.

551.    GM knew or should have known the July 2, 2018 MMR visit with G.B. was not medically necessary or reasonable, and thus not reimbursable by Medicare.

552.    National Medical nevertheless billed Medicare for this July 2, 2018 MMR visit using CPT 99310.

553.    This July 2, 2018 visit was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310.

554.    Medicare paid GM $93.32 for the July 2, 2018 visit with G.B.

**Examples 17, 18, and 19 – Nursing Home Resident L.B.**

555.    Defendant National Medical knowingly submitted a false claim for payment to Medicare Part B for a comprehensive subsequent nursing home visit (CPT 99310) with L.B., a Southern Illinois nursing home resident, on July 11, 2018.

556.    Although this was an MMR visit, the associated progress note failed to include three medications prescribed in June 2018 and contained several other medication errors.

557.    The visit resulted in no changes to L.B.'s care.

558.    GM had just completed an MMR with L.B. on July 2, 2018. The July 2 progress note contained the same errors as the July 11 note.

559.    The MMR for L.B. on July 11, 2018, was not medically necessary or reasonable.

560.    GM knew or should have known the July 11, 2018 MMR visit with L.B. was not medically necessary or reasonable, and thus not reimbursable by Medicare.

561.    National Medical nevertheless billed Medicare for this MMR visit on July 11, 2018 using CPT 99310.

562.    This visit on July 11, 2018 was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310.

563.    Medicare paid National Medical $109.78 for this July 11, 2018 visit.

564.    Defendant National Medical knowingly submitted another false claim for payment to Medicare Part B for a comprehensive subsequent nursing home visit (CPT 99310) with L.B. on August 13, 2018.

565.    This was a CPR visit, and the associated progress note contained multiple errors related to L.B.'s medications.

566.    The August 13 visit resulted in no changes to L.B.'s care.

567.    GM had already visited L.B. thirteen times since June 13, 2018.

568.    The CPR for L.B. on August 13, 2018 was not medically necessary or reasonable.

569.    GM knew or should have known the August 13, 2018 CPR visit with L.B. was not medically necessary or reasonable, and thus not reimbursable by Medicare.

570.    National Medical nevertheless billed Medicare for this August 13, 2018 CPR visit using CPT 99310.

571.    This August 13, 2018 visit was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310.

572.    Medicare paid National Medical $93.32 for this August 13, 2018 visit.

573.    Defendant National Medical knowingly submitted another false claim for payment to Medicare Part B for a comprehensive subsequent nursing home visit (CPT 99310) with L.B. just two days later, on August 15, 2018.

574.    This was an MMR visit, and the associated progress note contained the same medication errors as the August 13 note.

575.    The August 15 visit resulted in no changes to L.B.'s care.

576.    The MMR for L.B. on August 15, 2018, was not medically necessary or reasonable.

577.    GM knew or should have known the August 15, 2018 MMR visit with L.B. was not medically necessary or reasonable and thus not reimbursable by Medicare.

578.    National Medical nevertheless billed Medicare for this MMR visit using CPT 99310.

80

579.     This visit was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310.

580.     Medicare paid National Medical $109.78 for this August 15, 2018 visit with L.B.

**Example 20 – Assisted Living Facility Resident Y.C.**

581.     Defendant General Medicine of North Carolina knowingly submitted a false claim for payment to Medicare Part B for a comprehensive subsequent ALF visit (CPT 99337) with Y.C., a North Carolina ALF resident, on May 29, 2019.

582.     GM's May 29, 2019 visit with Y.C. was a "CPR/MMR combo" visit.

583.     GM had just performed another "CPR/MMR combo" visit with Y.C. on May 10, 2019.

584.     The CPR/MMR visit with Y.C. on May 29, 2019 was not medically necessary or reasonable.

585.     GM knew or should have known the May 29, 2019 CPR/MMR visit with Y.C. was not medically necessary or reasonable, and thus not reimbursable by Medicare.

586.     General Medicine of North Carolina nevertheless billed Medicare for this May 29, 2019 CPR/MMR visit using CPT 99337.

587.     This visit on May 29, 2019 was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99337.

588.     Medicare paid General Medicine of North Carolina $152.00 for this May 29, 2019 visit.

589.     On or about June 5, 2019, GM created a spreadsheet identifying duplicate CPRs performed in the same month for the same patient, including Y.C.'s duplicate CPR/MMR combo visits in May 2019.

590.    GM noted on the spreadsheet that Y.C. had "MCR", meaning that Y.C. was a Medicare beneficiary.

591.    Y.C.'s health insurer was important to GM because GM's policy dictated that Medicare beneficiaries receive separate CPRs and MMRs each month, while Medicaid patients receive one CPR/MMR combo visit per month.

592.    GM then determined that the progress notes for Y.C.'s duplicative CPR/MMR combo visits should be altered to remove MMR as the reason for the first visit and to remove CPR as the reason for the second visit. These changes would make it appear as though the May 10, 2019 visit was solely a CPR and the May 29, 2019 visit was solely an MMR, concealing the fact that the May 29, 2019 visit was duplicative and unnecessary.

593.    By failing to refund the Government for the May 29, 2019 CPR/MMR visit with Y.C. and altering the progress notes describing the services rendered, General Medicine, P.C. and General Medicine of North Carolina knowingly failed to satisfy a payment obligation to Medicare and knowingly and improperly avoided their obligation to repay Medicare for the false and fraudulent claim for reimbursement.

## IX.    PROSE ORCHESTRATED GM'S FRAUDULENT POLICIES AND PROFITED FROM THE RESULTS.

594.    As the owner, President, and Senior Medical Director of General Medicine, P.C., as well as the owner and President of the GM Shell Entities, Prose directly participated in GM's healthcare fraud scheme.

595.    Prose created and implemented the GM policies discussed above that caused the submission of medically unnecessary and upcoded claims.

596.     Prose established or approved GM's policies requiring clinicians perform monthly CPRs, MMRs, and other "regulatory" visits for all Medicare patients, regardless of medical necessity.

597.     Prose received regular updates tracking the number of visits performed.

598.     Prose directly and indirectly pressured employees to meet targeted numbers for visits, regardless of medical necessity.

599.     Prose kept a firm grip over General Medicine, P.C. and the GM Shell Entities, and most significant decisions were made or approved by him.

600.     Prose knew General Medicine, P.C. and the Defendant GM Shell Entities submitted false claims to Medicare for services that were not medically necessary and/or upcoded.

601.     Prose was aware of most, if not all, complaints about the frequency and necessity of GM's patient visits from employees, patient families, and nursing facilities.

602.     Prose knew reviews by Medicare contractors denied or downcoded GM's claims.

603.     Prose knew the Medicare Appeals Council issued decisions holding GM's monthly CPRs were not medically necessary and should not have been billed to Medicare using CPT 99310.

604.     As the sole owner of General Medicine, P.C. and the GM Shell Entities, Prose profited from the millions of dollars paid by Medicare for the false claims submitted by GM.

605.     Prose is liable for the fraudulent conduct attributed to GM.

## COUNT I
## PRESENTING AND CAUSING FALSE CLAIMS
### 31 U.S.C. § 3729(a)(1)(A)
### Against All Defendants

606.     Plaintiff realleges and incorporate Paragraphs 1 through 605 as though fully set forth herein.

607.    Through the acts described above, Defendants presented and caused to be presented false and fraudulent claims for payment and approval to the United States.

608.    General Medicine, P.C., through its employees and agents acting on its behalf, caused the presentment of false and fraudulent claims by the GM Shell Entities to Medicare. General Medicine, P.C. did this by establishing policies and practices about the type and frequency of the visits that had to be performed and by controlling the billing of those visits to Medicare.

609.    The false and fraudulent claims that were presented or caused to be presented to Medicare were for GM patient visits that were not provided, not medically necessary, and/or upcoded.

610.    The false and fraudulent claims expressly and impliedly certified the services were medically necessary, and these certifications were material to the United States' payment of the claims.

611.    The false and fraudulent claims misrepresented the services performed by upcoding the CPT codes listed on the claims, and the false CPT codes were material to the United States' payment of the claims.

612.    If Medicare had known GM's claims were for services that were not provided, not medically necessary, and/or upcoded, they would not have paid the claims that GM presented and caused to be presented for those visits.

613.    Each of the claims for payment submitted or caused to be submitted by Defendants for each service identified in this Complaint is a separate false or fraudulent claim.

614.    Defendants knew such claims were false or acted in deliberate indifference or reckless disregard as to the falsity of the claims.

84

615.    Medicare paid the false and fraudulent claims presented and caused to be presented by Defendants and thereby incurred damages.

616.    Plaintiff is entitled to statutory damages under the False Claims Act in an amount to be determined at trial, plus a civil penalty for each false claim submitted.

## COUNT II
## MAKING OR USING A FALSE RECORD OR STATEMENT
### 31 U.S.C. § 3729(a)(1)(B)
### Against All Defendants

617.    Plaintiff realleges and incorporate Paragraphs 1 through 605 as though fully set forth herein.

618.    Through the acts described above, Defendants knowingly made, used, and caused to be made and used, false records and statements material to the false and fraudulent claims for reimbursement they submitted to Medicare for GM's visits.

619.    Defendants made, used, and caused to be made numerous false records and statements in electronic claims submitted to CMS. Defendants falsely certified that claims to Medicare for GM's visits complied with applicable laws, regulations, and program instructions for payment, including the representations that the services were medically necessary and met the requirements of the CPT codes billed. Defendants submitted and caused the submission of these material false records and statements.

620.    Defendants also made, used, and caused to be made numerous false records and statements contained in the progress notes for GM's visits. The progress notes prepared by GM were material to the false and fraudulent claims submitted for reimbursement to Medicare.

621.    Medicare paid such false and fraudulent claims because of the acts and conduct of the Defendants.

622. If Medicare had known of the false records and statements made and caused to be made by Defendants, they would not have paid the false claims submitted by Defendants for GM's visits.

623. As a result of the false records or statements made, used, and caused to be made and used by Defendants, Medicare paid the false claims and thereby incurred damages.

624. Plaintiff is entitled to statutory damages under the False Claims Act in an amount to be determined at trial, plus a civil penalty for each false claim submitted.

**COUNT III**
**CONSPIRACY**
**31 U.S.C. § 3729(a)(1)(C)**
**Against General Medicine, P.C., General Medicine of Illinois Physicians, P.C., General Medicine of North Carolina, P.C., Advanced Medical Haggerty Partners, P.A., Borough Medical Partners, P.A., Centro Medical Partners, P.A., City Medical Partners, P.A., Integrated Medical Partners, P.A., Metro Medical Haggerty Partners, P.A., Metropolis Medical Partners, P.A., Metropolis Medical Partners, P.A., National Medical Partners, P.A., New Castle Haggerty Medical Partners, P.A., Regional Medical Partners, P.A., Sigma Haggerty Medical, P.A., Silverton Medical Partners, P.A., Statewide Medical Partners, P.A., Vicinity Medical Partners, P.A., and Westco Haggerty Medical Partners, P.A.**

625. Plaintiff realleges and incorporate Paragraphs 1 through 605 as though fully set forth herein.

626. Through the acts described above, and to the extent the named Defendants were not acting as agents on behalf of General Medicine, P.C., the Defendants named in this Count III entered into agreements among each other and conspired to defraud Medicare by presenting and causing to be presented false and fraudulent claims for services that were not provided, not medically necessary, and upcoded.

627. Through the acts described above, the named Defendants entered into agreements among each other and conspired to defraud the Government by making, using, and causing to be made and used, false records and statements material to the false and fraudulent claims for

86

reimbursement they submitted to Medicare for services that were not provided, not medically necessary, and upcoded.

628.    The named Defendants performed acts in furtherance of these conspiracies by, among other things, creating and enforcing policies and practices causing clinicians employed by them and other GM Shell Entities to perform "regulatory" and "company" visits to nursing home and ALF residents that were not provided, not medically necessary, and did not meet the requirements of the billing code selected.

629.    The named Defendants acted in furtherance of these conspiracies by submitting claims to Medicare for services performed by the GM Shell Entities at the direction of General Medicine, P.C. and conspired to spread the claims for reimbursement across multiple Defendants to avoid detection in CMS reviews and circumvent General Medicine, P.C.'s 2017 revocation from the Medicare program.

630.    The Defendants named in Count III conspired for the purpose of fraudulently obtaining payment from the Government based on false claims and false records.

631.    The United States suffered damages as a result of Defendants' conspiracies.

**COUNT IV**
**CONCEALING AND AVOIDING AN OBLIGATION TO PAY**
**31 U.S.C. § 3729(a)(1)(G)**
**Against All Defendants**

632.    Plaintiff realleges and incorporate Paragraphs 1 through 605 as though fully set forth herein.

633.    Through the acts described above, Defendants knowingly made, used, and caused to be made and used, false records and statements material to an obligation to pay money to the Government, and knowingly concealed and knowingly and improperly avoided and decreased an

obligation to pay money to the Government for the false and fraudulent claims for reimbursement they submitted to Medicare for GM's visits.

634.    Defendants made, used, and caused to be made numerous false records and statements in the electronic claims submitted to CMS.

635.    Defendants made, used, and caused to be made false certifications in claims to Medicare that GM's visits complied with applicable laws, regulations, and program instructions for payment, including the representations that the services were medically necessary and met the requirements of the CPT codes billed.

636.    Defendants submitted and caused the submission of these material false records and statements.

637.    Defendants also made, used, and caused to be made numerous false records and statements contained in the progress notes for GM's visits.

638.    The progress notes prepared by GM were material to the false and fraudulent claims submitted for reimbursement to Medicare.

639.    Medicare paid such false and fraudulent claims because of the acts and conduct of the Defendants.

640.    If Medicare had known of the false records and statements made and caused to be made by Defendants, they would not have paid the false claims submitted by Defendants for GM's visits.

641.    As a result of the false records and statements made, used, and caused to be made and used by Defendants, Medicare paid the false claims and thereby incurred damages.

642.     Defendants had an affirmative obligation to pay back to the Government the money Defendants knowingly received for those false and fraudulent claims within 60 days of identifying the overpayment. 42 U.S.C. 1320a-7k(d).

643.     Instead of repaying the money, Defendants knowingly concealed and knowingly and improperly avoided and decreased their obligation to repay the Government for the false and fraudulent claims for reimbursement they submitted to Medicare.

644.     Plaintiff is entitled to statutory damages under the False Claims Act in an amount to be determined at trial, plus a civil penalty for each false claim Defendants knowingly failed to repay.

**COUNT V**
**COMMON LAW FRAUD**
**Against All Defendants**

645.     Plaintiff realleges and incorporate Paragraphs 1 through 605 as though fully set forth herein.

646.     As set forth in detail above, for the relevant time period, Defendants made numerous material false statements to Medicare concerning the services provide to Medicare beneficiaries and by submitting claims for services that were not provided, not medically necessary, and upcoded.

647.     Defendants knew or should have known the claims submitted to Medicare were false.

648.     Defendants made such materially false statements with the intent to defraud Medicare, knowing Medicare would rely on their materially false statements in determining whether to pay the claims submitted.

649.     Medicare reasonably relied on Defendants' material misrepresentations.

89

650.     Plaintiff was injured because of Defendants' unlawful conduct in an amount to be proven at trial.

## COUNT VI
## PAYMENT BY MISTAKE OF FACT
### Against All Defendants

651.     Plaintiff realleges and incorporate Paragraphs 1 through 605 as though fully set forth herein.

652.     Medicare paid claims submitted by General Medicine, P.C. and the GM Shell Entities for services that were not performed, not medically necessary, and upcoded.

653.     Defendants made false representations and records concerning the services billed to Medicare and the actual performance of the services billed, which were material to Medicare's determination to reimburse General Medicine, P.C. and the GM Shell Entities for the services billed.

654.     Medicare would not have paid the false claims had they known the medical services billed in the claims were not performed, medically unnecessary, and upcoded.

655.     Medicare relied upon the representation and records made by Defendants concerning the medical necessity and actual performance of the medical services billed and paid the claims, thereby resulting in damages to the Plaintiff in an amount to be determined at trial.

## COUNT VII
## UNJUST ENRICHMENT
### Against All Defendants

656.     Plaintiff realleges and incorporate Paragraphs 1 through 605 as though fully set forth herein.

657.     Medicare paid claims submitted by General Medicine, P.C. and the GM Shell Entities for services that were not performed, not medically necessary, and/or upcoded.

658.    Defendants were unjustly enriched by these payments.

659.    In paying the claims submitted by General Medicine, P.C. and the GM Shell Entities, Plaintiff conferred a benefit on the Defendants.

660.    Defendants knew or should have known they were receiving reimbursement for false or fraudulent claims, in violation of the conditions of payment prescribed by Medicare.

661.    By causing Medicare to reimburse claims for falsely or fraudulently billed services, and by the receipt of those funds, the Defendants have been unjustly enriched and are liable to pay such amounts, which will be determined at trial, to the Plaintiff.

## PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE Plaintiff United States demands judgment as follows:

a.    On Counts I and II (False Claims Act), against all Defendants jointly and severally, for the amount of the United States' damages, trebled as required by law, together with the maximum civil penalties allowed by law, costs, post-judgment interest, and such other and further relief as the Court may deem appropriate;

b.    On Count III (False Claims Act Conspiracy), against Defendants General Medicine, P.C., General Medicine of Illinois Physicians, P.C., General Medicine of North Carolina, P.C., Advanced Medical Haggerty Partners, P.A., Borough Medical Partners, P.A., Centro Medical Partners, P.A., City Medical Partners, P.A., Integrated Medical Partners, P.A., Metro Medical Haggerty Partners, P.A., Metropolis Medical Partners, P.A., Metropolis Medical Partners, P.A., National Medical Partners, P.A., New Castle Haggerty Medical Partners, P.A., Regional Medical Partners, P.A., Sigma Haggerty Medical, P.A., Silverton Medical Partners, P.A., Statewide Medical Partners, P.A., Vicinity Medical Partners, P.A., and Westco Haggerty Medical Partners, P.A., jointly and severally, for the amount of the United States' damages, trebled as required by

91

law, together with the maximum civil penalties allowed by law, costs, post-judgment interest, and such other and further relief as the Court may deem appropriate;

  c. On Count IV (Concealing and Avoiding an Obligation to Pay), against all Defendants jointly and severally, for the amount of the United States' damages, trebled as required by law, together with the maximum civil penalties allowed by law, costs, post-judgment interest, and such other and further relief as the Court may deem appropriate;

  d. On Count V (Common Law Fraud), against all Defendants jointly and severally, for an amount equal to the United States' damages from each of them, plus costs, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate;

  e. On Count VI (Payment By Mistake), against all Defendants jointly and severally, for an amount equal to the United States' damages from each of them, plus costs, pre-and post-judgment interest, and such other and further relief as the Court may deem appropriate; and,

  f. On Count VII (Unjust Enrichment), against all Defendants jointly and severally, for an amount equal to the monies Defendants obtained from the United States without right and by which Defendants have been unjustly enriched, plus costs, pre-and post-judgment interest, and such other and further relief as the Court may deem appropriate.

**JURY DEMAND**

Plaintiff United States of America hereby demands a trial by jury.

92

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney

NATHAN E. WYATT
LAURA J. BARKE
Assistant United States Attorneys
9 Executive Drive
Fairview Heights, IL 62280
Tel: 618.628.3700
Fax: 618.628.3810
nathan.wyatt@usdoj.gov
laura.barke@usdoj.gov

*Attorneys for the United States of America*