IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

     Plaintiff,

                                    No. 22-cv-651

v.

GENERAL MEDICINE, P.C.,
GENERAL MEDICINE OF ILLINOIS PHYSICIANS, P.C.,
GENERAL MEDICINE OF NORTH CAROLINA, P.C.,
ADVANCED MEDICAL HAGGERTY PARTNERS, P.A.,
BOROUGH MEDICAL PARTNERS, P.A.,
CENTRO MEDICAL PARTNERS, P.A.,
CITY MEDICAL PARTNERS, P.A.,
INTEGRATED MEDICAL PARTNERS, P.A.,
METRO MEDICAL HAGGERTY PARTNERS, P.A.,
METROPOLIS MEDICAL PARTNERS, P.A.,
NATIONAL MEDICAL PARTNERS, P.A.,
NEW CASTLE HAGGERTY MEDICAL PARTNERS, P.A.,
REGIONAL MEDICAL PARTNERS, P.A.,
SIGMA HAGGERTY MEDICAL, P.A.,
SILVERTON MEDICAL PARTNERS, P.A.,
STATEWIDE MEDICAL PARTNERS, P.A.,
VICINITY MEDICAL PARTNERS, P.A.,
WESTCO HAGGERTY MEDICAL PARTNERS, P.A., and
THOMAS M. PROSE,

     Defendants.

---

**MOTION TO DISMISS (1) PLAINTIFF'S COMPLAINT WITH
RESPECT TO CLAIMS THAT DEFENDANTS ENGAGED IN UPCODING AND (2)
ALL CLAIMS WITH RESPECT TO VARIOUS DEFENDANTS**

**ORAL ARGUMENT REQUESTED**

Defendants, through their attorneys, respectfully move this Court to dismiss the complaint

with respect to the claims that Defendants engaged in so-called "upcoding" of medical bills

submitted to Medicare.  Defendants also move to dismiss all claims against Defendants General

Medicine of Illinois Physicians, P.C., Advanced Medical Haggerty Partners, P.A., Borough

Medical Partners, P.A., Centro Medical Partners, P.A., Integrated Medial Partners, P.A., Metro

Medical Haggerty Partners, P.A., New Castle Haggerty Medical Partners, P.A., Regional Medical

Partners, P.A., Silverton Medical Partners, P.A., Statewide Medical Partners, P.A., Vicinity

Medical Partners, P.A., and Westco Haggerty Medical Partners, P.A.  In support of the motion,

Defendants rely on the facts and arguments set forth in the accompanying brief.

WHEREFORE, Defendants respectfully request that this Court dismiss the Complaint for

the reasons set in the accompanying brief.

Respectfully submitted,

**SANDBERG PHOENIX & von GONTARD P.C.**

By:/s/ a. Courtney Cox
  A. Courtney Cox
  Attorneys for Defendants
  1405 West Main Street
  Carbondale, IL 62901
  618-351-7200
  ccox@sandbergphoenix.com

**CLARK HILL PLC**

By:/s/ David F. Hansma
  David F. Hansma *pro hac vice*
  Attorneys for Defendants
  151 S. Old Woodward Ave, Suite 200
  Birmingham, MI  48009
  (248) 988-5877
Dated: July 7, 2022  dhansma@clarkhill.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

      Plaintiff,

                                         No. 22-cv-651

v.

GENERAL MEDICINE, P.C.,
GENERAL MEDICINE OF ILLINOIS PHYSICIANS, P.C.,
GENERAL MEDICINE OF NORTH CAROLINA, P.C.,
ADVANCED MEDICAL HAGGERTY PARTNERS, P.A.,
BOROUGH MEDICAL PARTNERS, P.A.,
CENTRO MEDICAL PARTNERS, P.A.,
CITY MEDICAL PARTNERS, P.A.,
INTEGRATED MEDICAL PARTNERS, P.A.,
METRO MEDICAL HAGGERTY PARTNERS, P.A.,
METROPOLIS MEDICAL PARTNERS, P.A.,
NATIONAL MEDICAL PARTNERS, P.A.,
NEW CASTLE HAGGERTY MEDICAL PARTNERS, P.A.,
REGIONAL MEDICAL PARTNERS, P.A.,
SIGMA HAGGERTY MEDICAL, P.A.,
SILVERTON MEDICAL PARTNERS, P.A.,
STATEWIDE MEDICAL PARTNERS, P.A.,
VICINITY MEDICAL PARTNERS, P.A.,
WESTCO HAGGERTY MEDICAL PARTNERS, P.A., and
THOMAS M. PROSE,

      Defendants.

---

## BRIEF IN SUPPORT OF MOTION TO DISMISS

### ORAL ARGUMENT REQUESTED

## INTRODUCTION

This case arises from the government's claim that Defendants ("General Medicine") violated, among other things, the False Claims Act through the submission of false Medicare billings. The complaint alleges that General Medicine's billings were false because "the associated patient visits were either not performed, not medically necessary, or insufficient to meet the requirements of the billing code for which reimbursement was received," i.e. were "upcoded." [Dkt. # 1, ¶ 2]. The complaint focuses on procedures it refers to as Care Plan Reviews ("CPRs") and Monthly Medication Reviews ("MMRs") and alleges that General Medicine upcoded the claims for these procedures to the highest CPT billing code available, 99310. Pursuant to Fed. R. Civ. P. 12(b)(6), General Medicine now moves to dismiss the claims in the complaint alleging fraud based on upcoding

The government's claim that General Medicine engaged in upcoding should be dismissed because the claim is not pled with particularity. The complaint makes sweeping, conclusory allegations that General Medicine "systematically" upcoded claims submitted to Medicare and had a company policy to always bill CPRs and MMRs at the 99310 level. The complaint also alleges that General Medicine billed at this level "even though GM knew that the purported services being provided did not meet the codes' requirements and should have been billed, if at all, using a lower code for a less complex visit." [Dkt. # 1, ¶ 256]. But the complaint does not set forth particular facts to substantiate the claim that these visits were upcoded, or that General Medicine knew they were upcoded. The complaint does not analyze the claims at a transaction level to show how they fail to meet the coding requirements for 99310, or to show that General Medicine knew the coding requirements were not met. Nor does the complaint allege particular facts to support its allegation that General Medicine had a policy instructing clinicians to bill at the 99310 level.

Instead, the complaint relies on allegations of prior instances in which General Medicine's claims were downcoded by Medicare contractors or adjudicators in order to substantiate its claim of fraud.  But the complaint does not plead particular facts showing that those prior downcodes resulted from fraud instead of, for example, a lack of proper documentation or simply good faith disagreement between General Medicine's clinicians and the contractors regarding the subjective interpretation of the CPT code requirements.

In short, the government hopes to jump from sweeping allegations of a policy of upcoding to allegations of prior instances of downcodes to the conclusion of fraud without providing particular facts that would connect these dots.  This effort fails to state a claim upon which relief can be granted.  This is especially true because, as explained below, the complaint:

- Undercuts its own claim by alleging that the clinicians themselves selected the level of code to bill;

- Never alleges that General Medicine or its billers changed the codes selected by the clinicians;

- Never alleges any incentive for clinicians to upcode;

- Never provides any facts showing clinicians were pressured to bill at 99310;

- Never analyzes the CPT code requirements to show how any particular claim fails to meet those requirements; and

- Never pleads facts showing that General Medicine knew, at the time claims were submitted, that any claims billed at 99310 did not meet the requirements.

Defendants request that this Court dismiss the government's claims relating to upcoding.

Defendants also request that this Court dismiss the claims against Defendants General Medicine of Illinois Physicians, P.C., Advanced Medical Haggerty Partners, P.A., Borough Medical Partners, P.A., Centro Medical Partners, P.A., Integrated Medial Partners, P.A., Metro Medical Haggerty Partners, P.A., New Castle Haggerty Medical Partners, P.A., Regional Medical

Partners, P.A., Silverton Medical Partners, P.A., Statewide Medical Partners, P.A., Vicinity Medical Partners, P.A., and Westco Haggerty Medical Partners, P.A. because the Complaint improperly uses "group pleading" with respect to these defendants and fails to identify specific fraudulent conduct engaged in by these Defendants.

## FACTUAL BACKGROUND

### A.    Background on General Medicine and the Medicare Claims at Issue

General Medicine is in the business of providing post-hospitalist physicians and geriatric nurse practitioners to nursing homes and skilled nursing facilities.  [Dkt. # 1, ¶¶ 58-59].  As part of that business, General Medicine submits claims to Medicare for the medical services provided by its clinicians.  The complaint alleges that General Medicine "invented several so-called 'regulatory' visits and required [its] clinicians to perform them at regular intervals[.]"  [Dkt. # 1, ¶ 123].  The complaint claims that these "regulatory" visits, along with other visits, resulted in General Medicine "excessively billing Medicare for medically unnecessary, duplicative, and unreasonable patient visits each month."  [Dkt. # 1, ¶ 126].

The main "regulatory" visits at issue are referred to in the complaint as Care Plan Reviews ("CPRs") and Monthly Medication Reviews ("MMRs").  [Dkt. # 1, ¶ 131].  The complaint takes a shotgun approach in its attacks on the performance of these regulatory visits, alleging that they were either not medically necessary, were performed more often than was medical necessary, or were upcoded (which essentially means that the patient encounter was billed at a higher coding level than appropriate).  According to the complaint, General Medicine "routinely billed Medicare for MMRs and CPRs using the highest billing codes available, CPT 99310 and 99337, even though GM knew that the purported services being provided did not meet the codes' requirements and should have been billed, if at all, using a lower code for a less complex visit."  [Dkt. # 1, ¶ 256].

3

The complaint sets forth twenty alleged "Examples of False Claims," in which it repeatedly states, "This [] visit was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310."  [Dkt. # 1, ¶¶ 406, 417, 444, 453, 472, 490, 507, 525, 536, 545, 553, 562, 571, 579, 587].

### B.    The CPT Code Requirements

According to the complaint, the various CPT code billing requirements are as follows:

- CPT 99307 requires: "a face-to-face visit with the patient containing at least two of the following three components: (a) problem-focused interval history; (b) a problem-focused examination of the patient; and (c) straightforward medical decision making."  [Dkt. # 1, ¶ 106].

- CPT 99308 requires "a face-to-face visit with the patient containing at least two of the following three components: (a) an expanded, problem-focused interval history; (b) an expanded, problem-focused examination of the patient; and (c) medical decision-making of low complexity."  [Dkt. # 1, ¶ 107].

- CPT 99309 requires "a face-to-face visit with the patient containing at least two of the following three components: (a) a detailed interval history; (b) a detailed examination of the patient; and (c) medical decision-making of moderate complexity."  [Dkt. # 1, ¶ 108].

- CPT 99310 requires "a face-to-face visit with the patient containing at least two of the following three components: (a) a comprehensive interval history, including an extended history of present illness, a complete past, family, and social history, and a complete review of at least ten body systems directly related to the identified problems; (b) a comprehensive physical examination of the patient; and (c) medical decision-making of high complexity." [Dkt. # 1, ¶ 109].

While the complaint alleges that patients subject to these face-to-face visits "usually" exhibit certain conditions depending on the code (e.g., "stable," "significant complication," "unstable," etc.), there is no allegation in the complaint that the CPT codes *require* these conditions.  Instead, the only requirements alleged in the complaint for billing at the specific CPT codes are a history, physical examination, and medical decision-making of specific complexity (only two out of the three of which are required).  [Dkt. # 1, ¶¶ 106-09].

4

Similarly, while the complaint alleges various "approximate" amounts of time that each type of visit is "estimated to take," there is no allegation in the complaint that the examination must take a certain amount of time, nor that CMS reviews time when considering whether to pay a claim or audits time to determine whether coding was correct. [Dkt. # 1, ¶¶ 106-09]. Moreover, the complaint does not allege that the amount of time spent is material or that the government considers the amount of time spent as a factor determining whether to approve and pay for the patient encounter under these codes.

## LEGAL STANDARDS

### A.      Rule 8(a) Requires that the Government State a Plausible Claim for Relief

Rule 12(b)(6) provides for dismissal if a plaintiff fails to state a claim upon which relief can be granted. A motion to dismiss for failure to state a claim is analyzed under the "plausibility" standard. See *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). In order to avoid dismissal, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, supra* at 678. "In application, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Percival v. Girard*, 692 F. Supp. 2d 712, 718 (E.D. Mich. 2010) (cleaned up).

"Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal, supra* at 678 (cleaned up). The allegations of the complaint "must establish a nonnegligible probability that the claim is valid." *In re Text Messaging Antitrust Litig*., 630 F.3d 622, 629 (7th Cir. 2010).

In deciding the motion, this Court must "accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff." *Reilly v. Vadlamudi*, 680 F.3d 617, 622-23 (6th Cir. 2012). But a complaint must contain more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* (citation omitted). Conclusory allegations are not assumed to be true. *United States ex rel. Gravett, supra*.

Generic allegations against all "defendants" are insufficient. *See, e.g., In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009). A complaint must allege sufficient "specifics as to the role each [defendant] played in the alleged conspiracy." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008).

### B.     Rule 9 Requires Pleading Fraud with Particularity to Protect Defendants from Unsubstantiated Claims of Fraud

In addition to the Rule 8 requirements of plausibility, the complaint must also satisfy the heightened pleading requirements for pleading fraud. The heightened pleading standards exist because public charges of fraud can do great harm to the reputation of a business or individual. *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999).

Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." This means the plaintiff "must state the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation as communicated to the plaintiff[.]" *United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 705 (7th Cir. 2015). Further, the government must plead its claims "at the individual transaction level." *United States ex rel. Fowler v. Caremark RX, LLC*, 496 F.3d 730, 742 (7th Cir. 2007). "To survive a motion to dismiss, [plaintiffs] must at a minimum plead transaction-level details evidencing violations of" the False Claims Act. *United States ex rel. Sibley v. University of Chicago Medical Center*, 2021 WL 3290964 at \*6 (N.D. Ill. Aug. 2, 2021). (Exhibit 1).

C.      **Requirements of a False Claims Act Claim**

The complaint alleges liability under four subsections of the False Claims Act, 31 U.S.C.

§ 3729(a)(1)(A), (B), (C), and (G).  The Act makes it unlawful knowingly (1) to present or cause

to be presented a false or fraudulent claim for payment to the United States, (2) to make or use a

false record or statement material to a false or fraudulent claim, or (3) to use a false record or

statement to conceal or decrease an obligation to pay money to the United States. *United States ex*

*rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011). A successful claim

requires proof both that the defendant made a statement to receive money from the government

and that he made that statement knowing it was false. *Id.*

## ARGUMENT

I.      **PLAINTIFF'S CLAIMS RELATING TO UP-CODING SHOULD BE DISMISSED**

A.      **The Complaint Fails to Allege a Policy of Upcoding**

The complaint starts its upcoding allegations by claiming that General Medicine instructed

clinicians that CPRs and MMRs should always be billed at 99310.  This claim is not supported by

particular facts and is contradicted by other allegations of the complaint.

### 1.      The Complaint Fails to Plead Particular Facts Showing Clinicians were Instructed to Bill CPRs and MMRs at the 99310 Level

The complaint claims, "Through its company policies and guidance, GM instructed its

clinicians that CPRs and MMRs were 'Level 3' visits and should always be billed at CPT 99310

or 99337, depending on the facility setting."  [Dkt. # 1, ¶ 259]. This allegation—unadorned with

any factual content beyond a bald assertion—fails to plead fraud with particularity.  *See A.G. ex*

*rel. Maddox v. v. Elsevier, Inc.*, 732 F.3d 77, 81 (1st Cir. 2013) ("When allegations, though

disguised as factual, are so threadbare that they omit any meaningful factual content, we will treat

them as what they are: naked conclusions.").  Among other things, the allegation does not allege

which company policies or guidance contain this instruction, who issued or authored the policies and guidance, when they were authored, how they were communicated to clinicians, or even the specific wording of the alleged instruction.  Without this type of detail, the complaint fails to allege the circumstances constituting fraud with particularity.  *See Sanford-Brown, Ltd*., 788 F.3d at 705 (holding that the complaint "must state the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation as communicated to the plaintiff[.]").  The complaint must use some "means of injecting precision and some measure of substantiation into [its] allegations of fraud."  *United States ex rel. Schagrin v. LDR Industries, LLC*, 2018 WL 6064699 at *2 (N.D. Ill. Nov. 20, 2018). (Exhibit 2).  Here, the allegation of an instruction to clinicians to bill CPRs and MMRs at 99310 is unsupported by any substantiation.

An instructive case is *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770 (7th Cir. 2016), in which the Seventh Circuit held that the plaintiff had sufficiently alleged a false claim with respect to the use of CPT code 90801:

> According to the complaint, this code is only meant to apply to full psychological assessments by a therapist or an evaluation by a psychiatrist. Ms. Presser alleges that her superiors directed her to use this code even though they also "expressly told [her] to discontinue conducting" psychiatric evaluations. She also alleges that receptionists and medical nurse practitioners used this code, even though their job description clearly does not include psychological assessments. The clinic director indicated to Ms. Presser that the use of this specific code was the policy and that Mr. Freund wanted these policies in place. Acacia mandated that all patients be assessed by a receptionist, nurse practitioner, and medical nurse practitioner, and each of these encounters were billed separately. These allegations state clearly and specifically that Acacia provided non-psychiatric evaluations and then falsely presented those services as psychiatric evaluations on bills to the state and federal governments.  [*Id*. at 778].

Here, the complaint does not contain anywhere near the level of detail described above.

Unlike in *Presser*, the complaint does not identify any clinicians who claim to have been "directed"

8

to code CPRs and MMRs only at the 99310 level.  Nor does it identify a clinical director or similar employee who purportedly communicated such a directive.  Nor does it identify a written policy or guidance containing this instruction.  See *United States ex rel. Hilliard v. Hardin House Inc*., 2020 WL 362796 at *2-3 (N.D. Ill. Jan. 22, 2020) (distinguishing *Presser*.) (Exhibit 3).

### 2.     The Allegations Contradict the Claim of Upcoding

The complaint also contains multiple admissions that undercut the plausibility of its claim that General Medicine had a policy of upcoding.  First, the complaint alleges only that General Medicine "routinely" billed CPRs and MMRs at 99310.  [Dkt. # 1, ¶ 256].  There is no allegation that GM exclusively billed at 99310.  If General Medicine had a scheme to upcode, and if it instructed clinicians to bill CPRs and MMRs at the 99310 level, why are not all CPRs and MMRs billed at 99310?  The complaint gives no explanation.

Second, the complaint admits that it was the General Medicine clinicians who "selected the level of service provided when reporting the visit to [General Medicine.]"  [Dkt. # 1, ¶ 261].  In other words, the facts alleged show that it was the clinicians—apparently exercising their medical judgment and relying on the CPT code requirements described above[1]—who reported to General Medicine what level of service they provided to the beneficiaries.  There is no allegation in the complaint that General Medicine or its billers ever changed any codes after they were submitted by the clinician, and the clinicians' judgments as to the complexity and comprehensiveness of their services cannot be "false" for purposes of the FCA.  *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 335 F.3d 370, 376 (5th Cir. 2004) (holding that

---

[1] "When reviewing a motion to dismiss, a court generally considers the factual allegations of the complaint and any reasonable inferences that can be drawn from those allegations."  *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1113 n.1 (7th Cir. 2013).

31592\440601\267680515.v1-6/30/22

"expressions of opinion of scientific judgments about which reasonable minds may differ" cannot be "'false' for purposes of the FCA.").

Notably, the complaint also does not allege that clinicians had any incentive to bill at a higher level than appropriate.  The complaint claims that General Medicine "incentivized its clinicians through compensation to perform as many patient visits as possible."  [Dkt. # 1, ¶ 192].  But there is no similar allegation that the clinicians' compensation was tied in any way to the CPT code they billed for those visits.

### 3.   The Complaint's Claim of Pressure on Clinicians is Supported by no Particularity and is Undercut by the Facts Alleged

Instead, the complaint claims, without any factual elaboration, that General Medicine would "pressure clinicians to change" the level of billing to a higher level.  [Dkt. # 1, ¶ ].  But the complaint does not provide a single example of such pressure.  This mere allegation of "pressure," without more, does not even satisfy the Rule 8 pleading standards, much less the heightened pleadings requirements of Rule 9.  *Schagrin, supra*.

In *United States v. Baylor Scott & White Health*, 2019 WL 3713756 (W.D. Tex. Aug. 5, 2019), aff'd sub nom., 816 F. App'x 892 (5th Cir. 2020) (Exhibit 4), the plaintiff alleged that the defendant's "'medical coders then began to increasingly receive pressure directly from ... leadership to code unethically' and that one former medical coder quit because she 'was continually getting directives to compromise her integrity.'"  *Id*. at *5.  The District Court held that these allegations did not state a claim: "[T]hese allegations do not specify what the pressure was, who applied the pressure, or how the desired coding was unethical or fraudulent, and does not give any specific examples of any requests for unethical, inappropriate, or fraudulent coding. Such 'naked assertions devoid of further factual enhancement' are insufficient under Rule 8's pleading standards."  *Id*. (citation omitted).

Here, the complaint's allegation of "pressure" in paragraph 261 is not only a naked assertion, it is contradicted by the example described in the next five paragraphs of the complaint in which General Medicine specifically <u>did not</u> upcode a clinician's bill.  In those paragraphs, the complaint describes communications between nurse practitioner Tracy Dietz and clinical coordinator Kathy Stieb regarding a patient visit performed by physician D'Andrienne Jones.  Rather than show evidence of upcoding, the complaint alleges that General Medicine billed the visit at the 99309 level selected by Dr. Jones.  [Dkt. #1, ¶ 266].  While the government may believe that General Medicine engaged in wrongful conduct to allow it's clinicians to visit the patient more than necessary, the facts alleged do not show that those visits were upcoded.

### 4.    The Allegations Relating to the Twenty Exemplar Claims Are Equally Devoid of Particular Facts Constituting Fraud

The complaint's other examples of supposed up-coding also do not contain any particularity.  The complaint sets forth twenty alleged "Examples of False Claims."  In pleading these examples, the complaint repeatedly and formulaically states, "This [] visit was also upcoded, as GM knew or should have known whatever services may have been rendered did not meet the requirements for CPT 99310."  [Dkt. # 1, ¶¶ 406, 417, 444, 453, 472, 490, 507, 525, 536, 545, 553, 562, 571, 579, 587].  But no facts are alleged showing how these visits failed to "meet the requirements for CPT 99310."  Remember, the complaint alleges that a 99310 visit requires "at least two of the following three components: (a) a comprehensive interval history, including an extended history of present illness, a complete past, family, and social history, and a complete review of at least ten body systems directly related to the identified problems; (b) a comprehensive physical examination of the patient; and (c) medical decision-making of high complexity."  [Dkt. # 1, ¶ 109].  But the complaint does not allege which of these elements is missing with respect to any of the claims at issue.  Was the interval history not comprehensive?  Was the physical exam not

comprehensive?  Was the medical decision-making not sufficiently complex?  If so, why not?  The complaint doesn't answer these questions.  In short, the complaint "provides no medical, technical, or scientific context which would enable a reader of the complaint to understand why" these claims constitute upcoding.  *Presser*, 836 F.3d at 779.  *See Allstate Ins. Co. v. Advanced Health Professionals, P.C.*, 256 F.R.D. 49, 60 (D. Conn. 2008) ("Plaintiffs' allegations make no distinction between what Defendants say they did in their billing documentation, and what Plaintiffs claim they actually did.").

Again, the complaint concedes that the clinicians selected the level of billing for their claims.  [Dkt. # 1, ¶ 261].  Those clinicians thought at "least two" of the necessary components for billing 99310 were satisfied.  Why does the government disagree?  No explanation is proffered.  Without this explanation, the government's claim fails to even raise the claim above plausibility level, much less plead fraud with particularity.  *Twombly*, 550 U.S. at 555 ("A plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (cleaned up).

The plausibility of the government's claim is further undercut by the fact that the complaint <u>does not</u> allege upcoding with respect to all of the twenty examples.  Specifically, for examples 6, which was a CPR coded at 99310, the complaint does not allege that the visit was upcoded.  No explanation is proffered in the complaint as to why some 99310 claims are necessarily upcoded while other 99310 claims are not.  Thus, the reader of the complaint cannot know why some of the 99310 claims are allegedly fraudulent.  *Gravett,* 82 F. Supp. 3d at 838 (The complaint must be "sufficient to provide the defendant with 'fair notice' of the claim and its basis.").

**B.**     **The Allegations of Prior Downcodes do not Plead Fraud with Particularity**

In support of its upcoding allegation, the complaint alleges that Medicare contractors and the Medicare Appeals Council downcoded claims billed by General Medicine.  [Dkt. # 1, pp. 50-55].  Indeed, the complaint claims that the Medicare Appeals Council issued a "finding" that General Medicine's services are "upcoded."  [Dkt. # 1, ¶ 317].  But the Medicare Appeals Council decisions cited do not support such a sweeping characterization.[2]

### 1.    The Medicare Appeals Council Decisions Referenced in the Complaint do not Show Fraud with Particularity

The first Council decision referenced in the complaint—Docket No. E-15-73—related to claims for Medicare services rendered nine years ago.  In that decision, the Council did not hold that a CPR or MMR can never be sufficiently complex to bill at the 99310 level.  Nor did it hold that General Medicine knowingly upcoded any claims.  Instead, the Council held that the *documentation* submitted did not support the 99310 CPT code in the claims at issue in that appeal. (Exhibit 5, pp 18-19, "As reviewed below, the Council finds the documentation insufficient to meet coverage standards on multiple grounds.").  When addressing the particular claims, the Council repeatedly stated, "The record contains insufficient documentation to support the service billed as CPT code 99310[.]"  (See e.g. exhibit 5, p 21).  This is not evidence of fraud.  *See U.S. ex rel. Schuhardt v. Washington Univ.*, 361 F. Supp. 2d 992 (E.D. Mo. 2003), aff'd in relevant part, 390 F.3d 563 (8th Cir. 2004) ("[F]ailure to properly document a service does not, by itself, state a claim for relief under the FCA."); *U.S. ex rel. Davis v. D.C.*, 679 F.3d 832 (D.C. Cir. 2012) (holding that a lack of documentation is not itself a violation of the False Claims Act.).

---

[2] "[A] court may also examine information from documents referenced in the complaint that the plaintiff relies upon to support its claim."  *Craig*, 736 F.3d at 1113 n.1 (7th Cir. 2013).  Courts may also consider "matters of public record, including administrative decisions."  *El-Hewie v. Bergen Cty.*, 348 F. App'x 790, 794 (3d Cir. 2009).  *See also Austin v. City of Chicago*, 2019 WL 4750279 at *2 n.2 (N.D. Ill. Sept. 30, 2019).

The second Council decision referenced in the complaint—Docket No. M-12-655—arose from Medicare claims submitted in 2003, under different CPT codes than exist today.  Again, that decision does not hold that a CPR or MMR can never be billed at the 99310 level or that General Medicine knowingly upcoded any claims.  Where the Council downcoded claims in that decision it was because the documentation did not support the codes billed.  (See Exhibit 6, p 35).

Reference to these decisions does not plausibly allege that the claims at issue here were upcoded.  The complaint does not go through a similar analysis of the documentation relating to any of its exemplar claims to show how they fail to justify coding at 99310.  Instead, the complaint makes a logical leap that, because the Council found the documentation insufficient to support 99310 in other cases, the claims at issue here must be upcoded.  *See Hutton v. City of Chicago*, 2021 WL 809731 at *4 (N.D. Ill. Mar. 3, 2021) (holding that court "cannot make the logical leap" to find claims plausible).  (Exhibit 7).

### 2. The Medicare Contractor Audits Referenced in the Complaint do not Show Fraud with Particularity

The same is true with respect to the allegations of prior audits.  While the complaint alleges prior instances of audits leading to downcoding, it provides nothing more.  The particular facts "constituting fraud" in those circumstances is missing.  Fed. R. Civ. P. 9(b).  For example, the complaint cites a "prepayment review" by Medicare contractor Novitas Solutions, Inc. and an audit by contractor National Government Services, Inc.  [Dkt. # 1, ¶¶ 310-12].  According to the complaint, "Novitas downcoded or denied most of GM's 99310 claims it reviewed[.]"  [Dkt. # 1, ¶ 311].  But no other facts are alleged relating to these claims, why they were downcoded (perhaps it was a documentation issue), or how this is evidence of fraud.  And by lumping downcoded

14

claims with denied claims, it is impossible to know what percentage were actually downcoded.[3]

Similarly, the complaint alleges that in a 2017 audit National Government Services "downcoded 556 claims to a lower billing code." [Dkt. # 1, ¶ 312]. But, again, no facts are alleged in the complaint as to why the claims were downcoded, leaving the reader to guess that these "circumstances constitute[ed] fraud." Fed. R. Civ. P. 9(b). Moreover, the complaint does not even allege that the claims at issue in the audit were CPRs or MMRs, as at issue in this case.

The complaint also alleges that in 2019 a General Medicine employee "noted" that "at least two more visits should have been billed at a lower CPT code." [Dkt. # 1, ¶ 342]. But no particular facts are alleged as to how this is evidence of fraud. It is at least as likely that these claims resulted from a simple mistake or even good faith disagreement between the clinician and the auditor over the proper CPT level for the claim. "CPT coding is complex, voluminous, and subject to expert interpretation." *State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Center, Inc.*, 2008 WL 11337326 at *8 (M.D. Fla., Dec. 18, 2008). (Exhibit 8). As another federal court recently recognized, CPT coding requires subjective decisions, and words such as "detailed," "comprehensive," "low," and "moderate" are "difficult to apply in practice." *Government Employees Ins. Co. v. The Right Spinal Clinic, Inc.*, 2022 WL 743800 at *6 (M.D. Fla., March 11, 2022). (Exhibit 9). Without more detail, this allegation fails to state particular facts showing fraud. *See Twombly*, 550 U.S. at 567-68 (holding that where there is an "obvious alternative explanation" that is legal, the complaint fails to state a claim for relief.).

---

[3] Imagine there were 100 claims of which 58 were denied, two were downcoded, and the rest were approved as originally billed. In that scenario, only a small percentage of the claims paid were downcoded. But by lumping them together the government can say that "most" were "downcoded or denied."

31592\440601\267680515.v1-6/30/22

In short, nothing in these allegations about prior downcodes shows that fraud is the most likely reason for the levels billed by General Medicine.  It is just as likely that the clinicians themselves decided that the 99310 CPT level was the most appropriate code for the particular visits.  *Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.") (cleaned up);

### C.      The Complaint does not Plausibly Allege Defendants' Knowledge

"The FCA establishes liability only for knowingly false claims—it is not enough that a defendant suspect or believe that its claim was false."  *United States ex rel. Schutte v. SuperValu, Inc.*, 9 F.4th 455, 470 (7th Cir. 2021).  The knowledge inquiry is objective; the defendant's "subjective intent is irrelevant."  *Id.*  "Under the FCA, 'knowing' and 'knowingly' means that a defendant, at the time of filing the claim, (1) has actual knowledge of the information's false nature; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  *U.S. ex rel Trim v. McKean*, 31 F. Supp. 2d 1308 (W.D. Okla. 1998).  While knowledge may be pled generally, the complaint must still provide sufficient facts to make the knowledge allegation plausible.  *See United States ex rel. Rockey v. Ear Inst. of Chicago, LLC*, 92 F. Supp. 3d 804, 820 (N.D. Ill. 2015) (holding that complaint did "not plausibly allege that Ear Institute Defendants acted with the knowledge that their conduct violated the new Medicare regulations").

In *Schutte, supra*, the Seventh Circuit analyzed the definition of "knowledge" under the FCA, and particularly the "reckless disregard" standard of knowledge.  Relying on the Supreme Court's decision in *Safeco Insurance Company of America v. Burr*, 551 U.S. 47 (2007), the Seventh Circuit held that a "defendant who acted under an incorrect interpretation of the relevant

statute or regulation did not act with reckless disregard if (1) the interpretation was objectively reasonable and (2) no authoritative guidance cautioned defendants against it." *Id*. at 464. The court held that this standard "reaches all three of the scienter terms that define 'knowingly.'" *Id*. at 467. *See id.* at 459 ("[A] failure to establish the Safeco standard as a threshold matter precludes liability under any of [the] definitions [of 'knowingly.']").

Here, the complaint does not allege facts creating the inference that General Medicine's interpretation of the CPT code requirements is objectively unreasonable. Indeed, there is no allegation in the complaint regarding proper interpretation or application of CPT 99310 in any given case. And, as the complaint admits, the CPT codes contain (subjective) qualifiers such as "complex" and "comprehensive." [Dkt. # 1, ¶ 106-09]. *State Farm Mut., supra* at *8 ("CPT coding is complex, voluminous, and subject to expert interpretation."). General Medicine relied on the clinicians to code the visits in the first instance, thus relying on the clinician's representations regarding CPT code qualifications were met. Again, there is no allegation that General Medicine upcoded the level originally selected by the clinician.

Instead, the complaint apparently relies on the allegations of prior downcodes to suggest that billing CPRs and MMRs at 99310 must be unreasonable. But, as explained above, none of those audits or decisions held that a CPR or MMR can never meet the requirements of 99310. Rather, those audits found that at least some CPRs and MMRs could be billed at 99310. In short, the complaint fails to plead any facts showing that billing the 99310 code was objectively unreasonable in any given case.

Nor does the complaint allege that that General Medicine received "authoritative guidance" cautioning General Medicine that CPRs and MMRs could not be billed at 99310. The Medicare Appeals Council decisions do not qualify as such "authoritative guidance." In the first place, as

discussed above, those decisions did not specifically find that CPRs or MMRs could not be billed at 99310 or that General Medicine was engaged in upcoding. *Schutte, supra* at 471 ("[T]he CMS manual was not sufficiently specific to warn SuperValu that its program likely would fall within the definition of U&C price.").

In any event, decisions of the Medicare Appeals Council do not create binding precedent and are therefore not "authoritative guidance." *Lodge v. Burwell*, 227 F. Supp. 3d 198, 211 (D. Conn. 2016) ("Unlike the kinds of legislative rules that are promulgated through notice-and-comment rulemaking or that arise through adjudications that bind third-parties through a system of precedent, the MAC's decisions have no precedential power."); *Tangney v. Burwell*, 186 F. Supp. 3d 45, 56 (D. Mass. 2016) ("[T]he Council's decision was not precedential and thus not analogous to a proffered rule to be applied by all future hearing officers."). In *Safeco*, the plaintiffs relied on a letter sent from "an FTC staff member to [the defendant's] lawyer" that disagreed with the defendant's interpretation of the regulation at issue. But the Supreme Court held that even this direct guidance from the FTC was not "authoritative guidance" because it did not "canvass the issue" and was an "informal staff opinion … not binding on the Commission." *Safeco,* 551 U.S. at 70 n.19.  Here, the Medicare Appeals Council decisions are not binding on any other panels of the Council, ALJs, CMS or HHS, and therefore are not "authoritative guidance."

## II.     THE GOVERNMENT FAILED TO PLEAD FACTS SETTING FORTH A CLAIM AGAINST NUMEROUS DEFENDANTS

Courts have repeatedly held that a plaintiff must to plead "examples of specific claims submitted" to the government by each defendant to satisfy Federal Rule of Civil Procedure 9(b). *See e.g.*, *Jiazi Hu v. Chan*, 2016 WL 4269065, *6 (S.D. Ohio 2016); *U.S. v. Planned Parenthood of the Heartland, Inc.*, 2013 WL 11627782, *1 (S.D. Iowa 2013); *See also U.S. ex rel. SNAPP,*

*Inc.*, 618 F.3d at 513. As succinctly stated by the United States District Court for the Eastern District of New York,

> courts have held that the complaint must provide details that identify particular false claims for payment that were submitted to the government.... [D]etails concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices are the types of information that may help a [plaintiff] to state his or her claims with particularity. These details do not constitute a checklist of mandatory requirements that must be satisfied by each allegation included in a complaint. However ... some [ ] of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b). [*U.S. v. Northern Adult Daily Heath Care Center*, 205 F. Supp. 3d 276, 289 (E.D. N.Y. 2016) (alteration in original) (citations omitted)].

Courts have also determined that "group" pleading is not sufficient to satisfy claims that fall within this heightened pleading standard. *See e.g., U.S. ex. rel. Grynberg v. Alaskan Pipeline Co.*, 1997 WL 33763820, *4 (D.D.C. 1997); *Jiazi Hu v. Chan*, 2016 WL 4269065, at *6; *U.S. ex rel. Branham v. Mercy Health Systems of Southwest Ohio*, 188 F.3d 510, *2 (6th Cir. 1999) (Table) ("Even if the court had jurisdiction over plaintiff's False Claims Act claim, the court was correct in dismissing the amended complaint because plaintiff's allegations are based on generalized accusations of wrongdoing attributed to "defendants" without any specificity as to which employees of the defendants were engaged in the alleged fraudulent scheme.").

Here, the Government has utterly failed to plead any specific purportedly fraudulent claims submitted by numerous Defendants in the Complaint.  In particular, the Government failed to plead any specific examples of purportedly fraudulent claims submitted by Defendants General Medicine of Illinois Physicians, P.C., Advanced Medical Haggerty Partners, P.A., Borough Medical Partners, P.A., Centro Medical Partners, P.A., Integrated Medial Partners, P.A., Metro Medical Haggerty Partners, P.A., New Castle Haggerty Medical Partners, P.A., Regional Medical

Partners, P.A., Silverton Medical Partners, P.A., Statewide Medical Partners, P.A., Vicinity Medical Partners, P.A., and Westco Haggerty Medical Partners, P.A. This failure by the Government is fatal. The pleading of specific examples of the purported fraud is an indispensable element for any False Claims Act complaint. *See Walgreen Co.*, 846 F.3d at 881 ("The identification of at least one false claim with specificity is an indispensable element of a complaint that alleges a [False Claims Act] violation in compliance with Rule 9(b).") (quotations omitted).

## V.   CONCLUSION

WHEREFORE, Defendants respectfully request that this Court dismiss the Complaint for the reasons set forth above.

Respectfully submitted,

**SANDBERG PHOENIX & von GONTARD P.C.**

By:/s/ a. Courtney Cox
      A. Courtney Cox
      1405 West Main Street
      Carbondale, IL 62901
      618-351-7200
      ccox@sandbergphoenix.com

**CLARK HILL PLC**

By:/s/ David F. Hansma
      David F. Hansma (P71056)
      Attorneys for Defendants
      151 S. Old Woodward Ave, Suite 200
      Birmingham, MI  48009
      (248) 988-5877
Dated: July 7, 2022      dhansma@clarkhill.com

### *PROOF OF SERVICE*

I certify that this document was filed and
served on all attorneys of record in the
following manner:

| | | | |
|---|---|---|---|
| First Class Mail | ____ | Hand Delivery | ____ |
| CM/ECF | X | Electronic Mail | ____ |

Date:  July 7, 2022

*/s/ Kelli Ruthenberg*

**KELLI RUTHENBERG**

21

1

Case 3:22-cv-00651-SMY   Document 22   Filed 07/07/22   Page 26 of 405   Page ID #212
United States ex rel. Sibley v. University of Chicago Medical Center, Slip Copy (2021)
2021 WL 3290964, Med & Med GD (CCH) P 307,095

🏳 KeyCite Blue Flag – Appeal Notification

Appeal Filed by   KENYA SIBLEY, ET AL v. UNIVERSITY OF CHICAGO
MEDICAL, ET AL.   7th Cir.,   September 2, 2021

2021 WL 3290964
United States District Court, N.D. Illinois, Eastern Division

UNITED STATES of America, EX REL. Kenya
SIBLEY, Jasmeka Collins, and Jessica Lopez, Relators,

v

UNIVERSITY OF CHICAGO MEDICAL
CENTER, Medical Business Office Corp., and
Trustmark Recovery Services, Inc., Defendants

Case No. 17 C 4457
|
Signed 08/02/2021

## Attorneys and Law Firms

AUSA, United States Attorney's Office, Chicago, IL, for
Plaintiff United States of America

Warner Mendenhall, Akron, OH, for Plaintiffs Kenya Sibley,
Jasmeka Collins, Jessica Lopez

David S. Rosenbloom, Sean M. Hennessy, McDermott Will
& Emery LLP, Chicago, IL, for Defendant University of
Chicago Medicine

Sarah R. Marmor, Morgan Geoffery Churma, Scharf Banks
Marmor LLC, Chicago, IL, for Defendants Trustmark
Recovery Services, Medical Business Office

## MEMORANDUM OPINION AND ORDER

Harry D. Leinenweber, Judge

**\*1** For the reasons stated herein, the Court grants
Defendants' Motions to Dismiss (Dkt. Nos. 78, 81). The
Second Amended Complaint (Dkt. No. 75) is dismissed with
prejudice, except that Counts I–III are dismissed without
prejudice as to the United States.

## I. BACKGROUND

This case arises out of two alleged schemes by medical
billing company Medical Business Office ("MBO") and
debt collection company Trustmark Recovery Services, Inc.
("Trustmark") to defraud the United States of Medicare funds.
The University of Chicago Medical Center ("UCMC"), an
academic medical center, contracts with MBO to receive
medical debt collection services (SAC ¶¶ 7,11, Dkt. No.
75.) For certain clients, MBO works with its sister company,
Trustmark, on the client's bad debt collections. (Id. ¶¶ 9, 64.)
Relators Kenya Sibley, Jasmeka Collins, and Jessica Lopez
("Relators") are former employees of MBO and Trustmark
who allege they discovered the schemes while employed
and who were later fired for vocalizing their concerns.
Following dismissal of their First Amended Complaint
("FAC"), Relators filed the Second Amended Complaint
("SAC"), alleging three violations of the False Claims Act,
🏳 31 U.S.C. § 3729 ("FCA")

Relators allege that the Defendants violated the FCA when
(1) MBO caused UCMC to submit false statements to the
Government in violation of 🏳 31 U.S.C. §§ 3729(a)(1)(A)
& (B) (Count I), (2) UCMC retained and converted federal
funds premised on false claims in violation of 🏳 31 U.S.C.
§ 3729(a)(1)(G) (Count II), and (3) Trustmark caused its
hospital clients to submit false statements to the Government
in violation of 🏳 31 U.S.C. §§ 3729(a)(1)(A) & (B) (Count
III). Relators also allege individual retaliation claims, in
violation of 🏳 31 U.S.C. § 3730(h) (Counts IV–VI). (Id. ¶ 6.)

Relators' FCA claims center on the collection of outstanding
balances from Medicare patients. Under 42 C.F.R. § 417.534,
Medicare reimburses providers for allowable costs, defined
as the "direct and indirect costs... that are proper and
necessary for efficient delivery of needed health care
services." 42 C.F.R. § 417.534. Medicare also reimburses
healthcare providers for bad debt arising from unpaid
deductible and coinsurance amounts. 42 C.F.R. § 413.89.
Outstanding balances may be characterized as bad debt after
remaining unpaid for 120 days. Id. § 413.89(e)(2)(A)(5)(ii).
To be eligible for reimbursement after 120 days, healthcare
providers must have undertaken reasonable collection efforts
of the bad debt. Id. § 413.89(e)(2). To demonstrate that a
reasonable collection effort has been made, a bill must be
sent to the beneficiary, followed by other modes of collection
which may include continued billings, personal contacts with
the beneficiary through telephone calls, emails, texts, or
letters. Id. § 413.89(e)(2)(A). If ineffective to secure the debt

amount, providers are eligible to receive reimbursement by reporting the bad debt amounts in their annual cost reports to the Government *Id* § 413 89 (2020)

Relators allege two bad debt collection schemes which they claim violated the FCA as well as individual claims for retaliation  The Court explains each alleged scheme below

### A. MBO and UCMC Medicare Bad Debt Scheme

**\*2**  In July 2004, MBO contracted with UCMC to provide debt collection services  (SAC  ¶ 34 )  Under the terms of the parties' agreement, MBO collected debt on behalf of UCMC from patients with private insurance plans and patients with Medicare and Medicaid  (*Id* )  In exchange for these services, UCMC paid MBO a monthly rate based on the number of MBO employees working full time pursuing UCMC's collections (*Id* )  Under the terms of their agreement, Trustmark did not provide collection services for UCMC. (*Id* ¶ 64 )  To facilitate MBO's efforts, UCMC provides MBO employees with access to the hospital's internal software system  (*Id* ¶ 34 )

On September 1, 2016, MBO and UCMC amended their initial agreement and increased the number of accounts MBO would be responsible for on UCMC's behalf  (ACC Project Contract, SAC, Ex  1, Dkt  No 75-1 )  Relators allege that, due to the increased account volume, MBO and UCMC separated Medicare and Medicaid collections into a separate project (SAC ¶ 36 )  Collections for Government-insured patient debt was referred to the "Medicare/Medicaid Project " (*Id* )

Following the contract amendment, UCMC authorized MBO to have up to nine employees working on the Medicare/ Medicaid Project  (*Id*  ¶ 41 )  MBO assigned Lufreda Shine and Harriet Young to work on UCMC's government collections (*Id*  ¶ 39 )  Despite assigning just two staff members, MBO's invoices showed nine full time employees working on this project (*Id* )  According to Relators, the additional employees listed on the UCMC invoices only worked on collecting Medicare debt on a sporadic basis (*Id*  ¶ 50 )  Relators then conclude that MBO's purported efforts to collect bad debt did not comply with the federal regulations regarding reasonable collections, because the two employees actually working on the Medicare/Medicaid Project could not have complied with federal regulations for each of the balances characterized as bad debt (*Id* ¶¶ 58, 60 )  According to Relators, any outstanding balances that MBO

characterized as bad debt were entered directly into UCMC's internal software which is used to prepare submissions for reimbursement to the Government  (*Id* ¶ 57 )  Relators thus conclude that MBO caused UCMC to submit false claims for bad debt reimbursement in violation of ⬚ 31 U S C  § 3729 (*Id* ¶ 62 )

According to Relators, in 2017 UCMC initiated an internal audit of its MBO invoices  The UCMC audit spanned November 2016 to September 2017 and compared all MBO invoices to data from productivity reports generated from UCMC's systems, which recorded how much time a clerk actually spent in the UCMC database working on a UCMC account  (*Id*  ¶¶ 45, 47 )  The audit revealed that MBO's invoices were inconsistent with UCMC's productivity reports and MBO overbilled UCMC by $787,225  (UCMC Letter to MBO, SAC, Ex  3, Dkt  No  75-3 )  Of that amount, approximately $270,276 was related to the work done on the Medicare and Medicaid collections  (SAC ¶ 46 )

According to Relators, because of the audit, UCMC became aware that MBO did not undertake reasonable collection efforts for some portion of UCMC's Medicare bad debt  (*Id* ¶ 51 )  Relators excerpt a UCMC Cost Report submitted in 2017 covering the period from July 1, 2016 to June 30, 2017 where UCMC reported $1,160,095 in reimbursable bad debt, which was eventually reimbursed by the Government (*Id*  ¶ 56 )  This Cost Report was certified electronically, but unsigned, certifying compliance with the "laws and regulations regarding provision of health care services " (*Id* ¶ 62.) According to Relators, UCMC took no efforts to determine if the balances characterized as bad debt during the audit period — November 2016 to August 2017 — received reasonable collection efforts  (*Id*  ¶ 51 )  Relators allege that as a result of the audit, UCMC became aware they submitted false claims because of MBO's conduct Relators further allege that UCMC was required to report the overpayments to Medicare and reimburse the Government for those overpayments, which UCMC failed to do in violation of ⬚ 31 U S C  § 3729(a)(1)(G)

### B. Trustmark Medicare Bad Debt Scheme

**\*3**  Relators' second alleged scheme arises out of Trustmark's services as a licensed debt collection agency (*Id* ¶ 64 )  Trustmark is a medical debt collection agency that "handles MBO's bad debt collections, third party collections,

United States ex rel. Sibley v. University of Chicago Medical Center, Slip Copy (2021)
2021 WL 3290964, Med & Med GD (CCH) P 307,095

legal department, data entry, and payment processing/ posting " (*Id* ¶¶ 8, 9 ) Trustmark provided collection efforts for hospital clients, excluding UCMC (*Id* ¶ 66 ) Like MBO, Trustmark had access to the internal software systems of their clients and would make changes to the classification of debts pursuant to their collection efforts. (*Id* ¶ 73 ) Relators allege that Trustmark's collection efforts failed to comply with the standards set forth in 42 C F R § 413 89(c) Specifically, Relators allege that Trustmark declared debt uncollectable less than 120 days after a statement was billed, failed to send multiple statements of bills, and skipped regulatory review of debts before reporting them as uncollectable (SAC ¶ 64 )

According to the SAC, Relator Kenya Sibley ("Sibley") and her team would be assigned to work on Trustmark client teams (*Id* ¶ 65 ) Certain team members were tasked with pursuing collections (*Id* ) If these efforts were unsuccessful, the Trustmark employees would characterize the outstanding balance as bad debt (*Id* ) Other team members, including Sibley, would review anything tagged as a bad debt for compliance with 42 C F R § 413 89(c) (*Id* ) Pursuant to Trustmark company procedures, Sibley would record anything she believed to be improperly tagged (*Id* ) For each potentially mischaracterized debt she identified, Sibley included a rationale for the error, such as "patient did not receive statement," "patient is making monthly payments," or "patient did not receive two statements " (Bad Debt Turnover Error Spreadsheets, SAC , Ex 6, Dkt No 75-6 ) This record was then delivered by email and reviewed by Trustmark's CEO, Justin Manning ("Manning") (SAC ¶ 66.) According to Relators, Manning told Sibley to stop sending the spreadsheets through email and requested that she hand deliver them (*Id* ) A month later Manning told Sibley to stop creating and delivering these reports all together (*Id* ) Relators allege that through the spreadsheets Sibley delivered, Manning had knowledge that reasonable collection efforts were not conducted, and he refused to stop it (*Id* ¶ 69 )

Relators allege that in September 2016, Sibley was informed that Trustmark's policy was to "skip review of 5 to 10 files at a time and to automatically approve unreviewed bad debt write-offs " (*Id* ¶ 68 ) According to Relators, Trustmark's failure to review its bad debt designations caused its clients to improperly classify unpaid balances well before the conclusion of the 120-day collection period, in violation of 42 C F R § 413 89(c) (*Id* ¶ 72 ) In support of this allegation, Relators provide three examples from a September 26, 2016, Bad Debt Report sent to Trustmark client Community Hospital. (*Id* ¶ 71 ) The three patients

in the examples received services rendered by Medicare or Medicaid providers in June 2016 (*Id* ) By September 26, 2016, well before 120 days had passed, Trustmark had classified the unpaid balances associated with these services as bad debt (*Id* )

According to Relators, once Trustmark approved characterizing an unpaid balance as bad debt, this change would automatically be made in their client's systems (*Id* at 73 ) The clients relied on these software systems to fill out their Medicare cost reports (*Id* ) For example, Relators allege Trustmark entered information into the database of their client, Community Hospital, who generated their cost reports based on this information (*Id* ) Relators allege that their three examples were thus incorporated in Community Hospital's 2017 Cost Report from the period July 1, 2016, to June 30, 2017 (*Id* ¶ 74 ) In the Cost Report, Community Hospital reported $539,100 in reimbursable Medicare bad debt which was ultimately reimbursed by the Government (*Id* ¶¶ 76, 78.) This report was electronically certified, but unsigned, indicating compliance with "such laws and regulations regarding the provision of health care services " (Community Hospital Cost Report 7 1 2016 to 6 30 2017, SAC, Ex 11, Dkt No 75-11 ) Relators allege that because Community Hospital's systems automatically incorporated Trustmark's improper bad debt classifications into their cost reports, Trustmark caused their clients to submit false claims to the Government in violation of⌐ 31 U S C § 3729 (SAC ¶¶ 80, 109 )

## C. Retaliation Claims

**\*4** In addition to the FCA allegations, Relators allege individual retaliation claims against MBO and Trustmark. The Court summarizes each below

### *1. Termination of Relator Kenya Sibley*

Sibley was employed by MBO and Trustmark from September 6, 2016, to March 3, 2017 (*Id* ¶ 12 ) In October 2016, Sibley was promoted from MBO Call Center Customer Service Manager to the Director of Trustmark (*Id* ¶ 81 ) In her new role, Sibley supervised twelve employees including Relators Jessica Lopez and Jasmeka Collins (*Id* )

Case 3:22-cv-00651-SMY   Document 22   Filed 07/07/22   Page 29 of 405   Page ID #215

United States ex rel. Sibley v. University of Chicago Medical Center, Slip Copy (2021)
2021 WL 3290964, Med & Med GD (CCH) P 307,095

Relators allege that in November 2016, Sibley noticed her name was listed on invoices to UCMC despite her never working on any of their accounts (*Id* ¶ 83 ) This observation led to Sibley's investigation and discovery that only Shine and Young were consistently working on Medicare and Medicaid debts for UCMC (*Id*) Sibley informed Manning of the inaccuracies she observed in the invoices, but he did not remove Sibley's name or the names of others that did not work on the UCMC "Medicare/Medicaid Project " (*Id* ¶ 85 ) According to Relators, Manning also refused to accept the bad debt classification errors Sibley identified and compiled into spreadsheets (*Id* ¶ 87 )

Relators further allege that Manning, along with Trustmark Vice President Schade, created a hostile work environment (*Id* ¶ 88 ) Relators allege that this work environment caused Sibley to suffer a transient ischemic attack, or a mini stroke, on February 27, 2017, while at work (*Id* ¶ 89 ) Ultimately, Sibley was let go from her position on March 3, 2017 (*Id* ¶ 12.) Relators allege that Schade used Sibley's medical emergency as an opportunity to put an end to her efforts against MBO and Trustmark's practices (*Id* ¶ 89 )

### 2. *Termination of Relator Jasmeka Collins*

Collins was a manager in Trustmark's bad debt collections and legal department from January 19, 2016 to April 4, 2017 (*Id* ¶¶ 90, 93 ) Relators allege that in March 2017 Collins was instructed by Schade to mark balances as bad debt prior the expiration of the required 120-day collection period and before sending multiple statements to the patient (*Id* ¶ 92.) Relators allege Collins protested these practices, informing Schade this was a violation of federal regulations, to which Schade instructed Collins that he was "in charge, the rules were mandatory" and she was forbidden from using the word "illegal" on the job (*Id*) Following this interaction, Collins was demoted from manager to supervisor (*Id* ¶ 93 ) Relators allege that Collins was terminated on April 4, 2017, when she did not accept the demotion (*Id* ¶ 93 )

### 3. *Termination of Relator Jessica Lopez*

Relator Lopez worked as an MBO customer service representative from April 4, 2015 to February 9, 2017 (*Id* ¶¶ 94, 97 ) Around October 26, 2016, Lopez "voiced concerns about MBO's billing practices and described patient complaints of double billing to CEO Manning " (*Id* ¶ 95 )

Relators allege that Manning instructed Sibley to "come up with a reason to fire" Lopez, which Sibley refused (*Id*) On February 7, 2017, Schade requested Lopez document the issues customer service representatives were having, leading to Lopez and Sibley documenting what they believed to be illegal practices (*Id* ¶ 96 ) Relators allege that on February 9, 2017, Lopez was fired following her presentation of these findings for "using the word illegal" and accusing MBO of illegal billing practices (*Id* ¶ 97 )

### D. Procedural Posture

**\*5** Relators filed their original Complaint under seal in June 2017 (Dkt No 1 ) The Government declined to intervene on March 6, 2019, leaving Relators to pursue the action themselves (Dkt No 31 ) On March 3, 2020, Relators filed their First Amended Complaint (Dkt No 48 ) On June 8, 2020, MBO and Trustmark filed a Motion to Dismiss, and UCMC filed a separate Motion to Dismiss shortly thereafter. (Dkt Nos 58, 61 ) The Court granted both Motions without prejudice on September 14, 2020 (Dkt No 74.) Relators filed their Second Amended Complaint on October 14, 2020 (Dkt No 75 ) MBO and Trustmark filed a Motion to Dismiss on December 4, 2020, followed again by UCMC (Dkt Nos 78, 81 ) The Court now decides the motions

## II. LEGAL STANDARD

A Federal Rule of Civil Procedure 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint ⊡*Gibson v City of Chi* , 910 F 2d 1510, 1520 (7th Cir 1990) To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility," rising above a mere "speculative" right to relief ⊡*Bell Atl Corp v Twombly,* 550 U S 544, 555, 564 (2007) A claim is factually plausible "when the plaintiff pleads factual content that allows the court to draw reasonable inference that the defendant is liable for the misconduct alleged " ⊡*Ashcroft v Iqbal,* 556 U S 662, 678 (2009) The Court may "draw on its judicial experience and common sense" to determine if it is plausible that the defendant is liable for the misconduct that has been alleged *W Bend Mut Ins Co v Schumacher,* 844 F 3d 670, 676 (7th Cir 2016) (quotation and citation omitted). The Court construes the SAC in the light most favorable to the Relators, accepting as true all well-pleaded facts and drawing all possible inferences in the Relators'

United States ex rel. Sibley v. University of Chicago Medical Center, Slip Copy (2021)

2021 WL 3290964, Med & Med GD (CCH) P 307,095

favor *See Tamayo v Blagojevich*, 526 F 3d 1074, 1081 (7th Cir. 2008), △*McCullah v Gadert*, 344 F.3d 655 (7th Cir 2003) "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice " *Iqbal*, 556 U S at 678 This means legal conclusions are disregarded from consideration of the complaint *McCauley v City of Chicago*, 671 F 3d 611, 617 (7th Cir 2010)

The FCA is an anti-fraud statute and therefore subject to the heightened pleading requirements of FED R CIV P 9(b) *See, e g , US ex rel Garst v Lockheed-Martin Corp ,* 328 F 3d 374, 376–78 (7th Cir 2003) (analyzing FCA allegations under Rules 8 and 9(b)) Rule 9(b) requires that a plaintiff "state with particularity the circumstances constituting fraud or mistake," meaning "the who, what, when, where, and how the first paragraph of any newspaper story " *United States ex rel Hanna v City of Chicago*, 834 F.3d 775, 779 (7th Cir 2016) (quotation marks omitted). To meet the Rule 9(b) standard, Relators must plead each of their claims "at the individual transaction level" and include "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff " *United States ex rel Fowler v Caremark RX, L L C ,* 496 F 3d 730, 742 (7th Cir 2007), *overruled on other grounds by Glaser v Wound Care Consultants, Inc ,* 570 F 3d 907 (7th Cir 2009)

## III. DISCUSSION

### A. FCA Claims: Counts I, II and III

Relators allege violations of the following Section 3729(a)(1) subsections of the FCA The FCA imposes liability on any person who

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval,

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim,

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government

31 U S C § 3729(a)(1)

*6 To survive a motion to dismiss, Relators must at minimum plead transaction-level details evidencing violations of each of the foregoing subsections. *See Caremark,* 496 F 3d at 742 In its prior Order and Opinion dismissing the FAC, the Court set forth a detailed explanation of the Rule 9 pleading standard, the necessary components of an FCA claim, and the deficiencies in the FAC. (Op , Dkt No 74 ) Despite this guidance, Relators claims remain deficient Specifically, Relator has once again failed to set forth allegations evidencing violations of the FCA with the specificity required by Rule 9 For the reasons set out below, the FCA claims in the SAC are dismissed with prejudice

### 1. Bad Debt Collection (Counts I and III)

Counts I and III allege variations of the same misconduct MBO and Trustmark failed to comply with federal regulations governing the characterization of outstanding Medicare balances as bad debt As a result, MBO and Trustmark allegedly caused their clients to submit false claims for reimbursement to the Government in violation of 31 U S C §§ 3279(a)(1)(A), (B) To establish civil liability for a FCA violation, Relators must show "(1) a false or fraudulent claim, (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval, (3) with the knowledge that the claim was false" *Caremark,* 496 F 3d at 741 Additionally, Relators must show "(4) the false statement was material to the government's decision to pay or approve the false claim " *United States ex rel Uhlig v Fluor Corp ,* 839 F 3d 628, 633 (7th Cir 2016)

Relators must, at a minimum, allege the submission of a false statement to the Government for payment *See Mason v*

*Medline Indus., Inc.*, 2009 WL 1438096, at *4 (N.D. Ill. May 2009) ("The *sine qua non* of a False Claims Act violation is the submission of a fraudulent claim"). In Count I, Relators allege that MBO's misrepresentations to UCMC regarding staffing levels on the Medicare/Medicaid Project evidence that they could not have complied with federal regulations governing the collection of bad debt, which in turn caused UCMC to submit false claims for reimbursement to the Government. In Count III, Relators allege that Trustmark designated certain outstanding Medicare balances as bad debt in violation of federal regulations (*i.e.*, prior to the expiration of the required 120-day collection period), which caused Trustmark clients to submit false claims for reimbursement to the Government. But these allegations are not linked to a single example of a false statement made in connection with Medicare reimbursements, which necessarily dooms both Counts I and III.

In Count I, Relators allege that MBO failed to conduct reasonable collection efforts on UCMC's Medicare/Medicaid Project because they failed to "assign sufficient collection clerks" to the assignment. (SAC ¶¶ 36, 38.) In support of this allegation, Relators excerpt MBO's December 2016 invoices which list nine full time employees working on UCMC's account, but Relators allege only two staff members actually worked on the account. (*Id.* ¶¶ 39, 48.) From these facts, Relators draw the conclusion that MBO did have sufficient staffing to review all UCMC outstanding balances and must have characterized certain outstanding balances as bad debt without complying with the federal regulations regarding collection efforts. Relators further conclude that because MBO designated balances as bad debt in the same computer system UCMC used to submit its claims for Medicare reimbursement, MBO caused UCMC to submit false claims for reimbursement to the Government. (*Id.* ¶ 62.)

To survive a motion to dismiss Relators must allege the specific false claims for which UCMC sought reimbursement as a result of MBO's conduct. *See* *Caremark*, 496 F.3d at 742. Relators attempt to plead this level of particularity by pointing to the UCMC Cost Report from July 1, 2016 to June 30, 2017. (SAC ¶¶ 52–56.) In the July 1, 2016 to June 30, 2017 cost report, UCMC sought reimbursement for $1,160,095 in Medicare bad debt. (*Id.* ¶ 56.) But Relators do not allege that UCMC had no bad debt, such that the entire cost report is false. Instead, Relators allege that there must be a falsity somewhere in the cost report based on their prior conclusion that MBO failed to comply with federal regulations, prior to designating certain unpaid balances as bad debt. This falls far

short of the transaction level detail required under Rule 9. *See* *United States ex rel. Lanahan v. Cty. Of Cook*, No. 17 C 5829, 2020 WL 6894395, at *11 (N.D. Ill. Nov. 24, 2020) (Leinenweber, J.) (dismissing with prejudice where relator's second amended complaint failed to connect claim of wrongdoing to specific details in the cost report including what portion was improper). Absent of the ability to show a specific falsity in a cost report, or any document submitted to the government, Count I fails.

*\*7* In Count III, Relators allege that Trustmark routinely failed to comply with federal regulations regarding the collection of Medicare bad debt. In support of this allegation, Relators point to a report Trustmark prepared for Community Hospital, in which Trustmark characterized three unpaid balances as bad debt, prior to the expiration of the requisite 120-day collections period. (SAC ¶ 71.) Relators conclude that because Trustmark also designated these balances as bad debt in the same computer system Community Hospital used to submit its claims for Medicare reimbursement, Trustmark caused the hospital to submit false claims for reimbursement to the Government. (*Id.* ¶¶ 73–74.)

As with Count I, the allegations in Count III fail to meet the particularity requirements necessary to survive a motion to dismiss. While the SAC attaches and cites to a Community Hospital Cost Report that was submitted to the Government, Relators do not allege that Community Hospital had no bad debt, thereby rendering the entire submission fraudulent. Nor do the Relators identify individual unpaid balances for which Community Hospital sought reimbursement in violation of federal regulations. Instead, Relators again ask the Court to assume there is a false submission somewhere in the report. Because these allegations fail to identify the specific false claims for which Community Hospital sought reimbursement, Count III must fail. *See* *Caremark*, 496 F.3d at 742.

### *2. UCMC Audit (Count II)*

Count II alleges a reverse false claim, that UCMC avoided an obligation to repay the Government in violation of 31 U.S.C. § 3279(a)(1)(G). A reverse false claim "requires Relator to allege that defendant has an existing, legal obligation to pay or transmit money or property to the government and that the defendant submitted false statements or records to conceal, avoid, or decrease that obligation." *United States, ex rel. Besancon v. UChicago Argonne, LLC*, No. 12 C 7309,

Case 3:22-cv-00651-SMY   Document 22   Filed 07/07/22   Page 32 of 405   Page ID #218

United States ex rel. Sibley v. University of Chicago Medical Center, Slip Copy (2021)
2021 WL 3290964, Med & Med GD (CCH) P 307,095

2014 WL 4783056, at *4 (N.D. Ill. Sept. 24, 2014) (internal citations omitted). For the reasons set forth below, Relators' Count II allegations do not include any facts supporting a reverse false claim and UCMC's motion to dismiss is granted.

To survive a motion to dismiss, Relators must allege that UCMC became aware that it received an overpayment of Government funds. The SAC makes no such allegations. Relators rely on the fact that UCMC conducted an internal audit of MBO's invoices as evidence that the hospital identified overpayments to the Government. This conclusion is without support. The audit had nothing to do with UCMC's submissions to the Government. Indeed, the audit only concluded that MBO breached its contract with UCMC. Without more, Relators have failed to state any kind of FCA violation, let alone a reverse false claim. *See* [🔲] *Universal Health Servs., Inc. v. United States ex rel. Escobar,* 136 S. Ct. 1989, 2003 (2016) (concluding breach of contract does not automatically lead to false claims). Relators' failure to identify any point where UCMC recognized overpayment by the Government dooms Count II.

### B. Counts IV - VI: Individual Retaliation Claims

The FCA protects employees from discriminatory actions taken because of their efforts to report violations of the statute. Relators allege they were terminated because they reported MBO and Trustmark's FCA-violating misconduct, in further violation of [🔲] 31 U.S.C. § 3730(h). "To determine whether an employee's conduct [is] protected [by the FCA], we look at whether (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." [🔲] *United States ex rel. Uhlig v. Fluor Corp.,* 839 F.3d 628, 635 (7th Cir. 2016) (citation and quotations omitted). The reasonableness requirement compels this Court to examine "the facts known to the employee at the time of the alleged protected activity" to determine if an objective, reasonable employee could come to the same conclusion. *Id.* Additionally, the termination must be due to the protected activity, and the person making the termination decision must have known of this activity. *Halasa v. ITT Educ. Servs.,* 690 F.3d 844, 848 (7th Cir. 2012)

**\*8** The SAC's retaliation claims suffer from the same deficiencies warranting the dismissal of these claims in the FAC. Specifically, Relators once again cannot show that a

reasonable employee in their position, with the information they had, would have believed MBO and Trustmark were causing false claims to be filed with the Government. Relators only allege they had insight into and access to MBO and Trustmark's internal processes Relators did not have, nor do not allege that as a service provider they had, any insight into or role in preparing their clients' Medicare reimbursement claims. This gap in knowledge fails to establish a plausible connection between Relators' workplace observations and their conclusion that MBO and Trustmark were causing their clients to knowingly submit false claims to the Government. Absent this showing, their activity cannot be protected under the FCA. *See* [🔲] *Uhlig,* 839 F.3d at 635 (concluding a relator's belief is unreasonable without firsthand knowledge), [🔲] *U.S. ex rel. Crews v. NCH Healthcare of Illinois, Inc.,* 460 F.3d 853, 856 (7th Cir. 2006) (concluding knowledge of internal processes alone fails to meet standard under FCA), *United States v. Pfizer Inc.,* 2019 WL 1200753, at *9 (N.D. Ill. Mar. 14, 2019) (concluding a reasonable employee in the same position may believe there was regulatory violations or internal quality control problems, but this does not lend itself to a reasonable employee believing that fraudulent claims were submitted). Because Relators' activity was not protected, their claims necessarily fail to show that the person terminating them knew of the protected activity and fired them because of it. *Halasa,* 690 F.3d at 848 (concluding that termination must be caused by protected activity which the terminator was aware of). For these reasons, Counts IV-VI are dismissed.

### C. Dismissal with Prejudice

"Despite receiving express directions about what they had to do, counsel did not do it. At some point the train of opportunities ends." [🔲] *Guaranty Nat'l Title Co. v. J.E.G. Assocs.,* 101 F.3d 57, 59 (7th Cir. 1996) (citation omitted). Relators have had two opportunities to amend their Complaint, the second time with the benefit of the Court's prior opinion explaining the FAC's deficiencies. Even with this guidance, the SAC fails to address these deficiencies in their claims. Upon review of the SAC and the briefings submitted, it is clear that Relators do not have the ability to address these deficiencies and properly state a claim. *See, e.g.,* [🔲] *U.S. ex rel. Grant v. Thorek Hosp.,* 2008 WL 1883454, at *1 (N.D. Ill. Apr. 25, 2008) (dismissing the second amended

United States ex rel. Sibley v. University of Chicago Medical Center, Slip Copy (2021)
2021 WL 3290964, Med & Med GD (CCH) P 307,095

complaint where it was "clear that [Relator] cannot correct the deficiencies in her claims")

Relators are former employees of third-party service providers  They do not allege they had any role in generating their clients' reimbursement submissions  Lack of any firsthand knowledge of the disputed claims submitted to the Government is permanently fatal to an FCA claim  In addition, even if Relators could cure this deficiency, all three were terminated in early 2017  This is well before UCMC and Trustmark submitted the cost reports which allegedly include false claims  Thus, even if Relators pled some knowledge of their clients' internal processes, they would still be unable to connect their observed regulatory violations to their clients' submissions for Government reimbursement  The same is true regarding UCMC's internal audit  Relators have no firsthand knowledge of UCMC's process, findings, or next steps  Further amendments simply cannot cure these deficiencies and save their ⬚Section 3729(a) claims

Relators' gaps in knowledge also make it unreasonable for them to have concluded that based on their workplace observations, MBO and Trustmark were causing their clients to submit false claims to the Government  This is a necessary element of a ⬚Section 3730(h) retaliation claim  For the same reasons discussed above, further amendments cannot cure this deficiency and save Relators' retaliation claims.

For these reasons, the Court concludes that further amendments are futile, and the SAC is dismissed with prejudice

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motions to Dismiss (Dkt Nos 78, 81) are granted  The Second Amended Complaint (Dkt No 75) is dismissed with prejudice, except that Counts I–III are dismissed without prejudice as to the United States

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 3290964, Med & Med GD (CCH) P 307,095

---

**End of Document**                    © 2022 Thomson Reuters  No claim to original U S  Government Works

2

Case 3:22-cv-00651-SMY    Document 22    Filed 07/07/22    Page 35 of 405    Page ID #221

United States ex rel. Schagrin v. LDR Industries, LLC, Not Reported in Fed. Supp. (2018)

2018 WL 6064699

2018 WL 6064699
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division

UNITED STATES EX REL. Roger B
SCHAGRIN and Roger B. Schagrin, PC, Doing
Business as Schagrin Associates, Plaintiffs,

v.

LDR INDUSTRIES, LLC, GB Holdings, Inc., Larry
Greenspon, and Dennis Greenspon, Defendants.

No. 14 C 9125
|
Signed 11/20/2018

### Attorneys and Law Firms

David Joel Chizewer, Matthew K. Organ, Goldberg Kohn Ltd., Jimmy Lorenzo Arce, United States Attorneys Office, Chicago, IL, for Plaintiffs

Theresa Lynn Davis, Steven Alan Miller, Reed Smith LLP, Chicago, IL, Andrew C. Bernasconi, Pro Hac Vice, Reed Smith LLP, Washington, DC, Kristen Annemarie Bradley, Reed Smith LLP, Chicgao, IL, for Defendants

### MEMORANDUM OPINION AND ORDER

Thomas M. Durkin, United States District Judge

**\*1** Defendants manufactured and imported steel pipe from China. Relators, Roger Schagrin and his law firm, allege that Defendants misclassified the pipe to avoid paying certain customs duties. Relators claim that this worked a fraud against the federal government in violation of the False Claims Act. On May 23, 2018, the Court granted Defendants' motion to dismiss, holding that Relators' claims were barred by the "government action bar." *See* R. 59 (*Schagrin v. LDR Indust.*, 2018 WL 2332252 (N.D. Ill. May 23, 2018)). The Court's holding made it unnecessary to address the alternative arguments for dismissal in Defendants' motion.

After the Court dismissed the complaint, Relators filed a motion to reconsider, R. 61, and the government filed a statement of interest in support of that motion, R. 75. For the following reasons, the motion to reconsider is granted. The Court also considers the alternative arguments for dismissal

Defendants made in their earlier motion and again grants the motion.

### Legal Standard

To prevail on a motion for reconsideration, a "movant must demonstrate a manifest error of law or fact or present newly discovered evidence." *Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014). A motion to reconsider is proper where the court "has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citations omitted). Motions for reconsideration are not, however, "appropriate vehicle[s] for relitigating arguments that the Court previously rejected or for arguing issues that could have been raised during the consideration of the motion presently under reconsideration." *Caine v. Burge*, 897 F. Supp. 2d 714, 717 (N.D. Ill. 2012) (citing *Caisse Nationale de Credit Agricole v. CBI Indus.*, 90 F.3d 1264, 1270 (7th Cir. 1996))

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). " 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir.

United States ex rel. Schagrin v. LDR Industries, LLC, Not Reported in Fed. Supp. (2018)

2018 WL 6064699

2018) (quoting Iqbal, 556 U S at 678) In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party Tobey v Chibucos, 890 F 3d 634, 646 (7th Cir 2018)

**\*2** Additionally, it is well established that the FCA "is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b)" Thulin v Shopko Stores Operating Co , LLC, 771 F 3d 994, 998 (7th Cir 2014) Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." "The reference to 'circumstances' in the rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff[ ]" United States v Sanford-Brown, Ltd , 788 F 3d 696, 705 (7th Cir 2015), see also United States ex rel Lusby v Rolls-Royce Corp , 570 F 3d 849, 853 (7th Cir 2009) ("particularity means the who, what, when, where, and how") Nevertheless, courts should not "take an overly rigid view of the formulation," and the "requisite information may vary on the facts of a given case " Pirelli v Armstrong Tire Corp Retiree Med Benefits Trust v Walgreen Co , 631 F 3d 436, 442 (7th Cir 2011) Thus, although plaintiffs " 'are not absolutely required to plead the specific date, place, or time of the fraudulent acts,' " they "still must 'use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud ' " Id (quoting 2 James Wm. Moore, MOORE'S FEDERAL PRACTICE § 9 03[1] [b], at 9-18 (3d ed 2010) ). Rule 9(b) requires a "plaintiff to do more than the usual investigation before filing [a] complaint Greater precomplaint investigation is warranted in fraud cases because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual) " Ackerman v Nw Mut Life Ins Co , 172 F 3d 467, 469 (7th Cir 1999) (citations omitted)

## Background

The Court repeats here the alleged facts recounted in the Court's May 23 opinion

In international trade, products are sometimes imported to the United States and sold for less than their normal value This practice is referred to as "dumping," and can hurt domestic companies who sell the same product at normal value Similarly, some imports are able to be sold at less than normal value because of foreign government subsidies. The federal government can counter these practices with "anti-dumping" and "countervailing" customs duties, respectively

According to Relators, around November 2007 the federal government imposed such duties on "circular welded pipe" (i e , steel pipe of various specifications for use in plumbing, among other uses) imported from China R 1 ¶¶ 1, 27 These duties amount to at least 30% and sometimes as much as 620% Id ¶ 27 After these duties were imposed, steel pipe imports from China decreased from 748,181 tons in 2007 to only 2,813 tons in 2009, representing only 0 6% of consumption in the United States Id ¶ 30 The duty regulations exclude "pipe suitable for use in boilers [and] superheaters," among other exceptions Id ¶ 2

Defendant LDR Industries LLC, headquartered in Chicago, has imported steel pipe from China "since at least 2010 " Id ¶ 3 It sells steel pipe and related products to retail stores around the country including Home Depot Id ¶ 13 LDR owns companies in Taiwan and China that manufacture the pipe and prepare it for export to the United States Id Defendant GB Holdings, Inc is the sole member of LDR, and has its headquarters at the same Chicago address as LDR Id ¶ 14. GB Holdings is owned by defendants Larry and Dennis Greenspon, who are also LDR's managers Id ¶ 15

Relator Schagrin is an attorney experienced in the steel pipe industry and related matters of international trade Id ¶¶ 10-11 In 2010, Schagrin visited a Home Depot store and noticed LDR pipe imported from China Id ¶ 31 Based on his experience with the steel pipe industry he surmised that this pipe did not fall into any of the exceptions to the duty regulations, and was the same type of pipe LDR imported from China prior to implementation of the duty regulations Id ¶¶ 31-36 He also surmised that LDR had not paid the duties because the prices were too low Id ¶ 37 Schagrin alleges that these conclusions would have been obvious to anyone with sufficient knowledge of the industry and regulations Id ¶ 38

Schagrin reported his suspicions to the United States Customs and Border Protection Agency ("U S Customs") in 2012 Id ¶ 43 U S Customs investigated and determined that LDR had misclassified its imported pipe in order to avoid paying duties Id ¶ 44 Relators allege that U S Customs "billed" LDR for unpaid duties in the amount of $6 7 million, which was later

**United States ex rel. Schagrin v. LDR Industries, LLC, Not Reported in Fed. Supp. (2018)**

2018 WL 6064699

reduced to $4 85 million, covering pipe shipments in 2011 and 2012 *Id* Relators also allege that U S Customs "continues to investigate the matter " *Id*

**\*3** Largely due to the penalties imposed by U S Customs, LDR declared bankruptcy on September 2, 2014 U S Customs filed a proof of claim in that proceeding on February 3, 2015 Defendants have attached that proof of claim (and its amendments) to their motion to dismiss According to those documents, U S Customs claims the following

> The loss of revenue of $14,376,139.08 was a result of incorrect classification in which LDR Industries, LLC underpaid Customs duties on entries from November 2007 to September 2012

> The penalty is being assessed for $38,813,848 70 due to the findings that the entries were filed with incorrect classification with no rate and/or lower rates of dumping countervailing duties The penalty also includes entries that were filed as consumption should have been subject to anti-dumping and countervailing These findings are the result of the penalty pursuant to 19 U S C § 1592

R 45-4 at 8, R 45-5 at 8; 45-6 at 10 Additionally, in the initial proof of claim (although not in subsequent amendments), U S Customs stated that LDR "paid dumping deposit rate of 3 39% for entries imported from Korea, however, it turned out that the merchandise came from China and the rate for dumping and countervailing should have been at 68 24% and 39 01% " R 45-4 at 10

Relators did not file a proof of claim in LDR's bankruptcy proceedings Relators filed this action on November 13, 2014

On October 6, 2016, the bankruptcy court entered an order approving LDR's Chapter 11 plan *See* R 45-2 That order notes that the plan "incorporates the terms of a settlement between [LDR] and [U S Customs] which resolves the Disputed Claim filed by [U S Customs] in the amount of $58,717,368 86[ ]" *Id* at 8 The plan itself provides that the settlement constitutes a "full and complete satisfaction of [LDR's] obligations for all Claims held by [U S Customs] " *Id* at 21 No party contends that the plan constitutes a satisfaction of the claims against the Greenspons or GB Holdings at issue in this case

**Analysis**

**I. Motion to Reconsider**

The False Claims Act bars any action "which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party " [1] 31 U S C § 3730(e)(3) This is known as the "government action bar "

U S Customs' proof of claim in LDR's bankruptcy case stated that a "penalty is being assessed" and that the findings supporting the proof of claim were "the *result of the penalty* pursuant to 19 U S C § 1592." R 45-4 at 8, R 45-5 at 8, 45-6 at 10 (emphasis added) In the May 23 opinion, the Court found that this language indicated that U S Customs had initiated a penalty proceeding against LDR prior to the bankruptcy proceeding The Court also held that Relators' allegations in this case were "based on" the same "allegations or transactions" that were the subject of" that penalty proceeding "in which the Government [was] already a party," such that the claims should be dismissed under the government action bar

However, in support of Relators' motion to reconsider, the government has submitted affidavits from U S Customs indicating that—contrary to the Court's May 23 findings—no penalty proceeding was ever initiated *See* R 75-1, R 75-2 The government contends that a penalty proceeding under 19 U S C § 1592 can be initiated only by issuance of a pre-penalty notice pursuant to [image] 19 U S C § 1952, and no such notice was ever issued to LDR *See* R 75 at 3 The government contends further that U S Customs investigated LDR in 2012 and assessed LDR for unpaid customs duties According to the government, the results of this investigation were the basis for the "estimated" potential penalties described in the bankruptcy proof of claim *Id* at 5 The government argues that the statements referencing a penalty proceeding concerned "contingent or unmatured" claims that U S Customs "might have" but never "actually assessed " *Id*

**\*4** Defendants argue that the government's characterization of the statements in the proofs of claim is contrary to the express language in those documents But the Court need not delve into the reasons U S Customs used the particular language it did in submitting the proofs of claim to the bankruptcy court Defendants apparently do not dispute that U S Customs never issued a pre-penalty notice to LDR Defendants also do not contend that investigation prior to the issuance of a pre-penalty notice could constitute a penalty

proceeding for purposes of the government action bar under ⬜31 U.S.C. § 3730(c)(3) Absent argument to the contrary from Defendants, the Court agrees with the government and Relators that issuance of a pre-penalty notice pursuant to 19 U.S.C. § 1592 is necessary for a penalty proceeding to be in progress such that the government action bar is implicated Therefore, since there is no dispute that a pre-penalty notice was never issued, that fact is dispositive of the issue in this case at this point in the proceedings, and the Court must reverse its dismissal of the case based on the government action bar

Defendants argue that this is not a proper basis for a motion to reconsider because Relators could have made this argument on the initial motion to dismiss But, as Defendants also note, Relators did in fact make this argument The Court rejected the argument because the language in the proofs of claim appeared to plainly state that a penalty proceeding had occurred prior to Relators filing this action Now, however, the affidavits from U.S Customs call that factual finding into question Thus, reconsideration is appropriate on that basis

## II. Motion to Dismiss

Having dismissed the case based on the government action bar, it was unnecessary for the Court to address Defendants' alternative arguments for dismissal Now having found that the government action bar is not a basis to dismiss the case (at least at this point in the proceedings), the Court turns to the other arguments for dismissal of (1) the claims against the Greenspons and GB Holdings, and (2) the claims against LDR

### A. Claims Against the Greenspons and GB Holdings

Relators allege the following theories of liability against the Greenspons and GB Holdings: (1) direct violation of the False Claims Act, (2) alter ego liability for LDR's violation of the False Claims Act; and (3) liability for conspiring to violate the False Claims Act The Court addresses each in turn

#### 1. Direct Liability Under the False Claims Act

In general, to state a claim for a False Claims Act violation, a relator "must allege the following essential elements with particularity (1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew the statement was false "

⬜*United States ex rel Berkowitz v Automation Aids, Inc*, 896 F.3d 834, 840 (7th Cir 2018) In this case, the first element is different in that Relators do not allege false claims for payment *from* the government, but false statements made in order to avoid an "obligation" to pay customs duties *to* the government But this also constitutes a violation of the False Claims Act, ⬜31 U.S.C. § 3729(a)(1)(G) (providing liability for "any person who—(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government") Claims for violation of the False Claims Act must meet the heightened pleading standard of ⬜Federal Rule of Civil Procedure 9(b). *See* ⬜*Lusby*, 570 F.3d at 853 (under ⬜Rule 9(b) "particularity  means the who, what, when, where, and how")

It is undisputed that LDR failed to pay certain customs duties, and that the government has sought payment from LDR. These facts supply the "what, when, where, and how" required by ⬜Rule 9(b) Of course, Relators also allege that the Greenspons and GB Holdings are the "who" in this case Defendants argue that the complaint is deficient in this regard because Relators have not alleged " 'specific fraudulent acts' by each defendant" and have failed to "provide representative examples of the conduct of each individual Defendant " R 45 at 16 Thus, the question is not so much whether Relators' allegations satisfy ⬜Rule 9(b), as they have alleged a "who" and the other "circumstances of the fraud" itself Rather, the question is whether Relators have satisfied Rule 8's plausibility standard for alleging that the Greenspons and GB Holdings are liable for that fraud

**\*5** Relators claim that GB Holdings and the Greenspons are liable here "for 'causing' LDR's underlying violations." R. 50 at 18 (quoting ⬜31 U.S.C. § 3729(a)(1)(G) ). Relators allege that the Greenspons "caused" LDR's violations because they were LDR's owners and managers, and the Greenspons' experience with the industry would have made it obvious that customs duties were not being paid. R 1 ¶¶ 18, 39 Relators allege further that this information would have been obvious to anyone in the industry based on the following alleged facts (1) Home Depot generally only sells pipe that is subject to duties, (2) the characteristics of the pipe indicate that it

**United States ex rel. Schagrin v. LDR Industries, LLC, Not Reported in Fed. Supp. (2018)**

2018 WL 6064699

is subject to duties, and (3) the retail cost of the pipe was much too low considering the relevant customs duties R 1 ¶¶ 37-38 In sum, Relators argue that the Greenspons must have known that LDR was not paying the required customs duties and they either directed that to happen or failed to prevent or stop it from happening

"Generally, mere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish liability under the FCA " *U S ex rel Sikkenga v Regence Bluecross Blueshield of Utah*, 472 F 3d 702, 714 (10th Cir 2006), *see also United States ex rel Schmidt v Zimmer, Inc*, 386 F 3d 235, 245 (3d Cir 2004) ("[M]ere awareness that another may, or even has, chosen to make [a false] claim does not alone constitute 'causing a false claim to be presented ' ") Rather, a relator must allege that a defendant took an "active role" in the scheme *See United States ex rel Ailabouni v Advocate Health & Hosps Corp*, 2017 WL 4310640, at *11 (N D Ill Sept 28, 2017) ("[The defendant] is not liable because mere knowledge of a fraud [cannot] sustain an FCA cause of action To state a claim, Relator would have to allege that [the defendant] took an 'active role' in submitting false claims or material fraudulent documents to the government "), *see also United States ex rel Kalec v NuWave Monitoring, LLC*, 84 F Supp 3d 793, 802 (N D Ill 2015) ("[Relators] must allege that [the defendants] had an active role in submitting a false claim to the government or in preparing fraudulent documents that were material to a claim to the government "), *U S ex rel Lisitza v Par Pharm Cos , Inc*, 2013 WL 870623, at *4 (N D Ill Mar 7, 2013) ("[T]he allegations in the complaint that [the defendants] knew of the [false claims]—even though they pass muster under Rule 9(b)—are not enough to state a claim. In addition to allegations of knowledge, the relator must supply facts to plausibly assert that [the defendants] *caused* other parties' false statements or the submission of false claims. This requires some affirmative participation or action by these defendants that furthers the unlawful objective "), *U S ex rel Tyson v Amerigroup Illinois, Inc*, 488 F Supp 2d 719, 736 (N D Ill 2007) ("[M]ere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish liability under the FCA Instead, some sort of an affirmative action [is required] ")

In assessing whether defendant has taken an "active role" that can subject the defendant to liability, "the appropriate focus of the inquiry is on the specific conduct of the person" alleged

to have violated the statute *Sikkenga*, 472 F 3d at 714 The Seventh Circuit has held that this inquiry is governed by "established" principles of proximate causation *United States v Luce*, 873 F 3d 999, 1012 (7th Cir 2017) Requiring proximate cause for False Claims Act claims "comports with the [statute's] statutory purpose," by only permitting " 'FCA claims to proceed against parties who can fairly be said to have caused a claim to be presented to the government, while winnowing out those claims with only attenuated links between the defendants' specific actions and the presentation of the false claim ' " *Id* at 1012-13 (quoting *Sikkenga*, 472 F 3d at 714)

**\*6** However, some district courts have held that allegation that a defendant's "failure to act" to stop fraudulent claims is a "course of conduct" that violates the False Claims Act *U S ex rel Long v SCS Bus & Technical Inst*, 999 F Supp 78, 91 (D D C 1998) *rev'd on other grounds sub nom United States ex rel Long v SCS Bus & Technical Inst, Inc*, 173 F 3d 870 (D C Cir 1999), *see also United States v President & Fellows of Harvard Coll*, 323 F Supp 2d 151, 187 (D Mass 2004) ("Where a defendant has an ongoing business relationship with a repeated false claimant, and the defendant knows of the false claims, yet does not cease doing business with the claimant or disclose the false claims to the United States, the defendant's ostrich-like behavior itself becomes a course of conduct that allowed fraudulent claims to be presented to the government ") (internal quotation marks and citations omitted). "As a whole, these cases indicate that, in examining whether a non-submitting party has 'caused' the submission of a false claim or false statement, a court must look at the degree to which that party was involved in the scheme that results in the actual submission " *United States ex rel Tran v Computer Scis Corp*, 53 F Supp 3d 104, 127 (D D C 2014).

The Court agrees with Relators' theory of the case to the extent that if the Greenspons knew that LDR—the company they owned and managed—was not paying customs duties, they can be liable under the False Claims Act for failing to rectify the situation A corporate owner and manager's knowledge of fraudulent conduct by his company is not akin to that of a subordinate employee with no responsibility for the company's actions Such an employee possesses only the power to report fraudulent conduct to supervisors or legal authorities Relators do not argue that the Greenspons are liable for a mere failure to report, and the Court does not

Case 3:22-cv-00651-SMY Document 22 Filed 07/07/22 Page 40 of 405 Page ID #226

United States ex rel. Schagrin v. LDR Industries, LLC, Not Reported in Fed. Supp. (2018)

2018 WL 6064699

understand the False Claims Act to impose such liability. But when a person has the unfettered power, not simply to report, but to affirmatively stop fraudulent conduct, and instead affirmatively decides to allow to the fraud to continue, and furthermore, then enjoys the resulting corporate profits, such a person has proximately caused the fraud, and can be liable under the False Claims Act. For a person with such power, knowledge of the fraud is sufficient to allege the "active role" necessary for liability, because the failure to act constitutes a course of conduct that proximately causes the fraud.

Having alleged that the Greenspons were LDR's managers and owners, Relators have plausibly alleged that the Greenspons had the power to alter LDR's policies with regard to paying customs duties. The question here is whether Relators have sufficiently alleged that the Greenspons had knowledge that the customs duties were not being properly paid. "Knowledge" under the False Claims Act is defined as either "actual knowledge," "deliberate ignorance," or "reckless disregard." 31 U.S.C. § 3729(b)(1)(A). "In the [False Claims Act] context, the reckless disregard required to show the necessary knowledge is an extension of gross negligence." *United States ex rel Sheet Metal Workers Int'l Ass'n, Local Union 20 v. Horning Investments, LLC*, 828 F.3d 587, 593 (7th Cir 2016). The Supreme Court has held that the False Claims Act's knowledge provision should be "strict[ly] enforce[ed]." *Universal Health Servs, Inc v. United States*, 136 S. Ct. 1989, 2002 (2016).

Relators' argue that the Greenspons' must have had the requisite knowledge because the falsity of LDR's customs claims would be "obvious" to persons "in the industry." The Court questions whether the allegation of "obviousness" is well-pled, since it requires the Court to draw an inference which—not being "in the industry"—the Court does not have the expertise to make. In any event, the more apparent problem with Relators' claims is that they have not sufficiently alleged that the Greenspons were sufficiently experienced in the industry to apprehend the "obviousness" of the customs violation. True, Relators allege that the Greenspons owned and managed LDR for many years. But Relators allege nothing about the Greenspons' specific responsibilities in the company. Relators also do not allege anything about LDR's size or corporate management structure from which the Court might infer the extent of the Greenspons' experience and knowledge of the industry. It is possible that the Greenspons were active managers of a relatively small business, and the

products at issue here were a large percentage of that business. But it is equally possible, that the Greenspons owned a company that had expanded beyond their business acumen, and that they relied on subordinate officers to manage the details of overseas manufacture and importing, of many different products, and the pipes at issue in this case were merely a small percentage of that business. Some instances of the later scenario might evince "reckless disregard." But in other instances along the spectrum of possible descriptions of LDR's business, the Greenspons would not have had the requisite knowledge for liability under the False Claims Act, even if the Court could countenance Relators' allegations of obviousness. The complaint leaves these many possibilities open, such that Relators have only alleged that scenarios in which the Greenspons had sufficient knowledge are *possible*. But possibility is not enough to state a claim under Rule 12(b)(6). *See* Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.") Rather, Relators' allegations "must establish a nonnegligible probability that the claim is valid." In re Text Messaging Antitrust Litig, 630 F.3d 622, 629 (7th Cir 2010). Otherwise, all corporate owner-managers would be liable for False Claims Act violations committed by their companies without regard to the degree of their involvement in the fraudulent scheme. The False Claims Act does not provide for such a broad scope of liability. *See* Universal Health, 136 S. Ct. at 2002 ("[C]oncerns about fair notice and open-ended liability can be effectively addressed through strict enforcement of the [False Claims Act's] materiality and scienter requirements.")

**\*7** The Court notes that the Seventh Circuit has held that relators do not have to allege specific details about documents used to submit false claims if they are not in a position to have access to such documents. *See, e.g.*, Pirelli, 631 F.3d at 443, Lusby, 570 F.3d at 854-55. In *Pirelli* and *Lusby*, the Seventh Circuit reasoned that circumstantial allegations indicating that false claims were submitted are sufficient to satisfy Rule 9(b) even though relators do not know the specific dates, submitting person identities, and content of individual claims. Similarly, Relators here may not have access to information about LDR's inner workings.

But the principle permitting circumstantial pleading of claim submission is ultimately inapposite here, because in the cases in which it was applied, specific details about the individual

United States ex rel. Schagrin v. LDR Industries, LLC, Not Reported in Fed. Supp. (2018)

2018 WL 6064699

claim documents were not necessary to draw a plausible inference of fraudulent conduct, and the identity of the actor potentially liable was not in question  Unlike those cases, the plausibility of fraudulent conduct *by the Greenspons* is not present here. Rather, the Court has held that Relators have failed to satisfy Rule 8's notice pleading standard regarding the Greenspons' industry knowledge and responsibility within LDR  More must be alleged about the Greenspons' conduct as LDR managers and/or experience in the industry to be able to infer the level of knowledge necessary to allege liability [1]

## 2. Alter Ego Liability for LDR's False Claims Act Violations

In addition to alleging that the Greenspons have violated the False Claims Act themselves, Relators allege that the Greenspons are liable for LDR's False Claims Act violations under an alter ego theory  (Although the Court has not addressed in detail whether Relators have sufficiently alleged that LDR violated the False Claims Act, the Court has noted that the facts underlying U S  Customs' assessment of unpaid customs duties are likely sufficient to state a claim against LDR  The Court will address whether any claims remain against LDR below )[2]

" 'Generally, before the separate corporate identity of one corporation will be disregarded and treated as the alter ego of another, it must be shown that it is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice.' " *Northbound Grp , Inc v Norvax, Inc* , 795 F.3d 647, 652 (7th Cir 2015) (quoting *Main Bank of Chi  v Baker*, 427 N E 2d 94, 101 (Ill 1981) )  "Once the first element of the test is established, *either* the sanctioning of a fraud (intentional wrongdoing) *or* the promotion of injustice, will satisfy the second element " *Wellness Int'l Network, Ltd  v Sharif*, 727 F 3d 751, 774 (7th Cir 2013), rev'd on other grounds, 135 S Ct 1932 (2015) (emphases in original)  "Piercing the corporate veil is not favored and in general, courts are reluctant to do so " *Judson Atkinson Candies, Inc  v Latini-Hohberger Dhimantec*, 529 F 3d 371, 379 (7th Cir 2008)

**\*8** Relators allege the following with respect to their alter ego theory of liability

> LDR has operated as the alter ego of GB Holdings for purposes of committing the fraud alleged herein  As the sole member of LDR, GB Holdings exercises complete discretion over the decisions of LDR  LDR and GB Holdings also share common office space, addresses, and phone numbers as both companies are headquartered in the same location  In addition, there is overlap in ownership, officers, and personnel between the companies, with the owners of GB Holdings, Larry Greenspon and Dennis Greenspon, also serving as the managers of LDR  Furthermore, GB Holdings has not adequately capitalized LDR given that in or about September 2014, LDR filed for Chapter 11 Bankruptcy, in which LDR admitted that it was so undercapitalized that it did not have sufficient funds to pay the full amount of customs duties owed on its imports.

\* \* \* \*

> The Greenspons exercised complete discretion over the decisions of GB Holdings and LDR by virtue of their sole ownership of GB Holdings, which is the sole owner of LDR, as well as their position as managers of LDR  The Greenspons even own 600 N  Kilbourn, L L C , from which LDR leases its principal offices, with 600 N  Kilbourn Ave , Chicago, IL serving as the headquarters for both LDR and GB Holdings  In essence, the Greenspons created GB Holdings and other companies, like 600 N  Kilbourn, L L C , as shell companies for purposes of funneling their ill-gotten gotten gains

> Via the above-described ownership structure, the Greenspons extracted substantial sums of money from GB Holdings and LDR, amassing considerable personal wealth by depositing into the Greenspons' personal funds the unlawfully gained profit LDR obtained through fraudulently evading AD/CV duties, leaving LDR so undercapitalized that the company does not have sufficient cash to pay the full amount of customs duties owed to the U S  Government on its imports  Instead, the Greenspons caused and expressly authorized LDR to file for bankruptcy in order to avoid having to pay these AD/CV duties

R  1 ¶¶ 15, 18-19

It is unnecessary to address in detail Relators' allegations regarding the first element of an alter ego theory—i e , that LDR was the Greenspons' instrumentality [3]—because

Case 3:22-cv-00651-SMY   Document 22   Filed 07/07/22   Page 42 of 405   Page ID #228

United States ex rel  Schagrin v. LDR Industries, LLC, Not Reported in Fed. Supp. (2018)

2018 WL 6064699

Relators have failed to allege the second element—a fraud or injustice—for much the same reasons as the Court discussed with respect to Relators' claim of direct liability Relators' alter ego allegation boils down to the theory that the Greenspons' siphoning of LDR's ill-gotten profits from avoiding customs duties payments, so that LDR was forced to declare bankruptcy when U S  Customs came calling, demonstrates fraud or injustice  The Court assumes that Relators are correct that the Greenspons "extracted substantial sums" from LDR to "amass[ ] considerable personal wealth " But the Court has rejected Relators' allegations that the Greenspons knew of fraudulent conduct by LDR  Without competent allegations of fraudulent conduct, the Greenspons' "extraction" of assets from LDR is not a plausible basis to pierce the corporate veil  Relators have alleged no details about the timing of any asset transfers that would make LDR's bankruptcy a sufficient basis to support alter ego liability absent additional allegations of fraudulent intent And bankruptcy alone is insufficient to support such a showing  *See, e g*, *Lopez v Ram Shirdi Inc* , 2014 WL 4214892, at *5 (N D. Ill  Aug  26, 2014), *Escobedo v Ram Shirdi Inc* , No  2014 WL 4553186, at *5 (N D  Ill  Sept  15, 2014)  Therefore, Relators' claims against the Greenspons and GB Holdings based on an alter ego theory of liability are dismissed

### B. Claims Against LDR

**\*9**  Relators concede that the government has released its claims against LDR in the bankruptcy proceeding  R  50 at 10. But Relators argue that LDR should remain in the case as a defendant because they "are not seeking to recover damages from LDR," but "seek only a determination of LDR's liability " R. 50 at 10  Relators argue that this is analogous to circumstances in which a debtor discharged in bankruptcy may nevertheless be named in a lawsuit to recover from a surety. *Id*  (quoting *Matter of Shondel*, 950 F 2d 1301, 1307 (7th Cir  1991) )

But unlike a surety arrangement, which contractually ties the liability of the surety to the liability of the debtor, liability under the False Claims Act is determined on a person by person basis. Relators have not cited a case holding that a relator alleging a defendant "caused" a violation of the False Claims Act must also sue the person who actually submitted the false document  This is likely because liability of the causing defendant does not necessarily imply liability by the submitter, as the submitter may have acted without the requisite scienter  *See* United States ex rel  Ceas v Chrysler Grp  LLC, 2016 WL 6963060, at *5 (N D  Ill  Jan  19, 2016) ("The fact that the [non-defendant] relays the false statement verbally and/or through a written invoice charging the Government for the repairs    does not shield Defendant from liability under the FCA, as explained above, the FCA reaches claims that are rendered false by one party, but submitted to the government by another ' " (quoting *Mason v Medline Indus , Inc* , 731 F  Supp. 2d 730, 738 (N.D  Ill 2010) ("The wealth of case law supports the proposition that the FCA reaches claims that are rendered false by one party, but submitted to the government by another ") (citing cases) )

In any case, because Relators concede that they have only sued LDR to establish liability for the Greenspons and GB Holdings, and the Court has held that Relators have failed to state claims against the Greenspons and GB Holdings, the claims against LDR are also dismissed

### Conclusion

For the foregoing reasons, Relators' motion to reconsider, R  61, is granted  However, Relators' claims remain dismissed without prejudice  Should Relators believe they can cure the deficiencies described in this opinion, they may file a motion for leave to file an amended complaint attaching the proposed amended complaint showing the changes as compared against the operative complaint  The motion should be accompanied by a memorandum of no more than five pages explaining how the amended complaint cures the deficiencies of the current complaint  The deadline for such a motion is December 19, 2018  Defendants should not file a response unless the Court so orders  Unless Relators file a motion to amend, Relators' complaint will be dismissed with prejudice on December 20, 2018

### All Citations

Not Reported in Fed  Supp , 2018 WL 6064699

United States ex rel. Schagrin v. LDR Industries, LLC, Not Reported in Fed. Supp. (2018)
2018 WL 6064699

## Footnotes

1    This reasoning also serves as a basis to dismiss Relators' conspiracy claims. Moreover, the Court agrees with Defendants that the conspiracy claims are barred by the intracorporate conspiracy doctrine. *See* U.S. *ex rel. Chilcott v. KBR, Inc*, 2013 WL 5781660 (N.D. Ill. Oct. 25, 2013) (applying the intracorporate conspiracy doctrine to dismiss False Claims Act conspiracy claims against corporate officers).

2    The government's settlement with LDR in bankruptcy does not eliminate the possibility that the Greenspons and GB Holdings could be held liable for LDR's violation of the False Claims Act under an alter ego theory. *See Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 462 (7th Cir. 1991) ("the *alter ego* doctrine can be invoked to impose liability on a parent even when the plaintiff settles with the subsidiary"), *Cent. States, Se. & Sw. Areas Pension Fund v. Art Pape Transfer, Inc*, 79 F.3d 651, 653 (7th Cir. 1996) ("The settlement agreement in *Lumpkin* did not release the buyer, and we were skeptical of the buyer's attempt to pierce *its own* corporate identity to take advantage of the release.") (emphasis in original), *see also Carpenters Pension Fund of Ill. v. Martinak*, 2018 WL 3232791, at *3 (N.D. Ill. July 2, 2018) (citing *Lumpkin* ). No party contends that the bankruptcy plan constitutes a satisfaction of the claims against the Greenspons or GB Holdings at issue in this case.

3    The Court notes that the "fact that a corporation has only one single shareholder is not proof that the corporation is the 'alter ego' of that shareholder." *Judson Atkinson*, 529 F.3d at 381, *Main Bank*, 427 N.E.2d at 101 ("Stock ownership alone in one corporation by another does not create an identity of interest between the two or create the relation of principal and agent, representative, or alter ego between the two."). So too for shared locations. *See Bridge v. New Holland Logansport, Inc*, 815 F.3d 356, 364-65 (7th Cir. 2016). But bankruptcy is evidence of undercapitalization. And all of these facts together are likely sufficient to plausibly allege that LDR was the Greenspons' instrumentality. *See Northbound*, 795 F.3d at 652.

---

**End of Document**                                     © 2022 Thomson Reuters. No claim to original U.S. Government Works.

3

United States ex rel. Hilliard v. Hardin House Inc , Not Reported in Fed. Supp. (2020)

2020 WL 362796, Med & Med GD (CCH) P 306,697

2020 WL 362796
United States District Court, N D Illinois, Eastern Division.

UNITED STATES of America EX REL
Joyce HILLIARD, et al , Plaintiffs,

v

HARDIN HOUSE INC , et al , Defendants

No. 17 CV 1043
|
Signed 01/22/2020

**Attorneys and Law Firms**

AUSA, United States Attorney's Office, James Louis Bizzieri, Bizzieri Law Offices, L.L.C., Chicago, IL, for Plaintiff United States

Barney I Cohen, Concierge Attorneys, LLC, Evanston, IL, John Joseph Muldoon, III, Muldoon & Muldoon LLC, James Louis Bizzieri, Bizzieri Law Offices, L L C , Chicago, IL, for Plaintiffs Joyce Hilliard, Shawn Williams, Andrea Wilson, Carla Scott.

James Louis Bizzieri, Bizzieri Law Offices, L L C , Chicago, IL, for Plaintiff State of Illinois

Adella S Deacon, Sable Law Group, LLC, Chicago, IL, for Defendants Hardin House, Inc , Kathy Hardin, Drexel Counseling Services

Scott David Stein, Sidley Austin LLP, Neil Gerard Nandi, Loeb & Loeb LLP, Chicago, IL, for Defendant Quest Diagnostics Laboratories.

**ORDER**

Manish S Shah, U S District Judge

*1 Defendants' motions to dismiss, [38], [54], are granted. Relators' Second Amended Complaint, [26], is dismissed with prejudice Enter judgment and terminate civil case

**STATEMENT**

Relators Joyce Hilliard, Shawn Williams, Carla Scott, and Andrea Wilson were each employed in different capacities by defendants Hardin House Inc and Drexel Counseling Services [26] ¶ 7 [1] Defendant Kathy Hardin owns both Hardin House and Drexel [26] ¶ 12 Hardin House and Drexel's staff include counselors and therapists that provide inpatient and outpatient mental-health and substance-abuse services. [29] ¶¶ 10, 19

Although both Hardin House and Drexel purport to determine their clients' unique needs, [26] ¶ 21, they test every client for many different substances [26] ¶¶ 33, 34, 82 For example, a client that comes in seeking treatment for alcoholism is tested for drugs that are normally injected (as well as other drugs) [26] ¶ 34 Part of the reason for this is that Quest trained Hardin House's and Drexel's employees to enter computer codes into their billing system in a way that resulted in each client being tested for every substance it was possible to test for [26] ¶ 35 As a result, Hardin House and Drexel bill for a lot of testing, [26] ¶ 36, and many of those bills are submitted to Medicare and Medicaid [26] ¶¶ 38, 71 When submitting their invoices, defendants—all of them, according to the Second Amended Complaint—intentionally and knowingly certify that the drug analyses were reasonable and necessary [26] ¶¶ 39, 40

Hardin House, Drexel, Quest and Ms Hardin have all moved to dismiss the complaint, which alleges that they violated (and conspired to violate) the False Claims Act and the Illinois False Claims Act [26] at 6–17 (citing 31 U S C § 3729(a)(1)(A) (C), 740 Ill Comp Stat Ann 175/3(a)(1)(A)–(C)) The False Claims Act imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim " 31 U S C § 3729(1)(A), (B) Relators in False Claims Act cases must allege "(1) that the defendant made a statement in order to receive money from the government, (2) that the statement was false, and (3) that the defendant knew the statement was false " *United States ex rel Hanna v City of Chicago*, 834 F 3d 775, 778 (7th Cir 2016)

Complaints in False Claims Act cases are subject to the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure—they must "state with particularity the circumstances constituting fraud or mistake " Fed R Civ P 9(b); *United States ex rel Berkowitz v Automation Aids, Inc* , 896 F.3d 834, 839 (7th Cir 2018), *Hanna*, 834

**United States ex rel. Hilliard v. Hardin House Inc., Not Reported in Fed. Supp. (2020)**
2020 WL 362796, Med & Med GD (CCH) P 306,697

F 3d at 779, *United States ex rel Presser v Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 777–76 (7th Cir. 2016) Normally, in order to meet that standard, the complaint must at least allege "the who, what, when, where, and how the first paragraph of any newspaper story " *Hanna*, 834 F 3d at 779 (quoting *DiLeo v Ernst & Young*, 901 F.2d 624, 627 (7th Cir 1990)). *See also U S ex rel Grenadyor v Ukrainian Vill Pharmacy, Inc*, 772 F 3d 1102, 1106 (7th Cir 2014) (the complaint must include the "identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated"). But what constitutes particularity depends on the facts of the case and the test must not be applied in an overly rigid way *Berkowitz*, 896 F 3d at 839, *Pirelli Armstrong Tire Corp Retiree Med Benefits Tr v Walgreen Co*, 631 F 3d 436, 442 (7th Cir 2011) Relators should "use some means of injecting precision and some measure of substantiation into their allegations." *Presser*, 836 F.3d at 776, 778 (cleaned up)

**\*2** Unlike pleadings under Federal Rule of Civil Procedure Rule 8, "the pleader is not free to hold back and add facts via affidavit or brief," so the allegations must be evaluated based only on what is alleged in (or attached to) the complaint *Hanna*, 834 F 3d at 779. *See also* [60] at 8, *Ackerman v Nw Mut Life Ins Co*, 172 F 3d 467, 469 (7th Cir. 1999) (part of the purpose of Rule 9(b) is to "force the relator to do more than the usual investigation before filing his complaint") As a result, I decline to consider the declaration of Joyce Hilliard, [60-2], and what purports to be a urine testing policy issued by Quest, [60-1], neither of which were attached to the Second Amended Complaint

Looking only at the face of the Second Amended Complaint, relators' claims do not include sufficient specificity to satisfy Rule 9(b). With regard to Kathy Hardin, the Second Amended Complaint makes no mention of her involvement beyond the allegation that she owned some of the entities at issue Those entities employed counselors and therapists that provided many different services to many different types of patients Unlike in *Presser*, where there were allegations that the higher-ups wrote emails demanding compliance with the policies in question and had access to video cameras that allowed them to monitor how treatment was being provided, *Presser*, 836 F 3d at 774, the Second Amended Complaint

does not allege any specific factual circumstances that make it plausible that Ms Hardin knew about, or directed the implementation of, the polices at issue here *Rocha v Rudd*, 826 F.3d 905, 911 (7th Cir 2016) ("because fair notice is the most basic consideration underlying Rule 9(b), in a case involving multiple defendants, the complaint should inform each defendant of the nature of [her] alleged participation in the fraud") (cleaned up) The False Claims Act claim against Ms Hardin and the claim that Ms Hardin conspired to violate the False Claims act are both dismissed

The claims against Hardin House and Drexel fail, too With regard to when the alleged fraud took place, the Second Amended Complaint only narrows the window to a nine-year period reaching back to "at least 2011 " [26] ¶ 15 It also fails to identify any particular person that may have submitted false or fraudulent claims *See Grenadyor*, 772 F 3d at 1107 It even fails to nail down the location where the statements were made *See* [26] ¶¶ 10, 18, 29 (Hardin House and Drexel apparently operate multiple facilities, but the Second Amended Complaint does not specify from which facility or facilities false requests for treatment were submitted) Even though it gives a general idea of what relators say happened—Hardin House and Drexel submitted bills to federal medical programs for tests that were unnecessary in light of clients' unique medical needs—the Second Amended Complaint does not identify any of the individual clients (even by pseudonym), any of the employees that submitted the tests, or any particular test that was unnecessary It does not state with specificity the circumstances of the alleged fraud. *See also U S ex rel Garst v Lockheed-Martin Corp*, 328 F.3d 374, 378 (7th Cir 2003) (contending that the entirety of a claim is false "fails the requirement of specificity")

Nor does the Second Amended Complaint adequately allege a reason to believe that any pertinent regulations were knowingly violated According to the regulations cited, defendants were required to occasionally conduct randomized testing "in accordance with generally accepted clinical practice," *see* [26] ¶ 24, and were prohibited from submitting bills for laboratory tests that were not "reasonable and necessary for the diagnosis or treatment of illnesses." [26] ¶ 47 But the Second Amended Complaint contains "no medical, technical, or scientific context which would enable a reader of the complaint to understand why [defendants'] alleged actions amount to unnecessary care forbidden by the statute." *Presser*, 836 F.3d at 779 There may be reason to believe that people who have problems with one

substance never (or at least very rarely) need to be tested for other substances but, if so, the context that would support such reasoning was not included in the Second Amended Complaint In other words, the Second Amended Complaint does not "inject[ ] precision and some measure of substantiation" into the allegation that it was not in accordance with generally accepted clinical practice (or that it was not medically necessary) to test every patient for every substance

**\*3** The Second Amended Complaint also does not present circumstances that justify relaxing the pleading standards enough to forgive its generalities Relators may make allegations "on information and belief" if the "facts constituting the fraud are not accessible" to them and they nonetheless "provide[s] the grounds for [their] suspicions " ⊟ *Berkowitz*, 896 F 3d at 841 For instance, ⊟ Rule 9(b) can be relaxed when the relator lacks access to the necessary facts because he or she was denied access to that information during discovery, ⊟ *Corley v Rosewood Care Ctr, Inc*, 142 F 3d 1041, 1051 (7th Cir 1998), or because the relator never had regular access to the medical bills he or she needed to prove the claim ⊟ *Presser*, 836 F 3d at 778 But relators' attempts to draw comparisons to those cases are unconvincing In *Corley*, the complaint included detailed allegations of a bait-and-switch scheme that had been instituted by a nursing home against relator's mother and relator needed the additional discovery only to prove that the same scheme had been carried out against others ⊟ *Corley*, 142 F 3d at 1050–51 No such level of detail appears with regard to any patient in the Second Amended Complaint And unlike in *Presser*, the Second Amended Complaint does not explain what the relators did while they were working at Hardin House and Drexel, or whether they might have had regular access to the information they need to plead the circumstances of the fraud with particularity *See* [26] ¶ [7] Each relator was employed "in different capacities at certain relevant times," *id* , but that is insufficient to show that the relators were denied regular access to the facts they now say they cannot proceed without

Satisfying ⊟ Rule 9(b) does not require that relators violate the Health Insurance Portability and Accountability Act of 1996 (HIPAA) Pub L No 104–191,110 Stat 1936 (1996) Only some information is subject to protection under HIPAA, *see* 45 C F R § 160.103 (HIPAA protects information "(i) [t]hat identifies the individual, or (ii) with respect to which

there is a reasonable basis to believe the information can be used to identify the individual"), and relators have made no showing that there is some specific, identifiable information that is necessary to satisfy ⊟ Rule 9(b) that is protected under HIPAA [65] at 5–6 They mention no particular documents and no particular information, and in any event do not even argue that such documentation and information are the only source of that information This is insufficient, especially considering that relators do not need to "present, or even include allegations about, a specific document or bill that the defendants submitted to the Government," ⊟ *Presser*, 836 F 3d at 777, and may use pseudonyms to protect identities as necessary *See* ⊟ *id* at 774 (the nurse provided examples of treatment that was given to certain patients referred to as "John Doe 1 and Jane Doe 2")

The Second Amended Complaint fares no better with regard to Quest It does not identify the dates that Quest conducted any of their trainings nor any particular Quest employees that were involved in the training process [26] ¶¶ 35–36 It also lacks specificity with regard to how Quest's training caused false claims to be made For instance, the Second Amended Complaint does not describe whether the billing policy at issue was initiated by Quest (at which point, perhaps, Hardin House and Drexel first realized the potential gain to be had from the scheme and thereafter willingly went along with it) or whether Hardin House and Drexel requested that Quest train them to bill this way (This lack of specificity is part of what dooms their conspiracy claim, too ) It also does not describe who entered the billing codes, whether the people that entered the billing codes had been instructed to do so by doctors or other medical professionals, or whether any doctors or medical professionals reviewed the billing codes before the tests were performed Relators do not have to provide all of these details in their complaint, but they must plead their claims of fraud with more particularity than that which was included in the Second Amended Complaint

In *Presser*, a nurse alleged that she had been instructed to continue using a billing code that applied to medical services that were no longer being provided, making the bills she submitted expressly false ⊟ *Presser*, 836 F 3d at 778. The alleged falsity in the Second Amended Complaint is that the testing was not medically necessary (or not up to clinical standards), not that it never occurred *See* [26] ¶¶ 33, 34 And again, the Second Amended Complaint lacks the "medical, technical, or scientific context which would enable a reader of the complaint to understand why" the bills were false or

misleading ⌐Presser, 836 F 3d at 779 In any event, since the Second Amended Complaint fails to sufficiently allege that the bills submitted were false or misleading, Quest cannot be liable for causing defendants to submit those bills

**\*4** The Second Amended Complaint also fails to adequately allege a conspiracy Although the Second Amended Complaint alleges that Quest trained employees at Hardin House and Drexel on how to enter the incorrect codes, it does not contain any allegations that make it plausible that Hardin House, Drexel, and Quest agreed to violate the False Claims Act (or any other statute) It simply asks the court to infer that, because there was a training that resulted in repeated violations, the parties must have agreed to violate the False Claims Act See [26] ¶ 35 There is no allegation that the defendants met ahead of time to discuss (or at any time communicated) their mutual intent to obtain a false statement in order to procure payment from the government

⌐Allison Engine Co v U S ex rel Sanders, 553 U S. 662, 672–73 (2008) ("it must be shown that the conspirators had the purpose of 'getting' the false record or statement to bring about the Government's payment of a false or fraudulent claim") Nor are there any allegations about who made the agreement, when the agreement was made, or the terms of the agreement

Defendants' motions to dismiss are granted Relators' claims under the False Claims Act are dismissed, as are the claims that the defendants conspired to violate the False Claims Act [26] ¶¶ 44–67 Without federal claims pending, I decline to exercise jurisdiction over relators' remaining state law claims

See ⌐Domanus v Locke Lord LLP, 847 F 3d 469, 483 (7th Cir 2017) ("[t]ypically, when a case is dismissed under Rule 12(b)(6), the district court will relinquish jurisdiction over [state law] claims and allow the state courts to take over if that is proper under their rules"), ⌐28 U S C. § 1367(c)(3)

Ordinarily, leave to amend should be given after granting a motion to dismiss the original complaint filed in a case

⌐Runnion ex rel Runnion v Girl Scouts of Greater Chicago & Nw Indiana, 786 F 3d 510, 519 (7th Cir 2015) Here, Ms Hilliard's declaration provides additional detail relevant to her ability to access information before filing suit, id

[60-2] ¶ 5 (she was a manager), the time at which the billing practices began, id ¶¶ 9, 10, 12–18 (she says it was right after Quest installed new software on their computers), and the reason that Hardin House and Drexel ordered the tests ¶¶ 18–23 (the software made it impossible to request anything other than a full battery of tests) This additional detail could inject some "precision and substantiation," ⌐Presser, 836 F.3d at 776, into some aspects of a new complaint, but Ms Hilliard's declaration provides none of the "medical, technical, or scientific context" that might explain why it was unnecessary to test every patient for every substance.

⌐Presser, 836 F 3d at 779 In that regard, amendment would be futile because plaintiffs have failed to provide that context despite being given four opportunities (their three previous complaints and the response to the motion to dismiss) to do so Medical necessity is the crux of the allegation of falsity, and after several attempts, relators have not articulated a plausible, particular claim on that front

Part of the purpose behind requiring that sufficient facts be included in the original complaint in actions alleging fraud is to "force the relator to do more than the usual" pre-filing investigation Hanna, 834 F.3d at 779, ⌐Ackerman, 172 F 3d at 469 Almost three years have passed since the complaint was filed, see [7], and nearly a year and a half has passed since both the United States and the State of Illinois declined to intervene [12], [16] Nothing in Ms Hilliard's declaration explains why she could not have included the facts she now presents in any of the three complaints that relators have already filed

Ms Hilliard's declaration, [60-2], and Quest's policy, [60-1], are too little, too late. All of the federal claims are dismissed with prejudice The state-law claims are dismissed without prejudice for lack of jurisdiction ⌐Domanus, 847 F 3d at 483, ⌐28 U S C § 1367(c)(3) Enter judgment and terminate civil case

**All Citations**

Not Reported in Fed Supp , 2020 WL 362796, Med & Med GD (CCH) P 306,697

United States ex rel. Hilliard v. Hardin House Inc., Not Reported in Fed. Supp. (2020)
2020 WL 362796, Med & Med GD (CCH) P 306,697

## Footnotes

1       Bracketed numbers refer to entries on the district court docket  Referenced page numbers are taken from the
        CM/ECF header placed at the top of filings  The facts are taken from the Second Amended Complaint. [26]

---

**End of Document**                                    © 2022 Thomson Reuters  No claim to original U S  Government Works

4

United States v. Baylor Scott & White Health, Not Reported in Fed. Supp. (2019)

2019 WL 3713756, Med & Med GD (CCH) P 306,580

⚑ KeyCite Yellow Flag - Negative Treatment

Distinguished by United States v. Marlin Medical Solutions LLC., W.D. Tex., January 12, 2022

2019 WL 3713756
United States District Court, W.D.
Texas, San Antonio Division

UNITED STATES of America ex rel
Integra Med Analytics, LLC, Plaintiff,

v

BAYLOR SCOTT & WHITE HEALTH, Baylor
University Medical Center-Dallas, Hillcrest Baptist
Medical Center, Scott & White Hospital-Round
Rock, Scott & White Hospital Temple, Defendants

No 5 17-CV-886-DAE
|
Signed 08/05/2019

**Attorneys and Law Firms**

Erica Benites Giese, Susan Leslie Strawn, U S Attorney's Office, San Antonio, TX, Thomas Arthur Parnham, Jr, United States Attorney's Office, Austin, TX, for Plaintiff

Megan Alter Hudgeons, R Jeffrey Layne, Reed Smith LLP, Austin, TX, for Defendants

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS (DKT # 21)

David Alan Ezra, Senior United States District Judge

*1 Before the Court is a Motion to Dismiss filed by Defendants Baylor Scott & White Health, Baylor University Medical Center-Dallas, Hillcrest Baptist Medical Center, Scott & White Hospital-Round Rock, and Scott & White Hospital Temple (collectively "Defendants") (Dkt # 21) Pursuant to Local Rule CV-7(h), the Court finds these matters suitable for disposition without a hearing After careful consideration of the memoranda filed in support of and in opposition to the motion, the Court—for the reasons that follow—**GRANTS** Defendants' Motion to Dismiss (Id.)

BACKGROUND

I Factual Background

Defendants in this qui tam action are the operator of a network of inpatient short-term acute care hospitals and four of its affiliated hospitals (Dkt # 15 [1] at 3 ) Part of the services Defendants perform are for patients covered by Medicare, and therefore Defendants regularly submit requests to Medicare for reimbursement for these services (Id ) As such, these request for reimbursement are subject to the False Claims Act ("FCA"), and knowingly presenting false or fraudulent claims to the Government for reimbursement is illegal and incurs civil liability [2] ⚑ 31 U S C § 3729. Plaintiff alleges that Defendants have submitted "more than $61 8 million in false claims for Medicare reimbursement over the past seven years " (Dkt # 15 at 5 )

In order to determine the proper amount of reimbursement for services rendered to patients, Medicare groups patients with similar clinical problems that are expected to require similar amounts of hospital resources into what are called Diagnoses Related Groups ("DRG") (Id at 6 ) The DRG is primarily determined by three types of codes from a Medicare claim (1) the principle diagnosis code [3], (2) any surgical procedure code [4], and (3) any secondary diagnosis codes [5] (Id at 7 ) The DRG can then be further adjusted based on hospital specific factors like market conditions in the hospital's city (Id.)

The allegations in this case concern Defendants' coding of secondary diagnosis codes, which determine the severity level of the DRG The Centers for Medicare and Medicaid Services ("CMS") publishes a list of codes each year that, when added to a claim, result in the claim being considered a "Complication or Comorbidity" ("CC") or a "Major Complication or Comorbidity" ("MCC") (Id ) When a CC or MCC secondary code is added to claim, the value of that claim can increase anywhere from $1,000 to $25,000 (Id )

*2 Plaintiff alleges that Defendants engaged in a scheme to fraudulently upcode CCs and MCCs that were not justified by the underlying medical diagnosis in order to increase hospital revenue (Id at 9 ) According to Plaintiff, effectuation of this scheme took many forms, spearheaded by Anthony Matejicka, Defendants' Medical Director for Coding and Utilization, through Defendants' Clinical Documentation Improvement ("CDI") program [6] (Id at 8 )

**United States v. Baylor Scott & White Health, Not Reported in Fed. Supp. (2019)**

2019 WL 3713756, Med & Med GD (CCH) P 306,580

Plaintiff first alleges that Defendants trained its doctors and CDI staff by emphasizing coding for MCCs (Id. at 9.) Such training included encouraging staff to use certain key words that would trigger or permit MCC coding, disseminating a list of MCCs to focus on, and having employees walk around with a list of MCCs to look for opportunities to assign them as secondary diagnoses (Id.) Defendants also allegedly emphasized to its doctors the importance of their coding efforts to both Defendants' revenue and the doctors pay for performance metrics (id. at 10–11.) Defendants also allegedly distributed tip sheets called "Teal Quickies" that provided doctors with guidance on how to clinically document diagnoses in a way that is codable by CMS (Id. at 11–12.)

Plaintiff next alleges that Defendants pressured doctors to change diagnoses by sending them "queries" encouraging doctors to "specify" or amend their diagnoses when the initial diagnoses did not warrant a CC or an MCC (Id. at 12–16.) According to Plaintiff, these "document clarification sheets" reveal an intent towards influencing doctors to code higher-paying CCs and MCCs because the query sheets largely provide only options that could permit coding for a CC or and MCC (Id.)

Finally, Plaintiff alleges that Defendants provided unnecessary treatment in order to permit them to code for MCCs (Id. at 19.) In particular, Plaintiff alleges Defendants purposefully places patients on post-operative ventilator support, which enabled them to code for the MCC of acute respiratory failure. (Id. at 19–20.)

Plaintiff's allegations primarily revolve around the coding of three particular MCCs ("Allegedly Misstated MCCs"): encephalopathy, respiratory failure, and severe malnutrition (Id. at 23.) In order to support its allegations, Plaintiff requested and received from CMS inpatient claims data for short term acute care hospitals from 2011 through 2017 and applied various proprietary methods of statistical analysis on this data set (Id. at 21.) The upshot of this analysis is that Defendants coded for the Allegedly Misstated MCCs at rates significantly higher than the average of other hospitals (Id. at 23–57.) According to Plaintiff, their statistical analysis further demonstrates that alternative hypothesis such as patient characteristics and demographics, the preferences or treatment decisions of physicians who work with patients at Defendants' hospitals, unique characteristics of Defendants patients, or regional factors cannot explain differences in coding rates of the Allegedly Misstated MCCs (Id. at 55–83.)

On the strength of this analysis, Plaintiff alleges Defendants improperly received $61.8 million dollars from false claims due to fraudulent upcoding of the Allegedly Misstated MCCs (Id. at 85.)

**\*3** Based on these allegations, Plaintiff assert one cause of action against Defendants for violations of the False Claims Act. Plaintiff alleges that Defendants (1) knowingly presented, or caused to be presented, false or fraudulent claims for payment of approval, in violation of 31 U.S.C. § 3729(a)(1)(A), (2) knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violations of 31 U.S.C. § 3729(a)(1)(B), and (3) knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealing or knowingly and improperly avoiding or decreasing and obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)(G) (Id. at 88–89.)

## II Procedural Background

Defendants filed the instant motion to dismiss under the FCA's public disclosure bar, and under Rule 12(b)(6) for failing to plead fraud with particularity as required by Rule 9(b) and for failure to state a plausible claim for relief under Rule 8(a) (Dkt. # 21.) Plaintiff filed a response in opposition to Defendants' motion (Dkt. # 23.) Defendants then filed a reply in support of their motion. (Dkt. # 24.)

This motion before the Court is fully briefed and ripe for review.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Review is limited to the contents of the complaint and matters properly subject to judicial notice. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). In analyzing a motion to dismiss for failure to state a claim, "[t]he court accept[s] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.' " In re Katrina Canal Beaches Litig., 495 F.3d 191, 205

United States v. Baylor Scott & White Health, Not Reported in Fed. Supp. (2019)

2019 WL 3713756, Med & Med GD (CCH) P 306,580

(5th Cir 2007) (quoting Martin K Eby Constr Co v. Dallas Area Rapid Transit, 369 F 3d 464, 467 (5th Cir 2004))

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face " Bell Atl Corp v Twombly, 550 U S 544, 570 (2007) "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged " Ashcroft v Iqbal, 556 U S 662, 678 (2009)

## DISCUSSION

In order to prevail on FCA claim, a Plaintiff must plead and ultimately prove four elements (1) "a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter, (3) that was material, and (4) that caused the government to pay out money or to forfeit moneys due (i e , that involved a claim) " United States ex re Longhi v United States, 575 F 3d 458, 467 (5th Cir 2009) (quoting and adopting United States ex rel Wilson v. Kellogg Brown & Root, Inc , 525 F 3d 370, 376 (4th Cir 2008)

As previously stated, Defendants asserts three grounds for the dismissal of Plaintiff's complaint (1) Plaintiff's claim is barred by the FCA's Public Disclosure Bar; (2) Plaintiff has failed to plead fraud with particularity as required by Rule 9(b), and (3) Plaintiff has failed to state a plausible claim for relief as required by Rule 8(a) (Dkt # 21 at 9.) Because the Court concludes that dismissal is appropriate under Rule 8(a) working in conjunction with rule 9(b), the Court declines to reach Defendant's public disclosure bar arguments

### I  FCA Pleading Requirements

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "[A] complaint filed under the False Claims act must meet the heightened pleading standard of Rule 9(b)[ ]" United States ex rel Grubbs v Kanneganti, 565 F 3d 180, 190 (5th Cir 2009) Under Fifth Circuit law, "the particularity demanded by Rule 9(b) differs with the facts of each case, [but] a plaintiff pleading fraud must set forth 'the who, what, when, and where   before access to

the discovery process is granted " Hart v Bayer Corp , 199 F 3d 239, 247 (5th Cir 2000) (internal citations omitted) However, the Fifth Circuit later clarified that "the 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b) Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claims Act " Kanneganti, 565 F 3d at 190 As applied in the context of an FCA claim, "to plead with particularity the circumstances constituting fraud for a False Claims Act claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted " Id

*4   Applying this standard, the Court concludes that Plaintiff's complaint, as discussed above, alleges a scheme, spearheaded by Anthony Matejicka, to increase the number of claims submitted that include CCs and MCCs and contains reliable indicia leading to a strong inference that claims were actually submitted based on that scheme However, that conclusion does not end the inquiry. Plaintiff's complaint must allege that the scheme was to submit *false* claims Id And that is where Plaintiff's allegations fail

The essence of Plaintiff's allegations is that Anthony Matejicka enacted a scheme to increase the number of patients whose services were coded for CCs and MCCs That alleged scheme took several forms, including training doctors to document the medical record in a way that would permit coding for CCs and MCCs, training staff to be on the lookout for opportunities to code for CCs and MCCs and providing doctors with tip sheets and diagnosis clarification sheets that encouraged them to diagnose in ways that could permit coding for CCs and MCCs (Dkt # 15 at 9–19 ) But such a scheme is not in and of itself one to submit false claims and is equally consistent with a scheme to improve hospital revenue through accurate coding of patient diagnoses in a way that will be appropriately recognized and reimbursed by CMS commensurate with the type and amount of services rendered

CMS "encourage[s] hospitals to engage in complete and accurate coding" and has "reaffirm[ed its] view that hospitals focus their documentation and coding efforts to maximize reimbursement " Medicare Program, Changes to the Hospital Inpatient Prospective Payment systems and Fiscal Year 2008 Rates, 72 FR 47130, 47181 [7]  CMS is well aware of the existence of hospital "methods for improving clinical

**United States v. Baylor Scott & White Health, Not Reported in Fed. Supp. (2019)**

2019 WL 3713756, Med & Med GD (CCH) P 306,580

documentation in order to increase reimbursement" and that hospitals "utiliz[e] clinical documentation specialists that work on the hospital treatment floors to encourage improvements in clinical documentation" to "improve coding and increase payment." Id. at 47182

Moreover, CMS has directly disavowed "the notion that CMS believes changes in how services are documented or coded that [are] consistent with the medical record [are] inappropriate or otherwise unethical." Id. at 47181 CMS does "not believe there is anything inappropriate, unethical or otherwise wrong with hospitals taking full advantage of coding opportunities to maximize Medicare payment that is supported by documentation in the medical record." Id. CMS was fully aware that hospitals would "change their documentation and coding practices and increase case mix consistent with the payment incentives that are provided by the" then newly implemented MS-DRG system and fully supported this practice Id. at 47182

Consequently, the mere fact that Defendants took targeted steps to increase their coding of CCs and MCCs to increase hospitals revenues is neither fraudulent, nor improper per se See [image] United States ex rel Bennet v Medtronic, Inc., 747 F Supp 2d 745, 783 (S D Tex 2010) (concluding that Defendant's encouraging hospitals to exploit an opportunity for legitimate profits "does not create a reasonable inference that physicians and hospitals knowingly submitted false claims") To state a claim for relief, there must be an allegation that a defendant knew that using a particular code was incorrect Id Plaintiff has failed to make any such allegation

*5 At most, Plaintiff's complaint reveals is that Defendants made targeted efforts to encourage and incentivize diagnosing patients in a way that permitted the coding of CCs and MCCs But nothing in Plaintiff's complaint implicates a conclusion that these targeted efforts requested, demanded, or encouraged doctors and staff to diagnose in a way that was not justified by the physicians own medical opinions, judgments, and the medical record, beyond Plaintiff's mere conclusion that that is what the efforts reveal See Iqbal, 556 U S 678 (holding that a pleading that offers merely "labels and conclusions" is insufficient under Rule 8) As previously stated, CMS takes the opposite view as Plaintiff

The only allegations made by Plaintiff in any way implying that Defendants' coding efforts were in any way improper are the assertions that "medical coders then began to increasingly receive pressure directly from .. leadership

to code unethically" and that one former medical coder quit because she "was continually getting directives to compromise her integrity." (Dkt # 15 at 9 ) But these allegations do not specify what the pressure was, who applied the pressure, or how the desired coding was unethical or fraudulent, and does not give any specific examples of any requests for unethical, inappropriate, or fraudulent coding Such "naked assertions devoid of further factual enhancement" are insufficient under Rule 8's pleading standards [image] Iqbal, 556 U S at 678

Further, Plaintiff's allegations are equally consistent with the conclusion that Defendants were taking steps to improve the accuracy and consistency of their medical documentation and coding so as to align it with terminology that CMS would recognize and reimburse appropriately "[W]here a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" [image] Id at 678, see also [image] Bell Atl Corp, 550 U S at 567–69 (holding that where there is an "obvious alternative explanation" that is legal, the complaint fails to state a claim for relief Emphasizing to doctors that they should diagnose and document in a way that CMS's coding scheme would recognize, as opposed to the clinical terminology the doctors were used to using, is not in and of itself fraudulent, and can be adequately explained as merely "taking full advantage of coding opportunities to maximize Medicare payment," something CMS has expressly endorsed See 72 FR at 47181

This conclusion is even supported by some of the data provided in Plaintiff's complaint For each of the three Allegedly Misstated MCCs, as well as for all three collectively, Plaintiff's complaint provides bar graphs comparing Defendants use of the MCC as compared with the average of other hospitals for the years 2011 through 2017 (See Dkt # 15 at 22, 25, 35, 46 ) In all four instances, the trend reveals that the average use of the Allegedly Misstated MCC's by other hospitals increased every year from 2011 to 2017, and by 2017 was within a few percentage points of Defendants' use of the MCC's (See id ) This data is thus as consistent with the conclusion that Defendants were merely ahead of the industry in improving the accuracy of their coding as far as CMS reimbursements are concerned, and that the rest of the industry slowly but surely improved the accuracy of its own coding, closing the gap in the use of the Allegedly Misstated MCCs, as it is consistent with the conclusion that Defendants were submitting fraudulently

**Case 3:22-cv-00651-SMY   Document 22   Filed 07/07/22   Page 55 of 405   Page ID #241**

United States v. Baylor Scott & White Health, Not Reported in Fed. Supp. (2019)

2019 WL 3713756, Med & Med GD (CCH) P 306,580

coded reimbursement requests  Once again, "facts that are 'merely consistent with' a defendant's liability,    stop[ ] short of the line between possibility and plausibility of entitlement to relief " ⌐ Iqbal, 556 U S  at 678.

*6  Plaintiff's statistical analysis allegedly demonstrating that no other explanation but fraud accounts for the data it analyzed overlooks one major alternative hypothesis· Defendants were simply better than their peers in their efforts to ensure their medical documentation and coding maximized the opportunities for legitimate reimbursement from CMS  See ⌐ Bell Atl  Corp , 550 U S  at 567–69 (holding that where there is an "obvious alternative explanation" that is legal, the complaint fails to state a claim for relief)  Ultimately, Plaintiff's allegations are "not only compatible with" but arguably "more likely explained by" lawful conduct ⌐ Id  at 680  In such instances, Rule 8 has not been satisfied  See id , see also  United States v  Catholic Health Initiative, 312 F  Supp  3d 584, 598 (S D  Tex. 2018) (finding that where a defendant's alleged conducted "was legitimate, it renders implausible Relators' assertion that Defendants 'knowingly and willfully' " violated the FCA)

The closest Plaintiff's complaint comes to plausibly alleging a claim for relief is its assertion that Defendants provided unnecessary treatment, in particular mechanical ventilation for patients after undergoing major heart surgery, enabling them to code for the MCC of acute respiratory failure  (Dkt # 15 at 19–21 )  However, this conclusion appears to be based entirely on the mere fact that Defendants provided this service at rates higher than average  (See id )  On Rule 12(b)(6) review, the Court does not "accept conclusory allegations, unwarranted deductions, or legal conclusions " ⌐ Southland Sec  Corp  v  INSpire Ins  Solutions, Inc , 365 F 3d 353, 361 (5th Cir  2004)  And ultimately, medical diagnoses and the proper course of treatment are "expressions of opinion of scientific judgments about which reasonable minds may differ" and such "opinion[s] cannot be 'false' for the purposes of the FCA" because "a lie is actionable but not an error " United States ex rel  Riley v  St  Luke's Episcopal Hosp , 335 F 3d 370, 376 (5th Cir  2004)

Plaintiff makes no allegations that any doctors were told, ordered, or even encouraged to provide mechanical ventilator treatment in contradiction to their own independent medical judgments  (See Dkt # 15 at 19–21 )  That Defendants provided a certain treatment at rates higher than average, even significantly higher than average, is not by itself indicative of fraud or unnecessary treatment  See Iqbal, 556 U S  678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief ") (internal quotation marks omitted)  Plaintiff's bare allegation that Defendants provided medically unnecessary procedures to permit them to fraudulent code MCCs is thus insufficient to state a claim for relief  See id. (holding that "a pleading that offers labels and conclusions" and merely "tenders naked assertions" is insufficient under Rule 12(b)(6) )

Accordingly, the Court finds that Defendants Motion to Dismiss should be **GRANTED** (Dkt # 21 )  Further, because the operative complaint is Plaintiff's second amended complaint, meaning Plaintiff has had at least two opportunities to reformulate their allegations to state a claim for relief that satisfied federal pleading standards, Plaintiff's claims are **DISMISSED WITH PREJUDICE**

<u>CONCLUSION</u>

For the reasons stated, the Court **GRANTS** Defendants' Motion to Dismiss (Dkt # 21 )  Plaintiff's claims are **DISMISSED WITH PREJUDICE**, and this case is **CLOSED**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed  Supp , 2019 WL 3713756, Med & Med GD (CCH) P 306,580

**Footnotes**

United States v. Baylor Scott & White Health, Not Reported in Fed. Supp. (2019)
2019 WL 3713756, Med & Med GD (CCH) P 306,580

1    Because Plaintiff's complaint contains certain patient medical information, Plaintiff filed both a sealed, unredacted version of its complaint (Dkt # 17) as well as an unsealed, redacted version (Dkt # 15) In this order, when citing to the complaint, the Court will refer to the unsealed, redacted version

2    The Government has declined to intervene in this action (Dkt # 9 )

3    The principal diagnosis code is the "condition established after study to be chiefly responsible for occasioning the admission of the patient to the hospital for care " (Dkt # 15 at 6 )

4    The surgical procedure code represents surgical procedures performed in an operating room setting at the hospital (Id )

5    The secondary diagnosis code represents "all conditions that coexist at the time of admission, that develop subsequently, or that affect the treatment received and/or length of stay " (Id )

6    CDI programs themselves are common in the industry and are typically designed to promote accurate documentation of patient diagnoses and treatments so that hospitals can be properly reimbursed for services rendered (Id at 8 )

7    To the extent necessary, the Court takes judicial notice of this report as a matter of public record  The Court may take judicial notice of matters of public record  See Swindol v. Aurora Flight Sciences Corp , 805 F 3d 516, 518–19 (5th Cir. 2015)

---

**End of Document**                              © 2022 Thomson Reuters  No claim to original U S  Government Works

5

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD

**DECISION OF MEDICARE APPEALS COUNCIL**
**Docket Number:  E-15-73**

| In the case of | Claim for |
|---|---|
| General Medicine, P.C. | Supplementary Medical Insurance Benefits |
| (Appellant) | (Part B) |
| E.A. and 82 others | Multiple (see attached) |
| (Beneficiaries) | (HIC Numbers) |
| CGS Administrators LLC | 1-2744009931 |
| (Contractor) | (ALJ Appeal Number) |

The appellant has asked the Medicare Appeals Council (Council)
to review this case, escalated from the Office of Medicare
Hearings and Appeals (OMHA) without final action by an
Administrative Law Judge (ALJ).  *See* 42 C.F.R. §§ 405.1104,
405.1106.  The issues presented arise from the appellant's
claims for Medicare Part B coverage of physician nursing home
visits provided to the eighty-three beneficiaries listed on the
attached beneficiary list, from February 12, 2013, through June
29, 2013.

The Council admits the appellant's request for escalation, with
enclosures, into the record as Exhibit (Exh.) MAC-1.  The
Council admits interim correspondence and the Scheduling Order
in this case, dated March 30, 2016, into the record as Exhs.
MAC-2 through MAC-6.  The Council also admits the appellant's
supplementary brief and request to consider new evidence,
received April 28, 2016, into the record as Exh. MAC-7.

The Qualified Independent Contractor (QIC), the last adjudicator
to address these claims on the merits, issued a partially
favorable reconsideration.  When a party requests escalation of
a case to the Council without ALJ action, and procedural

1

requirements are met, "the QIC decision becomes the decision
that is subject to [Council] review consistent with
405.1102(a)."  42 C.F.R. § 405.1104(b)(3).  The Council reviews
the QIC's reconsideration *de novo* and may adopt, modify, or
reverse the reconsideration or remand the case to an ALJ for
further proceedings.  There is no right to a hearing before the
Council.  42 C.F.R. § 405.1108.

As explained below, the Council adopts the QIC's general
findings that Medicare does not cover the physician services at
the CPT code 99310 level billed by the appellant, but does cover
those services at the downcoded CPT code 99307 or 99308 level.
The Council also affirms the QIC's conclusion that certain
claims are not covered because the appellant has not shown that
it was medically reasonable and necessary to perform care plan
reviews more frequently than required by the relevant
regulations.  However, the Council reverses the QIC's conclusion
that there was no face to face encounter for certain claims and
finds those services covered as CPT code 99307.  The Council
further modifies the QIC's analysis to provide additional legal
and evidentiary bases for these findings and to respond to the
appellant's contentions.  The Council also agrees with the QIC
that the appellant is liable for the non-covered services under
section 1879 of the Social Security Act (Act).

### ADMINISTRATIVE RECORD

The Council received the administrative record in this case in
three boxes, which consisted of seven brown Smead accordion
folders.  The Council has consolidated the case record into two
boxes.

Each brown accordion folder is designated as a single paginated
exhibit, numbered Exhibits 1 through 8.  Exhibits 1-6 contain
individual beneficiary records, Exhibit 7 contains the
appellant's original request for ALJ hearing, and Exhibit 8
contains certain procedural documents, including the QIC
reconsideration, dated June 5, 2014, that is under review.  The
seven MAC exhibits admitted into the record by the Council are
found in the brown MAC Master File for Docket E-15-73
(Escalation).  All exhibits are reflected on the attached
Exhibit List.

2

*New Evidence*

With its request for review (also escalation), filed with the Council on February 27, 2015, the appellant attached a "Statement of Additional Evidence," stating its intention to submit additional medical records for the Council's review in order to provide a more complete picture of the beneficiaries' conditions.  Exh. MAC-1D, at 1.  In that submission, the appellant asserts that it "did not have control or possession of these records and therefore, there is good cause, pursuant to C.F.R. § 405.1028, for the ALJ to consider the additional evidence at the hearing." *Id.*

In a supplemental submission, filed with the Council on April 28, 2016, the appellant submitted a compact disc (CD) of patient records and a supplemental brief arguing for admission of these records.  Exh. MAC-7.  In the brief, the appellant argues that it is a "facility-based practice," and that "many facilities" did not respond to its requests for supporting documentation. *Id.* at 1.  The appellant states that "[w]ithout the power of subpoena at the QIC level, [the appellant] is at the mercy of the facility to provide the requested records" and that it was unable to obtain requested records before the QIC reconsideration. *Id.* at 1-2.  The appellant then states, without explanation, that "[a]fter the QIC reached its partially favorable decision, [the appellant] was able to obtain the complete medical records for the beneficiaries in question." *Id.* at 2.  The appellant explains that its "expert, ValueScope" considered these records when preparing its report for the ALJ, arguing for coverage of each service. *Id.*  The appellant therefore asks that the Council find that good cause exists for admission of these documents into the record at this level of review. *Id., citing* 42 C.F.R. § 405.1122(c)(1).

The record indicates that the appellant billed Medicare under Current Procedural Terminology (CPT) code 99310 for physician visits provided to skilled nursing facility (SNF) residents throughout the period at issue.  Exh. 1, at 15.  The Medicare Part B contractor issued additional documentation requests (ADRs), seeking further information or documentation supporting the claim billed. *See, e.g, Id.* at 22-23 (Beneficiary E.A., ADR dated April 3, 2013).  The contractor subsequently downcoded or denied the claims on initial determination or redetermination, and the QIC reconsideration indicates that the appellant, in some cases, submitted documentation to the QIC for

3

consideration.  Exh. 8, at 18 ("The appellant submitted the
missing visit notes for the QIC's review.")

Medicare appeals regulations provide as follows for submitting
new evidence to the Council for a case escalated from the QIC
without ALJ action:

> (b)  *Appeal before MAC [Council] as a result of
> appellant's request for escalation.*  (1)  If the MAC
> is reviewing a case that is escalated from the ALJ
> level to the MAC, the MAC will decide the case based
> on the record constructed at the QIC and any
> additional evidence, including oral testimony, entered
> in the record by the ALJ before the case was
> escalated.
> (2)  If the MAC receives additional evidence with
> the request for escalation that is material to the
> questions to be decided, or determines that additional
> evidence is needed to resolve the issues in the case,
> *and* the record provided to the MAC indicates that the
> *previous decision-makers did not attempt to obtain the
> evidence before escalation,* the MAC may remand the
> case to an ALJ to consider or obtain the evidence and
> issue a new decision.
> (c)  *Evidence related to issues previously
> considered by the QIC.*  (1)  If new evidence related
> to issues previously considered by the QIC is
> submitted to the MAC by a provider, supplier, or the
> beneficiary represented by a provider or supplier, the
> MAC must determine if the provider, supplier, or a
> beneficiary represented by a provider or supplier had
> good cause for submitting it for the first time at the
> MAC level.
> (2)  If the MAC determines that good cause does
> not exist, the MAC must exclude the evidence from the
> proceeding, may not consider it in reaching a
> decision, and may not remand the issue to an ALJ.

42 C.F.R. § 405.1122(b), *cross-referencing* 42 C.F.R. § 405.1028
(emphasis supplied).  "Good cause" is found "when the new
evidence is material to an issue addressed in the QIC's
reconsideration and that issue was not identified as a material
issue prior to the QIC's reconsideration."  42 C.F.R.

§ 405.1028(b).  If good cause is not found, the adjudicator "must exclude the evidence from the proceeding and may not consider it in reaching a decision."  42 C.F.R. § 405.1028(c).

The Council finds that the appellant has not established good cause for the submission of new evidence for the first time to the Council, on this case escalated from the QIC without ALJ action.  Previous decision-makers attempted to obtain supporting documentation from the appellant prior to case escalation.  The record indicates that the Medicare Part B contractor first requested documentation supporting the services billed by the appellant over three years ago.  The QIC indicated that the appellant had also submitted new evidence to the QIC over two years ago.

The new evidence now submitted by the appellant is related to issues previously considered by the QIC, and the new evidence is material to issues that were previously identified as material, prior to the QIC's reconsideration.  The appellant has not stated when it first requested this evidence from the facilities, what follow-up it did, or when it received the evidence.  The Council thus finds that the appellant has not established good cause and therefore excludes the newly submitted evidence from the record and does not consider it in reaching this decision.  The Council marks the CD of additional documentation submitted by the appellant as "EXCLUDED" for purposes of identification only.  *See* Exh. MAC-7, at 3 (excluded CD).

## BACKGROUND

At issue are 223 claims for Medicare coverage of physician visits to 83 SNF residents from February 12, 2013, through June 29, 2013.  For each claim, the appellant billed Medicare using the physician evaluation and management (E&M) service CPT code 99310 for SNF care plan review.  This is the highest level of E&M service.  The "long description" in the HCPCS and CPT Codebook (2013) defines this service as follows:

> **99310** Subsequent nursing facility care, per day, for the evaluation and management of a patient, which requires at least 2 of these 3 key components:  A *comprehensive interval history*; A *comprehensive examination*; *Medical decision making of high complexity*.  Counseling and/or coordination of care

5

> with other physicians, other qualified healthcare care
> professionals, or agencies are provided consistent
> with the nature of the problem(s) and the patient's
> and/or family's needs. The patient may be *unstable* or
> may have developed a significant new problem requiring
> *immediate* physician attention. Typically, 35 minutes
> are spent at the bedside and on the patient's facility
> floor or unit.

*Id.* (emphasis supplied).

The "medium description" for this code is "subsequent nursing
facility care per day, unstable or new problem, 35 minutes."
*Id.*

The appellant also billed some of these services with GV or GW
modifiers. These modifiers are to be used only when a patient
is enrolled in a Medicare certified hospice. The GV modifier
indicates that the attending physician is not employed or paid
under agreement by the hospice. The GW modifier indicates that
services are not related to the hospice patient's terminal
condition. *See,* www.wps.medicare.com/j8macpartb/respources/
modifiers/hospicemodifier. The appellant has not asserted that
these services should be covered as hospice care plan oversight.

As previously discussed, the record indicates that the Medicare
Part B contractor requested additional information to support
the services billed for the beneficiaries. *See, e.g.,* Exh. 1,
at 22-23 (E.A.); 53-54 (R.A.); 84-85 (J.A.1); 116-17 (L.A.);
163-64 (J.A.2). (The Council identifies record documentation by
individual beneficiary initials, when needed.) The contractor
then either denied the claims or paid the claims at a lower
level than billed ("downcoded" the claim), in individual initial
determinations or redeterminations. The downcoded claims were
allowed as either CPT code 99308 or CPT code 99307. These codes
are defined as:

> **99308** Subsequent nursing facility care, per day, for
> the evaluation and management of a patient, which
> requires at least 2 of these 3 key components: *An
> expanded problem focused interval history; An expanded
> problem focused examination; Medical decision making
> of low complexity.* Counseling and/or coordination of
> care with other physicians, other qualified healthcare
> care professionals, or agencies are provided

6

consistent with the nature of the problem(s) and the
patient's and/or family's needs.  Usually the patient
is responding inadequately to therapy or has developed
a minor complication. Typically, 15 minutes are spent
at the bedside and on the patient's facility floor or
unit.

*Id.* (emphasis supplied).

The "medium description" for this code is "subsequent nursing
facility care per day, minor complication, 15 minutes."  *Id.*

> **99307**  Subsequent nursing facility care, per day, for
> the evaluation and management of a patient, which
> requires at least 2 of these 3 key components:  *A
> problem focused interval history; A problem focused
> examination; Straightforward medical decision making.*
> Counseling and/or coordination of care with other
> physicians, other qualified healthcare care
> professionals, or agencies are provided consistent
> with the nature of the problem(s) and the patient's
> and/or family's needs.  Usually the patient is stable,
> recovering, or improving.  Typically, 10 minutes are
> spent at the bedside and on the patient's facility
> floor or unit.

*Id.* (emphasis supplied).

The "medium description" for this code is "subsequent nursing
facility care per day, evaluation and management stable, 15
minutes."  *Id.*

> *Requests for QIC Reconsideration*

The appellant's representative, T.P., filed individual form
requests for reconsideration with a brief memorandum summarizing
the "reason for appeal."  *See, e.g.,* Exh. 1, at 10-11 (E.A.),
43-44 (R.A.), 73-74 (J.A.1), 105-06 (L.A.), 152-53 (J.A.2).  The
only material differences among the memoranda are lists of
individual diagnoses and, in some cases, "positive physical
examination abnormality findings."  *Compare id.*  In its
supporting memoranda, the appellant generally argued that the
contractor erred in denying coverage because documentation did
not support that the service was reasonable and necessary.  *See,
e.g.,* Exh. 1, at 11.  The appellant then referred the QIC to the

description of CPT code 99310 and argued that the appellant had
met the three specified requirements, as evidenced by supporting
clinical documents:   a comprehensive history examination, a
comprehensive physical examination, and medical decision making
of high complexity "due to the fact that the patient suffered
from multiple medical problems that needed to be assessed by the
clinician . . . ."   *Id.*   The appellant then listed individual
beneficiary diagnoses and, in some cases, positive findings of a
physical examination.   *Compare id.* at 11, 74.   The appellant
then concluded as follows:

> Also, as per CMS transmittals, care plan oversight is
> to be billed under procedure code 99310.   Under
> Medicare regulations this date of service shall be
> paid due to the fact that it is a required service and
> it also included Medicare certification/
> recertification.

*Id.*

QIC Reconsideration

On June 5, 2014, the QIC issued a partially favorable
reconsideration, in which it consolidated the appellant's
individual requests.   Exh. 8, at 10-40.   In discussing
regulations, the QIC set forth the following authority:

- *Evaluation and Management (E&M) Services* (Section
  1862(a)(1) of the Act; Medicare Claims Processing Manual
  (MCPM)(Pub. 100-04) Ch. 12, § 30.6.);
- *Care Plan Oversight* (MCPM Ch. 12, §§ 180, 180.1A; Medicare
  Benefit Policy Manual (MBPM)(Pub. 100-02) Ch. 15);
- *Care Plan Oversight Services* (MBPM Ch. 15, § 30.G);
- *Frequency of Physician Visits* (42 C.F.R. § 483.40(c); State
  Operations Manual (SOM)(Pub. 100-07) Appendix PP;
- *Use of CPT* (MCPM Ch. 23, § 20);
- *Amendments, Corrections and Delayed Entries in Medical
  Documentation* (Medicare Program Integrity Manual (MPIM)
  (Pub. 100-08) Ch. 3, §§ 3.3.2.5(A),(B); and
- *Documentation Requirements* (Section 1833(e) of the Act; 42
  C.F.R. § 424.5(a)(6)).

*Id.* at 12-14.  The QIC then discussed requirements for levels of medical decision making, as follows:

**Medical Decision Making**

Medical decision making refers to the complexity of establishing a diagnosis and/or selecting a management option, which is determined by considering the following factors:

- The number of possible diagnoses and/or the number of management options that must be considered;
- The amount and/or complexity of medical records, diagnostic tests, and/or other information that must be obtained, reviewed, and analyzed; and
- The risk of significant complications, morbidity, and/or mortality as well as comorbidities associated with the patient's presenting problem(s), the diagnostic procedure(s), and/or the possible management options.

The chart below depicts the elements for each level of medical decision making.  Note that to qualify for a given type of medical decision making, two of the three elements must either be met or exceeded.

| Type of Decision Making | Number of Diagnoses or Management Options | Amount And/Or Complexity of Data To Be Reviewed | Risk of Significant Complications, Morbidity, And/Or Mortality |
|---|---|---|---|
| Straightforward | Minimal | Minimal or None | Minimal |
| Low Complexity | Limited | Limited | Low |
| Moderate Complexity | Multiple | Moderate | Moderate |
| High Complexity | Extensive | Extensive | High |

9

**Number of Diagnoses and/or Management Options**

The number of possible diagnoses and/or the number of management options that must be considered is based on:

- The number and types of problems addressed during the encounter;
- The complexity of establishing a diagnosis; and
- The management decisions that are made by the physician.

*Id.* at 15.  The QIC then discussed criteria for minimal, low, moderate, and high levels of risk, based on the nature of a beneficiary's presenting problems, the diagnostic procedure(s) ordered, and the management options selected.  *Id.* at 15-16. The Council incorporates these criteria herein.

In its analysis, the QIC first stated that the appellant billed for all of the physician E&M services using CPT code 99310. Exh. 8, at 17.  The QIC considered the appellant's argument that "CMS Transmittals" state that "care plan oversight is to be billed under [CPT] code 99310," but stated that its review "failed to demonstrate guidance" for care plan oversight billing, as argued by the appellant.  *Id.*  Instead, the QIC noted that Medicare authority allowed for care plan oversight billing for *home health and hospice patients* under HCPCS codes G0181 and G0182 and stated that, under this authority, "CPO is covered for *home health and hospice patients*, but *not for patients of skilled nursing facilities (SNFs)*, nursing home facilities, or hospitals."  *Id., citing* MBPM Ch. 15, § 30.G (emphasis supplied).

The QIC also acknowledged the appellant's argument that the physician services provided required medical decision making of high complexity because of the beneficiaries' multiple medical conditions, but stated that "medical decision making is more than a list of the patient's chronic conditions." Exh. 8, at 17.  The QIC explained that the level of medical decision making depended on "many components," including:

- levels of history and physical examination documented;
- number of possible diagnoses and/or management options that must be considered;

10

- amount and/or complexity of medical records, diagnostic
  tests and/or other information that must be obtained,
  reviewed, and analyzed; and
- risk of significant complications, morbidity, and/or
  mortality in addition to associated co-morbid conditions.

*Id.*  The QIC also stated that the number of diagnoses and/or
management options was based on:

- number and types of problems addressed during the visit;
- complexity of establishing a diagnosis; and
- management decisions made by the physician.

*Id.*

The QIC then found that the medical record documentation did not
support that the physicians considered these factors in their
medical decision making.  Exh. 8, at 18.  The QIC found that the
documents indicated that the treatment plan was "to continue to
care plan and discuss with staff."  *Id.*  The physician's data
analysis was also "seldom, if ever, described," and beneficiary
co-morbidities were not considered as creating a management
risk.  *Id.*  The QIC determined that it would not cover any
services provided at the level billed by the appellant, under
CPT code 99310.  *Id.*

The QIC also stated that it considered "missing visit notes"
that the appellant provided for some claims and allowed coverage
as physician E&M services under CPT code 99307 (2 of 3 problem
focused interval history, problem focused examination,
straightforward medical decision making).  Exh. 8, at 18.  The
QIC further stated that it did not allow coverage for
documentation that it described as "changed records," containing
unsigned and undated alterations.  *Id.*  The QIC further noted
that some services were denied based on visit frequency because
beneficiaries were "stable and without new complaints," while
the QIC denied other services billed for "care plan review"
(CPR) because documentation "did not clearly demonstrate face-
to-face care, as required for allowing an E/M code."  *Id.*

The QIC reconsideration summarizes findings for each service as
either unfavorable or partially favorable (for claims downcoded
to 99307) in a table incorporated within the document.  Exh. 8,

11

at 20-38.  The six reasons given for the unfavorable findings
are as follows:

- Documentation indicated seen for CPR (care plan review).
  No face-to-face encounter noted.
- Agree with prior downcode.
- Documentation not legible.
- Need for frequency of visit not indicated.
- Changed documentation not identified.
- Discrepancy in date of document and billed date.

*Id., passim.*  The QIC also found that the appellant was liable
for the non-covered charges under section 1879 of the Act.  *Id.*
at 39.

*Request for ALJ Hearing and Escalation*

On August 5, 2014, the appellant filed a request for ALJ hearing
with the OMHA.  Exh. 7.  The appellant enclosed with its
submission a form request for hearing (*id.* at 3-4), the QIC
reconsideration (*id.* at 5-35), a "Statement of Additional
Evidence" (*id.* at 36), a list of claims appealed (*id.* at 37-41),
and the report of its consultant, ValueScope, on coverage of the
claims (*id.* at 42-284).

On January 21, 2015, the appellant filed with the OMHA its
request to escalate the case from the ALJ to the Council without
ALJ action.  Exh. 8, at 2.  On January 22, 2015, the ALJ issued
an "Acknowledgment of Escalation Request," with instructions on
further action required for escalation.  *Id.* at 1.  On February
27, 2015, the appellant filed with the Council a request for
review, with enclosures.  Exh. MAC-1.  The Council and the
appellant exchanged additional interim correspondence to perfect
the escalation request.  Exh. MAC-2 through Exh. MAC-5.  On
March 30, 2015, the Council issued the Scheduling Order.  Exh.
MAC-6.  On April 28, 2016, the appellant filed the Supplemental
Brief to support submitting new evidence to the Council.  Exh.
MAC-7.

In the request for ALJ hearing, counsel for the appellant argues
only:  "see attached report from ValueScope."  Exh. 7, at 3;
*see also* Exh. MAC-1E.  The consultant's report contains a cover
letter, which asserts that there are three problems with the
contractor's coverage denials:

12

1. CMS's "key findings appear to be overreaching and systematic in nature."

2. The appellant "was provided specific guidance on how to code care plan reviews," Medicare regulations require monthly care plan reviews, and the contractor denied the claims "despite being a required service with specific guidance on coding."

3. CMS's denials based on a lack of "face-to-face contact" are erroneous, because "[i]n all cases, a full physical examination was performed, thereby requiring face-to-face contact." The assumption that no face-to-face encounter occurred because none was documented is "careless and lacks critical thought."

Exh. MAC-1E, at A1-A2.

The consultant's report also includes a "Table of Contents" for the analyses for each of the 223 claims at issue, indicating that the consultant argued that all claims should be allowed at the level initially billed by the appellant. Exh. MAC-1E, at B1-B5. The report also includes a table summary of each claim, with comment sections that contain one of four contentions supporting coverage. *Id.* at C1-C11. These contentions are as follows:

- This is a care plan review and billed on instructions from CMS. Furthermore, CMS bases their decision partially on a claim that no face-to-face contact was noted. The procedure performed requires face-to-face contact thereby nullifying CMS's argument. (42 contentions)

- This is a care plan review and billed based on instructions from CMS. (170 contentions)

- General Medicine has provided a transcribed document for each page so the auditor may better read them. (10 contentions)

- Based on our review, the date notes on the clinical notes is the same date of service billed to Medicare. The dates match and are correct. (1 contention)

13

*Id., passim* (83 beneficiaries, 223 claims).  The consultant also
prepared a single summary sheet for each claim, which repeats
contentions made for the same claim in the appellant's table.
*Compare id.* at C13-C235 *with* C1-C11.

The request for review (escalation) filed with the Council on
February 27, 2015, argues "See attached report" and encloses a
copy of the ValueScope report included with the request for ALJ
hearing.  Exh. MAC-1, at 3; *see* Exh. MAC-1E.

## APPLICABLE AUTHORITIES

*Physician E&M Services – Coverage*

The Medicare Part B benefit provides coverage for "medical and
other health services," which includes physicians' E&M services.
Sections 1832(a), 1861(s)(1); 42 C.F.R. § 410.10(a); MBPM Ch.
15, § 30.A.  In all cases, the *overarching* requirement for
coverage of physician's services is that the services are
"reasonable and necessary" for treatment of a particular
beneficiary's condition, in addition to the requirements of a
particular E&M code.  MCPM Ch. 12, § 30.6.1.A, and section
1862(a)(1)(A) of the Act.  It would not be medically necessary
or appropriate to bill a higher level of evaluation and
management service when a lower level service is warranted.
Further, the volume of documentation should not be the primary
influence upon which a specific service is billed, but
documentation should support the level of service reported.  The
code for the service should be based upon the content of the
service.  MCPM Ch. 12, § 30.6.1.A and .B.

Throughout its discussion of coverage of physician E&M services,
CMS points out that a billing physician must satisfy
documentation requirements set forth in either the 1995 or 1997
E&M Documentation Guidelines "to document the record with the
appropriate clinical information."  *See, e.g.,* MCPM Ch. 12,
§ 30.6.1.1.G; *https://www.cms.gov/Outreach-and-Education/
Medicare-Learning-Network-MLN/MLNProducts/Downloads/eval-mgmt-
serv-guide-ICN006764.pdf* (MLN Evaluation and Management
Services)(visited August 9, 2016); *see also, e.g.,* MCPM Ch. 12,
§§ 30.6.8.C, 30.6.9.1.D, 30.6.10.A., 30.6.13.A.  With respect to
billing the highest levels of E&M codes, CMS states:

Contractors must advise physicians that to bill the highest levels of visit codes, the services furnished must meet the definition of the code (e.g., to bill a Level 5 new patient visit, the history must meet CPT's definition of a comprehensive history).

The comprehensive history must include a review of all the systems and a complete past (medical and surgical) family and social history obtained at that visit.  In the case of an established patient, it is acceptable for a physician to review the existing record and update it to reflect only changes in the patient's medical, family, and social history from the last encounter, but the physician must review the entire history for it to be considered a comprehensive history.

The comprehensive examination may be a complete single system exam such as cardiac, respiratory, psychiatric, or a complete multi-system examination.

MCPM Ch. 12, § 30.6.1.D.

*Physician E&M Services – Federal SNF Participation Requirements*

The Medicare program has conditions of participation for SNFs to participate in the Medicare program.  *See, e.g.,* 42 C.F.R. Part 483, Subpart B.  These conditions include requirements for physicians services, including physician supervision of medical care for SNF residents, physician review of "the resident's total program of care," and physician visits "at least once every 30 days for the first 90 days after admission, and at least once every 60 days thereafter."  42 C.F.R. §§ 483.40(a), (b),(c).

CMS administrative authority discusses physician E&M services for federally required nursing facility visits, which states that "federally mandated visits . . . must be performed by the physician except as otherwise permitted (42 C.F.R. § 483.40(c)(4) and (f))."  MCPM Ch. 12, § 30.6.13.A.  The manual also provides that "[as] with all E/M visit for Medicare Part B payment policy, the E/M documentation guidelines apply."  *Id.* With respect to physician visits required by 42 C.F.R.

§ 483.40(c)(1), CMS states, in part, as follows:

> Payment is made under the physician fee schedule by
> Medicare Part B for federally mandated visits.
> Following the initial federally mandated visit by the
> physician or qualified NPP where permitted, payment
> shall be made for federally mandated visits that
> monitor and evaluate residents at least once every 30
> days for the first 90 days after admission and at
> least once every 60 days thereafter.

> \*\*\*\*\*

> Beginning January 1, 2006, the new CPT codes,
> Subsequent Nursing Facility Care, per day, (99307-
> 99310) shall be used to report federally mandated
> physician E/M visits and medically necessary E/M
> visits.

> \*\*\*\*\*

> The federally mandated E/M visit may serve also as a
> medically necessary E/M visit if the situation arises
> (i.e., the patient has health problems that need
> attention on the day the scheduled mandated physician
> E/M visit occurs).  The physician/qualified NPP shall
> bill only one E/M visit.

MCPM Ch. 12, § 30.6.13.B.

CMS also discusses physician "care plan oversight [CPO]
services" for "a patient receiving complex and/or
multidisciplinary care as part of Medicare-covered services
provided by a participating *home health agency* or Medicare
approved *hospice*."  MCPM Ch. 12, § 180 (emphasis supplied).
CPO services are covered in these cases "only if all the
criteria" in MBPM Chapter 15 are met.  *Id.* § 180.1.A.
Chapter 15 of the MBPM makes clear that CPO services "are
*not* covered for patients of skilled nursing facilities
(SNFs) . . . ."  MBPM Ch. 15, § 30.G (emphasis supplied).

*Documentation Requirements*

A provider "or other person" billing Medicare must provide
"such information as may be necessary in order to determine

16

the amounts due such provider or other person" for the claims submitted.   Section 1833(e) of the Act. Implementing regulations state that the billing entity or individual "must furnish . . . sufficient information to determine whether payment is due and the amount of payment."  42 C.F.R. § 424.5(a)(6).

With respect to amendments, corrections, and delayed entries in medical records, CMS encourages providers "to enter all relevant documents and entries into the medical record at the time they are rendering the service."  MPIM Ch. 3, § 3.3.2.5.A.  If medical record entries do not conform to accepted recordkeeping principles set forth in CMS authority, Medicare contractors do not consider those entries in determining coverage.  *Id.*  Generally, medical records submitted to a Medicare contractor to support coverage of a claim must:

1. Clearly and permanently identify any amendment, correction or delayed entry as such, and
2. Clearly indicate the date and author of any amendment, correction or delayed entry, and
3. Not delete but instead clearly identify all original content.

MPIM Ch. 3, § 3.3.2.5.B.  Corrections to paper medical records "are generally accomplished by using a single line strike through so that the original content is still readable.  Further the author of the alteration must sign and date the revision."  *Id.*

**DISCUSSION**

### A.   COVERAGE

As previously indicated, in cases escalated from the QIC to the Council without ALJ action, "the QIC decision becomes the decision that is subject to MAC [Council] review consistent with § 405.1102(a)."  42 C.F.R. § 405.1104(b)(3).  The Council has considered the appellant's contentions and the administrative record as a whole, including medical record documentation for each beneficiary claim found in each exhibit.  Documents for beneficiary claims consist of various administrative procedural documents and three form clinical documents prepared by the appellant, consisting of "fill-in-the-blank" or "check-the-box"

17

entries:   (1) Progress Note (Note); (2) Medical
Director/Physician History/Physical Assessment and Care Plan
Review (Assessment); and (3) Problem List (List).  As set forth
below, the Council does not find that the appellant has
presented sufficient contentions or documentation to support
coverage of the E&M services billed for each beneficiary under
CPT code 99310.

In general, the medical records indicate that the beneficiaries
examined were stable.  The medical evidence indicates that they
were seen for the care plan review required by the SNF
conditions of participation, and not for any particular problem.
Few or no changes in the plans of care were ordered.  As the QIC
found, the appellant does not identify, provide, or cite the CMS
authority or instructions that it argues supports billing for
all CPRs using CPT code 99310.  While the appellant seems to
argue that it should be permitted to bill at the highest coding
level for monthly or bi-monthly physician visits required by
federal SNF conditions of participation, SNF participation
compliance standards do not also establish coverage standards
for Medicare services.  Medicare does not pay for otherwise
covered services that are not "reasonable and necessary" to
treat a beneficiary in a particular case, and the billing party
is required to provide sufficient information to establish
payment.  Further, the appellant has not submitted any
persuasive evidence that it was medically reasonable and
necessary to perform care plan reviews on stable beneficiaries
more frequently than the minimum required.  Sections
1862(a)(1)(A), 1833(e) of the Act.

CMS authority states that E&M documentation guidelines apply to
the federally required physician visits.  As reviewed below, the
Council finds the documentation insufficient to meet coverage
standards on multiple grounds.  For example, there are no other
clinical records supporting the beneficiaries' conditions,
symptoms, or treatment.  The "chief complaint" noted in
virtually every visit note states that the beneficiary has no
complaints and the purpose of the visit is for "LTC residents."
The notes generally do not establish that the physician recorded
at least four descriptors of the chief complaint/interim history
of present illness, as required by appellant's own progress note
form.

Moreover, the notes also do not establish comprehensive "review
of systems" or "past/family/social history" for the visits, but

sometimes cross-reference history and physicals taken in prior
visits that are nowhere in the administrative record.  These
entries also lack any updates to reflect a change in the
beneficiaries' conditions in the current visit.  The "Physical
Examinations" also fall short, as they are generally checkmarks
for multiple systems that the appellant's own documentation
explanation sheet state are "within normal limits."  There are
no references to current multidisciplinary notes also
considered, and there are no laboratory/x-ray report findings.
No medications are listed.

The clinical records also do not establish that services billed
required medical decision making of "high complexity," with
beneficiary conditions being largely chronic and stable and
options for medical decision making on the form notes either not
selected, selected as "medium," or selected as medium and then
crossed out without identification of the author or date.  The
"plan" is generally to review the medical records, discuss the
beneficiary with the staff, and continue current treatment, all
supporting that the beneficiaries' conditions were chronic and
stable.  The first line of the Assessment form has a check block
for "Patient has developed a significant complication or a
significant new problem and major change in status.  Creation of
a new medical plan of care is required."  But this block is not
checked in these cases.  Further, the significance of the "Z"
line at the bottom of the progress note page through the blocks
next to the lines for number of diagnoses or management options;
amount and complexity of data reviewed; and risk of significant
complications, morbidity and/or mortality is unclear and does
not convey any meaningful information.

Further, in virtually every case, the physician documented time
spent with the beneficiary as 20, while the descriptor for CPT
code 99310 generally calls for 35 minutes spent with the
patient.  Finally, the handwritten entries on the medical
records are frequently illegible or have been altered, raising
questions about reliability.

We also give little probative weight to the ValueScope report
submitted by appellant.  The report is prepared by a CPA with
unknown credentials or reported expertise in Medicare matters.
The appellant has not established that ValueScope qualifies as
an expert under any standard.  Moreover, the report does not
identify the authorities reviewed or used in the report.  And
the report is indicated to be based on the new evidence that had

19

been excluded by the Council.  Exh. MAC 7 at 2.

However, we agree with the assertion that the QIC misidentified
the date of service in one case.  We also agree that the QIC's
determinations to deny some services for lack of a face to face
examination are not well-founded.  Although the medical records
for these cases do not include plain language which clearly
indicates that a face to face examination was conducted, they do
report information obtained from a physical examination and do
not differ materially from other claims allowed by the QIC at
the CPT code 99307 level.  Consequently, we will allow coverage
for those claims at CPT code 99307.

With respect to the altered documents which the appellant
asserts it "transcribed" for clarity, the Council gives no
weight to these altered documents.  They do not comply with CMS
guidance for changes or alterations to medical records.
Corrections or addenda must:

> 1.    Clearly and permanently identify any amendment,
>        correction or delayed entry as such, and
>
> 2.    Clearly indicate the date and author of any
>        amendment, correction or delayed entry, and
>
> 3.    Clearly identify all original content, without
>        deletion.

MPIM, ch. 3, §3.3.2.5.

When correcting a paper medical record, these principles are
generally accomplished by using a single line strike through so
the original content is still readable, and the author of the
alteration must sign and date the revision.  Amendments or
delayed entries to paper records must be clearly signed and
dated upon entry into the record.  Amendments or delayed entries
to paper records may be initialed and dated if the medical
record contains evidence associating the provider's initials
with their name.  *Id.*

In sum, the Council's review of the original clinical records
for each service billed do not support coverage of any of the
services at the level billed by the appellant, but in many
instances do support coverage at a lower level.  The Council
discusses the record for each claimed service below.

1.  **_Beneficiary E.A.: DOS 03/07/13_**.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 20.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C1.  The Note chief complaint indicates "no c/o" (no complaint),
(illegible), and seen for CPR; contains checkmarks and notations
for physical examination; the plan is "see CPR;" boxes for
medical decision making are not checked; and medium decision
making complexity is circled and partially erased.  Exh. 1, at
16.  The Assessment contains a "z" line through two boxes for
decision making, chief complaint is no complaint and
(illegible), boxes are checked for assessment, and time spent is
altered to reflect either 20 or 30.  _Id._ at 19.  The List
contains a "z" line through two boxes for decision making,
checked boxes and notations for diagnoses, and time spent
appears to be 20.  _Id._ at 20.  The Council concludes that the
record contains sufficient documentation to support the service
billed at the CPT code 99307 level.  The QIC's determination of
non-coverage is reversed.

2.  **_Beneficiary E.A.: DOS 05/11/13_**.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
20.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C1.  The Note chief
complaint states no new complaints, (illegible), and seen for
CPR; there are checkmarks and notations for physical
examination; plan is see CPR, discuss with staff, and record
review; medical decision making contains a "z" line entry in two
boxes; and decision making complexity is not circled.  Exh. 1,
at 36.  The Assessment contains a "z" line through two boxes for
decision making: chief complaint is no complaint, (illegible),
and "LTC ret" (long term care resident); there are checkmarks
and notations for the assessment; and time spent is "20."  _Id._
at 38.  The List contains a "z" line through two boxes for
decision making, checked boxes and notations for diagnoses, and
time spent is 20.  _Id._ at 39.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

3.  **_Beneficiary R.A.: DOS 03/07/13_**.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 20.  The appellant argues that
the service was a CPR billed based on CMS instructions and that

the service required a face to face encounter.  Exh. MAC-1E, at
C1.  The Note chief complaint indicates no complaints, "PT ||,"
and seen for CPR; there are checkmarks and notations for
physical examination; plan is see CPR, discuss with staff, and
record review; medical decision making contains a "z" line entry
in two boxes; and medium decision making complexity is circled
and partially erased (altered).  Exh. 1, at 48.  The Assessment
contains a "z" line through two boxes for decision making, chief
complaint is no complaint and LTC resident, there are checkmarks
and notations for the assessment, and time spent is 20.  *Id.* at
50.  The List contains a "z" line through two boxes for decision
making, checked boxes and notations for diagnoses, and time
spent is 20.  *Id.* at 51.  The Council concludes that the record
contains sufficient documentation to support the service billed
at the CPT code 99307 level.  The QIC's determination of non-
coverage is reversed.

    4.   ***Beneficiary R.A.: DOS 05/09/13.***  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 20.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C1.  The Note date is altered; chief complaint indicates no
complaint, seen for CPR, record reviewed, and discuss with
staff; physical examination contains checkmarks and notations;
plan is see CPR; medical decision making contains a "z" line
entry in one box; and decision making complexity is not circled.
Exh. 1, at 66.  The Assessment contains a "z" line through two
boxes for decision making, chief complaint appears to be no
complaints and (illegible), boxes are checked for the
assessment, and time spent is 20.  *Id.* at 68.  The List contains
a "z" line through two boxes for decision making, checked boxes
and notations for diagnoses, and time spent is altered to either
20 or 30.  *Id.* at 69.  The Council concludes that the record
contains sufficient documentation to support the service billed
at the CPT code 99307 level.  The QIC's determination of non-
coverage is reversed.

    5.   ***Beneficiary J.A.1.: DOS 03/07/13.***  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 20.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C1.  The Note chief complaint indicates no new complaint,
(illegible), poor intake, and seen for CPR; physical examination

contains checkmarks and notations; plan is see CPR and discuss
with staff; medical decision making contains a "z" line entry in
two boxes; and medium decision making complexity is circled and
crossed out with a large "X." Exh. 1, at 79. The Assessment
contains a "z" line through two boxes for decision making, chief
complaint appears to be no complaints and LTC resident, the form
contains checkmarks and notations, and time spent is 20. *Id.* at
81. The List contains a "z" line through two boxes for decision
making, checked boxes and notations for diagnoses, and time
spent is 20. *Id.* at 82. The Council concludes that the record
contains sufficient documentation to support the service billed
at the CPT code 99307 level. The QIC's determination of non-
coverage is reversed.

6. ***Beneficiary J.A.1.: DOS 04/17/13.*** The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter. Exh. 8, at 20. The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter. Exh. MAC-1E, at
C1. The Note chief complaint indicates patient seen for CPR, no
new complaints, a recent infection, and records reviewed;
physical examination contains checkmarks and notations; plan is
see CPR; medical decision making boxes are not checked; and
decision making complexity is not circled. Exh. 1, at 98. The
Assessment contains a "z" line through two boxes for decision
making, chief complaint is no complaint and LTC resident on
hospice, the form contains checkmarks, and time spent is 20.
*Id.* at 100. The List contains a "z" line through two boxes for
decision making, checked boxes and notations for diagnoses, and
time spent is 20. *Id.* at 101. The Council concludes that the
record contains sufficient documentation to support the service
billed at the CPT code 99307 level. The QIC's determination of
non-coverage is reversed.

7. ***Beneficiary L.A.: DOS 03/14/13.*** The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter. Exh. 8, at 21. The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter. Exh. MAC-1E, at
C1. The Note chief complaint indicates no complaint and seen
for CPR; physical examination contains checkmarks and notations;
plan is see CPR and discuss with staff; medical decision making
choices contain a "z" line through two boxes; and decision
making complexity is not circled. Exh. 1, at 111. The
Assessment contains a "z" line through two boxes for decision

making, chief complaint appears to be no new complaints and LTC
resident, the form contains checkmarks, and time spent appears
to be 20. *Id.* at 113. The List contains a "z" line through two
boxes for decision making, checked boxes and notations for
diagnoses, and time spent is illegible. *Id.* at 114. The
Council concludes that the record contains sufficient
documentation to support the service billed at the CPT code
99307 level. The QIC's determination of non-coverage is
reversed.

8. ***Beneficiary L.A.: DOS 05/12/13***. The QIC denied
coverage because documentation was not legible. Exh. 8, at 21.
The appellant argues that it "has provided a transcribed
document for each page so the auditor may better read them."
Exh. MAC-1E, at C1. The record contains two Notes, one stamped
"copy." Exh. 1, at 123, 128. The first Note contains multiple
lined out and changed entries without date or identification of
the author; chief complaint includes no new complaints, multiple
illegible entries, and seen for CPR; physical examination
contains checkmarks and altered notations; plan is see CPR,
discuss with staff, and records reviewed; no boxes are checked
for decision making complexity; and the decision making
complexity is not circled. *Id.* at 123. The second Note is
substantially similar and contains entries without alteration
and no identification of the author or date of the changes. *Id.*
at 128. The record contains two Assessments which do not appear
to have been altered or to differ from each other, both with
chief complaint as no complaint and LTC resident, checked boxes
for assessment, and time spent is 20. *Id.* at 125, 129. The
record contains two Lists which do not appear to have been
altered or to differ from each other, both with time documented
as 20. *Id.* at 126, 130. The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

9. ***Beneficiary L.A.: DOS 06/29/13***. The QIC denied
coverage because it agreed with the prior downcode. Exh. 8, at
21. The appellant argues that the service was a CPR billed
based on CMS instructions. Exh. MAC-1E, at C1. The Note chief
complaint states no complaints, seen for CPR, and there is a
crossed-out entry that is not signed or dated. Exh. 1, at 145.
The Note contains checkmarks and notations for physical
examination; plan is see CPR, discuss with staff, and record
reviewed; there are no checks in medical decision making boxes;
and decision making complexity is not circled. *Id.* The

Assessment contains a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, and time spent is 20.  *Id.* at 147.  The List contains a "z" line through one box for decision making, checked boxes and notations for diagnoses, and time spent is 20.  *Id.* at 148.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

10.  ***Beneficiary J.A.2.: DOS 03/10/13.***  The QIC denied coverage because the documentation indicated a CPR and no face to face encounter.  Exh. 8, at 21.  The appellant argues that the service was a CPR billed based on CMS instructions and that the service required a face to face encounter.  Exh. MAC-1E, at C1.  The Note chief complaint indicates no new complaint, seen for CPR, and what appears to be "VSS" (vital signs stable); physical examination contains checkmarks and notations; plan indicates see CPR, record reviewed, and discuss with staff; there is a "z" line in two boxes for medical decision making; and medium decision making complexity is circled and altered.  Exh. 1, at 158.  The Assessment contains a "z" line through two boxes for decision making, chief complaint is no complaints and LTC resident, the form contains checkmarks and notations, and time spent is cut off.  *Id.* at 160.  The List contains a "z" line through two boxes for decision making, checked boxes for diagnoses, and time spent is 20.  *Id.* at 161.  The Council concludes that the record contains sufficient documentation to support the service billed at the CPT code 99307 level.  The QIC's determination of non-coverage is reversed.

11.  ***Beneficiary J.A.2.: DOS 05/11/13.***  The QIC issued a partially favorable decision, allowing the services at a "downcode" 99307.  Exh. 8, at 21.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C1.  The record contains two Notes.  Exh. 1, at 176, 181.  The first Note contains altered entries that are not signed or dated.  *Id.* at 176.  The chief complaint indicates no new complaint, the patient "wander[s] around wheelchair," discuss with staff, review records, and seen for CPR; physical examination contains checkmarks and notations; plan indicates see CPR; boxes for medical decision making are not checked; and decision making complexity is not circled.  *Id.*  The second Note contains similar entries and has no alterations.  *Id.* at 181.  The record contains two Assessments, which do not appear to

25

differ, which  contain a "z" line through two boxes for decision
making, chief complaint is no complaints and LTC resident, the
form contains checkmarks, and time spent is 20.  *Id.* at 178,
182.  The record contains two Lists, which do not appear to
differ, and which contain a "z" line through two boxes for
decision making, checked boxes for diagnoses, and time spent is
20.  *Id.* at 179, 183.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

12.  ***Beneficiary J.A.2: DOS 06/10/13.***  The QIC denied
coverage, stating the need for frequency of visit not indicated.
Exh. 8, at 21.  We agree that the appellant has not shown that
it was medically reasonable and necessary to perform care plan
review on a stable beneficiary more frequently than the minimum
required.  The appellant argues that the service was a CPR
billed based on CMS instructions.  Exh. MAC-1E, at C1.  The Note
chief complaint indicates no complaint and seen for CPR;
physical examination contains checkmarks and notations; plan
indicates see CPR, discuss with staff, and record review; boxes
for medical decision making are not checked; and decision making
complexity is not circled.  Exh. MAC-1, at 198.  The Assessment
contains  a "z" line through two boxes for decision making,
chief complaint is no complaints, the form contains checkmarks
with initialed (but not dated) changes, and time spent is
illegible.  *Id.* at 200.  The List contains a "z" line through
two boxes for decision making, checked boxes for diagnoses, an
altered date, and time spent appears to be 20.  *Id.* at 201.  The
record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

13.  ***Beneficiary F.B.: DOS 05/11/13.***  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 21.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C2.  The record contains two Notes, one stamped "copy."  Exh. 1,
at 216, 223.  The first Note contains lined out and changed
entries without date or signature; chief complaint includes no
new complaints, doing much better, and seen for CPR;  physical
examination contains checkmarks and notations; plan is see CPR,
discuss with staff, and records review; there is a "z" line
through two boxes decision making complexity; and the decision
making complexity is not circled.  *Id.* at 216.  The second Note

is substantially similar and contains entries without alteration
and no identification of the author or date of the changes.  *Id.*
at 223.  The record contains two Assessments containing an
altered entry (psycho-social evaluation), chief complaint is no
complaint and LTC resident, the form has checkmarks, and time is
20.  *Id.* at 218, 221.  The record contains two Lists which do
not appear to differ from each other, with time documented as
20.  *Id.* at 219, 222.  The Council concludes that the record
contains sufficient documentation to support the service billed
at the CPT code 99307 level.  The QIC's determination of non-
coverage is reversed.

14.  ***Beneficiary F.B.: DOS 06/28/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
21.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C2.  The Note chief
complaint states no complaints and seen for CPR; contains
checkmarks and notations for physical examination;  plan is see
CPR, discuss with staff, and records reviewed; there is a "z"
line through two boxes for medical decision making boxes; and
decision making complexity is circled as medium and crossed-out.
Exh. 1, at 231.  The Assessment contains a "z" line through two
boxes for decision making, chief complaint is LTC resident,
boxes are checked for assessment, and time spent appears to be
20.  *Id.* at 233.  The List contains a "z" line through two boxes
for decision making, checked boxes and notations for diagnoses,
and time spent is 20.  *Id.* at 234.  The record contains
insufficient documentation to support the service billed as CPT
code 99310, and the Council agrees with the QIC's determination.

15.  ***Beneficiary P.B.: DOS 03/07/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
21.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C2.  The Note chief
complaint states no complaints, no pain, and seen for CPR;
contains checkmarks and notations for physical examination;
plan is see CPR and discuss with staff; there is a "z" line
through two boxes for medical decision making; and medium
decision making complexity is circled and partially erased.
Exh. 1, at 243.  The Assessment contains a "z" line through two
boxes for decision making, chief complaint is no complaint and
LTC resident, boxes are checked for assessment, and time spent
appears to be 20.  *Id.* at 245.  The List contains a "z" line
through two boxes for decision making, checked boxes and
notations for diagnoses, and time spent is 20.  *Id.* at 246.  The

record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

16. **_Beneficiary P.B.: DOS 05/11/13_**.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 21.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C2.  The record contains two Notes, one stamped "copy."  Exh. 1,
at 255, 260.  The first Note contains lined out and changed
entries without date or identification of the author; chief
complaint includes no new complaints, seen for CPR, records
reviewed, and discuss with staff; physical examination contains
checkmarks and notations; plan states see CPR; there is a "z"
line through two boxes for decision making complexity; and the
level of medical decision making is not circled.  _Id._ at 255.
The second Note is substantially similar, contains entries
without alteration and no identification of the author or date
of those changes, and some notations under physical examination
and plan on the first Note do not appear on this Note.  _Compare
id._ at 255, 260.  The record contains two Assessments which do
not appear to differ materially, chief complaint is no complaint
and LTC resident, boxes are checked for assessment, and time
documented is 20.  _Id._ at 257, 261.  The record contains two
Lists which do not appear to differ from each other, with time
documented as 20.  _Id._ at 258, 262.  The Council concludes that
the record contains sufficient documentation to support the
service billed at the CPT code 99307 level.  The QIC's
determination of non-coverage is reversed.

17. **_Beneficiary J.B.: DOS 03/07/13_**.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
22.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C2.  The Note chief
complaint states no complaints and see for CPR; there are
checkmarks and notations for physical examination;  plan is see
CPR, discuss with staff, and record reviewed; two medical
decision making boxes are checked; and medium decision making
complexity is circled and crossed out.  Exh. 1, at 271.  The
Assessment contains a "z" line through two boxes for decision
making, chief complaint is no complaint and LTC resident, and
time spent is 20.  _Id._ at 273.  The List contains a "z" line
through two boxes for decision making, checked boxes and
notations for diagnoses, and time spent appears to be 20.  _Id._

at 274.  The record contains insufficient documentation to
support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

18.  **Beneficiary J.B.: DOS 05/11/13**.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
22.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C2.  The Note chief
complaint states no complaints, pain controlled, and seen for
CPR; contains checkmarks and notations for physical examination;
plan is see CPR, list reviewed, and discuss with staff; medical
decision making boxes are not checked; and decision making
complexity choices are not circled.  Exh. 1, at 290.  The
Assessment contains a "z" line through two boxes for decision
making, chief complaint is no complaint and LTC resident, boxes
are checked for assessment, and time spent is 20.  *Id.* at 292.
The List contains a "z" line through two boxes for decision
making, checked boxes and notations for diagnoses, and time
spent is 20.  *Id.* at 293.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

19.  **Beneficiary J.B.: DOS 06/26/13**.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
22.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C2.  The Note chief
complaint states no complaints and seen for CPR; contains
checkmarks and notations for physical examination; plan is see
CPR, discuss with staff, and list reviewed; there is a "z" line
through two medical decision making boxes; and decision making
complexity choices are not circled.  Exh. 1, at 302.  The
Assessment contains a "z" line through two boxes for decision
making, chief complaint is no complaint and LTC resident, there
are checked boxes for assessment, and time spent is 20.  *Id.* at
304.  The List contains a "z" line through two boxes for
decision making, checked boxes and notations for diagnoses, and
time spent is 20.  *Id.* at 305.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

20.  **Beneficiary G.B.: DOS 05/11/13**.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 22.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at

C2.  The record contains two Notes, one stamped "copy."  Exh. 1,
at 320, 325.  The first Note contains lined out and changed
entries with what seem to be initials but no dates; chief
complaint is seen for CPR and no complaints; physical
examination contains checkmarks and notations; plan states see
CPR; there is a "z" line through two boxes for decision making
complexity; and medium decision making complexity is circled.
*Id.* at 320.  The second Note is substantially similar, contains
entries without alteration and no identification of the author
or date of those changes.  *Id.* at 325.  The record contains two
Assessments which do not appear to differ materially, chief
complaint is no complaints and LTC resident, boxes are checked
for the assessment, and time documented is 20.  *Id.* at 322, 326.
The record contains two Lists which do not appear to differ from
each other, there is a crossed-out entry for "stroke," and time
documented is 20.  *Id.* at 323, 327.  The Council concludes that
the record contains sufficient documentation to support the
service billed at the CPT code 99307 level.  The QIC's
determination of non-coverage is reversed.

21.  ***Beneficiary L.B.: DOS 05/11/13.***  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
22.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C2.  The Note chief
complaint states no complaints, (illegible), pain controlled,
and (illegible); contains checkmarks and notations for physical
examination; plan is see CPR, discuss with staff, and records
reviewed; medical decision making boxes are not checked; and
decision making complexity choices are not circled.  Exh. 1, at
342.  The Assessment contains a "z" line through two boxes for
decision making; chief complaint is no complaint, chronic pain
controlled, and LTC resident; boxes are checked for assessment;
and time spent is 20.  *Id.* at 344.  The List contains a "z" line
through two boxes for decision making, checked boxes and
notations for diagnoses, there is a handwritten entry for
"stable," and time spent is 20.  *Id.* at 345.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

22.  ***Beneficiary L.B.: DOS 06/10/13.***  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 22.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at

30

C2.  The Note chief complaint is no complaints and seen for CPR;
physical examination contains checkmarks and notations; plan
states see CPR, discuss with staff, and records reviewed; there
is a "z" line through two boxes for decision making complexity
and the level of medical decision making is not circled.  Exh.
1, at 361.  The Assessment contains a "z" line through two
medical decision making boxes, chief complaint is no complaint,
boxes are checked for assessment, and time documented as what
appears to be 20.  *Id.* at 363.  The List contains a "z" line
through two boxes for decision making complexity, there are
checked boxes and notations for diagnoses, and time documented
is 20.  *Id.* at 364.  The Council concludes that the record
contains sufficient documentation to support the service billed
at the CPT code 99307 level.  The QIC's determination of non-
coverage is reversed.

23.  ***Beneficiary M.B.: DOS 03/07/13.***  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
22.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C2.  The Note chief
complaint states no new complaints, seen for care plan
assessment, records reviewed, and discuss with staff; there are
checkmarks and notations for physical examination; plan is CPR;
boxes for medical decision making are unchecked; and choice for
decision making complexity is not circled.  Exh. 1, at 374.  The
Assessment contains a "z" line through two boxes for decision
making, chief complaint is no complaint and LTC resident, boxes
are checked for assessment, and time spent is 20.  *Id.* at 376.
The List contains a "z" line through two boxes for decision
making, checked boxes and notations for diagnoses, and time
spent is 20.  *Id.* at 377.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

24.  ***Beneficiary M.B.: DOS 05/11/13.***  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
22.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C2.  The Note chief
complaint states no new complaints, (illegible), and seen for
CPR; there are checkmarks and notations for physical
examination; plan is CPR; boxes for medical decision making are
unchecked; and choice for decision making complexity is not
circled.  Exh. 1, at 393.  The Assessment contains a "z" line
through two boxes for decision making; chief complaint is no
complaint, (illegible), and LTC resident; and time spent is 20.

*Id.* at 395.  The List contains a "z" line through two boxes for
decision making, checked boxes and notations for diagnoses, and
time spent appears to be 20.  *Id.* at 396.  The record contains
insufficient documentation to support the service billed as CPT
code 99310, and the Council agrees with the QIC's determination.

   25.  ***Beneficiary M.B.: DOS 06/26/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
22.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C2.  The Note chief
complaint states no complaints, seen for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR, discuss with staff, and records reviewed; there is a "z"
line through two boxes for medical decision making;  and choice
for decision making complexity is not circled.  Exh. 1, at 406.
The Assessment contains unchecked boxes for decision making,
chief complaint is LTC resident, boxes are checked for
assessment, and time spent is illegible.  *Id.* at 408.  The List
contains a "z" line through two boxes for decision making,
checked boxes and notations for diagnoses, and time spent is 20.
*Id.* at 409.  The record contains insufficient documentation to
support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

   26.  ***Beneficiary H.B.: DOS 04/09/13.***  The QIC denied
coverage because "changed documentation not identified."  Exh.
8, at 22.  The appellant argues that it has provided a
transcribed document for each page for easier auditor reading.
Exh. MAC-1, at C2.  Contrary to the appellant's contentions,
there is one set of clinical records for the date of service at
issue and no transcribed documents.  *See* Exh. 1, at 413-430,
passim; *id.* at 424-28.  The Note chief complaint contains lined
out entries and a changed name (different beneficiary), room
(different room number), and date (different date), all without
initials or date.  *Id.* at 424.  The remaining Note entries state
no complaints and seen for CPR; there are checkmarks and
notations for physical examination; plan is see CPR, discuss
with staff, and records reviewed; boxes for medical decision
making are not checked; and choice for decision making
complexity is not circled.  *Id.*  The Assessment contains a "z"
line through two boxes for decision making; chief complaint is
no complaint, (illegible), and blood sugar check; boxes are
checked for assessment; and time spent appears to be 20.  *Id.* at
426.  The List contains a "z" line through two boxes for
decision making, checked boxes and notations for diagnoses, and

time spent is 20.  *Id.* at 427.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

27.  ***Beneficiary H.B.: DOS 05/11/13.***  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
22.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C2.  The Note chief
complaint is (illegible) and seen for CPR; there are checkmarks
and notations for physical examination; plan is see CPR, discuss
with staff, and review records; there is a "z" line through two
boxes for medical decision making; and choice for decision
making complexity is obscured and unreadable.  Exh. 1, at 443.
The Assessment contains a "z" line through two boxes for
decision making, chief complaint is no complaint and LTC
resident, boxes are checked for assessment, and time spent is
20.  *Id.* at 445.  The List contains a "z" line through two boxes
for decision making, checked boxes and notations for diagnoses,
and time spent is altered to what appears to be 20 from the
original 30 (or vice versa).  *Id.* at 446.  The record contains
insufficient documentation to support the service billed as CPT
code 99310, and the Council agrees with the QIC's determination.

28.  ***Beneficiary C.C.: DOS 03/18/13.***  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
22.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C2.  The Note's date
is altered; the chief complaint states no complaints, chronic
lower extremity pain controlled, and seen for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR and discuss with staff; boxes for medical decision making
are unchecked; and choice for decision making complexity is not
circled.  Exh. 1, at 462.  The Assessment contains a "z" line
through two boxes for decision making, chief complaint is no
complaint and LTC resident, boxes are checked for assessment
(with an unsigned and undated altered entry), and time spent is
20.  *Id.* at 464.  The List contains a "z" line through two boxes
for decision making, checked boxes and notations for diagnoses
with an unsigned and undated deleted entry, and time spent is
20.  *Id.* at 465.  The record contains insufficient documentation
to support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

29. *Beneficiary C.C.: DOS 05/09/13*. The QIC denied coverage because it agreed with the prior downcode. Exh. 8, at 22. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C2. The record contains two Notes. Exh. 1, at 481, 486. The first Note contains altered entries that are sometimes initialed, but not dated. *Id.* at 481. The chief complaint indicates no new complaints, constipation, and seen for CPR; physical examination contains checkmarks and notations; plan indicates see CPR, discuss with staff, and records reviewed; boxes for medical decision making are not checked; and decision making complexity is not circled. *Id.* The second Note contains similar entries and has no alterations. *Id.* at 486. The record contains two Assessments, which do not appear to differ, which contain a "z" line through two boxes for decision making, chief complaint is no complaints and LTC resident, the form contains checkmarks, and time spent is 20. *Id.* at 483, 487. The record contains two Lists, which do not appear to differ, and which contain a "z" line through two boxes for decision making, checked boxes and handwritten notations for diagnoses, and time spent is 20. *Id.* at 484, 488. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

30. *Beneficiary C.C.: DOS 06/06/13*. The QIC denied coverage because the need for visit frequency was not indicated. Exh. 8, at 23. We agree that the appellant has not shown that it was medically reasonable and necessary to perform care plan review on a stable beneficiary more frequently than the minimum required. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C2. The Note's chief complaint states no complaints and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, review with staff, and record review; there is a "z" line through two boxes for medical decision making; and choice for decision making complexity is not circled. Exh. 1, at 503. The Assessment contains a "z" line through two boxes for decision making, illegible chief complaint, checked boxes for assessment, and time spent is 20. *Id.* at 505. The List contains a "z" line through two boxes for decision making, checked boxes and notations for diagnoses, and time spent is 20. *Id.* at 506. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

31.  *Beneficiary M.C.: DOS 02/12/13*.  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 23.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C2.  The Note chief complaint is partially illegible with what appears to be complaints of pain and "no change in MS;" there are checkmarks and notations for physical examination; plan is largely illegible, but indicates a discussion;  there is a "z" line through two boxes for medical decision making; and the medium choice for decision making complexity is partially circled. Exh. 1, at 515.  The Assessment contains a "z" line through two boxes for decision making, chief complaint is partially illegible but indicates no new complaints and LTC resident, checked boxes for assessment, a cutoff signature, and time spent is 20.  *Id.* at 517.  The List contains unchecked boxes for decision making, checked boxes and an entry for diagnoses, and time spent is 20.  *Id.* at 518.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

32.  *Beneficiary M.C.: DOS 03/10/13*.  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 23.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C2.  The Note's chief complaint is largely illegible with what appears to be no new complaints; there are checkmarks and notations for physical examination; plan is see CPR and discuss with staff; there is a "z" line through two boxes for medical decision making; and the medium choice for decision making complexity appears to have been circled and altered.  Exh. 1, at 528.  The Assessment contains a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident for hospice, checked boxes for assessment, and a partial and illegible entry for time spent.  *Id.* at 530.  The List contains a "z" line through two boxes for decision making, checked boxes and handwritten entries for diagnoses, and time spent appears to be 20.  *Id.* at 531. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

33.  *Beneficiary M.C.: DOS 05/09/13*.  The QIC denied coverage because "changed documentation not identified."  Exh. 8, at 23.  The appellant argues that it has provided a transcribed document for easier auditor reading.  Exh. MAC-1, at C3. The record contains two Notes.  Exh. 1, at 546, 551.  The

first Note contains altered entries that are not dated. *Id.* at
546.  The chief complaint indicates no new complaints, mood
fluctuation, and seen for CPR; physical examination contains
checkmarks and notations; plan indicates see CPR, discuss with
staff, and records reviewed; boxes for medical decision making
are not checked; and decision making complexity is not circled.
*Id.*  The second Note contains similar entries and has no
alterations.  *Id.* at 551.  The record contains two Assessments,
which do not appear to differ, which contain a "z" line through
two boxes for decision making, chief complaint is no complaints,
the form contains checkmarks, and time spent is 20.  *Id.* at 548,
552.  The record contains two Lists, which do not appear to
differ, and which contain a "z" line through two boxes for
decision making, checked boxes and a handwritten notation for
diagnoses, and time spent is 20.  *Id.* at 549, 553.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

34.  ***Beneficiary M.C.: DOS 06/10/13.***  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 23.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C3.  The Note chief complaint states no complaints and seen for
CPR; contains checkmarks and notations for physical examination;
plan is see CPR, hospice, discuss with staff, and record review;
there is a "z" line through two boxes for medical decision
making; and the decision making complexity is not circled.  Exh.
1, at 567.  The Assessment contains a "z" line through two boxes
for decision making, chief complaint is no new complaint, boxes
are checked, and time spent is 20.  *Id.* at 569.  The List
contains a "z" line through two boxes for decision making,
checked boxes and notations for diagnoses, and time spent is 20.
*Id.* at 570.  The Council concludes that the record contains
sufficient documentation to support the service billed at the
CPT code 99307 level.  The QIC's determination of non-coverage
is reversed.

35.  ***Beneficiary E.C.: DOS 06/29/13.***  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
23.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C3.  The Note chief
complaint is largely illegible with what appears to include
commenced help, rule out (ro) pain, and "BS 200's 100's;"  there

36

are checkmarks and notations for physical examination; plan is
see CPR, discuss with staff, and record review; boxes for
medical decision making are unchecked; and the choice for
decision making complexity is not circled. Exh. 1, at 586. The
Assessment contains a "z" line through two boxes for decision
making, chief complaint is LTC resident and "just got admitted
for ACR," assessment boxes contain multiple unsigned and undated
alterations, and time spent is 20. *Id.* at 588. The List
contains a "z" line through two boxes for decision making,
checked boxes and handwritten entries for diagnoses, and time
spent appears to be 20. *Id.* at 589. The record contains
insufficient documentation to support the service billed as CPT
code 99310, and the Council agrees with the QIC's determination.

   36. ***Beneficiary L.C.: DOS 03/12/13***. The QIC denied
coverage because it agreed with the prior downcode. Exh. 8, at
23. The appellant argues that the service was a CPR billed
based on CMS instructions. Exh. MAC-1E, at C3. The Note chief
complaint is no complaints and seen for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR and record review; boxes for medical decision making are
unchecked; and the choice for decision making complexity is not
circled. Exh. 1, at 599. The Assessment contains unchecked
boxes for decision making, chief complaint appears to be no
complaints and LTC resident, assessment boxes are checked, and
time spent is 20. *Id.* at 601. The List contains a "z" line
through two boxes for decision making, checked boxes for
diagnoses, and time spent is 20. *Id.* at 602. The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

   37. ***Beneficiary L.C.: DOS 04/08/13***. The QIC issued a
partially favorable decision, allowing the services at a
"downcode" 99307. Exh. 8, at 23. The appellant argues that the
service was a CPR billed based on CMS instructions. Exh. MAC-
1E, at C3. The Note chief complaint states no complaints, seen
for CPR, chronic lower extremity (illegible) controlled;
physical examination contains checkmarks and notations; plan
indicates see CPR, discuss with staff, and medical record
review; boxes for medical decision making are not checked; and
decision making complexity is not circled. Exh. 1, at 618. The
Assessment contain a "z" line through two boxes for decision
making; chief complaint is no complaint, LTC resident, and
"doing OK;" the form contains checkmarks; the date is altered;

and time spent is 20.  *Id.* at 620.  The List contains a "z" line
through two boxes for decision making, checked boxes for
diagnoses, and time spent is 20.  *Id.* at 621.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

38.  ***Beneficiary L.C.: DOS 06/22/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
23.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C3.  The Note chief
complaint is no complaints, seen for CPR, and what appears to be
concerned about lower extremity edema; there are checkmarks and
notations for physical examination; plan is see CPR, discuss
with staff, and record review; boxes for medical decision making
are unchecked; and the choice for decision making complexity is
not circled.  Exh. 1, at 631.  The Assessment a "z" line through
two boxes for decision making, chief complaint is LTC resident,
assessment boxes are checked, and time spent is 20.  *Id.* at 633.
The List contains a "z" line through two boxes for decision
making, checked boxes for diagnoses, and time spent is 20.  *Id.*
at 634.  The record contains insufficient documentation to
support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

39.  ***Beneficiary N.C.: DOS 03/12/13***.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 23.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C3.  The Note chief complaint states no new complaints and seen
for CPR; contains checkmarks and notations for physical
examination; plan is see CPR; boxes for medical decision making
are unchecked; and the decision making complexity is not
circled.  Exh. 1, at 641.  The Assessment contains a "z" line
through two boxes for decision making, chief complaint is no new
complaint and LTC resident, boxes are checked, and time spent is
20.  *Id.* at 643.  The List contains a "z" line through two boxes
for decision making, checked boxes and a notation for diagnoses,
and time spent is 20.  *Id.* at 644.  The Council concludes that
the record contains sufficient documentation to support the
service billed at the CPT code 99307 level.  The QIC's
determination of non-coverage is reversed.

40.  **Beneficiary N.C.: DOS 04/08/13**.  The QIC issued a partially
favorable decision, allowing the services at a "downcode" 99307.
Exh. 8, at 23.  The appellant argues that the service was a CPR
billed based on CMS instructions.  Exh. MAC-1E, at C3.  The Note
chief complaint indicates no complaints and seen for CPR;
physical examination contains checkmarks and notations; plan
indicates see CPR, discuss with staff, and medical record
review; boxes for medical decision making are not checked; and
decision making complexity is not circled.  Exh. 1, at 661.  The
Assessment contain a "z" line through two boxes for decision
making; chief complaint is no complaints and LTC resident; the
form contains checkmarks; and time spent is 20.  *Id.* at 663.
The List contains a "z" line through two boxes for decision
making, checked boxes for diagnoses, and time spent appears to
be 20.  *Id.* at 664.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

41.  **Beneficiary N.C.: DOS 06/29/13**.  The QIC denied coverage
because it agreed with the prior downcode.  Exh. 8, at 23.  The
appellant argues that the service was a CPR billed based on CMS
instructions.  Exh. MAC-1E, at C3.  The Note chief complaint is
no complaints, seen for CPR, and pain control; there are
checkmarks and notations for physical examination; plan is see
CPR, discuss with staff, and record review; boxes for medical
decision making are unchecked; and the choice for decision
making complexity is not circled.  Exh. 1, at 680.  The
Assessment contains a "z" line through two boxes for decision
making, chief complaint is LTC resident, assessment boxes are
checked, and time spent is 20.  *Id.* at 682.  The List contains a
"z" line through two boxes for decision making, checked boxes
and notations for diagnoses, and time spent is 20.  *Id.* at 683.
The record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

42.  **Beneficiary W.C.: DOS 03/12/13**.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
23.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C3.  The Note chief
complaint is no complaint and seen for CPR; there are checkmarks
and notations for physical examination; plan is see CPR and
discuss with staff; boxes for medical decision making are
unchecked; and the choice for decision making complexity is not
circled.  Exh. 1, at 693.  The Assessment contains a "z" line

39

through two boxes for decision making, chief complaint is no
complaint and LTC resident, assessment boxes are checked, and
time spent is partially cut off. *Id.* at 695. The List contains
a "z" line through two boxes for decision making, checked boxes
for diagnoses, and time spent is an unclear entry of either 20
or 30. *Id.* at 696. The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

43. ***Beneficiary W.C.: DOS 04/08/13***. The QIC denied
coverage because it agreed with the prior downcode. Exh. 8, at
24. The appellant argues that the service was a CPR billed
based on CMS instructions. Exh. MAC-1E, at C3. The Note chief
complaint is no complaint and seen for CPR; there are checkmarks
and notations for physical examination; plan is see CPR, discuss
with staff, and medical record review; boxes for medical
decision making are unchecked; and the choice for decision
making complexity is not circled. Exh. 1, at 713. The
Assessment contains a "z" line through two boxes for decision
making, chief complaint is no complaint and LTC resident,
assessment boxes are checked, and time spent is 20. *Id.* at 715.
The List contains a "z" line through two boxes for decision
making, checked boxes and entries for diagnoses, and time spent
is 20. *Id.* at 716. The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

44. ***Beneficiary W.C.: DOS 06/29/13***. The QIC denied
coverage because it agreed with the prior downcode. Exh. 8, at
24. The appellant argues that the service was a CPR billed
based on CMS instructions. Exh. MAC-1E, at C3. The Note chief
complaint is no complaint, vital signs stable, blood sugar
check, and seen for CPR; there are checkmarks and notations for
physical examination; plan is see CPR, discuss with staff, and
record review; boxes for medical decision making are unchecked;
and the choice for decision making complexity is not circled.
Exh. 1, at 732. The Assessment contains a "z" line through two
boxes for decision making, chief complaint is no complaint and
LTC resident, assessment boxes are checked, and time spent is
20. *Id.* at 734. The List contains a "z" line through two boxes
for decision making, checked boxes and an entry for diagnoses,
and time spent is 20. *Id.* at 735. The record contains
insufficient documentation to support the service billed as CPT
code 99310, and the Council agrees with the QIC's determination.

45.  **Beneficiary V.C.: DOS 05/09/13**.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
24.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C3.  The Note chief
complaint is no complaints and seen for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR, discuss with staff, and record review; boxes for medical
decision making are unchecked; and the choice for decision
making complexity is not circled.  Exh. 2, at 14.  The
Assessment contains a "z" line through two boxes for decision
making, chief complaint is LTC resident, assessment boxes are
checked, and time spent is 20.  *Id.* at 16.  The List contains a
"z" line through two boxes for decision making, checked boxes
and an entry for diagnoses, and time spent is 20.  *Id.* at 17.
The record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

46.  **Beneficiary D.C.: DOS 04/08/13**.  The QIC issued a
partially favorable decision, allowing the services at a
"downcode" 99307.  Exh. 8, at 24.  The appellant argues that the
service was a CPR billed based on CMS instructions.  Exh. MAC-
1E, at C3.  The Note chief complaint indicates no complaints,
doing well, and seen for CPR; physical examination contains
checkmarks and notations; plan indicates see CPR, medical record
review, and discuss with staff; one box for medical decision
making is checked; and decision making complexity is not
circled.  Exh. 2, at 27.  The Assessment contain a "z" line
through two boxes for decision making; chief complaint is no
complaints and LTC resident; the form contains checkmarks; and
time spent is 20.  *Id.* at 29.  The List contains a "z" line
through two boxes for decision making, checked boxes and entries
for diagnoses, and time spent is illegible.  *Id.* at 30.  The
record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

47.  **Beneficiary A.D.: DOS 03/07/13**.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
24.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C3.  The Note chief
complaint is no complaint, seen for CPR, and what appears to be
"uvs;" there are checkmarks and notations for physical
examination; plan is see CPR; there is a "z" line through two
boxes for medical decision making; and the choice of medium for

41

decision making complexity is partially altered.  Exh. 2, at 40.
The Assessment contains an unsigned and undated change to the
patient name, "z" line through two boxes for decision making,
chief complaint is no complaint and LTC resident, assessment
boxes are checked, and time spent is 20.  *Id.* at 42.  The List
contains a "z" line through two boxes for decision making,
checked boxes and an entry for diagnoses, and time spent is 20.
*Id.* at 43.  The record contains insufficient documentation to
support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

    48.  ***Beneficiary A.D.: DOS 05/11/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
24.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C3.  The Note date
is altered; chief complaint is no complaints, seen for CPR,
chart review, and discuss with staff; there are checkmarks and
notations for physical examination; plan is see CPR; there is a
"z" line that seems to be through one box for medical decision
making; and the choice for decision making complexity is not
circled.  Exh. 2, at 59.  The Assessment contains a "z" line
through two boxes for decision making, chief complaint is no
complaint and LTC resident, assessment boxes are checked, and
time spent is 20.  *Id.* at 61.  The List contains a "z" line
through two boxes for decision making, checked boxes and an
entry for diagnoses, and time spent is 20.  *Id.* at 62.  The
record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

    49.  ***Beneficiary A.D.: DOS 06/10/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
24.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C3.  The Note chief
complaint is no complaints and seen for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR, discuss with staff, and record review; boxes for medical
decision making are not checked; and the choice for decision
making complexity is not circled.  Exh. 2, at 78.  The
Assessment contains a "z" line through two boxes for decision
making, chief complaint is no complaint, assessment boxes are
checked, and time spent is 20.  *Id.* at 80.  The List contains a
"z" line through two boxes for decision making, checked boxes
and entries for diagnoses, and time spent is 20.  *Id.* at 81.
The record contains insufficient documentation to support the

service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

50.   ***Beneficiary J.D.1: DOS 03/07/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
24.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C3.  The Note chief
complaint is no complaints and seen for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR and discuss with staff; there is a "z" line through two
boxes for medical decision making; and the medium choice for
decision making complexity is circled and partially altered.
Exh. 2, at 91.  The Assessment contains a "z" line through two
boxes for decision making, chief complaint is no complaint and
LTC resident, assessment boxes are checked, and time spent is
not documented.  *Id.* at 101.  The List contains a "z" line
through two boxes for decision making, checked boxes and an
entry for diagnoses, and time spent is 20.  *Id.* at 102.  The
record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

51.   ***Beneficiary J.D.1: DOS 05/09/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
24.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C3.  The Note date
is altered with undated initials; chief complaint is no
complaints and seen for CPR; there are checkmarks and notations
for physical examination; plan is see CPR, chart reviewed, and
discuss with staff; boxes for medical decision making are
unchecked; and the choice for decision making complexity is not
circled.  Exh. 2, at 119.  The Assessment contains a "z" line
through two boxes for decision making, chief complaint is no
complaint and (illegible), assessment boxes are checked, and
time spent is 20.  *Id.* at 121.  The List contains a "z" line
through two boxes for decision making, checked boxes and
entries for diagnoses, and time spent is 20.  *Id.* at 122.  The
record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

52.   ***Beneficiary J.D.2: DOS 03/07/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
24.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C3.  The Note chief

complaint is no complaints, an entry concerning her mood, and
seen for CPR; there are checkmarks and notations for physical
examination; plan is see CPR and discuss with staff; two boxes
for medical decision making are checked; and the medium choice
for decision making complexity is circled and partially erased.
Exh. 2, at 133.  The Assessment contains a "z" line through two
boxes for decision making, chief complaint is no complaint and
LTC resident, assessment boxes are checked with one entry, and
time spent is 20.  *Id.* at 135.  The List contains a "z" line
through two boxes for decision making, checked boxes for
diagnoses, and time spent is 20.  *Id.* at 136.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

     53.  ***Beneficiary J.D.2: DOS 05/11/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
24.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C3.  The Note date
is altered without initial or date; chief complaint is no
complaints, record reviewed, and discuss with staff; there are
checkmarks and notations for physical examination; plan is see
CPR; two boxes for medical decision making are checked; and the
medium choice for decision making complexity is circled and
crossed out.  Exh. 2, at 152.  The Assessment contains a "z"
line through two boxes for decision making, chief complaint is
no complaint and LTC resident, assessment boxes are checked, the
date is altered, and time spent is 20.  *Id.* at 154.  The List
contains a "z" line through two boxes for decision making,
checked boxes for diagnoses with a handwritten entry of
"stable," and time spent is 20.  *Id.* at 155.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

     54.  ***Beneficiary D.E.: DOS 05/12/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
24.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C3.  The record
contains two Notes, one stamped "Copy."  Exh. 2, at 171, 176.
The first Note (Copy) contains altered entries that are not
dated and sometimes not initialed.  *Id.* at 171.  The chief
complaint indicates no new complaints, back pain controlled, and
seen for CPR; physical examination contains checkmarks and
notations; plan indicates see CPR, discuss with staff, and

44

records reviewed; boxes for medical decision making are not
checked; and decision making complexity is not circled. *Id.*
The second Note contains similar entries and has no alterations.
*Id.* at 176. The record contains two Assessments, which do not
appear to differ, which contain a "z" line through two boxes for
decision making; chief complaint is chronic back pain, LTC
resident, and a partially illegible "rule out" complaints; the
form contains checkmarks with an alteration that is not
initialed or dated; and time spent is 20. *Id.* at 173, 177. The
record contains two Lists, which do not appear to differ, and
which contain a "z" line through two boxes for decision making,
checked boxes and handwritten notations for diagnoses, and time
spent is 20. *Id.* at 174, 178. The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

55. ***Beneficiary D.E.: DOS 06/29/13***. The QIC denied
coverage because it agreed with the prior downcode. Exh. 8, at
24. The appellant argues that the service was a CPR billed
based on CMS instructions. Exh. MAC-1E, at C3. The Note chief
complaint indicates no new complaints, seen for CPR, and
(illegible); physical examination contains checkmarks and
notations; plan indicates see CPR, discuss with staff, and
record review; there is a "z" line through two boxes for medical
decision making; and decision making complexity is not circled.
Exh. 2, at 193. The Assessment boxes for decision making level
are not checked, chief complaint is LTC resident, the form
contains checkmarks, and time spent is not documented. *Id.* at
195. The List contains a "z" line through two boxes for
decision making, checked boxes and handwritten notations for
diagnoses, and time spent appears to be 20. *Id.* at 196. The
record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

56. ***Beneficiary O.F.: DOS 03/10/13***. The QIC issued a
partially favorable decision, allowing the services at a
"downcode" 99307. Exh. 8, at 24. The appellant argues that the
service was a CPR billed based on CMS instructions. Exh.
MAC-1E, at C3. The Note chief complaint indicates no complaint,
blood pressure stable, no pain, and see for CPR assessment;
physical examination contains checkmarks and notations; plan
indicates see CPR and discuss with staff; boxes for medical
decision making are unchecked; and medium decision making
complexity is circled and partially erased. Exh. 2, at 205.

The Assessment boxes for decision making level are not checked;
chief complaint is no complaint and LTC resident; the form
contains checkmarks; and time spent is 20.  *Id.* at 207.  The
List contains a "z" line through two boxes for decision making,
checked boxes for diagnoses, and time spent is 20.  *Id.* at 208.
The record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

57.  ***Beneficiary O.F.: DOS 05/11/13.***  The QIC issued a
partially favorable decision, allowing the services at a
"downcode" 99307.  Exh. 8, at 24.  The appellant argues that the
service was a CPR billed based on CMS instructions.  Exh. MAC-
1E, at C4. The record contains two Notes, one stamped "Copy."
Exh. 2, at 223, 228.  The first Note (Copy) contains an altered
date and other entries that are not dated and sometimes not
initialed.  *Id.* at 223.  The chief complaint indicates no new
complaint, forgetful, no pain, and seen for CPR; physical
examination contains checkmarks and notations; plan indicates
see CPR, discuss with staff, and records review; boxes for
medical decision making are not checked; and decision making
complexity is not circled.  *Id.*  The second Note contains
similar entries and has no alterations.  *Id.* at 228.  The record
contains two Assessments, which do not appear to differ, which
contain a "z" line through two boxes for decision making, chief
complaint is no new complaint and LTC resident, the form
contains checkmarks, and time spent is 20.  *Id.* at 225, 229.
The record contains two Lists, which do not appear to differ,
and which contain a "z" line through two boxes for decision
making, checked boxes and handwritten notations for diagnoses,
and time spent is 20.  *Id.* at 226, 230.  The record contains
insufficient documentation to support the service billed as CPT
code 99310, and the Council agrees with the QIC's determination.

58.  ***Beneficiary O.F.: DOS 06/13/13.***  The QIC denied
coverage because the need for visit frequency was not indicated.
Exh. 8, at 24.  We agree that the appellant has not shown that
it was medically reasonable and necessary to perform care plan
review on a stable beneficiary more frequently than the minimum
required.  The appellant argues that the service was a CPR
billed based on CMS instructions.  Exh. MAC-1E, at C4.  The Note
chief complaint states no complaints and seen for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR, discuss with staff, and record review; boxes for medical
decision making are unchecked; and choice for decision making

46

complexity is not circled. Exh. 2, at 245. The Assessment
contains a "z" line through two boxes for decision making, chief
complaint is LTC resident, assessment boxes are checked, and
time spent appears to be 20. _Id._ at 247. The List contains a
"z" line through two boxes for decision making, checked boxes
and notations for diagnoses, and time spent is 20. _Id._ at 248.
The record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

    59.   ***Beneficiary M.F.1.: DOS 04/08/13.***  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter. Exh. 8, at 25. The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter. Exh. MAC-1E, at
C4. The Note chief complaint states no complaints and seen for
CPR; contains checkmarks and notations for physical examination;
plan is see CPR, discuss with staff, and medical record review;
boxes for medical decision making are unchecked; and the
decision making complexity is not circled. Exh. 2, at 264. The
Assessment contains a "z" line through two boxes for decision
making, chief complaint is no complaint and LTC resident, boxes
are checked for assessment, and time spent is 20. _Id._ at 266.
The List has boxes for medical decision making that are not
checked, there are checked boxes and notations for diagnoses,
and time spent is 20. _Id._ at 267. The Council concludes that
the record contains sufficient documentation to support the
service billed at the CPT code 99307 level. The QIC's
determination of non-coverage is reversed.

    60.   ***Beneficiary M.F.1.: DOS 06/29/13.***  The QIC denied
coverage because it agreed with the prior downcode. Exh. 8, at
25. The appellant argues that the service was a CPR billed
based on CMS instructions. Exh. MAC-1E, at C4. The Note chief
complaint indicates no complaints and seen for CPR; physical
examination contains checkmarks and notations; plan indicates
see CPR, record review, and discuss with staff; boxes for
medical decision making are unchecked; and decision making
complexity is not circled. Exh. 2, at 283. The Assessment has
a "z" line through two boxes for medical decision making; chief
complaint is no complaint and LTC resident; the form contains
checkmarks for the assessment; and time spent is 20. _Id._ at
285. The List contains unchecked boxes for decision making,
checked boxes for diagnoses, and time spent is 20. _Id._ at 286.
The record contains insufficient documentation to support the

service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

61.   ***Beneficiary E.F.: DOS 03/18/13***.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 25.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C4.  The Note contains an altered date that is unsigned and
undated; chief complaint states no complaints and seen for CPR;
there are checkmarks and altered notations for physical
examination; plan is see CPR; boxes for medical decision making
are unchecked; and the decision making complexity is not
circled.  Exh. 2, at 295.  The Assessment contains a "z" line
through two boxes for decision making, chief complaint is no
complaint and LTC resident, boxes are checked for assessment,
and time spent is 20.  *Id.* at 297.  The List has a "z" line
through two boxes for medical decision making, there are checked
boxes and notations for diagnoses, and time spent is 20.  *Id.* at
298.  The Council concludes that the record contains sufficient
documentation to support the service billed at the CPT code
99307 level.  The QIC's determination of non-coverage is
reversed.

62.   ***Beneficiary E.F.: DOS 06/06/13***.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 25.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C4.  The Note chief complaint states no complaints and seen for
CPR; there are checkmarks and notations for physical
examination; plan is see CPR, discuss with staff, and record
review; boxes for medical decision making are unchecked; and the
decision making complexity is not circled.  Exh. 2, at 307.  The
Assessment contains a "z" line through two boxes for decision
making, chief complaint is illegible, boxes are checked for
assessment, and time spent appears to be 20.  *Id.* at 309.  The
List has a "z" line through two boxes for medical decision
making, there are checked boxes and notations for diagnoses,
there is a notation that the beneficiary is "stable," and time
spent is 20.  *Id.* at 310.  The Council concludes that the record
contains sufficient documentation to support the service billed
at the CPT code 99307 level.  The QIC's determination of non-
coverage is reversed.

63. ***Beneficiary M.F.2.: DOS 03/18/13***.  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 25.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C4.  The Note date is altered without initial or date; chief complaint indicates no complaints, seen for CPR, discuss with staff, and record review; physical examination contains checkmarks and notations; plan indicates see CPR; boxes for medical decision making are unchecked; and decision making complexity is not circled.  Exh. 2, at 321.  The Assessment has a "z" line through two boxes for medical decision making; chief complaint is no complaint; the form contains checkmarks for the assessment; and time spent is 20.  *Id.* at 323.  The List contains a "z" line through two boxes for decision making, checked boxes and notations for diagnoses, and time spent is 20.  *Id.* at 324.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

64. ***Beneficiary M.F.2.: DOS 04/09/13***.  The QIC denied coverage because the need for visit frequency was not indicated. Exh. 8, at 25.  We agree that the appellant has not shown that it was medically reasonable and necessary to perform care plan review on a stable beneficiary more frequently than the minimum required.  The appellant argues that the service was a CPR billed based on CMS instructions and that the service required a face to face encounter.  Exh. MAC-1E, at C4.  The Note chief complaint states no complaint and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and record review; boxes for medical decision making are unchecked; and choice for decision making complexity is not circled.  Exh. 2, at 341.  The Assessment contains a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, assessment boxes are checked, and time spent is 20.  *Id.* at 343.  The List contains a "z" line through three boxes for decision making, checked boxes and notations for diagnoses, and time spent is not documented. *Id.* at 344.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

65. ***Beneficiary M.F.2: DOS 05/09/13***.  The QIC denied coverage because "changed documentation not identified."  Exh. 8, at 25.  The appellant argues that it has provided a transcribed document for easier auditor reading.  Exh. MAC-1, at C4.  The record contains two Notes.  Exh. 2, at 359, 364.  The

49

first Note contains an altered date and altered entries that appear to have initials, but are not dated. *Id.* at 359. The chief complaint indicates no new complaints, behavior issues, and seen for CPR; physical examination contains checkmarks and notations; plan indicates see CPR, discuss with staff, and records reviewed; there is a "u" line in two boxes for medical decision making; and decision making complexity is not circled. *Id.* The second Note contains similar entries and still has an altered date that is not initialed or dated. *Id.* at 364. The record contains two Assessments, which do not appear to differ, which contain a "z" line through two boxes for decision making, chief complaint is no complaints and LTC resident, the form contains checkmarks, and time spent is 20. *Id.* at 361, 365. The record contains two Lists, which do not appear to differ, and which contain a "z" line through two boxes for decision making, checked boxes and handwritten notations for diagnoses, and time spent is 20. *Id.* at 362, 366. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

66. ***Beneficiary M.F.: DOS 06/06/13***. The QIC denied coverage because the documentation indicated a CPR and no face to face encounter. Exh. 8, at 25. The appellant argues that the service was a CPR billed based on CMS instructions and that the service required a face to face encounter. Exh. MAC-1E, at C4. The Note chief complaint states no complaints and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and record review; there is a "z" line through two boxes for medical decision making; and the medium decision making complexity is circled and crossed out. Exh. 2, at 374. The Assessment contains a "z" line through two boxes for decision making, chief complaint is no new complaints, boxes are checked for assessment, and time spent is 20. *Id.* at 376. The List has a "z" line through two boxes for medical decision making, there are checked boxes for diagnoses, and time spent is illegible. *Id.* at 377. The Council concludes that the record contains sufficient documentation to support the service billed at the CPT code 99307 level. The QIC's determination of non-coverage is reversed.

67. ***Beneficiary D.F.: DOS 03/14/13***. The QIC denied coverage because it agreed with the prior downcode. Exh. 8, at 25. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C4. The Note chief

complaint indicates no new complaints, discuss, (illegible), and
see for CPR; physical examination contains checkmarks and
notations; plan indicates see CPR and discuss with staff; boxes
for medical decision making are unchecked; and decision making
complexity is not circled.  Exh. 2, at 387.  The Assessment has
checks in two boxes for medical decision making; chief complaint
is no complaint, LTC resident, and (illegible); boxes are
checked for the assessment; and time spent is 20.  *Id.* at 389.
The List contains a "z" line through two boxes for decision
making, checked boxes and notations for diagnoses, and time
spent is 20.  *Id.* at 390.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

68.   ***Beneficiary D.F.: DOS 05/12/13***.  The QIC issued a partially
favorable decision, allowing the services at a "downcode" 99307.
Exh. 8, at 25.  The appellant argues that the service was a CPR
billed based on CMS instructions.  Exh. MAC-1E, at C4.  The
record contains two Notes, one stamped "Copy."  Exh. 2, at 399,
404.  The first Note (Copy) contains an altered date and other
entries that are not dated and sometimes not initialed.  *Id.* at
399.  The chief complaint indicates no new complaints, see CPR,
and "ro" (rule out) diarrhea; physical examination contains
checkmarks and notations; plan indicates see CPR, discuss with
staff, and records reviewed; there is a "z" line through two
boxes for medical decision making; and the medium decision
making complexity is circled.  *Id.*  The second Note contains
similar entries, and one alteration is without initials or date.
*Id.* at 404.  The record contains two Assessments, which do not
appear to differ, which contain a "z" line through two boxes for
decision making; chief complaint is no complaint, LTC resident,
and no loose stool; the form contains checkmarks; and time spent
is 20.  *Id.* at 401, 405.  The record contains two Lists, which
do not appear to differ, and which contain a "z" line through
two boxes for decision making, checked boxes and handwritten
notations for diagnoses, and time spent is 20.  *Id.* at 402, 406.
The record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

69.   ***Beneficiary D.F.: DOS 06/29/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
26.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C4.  The Note chief
complaint indicates no new complaints, loose stool findings, and

seen for CPR; physical examination contains checkmarks and
notations; plan indicates see CPR, discuss with staff, and
records reviewed; boxes for medical decision making are
unchecked; and decision making complexity is not circled.  Exh.
2, at 414.  The Assessment has a "z" line in two boxes for
medical decision making; chief complaint is LTC resident; the
form contains checkmarks for the assessment; and time spent is
20.  *Id.* at 416.  The List contains a "z" line through two boxes
for decision making, checked boxes and notations for diagnoses,
and time spent is 20.  *Id.* at 417.  The record contains
insufficient documentation to support the service billed as CPT
code 99310, and the Council agrees with the QIC's determination.

70.  ***Beneficiary M.G.: DOS 03/07/13.***  The QIC denied coverage
because it agreed with the prior downcode.  Exh. 8, at 26.  The
appellant argues that the service was a CPR billed based on CMS
instructions.  Exh. MAC-1E, at C4.  The Note chief complaint
indicates no complaints, seen for CPR, vital signs and blood
pressure check; physical examination contains checkmarks and
notations; plan indicates see CPR and discuss with staff; boxes
for medical decision making are unchecked; and medium decision
making complexity is circled and altered.  Exh. 2, at 525.  The
Assessment has a "z" line in two boxes for medical decision
making; chief complaint is no complaint and LTC resident; the
form contains checkmarks for the assessment; and time spent is
20.  *Id.* at 527.  The List contains a "z" line through two boxes
for decision making, checked boxes for diagnoses, and time spent
is 20.  *Id.* at 528.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

71.  ***Beneficiary M.G.: DOS 06/10/13.***  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 26.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C4.  The Note chief complaint states no complaints and seen for
CPR; there are checkmarks and notations for physical
examination; plan is see CPR, discuss with staff, and record
review; there is a "z" line through two boxes for medical
decision making; and the medium decision making complexity is
circled.  Exh. 2, at 537.  The Assessment contains a "z" line
through two boxes for decision making, chief complaint is no
complaints, boxes are checked for assessment (and there are
alterations that are not initialed or dated), and time spent is

20.  *Id.* at 539.  The List has a "z" line through two boxes for medical decision making, there are checked boxes for diagnoses, and time spent is 20.  *Id.* at 540.  The Council concludes that the record contains sufficient documentation to support the service billed at the CPT code 99307 level. . The QIC's determination of non-coverage is reversed.

72.  ***Beneficiary H.G.: DOS 03/07/13.***  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 26.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C4.  The Note chief complaint indicates no complaint, seen for CPR, and vital signs stable; physical examination contains checkmarks; plan indicates see CPR, discuss with staff, and record review; there is a "z" line through two boxes for medical decision making; and medium decision making complexity is circled and altered.  Exh. 2, at 550.  The Assessment has a "z" line in two boxes for medical decision making; chief complaint is no complaint and LTC resident; the form contains checkmarks for the assessment; and time spent is 20.  *Id.* at 552.  The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses, and time spent is 20.  *Id.* at 553.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

73.  ***Beneficiary H.G.: DOS 04/17/13.***  The QIC denied coverage because the documentation indicated a CPR and no face to face encounter.  Exh. 8, at 26.  The appellant argues that the service was a CPR billed based on CMS instructions and that the service required a face to face encounter.  Exh. MAC-1E, at C5.  The Note chief complaint states see for CPR, no new complaint, and (illegible) pain resolved; there are checkmarks and notations for physical examination; plan is see CPR and record review; boxes for medical decision making are unchecked; and the decision making complexity is not circled.  Exh. 2, at 563.  The Assessment contains a "z" line through two boxes for decision making; chief complaint is no complaint, (illegible), and LTC resident; boxes are checked for assessment; and time spent is 20.  *Id.* at 565.  The List has a "z" line through two boxes for medical decision making, there are checked boxes and entries for diagnoses, and time spent is 20.  *Id.* at 566.  The Council concludes that the record contains sufficient documentation to support the service billed at the CPT code

53

99307 level.  The QIC's determination of non-coverage is
reversed.

74.  ***Beneficiary H.G.: DOS 05/11/13***.  The QIC denied
coverage because "changed documentation not identified."  Exh.
8, at 26.  The appellant argues that it has provided a
transcribed document for easier auditor reading.  Exh. MAC-1, at
C5.  The record contains two Notes.  Exh. 2, at 575, 580.  The
first Note contains altered entries that sometimes have
initials, but are not dated.  *Id.* at 575.  The chief complaint
indicates no new complaints, no pain, and seen for CPR; physical
examination contains checkmarks and notations; plan indicates
see CPR, records reviewed, and discuss with staff; boxes for
medical decision making are unchecked; and decision making
complexity is not circled.  *Id.*  The second Note contains
similar entries with no initials.  *Id.* at 580.  The record
contains two Assessments, which do not appear to differ, which
contain a "z" line through two boxes for decision making, chief
complaint is no complaint and LTC resident, the form contains
checkmarks, and time spent is 20.  *Id.* at 577, 581.  The record
contains two Lists, which do not appear to differ, and which
contain a "z" line through two boxes for decision making,
checked boxes and handwritten notations for diagnoses, and time
spent is 20.  *Id.* at 578, 582.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

75.  ***Beneficiary H.G.: DOS 06/26/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
26.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C5.  The Note chief
complaint indicates no complaint and seen for CPR; physical
examination contains checkmarks and notations; plan indicates
see CPR, discuss with staff, and chart review; there is a "z"
line through two boxes for medical decision making; and medium
decision making complexity is circled.  Exh. 2, at 597.  The
Assessment has a "z" line in two boxes for medical decision
making, chief complaint is LTC resident, the form contains
checkmarks for the assessment, and time spent appears to be 20.
*Id.* at 599.  The List contains a "z" line through two boxes for
decision making, checked boxes and entries for diagnoses, and
time spent is 20.  *Id.* at 600.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

76.  **Beneficiary W.G.: DOS 03/10/13.**  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
26.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C5.  The Note chief
complaint indicates no new complaint, pain (illegible), and seen
for CPR; physical examination contains checkmarks and notations;
plan contains a check mark by "problem list reviewed; continue
with present management;"  there is a "z" line through two boxes
for medical decision making; and medium decision making
complexity is circled and altered.  Exh. 2, at 429.  The
Assessment has a "z" line in two boxes for medical decision
making; chief complaint is no complaint; the form contains
checkmarks for the assessment; and time spent is cut off.  *Id.*
at 431.  The List contains unchecked boxes for decision making,
checked boxes and entries for diagnoses, and time spent is 20.
*Id.* at 432.  The record contains insufficient documentation to
support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

77.  **Beneficiary W.G..: DOS 04/18/13.**  The QIC denied
coverage because the need for visit frequency was not indicated.
Exh. 8, at 26.  We agree that the appellant has not shown that
it was medically reasonable and necessary to perform care plan
review on a stable beneficiary more frequently than the minimum
required.  The appellant argues that the service was a CPR
billed based on CMS instructions.  Exh. MAC-1E, at C5.  The Note
chief complaint states no complaint, occasional confusion, and
seen for CPR; there are checkmarks and notations for physical
examination; plan is see CPR, chart review, and discuss with
staff; boxes for medical decision making are unchecked; and
choice for decision making complexity is not circled.  Exh. 2,
at 441.  The Assessment contains a "z" line through two boxes
for decision making, chief complaint is no complaint and status
post (illegible), assessment boxes are checked, and time spent
is illegible and appears altered.  *Id.* at 443.  The List
contains a "z" line through two boxes for decision making,
checked boxes and notations for diagnoses, and time spent is 20.
*Id.* at 444.  The record contains insufficient documentation to
support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

78.  **Beneficiary W.G.: DOS 06/10/13.**  The QIC issued a
partially favorable decision, allowing the services at a
"downcode" 99307.  Exh. 8, at 26.  The appellant argues that the
service was a CPR billed based on CMS instructions.  Exh. MAC-

1E, at C5.  The Note chief complaint indicates no new complaints and seen for CPR; physical examination contains checkmarks and notations; plan indicates see CPR, discuss with staff, and records reviewed; boxes for medical decision making are unchecked; and the decision making complexity is not circled. Exh. 2, at 460.  The Assessment contains a "z" line through two boxes for decision making, chief complaint is no complaint, the form contains checkmarks, and time spent appears to be 20.  *Id.* at 462.  The List contains a "z" line through two boxes for decision making, checked boxes and handwritten notations for diagnoses, and time spent is 20.  *Id.* at 463.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

   79.  ***Beneficiary V.G.: DOS 03/18/13.***  The QIC issued a partially favorable decision, allowing the services at a "downcode" 99307.  Exh. 8, at 26.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C5.  The Note chief complaint indicates no complaint, comfortable and hospice, and seen for CPR; physical examination contains checkmarks and notations; plan indicates see CPR, discuss with staff, and records reviewed; boxes for medical decision making are unchecked; and the decision making complexity is not circled.  Exh. 2, at 472.  The Assessment contain a "z" line through two boxes for decision making; chief complaint is no complaint, LTC resident, and hospice; the form contains checkmarks; and the signature date and time spent are partially cut off.  *Id.* at 474.  The List contains a "z" line through two boxes for decision making, checked boxes and handwritten notations for diagnoses, and time spent is 20.  *Id.* at 475.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

   80.  ***Beneficiary V.G.: DOS 04/09/13.***  The QIC denied coverage because the need for visit frequency was not indicated. Exh. 8, at 26.  We agree that the appellant has not shown that it was medically reasonable and necessary to perform care plan review on a stable beneficiary more frequently than the minimum required.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C5.  The Note chief complaint states no complaints, seen for CPR, and hospice; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and medical record review;

boxes for medical decision making are unchecked; and choice for
decision making complexity is not circled. Exh. 2, at 490. The
Assessment contains a "z" line through two boxes for decision
making; chief complaint is no complaint, LTC, and hospice;
assessment boxes are checked; and time spent is 20. Id. at 492.
The List contains a "z" line through two boxes for decision
making, checked boxes and notations for diagnoses, and time
spent is 20. Id. at 493. The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

81. **Beneficiary V.G.: DOS 05/12/13**. The QIC denied
coverage because "changed documentation not identified." Exh.
8, at 27. The appellant argues that it has provided a
transcribed document for easier auditor reading. Exh. MAC-1, at
C5. The record contains two Notes. Exh. 2, at 508, 513. The
first Note contains altered entries that are sometimes
initialed, but are not dated. Id. at 508. The chief complaint
indicates no new complaints and see for CPR; physical
examination contains checkmarks and notations; plan indicates
see CPR, discuss with staff, record review, and hospice; there
is a "z" line through two boxes for medical decision making; and
decision making complexity is not circled. Id. The second Note
contains similar entries with no initials. Id. at 513. The
record contains two Assessments, which do not appear to differ,
which contain a "z" line through two boxes for decision making;
chief complaint is no complaints, LTC resident, and hospice; the
form contains checkmarks; and time spent is 20. Id. at 510,
514. The record contains two Lists, which do not appear to
differ, with unchecked boxes for decision making, checked boxes
and handwritten notations for diagnoses, and time spent is 20.
Id. at 511, 515. The record contains insufficient documentation
to support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

82. **Beneficiary V.G.: DOS 06/06/13**. The QIC issued a
partially favorable decision, allowing the services at a
"downcode" 99307. Exh. 8, at 27. The appellant argues that the
service was a CPR billed based on CMS instructions. Exh. MAC-
1E, at C5. (Clinical records for this date of service are found
in the folder for Exhibit 3 of 7.) The Note chief complaint
indicates no complaints and seen for CPR; physical examination
contains checkmarks and notations; plan indicates see CPR,
discuss with staff, records reviewed, and hospice care; boxes
for medical decision making are unchecked; and the decision

making complexity is not circled.  Exh. 3, at 22.  The
Assessment contain a "z" line through two boxes for decision
making, chief complaint is no new complaint, the form contains
checkmarks; and time spent is 20.  *Id.* at 24.  The List contains
a "z" line through two boxes for decision making, checked boxes
and handwritten notations for diagnoses, and time spent is 20.
*Id.* at 25.  The record contains insufficient documentation to
support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

83.  ***Beneficiary P.G.: DOS 04/09/13.***  The QIC issued a partially
favorable decision, allowing the services at a "downcode" 99307.
Exh. 8, at 27.  The appellant argues that the service was a CPR
billed based on CMS instructions.  Exh. MAC-1E, at C5.  The Note
chief complaint indicates no complaints, seen for CPR, and
(illegible); physical examination contains checkmarks and
notations; plan indicates see CPR, discuss with (illegible), and
record review; boxes for medical decision making are unchecked;
and the decision making complexity is not circled.  Exh. 3, at
42.  The Assessment contain a "z" line through two boxes for
decision making, chief complaint is no complaint and what
appears to be "here for rehab doing well;" the form contains
checkmarks; and time spent is 20.  *Id.* at 44.  The List contains
a unchecked boxes for decision making, checked boxes and
handwritten notations for diagnoses, and time spent is 20.  *Id.*
at 45.  The record contains insufficient documentation to
support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

84.  ***Beneficiary C.H..: DOS 03/14/13.***  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
27.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C5.  The Note chief
complaint indicates no new complaint and seen for CPR; physical
examination contains checkmarks and notations; plan is see CPR
and discuss with staff; boxes for medical decision making are
unchecked; and decision making complexity is not circled.  Exh.
3, at 54.  The Assessment has a "z" line in two boxes for
medical decision making; chief complaint is no complaint and LTC
resident; the form contains checkmarks for the assessment; and
the physician's signature, date, and time spent are cut off.
*Id.* at 56.  The List contains a "z" line through two boxes for
decision making, checked boxes and entries for diagnoses, and
the physician's signature, date, and time spent are cut off.
*Id.* at 57.  The record contains insufficient documentation to

support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

85.   ***Beneficiary C.H.: DOS 04/07/13.***  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 27.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C5.  The Note chief complaint indicates no new complaint and seen for CPR; physical examination contains checkmarks and notations; plan is see CPR, discuss with staff, and medical records reviewed; boxes for medical decision making are unchecked; and decision making complexity is not circled.  Exh. 3, at 73.  The Assessment has an altered name and a "z" line in two boxes for medical decision making, chief complaint is no complaint and LTC resident, the form contains checkmarks for the assessment, the date is altered, and time spent is 20.  *Id.* at 75.  The List contains a "z" line through three boxes for decision making, checked boxes and entries for diagnoses, and time spent is 20.  *Id.* at 76.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

86.   ***Beneficiary C.H.: DOS 05/12/13.***  The QIC issued a partially favorable decision, allowing the services at a "downcode" 99307.  Exh. 8, at 27.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C5.  The record contains two Notes.  Exh. 3, at 91, 96.  The first Note, stamped "copy," contains altered entries that are sometimes initialed, but are not dated.  *Id.* at 91.  The chief complaint indicates no new complaint and seen for CPR; physical examination contains checkmarks and notations; plan indicates see CPR, discuss with staff, and record reviewed; boxes for medical decision making are unchecked; and decision making complexity is not circled.  *Id.*  The second Note contains similar entries with no initials.  *Id.* at 96.  The record contains two Assessments, which do not appear to differ, which contain a "z" line through two boxes for decision making; chief complaint is no complaints and LTC resident; the form contains checkmarks; and time spent is 20.  *Id.* at 93, 97.  The record contains two Lists, which do not appear to differ, with a "z" line through two boxes for decision making, checked boxes and handwritten notations for diagnoses, and time spent is 20.  *Id.* at 94, 98.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

87.   *Beneficiary C.H.: DOS 06/28/13*.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
27.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C5.  The Note chief
complaint indicates no new complaint and seen for CPR; physical
examination contains checkmarks and notations; plan is see CPR,
discuss with staff, and records review; there is a "z" line
through two boxes for medical decision making; and decision
making complexity is not circled.  Exh. 3, at 113.  The
Assessment has "z" line in two boxes for medical decision
making; chief complaint is LTC resident; the form contains
checkmarks for the assessment; and time spent is 20.  *Id.* at
115.  The List contains unchecked boxes for decision making,
checked boxes and entries for diagnoses, and time spent is 20.
*Id.* at 116.  The record contains insufficient documentation to
support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

88.   *Beneficiary S.H.: DOS 03/14/13*.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
27.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C5.  The Note chief
complaint indicates no new complaint, seen for CPR, and an
illegible entry concerning the eye; physical examination
contains checkmarks and notations; plan is see CPR and discuss
with staff; boxes for medical decision making are unchecked; and
decision making complexity is not circled.  Exh. 3, at 125.  The
Assessment has "z" line in two boxes for medical decision
making; chief complaint is no complaint, LTC resident, and what
appears to be await eye surgery; the form contains checkmarks
for the assessment; and the physician's signature, date, and
time spent are cut off.  *Id.* at 127.  The List contains a "z"
line through two boxes for decision making, checked boxes and
entries for diagnoses, and physician signature, date, and time
spent are cut off.  *Id.* at 128.  The record contains
insufficient documentation to support the service billed as CPT
code 99310, and the Council agrees with the QIC's determination.

89.   *Beneficiary S.H.: DOS 04/07/13*.  The QIC denied
coverage because the need for visit frequency was not indicated.
Exh. 8, at 27.  We agree that the appellant has not shown that
it was medically reasonable and necessary to perform care plan
review on a stable beneficiary more frequently than the minimum
required.  The appellant argues that the service was a CPR
billed based on CMS instructions.  Exh. MAC-1E, at C5. (The

60

record for this date of service (04/07/13) is found in different places in Exhibit 3.  Procedural documents for this date of service are found at Exh. 3, at 132-134.  After unrelated documents, the exhibit resumes with other records for this beneficiary and date of service.  *Id.* at 430-440.)  The Note chief complaint states no complaint and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and medical record review; two boxes for medical decision making are checked; and the medium choice for decision making complexity is partially circled and lined through.  Exh. 3, at 434.  The Assessment contains a "z" line through two boxes for decision making, chief complaint is no complaint and what appears to be status post eye surgery doing well, assessment boxes are checked, the date is altered, and time spent is 20.  *Id.* at 436.  The List contains unchecked boxes for decision making, checked boxes and notations for diagnoses, the physician's signature is partially cut off, and time spent is 20.  *Id.* at 434.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

90.  ***Beneficiary S.H.: DOS 05/12/13.***  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 27.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C5.  The Note chief complaint indicates no complaint, a partially legible entry concerning eye complaint, and seen for CPR; physical examination contains checkmarks and notations; plan is see CPR, discuss with staff, and record review; boxes for medical decision making are unchecked; and decision making complexity is not circled.  Exh. 3, at 453.  The Assessment has a "z" line in two boxes for medical decision making; chief complaint is no complaint, LTC resident, and status post eye surgery: the form contains checkmarks for the assessment; and time spent is 20.  *Id.* at 455.  The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses, and time spent is 20.  *Id.* at 456.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

91.  ***Beneficiary S.H.: DOS 06/28/13.***  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 27.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C5.  (The record for this date of service is located at different places in Exhibit

61

3. *See* Exh. 3, at 392-408, 460-463.)  The Note chief complaint indicates no complaint and seen for CPR; physical examination contains checkmarks and notations; plan is see CPR, chart reviewed, and discuss with staff; there is a "z" line through two boxes for medical decision making; and medium decision making complexity is circled.  *Id.* at 402.  The Assessment has a "z" line in three boxes for medical decision making; chief complaint is LTC; the form contains checkmarks for the assessment; and time spent is 20.  *Id.* at 404.  The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses, and time spent is 20.  *Id.* at 405.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

92.  ***Beneficiary L.H.: DOS 03/14/13.***  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 27.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C5.  The Note chief complaint indicates no complaint and seen for CPR; physical examination contains checkmarks and notations; plan is see CPR and discuss with staff; boxes for medical decision making are unchecked; and decision making complexity is not circled.  Exh. 3, at 414.  The Assessment has "z" line in two boxes for medical decision making, chief complaint is no complaint and LTC resident, the form contains checkmarks for the assessment, and time spent is 20.  *Id.* at 416.  The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses, and time spent is 20.  *Id.* at 417.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

93.  ***Beneficiary L.H.: DOS 04/07/13.***  The QIC denied coverage because the need for visit frequency was not indicated. Exh. 8, at 27.  We agree that the appellant has not shown that it was medically reasonable and necessary to perform care plan review on a stable beneficiary more frequently than the minimum required.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C5.  (The record for this date of service is in two places in Exhibit 3. *See id.* at 421-429, 464-474.)  The Note chief complaint indicates no complaint and see for CPR; physical examination contains checkmarks and notations; plan is see CPR, discuss with staff, and record review; boxes for medical decision making are

unchecked; and decision making complexity is not circled. *Id.* at 468.  The Assessment has a "z" line in two boxes for medical decision making; chief complaint is no complaint and LTC resident; the form contains checkmarks for the assessment; and time spent is 20.  *Id.* at 470.  The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses, and time spent is 20.  *Id.* at 471.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

94.  ***Beneficiary M.H.1: DOS 03/14/13***.  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 27.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C5.  The Note date is altered; chief complaint states no complaints and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR and discuss with staff; boxes for medical decision making are unchecked; and choice for decision making complexity is not circled.  Exh. 3, at 480.  The Assessment boxes for decision making are unchecked; chief complaint is no complaint, LTC resident, and (illegible); assessment boxes are checked; and time spent is 20.  *Id.* at 482.  The List contains a "z" line through two boxes for decision making, checked boxes and notations for diagnoses, and time spent is 20.  *Id.* at 483.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

95.  ***Beneficiary M.H.1: DOS 04/09/13***.  The QIC denied coverage because the need for visit frequency was not indicated.  Exh. 8, at 27.  We agree that the appellant has not shown that it was medically reasonable and necessary to perform care plan review on a stable beneficiary more frequently than the minimum required.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C5.  The Note chief complaint indicates no complaint and seen for CPR; physical examination contains checkmarks and notations; plan is see CPR, discuss with staff, and record review; boxes for medical decision making are unchecked; and decision making complexity is not circled.  *Id.* at 498.  The Assessment has a "z" line in two boxes for medical decision making; chief complaint is no complaint and LTC resident; the form contains checkmarks for the assessment; the date is illegible; and time spent is 20.  *Id.* at 500.  The List contains a "z" line through

two boxes for decision making, checked boxes and entries for diagnoses, and time spent is 20. *Id.* at 501. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

96. ***Beneficiary M.H.1: DOS 05/12/13.*** The QIC denied coverage because "changed documentation not identified." Exh. 8, at 28. The appellant argues that it has provided a transcribed document for easier auditor reading. Exh. MAC-1, at C5. The record contains two Notes. Exh. 3, at 516, 521. The first Note, stamped "copy," contains altered entries that are sometimes initialed, but are not dated. *Id.* at 516. The chief complaint indicates no new complaints, chest pain, (illegible), no shortness of breath, and seen for CPR; physical examination contains checkmarks and notations; plan indicates see CPR, cardiology followup, (illegible), what appears to be if no relief, to emergency room, discuss with staff, and record review; boxes for medical decision making are unchecked; and decision making complexity is not circled. *Id.* The second Note contains similar entries with no initials. *Id.* at 521. The record contains two Assessments, which do not appear to differ, which contain a "z" line through two boxes for decision making; chief complaint is no complaints, LTC resident, chest pain on referral, and check vital signs; the form contains checkmarks for assessment; and time spent is 20. *Id.* at 518, 522. The record contains two Lists, which do not appear to differ, with a "z" line through three boxes for decision making, checked boxes and handwritten notations for diagnoses, and time spent is 20. *Id.* at 519, 523. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

97. ***Beneficiary M.H.1: DOS 06/29/13.*** The QIC denied coverage because it agreed with the prior downcode. Exh. 8, at 28. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C5. The Note chief complaint states no complaints, there is an entry concerning chest pain, no panic attack, and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and record review; boxes for medical decision making are unchecked; and choice for decision making complexity is not circled. Exh. 3, at 538. The Assessment has a "z" line through two boxes for decision making, chief complaint LTC resident, assessment boxes are checked, and time

spent is 20.  *Id.* at 540.  The List contains a "z" line through
two boxes for decision making, checked boxes and notations for
diagnoses, and time spent is 20.  *Id.* at 541.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

     98.  ***Beneficiary D.H.: DOS 04/08/13***.  The QIC issued a
partially favorable decision, allowing the services at a
"downcode" 99307.  Exh. 8, at 28.  The appellant argues that the
service was a CPR billed based on CMS instructions.  Exh. MAC-
1E, at C6.  The Note date is altered; chief complaint indicates
no complaints, pain controlled, and seen for CPR; physical
examination contains checkmarks and notations; plan indicates
see CPR, discuss with staff, and medical record reviewed; boxes
for medical decision making are unchecked; and decision making
complexity is not circled.  Exh. 3, at 558.  The Assessment
contains a "z" line through two boxes for decision making,
chief complaint is no complaints and LTC resident, the form
contains checkmarks for assessment, and time spent is 20.  *Id.*
at 560.  The List contains a "z" line through two boxes for
decision making, checked boxes and handwritten notations for
diagnoses, and time spent is 20.  *Id.* at 561.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

     99.  ***Beneficiary D.H.: DOS 06/29/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
28.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C6.  The Note chief
complaint states pain controlled, feel good, no new complaint,
and seen for CPR; there are checkmarks and notations for
physical examination; plan is see CPR, discuss with staff, and
record review; boxes for medical decision making are unchecked;
and choice for decision making complexity is not circled.  Exh.
3, at 577.  The Assessment has a "z" line through two boxes for
decision making, chief complaint LTC resident, assessment boxes
are checked, and time spent is altered as either 20 or 30.  *Id.*
at 579.  The List contains a "z" line through one box for
decision making, checked boxes and notations for diagnoses, and
time spent is 20.  *Id.* at 580.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

100.   *Beneficiary M.H.2.: DOS 04/08/13*.  The QIC issued a partially favorable decision, allowing the services at a "downcode" 99307.  Exh. 8, at 28.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C6.  The Note chief complaint indicates no complaints, (illegible), and seen for CPR; physical examination contains checkmarks and notations; plan indicates see CPR, discuss with staff, and record reviewed; boxes for medical decision making are unchecked; and decision making complexity is not circled.  Exh. 3, at 596.  The Assessment contains a "z" line through two boxes for decision making; chief complaint is no complaint, (illegible), and LTC resident; the form contains checkmarks for assessment; and time spent is 20.  *Id.* at 598.  The List contains a "z" line through two boxes for decision making, checked boxes and handwritten notations for diagnoses, and time spent is 20.  *Id.* at 599.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

101.   *Beneficiary M.H.2.: DOS 06/13/13*.  The QIC issued a partially favorable decision, allowing the services at a "downcode" 99307.  Exh. 8, at 28.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C6.  The Note chief complaint indicates no complaints, seen for CPR, and there are multiple notations that are illegible or unclear; physical examination contains checkmarks and notations; plan indicates see CPR, there is a reference to "more CRT/MR," and there is also a "CT" notation; boxes for medical decision making are unchecked; and the medium decision making complexity is partially circled and appears to have been altered. Exh. 3, at 615.  The Assessment contains a "z" line through two boxes for decision making; chief complaint is LTC resident; the form contains checkmarks for assessment; the date is partially cut off; and time spent is 20.  *Id.* at 617.  The List contains a "z" line through two boxes for decision making, checked boxes and handwritten notations for diagnoses, and time spent is 20.  *Id.* at 618.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

102.   *Beneficiary A.J.: DOS 03/14/13*.  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 28.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C6.  The Note chief complaint states no new complaint, seen for CPR, and "HOH+"

(which the Council interprets as hard of hearing); there are checkmarks and notations for physical examination; plan is see CPR and discuss with staff; boxes for medical decision making are unchecked; and decision making complexity is not circled. Exh. 3, at 627.  The Assessment has a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, assessment boxes are checked, and time spent reflects alteration and is either 20 or 30.  *Id.* at 629.  The List contains a "z" line through two boxes for decision making, checked boxes and notations for diagnoses, and time spent is 20. *Id.* at 630.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

103.  ***Beneficiary A.J.: DOS 04/09/13.***  The QIC denied coverage because the need for visit frequency was not indicated. Exh. 8, at 28.  We agree that the appellant has not shown that it was medically reasonable and necessary to perform care plan review on a stable beneficiary more frequently than the minimum required.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C6.  The Note chief complaint indicates no complaint and seen for CPR; physical examination contains checkmarks and notations; plan is CPR, record review, and discuss with staff; boxes for medical decision making are unchecked; and decision making complexity is not circled.  *Id.* at 647.  The Assessment has a "z" line in two boxes for medical decision making; chief complaint indicates "feel OK," complains of tired, poor appetite, (illegible), and blood pressure check; the form contains checkmarks for the assessment; and time spent is 20.  *Id.* at 649.  The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses, and time spent is 20. *Id.* at 650.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

104.  ***Beneficiary A.J.: DOS 05/12/13.***  The QIC denied coverage because "changed documentation not identified."  Exh. 8, at 28.  The appellant argues that it has provided a transcribed document for easier auditor reading.  Exh. MAC-1, at C6.  The record contains two Notes.  Exh. 3, at 665, 670.  The first Note, stamped "copy," contains altered entries that are sometimes initialed, but are not dated.  *Id.* at 665.  The chief complaint indicates no new complaints and seen for CPR; physical examination contains checkmarks and notations; plan indicates

see CPR, discuss with staff, and records reviewed; boxes for
medical decision making are unchecked; and decision making
complexity is not circled.  *Id.*  The second Note contains
similar entries with no initials.  *Id.* at 670.  The record
contains two Assessments, which do not appear to differ, which
contain a "z" line through two boxes for decision making; chief
complaint is no complaints, LTC resident, and hospice; the form
contains checkmarks for assessment; and time spent is 20.  *Id.*
at 667, 671.  The record contains two Lists, which do not appear
to differ, with a "z" line through two boxes for decision
making, checked boxes and handwritten notations for diagnoses,
and time spent is 20.  *Id.* at 668, 672.  The record contains
insufficient documentation to support the service billed as CPT
code 99310, and the Council agrees with the QIC's determination.

   105. ***Beneficiary D.J.: DOS 03/12/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
28.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C6.  The Note chief
complaint states no new complaint, seen for CPR assessment,
(illegible), and no chest pain; there are checkmarks and
notations for physical examination; plan is see CPR, discuss
with staff, and records reviewed; there is a "z" line through
two boxes for medical decision making; and the medium choice for
decision making complexity is partially circled and altered.
Exh. 3, at 680.  The Assessment has a "z" line through two boxes
for decision making, chief complaint is no complaint and LTC
resident, assessment boxes are checked, the date is partially
cut off, and time spent is completely cut off.  *Id.* at 682.  The
List contains a "z" line through two boxes for decision making,
checked boxes for diagnoses, the signature is partially cut off,
and time spent is 20.  *Id.* at 683.  The record contains
insufficient documentation to support the service billed as CPT
code 99310, and the Council agrees with the QIC's determination.

   106. ***Beneficiary D.J.: DOS 04/08/13***.  The QIC denied
coverage because the need for visit frequency was not indicated.
Exh. 8, at 28.  We agree that the appellant has not shown that
it was medically reasonable and necessary to perform care plan
review on a stable beneficiary more frequently than the minimum
required.  The appellant argues that the service was a CPR
billed based on CMS instructions.  Exh. MAC-1E, at C6. The Note
chief complaint indicates no complaint, (illegible), and seen
for CPR; physical examination contains checkmarks and notations;
plan is CPR, discuss with staff, and medical record reviewed;

boxes for medical decision making are unchecked; and decision making complexity is not circled. *Id.* at 699. The Assessment has a "z" line in two boxes for medical decision making, chief complaint indicates no complaint and LTC, the form contains checkmarks for the assessment, the date is altered, and time spent is 20. *Id.* at 701. The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses, the date is altered, and time spent is 20. *Id.* at 702. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

107. ***Beneficiary D.J.: DOS 06/13/13.*** The QIC issued a partially favorable decision, allowing the services at a "downcode" 99307. Exh. 8, at 28. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C6. (The records for this date of service are found at Exh. 3, at 706-715, 135-142). The Note chief complaint indicates no complaints, seen for CPR, and there are multiple notations that are illegible or unclear; physical examination contains checkmarks and notations; plan indicates see CPR and check blood pressure, and there is a partially legible "CT" notation; boxes for medical decision making are unchecked; and the medium decision making complexity is partially circled. Exh. 3, at 136. The Assessment contains a "z" line through two boxes for decision making; chief complaint is LTC resident; the form contains checkmarks for assessment; date is partially cut off; and time spent is almost completely cut off and is illegible. *Id.* at 138. The List contains a "z" line through two boxes for decision making, checked boxes and handwritten notations for diagnoses, and time spent is 20. *Id.* at 139. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

108. ***Beneficiary M.J.: DOS 03/12/13.*** The QIC denied coverage because it agreed with the prior downcode. Exh. 8, at 28. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C6. The Note chief complaint states no new complaint and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and review (illegible); boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled. Exh. 3, at 156. The Assessment has a "z" line through two boxes for decision making,

chief complaint is no complaint and LTC resident, assessment boxes are checked, the date is partially cut off, and time spent is 30. *Id.* at 158. The List contains a "z" line through two boxes for decision making, checked boxes and notations for diagnoses, and time spent is 20. *Id.* at 159. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

109. ***Beneficiary M.J.: DOS 04/08/13***. The QIC denied coverage because the documentation indicated a CPR and no face to face encounter. Exh. 8, at 29. The appellant argues that the service was a CPR billed based on CMS instructions and that the service required a face to face encounter. Exh. MAC-1E, at C6. The Note chief complaint states no complaint and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and medical record reviewed; boxes for medical decision making are unchecked; and the decision making complexity is not circled. Exh. 3, at 176. The Assessment contains a "z" line through two boxes for decision making, chief complaint is no complaints and LTC resident, boxes are checked for assessment, and time spent is 20. *Id.* at 178. The List has a "z" line through two boxes for medical decision making, there are checked boxes and entries for diagnoses, and time spent is 20. *Id.* at 179. The Council concludes that the record contains sufficient documentation to support the service billed at the CPT code 99307 level. The QIC's determination of non-coverage is reversed.

110. ***Beneficiary M.J.: DOS 06/22/13***. The QIC denied coverage because it agreed with the prior downcode. Exh. 8, at 29. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C6. The Note chief complaint states seen for CPR and no complaint; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and record review; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled. Exh. 3, at 188. The Assessment has unchecked boxes for decision making, chief complaint is LTC resident, assessment boxes are checked, and time spent is 20. *Id.* at 190. The List contains a "z" line through two boxes for decision making, checked boxes and notations for diagnoses, and time spent is 20. *Id.* at 191. The record contains insufficient documentation to support the

service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

111. *Beneficiary J.J.: DOS 03/18/13*.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
29.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C6.  The Note chief
complaint states no complaints, seen for CPR, positive for loose
stool, and vital signs stable; there are checkmarks and
notations for physical examination; plan is see CPR; boxes for
medical decision making are unchecked; and the choice for
decision making complexity is not circled.  Exh. 3, at 205.  The
Assessment has a "z" line through two boxes for decision making,
chief complaint is no complaint and what appears to be a
reference to a pacemaker, assessment boxes are checked, and time
spent is 20.  *Id.* at 207.  The List contains a "z" line through
two boxes for decision making, checked boxes and notations for
diagnoses, and time spent is 20.  *Id.* at 208.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

112. *Beneficiary J.J.: DOS 04/09/13*.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 38.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C6.  We find that the visit is not covered because it occurred
less than thirty days after the previous CPR visit.  The
appellant has not shown that it was medically reasonable and
necessary to perform care plan review on a stable beneficiary
more frequently than the minimum required.

Further, the Note has an altered patient name and room number;
chief complaint states no complaint, seen for CPR, and hospice;
there are checkmarks and notations for physical examination;
plan is see CPR, discuss with staff, and record reviewed; boxes
for medical decision making are unchecked; and the decision
making complexity is not circled.  Exh. 3, at 223.  The
Assessment contains a "z" line through two boxes for decision
making; chief complaint is no complaints, LTC resident, and
hospice; boxes are checked for assessment; and time spent is 20.
*Id.* at 225.  The List has a "z" line through two boxes for
medical decision making, there are checked boxes and entries for
diagnoses, and time spent is 20.  *Id.* at 226.  The Council

71

concludes that the record contains insufficient documentation to support the service billed as CPT code 99310 and modifies the QIC's determination.

113. ***Beneficiary J.J.: DOS 06/06/13***.  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 29.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C6.  The Note chief complaint states no complaints, seen for CPR, and what appears to be a notation for vital signs; there are checkmarks and notations for physical examination; plan is see CPR, medical record review, (illegible), and hospice; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled.  Exh. 3, at 242.  The Assessment has a "z" line through two boxes for decision making, chief complaint is "concerned about LE/(illegible)," assessment boxes are checked, and time spent is 20.  *Id.* at 244.  The List contains unchecked boxes for decision making, checked boxes and notations for diagnoses, and time spent is 20.  *Id.* at 245.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

114. ***Beneficiary V.K.: DOS 03/14/13***.  The QIC issued a partially favorable decision, allowing the services at a "downcode" 99307.  Exh. 8, at 29.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C6.  The Note chief complaint indicates no complaints, seen for CPR, and hard of hearing; physical examination contains checkmarks and notations; plan contains an altered entry for see CPR and discuss with staff; two boxes for medical decision making are checked; and medium decision making complexity is circled and partially erased.  Exh. 3, at 260.  The Assessment contains a "z" line through two boxes for decision making; chief complaint is no new complaint and (illegible); the form contains checkmarks for assessment; and time spent is altered as either 20 or 30.  *Id.* at 262.  The List contains a "z" line through two boxes for decision making, checked boxes and handwritten notations for diagnoses, and time spent is 20.  *Id.* at 263.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

115. ***Beneficiary V.K.: DOS 04/07/13.***  The QIC denied coverage because the need for visit frequency was not indicated.  Exh. 8, at 29.  We agree that the appellant has not shown that it was medically reasonable and necessary to perform care plan review on a stable beneficiary more frequently than the minimum required.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C6.  The Note chief complaint indicates no complaint, seen for CPR, and (illegible); physical examination contains checkmarks and notations; plan is see CPR, discuss with staff, and record review; there is a "z" line through two boxes for medical decision making; and decision making complexity is not circled.  *Id.* at 278.  The Assessment has "z" line in two boxes for medical decision making, chief complaint indicates no complaint and LTC resident, the form contains checkmarks and notations for the assessment, the date is altered, and time spent is 20.  *Id.* at 280.  The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses, and time spent is 20.  *Id.* at 281.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

116. ***Beneficiary V.K.: DOS 05/12/13.***  The QIC denied coverage because "changed documentation not identified."  Exh. 8, at 29.  The appellant argues that it has provided a transcribed document for easier auditor reading.  Exh. MAC-1, at C6.  The record contains two Notes.  Exh. 3, at 296, 301.  The first Note, stamped "copy," contains altered entries that are sometimes initialed, but are not dated.  *Id.* at 296.  The chief complaint indicates no new complaints, positive for behavior issues, and see for CPR; physical examination contains checkmarks and notations; plan indicates see CPR, discuss with staff, and records reviewed; boxes for medical decision making are unchecked; and decision making complexity is not circled.  *Id.*  The second Note contains similar entries with no initials.  *Id.* at 301.  The record contains two Assessments, which do not appear to differ, which contain a "z" line through two boxes for decision making, chief complaint is no complaints and LTC resident, the form contains checkmarks for assessment, the date is altered, and time spent is 20.  *Id.* at 298, 302.  The record contains two Lists, which do not appear to differ, with a "z" line through two boxes for decision making, checked boxes and handwritten notations for diagnoses, and time spent is 20.  *Id.* at 299, 303.  The record contains insufficient documentation to

support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

117. ***Beneficiary N.K.: DOS 04/09/13***. The QIC issued a partially favorable decision, allowing the services at a "downcode" 99307. Exh. 8, at 29. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C6. The Note chief complaint indicates no complaints and see for CPR; physical examination contains checkmarks and notations; plan states see CPR, discuss with staff, and medical record reviewed; boxes for medical decision making are unchecked; and the decision making complexity is not circled. Exh. 3, at 317. The Assessment contains a "z" line through two boxes for decision making; chief complaint is no complaint, LTC resident, and status post (illegible); the form contains checkmarks for assessment; and time spent is 20. *Id.* at 319. The List contains a "z" line through two boxes for decision making, checked boxes and handwritten notations for diagnoses, and time spent is 20. *Id.* at 320. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

118. ***Beneficiary N.K.: DOS 05/11/13***. The QIC denied coverage because the need for visit frequency was not indicated. Exh. 8, at 29. We agree that the appellant has not shown that it was medically reasonable and necessary to perform care plan review on a stable beneficiary more frequently than the minimum required. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C6. The Note chief complaint indicates no complaint and seen for CPR; physical examination contains checkmarks and notations; plan is see CPR, discuss with staff, and record review; boxes for medical decision making are not checked; and decision making complexity is not circled. Exh. 3, at 335. The Assessment has "z" line in two boxes for medical decision making, chief complaint indicates no complaint and LTC resident, the form contains checkmarks and notations for the assessment, and time spent is 20. *Id.* at 337. The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses, the date is altered, and time spent is 20. *Id.* at 338. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

119. **_Beneficiary N.K.: DOS 06/28/13_**.  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 29.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C6.  The Note date is altered; the chief complaint states no complaints, seen for CPR, and no shortness of breath; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and medical record review; there is a "z" line through two boxes for medical decision making; and the medium choice for decision making complexity is circled and crossed out.  Exh. 3, at 354.  The Assessment has a "z" line through two boxes for decision making, chief complaint is LTC resident, assessment boxes are checked, and time spent is 20.  _Id._ at 356.  The List contains a "z" line through two boxes for decision making, checked boxes and notations for diagnoses, and time spent is 20.  _Id._ at 357.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

120. **_Beneficiary M.L.: DOS 03/12/13._**  The QIC issued a partially favorable decision, allowing the services at a "downcode" 99307.  Exh. 8, at 29.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C6.  The Note chief complaint indicates no complaints and seen for CPR; physical examination contains checkmarks and notations; plan states discuss with staff and record reviewed; boxes for medical decision making are unchecked; and the decision making complexity is not circled.  Exh. 3, at 366.  The Assessment contains a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, the form contains checkmarks for assessment, and time spent is 20.  _Id._ at 368.  The List contains a "z" line through two boxes for decision making, checked boxes for diagnoses, and time spent is 20.  _Id._ at 369.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

121. **_Beneficiary M.L.: DOS 04/08/13._**  The QIC denied coverage because the need for visit frequency was not indicated.  Exh. 8, at 29.  We agree that the appellant has not shown that it was medically reasonable and necessary to perform care plan review on a stable beneficiary more frequently than the minimum required.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C6.  The Note chief complaint indicates no complaint and seen for CPR;

physical examination contains checkmarks and notations; plan is
see CPR, discuss with staff, and medical record review; one box
for medical decision making is checked; and decision making
complexity is not circled. Exh. 3, at 385. The Assessment has
"z" line in two boxes for medical decision making, chief
complaint indicates no complaint and LTC resident, the form
contains checkmarks and notations for the assessment, and time
spent is 20. *Id.* at 387. The List contains two checked boxes
for decision making, checked boxes for diagnoses, and time spent
is 20. *Id.* at 388. The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

122. ***Beneficiary M.L.: DOS 06/22/13.*** The QIC denied
coverage because it agreed with the prior downcode. Exh. 8, at
29. The appellant argues that the service was a CPR billed
based on CMS instructions. Exh. MAC-1E, at C7. (The record for
this date of service is found in Exhibit 4. *See* Exh. 4, at
2-12.) The Note chief complaint states no complaints and seen
for CPR; there are checkmarks and notations for physical
examination; plan is see CPR, discuss with staff, and record
review; boxes for medical decision making are unchecked; and the
choice for decision making complexity is not circled. Exh. 4,
at 8. The Assessment has a "z" line through two boxes for
decision making, chief complaint is LTC resident, assessment
boxes are checked, and time spent is 20. *Id.* at 10. The List
contains a "z" line through two boxes for decision making,
checked boxes for diagnoses, and time spent is 20. *Id.* at 11.
The record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

123. ***Beneficiary N.L.1: DOS 03/18/13.*** The QIC denied
coverage because it agreed with the prior downcode. Exh. 8, at
38. The appellant argues that the service was a CPR billed
based on CMS instructions. Exh. MAC-1E, at C7. The Note chief
complaint states seen for CPR, no new complaint, and hospice;
there are checkmarks and notations for physical examination;
plan is see CPR; boxes for medical decision making are
unchecked; and the choice for decision making complexity is not
circled. Exh. 4, at 18. The Assessment has a "z" line through
two boxes for decision making; chief complaint is no complaint,
LTC resident, and hospice; assessment boxes are checked, and
time spent is 20. *Id.* at 20. The List contains a "z" line
through two boxes for decision making, checked boxes for

diagnoses, and time spent is 20.  *Id.* at 21.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

124.  ***Beneficiary N.L.1: DOS 04/09/13.***  The QIC denied coverage because the documentation indicated a CPR and no face to face encounter.  Exh. 8, at 30.  The appellant argues that the service was a CPR billed based on CMS instructions and that the service required a face to face encounter.  Exh. MAC-1E, at C7.  The Note chief complaint states no complaint, hospice, and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and medical record review; boxes for medical decision making are unchecked; and the decision making complexity is not circled.  Exh. 4, at 37.  The Assessment contains a "z" line through two boxes for decision making; chief complaint is no complaint, LTC resident, and hospice; boxes are checked for assessment; and time spent is 20.  *Id.* at 39.  The List has a "z" line through two boxes for medical decision making, there are checked boxes and entries for diagnoses, and time spent is 20.  *Id.* at 40.  The Council concludes that the record contains sufficient documentation to support the service billed at the CPT code 99307 level.  The QIC's determination of non-coverage is reversed.

125.  ***Beneficiary N.L.1: DOS 05/09/13.***  The QIC denied coverage because the documentation indicated a CPR and no face to face encounter.  Exh. 8, at 30.  The appellant argues that the service was a CPR billed based on CMS instructions and that the service required a face to face encounter.  Exh. MAC-1E, at C7.  The Note chief complaint states no complaint and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and record review; boxes for medical decision making are unchecked; and the decision making complexity is not circled.  Exh. 4, at 56.  The Assessment contains a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, boxes are checked for assessment, and time spent appears to be 20.  *Id.* at 59.  The List has a "z" line through two boxes for medical decision making, there are checked boxes and entries for diagnoses, and time spent is 20.  *Id.* at 60.  The Council concludes that the record contains sufficient documentation to support the service billed at the CPT code 99307 level.  The QIC's determination of non-coverage is reversed.

126. ***Beneficiary N.L.1: DOS 06/06/13.***  The QIC issued a
partially favorable decision, allowing the services at a
"downcode" 99307.  Exh. 8, at 30.  The appellant argues that the
service was a CPR billed based on CMS instructions.  Exh. MAC-
1E, at C7.  The Note chief complaint indicates no complaints,
seen for CPR, and vital signs stable; physical examination
contains checkmarks and notations; plan states see CPR, discuss
with staff, and hospice; there is a "z" line in two boxes for
medical decision making; and the medium decision making
complexity is circled and crossed out.  Exh. 4, at 77.  The
Assessment contains a "z" line through two boxes for decision
making, chief complaint is no complaint and hospice, the form
contains checkmarks for assessment, and time spent is 20.  *Id.*
at 79.  The List contains a "z" line through two boxes for
decision making, checked boxes for diagnoses, and time spent is
20.  *Id.* at 80.  The record contains insufficient documentation
to support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

127. ***Beneficiary N.L.1: DOS 06/24/13.***  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
30.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C7.

The Note in the record consists of two pages of the same form,
with facsimile transmission date stamp 07/21/13.  Exh. 4, at 96-
97.  The chief complaint contains multiple entries, largely
illegible, including entries concerning what appears to be
dysphagia, hospice, and "would like to continue hospice care."
*Id.* at 96.  The physical examination reveals findings primarily
within normal limits, with an exception noted for cardiovascular
system and extremities.  *Id.*  The assessment includes a
reference to left side CVA (cerebrovascular accident or stroke).
*Id.*  The plan includes discussion with patient and "does not
want to revoke hospice."  *Id.*  There is a "z" line through two
boxes in medical decision making, and the medium decision making
complexity is circled and crossed out, with the "high" level of
medical decision making also circled.  *Id.*  There are no
initials or date on these record changes.  *Id.*

The second page of the Note contains additional entries, most of
which are also illegible.  Exh. 4, at 97.  There is a notation
under chief complaint for PERLA (pupils equal, round, reactive
to lights and accommodation), a blood pressure notation of
168/98, as well as temperature, respiration, and blood sugar

entries that are within normal limits.  *Id.*  There are continued
entries concerning the assessment and plan, in which the
physician lists Xanax and Lipitor as medications.  *Id.*  The plan
also references a pureed diet if the patient cannot tolerate a
regular diet and hospice care.  *Id.*  Boxes for medical decision
making are unchecked, and the medium level of decision making is
circled and crossed out, with the "high" level also circled.
*Id.*  These alterations are also not initialed or dated.

Unlike the other claims, the record for this service does not
contain the appellant's form Assessment or List.   The records
provided contain no documentation of time spent with the
patient.   The record contains insufficient documentation to
support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

    128.  ***Beneficiary S.L.: DOS 03/14/13***.  The QIC issued a
partially favorable decision, allowing the services at a
"downcode" 99307. Exh. 8, at 30.  The appellant argues that the
service was a CPR billed based on CMS instructions.  Exh. MAC-
1E, at C7.  The Note chief complaint indicates no complaints,
seen for CPR, vital signs stable, and "no new episode of
epistasis;" physical examination contains checkmarks and
notations; plan is a checkmark by the line "problem list
reviewed; continue with present management;" there is a "z" line
in two boxes for medical decision making; and the medium
decision making complexity is circled and crossed out.  Exh. 4,
at 114.  The Assessment contains a "z" line through two boxes
for decision making, chief complaint is no complaint and LTC
resident, the form contains checkmarks for assessment, and time
spent is 20.  *Id.* at 116.  The List contains a "z" line through
two boxes for decision making, checked boxes for diagnoses, and
time spent is 20.  *Id.* at 117.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

    129.  ***Beneficiary S.L.: DOS 04/09/13***.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter. Exh. 8, at 30.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C7.  The Note contains an altered patient name and room number;
chief complaint states no complaint and seen for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR, discuss with staff, and medical record review; boxes for

medical decision making are unchecked; and the decision making
complexity is not circled.  Exh. 4, at 133.  The Assessment
contains a "z" line through two boxes for decision making, chief
complaint is no complaint and LTC resident, boxes are checked
for assessment, and time spent is 20.  *Id.* at 135.  The List has
a "z" line through two boxes for medical decision making, there
are checked boxes and entries for diagnoses, and time spent is
20.  *Id.* at 136.  The Council concludes that the record contains
sufficient documentation to support the service billed at the
CPT code 99307 level.  The QIC's determination of non-coverage
is reversed.

130.  ***Beneficiary S.L.: DOS 05/12/13***.  The QIC denied
coverage because the·need for visit frequency was not indicated.
Exh. 8, at 30.  We agree that the appellant has not shown that
it was medically reasonable and necessary to perform care plan
review on a stable beneficiary more frequently than the minimum
required.  The appellant argues that the service was a CPR
billed based on CMS instructions.  Exh. MAC-1E, at C7.  The Note
has an altered patient name; chief complaint indicates seen for
CPR and no new complaint; physical examination contains
checkmarks and notations; plan is see CPR, discuss with staff,
and record reviewed; there is a "z" line through two boxes for
medical decision making; and decision making complexity is not
circled.  Exh. 4, at 152.  The Assessment has a "z" line in two
boxes for medical decision making, chief complaint indicates no
complaint and LTC resident, the form contains checkmarks for the
assessment, the date is altered, and time spent is 20.  *Id.* at
154.  The List contains a "z" line through two boxes for
decision making, checked boxes and a handwritten entry for
diagnoses, and time spent is 20.  *Id.* at 155.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

131.  ***Beneficiary A.L.: DOS 04/09/13***.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 30.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C7.  The Note chief complaint states no complaint and seen for
CPR; there are checkmarks and notations for physical
examination; plan is see CPR, discuss with staff, and medical
record review; boxes for medical decision making are unchecked;
and the decision making complexity is not circled.  Exh. 4, at

164.  The Assessment contains a "z" line through two boxes for decision making; chief complaint is no complaint, LTC resident, and an entry that may be ESRD (end stage renal disease); boxes are checked for assessment; and time spent is 20.  *Id.* at 166. The List has a "z" line through two boxes for medical decision making, there are checked boxes and entries for diagnoses, and time spent is 20.  *Id.* at 167.  The Council concludes that the record contains sufficient documentation to support the service billed at the CPT code 99307 level.  The QIC's determination of non-coverage is reversed.

132.  ***Beneficiary A.L.: DOS 5/12/13.***  The QIC issued a partially favorable decision, allowing the services at a "downcode" 99307.  Exh. 8, at 30.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C7.  The Note chief complaint indicates no complaints, chronic chest pain, (illegible), and seen for CPR;  physical examination contains checkmarks and notations; plan is see for CPR, discuss with staff, and record reviewed; there is a "z" line in two boxes for medical decision making; and the medium decision making complexity is circled.  Exh. 4, at 186.  The Assessment contains a "z" line through two boxes for decision making; chief complaint is no complaint, chronic chest pain, and LTC resident; the form contains checkmarks for assessment; and time spent is 20.  *Id.* at 183.  The List contains a "z" line through two boxes for decision making, checked boxes for diagnoses, and time spent is 20.  *Id.* at 184.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

133.  ***Beneficiary N.L.2: DOS 04/09/13***.  The QIC issued a partially favorable decision, allowing the services at a "downcode" 99307.  Exh. 8, at 30.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C7.  The Note chief complaint indicates no complaints and seen for CPR and hospice; physical examination contains checkmarks and notations; plan is see CPR, discuss with staff, and medical record reviewed; boxes for medical decision making are unchecked; and the decision making complexity is not circled.  Exh. 4, at 207.  The Assessment contains a "z" line through two boxes for decision making, chief complaint is no complaint and what appears to be "physical & mental decline," the form contains checkmarks for assessment, and time spent appears to be 20.  *Id.* at 202.  The List contains a "z" line

through two boxes for decision making, checked boxes and entries
for diagnoses (with an alteration), and time spent is 30. *Id.*
at 203.  The record contains insufficient documentation to
support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

134. ***Beneficiary N.L.2: DOS 05/12/13.***  The QIC denied
coverage because the need for visit frequency was not indicated.
Exh. 8, at 31.  We agree that the appellant has not shown that
it was medically reasonable and necessary to perform care plan
review on a stable beneficiary more frequently than the minimum
required.  The appellant argues that the service was a CPR
billed based on CMS instructions.  Exh. MAC-1E, at C7.  The Note
has an altered patient name, room number, and date; chief
complaint indicates no complaint and seen for CPR; physical
examination contains checkmarks and notations; plan is see CPR,
discuss with staff, record reviewed, and hospice; there is a "z"
line through three boxes for medical decision making; and
decision making complexity is not circled.  Exh. 4, at 224.  The
Assessment has a "z" line in two boxes for medical decision
making, chief complaint indicates no complaint and LTC resident,
the form contains checkmarks and notations for the assessment,
and time spent is 20.  *Id.* at 221.  The List contains a "z" line
through two boxes for decision making, checked boxes and entries
for diagnoses, and time spent is 20.  *Id.* at 222.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

135. ***Beneficiary N.L.2: DOS 06/06/13.***  The QIC denied
coverage because the need for visit frequency was not indicated.
Exh. 8, at 31.  We agree that the appellant has not shown that
it was medically reasonable and necessary to perform care plan
review on a stable beneficiary more frequently than the minimum
required.  The appellant argues that the service was a CPR
billed based on CMS instructions.  Exh. MAC-1E, at C7.  The Note
has an altered date; chief complaint indicates no complaint and
seen for CPR; physical examination contains checkmarks and
notations; plan is see CPR, discuss with staff, and record
review; boxes for medical decision making are not checked; and
decision making complexity is not circled.  Exh. 4, at 243.  The
Assessment has "z" line in two boxes for medical decision
making, chief complaint indicates no complaint and LTC resident,
the form contains checkmarks and notations for the assessment,
and time spent is 20.  *Id.* at 240.  The List contains a "z" line

through two boxes for decision making, checked boxes and entries
for diagnoses, and time spent is 20.  *Id.* at 241.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

136.  ***Beneficiary E.M.: DOS 05/12/13.***  The QIC issued a
partially favorable decision, allowing the services at a
"downcode" 99307.  Exh. 8, at 31.  The appellant argues that the
service was a CPR billed based on CMS instructions.  Exh. MAC-
1E, at C7.  The Note chief complaint indicates no complaints and
(illegible); physical examination contains checkmarks and
notations; plan is see CPR, discuss with staff, and
documentation reviewed; boxes for medical decision making are
unchecked; and the decision making complexity is not circled.
Exh. 4, at 262.  The Assessment contains a "z" line through two
boxes for decision making, chief complaint is LTC resident and
no complaint, the form contains checkmarks and an entry for
assessment, and time spent is 20.  *Id.* at 259.  The List
contains unchecked boxes for decision making, checked boxes and
entries for diagnoses, and time spent is 20.  *Id.* at 260.  The
record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

137.  ***Beneficiary B.M.: DOS 03/12/13***.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 31.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C7.  The Note chief complaint states no complaint, PO intake no
change, blood sugar check, and no headache; there are checkmarks
and notations for physical examination; plan is see CPR, discuss
with staff, and record reviewed; boxes for medical decision
making are unchecked; and the medium decision making complexity
is circled and partially erased.  Exh. 4, at 278.  The
Assessment contains a "z" line through two boxes for decision
making; chief complaint is no complaint and  LTC resident; boxes
are checked for assessment; and time spent is 20.  *Id.* at 280.
The List has a "z" line through two boxes for medical decision
making, there are checked boxes for diagnoses, and time spent is
20.  *Id.* at 281.  The Council concludes that the record contains
sufficient documentation to support the service billed at the
CPT code 99307 level.  The QIC's determination of non-coverage
is reversed.

138. ***Beneficiary B.M.: DOS 04/08/13.*** The QIC denied coverage because it agreed with the prior downcode. Exh. 8, at 31. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C7. The Note chief complaint states no complaint, (illegible), headache, and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and record reviewed; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled. Exh. 4, at 297. The Assessment has a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, assessment boxes are checked, and time spent is illegible. *Id.* at 299. The List contains a "z" line through two boxes for decision making, checked boxes for diagnoses, and time spent is 20. *Id.* at 300. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

139. ***Beneficiary B.M.: DOS 06/29/13.*** The QIC denied coverage because it agreed with the prior downcode. Exh. 8, at 31. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C7. The Note chief complaint states seen for CPR, no headache, and blood sugar check; there are checkmarks and notations for physical examination; plan is see CPR, record review, and discuss with staff; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled. Exh. 4, at 316. The Assessment has a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, assessment boxes are checked, and time spent is 20. *Id.* at 318. The List contains a "z" line through one box for decision making, checked boxes for diagnoses, and time spent appears to be 20. *Id.* at 319. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

140. ***Beneficiary H.M.: DOS 04/08/13.*** The QIC denied coverage because it agreed with the prior downcode. Exh. 8, at 31. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C7. The Note chief complaint states no complaint, (illegible), and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and record review; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled. Exh. 4, at 335. The

Assessment has a "z" line through two boxes for decision making; chief complaint is no complaint, LTC resident, and (illegible); assessment boxes are checked; and time spent is 20. *Id.* at 337. The List contains a "z" line through two boxes for decision making, checked boxes and notations for diagnoses, and time spent is 20. *Id.* at 338. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

141. ***Beneficiary D.M.: DOS 03/10/13***. The QIC denied coverage because the documentation indicated a CPR and no face to face encounter. Exh. 8, at 31. The appellant argues that the service was a CPR billed based on CMS instructions and that the service required a face to face encounter. Exh. MAC-1E, at C8. The Note chief complaint states no complaint, see for CPR, and vital signs stable; there are checkmarks and notations for physical examination; plan is see CPR and discuss with staff; there is a "z" line in two boxes for medical decision making; and the medium decision making complexity is circled and partially erased. Exh. 4, at 354. The Assessment contains a "z" line through two boxes for decision making; chief complaint is no complaint and LTC resident; boxes are checked for assessment; and date and time spent are partially cut off and illegible. *Id.* at 356. The List has a "z" line through two boxes for medical decision making, there are checked boxes and entries for diagnoses, and time spent is illegible. *Id.* at 357. The Council concludes that the record contains sufficient documentation to support the service billed at the CPT code 99307 level. The QIC's determination of non-coverage is reversed.

142. ***Beneficiary D.M.: DOS 05/09/13***. The QIC denied coverage because it agreed with the prior downcode. Exh. 8, at 31. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C8. The Note chief complaint states no complaint, (illegible), and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and record review; one box for medical decision making is checked; and the choice for decision making complexity is not circled. Exh. 4, at 373. The Assessment has a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident; and time spent is 20. *Id.* at 375. The List contains a "z" line through two boxes for decision making, checked boxes and notations for diagnoses, and time spent is 20. *Id.* at 376. The record

contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

143. ***Beneficiary D.M.: DOS 06/13/13***. The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter. Exh. 8, at 31. The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter. Exh. MAC-1E, at
C8. The Note chief complaint states no complaint and seen for
CPR; there are checkmarks and notations for physical
examination; plan is see CPR, discuss with staff, and record
reviewed; there is a "z" line in two boxes for medical decision
making; and the decision making complexity is not circled. Exh.
4, at 391. The Assessment contains a "z" line through two boxes
for decision making, chief complaint is LTC resident, boxes are
checked for assessment, and time spent is 20. *Id.* at 393. The
List has a "z" line through two boxes for medical decision
making, there are checked boxes and entries for diagnoses, and
time spent is 20. *Id.* at 394. The Council concludes that the
record contains sufficient documentation to support the service
billed at the CPT code 99307 level. The QIC's determination of
non-coverage is reversed.

144. ***Beneficiary V.M.: DOS 03/07/13***. The QIC issued a
partially favorable decision, allowing the services at a
"downcode" 99307. Exh. 8, at 31. The appellant argues that the
service was a CPR billed based on CMS instructions. Exh. MAC-
1E, at C8. The Note chief complaint indicates physical
(illegible), no apparent complaints, and see for CPR; physical
examination contains checkmarks and notations with vital signs
stable; plan is see CPR; there is a "z" line through boxes for
medical decision making; and the medium decision making
complexity is circled and crossed out. Exh. 4, at 408. The
Assessment contains a "z" line through two boxes for decision
making; chief complaint is no complaints, physical/ mental
decline, and LTC resident; the form contains checkmarks for
assessment; and time spent is 20. *Id.* at 410. The List
contains a "z" line through two boxes for decision making,
checked boxes and entries for diagnoses, and time spent is 20.
*Id.* at 411. The record contains insufficient documentation to
support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

145. *Beneficiary V.M.: DOS 04/17/13*.  The QIC denied coverage
because it agreed with the prior downcode. Exh. 8, at 31.  The
appellant argues that the service was a CPR billed based on CMS
instructions. Exh. MAC-1E, at C8.  The Note chief complaint
states no new complaints, seen for CPR, and stable (illegible);
there are checkmarks and notations for physical examination;
plan is see CPR; boxes for medical decision making are not
checked; and the choice for decision making complexity is not
circled.  Exh. 4, at 428.  The Assessment has a "z" line through
two boxes for decision making, chief complaint is no complaint
and what appears to be "declined-stable," the date is altered,
and time spent is 20.  *Id.* at 430.  The List contains a "z" line
through two boxes for decision making, checked boxes and a
notation for diagnoses, and time spent is 20.  *Id.* at 431.  The
record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

146. *Beneficiary V.M.: DOS 05/11/13*.  The QIC denied
coverage because the need for visit frequency was not indicated.
Exh. 8, at 32.  We agree that the appellant has not shown that
it was medically reasonable and necessary to perform care plan
review on a stable beneficiary more frequently than the minimum
required.  The appellant argues that the service was a CPR
billed based on CMS instructions. Exh. MAC-1E, at C8.  The Note
chief complaint indicates patient seen for CPR, no new
complaints, and (illegible) reviewed and discussed with staff;
physical examination contains checkmarks and notations; plan is
see CPR; boxes for medical decision making are not checked; and
decision making complexity is not circled.  Exh. 4, at 446.  The
Assessment has "z" line in one box for medical decision making;
chief complaint indicates no complaint; the form contains
checkmarks for the assessment; the signature, date and time are
cut off and partially illegible; and the date appears to have
been altered.  *Id.* at 448.  The List contains a "z" line through
two boxes for decision making, checked boxes and an entry for
diagnoses, and the signature, date, and time spent entries are
also cut off.  *Id.* at 449.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

147. *Beneficiary V.M.: DOS 06/26/13*.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
32.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C8.  The Note date

87

is altered; chief complaint states no new complaints and seen
for CPR; there are checkmarks and notations for physical
examination; plan is see CPR, chart reviewed, and discuss with
staff; there is a "z" line through two boxes for medical
decision making; and the choice for decision making complexity
is not circled.  Exh. 4, at 465.  The Assessment has a "z" line
through two boxes for decision making, chief complaint is no
complaint, the signature and date are partially cut off, and
time spent is altered and illegible.  *Id.* at 467.  The List
contains a "z" line through two boxes for decision making,
checked boxes and a notation for diagnoses, and time spent is
20.  *Id.* at 468.  The record contains insufficient documentation
to support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

148. ***Beneficiary J.M.: DOS 04/08/13.***  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
32.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at G8.  The Note chief
complaint states no new complaints, "NSOB" (no shortness of
breath), and seen for CPR; there are checkmarks and notations
for physical examination; plan is see CPR, discuss with staff,
and medical record review; boxes for medical decision making are
unchecked; and the choice for decision making complexity is not
circled.  Exh. 4, at 484.  The Assessment has a "z" line through
two boxes for decision making; chief complaint is no complaint,
status post (illegible), doing good, and check vital signs;
there are checked boxes for the assessment; and time spent is
20.  *Id.* at 486.  The List contains a "z" line through two boxes
for decision making, checked boxes and notations for diagnoses,
and there is no signature, no date, and no time spent
documented.  *Id.* at 487.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

149. ***Beneficiary G.M.: DOS 03/14/13.***  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 32.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C8.  The Note chief complaint states no new complaint and seen
for CPR, there are checkmarks and notations for physical
examination, plan is see CPR and discuss with staff, boxes for
medical decision making are unchecked, and the decision making
complexity is not circled.  Exh. 4, at 503.  The Assessment

contains a "z" line through two boxes for decision making, chief complaint is no new complaint and two illegible entries, boxes are checked for assessment, and time spent is 20. *Id.* at 505. The List has a "z" line through two boxes for medical decision making, there are checked boxes and entries for diagnoses, and time spent is 20. *Id.* at 506. The Council concludes that the record contains sufficient documentation to support the service billed at the CPT code 99307 level. The QIC's determination of non-coverage is reversed.

150. ***Beneficiary G.M.: DOS 04/09/13***. The QIC denied coverage because it agreed with the prior downcode. Exh. 8, at 32. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C8. The Note chief complaint states no complaints and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and medical record review; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled. Exh. 4, at 516. The Assessment has a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, there are checked boxes for the assessment, and time spent is 20. *Id.* at 518. The List contains a "z" line through three boxes for decision making, checked boxes for diagnoses, and time spent is 20. *Id.* at 519. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

151. ***Beneficiary G.M.: DOS 05/12/13***. The QIC denied coverage because the documentation indicated a CPR and no face to face encounter. Exh. 8, at 32. The appellant argues that the service was a CPR billed based on CMS instructions and that the service required a face to face encounter. Exh. MAC-1E, at C8. The Note chief complaint states no new complaint and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, record reviewed, and discuss with staff; there is a "z" line through two boxes for medical decision making; and the decision making complexity is not circled. Exh. 4, at 536. The Assessment contains a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, boxes are checked for assessment, and time spent is 20. *Id.* at 538. The List has a "z" line through two boxes for medical decision making, there are checked boxes for diagnoses, and time spent is 20. *Id.* at 539. The Council concludes that the record contains sufficient

documentation to support the service billed at the CPT code
99307 level.  The QIC's determination of non-coverage is
reversed.

152.  *Beneficiary G.M.: DOS 06/29/13*.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
32.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C8.  The Note chief
complaint states status post (illegible), (altered entry), and
seen for CPR; there are checkmarks and notations for physical
examination; plan is see CPR, record review, and discuss with
staff; there is a "z" line through two boxes for medical
decision making; and the choice for decision making complexity
is not circled.  Exh. 4, at 555.  The Assessment has a "z" line
through two boxes for decision making; chief complaint is LTC
resident; there are checked boxes for the assessment; and time
spent is 20.  *Id.* at 557.  The List contains a "z" line through
one box for decision making, checked boxes and an entry for
diagnoses, and time spent is 20.  *Id.* at 558.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

153.  *Beneficiary E.N.: DOS 03/10/13*.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 32.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C8.  The Note chief complaint states no complaint, (illegible),
wandering, and seen for CPR; there are checkmarks and notations
for physical examination; plan is discuss with staff and record
review; there is a "z" line through two boxes for medical
decision making; and the medium decision making complexity is
circled and partially erased.  Exh. 4, at 567.  The Assessment
contains a "z" line through two boxes for decision making; chief
complaint is no complaint and LTC resident; boxes are checked
for assessment; and time spent is 20.  *Id.* at 569.  The List has
a "z" line through two boxes for medical decision making, there
are checked boxes for diagnoses, and time spent is 20.  *Id.* at
570.  The Council concludes that the record contains sufficient
documentation to support the service billed at the CPT code
99307 level.  The QIC's determination of non-coverage is
reversed.

154. *Beneficiary J.N.: DOS 03/10/13.* The QIC denied coverage
because it agreed with the prior downcode. Exh. 8, at 32.  The
appellant argues that the service was a CPR billed based on CMS
instructions. Exh. MAC-1E, at C8. The Note date is altered;
chief complaint states no new complaints, see CPR, and pain
(illegible) controlled;  there are checkmarks and notations for
physical examination; plan is see CPR; there is a "z" line
through two boxes for medical decision making; and the medium
choice for decision making complexity is circled and partially
erased.  Exh. 5, at 22.  The Assessment has a "z" line through
one box for decision making, chief complaint is no complaint and
LTC resident, there are checked boxes for the assessment, and
time spent is 20.  *Id.* at 24.  The List contains a "z" line
through two boxes for decision making, checked boxes and
multiple entries for diagnoses, and time spent is 20.  *Id.* at
25.  The record contains insufficient documentation to support
the service billed as CPT code 99310, and the Council agrees
with the QIC's determination.

155. *Beneficiary J.N.: DOS 04/18/13.*  The QIC denied
coverage because it agreed with the prior downcode. Exh. 8, at
32.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C8.  The Note chief
complaint states no new complaints, (illegible), and seen for
CPR;  there are checkmarks and notations for physical
examination; plan is see CPR, discuss with staff, and record
review; boxes for medical decision making are unchecked; and the
choice for decision making complexity is not circled. Exh. 5,
at 41.  The Assessment has a "z" line through two boxes for
decision making, chief complaint is no complaint and LTC
resident, there are checked boxes for the assessment, and time
spent is 20.  *Id.* at 43.  The List contains a "z" line through
two boxes for decision making, checked boxes and multiple
entries for diagnoses, and time spent is 20.  *Id.* at 44.  The
record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

156. *Beneficiary J.N..: DOS 05/11/13.*  The QIC denied
coverage because the need for visit frequency was not indicated.
Exh. 8, at 32.  We agree that the appellant has not shown that
it was medically reasonable and necessary to perform care plan
review on a stable beneficiary more frequently than the minimum
required.  The appellant argues that the service was a CPR
billed based on CMS instructions.  Exh. MAC-1E, at C8.  The Note

chief complaint indicates no complaint and seen for CPR;
physical examination contains checkmarks and notations; plan is
see CPR, discuss with staff, and record reviewed; boxes for
medical decision making are not checked; and decision making
complexity is not circled. Exh. 5, at 60. The Assessment has
"z" line through two boxes for medical decision making; chief
complaint indicates no complaint, LTC resident, and ESRD
(illegible); the form contains checkmarks for the assessment;
and time spent is 20. Id. at 62. The List contains a "z" line
through two boxes for decision making, checked boxes and
multiple entries for diagnoses, and time spent is 20. Id. at
63. The record contains insufficient documentation to support
the service billed as CPT code 99310, and the Council agrees
with the QIC's determination.

157. **_Beneficiary L.N.1: DOS 04/18/13._** The QIC denied
coverage because it agreed with the prior downcode. Exh. 8, at
32. The appellant argues that the service was a CPR billed
based on CMS instructions. Exh. MAC-1E, at C8. The Note chief
complaint states no complaints and seen for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR, medical record review, and discuss with staff; boxes for
medical decision making are unchecked; and the choice for
decision making complexity is not circled. Exh. 5, at 79. The
Assessment has a "z" line through two boxes for decision making;
chief complaint is no complaint, LTC resident, edema, no
shortness of breath, and (illegible); there are checked boxes
for the assessment; and time spent is 20. Id. at 81. The List
contains a "z" line through two boxes for decision making,
checked boxes and multiple entries for diagnoses, and time spent
is 20. Id. at 82. The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

158. **_Beneficiary L.N.1: DOS 05/11/13._** The QIC denied
coverage because the need for visit frequency was not indicated.
Exh. 8, at 33. We agree that the appellant has not shown that
it was medically reasonable and necessary to perform care plan
review on a stable beneficiary more frequently than the minimum
required. The appellant argues that the service was a CPR
billed based on CMS instructions. Exh. MAC-1E, at C8. The Note
chief complaint indicates no complaint and seen for CPR;
physical examination contains checkmarks and notations; plan is
see CPR, discuss with staff, and record reviewed; boxes for
medical decision making are not checked; and decision making

complexity is not circled.  Exh. 5, at 98.  The Assessment has
"z" line through two boxes for medical decision making; chief
complaint indicates no complaint, LTC resident, positive for
edema, and no shortness of breath; the form contains checkmarks
for the assessment; and time spent is 20.  *Id.* at 100.  The List
contains a "z" line through two boxes for decision making,
checked boxes and multiple entries for diagnoses, the date is
altered, and time spent is 20.  *Id.* at 101.  The record contains
insufficient documentation to support the service billed as CPT
code 99310, and the Council agrees with the QIC's determination.

159. ***Beneficiary L.N.1: DOS 06/13/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
33.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C8.  The Note chief
complaint states no complaints, seen for CPR, status post
(illegible), and wound looks good; there are checkmarks and
notations for physical examination; plan is (illegible)
discharged, see CPR, discuss with staff, and document reviewed;
there is a "z" line through two boxes for medical decision
making; and the choices for decision making complexity of both
low and medium are circled and crossed out.  Exh. 5, at 117.
The Assessment has a "z" line through two boxes for decision
making, chief complaint is no complaint and LTC resident, there
are checked boxes for the assessment, and time spent is 20.  *Id.*
at 119.  The List contains a "z" line through two boxes for
decision making, checked boxes and multiple entries for
diagnoses, and time spent is 20.  *Id.* at 120.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

160. ***Beneficiary L.N.2: DOS 03/10/13***.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 33.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C9.  The Note chief complaint states no complaint, seen for CPR,
and two illegible entries; there are checkmarks and notations
for physical examination; plan is see CPR, discuss with staff,
and record review; there is a "z" line through two boxes for
medical decision making; and the medium decision making
complexity is circled and partially erased.  Exh. 5, at 130.
The Assessment contains a "z" line through two boxes for
decision making; chief complaint is no complaint and LTC

resident; boxes are checked for assessment; the date and time
spent are partially cut off and illegible. *Id.* at 132.  The
List has a "z" line through two boxes for medical decision
making, there are checked boxes for diagnoses, and time spent is
20.  *Id.* at 133.  The Council concludes that the record contains
sufficient documentation to support the service billed at the
CPT code 99307 level.  The QIC's determination of non-coverage
is reversed.

161.  ***Beneficiary L.N.2: DOS 04/18/13***.  The QIC denied
coverage because it agreed with the prior downcode. Exh. 8, at
33.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C9.  The Note chief
complaint states no new complaint, poor intake, and seen for
CPR; there are checkmarks and notations for physical
examination; plan is see CPR, discuss with staff, and record
reviewed; boxes for medical decision making are unchecked; and
the choice for decision making complexity is not circled.  Exh.
5, at 150.  The Assessment has a "z" line through two boxes for
decision making, chief complaint is no complaint and LTC
resident, there are checked boxes for the assessment, and time
spent is 20.  *Id.* at 152.  The List contains a "z" line through
two boxes for decision making, checked boxes and multiple
entries for diagnoses, the date appears to have been altered,
and time spent is illegible.  *Id.* at 153.  The record contains
insufficient documentation to support the service billed as CPT
code 99310, and the Council agrees with the QIC's determination.

162.  ***Beneficiary L.N.2: DOS 05/09/13***.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 33.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C9.  The Note date is altered; chief complaint states no
complaint and (illegible); there are checkmarks and notations
for physical examination; plan is see CPR, discuss with staff,
and record review; there is a "z" line through two boxes for
medical decision making; and the decision making complexity is
not circled.  Exh. 5, at 169.  The Assessment contains a "z"
line through two boxes for decision making, chief complaint is
no complaint and (illegible), boxes are checked for assessment,
and time spent is 20.  *Id.* at 171.  The List has a "z" line
through two boxes for medical decision making, there are checked
boxes and entries for diagnoses, and time spent is 20.  *Id.* at
172.  The Council concludes that the record contains sufficient

documentation to support the service billed at the CPT code
99307 level.  The QIC's determination of non-coverage is
reversed.

163.  ***Beneficiary R.P.: DOS 04/08/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
33.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C9.  The Note date
is altered; chief complaint states no complaint, seen for CPR,
and two illegible entries; there are checkmarks and notations
for physical examination; plan is see CPR, discuss with staff,
and record reviewed; boxes for medical decision making are
unchecked; and the choice for decision making complexity is not
circled.  Exh. 5, at 189.  The Assessment has a "z" line through
two boxes for decision making; chief complaint is no complaint,
LTC resident, and (illegible); there are checked boxes for the
assessment; and time spent is 20.  *Id.* at 191.  The List
contains a "z" line through two boxes for decision making,
checked boxes and multiple entries for diagnoses, and time spent
is 20.  *Id.* at 192.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

164.  ***Beneficiary R.P.: DOS 06/22/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
33.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C9.  The Note chief
complaint states (illegible) and seen for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR, discuss with staff, and record reviewed; boxes for medical
decision making are unchecked; and the choice for decision
making complexity is not circled.  Exh. 5, at 202.  The
Assessment has unchecked boxes for decision making, chief
complaint is LTC resident, there are checked boxes for the
assessment, and time spent is 20.  *Id.* at 204.  The List
contains a "z" line through two boxes for decision making,
checked boxes and multiple entries for diagnoses, the
beneficiary is stable, and time spent is 20.  *Id.* at 205.  The
record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

165.  ***Beneficiary F.P.: DOS 04/08/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
33.  The appellant argues that the service was a CPR billed

based on CMS instructions.  Exh. MAC-1E, at C9.  The Note chief
complaint states no complaint and seen for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR, discuss with staff, and medical record reviewed; boxes for
medical decision making are unchecked; and the choice for
decision making complexity is not circled.  Exh. 5, at 219.  The
Assessment has a "z" line through two boxes for decision making,
chief complaint is no complaint and LTC resident, there are
checked boxes for the assessment, and time spent is 20.  *Id.* at
221.  The List contains a "z" line through two boxes for
decision making, checked boxes and multiple entries for
diagnoses, and time spent is 20.  *Id.* at 222.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

166.  ***Beneficiary F.P.: DOS 06/29/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
33.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C9.  The Note chief
complaint states no complaint and seen for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR, discuss with staff, and record reviewed; boxes for medical
decision making are unchecked; and the choice for decision
making complexity is not circled.  Exh. 5, at 238.  The
Assessment has two checked boxes for decision making, chief
complaint LTC resident, there are checked boxes for the
assessment, and time spent is 20.  *Id.* at 240.  The List
contains a "z" line through two boxes for decision making,
checked boxes and entries for diagnoses, and time spent is 20.
*Id.* at 241.  The record contains insufficient documentation to
support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

167.  ***Beneficiary J.P.: DOS 05/09/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
33.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C9.  The Note chief
complaint states no new complaint, (illegible), and seen for
CPR; there are checkmarks and notations for physical
examination; plan is see CPR, discuss with staff, and record
reviewed; boxes for medical decision making are unchecked; and
the choice for decision making complexity is not circled.  Exh.
5, at 257.  The Assessment has a "z" line through two boxes for
decision making, chief complaint is no complaint and

(illegible), there are checked boxes for the assessment, and the date and time spent are partially cut off and illegible.  *Id.* at 259.  The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses, and time spent is 20.  *Id.* at 260.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

168*. Beneficiary J.P.: DOS 06/28/13.*  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 33.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C9.  The Note chief complaint states no new complaint and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and record reviewed; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled.  Exh. 5, at 269.  The Assessment has a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, there are checked boxes for the assessment, and time spent appears to be an altered 20 or 30.  *Id.* at 271.  The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses, and time spent is 20.  *Id.* at 272.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

169*. Beneficiary B.P.: DOS 04/09/13.*  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 33.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C9.  The Note chief complaint states no complaint, hospice, and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and record reviewed; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled.  Exh. 5, at 281.  The Assessment has a "z" line through two boxes for decision making, chief complaint is no complaint and rule out increased (illegible), there are checked boxes for the assessment, and time spent is 30.  *Id.* at 283.  The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses, and time spent is 20.  *Id.* at 284.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

170. ***Beneficiary B.P.: DOS 05/12/13***. The QIC denied coverage because the need for visit frequency was not indicated. Exh. 8, at 33. We agree that the appellant has not shown that it was medically reasonable and necessary to perform care plan review on a stable beneficiary more frequently than the minimum required. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C9. The Note chief complaint indicates no complaint, (altered and illegible), and seen for CPR; physical examination contains checkmarks and notations; plan is see CPR, discuss with staff, and record reviewed; there is a "z" line through two boxes for medical decision making; and the medium decision making complexity is circled and crossed out. Exh. 5, at 300. The Assessment has "z" line through two boxes for medical decision making; chief complaint indicates no complaint, LTC resident, and hospice; boxes are checked for the assessment; and time spent is 20. *Id.* at 302. The List contains a "z" line through two boxes for decision making, checked boxes and multiple entries for diagnoses, and time spent is 20. *Id.* at 303. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

171. ***Beneficiary B.P.: DOS 06/06/13***. The QIC denied coverage because it agreed with the prior downcode. Exh. 8, at 34. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C9. The Note chief complaint states no new complaint, seen for CPR, and (illegible); there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, record review, and hospice; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled. Exh. 5, at 319. The Assessment has a "z" line through two boxes for decision making, chief complaint is "c/o not doing well," there are checked boxes for the assessment, and time spent is 20. *Id.* at 321. The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses, and time spent is 20. *Id.* at 322. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

172. ***Beneficiary M.R.1.: DOS 03/07/13***. The QIC issued a partially favorable decision, allowing the services at a "downcode" 99307. Exh. 8, at 34. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-

1E, at C9.  The Note chief complaint indicates no new complaints
and seen for CPR; physical examination contains checkmarks and
notations; plan is see CPR, discuss with staff, and review
chart; two boxes for medical decision making are checked; and
the medium decision making complexity is circled and partially
erased.  Exh. 5, at 337.  The Assessment contains a "z" line
through three boxes for decision making, chief complaint is no
complaints and LTC resident, the form contains checkmarks for
assessment, and time spent is 20.  *Id.* at 339.  The List
contains a "z" line through two boxes for decision making,
checked boxes and an entry (brittle diabetes) for diagnoses, and
time spent is 20.  *Id.* at 340.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

173. ***Beneficiary M.R.1.: DOS 04/17/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
34.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C9.  The Note chief
complaint states no complaint, seen for CPR, medical record
reviewed, and discuss with staff; there are checkmarks and
notations for physical examination; plan is see CPR; there is a
"z" line through two boxes for medical decision making; and the
choice for decision making complexity is not circled.  Exh. 5,
at 356.  The Assessment has a "z" line through two boxes for
decision making, chief complaint is no complaint and LTC
resident, there are checked boxes for the assessment, and time
spent is 20.  *Id.* at 358.  The List contains a "z" line through
two boxes for decision making, checked boxes and an entry
(brittle diabetes) for diagnoses, and time spent is 20.  *Id.* at
359.  The record contains insufficient documentation to support
the service billed as CPT code 99310, and the Council agrees
with the QIC's determination.

174. ***Beneficiary M.R.1.: DOS 05/11/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
34.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C9.  The Note chief
complaint states no complaint, blood sugar check, and see for
CPR; there are checkmarks and notations for physical
examination; plan is see CPR, discuss with staff, and record
reviewed; boxes for medical decision making are unchecked; and
the choice for decision making complexity is not circled.  Exh.
5, at 375.  The Assessment has a "z" line through two boxes for
decision making, chief complaint is no complaint and LTC

resident, there are checked boxes for the assessment, and time
spent is 20. *Id.* at 377. The List contains a "z" line through
two boxes for decision making, checked boxes and an entry
(brittle diabetes) for diagnoses, and time spent is 20. *Id.* at
378. The record contains insufficient documentation to support
the service billed as CPT code 99310, and the Council agrees
with the QIC's determination.

175. ***Beneficiary M.R.1.: DOS 06/10/13.*** The QIC denied
coverage because the need for visit frequency was not indicated.
Exh. 8, at 34. We agree that the appellant has not shown that
it was medically reasonable and necessary to perform care plan
review on a stable beneficiary more frequently than the minimum
required. The appellant argues that the service was a CPR
billed based on CMS instructions. Exh. MAC-1E, at C9. The Note
chief complaint states no complaint and see for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR, medical record reviewed, and discuss with staff; there is a
"z" line through two boxes for medical decision making; and the
choice for decision making complexity is not circled. Exh. 5,
at 393. The Assessment has a "z" line through two boxes for
decision making, chief complaint is no complaint, there are
checked boxes for the assessment, and time spent is 20. *Id.* at
395. The List contains a "z" line through two boxes for
decision making, checked boxes and an entry (brittle diabetes)
for diagnoses, and time spent is 20. *Id.* at 396. The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

176. ***Beneficiary M.R.2.: DOS 03/12/13.*** The QIC denied
coverage because it agreed with the prior downcode. Exh. 8, at
34. The appellant argues that the service was a CPR billed
based on CMS instructions. Exh. MAC-1E, at C9. The Note chief
complaint states no complaint and see for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR and discuss with staff; boxes for medical decision making
are unchecked; and the choice for decision making complexity is
not circled. Exh. 5, at 412. The Assessment has a "z" line
through two boxes for decision making, chief complaint is no
complaint and LTC resident, there are checked boxes for the
assessment, and time spent is cut off and illegible. *Id.* at
414. The List contains a "z" line through two boxes for
decision making, checked boxes and entries for diagnoses
(including "stable"), and time spent is 20. *Id.* at 415. The

record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

177. ***Beneficiary M.R.2.: DOS 04/08/13***.  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 34.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C9.  The Note chief complaint states no complaint and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and "1 med record reviewed;" boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled.  Exh. 5, at 431.  The Assessment has a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, there are checked boxes for the assessment, and time spent is 20.  *Id.* at 433.  The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses (including "stable"), and time spent is 20.  *Id.* at 434.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

178. ***Beneficiary M.R.2.: DOS 06/29/13***.  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 34.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C9.  The Note chief complaint states no complaint and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and record reviewed; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled.  Exh. 5, at 443.  The Assessment has an altered patient name, a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, there are checked boxes for the assessment, and time spent is 20.  *Id.* at 445.  The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses (including "stable"), and time spent is 20.  *Id.* at 446.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

179. ***Beneficiary D.R.: DOS 03/10/13***.  The QIC denied coverage because the documentation indicated a CPR and no face to face encounter.  Exh. 8, at 34.  The appellant argues that

the service was a CPR billed based on CMS instructions and that the service required a face to face encounter. Exh. MAC-1E, at C9. The Note chief complaint states no new complaint, see for CPR, and vital signs stable; there are checkmarks and notations for physical examination; plan is see CPR and discuss with staff; there is a "z" line through two boxes for medical decision making; and the medium decision making complexity is altered and partially erased. Exh. 5, at 461. The Assessment contains a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, boxes are checked for assessment, and time spent is 20. *Id.* at 463. The List has a "z" line through two boxes for medical decision making, there are checked boxes for diagnoses, and time spent is 20. *Id.* at 464. The Council concludes that the record contains sufficient documentation to support the service billed at the CPT code 99307 level. The QIC's determination of non-coverage is reversed.

180. ***Beneficiary D.R.: DOS 04/18/13***. The QIC denied coverage because it agreed with the prior downcode. Exh. 8, at 34. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C9. The Note chief complaint states no complaint and seen for CPR, there are checkmarks and notations for physical examination, plan is a checkmark by the statement "Problem list reviewed; continue with present management," there is a "z" line through two boxes for medical decision making, and the medium choice for decision making is circled and crossed out. Exh. 5, at 481. The Assessment has a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, there are checked boxes for the assessment, and time spent is 20. *Id.* at 483. The List contains a "z" line through two boxes for decision making, checked boxes and an illegible entry for diagnoses, and time spent is 20. *Id.* at 484. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

181. ***Beneficiary D.R.: DOS 05/11/13***. The QIC denied coverage because it found that there was a "discrepancy in date of document and billed date." Exh. 8, at 34. The appellant argues that, based on its review, the "dates match and are correct." Exh. MAC-1E, at C9.

The Council agrees with the appellant that the date of service under review matches the dates on the procedural and clinical documents in the record for this service.  *See* Exh. 5, at 488-499, *passim,* 493, 495, 496*.*  However, that is not the end of the inquiry, as the Council reviews the QIC's action *de novo*. 42 C.F.R. § 405.1100(c).  As explained below, the Council finds that the documentation does not establish coverage of the service billed under CPT code 99310, but does establish coverage under CPT code 99307.

The Note chief complaint states no new complaint and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, record reviewed, and discuss with staff; boxes for medical decision making are unchecked; and the decision making complexity is not circled.  Exh. 5, at 493.  The Assessment has a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, there are checked boxes for the assessment, and time spent is 20.  *Id.* at 495.  The List contains a "z" line through two boxes for decision making, checked boxes for diagnoses, and time spent is 20.  *Id.* at 496.  The Council concludes that the record contains sufficient documentation to support the service billed at the CPT code 99307 level.  The QIC's determination of non-coverage is reversed.

182.  ***Beneficiary D.R.: DOS 06/10/13.***  The QIC issued a partially favorable decision, allowing the services at a "downcode" 99307.  Exh. 8, at 34.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C10.  The Note chief complaint indicates no complaint and see for CPR; physical examination contains checkmarks and notations; plan is see CPR, discuss with staff, and records reviewed; boxes for medical decision making are unchecked; and the decision making complexity is not circled.  Exh. 5, at 512.  The Assessment contains a "z" line through two boxes for decision making; chief complaint is no complaint; the form contains checkmarks for assessment; and time spent is 20.  *Id.* at 514.  The List contains a "z" line through two boxes for decision making, checked boxes for diagnoses, and time spent is 20.  *Id.* at 515.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

183.  ***Beneficiary A.S.: DOS 03/10/13.***  The QIC denied coverage because "changed documentation not identified."  Exh.

103

8, at 34.  The appellant argues that it has provided a
transcribed document for easier auditor reading.  Exh. MAC-1, at
C10.  Contrary to the appellant's assertion, the record contains
one set of clinical records for this date of service, which does
not appear to be a transcribed set of records.  Exh. 5, at 531,
533, 534.  The Note contains altered entries that are not
initialed or dated.  *Id.* at 531.  The chief complaint indicates
no new complaint, patient seen for CPR, vital signs stable, and
physical (illegible) and increased tremors; physical examination
contains checkmarks and notations; plan indicates see CPR and
discuss with staff; boxes for medical decision making are
unchecked; and decision making complexity is not circled.  *Id.*
The Assessment contains a "z" line through two boxes for
decision making, chief complaint is no complaint and LTC
resident, the form contains checkmarks for assessment, and the
date and time entries are cut off and illegible.  *Id.* at 533.
The List contains a "z" line through two boxes for decision
making, checked boxes and handwritten notations for diagnoses,
and time spent is 20.  *Id.* at 534.  The record contains
insufficient documentation to support the service billed as CPT
code 99310, and the Council agrees with the QIC's determination.

    184.  ***Beneficiary C.S.: DOS 03/12/13***.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 35.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C10.  The Note chief complaint states no new complaint, seen for
CPR, hospice, and (illegible); there are checkmarks and
notations for physical examination; plan is see CPR and discuss
with staff; there is a "z" line through two boxes for medical
decision making; and the medium decision making complexity is
partially circled and crossed out.  Exh. 5, at 550.  The
Assessment contains a "z" line through two boxes for decision
making; chief complaint is no complaint, feel (illegible), and
hospice; boxes are checked for assessment with one altered
entry; and time spent is 20.  *Id.* at 552.  The List has a "z"
line through two boxes for medical decision making, there are
checked boxes and entries for diagnoses, and time spent is 20.
*Id.* at 553.  The Council concludes that the record contains
sufficient documentation to support the service billed at the
CPT code 99307 level.  The QIC's determination of non-coverage
is reversed.

185. **Beneficiary C.S.: DOS 04/08/13**.  The QIC denied coverage
because it agreed with the prior downcode.  Exh. 8, at 35.  The
appellant argues that the service was a CPR billed based on CMS
instructions.  Exh. MAC-1E, at C10.  The Note chief complaint
states no complaint, pain control, no SOB (shortness of breath),
and seen for CPR; there are checkmarks and notations for
physical examination; plan is see CPR, discuss with staff, and
medical record review; boxes for medical decision making are
unchecked; and the choice for decision making complexity is not
circled.  Exh. 5, at 569.  The Assessment has a "z" line through
two boxes for decision making, chief complaint is no complaint
and LTC resident, there are checked boxes for the assessment,
and time spent is 20.  *Id.* at 571.  The List contains a "z" line
through two boxes for decision making, checked boxes and entries
for diagnoses, and time spent is 20.  *Id.* at 572.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

186. **Beneficiary C.S.: DOS 06/29/13**.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
35.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C10.  The Note chief
complaint states status post (illegible), no new complaint, pain
controlled, and does not want strong pain medication; there are
checkmarks and notations for physical examination; plan is see
CPR, discuss with staff, records reviewed, hospice/comfort care;
boxes for medical decision making are unchecked; and the choice
for decision making complexity is not circled.  Exh. 5, at 588.
The Assessment has a "z" line through two boxes for decision
making, chief complaint is LTC resident and hospice, there are
checked boxes for the assessment, and time spent is 20.  *Id.* at
590.  The List contains a "z" line through two boxes for
decision making, checked boxes and entries for diagnoses, and
time spent is 20.  *Id.* at 591.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

187. **Beneficiary E.S.: DOS 03/18/13**.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
35.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C10.  The Note chief
complaint states no complaint, pain control, and seen for CPR;
there are checkmarks and notations for physical examination;
plan is see CPR and discuss with staff; boxes for medical

decision making are unchecked; and the choice for decision making complexity is not circled. Exh. 5, at 607. The Assessment has a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, there are checked boxes for the assessment, and time spent is 20. *Id.* at 609. The List contains a "z" line through two boxes for decision making, checked boxes and an entry (ESRD) for diagnoses, and time spent is 20. *Id.* at 610. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

188. ***Beneficiary E.S.: DOS 04/09/13***. The QIC denied coverage because it agreed with the prior downcode. Exh. 8, at 35. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C10. The Note chief complaint states no complaint and see for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and medical record reviewed; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled. Exh. 5, at 626. The Assessment has a "z" line through two boxes for decision making; chief complaint is no complaint, ESRD (illegible), and LTC resident; there are checked boxes for the assessment; and time spent is cut off and illegible. *Id.* at 628. The List contains unchecked boxes for decision making, checked boxes and entries (including ESRD) for diagnoses, and time spent is illegible. *Id.* at 629. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

189. ***Beneficiary E.S.: DOS 05/12/13***. The QIC denied coverage because the documentation indicated a CPR and no face to face encounter. Exh. 8, at 35. The appellant argues that the service was a CPR billed based on CMS instructions and that the service required a face to face encounter. Exh. MAC-1E, at C10. The Note chief complaint states no new complaint, ESRD (illegible), and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and record reviewed; there is a "z" line through two boxes for medical decision making; and the medium decision making complexity is circled and crossed out. Exh. 6(1), at 14. The Assessment contains a "z" line through two boxes for decision making; chief complaint is no complaint, LTC resident, and ESRD (illegible); boxes are checked for assessment; and time

spent is 20.  *Id.* at 16.  The List has a "z" line through three
boxes for medical decision making, there are checked boxes and
entries for diagnoses, and time spent is 20.  *Id.* at 17.  The
Council concludes that the record contains sufficient
documentation to support the service billed at the CPT code
99307 level.  The QIC's determination of non-coverage is
reversed.

190.  ***Beneficiary E.S.: DOS 06/06/13***.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 35.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C10.  The Note chief complaint states no new complaint, blood
sugar check, and seen for CPR; there are checkmarks and
notations for physical examination; plan is see CPR, record
review, and discuss with staff; there is a "z" line through two
boxes for medical decision making; and the decision making
complexity is not circled.  Exh. 6(1), at 33.  The Assessment
contains a "z" line through two boxes for decision making; chief
complaint is no new complaint; boxes are checked for assessment;
and the date is altered and time spent is cut off and illegible.
*Id.* at 35.  The List has a "z" line through two boxes for
medical decision making, there are checked boxes and entries for
diagnoses, the date is altered, and time spent is illegible.
*Id.* at 36.  The Council concludes that the record contains
sufficient documentation to support the service billed at the
CPT code 99307 level.  The QIC's determination of non-coverage
is reversed.

191.  ***Beneficiary D.S.: DOS 03/18/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
35.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C10.  The Note chief
complaint states no complaint and seen for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR; boxes for medical decision making are unchecked; and the
choice for decision making complexity is not circled.  Exh.
6(1), at 46.  The Assessment has a "z" line through two boxes
for decision making, chief complaint is no complaint and LTC
resident, there are checked boxes for the assessment, and time
spent is 20.  *Id.* at 48.  The List contains a "z" line through
two boxes for decision making, checked boxes for diagnoses, and
time spent is 20.  *Id.* at 49.  The record contains insufficient

documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

192. **Beneficiary D.S.: DOS 04/09/13.** The QIC denied coverage because it agreed with the prior downcode. Exh. 8, at 35. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C10. The Note date is altered; chief complaint states no complaint and patient seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and medical record reviewed; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled. Exh. 6(1), at 65. The Assessment has a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, there are checked boxes for the assessment, and time spent is altered and could be either 20 or 30. *Id.* at 67. The List contains a "z" line through two boxes for decision making, checked boxes for diagnoses, and time spent is 20. *Id.* at 68. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

193. **Beneficiary D.S.: DOS 05/09/13.** The QIC denied coverage because the need for visit frequency was not indicated. Exh. 8, at 35. We agree that the appellant has not shown that it was medically reasonable and necessary to perform care plan review on a stable beneficiary more frequently than the minimum required. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C10. The Note chief complaint states no new complaint and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and record review; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled. Exh. 6(1), at 83. The Assessment has a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, there are checked boxes for the assessment, and time spent is 20. *Id.* at 85. The List contains a "z" line through two boxes for decision making, checked boxes for diagnoses, and time spent is 20. *Id.* at 86. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

194. **Beneficiary D.S.: DOS 06/06/13.** The QIC issued a partially favorable decision, allowing the services at a

"downcode" 99307.  Exh. 8, at 35.  The appellant argues that the
service was a CPR billed based on CMS instructions.  Exh. MAC-
1E, at C10.  The Note chief complaint indicates no complaint and
see for CPR; physical examination contains checkmarks and
notations; plan is see CPR, discuss with staff, and records
reviewed; there is a "z" line through two boxes for medical
decision making; and the decision making complexity is not
circled.  Exh. 6(1), at 95.  The Assessment contains a "z" line
through two boxes for decision making, chief complaint is no
complaint, the form contains checkmarks for assessment, and time
spent is 20.  *Id.* at 97.  The List contains unchecked boxes for
decision making, checked boxes for diagnoses, the date is
altered, and time spent is 20.  *Id.* at 98.  The record contains
insufficient documentation to support the service billed as CPT
code 99310, and the Council agrees with the QIC's determination.

195. ***Beneficiary M.T.: DOS 03/18/13.***  The QIC denied coverage
because it agreed with the prior downcode.  Exh. 8, at 35.  The
appellant argues that the service was a CPR billed based on CMS
instructions.  Exh. MAC-1E, at C10.  The Note chief complaint
states no complaint, seen for CPR, discuss with staff, and
record reviewed; there are checkmarks and notations for physical
examination; plan is see CPR; boxes for medical decision making
are unchecked; and the choice for decision making complexity is
not circled.  Exh. 6(1), at 114.  The Assessment has a "z" line
through two boxes for decision making, chief complaint is no
complaint and LTC resident, there are checked boxes for the
assessment, and time spent is 20.  *Id.* at 116.  The List
contains a "z" line through two boxes for decision making,
checked boxes and entries for diagnoses, and time spent is 20.
*Id.* at 117.  The record contains insufficient documentation to
support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

196. ***Beneficiary M.T.: DOS 04/09/13.***  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
36.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C10.  The Note chief
complaint states patient seen for CPR and no complaint; there
are checkmarks and notations for physical examination; plan is
see CPR, discuss with staff, and medical record reviewed; two
boxes for medical decision making are checked; and the choice
for decision making complexity is not circled.  Exh. 6(1), at
133.  The Assessment has a "z" line through two boxes for
decision making, chief complaint is no complaint and LTC

resident, there are checked boxes for the assessment, and time spent is 20. *Id.* at 135. The List contains a "z" line through two boxes for decision making, checked boxes for diagnoses, and time spent is 20. *Id.* at 136. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

197. ***Beneficiary A.T.: DOS 04/18/13.*** The QIC denied coverage because it agreed with the prior downcode. Exh. 8, at 36. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C10. The Note chief complaint states no complaint and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and medical record reviewed; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled. Exh. 6(1), at 152. The Assessment has a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, there are checked boxes for the assessment, and time spent is illegible. *Id.* at 154. The List contains a "z" line through two boxes for decision making, checked boxes for diagnoses, and the date and time spent are illegible. *Id.* at 155. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

198. ***Beneficiary A.T.: DOS 05/11/13.*** The QIC denied coverage because it agreed with the prior downcode. Exh. 8, at 36. The appellant argues that the service was a CPR billed based on CMS instructions. Exh. MAC-1E, at C10. The Note chief complaint states no complaint, (illegible), and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and record reviewed; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled. Exh. 6(1), at 171. The Assessment has a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, there are checked boxes for the assessment, and time spent is 20. *Id.* at 173. The List contains a "z" line through two boxes for decision making, checked boxes and an altered entry for diagnoses, and time spent is 20. *Id.* at 174. The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

199.  **Beneficiary D.U.: DOS 03/10/13**.  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 36.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at
C10.  The Note chief complaint states no new complaint, what
appears to be no decline, and seen for CPR; there are checkmarks
and notations for physical examination; plan is see CPR and
discuss with staff; there is a "z" line through two boxes for
medical decision making; and the medium decision making
complexity is partially circled and shows signs of alteration.
Exh. 6(1), at 189.  The Assessment contains a "z" line through
two boxes for decision making; chief complaint is no complaint
and LTC resident; boxes are checked for assessment; and date and
time spent entries are cut off.  Id. at 191.  The List has a "z"
line through two boxes for medical decision making, there are
checked boxes and entries for diagnoses, and time spent is 20.
Id. at 192.  The Council concludes that the record contains
sufficient documentation to support the service billed at the
CPT code 99307 level.  The QIC's determination of non-coverage
is reversed.

200.  **Beneficiary D.U.: DOS 04/18/13**.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
36.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C10.  The Note chief
complaint states no complaint, what appears to be no diarrhea,
and seen for CPR; there are checkmarks and notations for
physical examination; plan is see CPR, record review, and
discuss with staff; boxes for medical decision making are
unchecked; and the choice for decision making complexity is not
circled.  Exh. 6(1), at 201.  The Assessment has a "z" line
through two boxes for decision making, chief complaint is no
complaint and LTC resident, there are checked boxes for the
assessment, and time spent is 20.  Id. at 203.  The List
contains a "z" line through two boxes for decision making,
checked boxes and entries for diagnoses, and time spent appears
to be 20.  Id. at 204.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

201.  **Beneficiary D.U.: DOS 06/28/13**.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
36.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C10.  The Note chief

complaint states loose stool (illegible), a second illegible entry, and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and record review; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled. Exh. 6(1), at 220.  The Assessment has a "z" line through two boxes for decision making, chief complaint is LTC resident, there are checked boxes for the assessment, and time spent is 20.  *Id*. at 222.  The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses, and time spent is 20.  *Id*. at 223.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

202.  ***Beneficiary V.W.: DOS 03/14/13***.  The QIC denied coverage because the documentation indicated a CPR and no face to face encounter.  Exh. 8, at 36.  The appellant argues that the service was a CPR billed based on CMS instructions and that the service required a face to face encounter.  Exh. MAC-1E, at C11.  The Note chief complaint states no new complaint and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR and discuss with staff; boxes for medical decision making are unchecked; and the decision making complexity is not circled.  Exh. 6(1), at 238.  The Assessment contains unchecked boxes for decision making, chief complaint is no complaint and LTC resident, boxes are checked for assessment, and time spent is 20.  *Id*. at 240.  The List has a "z" line through two boxes for decision making, there are checked boxes for diagnoses, and time spent is 20.  *Id*. at 241.  The Council concludes that the record contains sufficient documentation to support the service billed at the CPT code 99307 level.  The QIC's determination of non-coverage is reversed.

203.  ***Beneficiary V.W.: DOS 04/07/13***.  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 36.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C11.  The Note chief complaint states no complaint and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and record review; there is a "z" line through two boxes for medical decision making; and the choice for decision making complexity is not circled.  Exh. 6(1), at 257.  The Assessment has a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, there are checked boxes for the assessment, and time

spent is altered and is either 20 or 30.  *Id.* at 259.  The List
contains a "z" line through two boxes for decision making,
checked boxes for diagnoses, and time spent is 20.  *Id.* at 260.
The record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

204.  ***Beneficiary V.W.: DOS 05/12/13***.  The QIC denied
coverage because the need for visit frequency was not indicated.
Exh. 8, at 36.  We agree that the appellant has not shown that
it was medically reasonable and necessary to perform care plan
review on a stable beneficiary more frequently than the minimum
required.  The appellant argues that the service was a CPR
billed based on CMS instructions.  Exh. MAC-1E, at C11.  The
Note chief complaint states no new complaint, seen for CPR, and
either no or rule out pain; there are checkmarks and notations
for physical examination; plan is see CPR, discuss with staff,
and record review; boxes for medical decision making are
unchecked; and the choice for decision making complexity is not
circled.  Exh. 6(1), at 276.  The Assessment has a "z" line
through two boxes for decision making, chief complaint is no
complaint and LTC resident, there are checked boxes for the
assessment, and time spent is 20.  *Id.* at 278.  The List
contains a "z" line through two boxes for decision making,
checked boxes for diagnoses, and time spent is 20.  *Id.* at 279.
The record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

205.  ***Beneficiary V.W.: DOS 06/29/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
36.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C11.  The Note chief
complaint states no complaint and seen for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR, discuss with staff, and record review; there is a "z" line
through two boxes for medical decision making; and the choice
for decision making complexity is not circled.  Exh. 6(1), at
295.  The Assessment contains a check in one box for decision
making, chief complaint is LTC resident, there are checked boxes
for the assessment, and time spent is 20.  *Id.* at 297.  The List
contains a check in one box for decision making, checked boxes
for diagnoses, and time spent is 20.  *Id.* at 298.  The record
contains insufficient documentation to support the service

113

billed as CPT code 99310, and the Council agrees with the QIC's determination.

206.   ***Beneficiary W.W.: DOS 03/07/13***.   The QIC denied coverage because the documentation indicated a CPR and no face to face encounter.  Exh. 8, at 36.   The appellant argues that the service was a CPR billed based on CMS instructions and that the service required a face to .face encounter.  Exh. MAC-1E, at C11.   The Note date appears to be altered; chief complaint states no new complaint, no pain, and patient seen for CPR; there are checkmarks and notations for physical examination with vital signs stable notation; plan is see CPR and discuss with staff; two boxes for medical decision making are checked; and the decision making complexity is not circled.  Exh. 6(1), at 313.   The Assessment contains a "z" line through two boxes for decision making; chief complaint is no complaint, a deleted entry, and LTC resident; boxes are checked for assessment; and time spent is 20.  *Id.* at 315.   The List has a "z" line through two boxes for medical decision making, there are checked boxes and entries for diagnoses, and time spent is 20.  *Id.* at 316.  The Council concludes that the record contains sufficient documentation to support the service billed at the CPT code 99307 level.   The QIC's determination of non-coverage is reversed.

207.   ***Beneficiary W.W.: DOS 04/17/13***.   The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 36.   The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C11.   The Note chief complaint states no complaint, patient seen for CPR, and record reviewed; there are checkmarks and notations for physical examination; plan is see CPR; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled.  Exh. 6(1), at 325.   The Assessment contains a "z" line through two boxes for decision making, chief complaint is no new complaint and LTC resident, there are checked boxes for the assessment, the date is altered, and time spent is 20.  *Id.* at 327.   The List contains a "z" line through two boxes for decision making, checked boxes and entries for diagnoses, and time spent is 30.  *Id.* at 328.   The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

208. ***Beneficiary W.W.: DOS 05/09/13***.   The QIC denied coverage because the need for visit frequency was not indicated.

114

Exh. 8, at 37.  We agree that the appellant has not shown that
it was medically reasonable and necessary to perform care plan
review on a stable beneficiary more frequently than the minimum
required.  The appellant argues that the service was a CPR
billed based on CMS instructions.  Exh. MAC-1E, at C11.  The
Note chief complaint states patient seen for CPR and no new
complaint; there are checkmarks and notations for physical
examination; plan is see CPR, record reviewed, and discuss with
staff; boxes for medical decision making are unchecked; and the
choice for decision making complexity is not circled.  Exh.
6(1), at 344.  The Assessment has a "z" line through two boxes
for decision making, chief complaint is no complaint and LTC
resident, there are checked boxes for the assessment, and time
spent is 20.  *Id.* at 346.  The List contains a "z" line through
two boxes for decision making, checked boxes and entries for
diagnoses, and time spent is 20.  *Id.* at 347.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

209. ***Beneficiary W.W.: DOS 06/26/13.***  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
37.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C11.  The Note chief
complaint states no complaint, status post skin (illegible),
doing well, and seen for CPR; there are checkmarks and notations
for physical examination; plan is see CPR, discuss with staff,
and record reviewed; boxes for medical decision making are
unchecked; and the medium choice for decision making complexity
is circled and crossed out.  Exh. 6(1), at 363.  The Assessment
contains a "z" line through two boxes for decision making, chief
complaint is LTC resident and no new complaint, there are
checked boxes for the assessment, and time spent appears to be
20.  *Id.* at 365.  The List contains a "z" line through two boxes
for decision making, checked boxes and entries for diagnoses,
and there are no signature, date, or time spent entries.  *Id.* at
366.  The record contains insufficient documentation to support
the service billed as CPT code 99310, and the Council agrees
with the QIC's determination.

210. ***Beneficiary O.W.: DOS 03/10/13.***  The QIC denied
coverage because the documentation indicated a CPR and no face
to face encounter.  Exh. 8, at 37.  The appellant argues that
the service was a CPR billed based on CMS instructions and that
the service required a face to face encounter.  Exh. MAC-1E, at

C11.  The Note chief complaint states no complaint and patient
seen for CPR; there are checkmarks and notations for physical
examination; plan is see CPR and discuss with staff; two boxes
for medical decision making are checked; and the medium decision
making complexity is circled and partially erased (altered).
Exh. 6(1), at 381.  The Assessment contains a "z" line through
two boxes for decision making; chief complaint is no complaint
and LTC resident; boxes are checked for assessment; and time
spent is cut off and illegible.  *Id.* at 383.  The List has a "z"
line through two boxes for medical decision making, there are
checked boxes and entries for diagnoses, and time spent is 20.
*Id.* at 384.  The Council concludes that the record contains
sufficient documentation to support the service billed at the
CPT code 99307 level.  The QIC's determination of non-coverage
is reversed.

211.  ***Beneficiary O.W.: DOS 04/18/13***.  The QIC denied coverage
because it agreed with the prior downcode.  Exh. 8, at 37.  The
appellant argues that the service was a CPR billed based on CMS
instructions.  Exh. MAC-1E, at C11.  The Note chief complaint
states no complaint, (illegible), and seen for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR, record reviewed, and discuss with staff; boxes for medical
decision making are unchecked; and the choice for decision
making complexity is not circled.  Exh. 6(1), at 393.  The
Assessment contains a "z" line through two boxes for decision
making, chief complaint is no complaint and LTC resident, there
are checked boxes for the assessment, and time spent is 20.  *Id.*
at 395.  The List contains a "z" line through two boxes for
decision making, checked boxes and entries for diagnoses, and
the date and time spent entries are illegible.  *Id.* at 396.  The
record contains insufficient documentation to support the
service billed as CPT code 99310, and the Council agrees with
the QIC's determination.

212.  ***Beneficiary O.W.: DOS 06/28/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
37.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C11.  The Note chief
complaint states no complaint, (illegible), and seen for CPR;
there are checkmarks and notations for physical examination;
plan is see CPR, discuss with staff, and record reviewed; there
is a "z" line through two boxes for medical decision making; and
the choice for decision making complexity is not circled.  Exh.
6(1), at 412.  The Assessment contains a "z" line through two

boxes for decision making, chief complaint is no complaint and
LTC resident, there are checked boxes for the assessment, and
time spent is 20.  *Id.* at 414.  The List contains a "z" line
through two boxes for decision making, checked boxes and entries
for diagnoses, and time spent is 20.  *Id.* at 415.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

213.  ***Beneficiary M.W.: DOS 04/08/13.***  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
37.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C11.  The Note chief
complaint states no complaint, (illegible), no GI bleed, and
seen for CPR; there are checkmarks and notations for physical
examination; plan is see CPR, discuss with staff, and medical
record reviewed; boxes for medical decision making are
unchecked; and the choice for decision making complexity is not
circled.  Exh. 6(1), at 424.  The Assessment contains a "z" line
through two boxes for decision making; chief complaint is no
complaint and four illegible entries, there are checked boxes
for the assessment, and time spent is 20.  *Id.* at 426.  The List
contains a "z" line through two boxes for decision making,
checked boxes and entries for diagnoses, the date is illegible,
and time spent appears to be 20.  *Id.* at 427.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

214.  ***Beneficiary M.W.: DOS 06/13/13***.  The QIC issued a
partially favorable decision, allowing the services at a
"downcode" 99307.  Exh. 8, at 37.  The appellant argues that the
service was a CPR billed based on CMS instructions.  Exh. MAC-
1E, at C11.  The Note chief complaint indicates no complaint and
(illegible); physical examination contains checkmarks and
notations; plan is see CPR, discuss with staff, and records
reviewed; boxes for medical decision making are unchecked; and
the decision making complexity is not circled.  Exh. 6(1), at
442.  The Assessment contains a "z" line through two boxes for
decision making, chief complaint is LTC resident, the form
contains checkmarks for assessment, and time spent is 20.  *Id.*
at 444.  The List contains a "z" line through two boxes for
decision making, checked boxes and entries for diagnoses, and
time spent is 20.  *Id.* at 445.  The record contains insufficient

117

documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

215.  **Beneficiary D.W.: DOS 06/06/13**.  The QIC issued a partially favorable decision, allowing the services at a "downcode" 99307.  Exh. 8, at 37.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C11.  The Note chief complaint indicates no complaint and back pain controlled; physical examination contains checkmarks and notations; plan is see CPR, discuss with staff, and records reviewed; there is a "z" line through two boxes for medical decision making; and the medium decision making complexity is circled.  Exh. 6(1), at 461.  The Assessment contains a "z" line through two boxes for decision making; chief complaint is complains of back pain controlled with pain medication, and LTC resident; the form contains checkmarks for assessment, and time spent is 20.  *Id.* at 463.  The List contains a "z" line through boxes for decision making, there are no checked boxes for diagnoses and one entry (chronic back pain), and time spent is 20.  *Id.* at 464.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

216.  **Beneficiary T.W.: DOS 03/14/13**.  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 37.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C11.  The Note chief complaint states no new complaint, seen for CPR, and wound healed; there are checkmarks and notations for physical examination; plan is see CPR and discuss with staff; there is a "z" line through two boxes for medical decision making; and the medium choice for decision making complexity is circled and erased (altered).  Exh. 6(1), at 474.  The Assessment contains an altered patient name and "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, there are checked boxes and an entry (skin breakdown on lower extremity "healed now" for the assessment), and time spent is 20.  *Id.* at 476.  The List contains a "z" line through two boxes for decision making, checked boxes for diagnoses, and time spent is 20.  *Id.* at 477.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

217.  **Beneficiary T.W.: DOS 04/07/13**.  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at

37.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C11.  The Note date is altered; chief complaint states no new complaint, (illegible), and seen for CPR; there are checkmarks and notations for physical examination; plan is see CPR, discuss with staff, and medical record reviewed; boxes for medical decision making are unchecked; and the choice for decision making complexity is not circled.  Exh. 6(1), at 486.  The Assessment contains a "z" line through two boxes for decision making, chief complaint is no complaint and LTC resident, there are checked boxes for the assessment, the date is altered, and time spent is 20.  *Id.* at 488.  The List contains a "z" line through two boxes for decision making, checked boxes for diagnoses, an altered date, and time spent is illegible.  *Id.* at 489.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

218.  ***Beneficiary T.W.: DOS 05/12/13***.  The QIC issued a partially favorable decision, allowing the services at a "downcode" 99307.  Exh. 8, at 37.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C11.  The Note chief complaint indicates no new complaint, lower extremity (illegible), and pain control; physical examination contains checkmarks and notations; plan is see CPR, discuss with staff, and record reviewed; boxes for medical decision making are unchecked; and the decision making complexity is not circled.  Exh. 6(2), at 505.  The Assessment contains a "z" line primarily through one box for decision making, chief complaint is no complaint and right lower extremity pain (illegible), the form contains checkmarks for assessment, and time spent is 20.  *Id.* at 507.  The List contains a "z" line through two boxes for decision making, there are checked boxes and an entry (lower extremity wound) for diagnoses, and time spent is 20.  *Id.* at 508.  The record contains insufficient documentation to support the service billed as CPT code 99310, and the Council agrees with the QIC's determination.

219.  ***Beneficiary T.W.: DOS 06/28/13***.  The QIC denied coverage because it agreed with the prior downcode.  Exh. 8, at 37.  The appellant argues that the service was a CPR billed based on CMS instructions.  Exh. MAC-1E, at C11.  The Note date appears altered; chief complaint states no complaint and seen for CPR; there are checkmarks and notations for physical

examination; plan is see CPR, discuss with staff, and record
reviewed; boxes for medical decision making are unchecked; and
the choice for decision making complexity is not circled.  Exh.
6(2), at 524.  The Assessment contains a "z" line through two
boxes for decision making, chief complaint is LTC, there are
checked boxes and one altered entry for the assessment, and time
spent is 20.  *Id.* at 526.  The List contains a "z" line through
two boxes for decision making, checked boxes for diagnoses, and
time spent is 20.  *Id.* at 527.  The record contains insufficient
documentation to support the service billed as CPT code 99310,
and the Council agrees with the QIC's determination.

220.  ***Beneficiary G.Y.: DOS 03/10/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
37.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C11.  The Note chief
complaint states no complaint, "crying spell (illegible)," and
seen for CPR; there are checkmarks and notations for physical
examination; plan is see CPR and discuss with staff; two boxes
for medical decision making are checked; and the medium choice
for decision making complexity appears to have been circled and
partially erased (altered).  Exh. 6(2), at 543.  The Assessment
contains a "z" line through two boxes for decision making, chief
complaint is no complaint and LTC resident, there are checked
boxes and one altered entry for the assessment, and time spent
is 20.  *Id.* at 545.  The List contains a "z" line through two
boxes for decision making, checked boxes and entries for
diagnoses, and time spent is 20.  *Id.* at 546.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

221.  ***Beneficiary G.Y.: DOS 04/18/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
37.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C11.  The Note chief
complaint states no complaint, what appears to be pain and
medicine, and seen for CPR; there are checkmarks and notations
for physical examination; plan is see CPR, record reviewed, and
discuss with staff; boxes for medical decision making are
unchecked; and the choice for decision making complexity is not
circled.  Exh. 6(2), at 562.  The Assessment contains a "z" line
through two boxes for decision making, chief complaint is no
complaint and physical and mental decline, there are checked
boxes for the assessment, and date and time entries are

illegible.  *Id.* at 564.  The List contains a "z" line through
two boxes for decision making, checked boxes and entries for
diagnoses, and time spent is 20.  *Id.* at 565.  The record
contains insufficient documentation to support the service
billed as CPT code 99310, and the Council agrees with the QIC's
determination.

222.  ***Beneficiary G.Y.: DOS 05/11/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
38.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C11.  The Note chief
complaint states no complaint, seen for CPR, and negative for
weight loss; there are checkmarks and notations for physical
examination; plan is see CPR, discuss with staff, and record
reviewed; boxes for medical decision making are unchecked; and
the choice for decision making complexity is not circled.  Exh.
6(2), at 581.  The Assessment contains a "z" line through two
boxes for decision making, chief complaint is no complaint and
physical and mental decline, there are checked boxes for the
assessment, and time spent is 20.  *Id.* at 583.  The List
contains a "z" line through two boxes for decision making,
checked boxes and entries for diagnoses, and time spent is 20.
*Id.* at 584.  The record contains insufficient documentation to
support the service billed as CPT code 99310, and the Council
agrees with the QIC's determination.

223.  ***Beneficiary G.Y.: DOS 06/10/13***.  The QIC denied
coverage because it agreed with the prior downcode.  Exh. 8, at
38.  The appellant argues that the service was a CPR billed
based on CMS instructions.  Exh. MAC-1E, at C11.  The Note chief
complaint states no complaint and seen for CPR; there are
checkmarks and notations for physical examination; plan is see
CPR, record review, and discuss with staff; there is a "z" line
through one box for medical decision making; and the choice for
decision making complexity is not circled.  Exh. 6(2), at 600.
The Assessment contains a "z" line through two boxes for
decision making, chief complaint is no complaint, there are
checked boxes for the assessment, and time spent appears to be
20.  *Id.* at 602.  The List contains a "z" line through two boxes
for decision making, checked boxes and entries for diagnoses,
and time spent is 20.  *Id.* at 603.  The record contains
insufficient documentation to support the service billed as CPT
code 99310, and the Council agrees with the QIC's determination.

**B.   *LIMITATION ON LIABILITY***

Under section 1879(a) of the Act, a beneficiary or provider may
be liable for the cost of an item or service that is not
"reasonable and necessary" based upon prior knowledge of the
non-coverage of services.   *See also* 42 C.F.R. §§ 411.400,
411.404, 411.406; MCPM Ch. 30, §§ 10-40.   A beneficiary is
deemed to have knowledge of non-coverage based upon prior
written notice from the provider containing specific
information.   42 C.F.R. § 411.408(f).   A provider has actual or
constructive knowledge of non-coverage based upon "[i]ts receipt
of CMS notices, including manual issuances, bulletins, or other
written guides or directives from [Medicare contractors]" and
knowledge of acceptable practice standards in the local medical
community.   42 C.F.R. §§ 411.406(e)(1),(3).

The QIC found that the appellant liable for the non-covered
services.   Exh. 8, at 39.   The appellant does not contest
liability in the request for ALJ hearing.   Exh. 7, at 3; *id.* at
42-43, 44-49, 50-61, 62-284.   The Council thus affirms without
further discussion that the appellant is liable for non-covered
charges.

**DECISION**

It is the decision of the Medicare Appeals Council that the
QIC's reconsideration, dated June 5, 2014, is affirmed in part,
reversed in part, and modified in part, as detailed in the
individual beneficiary determinations above.   The appellant is
liable for the non-covered services.

MEDICARE APPEALS COUNCIL


Clausen J. Krzywicki
Administrative Appeals Judge


Eric J. Lester
Appeals Officer

NOV 17 2016

Date:

122

**BENEFICIARY LIST**
**GENERAL MEDICINE**
**ALJ Appeal 1-2744009931**
**Docket E-15-73**

| | Bene | HICN | Dates of Service |
|---|---|---|---|
| 1 | E.A. | XXX-XX-9106A | 03/07/13, 05/11/13 |
| 2 | R.A | XXX-XX-0032A | 03/07/13, 05/09/13 |
| 3 | J.A.1 | XXX-XX-6064A | 03/07/13, 04/17/13 |
| 4 | L.A. | XXX-XX-8643A | 03/14/13, 05/12/13, 06/29/13 |
| 5 | J.A.2 | XXX-XX-4728B | 03/10/13, 05/11/13, 06/10/13 |
| 6 | F.B. | XXX-XX-2977A | 05/11/13, 06/28/13 |
| 7 | P.B. | XXX-XX-1242A | 03/07/13, 05/11/13 |
| 8 | J.B. | XXX-XX-4189A | 03/07/13, 05/11/13, 06/26/13 |
| 9 | G.B. | XXX-XX-1602A | 05/11/13 |
| 10 | L.B. | XXX-XX-5542A | 05/11/13, 06/10/13 |
| 11 | M.B. | XXX-XX-1665A | 03/07/13, 05/11/13, 06/26/13 |
| 12 | H.B. | XXX-XX-8381D | 04/09/13, 05/11/13 |
| 13 | C.C. | XXX-XX-1831A | 03/18/13, 05/09/13, 06/06/13 |
| 14 | M.C. | XXX-XX-0401D | 02/12/13, 03/10/13, 05/09/13, 06/10/13 |
| 15 | E.C. | XXX-XX-8904A | 06/29/13 |
| 16 | L.C. | XXX-XX-2510A | 03/12/13, 04/08/13, 06/22/13 |
| 17 | N.C. | XXX-XX-1481A | 03/12/13, 04/08/13, 06/29/13 |
| 18 | W.C. | XXX-XX-2503A | 03/12/13, 04/08/13, 06/29/13 |
| 19 | V.C. | XXX-XX-8972A | 05/09/13 |
| 20 | D.C. | XXX-XX-4012A | 04/08/13 |
| 21 | A.D. | XXX-XX-1374A | 03/07/13, 05/11/13, 06/10/13 |
| 22 | J.D.1 | XXX-XX-6998D | 03/07/13, 05/09/13 |
| 23 | J.D.2 | XXX-XX-4171A | 03/07/13, 05/11/13 |
| 24 | D.E. | XXX-XX-9245A | 05/12/13, 06/29/13 |
| 25 | O.F. | XXX-XX-5419A | 03/10/13, 05/11/13, 06/13/13 |
| 26 | M.F.1 | XXX-XX-9168D4 | 04/08/13, 06/29/13 |
| 27 | E.F. | XXX-XX-6793A | 03/18/13, 06/06/13 |
| 28 | M.F.2 | XXX-XX-4392M | 03/18/13, 04/09/13, 05/09/13, 06/06/13 |
| 29 | D.F. | XXX-XX-1117D | 03/14/13, 05/12/13, 06/29/13 |
| 30 | M.G. | XXX-XX-5297A | 03/07/13, 06/10/13 |
| 31 | H.G. | XXX-XX-8690D6 | 03/07/13, 04/17/13, 05/11/13, 06/26/13 |
| 32 | W.G. | XXX-XX-0560A | 03/10/13, 04/18/13, 06/10/13 |
| 33 | V.G. | XXX-XX-9853A | 03/18/13, 04/09/13, 05/12/13, 06/06/13 |
| 34 | P.G. | XXX-XX-7993A | 04/09/13 |
| 35 | C.H. | XXX-XX-8669A | 03/14/13, 04/07/13, 05/12/13, 06/28/13 |
| 36 | S.H. | XXX-XX-8669B | 03/14/13, 04/07/13, 05/12/13, 06/28/13 |
| 37 | L.H. | XXX-XX-0369D | 03/14/13, 04/07/13 |
| 38 | M.H.1 | XXX-XX-4280D6 | 03/14/13, 04/09/13, 05/12/13, 06/29/13 |

123

<u>BENEFICIARY LIST (cont.)</u>
GENERAL MEDICINE
ALJ Appeal 1-2744009931
Docket E-15-73

| | **Bene** | **HICN** | **Dates of Service** |
|---|---|---|---|
| 39 | D.H. | XXX-XX-7168D | 04/08/13, 06/29/13 |
| 40 | M.H.2 | XXX-XX-3234A | 04/08/13, 06/13/13 |
| 41 | `A.J. | XXX-XX-5612D | 03/14/13, 04/09/13, 05/12/13 |
| 42 | D.J. | XXX-XX-2618C1 | 03/12/13, 04/08/13, 06/13/13 |
| 43 | M.J. | XXX-XX-8190A | 03/12/13, 04/08/13, 06/22/13 |
| 44 | J.J. | XXX-XX-7487A | 03/18/13, 04/09/13, 06/06/13 |
| 45 | V.K. | XXX-XX-5153D | 03/14/13, 04/07/13, 05/12/13 |
| 46 | N.K. | XXX-XX-3091A | 04/09/13, 05/11/13, 06/28/13 |
| 47 | M.L. | XXX-XX-6219D | 03/12/13, 04/08/13, 06/22/13 |
| 48 | N.L.1 | XXX-XX-9050D7 | 03/18/13, 04/09/13, 05/09/13, 06/06/13, 06/24/13 |
| 49 | S.L. | XXX-XX-5282D | 03/14/13, 04/09/13, 05/12/13 |
| 50 | A.L. | XXX-XX-0288C1 | 04/09/13, 05/12/13 |
| 51 | N.L.2 | XXX-XX-3868A | 04/09/13, 05/12/13, 06/06/13 |
| 52 | E.M. | XXX-XX-9949A | 05/12/13 |
| 53 | B.M. | XXX-XX-0924A | 03/12/13, 04/08/13, 06/29/13 |
| 54 | H.M. | XXX-XX-0445A | 04/08/13 |
| 55 | D.M. | XXX-XX-7275A | 03/10/13, 05/09/13, 06/13/13 |
| 56 | V.M. | XXX-XX-2918A | 03/07/13, 04/17/13, 05/11/13, 06/26/13 |
| 57 | J.M. | XXX-XX-6128A | 04/08/13 |
| 58 | G.M. | XXX-XX-6297A | 03/14/13, 04/09/13, 05/12/13, 06/29/13 |
| 59 | E.N. | XXX-XX-4834D | 03/10/13 |
| 60 | J.N. | XXX-XX-2601A | 03/10/13, 04/18/13, 05/11/13 |
| 61 | L.N.1 | XXX-XX-3541D | 04/18/13, 05/11/13, 06/13/13 |
| 62 | L.N.2 | XXX-XX-8100D | 03/10/13, 04/18/13, 05/09/13 |
| 63 | R.P. | XXX-XX-0640A | 04/08/13, 06/22/13 |
| 64 | F.P. | XXX-XX-5499D | 04/08/13, 06/29/13 |
| 65 | J.P. | XXX-XX-9530D | 05/09/13, 06/28/13 |
| 66 | B.P. | XXX-XX-0017D | 04/09/13, 05/12/13, 06/06/13 |
| 67 | M.R.1 | XXX-XX-7278A | 03/07/13, 04/17/13, 05/11/13, 06/10/13 |
| 68 | M.R.2 | XXX-XX-2361D | 03/12/13, 04/08/13, 06/29/13 |
| 69 | D.R. | XXX-XX-6197A | 03/10/13, 04/18/13, 05/11/13, 06/10/13 |
| 70 | A.S. | XXX-XX-9547A | 03/10/13 |
| 71 | C.S. | XXX-XX-4244D | 03/12/13, 04/08/13, 06/29/13 |
| 72 | E.S. | XXX-XX-0357D | 03/18/13, 04/09/13, 05/12/13, 06/06/13 |
| 73 | D.S. | XXX-XX-3815D | 03/18/13, 04/09/13, 05/09/13, 06/06/13 |
| 74 | M.T. | XXX-XX-3347D2 | 03/18/13, 04/09/13 |
| 75 | A.T. | XXX-XX-2339D | 04/18/13, 05/11/13 |

BENEFICIARY LIST (cont.)
GENERAL MEDICINE
ALJ Appeal 1-2744009931
Docket E-15-73

| | Bene | HICN | Dates of Service |
|---|------|------|------------------|
| 76 | D.U. | XXX-XX-6244A | 03/10/13, 04/18/13, 06/28/13 |
| 77 | V.W. | XXX-XX-1505D | 03/14/13, 04/07/13, 05/12/13, 06/29/13 |
| 78 | W.W. | XXX-XX-4366A | 03/07/13, 04/17/13, 05/09/13, 06/26/13 |
| 79 | O.W. | XXX-XX-2373A | 03/10/13, 04/18/13, 06/28/13 |
| 80 | M.W. | XXX-XX-5257D6 | 04/08/13, 06/13/13 |
| 81 | D.W. | XXX-XX-1842A | 06/06/13 |
| 82 | T.W. | XXX-XX-0736A | 03/14/13, 04/07/13, 05/12/13, 06/28/13 |
| 83 | G.Y. | XXX-XX-0545A | 03/10/13, 04/18/13, 05/11/13, 06/10/13 |

**EXHIBIT LIST**
**GENERAL MEDICINE**
**ALJ Appeal 1-2744009931**
**Docket E-15-73**

| EXHIBIT NUMBER | DESCRIPTION | PAGE RANGE |
|---|---|---|
| MAC-7 | Correspondence, dated April 26, 2016, from Appellant to Medicare Appeals Council concerning Appellant's supplemental brief on additional medical records and enclosed compact disc | 4 |
| MAC-6 | Notice of Order and Scheduling Order of Medicare Appeals Council, dated March 30, 2016 | 7 |
| MAC-5 | Facsimile from Appellant to Medicare Appeals Council, dated October 9, 2015, with enclosures | 9 |
| MAC-4 | Correspondence, dated September 17, 2015, from Medicare Appeals Council to Appellant amending prior correspondence | 3 |
| MAC-3 | Correspondence, dated September 4, 2015, from Medicare Appeals Council to Appellant concerning perfecting escalation request | 2 |
| MAC-2 | Correspondence, dated September 4, 2015, from Medicare Appeals Council to Appellant acknowledging receipt of escalation request | 1 |
| MAC-1 | Appellant's Request for Review of Administrative Law Judge (ALJ) Medicare Decision/Dismissal, with attachments, dated February 26, 2015 | 162 2 side |

(Continued on next page)

EXHIBIT LIST (cont.)
GENERAL MEDICINE
ALJ Appeal 1-2744009931
Docket E-15-73

| EXHIBIT NUMBER | DESCRIPTION | PAGE RANGE |
|---|---|---|
| 1 | QIC Procedural Files, Beneficiaries A-C | 1-738 |
| 2 | QIC Procedural Files, Beneficiaries C-G | 1-600 |
| 3 | QIC Procedural Files, Beneficiaries G-L | 1-715 |
| 4 | QIC Procedural Files, Beneficiaries L-N | 1-572 |
| 5 | QIC Procedural Files, Beneficiaries N-S | 1-632 |
| 6 | QIC Procedural Files, Beneficiaries S-Z | 1-1060 |
| 7 | Request for Medicare Hearing ALJ Appeal No. 1-2744009931, QIC Appeal No. 1-2306970649; Appellant's Escalation Request | 1-284 |
| 8 | ALJ Acknowledgment of Escalation Request, ALJ Appeal No. 1-2744009931, QIC Appeal No. 1-2306970649 | 1-82 |

6

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD

DECISION OF MEDICARE APPEALS COUNCIL
Docket Number:  M-12-655
(Formerly M-10-1933)

| | |
|---|---|
| In the case of | Claim for |
| General Medicine | Supplementary Medical Insurance Benefits (Part B) |
| (Appellant) | |
| E.A. and 180 others | Multiple |
| (Beneficiaries) | (HIC Numbers) |
| Palmetto, GBA | 1-705153517 (Formerly 1-569697542) |
| (Contractor) | (ALJ Appeal Number) |

The Administrative Law Judge (ALJ) issued a decision partially
favorable to the appellant, dated November 18, 2011.  Following
a November 24, 2010 remand by the Council (Docket M-10-1933),
the ALJ reexamined an extrapolated overpayment assessed against
the appellant involving evaluation and management (E&M) services
provided by the appellant's physicians to resident-beneficiaries
in various nursing facilities between January 4, 2002 and
March 24, 2004.  The ALJ found the underlying sampling
methodology valid; coverage warranted for some claims, either as
originally billed, or at down-coded levels, while denying
coverage for the remainder; the appellant liable for the
associated non-covered costs and ineligible for waiver of
recoupment of the overpayment.  The appellant has asked the
Medicare Appeals Council (Council) to review this action.
Retaining the numbering convention from our earlier
consideration of this case, we enter the appellant's request for
review into the record as Exhibit (Exh.) MAC-3.

The Council reviews an ALJ decision de novo.  42 C.F.R.
§ 405.1108(a).  The Council modifies the ALJ's decision, finding
coverage for a limited number of additional services, deleting

2

three services from the frame, and discussing the overall issues in greater depth.

BACKGROUND

The case history now involves two ALJ decisions.  The Council cites to the first ALJ decision (Appeal Number 1-569697542) as Decision A (Dec. A) and the more recent ALJ decision as Decision (Dec.).  The Council cites its Order of Remand in M-10-1933, in the current record as Exhibit 81, as "Order."

The record is replete with numerous decisions, actions, orders, recalculations, dismissals and remands spanning three stages of review up to, and including, this second review by the Council. The procedural history below should be read in conjunction with that found at pages 1 to 4 of ALJ Decision A, as well as pages 2 to 7 of the Council's Order of Remand (both of which are incorporated by reference here).

On January 2, 2007, AdvanceMed, a Medicare Program Safeguard Contractor (PSC), notified the appellant of its preliminary determination that the appellant had received a Medicare overpayment.  The overpayment stemmed from the PSC's audit of the appellant's previously paid Medicare claims for E&M services provided by various physicians in the appellant's practice group to residents in twelve nursing facilities and billed under HCPCS codes 99302, 99303, 99311, 99312, 99313, and 99316.  The audit utilized a statistical sample of 382 fully or partially paid claims (involving 278 beneficiaries) with dates of service between January 1, 2002, and March 24, 2004.  *See* Master Exh. 10 at 47-45; *see also* Master Exh. 57 at 53-51.

The PSC allowed coverage for sixty-eight of the sampled claims; thirty-five as originally billed and the remaining thirty-three, either as down-coded or paid as subsequent, rather than comprehensive, visits.  Three hundred fourteen claims remained wholly denied.  Of those denied claims, the PSC determined –

- three did not meet the "incident to" policy guidelines, applicable when a Nurse Practitioner provides the service without documentation supporting the physician's participation;

- seventy-three did not contain documentation to show that a service was rendered;

3

  • two hundred thirty-eight [services] were not medically
    necessary.

Master Exh. 10 at 46.

The overpayment for the sampled claims was $16,778.80 which,
after extrapolation to the frame (41,818 claims), resulted in a
$1,836,646.56 overpayment.  *See* Master Exh. 10 at 46-45.

The Medicare contractor formally notified the appellant of the
overpayment on January 3, 2007, after which the appellant
requested a redetermination.  The contractor's redetermination
(April 25, 2007) was partially favorable to the appellant,
reducing the overpayment to $1,836,114.62.  *See* Master Exh. 15
at 1-3; 6-33.  The appellant requested reconsideration by a
Qualified Independent Contractor (QIC).  *See* Master Exh. 17.

On September 13, 2007, the QIC issued its initial, partially
favorable, reconsideration which further reduced the
overpayment.  *See* Master Exh. 18.  On February 8, 2008,
following an ALJ-directed remand, the QIC issued a second
reconsideration, again partially favorable to the appellant.
*See* Master Exh. 23; *see also* Dec. A. at 2.  On July 21, 2009,
pursuant to a second ALJ-directed remand, the QIC issued its
third, and final, reconsideration, again partially favorable to
the appellant.  *See* Master Exh. 49; *see also* Dec. A. at 2.

Following the QIC's third reconsideration, the case was returned
to the ALJ.  By letter dated April 13, 2010, the PSC notified
the ALJ and appellant that it was in the process of
recalculating the overpayment to reflect the coverage findings
and associated overpayment after the QIC's third
reconsideration.  *See* Master Exh. 71 at 1-2.  By letter dated
April 23, 2010, the PSC indicated that the recalculated
overpayment was $1,073,183.00.  *See* Master Exh. 73 at 1-2.

On May 27, 2010, the ALJ conducted a hearing on the validity of
the underlying statistical sample.  Represented by counsel, the
appellant presented testimony from its President, T.P., M.D. and
its statistical expert, M.I., Ph.D.  The PSC was represented by
and offered testimony from its Medical Review Examiner, J.W. and
its statistical expert, D.S., Ph.D.  *See* Dec. A. at 3-4.  (The
Council's summary of these expert statisticians' hearing
testimony is found at pages 4-5 of its Order and incorporated by
reference here.)  Subsequent to the hearing, the appellant
notified the ALJ that, in the event the ALJ invalidated the

4

sampling methodology, it would accept the actual overpayment based on the non-coved costs derived from the sampled claims actually reviewed. *See* Dec. A at 4; *see also* Master Exh. 77.

In the ensuing decision, the ALJ "[a]fter weighing the testimony of the two experts in statistics" found the appellant's expert testimony "more credible." The ALJ determined that the PSC's sample "failed to accurately represent all the services in the universe," particularly those performed at eight (from which there were apparently no claims drawn) of the twenty facilities at which the appellant performed the services identified in the sampled claims. Thus, the ALJ concluded, the appellant had met its burden to prove the sample was not statistically valid. *See* Dec. A at 13-16.

The Centers for Medicare & Medicaid Services (CMS) then urged the Council to take own motion review of Decision A asserting that –

> the appellant's arguments . . . [before the ALJ did]
> not meet the burden imposed [on appellants] by CMS
> Ruling 86-1 and that the ALJ's acceptance of those
> arguments effectively shifted the burden to the PSC to
> prove that its simple random sample was valid. CMS
> argues that the record does not support the ALJ's
> conclusion that the sampling methodology was invalid
> or that the overpayment amount was overstated.
> Rather, the appellant's arguments and, by his
> acceptance of them, the ALJ's reasoning were based
> upon conjecture, rather than empirical evidence. CMS
> maintains that the PSC's sampling design conforms to
> the MPIM [Medicare Program Integrity Manual]
> instructions regarding the definition of the universe,
> frame, sampling units and stratification and provides
> a sufficient estimate of the overpayment.

Exh. MAC-1 at 2; *see also* Order at 6-7.

In response, the appellant asserted that –

> the heterogeneous nature of the universe of claims
> required CMS to consider the use of a stratified
> sample. The appellant maintains that the ALJ neither
> ruled that stratification is always required, nor that
> CMS had the burden of proving the validity of the
> sample. Rather, the appellant asserts, the ALJ simply

5

> determined that the appellant had met its burden of
> producing evidence to show that the sample was invalid
> because stratified sampling was warranted, but not
> considered, and because the results were not
> representative of the universe.  Thus, when CMS failed
> to produce evidence to refute the appellant's
> position, the ALJ decided that the appellant had met
> its burden of proof to show that the sample was not
> valid under generally accepted statistical principles.
> Therefore, the appellant argues, the only burden CMS
> had was to go forward with evidence to meet the
> appellant's evidence.  The appellant asserts that CMS
> failed to meet that burden.  Consequently the ALJ made
> the correct finding of fact, that the sample was
> invalid.

Exh. MAC-2 at 3; *see also* Order at 6-7.

After careful consideration of the parties' arguments in the
context of the applicable authorities, the Council vacated the
ALJ's decision, agreeing -

> with CMS's contention that the appellant's arguments
> substitute conjecture for evidence and do not
> demonstrate that the sample was not randomly drawn or
> statistically valid, or that the extrapolated
> overpayment amount overestimated the amount due to
> Medicare.  Exh. MAC-1 at 2.  As noted in the
> applicable program guidance, an appellant bears the
> burden of proving the invalidity of the PSC's sampling
> methodology.  The appellant here has presented no
> empirical evidence supporting a conclusion that the
> sampling methodology employed by AdvanceMed in this
> case was invalid.

> However, the Council does agree that the appellant has
> raised some valid theoretical objections to the
> sampling and, on remand, may wish to pursue and
> establish an actual factual basis for these arguments.
> The Council does not find the appellant's statistical
> consultant's arguments frivolous, only unproven at
> this stage and given its burden of proof.

Order at 15.  The Council remanded the case to the ALJ directing
the ALJ to conduct another hearing, or, at the minimum, give CMS
and the appellant "the opportunity to more fully address the

6

statistical sampling methodology in writing." The Council noted
that the burden to prove that there were flaws in the sampling
methodology rested with the appellant. The Council added that,
if the ALJ found the sampling methodology valid, the ALJ would
be required to conduct a coverage analysis for the claims
remaining in issue. *See id.*

On remand, the ALJ re-docketed the case as noted above. *See*
Master Exh. 82. In the interim however, the appellant
challenged the Council's Order of Remand in Federal District
Court. *See General Medicine, P.C. vs. Sebelius*, Civil Action
No. 11-CV-10052 (E.D. Mi.). On July 7, 2011, the Court
dismissed the appellant's suit, without prejudice, finding that
Council's Order was "not a final order under the first sentence
of 42 U.S.C. § 405(g), and thus not reviewable by this Court."
*See id. Opinion and Order Granting Defendant's Motion to Dismiss*
at 8; *see also* Master Exh. 86.

Following the District Court's ruling, the ALJ conducted "a
supplemental hearing . . . on July 25, 2011." *See* Master
Exh. 91; *see also* Dec. at 3 (originally unnumbered but now added
by the Council). Counsel for the appellant, the appellant's
President, and the appellant's statistical expert appeared. The
PSC was not present. Moreover, the ALJ encountered some
confusion regarding whether the PSC had actually received a
July 18, 2011 Supplemental Statement created by the appellant's
statistical expert. Because the PSC's input was necessary to
full consideration of the sampling issues, the ALJ issued an
Order, dated August 17, 2011, transmitting the statistical
expert's report to the PSC and giving it until September 16,
2011 to respond. The ALJ also set a new hearing date. *See id.*
The PSC timely filed a written response to the statistical
expert's Supplemental Statement. *See* Master Exh. 92.

On October 27, 2011, the ALJ conducted a hearing. Counsel for
the appellant presented the appellant's case with testimony from
its President. Also testifying for the appellant was S.H., MBA.
S.H., who was certified in financial forensics and had
previously submitted an affidavit concurring with Dr. M.I.'s
findings. The PSC, again represented by its Medical Review
Examiner, J.W., offered testimony from J.W., an analyst J.T. and
Medical Review Specialist, L.P., R.N. *See* Dec. at 3 and 13.

In the decision which followed, the ALJ first addressed the
validity of the sampling methodology. After briefly summarizing
the Council's analysis of this issue in its Order, the ALJ set

out the appellant's historical position as supplemented by the
written arguments in its statistical expert's July 18, 2011
submission (Master Exhibit 92) and the appellant's testimony in
the subsequent hearing.  The ALJ then engaged in a detailed
comparative assessment of those arguments and the PSC's response
to them.  *See* Dec 8-13.  Based on that analysis, the ALJ
ultimately found that the appellant had "not sustained his
burden to prove [the sampling methodology's] invalidity."  *See
id.* at 13.

The ALJ next provided an overarching analysis relative to the
coverage elements and associated documentation requirements,
specific both to coverage in general and the six E&M codes in
issue.  *See* Dec. at 13-19.  The ALJ followed with a beneficiary
and claim-specific analysis, which mirrored the QIC's findings.
*See id.* at Spreadsheet.  The ALJ then found the appellant liable
for the resulting non-covered costs, under section 1879 of the
Social Security Act (Act) and ineligible for waiver of
recoupment of the overpayment, under section 1870(b) of the Act.
*See id.* at 19-21.

Before the Council and addressed in detail below, the appellant
presents various arguments relative to the validity of the
sampling methodology as well as the manner in which the ALJ
collected and assessed the evidence.  *See* Exh. MAC-3 at 1-19.
Additionally, the appellant submits claim specific coverage
arguments.  *See generally* Exh. MAC-3, Att. D.

## LEGAL AUTHORITIES

CMS (formerly HCFA) Ruling 86-1 describes the agency's policy on
the use of statistical sampling to project overpayments to
Medicare providers and suppliers.  The Ruling also outlines the
history and authority, both statutory and precedential, for the
use of statistical sampling and extrapolation by CMS in
calculating overpayments.  In part, CMS Ruling 86-1 provides –

> Sampling does not deprive a provider of its rights to
> challenge the sample, nor of its rights to procedural
> due process.  Sampling only creates a presumption of
> validity as to the amount of an overpayment which may
> be used as the basis for recoupment.  The burden then
> shifts to the provider to take the next step.  The
> provider could attack the statistical validity of the
> sample, or it could challenge the correctness of the

8

determination in specific cases identified by the
sample (including waiver of liability where medical
necessity or custodial care is at issue).  In either
case, the provider is given a full opportunity to
demonstrate that the overpayment determination is
wrong.  If certain individual cases within the sample
are determined to be decided erroneously, the amount
of overpayment projected to the universe of claims can
be modified.  If the statistical basis upon which the
projection was based is successfully challenged, the
overpayment determination can be corrected.

CMS Ruling 86-1-9 & 86-1-10.

CMS' guidelines in effect at the time of this audit are found in
Chapter 3 of the Medicare Program Integrity Manual (MPIM) (CMS
Pub. 100-08).  *See* MPIM, Ch. 3, § 3.10 (Rev. 71, Effective May
10, 2004); *now* at MPIM, Ch. 8, (Rev. 377, Effective June 28,
2011).  The guidelines reflect the perspective that the time and
expense of drawing and reviewing the claims from large sample
sizes and finding point estimates which accurately reflect the
estimated overpayment with relative precision may not be
administratively or economically feasible for contractors
performing audits.  Instead, the guidelines allow for smaller
sample sizes and less precise point estimates, but offset such
lack of precision with direction to the contractors to assess
the overpayment at the lower level of a confidence interval--
generally, the lower level of a ninety percent, one-sided
confidence interval.  This results in the assumption, in
statistical terms, that there is a ninety percent chance that
the actual overpayment is higher than the overpayment which is
being assessed, thus giving the benefit of the doubt resulting
from any imprecision in the estimation of the overpayment to the
appellant, not the agency.  As a result of the above policy
decision, the question becomes whether the sample size and
design were sufficiently adequate to provide a meaningful
measure of the overpayment, and whether the provider/supplier is
treated fairly despite any imprecision in the estimation.

The MPIM provides guidance to contractors in conducting
statistical sampling for use in estimating overpayment amounts.
The instructions are intended to ensure that a statistically
valid sample is drawn and that statistically valid methods are
used to project overpayments where review of claims indicates
that overpayments have been made.  The MPIM describes the
purpose of its guidance as follows -

9

These instructions are provided so that a sufficient process is followed when conducting statistical sampling to project overpayments.  Failure by the PSC or the Medicare BI unit to follow one or more of the requirements contained herein does not necessarily affect the validity of the statistical sampling that was conducted or the projection of the overpayment. An appeal challenging the validity of the sampling methodology must be predicated on the actual statistical validity of the sample as drawn and conducted.  *Failure by the PSC or Medicare contractor BI unit or the contractor MR units to follow one or more requirements may result in review by CMS of their performance, but should not be construed as necessarily affecting the validity of the statistical sampling and/or the projection of the overpayment.*

MPIM, Ch. 3, § 3.10.1.1 (emphasis added).

The MPIM further provides that a contractor may employ any sampling methodology that results in a "probability sample." The MPIM explains -

[The contractor] shall follow a procedure that results in a probability sample.  For a procedure to be classified as probability sampling, the following two features must apply:

- It must be possible, in principle, to enumerate a set of distinct samples that the procedure is capable of selecting if applied to the target universe.  Although only one sample will be selected, each distinct sample of the set has a known probability of selection.  It is not necessary to actually carry out the enumeration or calculate the probabilities, especially if the number of possible distinct samples is large - possibly billions.  It is merely meant that one could, in theory, write down the samples, the

000011

10

> sampling units contained therein, and the
> probabilities if one had unlimited time; and
>
> • Each sampling unit in each distinct possible
>   sample must have a known probability of
>   selection.  For statistical sampling for
>   overpayment estimation, one of the possible
>   samples is selected by a random process according
>   to which each sampling unit in the target
>   population receives its appropriate chance of
>   selection.  The selection probabilities do not
>   have to be equal but they should all be greater
>   than zero.  In fact, some designs bring gains in
>   efficiency by not assigning equal probabilities
>   to all of the distinct sampling units.

For a procedure that satisfies these bulleted
properties it is possible to develop a mathematical
theory for various methods of estimation based on
probability sampling and to study the features of the
estimation method (i.e., bias, precision, cost)
although the details of the theory may be complex.  *If
a particular probability sample design is properly
executed, i.e., defining the universe, the frame, the
sampling units, using proper randomization, accurately
measuring the variables of interest, and using the
correct formulas for estimation, then assertions that
the sample and its resulting estimates are "not
statistically valid" cannot legitimately be made.  In
other words, a probability sample and its results are
always "valid."  Because of differences in the choice
of a design, the level of available resources, and the
method of estimation, however, some procedures lead to
higher precision (smaller confidence intervals) than
other methods.*  A feature of probability sampling is
that the level of uncertainty can be incorporated into
the estimate of overpayment as is discussed below.

MPIM, Ch. 3, § 3.10.2 (emphasis added).  The MPIM recognizes
that a number of sampling designs are acceptable, including
simple random sampling, systematic sampling, stratified
sampling, and cluster sampling, or a combination of these.  *Id.*
at § 3.10.4.

11

As stated above, the level of uncertainty that may be part of a sampling design can be addressed when the results of the sampling are used to estimate the total overpayment. The MPIM addresses this explaining, in pertinent part -

> In simple random or systematic sampling the total overpayment in the frame may be estimated by calculating the mean overpayment, net of underpayment, in the sample and multiplying it by the number of units in the frame. In this estimation procedure, which is unbiased, the amount of overpayment dollars in the sample is expanded to yield an overpayment figure for the universe. The method is equivalent to dividing the total sample overpayment by the selection rate. The resulting estimated total is called the point estimate of the overpayment, i.e., the difference between what was paid and what should have been paid. In stratified sampling, an estimate is found for each stratum separately, and the weighted stratum estimates are added together to produce an overall point estimate.

> In most situations the lower limit of a one-sided 90 percent confidence interval shall be used as the amount of overpayment to be demanded for recovery from the provider or supplier. The details of the calculation of this lower limit involve subtracting some multiple of the estimated standard error from the point estimate, thus yielding a lower figure. *This procedure, which, through confidence interval estimation, incorporates the uncertainty inherent in the sample design, is a conservative method that works to the financial advantage of the provider or supplier. That is, it yields a demand amount for recovery that is very likely less than the true amount of overpayment, and it allows a reasonable recovery without requiring the tight precision that might be needed to support a demand for the point estimate.* However, the PSC or Medicare contractor BI unit is not precluded from demanding the point estimate where high precision has been achieved.

MPIM, Ch. 3, § 3.10.5.1 (emphasis added).

CMS explains that, in the above context, the term "bias" is used "in a technical sense and does not imply a finding that treats

12

the supplier or provider unfairly." MPIM, Ch. 3, § 3.10.5.1. "A biased estimator is often used rather than an unbiased estimate because the advantage of its greater precision outweighs the tendency of the point estimate to be a bit high or low." *Id.*

With respect to its component parts, a statistical sample's "universe and sampling frame will usually cover all relevant claims or line items for the period under review," and CMS assumes, for purposes of discussion, "that the sampling unit is the claim, although this is not required." MPIM, Ch. 3, § 3.10.3.2. Relative to Part B claims, CMS states that "[t]he universe shall consist of all *fully and partially paid claims* . . ." *Id.* at § 3.10.3.2.1.B (emphasis added). The sampling frame is a list of all "possible sampling units from which the sample is selected." *Id. at* § 3.10.3.2.3. As an example, the frame can be "a list of all claims for which fully or partially favorable determinations have been issued, or a list of all the line items for specific items or services for which fully or partially favorable determinations have been issued." *Id.* CMS states that an "ideal frame is a list that covers the target universe completely" although, in some cases, duplicate sampling units must be eliminated before selecting the sample. *Id.*

A contractor must "identify the source of the random numbers used to select the individual sampling units." MPIM, Ch. 3, § 3.10.4.2. The contractor must document "the program and its algorithm or table" and make that documentation available for review. *Id.* The contractor must also "document the known seed value if a computer algorithm is used." *Id.* The contractor documents "all steps taken in the random selection process exactly as done to ensure that the necessary information is available for anyone attempting to replicate the sample selection." *Id.* CMS states that SPSS, SAS, and RAT-STATS are among the "well-known, reputable software statistical packages . . . that may be used for generating a sample." *Id.*

The MPIM further provides -

> If the decision on appeal upholds the sampling methodology but reverses one or more of the revised initial claim determinations, the estimate of overpayment shall be recomputed *and a revised projection of overpayment issued.*

MPIM, Ch. 3, § 10.3.9.2 (emphasis added).

000014

13

Medicare regulations provide that ALJs and the Council are not
bound by CMS program guidance, such as manual authority, but
"*will* give substantial deference to these policies if they are
applicable to a particular case." 42 C.F.R. § 405.1062(a)
(emphasis added). If an ALJ or the Council "declines to follow
a policy in a particular case," the ALJ or the Council must
explain the reasons for not following the policy in that case.
42 C.F.R. § 405.1062(b). ALJs and the Council are bound by CMS
Rulings. 42 C.F.R. § 405.1063.


## ANALYSIS

Several of the arguments in Sections 1-4 below pertain to events
which occurred in the proceedings before the ALJ prior to the
issuance of Decision A. As noted above, in that context, the
appellant indicated it would forego its coverage arguments, in
the event the ALJ overturned the sampling methodology. Even
though the ALJ initially found the sampling methodology invalid,
the appellant had an opportunity to raise perceived errors in
Decision A, either regarding sampling or coverage even if only
to preserve them, in its response to CMS' Memorandum urging own
motion review. However, the appellant confined its responses to
the issues raised by CMS, generally maintaining that there was
no error in the ALJ decision. *See generally* Exh. MAC-2.
Nonetheless, it is apparent that, from the outset, the appellant
had significant issues with both the audit process and certain
of the ALJ's rulings.

*Sampling Methodology, Subpoenas, Notice & the ALJ's Assessment
of the Evidence*

### 1. Limitation on Extrapolation

The appellant recounts that in the earlier stages of this case,
it had argued that extrapolation was not warranted because the
"Secretary of HHS did not determine that there was a sustained
or high level of payment error, or that documented educational
intervention had failed to correct the error," as required by
section 1893(f)(3) of the Act. The appellant notes that, in a
December 17, 2009 ruling, the ALJ correctly found that this
"statutory limitation only applies to samples initiated after
December 8, 2004 . . . [and that this] sample . . . was
initiated on August 12, 2004." Exh. MAC-3 at 1 (referencing
Master Exh. 58 at 4 and Master Exh. 41 at 258-A & 283-A).

14

However, the appellant contends that because this audit "was closed and not reopened until March 4, 2005," per congressional intent, this and "all audits conducted after December 8, 2004 would be utilizing the new standard methodology of sampling, and be subject to the Secretary's determination on the need for extrapolation."  *Id.*

The appellant states that it filed a "Motion for Reconsideration" with the ALJ asking the ALJ to permit discovery into the question of why the case had been closed then reopened several months later.  The basis for the appellant's motion was that during the period the audit was "closed" subparts (3) and (8) of section 1893(f) of the Act went into effect and should now be read to govern this audit process.  *See* Exh. MAC-3 at 1.  The appellant sets out its interpretation of the legislative history behind section 1893(f).  *See id.* at 1-7. The appellant asserts that "[r]equiring the Secretary of HHS or his or her delegate to first make a determination that extrapolation was even warranted removed Program Safeguard Contractors from the equation and reduced the risk of abuse," which was Congress' legislative intent.  *See id.* at 3.  The appellant notes that the ALJ never ruled on its motion.  *See id.* at 1.

However, the appellant contends that, while the reasons the audit was "closed" were never explained either to it or the ALJ, it is clear from the legislative history that the requirements of section 1893(f)(3) of the Act should control this audit, "which was conducted after December 8, 2004."  *See* Exh. MAC-3 at 3.  The appellant notes that the sampling methodology in issue was based upon guidelines established in CMS Program Memorandum B-02-007, which went into effect on February 9, 2001. The appellant again maintains that since the audit was reopened subsequent to the changes in the section 1893(f) requirements, the PSC should have "redrawn the sample using the standard methodology implemented by HHS subsequent to the section 1893(f) amendments."  *See id.* at 3-4.

Moreover, the appellant insists that the PSC "clearly violated the spirit if not the letter of the amendments" because section 1893(f) specifically requires *the Secretary of HHS to find that there has been a sustained high level of payment error or a failure to respond to educational interventions.* Likewise, the statutory *prohibition of review of findings* of a sustained high level of payment error or a failure to respond to educational interventions is also directed at findings by "*the*

15

*Secretary.*" *See id.* at 3-4 (emphasis added).  In the context of
this theory, the appellant argues that the PSC was not
authorized to make the high level of error or failure of
educational intervention determination underlying this audit.
The appellant asserts that the PSC was not part of either HHS or
CMS, nor was it an authorized delegatee of the Secretary.
Rather, a PSC is a private, for-profit, contractor whose
neutrality is compromised if it is allowed to make
determinations of a high level of error or a failure of
educational intervention because its reimbursement is premised
on a percentage of overpayments recovered.  *See id.* at 4-7.

The Council does not agree that a CMS contractor is prohibited
from making the determinations assigned to the Secretary of HHS
under section 1893(f)(3) of the Act.  Section 1874(b) of the Act
authorizes the Secretary to "contract with any person, agency or
institution to secure, on a reimbursable basis, such special
data, actuarial information, and other information as may be
necessary in the carrying out of functions within this title."
*See also* Act, § 1874A(a)&(b).  AdvanceMed identified its
delegation authorities in its December 16, 2009 submission to
the ALJ, citing 49 Fed. Reg. 35,247 (September 6, 1984) and 68
Fed. Reg. 60694 (October 23, 2003).  *See* Master Exh. 60.

The Health Insurance Portability and Accountability Act (HIPAA)
of 1996 established the Medicare Integrity Program, in part, to
strengthen CMS' ability to effectively and efficiently carry out
program safeguard functions.  The Medicare Modernization Act
(MMA) became effective December 8, 2003.  Section 911 of the MMA
implemented Medicare's "Fee-For-Service Contracting Reform"
which, in turn, led to the creation of PSCs, active on a
regional basis nationwide.  The PSCs operate within the larger
scope of the Medicare Administrative Contractor and Medical
Review (MR) Program set out in the MPIM.  The principal
statutory authorities for the MR program are found in sections
1833(e), 1842(a)(2)(B), 1862(a)(1), 1862(a) and 1893(b)(1) of
the Act; further authorities are found at sections 1812, 1861,
1832, 1874, 1816 and 1842 of the Act.  The associated regulatory
authorities are found at 42 C.F.R. §§ 421.100, 421.200 and
421.400.  *See* MPIM, Ch. 1, § 1.3.7.

These authorities allow the Secretary to engage PSCs to conduct
the Medicare audit review process on behalf of Medicare and CMS.
To suggest that the audit review process hinges on the Secretary
formally making a decision, which is clearly within the realm of

16

the entity specifically charged by the Secretary to perform this review, is an elevation of form over substance.

Beginning on December 8, 2004, one year to the date after enactment, the statute prohibits the use of extrapolation to determine an overpayment recovery unless the Secretary determines that: (A) there is a sustained or high level of payment error; or (B) documented educational intervention has failed to correct the payment error.  The statute states that "[t]here shall be no administrative or judicial review ... of determinations by the Secretary of sustained or high levels of payment errors under this paragraph."  *See* Act, § 1893(f)(3). The appellant argues that this provision should be applied because the case was "closed" and then reopened after its effective date.  Furthermore, the appellant argues that the Council is not prohibited from reviewing the "sustained or high levels of payment errors" issue because such a determination was not made by the Secretary but was delegated to a contractor.

The Council agrees with the ALJ's ruling that because the sample was initiated on August 12, 2004, prior to the effective date of section 1893(f)(3), this section is inapplicable.  *See* Master Exh. 58 at 4.  However, regardless of this provision's effective date, the Council would not be prohibited from reviewing this matter regardless of whether the Secretary or his/her contractor made the "sustained or high levels of payment errors" finding. *See* 42 C.F.R. § 405.1112(b).

## 2. Failure to Issue Subpoenas

The appellant explains that it "is a facility-based practice and does not maintain its own set of patient records."  The appellant adds that when "a facility is uncooperative in providing . . . records the only avenue available to a provider" is an ALJ's subpoena power.  Consequently, on March 5, 2009, the appellant asked the ALJ to issue subpoenas, to various facilities, for "the complete medical records for each beneficiary that was part of the sample."  *See* Exh. MAC-3 at 8. The appellant notes that in this audit, payment was denied based either upon incomplete medical documentation or a perceived lack of medical necessity.  The appellant asserts that these subpoenas would have produced records disproving the PSC's unfavorable coverage findings.  *See id.*  The appellant indicates that it repeated this request to the ALJ on April 2, 2009, but notes that on April 20, 2009, the ALJ directed the appellant to demonstrate that it had been unsuccessful in its own efforts to

17

obtain those records. *See id.; see also* Master Exhs. 31, 35
and 42.

The appellant states that, on April 27, 2009, it complied with
the ALJ's directive to document its efforts and formally
requested subpoenas, reporting that the facilities had
effectively been non-compliant with the PSC's request for
records. However, on May 11, 2009, the ALJ issued an order
remanding the case to the QIC with instructions to "obtain all
relevant medical records" for all beneficiaries, an order which
the QIC ignored. *See* Exh. MAC-3 at 8-9; *see also* Master
Exhs. 40, 43 and 45. On May 12, 2009, and without referencing
the May 11, 2009 order to the QIC, the ALJ denied the
appellant's request for subpoenas, reasoning that the appellant
had not made sufficient effort to obtain that information on its
own.  The ALJ did direct the appellant to send certified letters
to the facilities requesting the information. *See* Exh. MAC-3
at 9; *see also* Master Exh. 46.  The appellant indicates that it
followed the ALJ's instruction by sending certified letters to
the facilities on May 20, 2009, but the facilities did not
respond. *See* Exh. MAC-3 at 9.  The appellant references an
"Exhibit 95" as proof of its compliance.  We note that the
record consists of Master Exhibits numbered 1-92, some with
identified sub-exhibits. *See* Revised Master Exhibit List.
There is no Master Exhibit 95 in the record.  While not
determinative to the Council's analysis of this issue, our
review of the exhibits themselves has not revealed the May 20,
2009 letter(s) referenced by the appellant.

The appellant points out that in a case presenting similar
issues, which it had brought to the Council (M-10-101), the
Council had issued a remand, instructing the presiding ALJ to
issue the necessary subpoenas.  The appellant argues that
Congress did not intend that a provider be subject to an audit,
but have no recourse against facilities unwilling to cooperate
with record production requests.  The appellant also questions
CMS' decision to merely "participate" in this proceeding, rather
than becoming a "party," which hampers an ALJ's authority to
involve CMS in documentation production efforts. *See* Exh. MAC-3
at 9; Exh. MAC-3, Att. D; *see also* 42 C.F.R. §§ 405.1010,
405.1012 and 405.1037(a).

By regulation, CMS may either "participate" in the claim appeal
process or appear as a "party." *See* 42 C.F.R. §§ 405.1010
and 405.1012.  However, the decision as to CMS' involvement, if
any, is its own.  Consequently, an "ALJ *cannot draw any adverse*

18

*inferences* if CMS or a contractor decides not to participate in any proceedings before an ALJ, including the hearing." 42 C.F.R. § 405.1010(f)(emphasis added). Similarly, an "ALJ *may not require CMS or a contractor to enter a case as a party or draw any adverse inferences if CMS or a contractor decides not to enter as a party.*" 42 C.F.R. § 405.1012(d) (emphasis added).

The regulations provide --

> (f) *Subpoenas.* (1) Except as provided in this section, when it is reasonably necessary for the full presentation of a case, an ALJ may, on his or her own initiative or at the request of a party issue subpoenas for the appearance and testimony of witnesses and *for a party to make books, records, correspondence, papers, or other documents that are material* to an issue at the hearing available for inspection and copying. An ALJ may not issue a subpoena to CMS or its contractors, on his or her own initiative or at the request of a party, to compel an appearance, testimony, or the production of evidence.

42 C.F.R. 405.1036(f) (*italics* added). Thus, since the nursing homes where the appellant's physicians practiced were not parties to this action, it is not clear the extent to which the ALJ has the authority to subpoena medical records in their possession.

In the context of ALJ Appeal Number 1-495921721, the ALJ issued an "Order After April 16, 2009 Pre-Hearing" (Order . . . Pre-Hearing) signed by the ALJ on April 20, 2009, but formally dated February 19, 2009. There, the ALJ issued a series of directives to both the PSC and the appellant aimed at providing some procedural and substantive clarity to the proceedings before him. *See generally* Master Exh. 42. The ALJ explained that it was the appellant's responsibility to document its claims for coverage and set out the general parameters which the appellant must reach in order for the ALJ to consider issuing a subpoena. *See id.* at 1(b)(unpaginated side of two-sided copy). However, the subpoena in ALJ Appeal Number 1-495921721 was issued to the PSC (a CMS contractor) and the appellant (a party), which are distinguishable from third-party entities such as nursing homes.

The Council notes that we are not bound by the decisions of past administrative adjudicators or by our own decisions; rather, we address each case *de novo*. *See* 42 C.F.R. § 405.1100(c). In the Council Order (M-10-101) referenced by the appellant, the issues

19

presented were vastly different than those here.  There, the ALJ
issued what the Council characterized as limited subpoenas, but
then issued a decision prior to receiving the information for
which the subpoenas were issued.  *See generally* Exh. MAC-3,
Att. D.  Here, however, the ALJ denied the appellant's request,
finding that the appellant "had not made sufficient effort to
obtain that information on its own."

In any event, to the extent that the ALJ did have the authority
to subpoena records from non-party nursing facilities, the
appellant essentially asked the ALJ to subpoena records for
services furnished by the appellant's own physicians in those
facilities.  The need to keep medical documents supporting an
E&M service furnished by one of the appellant's physicians is
the responsibility of the appellant since the appellant billed
for those services.  Thus, the appellant asked the ALJ to
subpoena documents that should have already been in the
appellant's files.  Section 1833(e) of the Act requires that an
appellant submit sufficient documentation to establish that it
is entitled to payment and the amount of that payment.
Nonetheless, the case record in this case did, in fact, have E&M
visit assessments or treatment notes for most of these visits.

To the extent that the appellant was seeking to obtain nursing
facility records that were created by nursing facility
personnel, the Council does not find that issuing subpoenas to
obtain those documents would ultimately a material difference in
the claims' adjudication here.  The only issue addressed by the
ALJ and by the Council was whether the E&M service billed on
each specific date of service was supported by sufficient
documentation to establish medical reasonableness and necessity
on that date, as well as at what CPT coding level the service
should be reimbursed.  While, in the pages ahead, the Council
references the frequency of other E&M services furnished by the
appellant in the timeframe of the service(s) at issue (an issue
raised below with regard to some claims), the Council has
neither reduced nor denied reimbursement for any service based
on the fact of other services furnished in the same timeframe.
Nor did the Council deny or reduce reimbursement based on the
general diagnoses or the condition of any beneficiary that may
have been addressed in other medical records.

Rather, the Council looked only at the medical notes for the
date(s) of service at issue in determining medical
reasonableness and necessity and reimbursement level.  The
treatment or assessment note for each date of service should be

20

expected to stand alone and support coverage for that date of
service, and these records should have been in the possession of
the appellant.  Most were, in fact, entered into the claim file
by the ALJ.  Thus, we find that the appellant was not
disadvantaged by not having the nursing homes' complete records
obtained and entered into the record.

Based upon our review of the record, we find no error in the
ALJ's ruling.

### 3. Lack of Notice of Audit

The appellant states that, pursuant to section 1893(f)(7)(A) of
the Act, Medicare contractors must provide parties with written
notice prior to conducting an audit.  The appellant points out
that CMS admitted it had not provided notice to the appellant,
basing that failure on the exclusion found in section
1893(f)(7)(C) ("Subparagraphs (A) and (B) shall not apply if the
*provision of notice or findings would compromise pending law
enforcement activities, whether civil or criminal, or reveal the
findings of law enforcement related audits."*).  The appellant
adds that the ALJ specifically found that CMS had not provided
notice *and* that the exception upon which it relied *was
inapplicable*.  However, the ALJ then found both that neither the
Act nor Medicare program manuals provided relief for CMS'
failure to notify *and*, in any event, the appellant was not
harmed by that failure.  *See* Exh. MAC-3 at 10 (emphasis added).

Contending that the "purpose of the notice requirement is to
give the provider an opportunity to have input into the audit
process and to preserve important records and testimony that
could aid the provider in the administrative proceedings,"  the
appellant challenges the ALJ's ruling.  The appellant indicates
that two of the physicians whose services were audited had left
its employ by the time the PSC provided the appellant with
notice in January 2007.  However, both were still employed when
the audit was initiated in July 2004.  The appellant maintains
that had it been provided more timely notice, it "could have
taken steps to preserve their testimony.  In addition, it would
have been considerably easier . . . to obtain cooperation from
the facilities in 2004 in obtaining medical records than it was
three years later when the notice was finally provided."  *See*
Exh. MAC-3 at 10-11.  The appellant argues that these two
physicians "provided 59% of the services in question" and the
lack of timely notice denied it "the opportunity to submit their
input during the audit itself."  *See id.* at 11.  Thus, contrary

to the ALJ's reasoning, the appellant maintains that the PSC's
lack of notice inflicted significant harm upon it, such that CMS
should be precluded from extrapolating the audit results.  *See
id.*

The appellant first raised this issue in its November 16, 2009
pre-hearing brief in ALJ Appeal Number 1-495921721.  *See* Master
Exh. 55 at 41-37.  That submission was in response to the ALJ's
Order . . . Pre-Hearing.  *See* Master Exh. 42.  The appellant's
brief sets out the history of its notice issue in more detail.
The appellant notes that it "had been [the] subject of an
earlier audit since March, 2002, and had been fully aware of
. . . [that] audit since August, 2002 . . .  That 2002 audit was
still ongoing in March 2005, when AdvanceMed initiated the audit
that is the subject of this appeal."  *See* Master Exh. 55 at 39.
The appellant also references the PSC's timeline in its undated
summary of the anticipated testimony of its representative at
the ALJ hearing.  There, the PSC indicated that the appellant's
president contacted the PSC in August 2002 "requesting the name
of the physician under investigation, why the audit was being
done, etc."  *See id.*, Att. F at 5.  In its April 28, 2009
response to the ALJ's Order . . . Pre-Hearing, the PSC directly
addressed notice stating that the notice requirement of section
1893(f)(7)(A) of the Act, is subject to subparagraph (C)
exception if giving notice or findings "would compromise pending
law enforcement activities, whether civil or criminal . . . ."
The PSC asserted that because its "mandate" was to identify
fraud, waste and abuse, the 1893(f)(7)(C) exception applied to
it here.  *See* Master Exh. 41 at 283.

Having examined the record as a whole, we do not see that the
appellant was irreparably harmed by the lack of formal notice of
the pending audit.  Nor are we entirely certain that the
appellant was totally without reasonable notice or at least
notice similar to that which it received in connection with the
2002 audit.  The PSC indicated that it requested records from
the facilities reviewed, but did not specify the timing of that
request.  *See* Master Exh. 10 at 47.  The record also contains
written communications between the PSC and at least one, but
possibly two, facilities, dated March 4 and 23, 2005, regarding
the provision of medical records.  *See* Master Exhs. 5 and 6.

As the ALJ noted, while affording a party a right to notice of
an audit, the Act does not address the consequences of failing
to provide such notice.  Moreover, the Act does not even go so
far as to indicate the timing of such notice.  *See generally*

22

Act, § 1893(f). Additionally, the appellant has, over these many years, ably and thoroughly argued the principal issues resulting from the audit, the validity of the sampling methodology, and the coverage of the reviewed claims. We see no area where the form of notice which the appellant received compromised its ability to present its case.

**4. Invalidity of the Sample**

The appellant generally asserts that, in the most recent decision, the ALJ's analysis was over-reliant on the PSC's August 31, 2011 response to the supplemental submission from the appellant's statistical expert. The appellant maintains that many of the statements in the PSC's response were "misleading, contradict actual findings, and imply that the universe file from which the sample was extracted was invalid." *See* Exh. MAC-3 at 11; *see also* Master Exhs. 87 and 92. We address the appellant's statistical arguments as follows.

   **A. The appellant argued that AdvanceMed erred by including claims containing CPT codes not under review**

The appellant recounts that the PSC's response identified the codes in the universe as CPT codes 99302, 99303, 99311, 99312, 99313 and 99316. However, the appellant points out that the PSC's documentation, specifically Appendix D to the PSC's August 31, 2011 response, identifies CPT code 99301 on three records within the frame. Those records contradict the PSC's definition of the universe and provide "a clear indication that AdvanceMed did not follow generally accepted statistical principles regarding documentation and selection of claims." The appellant argues that, because the universe is invalid, so too are the sample selection and extrapolation. *See* Exh. MAC-3 at 12. The appellant subsequently notes that had the PSC utilized a stratified sample, it could have caught this error.

The document from which the appellant draws this argument is a Table titled *Procedure Code Frequencies for the General Medicine Sample Frame 4-22-10. See* Master Exh. 92 at 17. The sampling frame is a list of all elements in a population from which the sample is drawn. This Table sets out the cumulative frequency, *i.e.*, the number of times which each CPT code appears in the frame, as identified by PSC. The 99301 code, as the appellant notes, is also identified on this Table as part of the frame. Its three appearances represent a 0.01 cumulative percentage.

The six CPT codes (99302, 99303, 99311, 99312, 99313 and 99316) which were actually reviewed have a cumulative frequency of 41,815 and, standing alone (*i.e.*, without inclusion of the 0.01% frequency associated with code 99301), have a cumulative percent of 100. *See id.* While the PSC has not responded to the presence of the 99301 code in the frame, we see minimal to no impact on the extrapolation. Since the sample units were line items containing one of the CPT codes at issue it was erroneous for line items with code 99301 to be in the frame as these codes were not identified as part of the sampling study. From a practical perspective, the sample itself did not include a claim filed with CPT code 99301. *See* Master Exh. 10 at 40-1. **However, in an abundance of caution, on implementation and re-extrapolation, AdvanceMed should delete these three line items from the frame and extrapolate the overpayment based on the remaining number of line items (41,815 rather than 41,818).**

**B.** **The appellant argued that not all General Medicine**
   **clinicians were included in the AdvanceMed universe file**

The appellant compares the PSC's January 2, 2007 identification (description) of the universe ("services submitted with all the physicians affiliated with General Medicine with the exception of . . . [its President]") with the PSC response statement ("all claims billed by [the appellant with] PIN numbers 9289741 and 9289742 (excluding those where . . . [its President] was the rendering physician)" and that met coding and dates of service parameters, regardless of the facility in which the beneficiary resided. The appellant then indicates that the PSC's "universe file" (frame) contains "41,818 claims associated with 12 PINs corresponding to seven clinicians."

Relying on review of "internal records," the appellant alleges that six clinicians *who* performed services at "General Medicine nursing facilities . . . during the period under review" are not found in the PSC's universe file (frame). *See* Exh. MAC-3 at 12-13. The appellant asserts that if the universe file created by the PSC "followed the definition used by" the PSC, the claims of these six physicians should have been present in the universe file. The appellant maintains that the absence of these six clinicians from the universe constitutes "a clear violation of generally accepted statistical principles" as well as guidance found at chapter 3, section 3.10.4.4.1 of the MPIM. *See id.* at 14.

24

The appellant has not demonstrated that the PSC's purported failure to include each of the appellant's clinicians impacted the ultimate overpayment in a negative manner for the appellant. To the extent that the PSC excluded certain of appellant's clinicians from the frame, the sample units would have only included those limited physicians' claims and the results would have only been extrapolated to those physicians. AdvanceMed indicated that it included services billed with only two PIN numbers of several used by the appellant, and these numbers were not used by all of the appellant's physicians. The Council concludes that to the extent that such PIN numbers may not have represented all of the appellant's physicians or all of the facilities does not *per se* invalidate the sample as long as the PSC did not individually select claims for the frame but used general criteria such as PIN numbers, CPT codes, and dates of service for selecting the frame.

We acknowledge that the PSC did not accurately describe the universe when it referenced "all physicians [except the appellant's President;]" the frame and sample were, in fact, more limited. However, as long as the sample was drawn randomly from an unbiased frame (even if less inclusive than the defined universe) and the results extrapolated to that frame, the appellant has not established unfairness.

####     C.  The appellant argued that not all claims were included in the AdvanceMed universe

The appellant contends the PSC's "universe file . . . does not permit the identification of the nursing facility associated with each claim." The appellant believes that the "universe file" contains claims from only twelve facilities, rather than the twenty-three state-wide facilities in which it provided services during the period under review. The appellant maintains that its "internal review" "identified in excess of 10,000 other claims for the CPT codes under review corresponding to services [which it] performed" at those facilities. The appellant explains that the absence of those claims can be explained by the PSC's failure to include all facilities, clinicians or both. *See* Exh. MAC-3 at 14. The appellant asserts that not including every facility in the universe "implies" that the PSC "explicitly filtered its records to include only certain facilities in the universe file contradicting" the PSC's claim, in its August 31, 2011 response, that it "did not use a universe either including or excluding specific nursing facilities." Additionally, the appellant

25

argues that not including "all claims with the seven physicians present in the . . . universe file" constitutes "a clear violation" of chapter 3, section 3.10.3.2.1 of the MPIM. ("The universe shall consist of all fully and partially paid claims submitted by the supplier for the period selected for review and for the sampling units to be reviewed.") *See id.* at 15. This argument is also addressed following Section D.

First, it is not clear to the Council that claims in the sample were selected from a frame of exactly twenty-three facilities. When this case was first before the Council (M-10-1933), in its exceptions to CMS' Referral Memorandum, the appellant argued that there were twenty facilities included in the frame. *See* Master Exh 80. Previous to that, in its June 4, 2010 post-hearing brief to the ALJ, the appellant referenced twenty-two facilities represented in the frame. Master Exh. 74 at 4. Now, in its request for Council review, the appellant references twenty-three facilities. *See* Exh. MAC-3 at 14. Thus, the number of nursing facilities represented in the frame appears to be unclear even to the appellant. The appellant has not identified the names of facilities included in the frame but not represented in the sample. Thus, it is nearly impossible for the Council to determine the degree to which facilities in the frame may not have been represented in the sample, the proportion of claims from each facility represented in the sample and the frame, and the degree to which the sample and frame proportions align.

In any event, in its November 24, 2010 remand order, the Council addressed why a sample might not contain claims from each and every facility represented in the frame if the facilities had vastly different numbers of claims submitted -

> The appellant argued that the sample drew claims from only 12 of the 20 facilities included in the frame. Thus, the appellant implies, the sample could not have been truly random and the outcome is not trustworthy. On its face, this argument has some appeal because the sample included only 60% of the facilities whose claims appeared in the frame. If the eight facilities missing from the sample claims in fact were the locations where approximately 40% of the claims were generated, the Council would find merit to the appellant's concern with regard to the randomness of the sample. However, the appellant has presented no evidence that these eight facilities billed a proportionate share of the total claims in the frame. If for example,

26

the 12 facilities whose claims appeared in the sample were
the site of services for 98% of the claims in the frame,
and the remaining eight facilities collectively billed only
2% of the claims, it is statistically possible that
a random sample pulling less than one percent of the claims
in the entire frame would not necessarily select a claim
from one of the eight "low-volume" facilities.  Thus, while
the appellant's consultant's argument has merit in theory,
neither the appellant nor its counsel has provided evidence
of the nature and volume of claims from the eight "missing"
facilities.

Order at 14.

The appellant has never addressed this point in its submissions
to the ALJ on remand or to the Council.  Moreover, it has not
addressed how its physicians were assigned to furnish services
in nursing facilities and whether the physicians associated with
the two PIN numbers at issue furnished services proportionally
in each facility.

### D. The appellant argued for a need for stratification

Having detailed arguments for stratification in sections B and C
above, the appellant again revisits its position, which has been
argued comprehensively by its statistical expert throughout this
case history, that "a stratified random sample should have been
employed instead of a simple random sample."  Specifically, the
appellant now contends that –

   • if stratified by procedure code, "it [the PSC] would
   have identified that procedure code 99301 is included
   in the universe file, despite not being included in
   the definition of the universe;"

   • if stratified by clinician, it would have identified
   that not all the appellant's "clinicians . . . [with
   the intended omission of its President] were included
   in the universe file, thus contradicting the
   definition of the universe;"

   • if stratified by facility it would have observed
   that it was not possible to identify the facility in
   the universe file and that certain facilities might
   not have been included in the universe file."

*See* Exh. MAC-3 at 16.

The appellant asserts that stratification "goes beyond just providing a better estimate; it imposes additional verification steps to insure the validity of the data included in the universe."  The appellant then references what it characterizes as a "vague and misleading statement" in the PSC's August 31, 2011 response:  "If AdvanceMed had attempted to manipulate the sample to include claims from all facilities, the sample would not have been random.  This process of manipulating the sample would be considered 'cherry picking' of claims.  Any manipulation of a random sample would invalidate that sample." The appellant disputes the PSC's premise, and asserts that stratification would have eliminated some of the errors which it has highlighted so far and points that MPIM "recommends stratification." *See* Exh. MAC-3 at 16-17 (referencing Master Exh. 92 at 2); *see also* MPIM, Ch. 3, § 3.10.4.1.

Although framed somewhat differently from a contextual perspective, the appellant first presented its overarching arguments for the use of stratification in this audit in response to CMS' Referral Memorandum (M-10-1933). *See* Exh. MAC-2.  The Council provided a detailed analysis of those arguments in its Order of Remand. *See* Order at 12-15.  The Council incorporates that *initial analysis by reference here and* sees no bases in the appellant's subsequent arguments to change that analysis.

The MPIM extensively addresses the use and potential benefits of stratification. *See* MPIM, Ch. 3, §§ 3.10.4.1 and 3.10.11.1. However, the MPIM does not require stratification over simple random, systematic or cluster sampling, each of which is discussed as a possible audit design methodology. *See generally* MPIM, Ch. 3, §§ 3.10.4.1.1 - 3.10.4.1.5.

As during the Council's initial consideration of this issue, the appellant's current arguments on the necessity of stratification are not compelling.  The sample was comprised of three hundred eighty-two (382) claims for a variety of E&M services provided by certain physicians from January 1, 2002 through March 24, 2004, an approximate twenty-seven month period. *See* Master Exh. 10 at 47.  This is a very large sample size, much larger than other audits the Council regularly reviews.  While the appellant noted that only twelve of the twenty or more facilities were represented in the sample, the appellant has not provided evidence regarding the nature and volume of the claims

28

from the "missing" facilities or how they differed from those that were selected by the sampling.  To determine the amount of overpayment for which Medicare sought recovery, the PSC used the lower limit of a one-sided 90 percent confidence interval.  *See id.* at 47-41.  As explained in the MPIM, using the lower limit of a one-sided 90 percent confidence interval "incorporates the uncertainty inherent in a sample design, [and] is a conservative method that works to the financial advantage of the provider or supplier." *See* MPIM, Ch. 3, § 3.10.5.1.

Finally, the Council finds convincing the points raised by AdvanceMed before the ALJ in its August 31, 2011 submission -

- Data regarding different levels of "acuity" at different facilities has not been submitted, and the billed level of service would account for the amount of time and effort expended at each visit and should be self-supporting.

- The Histograms submitted by AdvanceMed's statistician reflect that the total line amount paid for the claims in the frame and for the claims in the sample reflect a similarity of distribution such that the sample accurately reflects the frame in total line amounts paid.  By extension, this correlation would presumably be true for the overpayment amounts also.

- Sufficient information was available to the appellant's statistician upon request to duplicate the sampling, and the sampling was replicated by an AdvanceMed physician that did not participate in the original sampling.

- The appellant has not established that any claims identified by the AdvanceMed criteria (billed with one of two PIN numbers, one of the six CPT billing codes, and during the dates of service at issue) were excluded from the frame.

*See* Master Exh. 92.

Taken together, the appellant's arguments above are largely a reiteration of those addressed by the Council in its Order of Remand.  Essentially, the appellant asserts that a better sampling methodology should have been employed and would have produced a result more favorable to it.  As is evident from the law and, to a greater degree, Program guidance, the CMS contractors have a significant degree of latitude in performance

29

of the review, so long as the particular methodology employed,
*i.e.*, simple random, cluster or stratified sampling or a
combination of methodologies, is properly executed.  The
expertise of the appellant's statisticians is not in question.
However, their preference for one methodology over another is
not determinative.  A qualified expert can reasonably argue an
issue with any audit methodology.  However, the primary question
to be resolved, in any case before the Council, is *whether the
particular methodology in issue was both reasonable and properly
executed in the audit under review*.  The appellant has not
demonstrated that the PSC erroneously executed a random sample
in this audit.

### E. Other inaccuracies alleged in the AdvanceMed letter

The appellant takes exception to the following responsive
statement from the PSC -

> Review of the data from the sample shows that all six
> of the CPT codes included in the sample are billed for
> patients in some of the facilities.  Data also shows
> that different levels of CPT code are billed for this
> patient, which would show different levels of service
> provided at different times by General Medicine.  **The
> data proves that the facility does not determine the
> acuity of service billed.**

Exh. MAC-3 at 17 (appellant's emphasis); *see also* Master Exh. 92
at 3.  The appellant maintains that because "the universe file
does not permit identification of the nursing facility, it is
impossible to make any statements regarding CPT codes and
facility based only on the data present in the universe file,
especially when the universe file might not include claims from
all facilities."  *See* Exh. MAC-3 at 17.  Finally, the appellant
challenges the PSC's conclusions that the "universe is complete"
and includes all claims meeting the sampling parameters, and
that the sample is otherwise fully compliant with CMS
regulations.  The appellant again asserts that its arguments
have disproven the PSC's conclusions.  *See id.*; *see also* Master
Exh. 92 at 5.

The Council interprets the above statement from the PSC to mean
that the different levels of services occurred within the
facilities reviewed, and that the fact a beneficiary is in a
particular facility does not have a bearing on the essential
elements of the specific claim for coverage.  Rather, the burden

30

is on a claiming party to demonstrate that coverage for the
claim as billed is warranted and the amount of that coverage.
*See* Act, § 1833(e); *see also* 42 C.F.R. § 424.5(a)(6).  Simply
put, if you have billed a code, you must prove the coverage
elements of that code.  Much of the overpayment assessed in this
action was due to either a lack of medical records for certain
dates of service, or medical records not establishing the
medical reasonableness and necessity of the services.  Regard-
less of the "acuity" of the beneficiaries and/or the level and
frequency of services billed, each evaluation and management
service must stand on its own merits and be appropriately
documented.


*Coverage*

In addition to the beneficiary-specific arguments below, the
appellant offers overarching arguments concerning the ALJ's
consideration of the coverage issue.

The appellant asserts that, by regulation, an ALJ is required to
fully examine the issues.  *See* Exh. MAC-3 at 18 (citing 42
C.F.R. § 405.1030(b) and 42 C.F.R. § 405.1036(a)(1)).  The
appellant recounts that this case originally involved an audit
of 382 sampled claims but, following the QIC's final
reconsideration, coverage for 213 remained in dispute.  The
appellant notes that the Council's Order directed the ALJ to
consider the question of Medicare coverage for each of the
individual claims remaining in dispute.  *See id.* (referencing
Master Exh. 81 at 15-16).

The appellant explains that in the ALJ hearing following the
Council's remand it presented evidence on each of the 213
claims, which included testimony from its Senior Medical
Director (Dr. P.); medical records for 138 beneficiaries; and "a
report from ValueScope, Inc. on [the remaining] 75 . . .
beneficiaries."  *See* Exh. MAC-3 at 18 (referencing Master
Exh. 88).  However, the ALJ's decision included an "attached
. . . spreadsheet on 335 claims.  The spreadsheet included 122
claims that were part of the original sample, but which had been
resolved in General's favor during the earlier levels of
appeal."  The appellant points out that on the remaining "213
claims . . . the ALJ made findings that were identical to the
findings of the QIC."  *See id*.  The appellant argues that the
ALJ's findings are "absolutely identical" to the QIC's, "with
the exception of the four claims that the ALJ remanded to the

QIC for decision on May 11, 2009 . . . and again on January 21, 2010 when the QIC failed to address all four claims . . . However, the ALJ's decision incorporates the QIC's decision on the four remanded cases verbatim . . . ." *See id.; see also* Master Exhs. 45, 49 and 63-65.

The appellant maintains that "it strains the bounds of believability" "that the ALJ came to the identical conclusion as the QIC for the very same reasons, on all 213 claims"  The appellant points out that although "at the lower levels of the appeal, without being able to present any evidence whatsoever, the original overpayment of 335 claims was reduced by over 36% to 213 claims . . .  the ALJ did not down-code or reverse even one of the 213 claims appealed by General." *See* Exh. MAC-3 at 19.  The appellant adds that the ALJ's spreadsheet analysis of coverage issues is identical to the QIC's "right down to the exact same verbiage for each denial."  The appellant asserts that, rather than "exercising . . . independent judgment," the ALJ "refused to consider the evidence" on a claim-specific basis as directed by the Council and required by regulations.  In view of these circumstances, the appellant argues that there is a "clear implication that the ALJ simply rubber-stamped the findings of the QIC." *See id.*  The appellant contends that it has adequately documented each of the claims remaining in issue and urges that, in its assessment of coverage, the Council review the ALJ decision de novo, and considering all the evidence in the administrative record. *See id.; see also* 42 C.F.R. § 405.1108(a).

The E&M services at issue were billed under six HCPCS codes then in effect:  99302, 99303, 99311, 99312, 99313 and 99316.  As summarized, these codes involved -

>  99302 Evaluation and management of a new patient in a nursing facility requiring three key components:  a detailed history, comprehensive examination and medical decision making of moderate to high complexity.

>  99303 Evaluation and management of a new patient in a nursing facility requiring three key components:  a comprehensive history and examination, medical decision making of moderate to high complexity.

>  99311 Subsequent nursing facility care for the evaluation of a new or established patient that

32

> requires at least two of three key components:  a
> problem focused interval history; a problem focused
> examination, medical decision making that is
> straightforward or of low complexity.
>
> 99312 Subsequent nursing facility care for the
> evaluation of a new or established patient that
> requires at least two of three key components:
> expanded, problem focused history and examination;
> medical decision making of moderate to high
> complexity.
>
> 99313 Subsequent nursing facility care for the
> evaluation of a new or established patient that
> requires at least two of three key components:  a
> comprehensive history and examination, medical
> decision making of moderate to high complexity.
>
>
> 99316 Nursing facility discharge day management; more
> than 30 minutes.

*See* Master Exh. 41 at 273-271; *see also* Dec. at 14-15.

Generally recounting the coverage history of the appellant's
claims, the ALJ indicated that –

> While some of the audited claims were . . .
> sufficiently documented and therefore payable, others
> were not and were either . . . down-coded or paid as
> subsequent, rather than comprehensive, visits.  The
> majority . . . were denied in whole because they did
> not meet the "incident to" policy guidelines
> applicable when a Nurse Practitioner provides the
> service without documentation supporting the
> physician's participation; or they did not contain
> documentation to show the service was rendered; while
> others were denied as not medically necessary.

Dec. at 14.  The ALJ then set out brief, overarching synopses of
his reasoning for the categorical denials of coverage.  *See id.*
at 15-19.  As the appellant has noted, the ALJ then provided a
spreadsheet of claim-specific findings which largely replicated
the QIC's.  *See* Dec., Att. at 1-23.

000034

33

The Council has reviewed the medical records for each of the claims at issue. All of the beneficiaries appear to have been in long term care stays in nursing facilities. The Council notes that the appellant used "check-box" forms for all of the treatment notes and assessments. We understand the convenience of this form structure for medical professionals. However, standing alone, check-box information may be insufficient to support Medicare coverage of an E&M service, where a reviewer is faced with having to assess the content of services over several possible coding levels. The check-box forms found in the case files were usually supplemented, if at all, with additional diagnoses or single-word entries but no other substantive information. To the extent that handwritten entries were present, the vast majority of those entries were illegible.

With regard to many claims, the ALJ noted that there were several additional E&M visits furnished in the same month as the service date(s) at issue; at the same time, there were no new complaints indicated and the reason for each visit was not clearly documented. As we noted with regard to some beneficiaries – and which should be assumed to apply to all claims where applicable – where there were frequent dates of service that occurred in the same month but *after* the date(s) of service at issue, they would have no bearing on the date(s) at issue because they had not yet occurred. Nonetheless, while the Council did not deny coverage for any dates of service based on the frequency of other surrounding dates of E&M services, the Council agrees that many of these treatment notes did not document a clear purpose for the visit. Without such clear documentation of purpose, the Council agrees that the frequency of visits was excessive. Moreover, the appellant's physicians merely checked off diagnostic boxes on the form applicable to the particular beneficiary, but the notes reflected no plan of treatment or course of action to be taken as a result of the treatment.

Most of the services billed with CPT code 99302 were documented on a form titled, "Medical Director/Physician: History/Physical Assessment and Care Plan Review." These were usually followed by single page check-box forms titled "Problem List -- Disease Diagnosis." Together, these two pages were used to record monthly assessments. Most of these forms, though titled in part "Care Plan Review," had nothing indicating a plan of care for the conditions checked on the assessment form. During the dates of service at issue, code 99302 required a detailed history, comprehensive examination, *and* "medical decision making of

34

moderate to high complexity." There was no documentation of any decision making, let alone that of moderate to high complexity. Moreover, while the appellant also argued that the services were necessary for "Medicare certification/recertification" that required billing with code 99302, the appellant has not provided evidence of that billing requirement, and the services furnished do not meet the level of services described by code 99302. Therefore, we disallowed coverage for these visits.

The appellant also billed some services as "incident to" a physician's services. The Council has denied coverage for these services on the grounds that "incident to" services "must be furnished in a non-institutional setting to non-institutional patients." 42 C.F.R. 410.26(b)(1). Thus, these services may not be billed for nursing facility beneficiaries.

Finally, as referenced in the above discussion on the issuance of subpoenas, some E&M documents addressing the dates of service at issue are not in the claims files. Since we based our decision in each claim largely on the four corners of the treatment note or assessment for the date of service at issue, we would expect that the appellant's physicians would have custody of their own E&M treatment records. Nonetheless, the appellant sought to blame the lack of documentation supporting the dates of service at issue on the facility –

> The nursing home did not furnish Medicare with a case file for the patient. Often times in a nursing home a single patient can have numerous boxes of medical records for one year alone. These boxes are kept in no particular order and charts are a mess from being thinned out, etc.

See, e g., Request for Review, Beneficiary J.A. The Council finds no merit to this argument. As stated previously, we did not deny any services based on the beneficiary's overall condition, diagnoses, or the frequency of services; thus, these medical records were not material. Rather, we decided each claim based only on medical records created by the appellant's physicians, which the physicians had or should have had in their possession.

Below, we address each of the services remaining in dispute. Unless otherwise indicated, references to exhibits in the Council's beneficiary-specific analyses are also beneficiary-specific. The appellant's beneficiary-specific, single-page,

arguments are contained, among other documentation, in its Attachment D, to Exhibit MAC-3. As the arguments are not paginated, it should be understood that they are located, alphabetically, in that Attachment. A parenthetical number accompanying a beneficiary's initials distinguishes between beneficiaries who, post-redaction, have identical initials. Where there are distinct codes for multiple dates of service, the codes are listed sequential to their billing.

Pertinent to each of the following analyses, by law, an appellant bears the burden of establishing that it is entitled to reimbursement. Section 1833(e) of the Act provides that no claim for Medicare coverage may be paid unless "there has been furnished such information as may be necessary to determine the amounts due such provider." Thus, the law clearly places the burden of substantiating a claim for payment on the entity making the claim by requiring the appellant to provide documentation explaining the conditions necessitating the item or service and meeting all payment requirements. *See also* 42 C.F.R. § 424.5(a)(6).

In its beneficiary-specific arguments for coverage (where the absence of documentation was not an issue), the appellant generally recounts a beneficiary's medical history and maintains that the physician's need to address those conditions and associated medications justifies the E&M billing in issue. While we understand the essence of an argument framed in that manner, we cannot simply accept, on faith, an appellant's assertion that a claim should simply be reimbursed at the code level billed. Rather, we must find that there is discernable clinical medical information supporting an argument for a specific E&M billing.

We note at the outset, and as will be evident below, the appellant's argument that the ALJ's beneficiary-specific analyses were a verbatim repetition of the QIC's findings has merit. Even where we find no error in the ALJ's analyses (and there are a number where we do), the ALJ should have provided individual review where contentions were raised for the individual claims.

36

1. **Beneficiary E.A.**
   **Date of Service - September 5, 2002**
   **Code - 99311**

The PSC denied coverage reasoning that since, when seen on
August 8 and 20 the beneficiary reported no new complaints, the
September 5th service was not necessary.  The PSC added that it
was unable to determine the name of the physician who signed the
report for this date of service.  *See* Master Exh. 10 at 40.  The
ALJ and the QIC denied coverage finding that this service did
not meet the "incident to criteria."  *See* Dec., Att. at 1; see
also Master Exh. 49 at 25.

In his overarching analysis, the ALJ explained that "incident to
a physician's professional services" refers to "services or
supplies . . . furnished as an integral, although incidental
part, of the physician's personal services in the course of
diagnosis or treatment . . . ."  Dec. at 17 (referencing
Medicare Benefit Policy Manual (MBPM) (CMS Pub. 100-02), Ch. 15,
§ 60.1).  The ALJ noted that "billing guidance" in the Medicare
Claims Processing Manual (MCPM) (CMS Pub. 100-04), provides that
"Medicare will pay for E&M services for [*i.e.*, performed by,]
specific non-physician practitioners (*e.g.*, nurse practitioners)
. . . ."  *Id.*  The ALJ stated that, when E&M services are
provided in an "incident to" context, the MCPM requires that
"[d]ocumentation must be in sufficient detail to support the
claim."  *Id.* (Referencing MCPM, Ch. 12, §§ 30.6.1 and 30.6.4.)
The ALJ added that the pertinent treatment notes for all
beneficiaries were not co-signed by the physician as required
under the "incident to" criteria.  *See id.* at 18.

The appellant asserts that its documentation evidences its
compliance with Medicare's "incident to" criteria in providing
these services.  The appellant adds that the Nurse Practitioner
(NP) plainly indicated, and the physician affirmed, that she had
timely and affirmatively discussed the beneficiary's care with
the physician.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for
schizophrenia, dementia with delusions, depression, shoulder
joint pain, angioedema as well as cataracts and dental issues.
*See* Exh. 1 at 6-7.  The September 5th treatment note is a check-
box form with entries supplemented by the Nurse Practitioner's
hand-written notations.  The examination was conducted to update
the beneficiary's clinical status and reports the beneficiary
denying pain or discomfort.  In addition to examination-specific

37

notations, the note reports on the status and future action for the beneficiary's principal diagnoses. Moreover, the note indicates that the NP discussed the examination results with one of the appellant's physicians under review, who agreed with its content. *See id.* at 17; *see also* Exh. MAC-3 at 13.

Coverage criteria for CPT code 99311 requires satisfaction of at least two of the following three elements - a problem focused interval history; a problem focused examination and medical decision making that is straightforward or of low complexity. Those criteria would appear to have been met for this service.

However, as discussed above, by regulation, "incident to" services "must be furnished in a non-institutional setting to non-institutional patients." *See* 42 C.F.R. 410.26(b)(1). Thus, these services cannot be billed to Medicare under the circumstances of this claim.

The appellant's claim for E&M services provided to Beneficiary E.A. on September 5, 2002 and billed under code 99311 is not covered by Medicare.

2. **Beneficiary J.A.**
   **Dates of Service - April 8, 2002 & September 4, 2003**
   **Codes - 99302 & 99313**

The PSC denied coverage based on the lack of medical records. *See* Master Exh. 10 at 40. The ALJ and the QIC also denied coverage for this reason. *See* ALJ Dec., Att. at 1; *see also* Master Exh. 49 at 25.

The appellant concedes there are no medical records, attributing this situation to the facility's poor record maintenance. *See* Exh. MAC-3, Att. D.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claims for E&M services provided to Beneficiary J.A. on April 8, 2002 and September 4, 2003 and billed under codes 99302 and 99313, are not covered by Medicare.

3.  **Beneficiary B.A.**
    **Dates of Service – June 25 & December 14, 2002**
    **Codes - 99302 & 99311**

For both dates of service, the PSC found each E&M service not "medically reasonable and necessary" because the beneficiary had been seen weekly in the prior two or three weeks and had presented "no new complaints." *See* Master Exh. 10 at 40. Relative to the June 25th date of service, the ALJ and QIC denied coverage finding a face-to-face assessment "not clearly demonstrated." Relative to the December 14th claim, the ALJ and QIC denied coverage finding "no supporting documentation." *See* ALJ Dec., Att. at 1; *see also* Master Exh. 49 at 25.

The appellant asserts that the treating physician fully complied with the standards for coverage (99302) for the June date of service. The appellant asserts that the beneficiary had multiple conditions and the physician's examination addressed their interplay. *See* Exh. MAC-3, Att. D. The appellant adds that, due to poor record maintenance, the facility did not provide the documentation necessary for the December (99311) date of service. *See id.*

The beneficiary's medical history was significant for diabetes, congestive heart failure, cardiac dysrhythmia, hypertension, arthritis and depression. *See* Exh. 1 at 19. The treatment note for the June 25 date of service is a form titled "*Medical Director/Physician: History/ Physical Assessment and Care Plan Review.*" This is a check-box instrument which other than indicating the number of medications (0) the beneficiary takes PRN (as necessary), contains no hand-written substantive medical information supplementing the check-box entries on the form. *See id.* at 18. Consequently, there is insufficient clinical support of record for coverage of the appellant's June 25th claim as billed. While, in total, the beneficiary's claim file contains an extensive amount of medical documentation, there is, as the appellant concedes, no documentation relative to the December 14, 2002 date of service. *See generally id.*

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

39

The appellant's claims for E&M services provided to Beneficiary
B.A. on June 25 and December 14, 2002 and billed under codes
99302 and 99311 are not covered by Medicare.

4.  **Beneficiary A.A.**
    **Date of Service – February 3, 2003**
    **Code - 99313**

The appellant billed this claim as an E&M service requiring at
least two of three key components - a comprehensive history,
comprehensive examination and medical decision making of
moderate to high complexity.  The PSC down-coded the claim to
CPT code 99312, finding that the services provided involved a
problem focused history and/or examination, and/or medical
decision making of moderate to high complexity.  The PSC
attributed the performance of these services to Dr. I., one of
the physicians under review.  *See* Master Exh. 10 at 40; *see also*
Exh. MAC-3 at 13.  As had the QIC, the ALJ down-coded this claim
to E&M services reimbursable under CPT code 99311.  *See* Dec.,
Att. at 1; *see also* Master Exh. 49 at 25.

The appellant maintains that its physician fully complied with
the coverage criteria for code 99313 and that the examination
necessitated a review of the beneficiary's medication chart in
order to make any needed adjustments.  *See* Exh. MAC-3, Att. D.
The beneficiary's medical history was significant for dementia
other than Alzheimer's disease, strike, seizure disorder, peptic
ulcer disease and a urinary tract infection.  *See* Exh. 1 at 11;
*see also id.* at 15.  The record contains a signed, check-box
form, progress note for this date of service, supplemented by a
limited, hand-written addendum, which is largely illegible.  The
individual signing the note indicated that decision making of
"high" complexity was involved in this examination.  *See id.*
at 13.  Neither the content of the progress note, nor any other
information in the beneficiary's medical record indicates that
decision making of high, or even moderate, complexity was
involved in the February 3 examination of the beneficiary, who
died from dementia eleven days later.  *See id.* at 32.  The
appellant has not met its burden of establishing the medical
necessity of the services at issue, as billed, nor its
entitlement to Medicare reimbursement for those services.  *See*
Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
A.A. on February 3, 2003 was properly down-coded and is only
reimbursable under the rate paid for code 99311.

000041

40

5.  Beneficiary K.B.
    Date of Service - October 31, 2002
    Code - 99302

The PSC denied coverage finding no "documentation for this service." *See* Master Exh. 10 at 40.  The ALJ and the QIC also denied coverage for this reason. *See* Dec., Att. at 1; *see also* Master Exh. 49 at 25.

The appellant asserts that, due to poor record maintenance, the facility did not provide the documentation necessary for this date of service. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for paranoid schizophrenia, CVA, peptic ulcer disease, extrapyramidal symptoms and aortic stenosis. *See* Exh. 1 at 6.  Other than a "10/31/02" entry on a larger series of nursing progress notes (Exhibit 1 at 36), there is no clinical documentation relative to this date of service. *See generally* Exh. 1.  There are examination forms, similar to those identified above as having been used by the appellant's medical practitioners for other beneficiaries, but those forms are either undated or contain dates other than October 31, 2002. *See id.* at 11-13.  The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M service provided to Beneficiary K.B. on October 31, 2002 and billed under code 99302 is not covered by Medicare.

6.  Beneficiary F.B.(1)
    Date of Service - July 23, 2003
    Code - 99313

The PSC denied coverage finding no "documentation for this service." *See* Master Exh. 10 at 40.  The ALJ and the QIC also denied coverage for this reason. *See* Dec., Att. at 1; *see also* Master Exh. 49 at 25.

The appellant asserts that, due to poor record maintenance, the facility did not provide the documentation necessary for this date of service. *See* Exh. MAC-3, Att. D.

000042

41

The beneficiary's medical history was significant for schizophrenia and COPD. *See* Exh. 1 at 48. There is no medical documentation reflecting July 23, 2003 E&M services. The record does contain a July 22, 2003 Progress Note reflecting an examination, but which does not clearly identify the individual performing the examination, nor is it signed by a physician. *See id.* at 40. The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M service provided to Beneficiary F.B.(1) on July 23, 2003 and billed under code 99313 is not covered by Medicare.

7. **Beneficiary M.B.**
   **Date of Service – February 27, 2002**
   **Code – 99302**

The PSC denied coverage finding no documentation for this date of service. *See* Master Exh. 10 at 40. The ALJ and the QIC also denied coverage for this reason. *See* Dec., Att. at 1; *see also* Master Exh. 49 at 25.

The appellant asserts that, due to poor record maintenance, the facility did not provide the documentation necessary for this date of service. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for dementia, chronic anxiety, degenerative join disease (DJD) and organic brain syndrome. *See* Exh. 1 at 30. There are various documents of record identifying medical and psychosocial-spiritual services provided to the beneficiary in close proximity to the date of service in issue. However, there are no documents indicating that the beneficiary received E&M, or any other, services on the date in issue. *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M service provided to Beneficiary M.B. on February 27, 2002 and billed under code 99302 is not covered by Medicare.

42

8.  Beneficiary R.B.
    Date of Service – May 21, 2002
    Code - 99302

The PSC denied coverage finding that the beneficiary had been
seen five days earlier, with no new complaints.  *See* Master
Exhibit 10 at 40; *see also* Exh. MAC-3 at 13.  The ALJ and the
QIC denied coverage finding that a "face-to-face assessment
[was] not clearly demonstrated.  *See* Dec., Att. at 1; *see also*
Master Exh. 49 at 25.

The appellant asserts that the treating physician fully complied
with the standards for coverage of CPT code 99302.  The
appellant asserts that the beneficiary had multiple conditions
and the physician's examination addressed their interplay.  *See*
Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for
polydipsia, hyposmolality, schizophrenia, seizure disorders and
change in mental status.  *See* Exh. 1 at 67.  The record contains
an extensive series of typed, physician-generated, psychiatric
"notes" reflecting evaluations of the beneficiary's psycho-
social status between March 25 and July 7, 2002.  The notes
reflect that the beneficiary's mental status was unstable and
deteriorating.  *See id.* at 57-18.  Additionally, and pertinent
to this claim, the record contains a note identifying a May 21,
2002 physical assessment performed by one of the physicians
under review.  *See id.* at 59-58.  However, virtually the
entirety of the information on this note is presented in check-
box fashion.  A billing under code 99302 requires a detailed
history, a comprehensive examination and medical decision making
of moderate to high complexity.  The note's content does not
reflect that depth of examination.  The appellant has not met
its burden of establishing the medical necessity of the services
at issue, nor its entitlement to Medicare reimbursement for
those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M service provided to
Beneficiary R.B. on May 21, 2002 and billed under code 99302 is
not covered by Medicare.

43

9.  Beneficiary C.B.(1)
    Date of Service — February 9, 2004
    Code - 99312

The PSC denied coverage finding that the beneficiary had been
seen twice within the preceding seven days, with no new
complaints on this visit.  Moreover, the PSC reviewer could not
determine the name of the physician signing this treatment note.
*See* Master Exhibit 10 at 40.  The ALJ and the QIC both directed
that the appellant's claim be down-coded "to 99311."  *See* Dec.,
Att. at 2; *see also* Master Exh. 49 at 24.

The appellant asserts that the treating physician fully complied
with the standards for coverage of CPT code 99312.  The
appellant maintains that the physician completed an expanded
problem focused interval history and examination and, based on
review of lab reports and ensuing medication changes, engaged in
decision making of moderate complexity.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for pneumonia,
PEG Tube failure, Alzheimer's disease, dementia and a steady
decrease in cognition and overall condition, characterized as
"vegetative," leading to death on February 16, 2004.  *See* Exh. 1
at 28-27 and 3; *see also id.* at 48-41.  The hand-written addenda
to the pertinent treatment note are somewhat illegible.  *See id.*
at 39.  In context however, it is clear that, at a minimum, the
physician conducted a problem focused examination and engaged in
decision making that was straightforward or of low-complexity as
required for coverage of CPT code 99311.  As reported however,
the examination cannot be interpreted as meeting the higher
examination standards necessary for coverage of a claim billed
under code 99312.

The appellant's claim for E&M services provided to Beneficiary
C.B.(1) on February 9, 2004 is not covered by Medicare as
originally billed (99312) but may be reimbursed at rate
available for code 99311

10.  Beneficiary O.B.
     Date of Service - July 3, 2003
     Code - 99313

The appellant billed this service under CPT code 99313 as E&M
services evidencing at least two of three key components -
comprehensive history and examination, medical decision making

44

of moderate to high complexity.  The PSC allowed coverage, but for a down-coded (99312) level, finding that the evidence demonstrated a problem focused history, expanded, problem-focused examination, and moderate decision making.  *See* Master Exh. 10 at 40.  The ALJ and the QIC denied coverage for the 99313 billing finding "[n]o documentation for this date of service."  *See* Dec., Att. at 2; *see also* Master Exh. 49 at 24.

The appellant asserts that, due to poor record maintenance, the facility did not provide the documentation necessary for this date of service.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for ovarian cancer, a pelvic abscess, coronary artery disease, deep vein thrombosis and osteoarthritis.  *See* Exh. 1 at 7.  Contrary to the ALJ's and QIC's finding, the record before the Council contains medical documentation pertinent to the beneficiary's care from her April 15, 2003 facility admission through her expiration (July 7, 2003).  *See generally* Exh. 1.  As the PSC found, the E&M services provided to the beneficiary on July 3, are more reflective of a billing under CPT code 99312, rather than code 99313.  Taken together, the treatment note and associated nursing note indicate an individual with no change in condition, without noted complaint, denying pain and resting comfortably, within the conditional context.  *See id.* at 19-20.

The appellant has not met its burden of establishing the medical necessity of the services at issue, as billed, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary O.B. on July 3, 2003 is not covered by Medicare as originally billed (99313) but is reimbursable under the rate paid for code 99312.

11.  **Beneficiary A.B.(1)**
     **Date of Service – February 28, 2002**
     **Code – 99311**

On its roster of claims for which it was requesting review, the appellant specifically sought review for the February 28, 2002 date of service for this beneficiary.  *See* Exh. MAC-3, Att. at 1.

45

The appellant billed this claim under CPT code 99311. However, the PSC found coverage warranted for this date of service at the higher level of reimbursement associated with an E&M 99312 billing explaining that the appellant's records demonstrated an expanded, problem-focused history and examination and low complexity decision making. The PSC then denied coverage for an April 4, 2002 date of service, also billed at the 99311 level, finding that the beneficiary had been examined on April 1 and 2 with no new complaints. *See* Master Exh. 10 at 40.

Upon redetermination, the Medicare contractor denied coverage for the February 28th claim as billed (99311) based on the absence of medical necessity. *See* Master Exh. 15 at 7. The contractor also denied coverage for the April 4th claim. *See id.* The appellant requested reconsideration for the April 4th claim, but did not request reconsideration for the February 28th claim. *See* Master Exh. 17 at 7. The QIC did not address coverage for the February 28th date of service, but found coverage warranted for the April 4 date, at the rate applicable to code 99311, based on "supporting documentation." *See* Master Exh. 49 at 24. The appellant included the February 28th claim in its roster of claims for which it sought an ALJ hearing. *See* Master Exh. 19 at 17-14 & 12. The ALJ found coverage warranted for the February 28th date of service, finding that the appellant's documentation supported the claim as billed. The ALJ also found coverage warranted for the April 4th date of service, again at the rate applicable to code 99311, based on "supporting documentation." *See* Dec., Att. at 2.

In spite of identifying this claim as one for which it was seeking Council review, the appellant provided the Council with no substantive argument for review of the February 28, 2002 date of service. *See generally* Exh. MAC-3, Att. D.

Even though the appellant sought an ALJ hearing for this claim, in the absence of a QIC reconsideration, the appellant did not have a right to an ALJ hearing on the merits of this claim. *See* 42 C.F.R. §§ 405.1000; 405.1002 and 405.1032(a).

The Council will dismiss a request for hearing for any reason that the ALJ could have dismissed the request for hearing. 42 C.F.R. § 405.1108(c). Accordingly, we dismiss the appellant's request for hearing as it applies to the February 28, 2002 claim for Beneficiary A.B.(1).

46

The Medicare contractor's redetermination, denying coverage for
the February 28, 2002 E&M service (99311) administered to
Beneficiary A.B.(1) stands as the final decision of the
Secretary.  *See* 42 C.F.R. § 405.958(a).

12.   **Beneficiary F.B.(2)**
      **Date of Service - June 7, 2002**
      **Code - 99313**

The PSC denied coverage for this claim as billed, but allowed
reimbursement at a down-coded (99312) level, finding that the
evidence demonstrated a "problem focused examination and
moderate complexity decision making."  *See* Master Exh. 10 at 39.
The ALJ and the QIC also directed a "down-code to 99312."  *See*
Dec., Att. at 2; *see also* Master Exh. 49 at 24.

The appellant asserts that coverage as a 99313 service is
warranted in light of the beneficiary's medical history and the
fact that its physician was "required to fulfill a comprehensive
history . . . and physical examination, and/or have medical
decision making of high complexity in order to bill a 99313."
The appellant adds that the physician was also required to
fulfill this level of decision making in order to authorize
refills of the appellant's medication.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for senile
dementia, depressive disorder, glaucoma, anemia and venous
thrombosis.  *See* Exh. 1 at 8.  In essence, the appellant's
argument is that because it billed this service under code
99313, *the service provided must have met that code's coverage
criteria.*  That is, the billing leads to a conclusion that the
required services were performed.  The appellant's argument
defeats the purpose of section 1833(e) of the Act and its
implementing regulation.  Those authorities require an appellant
to document that its claim meets Medicare coverage criteria and
supports the corresponding amount of such coverage.  Other than
noting *the beneficiary has poor communication skills,* the hand-
written addenda to the treatment note for this date of service
adds little new substance to the information reflected in the
form's check-box entries; the principle entries being two
listings of the beneficiary's conditions.  *See id.* at 24

The appellant has not met its burden of establishing the medical
necessity of the services at issue, as billed, nor its
entitlement to Medicare reimbursement for those services.  *See*
Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

47

The appellant's claim for E&M services provided to Beneficiary
F.B.(2) on June 7, 2002 is not covered as originally billed
(99313) but may be reimbursed the rate associated with
code 99312.

13.   Beneficiary P.B.(1)
      Date of Service - November 20, 2002
      Code - 99311

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 39.  The ALJ and QIC denied
coverage for this reason.  *See* Dec., Att. at 2; *see also* Master
Exh. 49 at 24.

The appellant asserts that the facility "did not furnish
Medicare with a complete chart for this patient."  The appellant
maintains that, for a single patient, facilities "can have
numerous boxes of medical records for one year alone."  The
appellant maintains that its physician performed the service as
billed and that a clinician reviewed and signed the
beneficiary's laboratory results for this date of service.  *See*
Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for diabetes,
delusions, psychotic mood disorder, dementia, osteoarthritis,
peripheral vascular disease and coronary artery disease.  *See*
Exh. 1 at 6.  The beneficiary's medical record contains numerous
treatment notes, nursing notes, lab reports and medication
administration reports identifying a range of services provided
in 2002.  However, there are no treatment notes or, contrary to
the appellant's contention, lab results for this date of
service.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to
Beneficiary P.B.(1) on November 20, 2002 and billed under
code 99311 is not covered by Medicare.

48

14.  Beneficiary P.B.(2)
     Date of Service – January 30, 2002
     Code – 99312

The PSC denied coverage reasoning that the beneficiary had been
seen on January 9 and 16 "with no new complaints, therefore this
service was not medically necessary."  See Master Exh. 10 at 39.
The ALJ and the QIC directed a "down-code to 99311."  See Dec.,
Att. at 2; see also Master Exh. 49 at 24.

The appellant asserts that the treating physician fully complied
with the standards for coverage of CPT code 99312.  The
appellant maintains that the physician completed an expanded
problem focused interval history and examination and, based on
review of lab reports and ensuing medication changes, engaged in
decision making of moderate complexity.  See Exh. MAC-3, Att. D.

The appellant asserts that its documentation fully warrants
reimbursement of this service as initially billed.
Specifically, the appellant notes that the visit supported
decision making of moderate complexity because this was a
follow-up visit to a patient with seizure disorders during which
the clinician reviewed labs and made medication changes.  See
Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for diabetes,
dementia, seizures, syncope, hypertension, coronary artery
disease and depression.  See Exh. 1 at 5.  The January 30th
treatment note evidences an expanded, problem-focused history
and examination accompanied by medical decision making of
moderate to high complexity.  See id. at 18.  Considered in the
context of the beneficiary's overall condition, the appellant's
documentation supports a claim for coverage of E&M services
billed under CPT code 99312.
**The appellant's claim for E&M services provided to Beneficiary
P.B.(2) on January 30, 2002 and billed under code 99312 is
covered by Medicare.**

15.  Beneficiary A.B.(2)
     Date of Service – July 5, 2003
     Code – 99312

The PSC denied coverage reasoning that the beneficiary had "no
complaints this visit and . . . [had been] seen 8 other times
this month therefore this service was not medically necessary."

000050

*See* Master Exh. 10 at 39.  The ALJ and the QIC directed a "down-code to 99311."  *See* Dec., Att. at 2; *see also* Master Exh. 49 at 24.

The appellant asserts that its documentation fully warrants reimbursement of this service as initially billed. Specifically, the appellant notes that the visit supported decision making of moderate complexity because the clinician reviewed lab reports and the beneficiary's condition was significant for advanced dementia and a PEG Tube "that needed observation."  Additionally, the clinician ordered a basic metabolic panel in two weeks and changed treatment, ordering 300cc water flushes every four hours.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for dementia, hypertension, peripheral vascular disease and arthritis.  *See* Exh. 1 at 16.  As the PSC reviewer indicated, the beneficiary had been subject to numerous examinations in July 2003. However, per the record, all of these July visits were *subsequent* to the date of service at issue.  *See id.* at 29-36. Thus, based upon the documentation of record, overly-frequent examination is not an issue for the July 5th examination, which was the first examination in the sequence referenced by the PSC. However, the treatment note for July 5 does not demonstrate at least two of three elements among an expanded, problem focused history and examination or medical decision making of moderate to high complexity.  In fact, the treating physician's characterization of the complexity decision making complexity varied between "low" and "moderate."  *See id.* at 29.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary A.B.(2) on July 5, 2003 is not covered by Medicare as originally billed (99312) but may be reimbursed at the rate associated with code 99311.

16.  Beneficiary C.B.(2)
     Date of Service - December 23, 2003
     Code - 99311

The PSC denied coverage finding no documentation for this date of service.  *See* Master Exh. 10 at 39.  The ALJ and QIC denied

50

coverage for this reason.  *See* Dec., Att. at 2; *see also* Master
Exh. 49 at 24.

The appellant simply asserts that its "medical documentation is
for date of service 12/23/03 not 12/2/03" as it did not bill for
December 2nd.  *See* Exh. MAC-3, Att. D.  It would appear that the
genesis of the appellant's contention arises from a treatment
note bearing the hand-written date "12/2[indistinguishable]/03".
*See* Exh. 1 at 34.  This treatment note appears sequentially in a
series of notes spanning "12/3/03" through "1/26/04."  *See id*.
at 35-31.  Considered in the context of similar records, we note
that the physician appears to have attempted to add a second
numeral, presumably a "3," to the numerical "day" identified as
"indistinguishable" above.  Consequently, the Council finds that
there is in fact a treatment note for December 23, 2003.  That
content of that note demonstrates a problem focused interval
history and examination, medical decision making that is
straightforward or of low complexity.  Considered in the context
of the beneficiary's overall condition, the appellant's
documentation supports a claim for coverage of E&M services
billed under CPT code 99311.

**The appellant's claim for E&M services provided to Beneficiary
C.B.(2) on December 23, 2003 and billed under code 99311 is
covered by Medicare.**

17.  **Beneficiary E.B.**
     **Date of Service - April 11, 2003**
     **Code — 99311**

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 39.  The ALJ and QIC also
denied coverage for this reason.  *See* Dec., Att. at 2; *see also*
Master Exh. 49 at 24.

The appellant asserts that the facility "did not furnish
Medicare with a complete chart for this patient."  The appellant
maintains that, for a single patient, facilities "can have
numerous boxes of medical records for one year alone."  The
appellant maintains that its physician performed the service as
billed and reimbursement was warranted.  The appellant adds that
"Medicare (*sic*) *only* submitted progress notes and care plan
reviews for the month of December, they submitted no medical
documentation for April."  *See* Exh. MAC-3, Att. D.

51

The beneficiary's medical history is significant for arteriosclerotic heart disease, hypertension, Alzheimer's disease, dementia, depression and anemia.  *See* Exh. 1 at 12. There are no medical records pertinent to the date of service at issue.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to Beneficiary E.B. on April 11, 2003 and billed under code 99311 is not covered by Medicare.

18.    Beneficiary J.B.
       Date of Service – August 15, 2002
       Code - 99312

The PSC denied coverage finding that the treatment note created by the Nurse Practitioner "did not meet incident to guidelines, there was no documentation by the physician."  *See* Master Exh. 10 at 39.  Generally referencing the "regulations," the ALJ and the QIC both denied coverage for failure to meet the incident to guidelines.  *See* Dec., Att. at 3; *see also* Master Exh. 49 at 23.

The appellant asserts that its documentation evidences its compliance with Medicare's "incident to" criteria in providing these services.  The appellant adds that the Nurse Practitioner plainly indicated, and the physician affirmed, that she had timely and affirmatively discussed the beneficiary's care with the physician.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for cardiac dysrhythmia, arthritis, Alzheimer's disease, stroke, schizophrenia, pneumonia and UTI.  *See* Exh. 1 at 20.  In and of itself, the treatment note for the August 15, 2002 date of service supports the performance of at least two of the following three coverage elements - an expanded, problem focused history and examination with medical decision making of moderate to high complexity.  *See id.* at 26.  Additionally, the note is plainly signed by the nurse practitioner and indicates that one of the appellant's physicians was present and involved in this review.  *See id.; see also* Exh. MAC-3 at 13.

52

However, as discussed above, by regulation, "incident to" services "must be furnished in a non-institutional setting to non-institutional patients." *See* 42 C.F.R. 410.26(b)(1). Thus, these services cannot be billed to Medicare under the circumstances of this claim.

The appellant's claim for E&M services provided to Beneficiary J.B. on August 15, 2002 and billed under code 99312 is not covered by Medicare.

19. **Beneficiary W.B.**
    **Date of Service – February 12, 2002**
    **Code – 99302**

The PSC denied coverage finding that the beneficiary had been seen twice within the preceding eleven days, with "no new complaints." Additionally, the reviewer was unable to determine the name of the physician who signed the progress note. *See* Master Exh. 10 at 39. The ALJ and the QIC both denied coverage finding a "face-to-face assessment not clearly demonstrated." *See* Dec., Att. at 3; *see also* Master Exh. 49 at 23.

The beneficiary's medical history was significant for diabetes, peripheral vascular disease, renal failure, dementia, schizophrenia and hypothyroidism. *See* Exh. 1 at 7 and 13. To the extent that the PSC review may not have been able to "read" the physician's signature, we note that the form of the physician's signature is consistent throughout the record. *See id.* at 12 and 9-7.

The appellant asserts that, based on the beneficiary's medical history, its physician fully complied with the coverage criteria for code 99302. The appellant adds that per "Medicare regulations this date of service shall be paid due to the fact that it is a required . . . service and . . . included Medicare certification/recertification." *See* Exh. MAC-3, Att. D.

CPT code 99302 addresses E&M services for a new patient in a facility and requires three components - a detailed history, comprehensive examination and medical decision making of moderate to high complexity. The record indicates that the beneficiary was *readmitted* to the facility on October 22, 2001. *See* Exh. 1 at 14-13. The appellant has not cited evidence supporting its position that the beneficiary, with an

000054

53

immediately preceding facility-residency of at least three-
months, was a new patient for purposes of CPT
code 99302. *See also id.* at 2. Additionally, the substantive
content of the treatment note itself does not satisfy the above-
identified coverage elements for CPT code 99302.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services. *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to
Beneficiary W.B. on February 12, 2002 and billed under code
99302 is not covered by Medicare.

20.  **Beneficiary M.B.**
     **Date of Service – January 26, 2004**
     **Code - 99302**

The PSC denied coverage finding that the beneficiary had been
seen four times within the preceding thirteen days, with "no new
complaints." Additionally, the reviewer was unable to determine
the name of the physician who signed the progress note. *See*
Master Exh. 10 at 39. The ALJ and the QIC both denied coverage
finding a "face-to-face assessment not clearly demonstrated."
*See* Dec., Att. at 3; *see also* Master Exh. 49
at 23.

The appellant asserts that, based on the beneficiary's medical
history, its physician fully complied with the coverage criteria
for code 99302. The appellant adds that per "Medicare
regulations" care plan oversight is to be billed under CPT
code 99302. *See* Exh. MAC-3, Att. D.

CPT code 99302 involves evaluation and management of a new
patient in a nursing facility requiring - a detailed history,
comprehensive examination and medical decision making of
moderate to high complexity. To the extent it is evident from
the record, the beneficiary's medical history is significant for
psychiatric issues. *See generally* Exh. 1. Other than
identifying the number (7) of medications the beneficiary takes
PRN, the January 26th assessment contains no hand-written
substantive medical information supplementing the check-box
entries on the form. *See id.* at 33. Consequently, there is no
support of record for coverage of the appellant's claim as
billed.

54

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to Beneficiary M.B. on January 26, 2004 and billed under code 99302 is not covered by Medicare,

21.  **Beneficiary D.B.**
     **Date of Service – February 11, 2002**
     **Code – 99302**

The PSC denied coverage finding that the beneficiary had been seen on February 6th "with no new complaints."  Additionally, the reviewer was unable to determine the name of the physician who signed the progress note.  *See* Master Exh. 10 at 39.  The ALJ and the QIC both denied coverage finding the "face-to-face assessment not clearly demonstrated."  *See* Dec., Att. at 3; *see also* Master Exh. 49 at 23.

The appellant asserts that, based on the beneficiary's medical history, its physician had fully complied with the coverage criteria for code 99302.  The appellant adds that per "Medicare regulations" care plan oversight is to be billed under CPT code 99302.  The appellant adds that this service must be covered because it "included Medicare certification/recertification."  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for renal insufficiency, pre-senile depression, hypertension, stroke and abdominal pain.  *See* Exh. 1 at 24.  The beneficiary was admitted to the facility in March 2001.  *See id.* at 21.

CPT code 99302 involves evaluation and management of a new patient in a nursing facility requiring - a detailed history, comprehensive examination and medical decision making of moderate to high complexity.  Other than identifying the number (3) of medications the beneficiary takes PRN, the February 11th assessment contains little hand-written substantive medical information supplementing the check-box entries on the form. *See* Exh. 1 at 18-19.  Consequently, there is no support of record for coverage of the appellant's claim as billed.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to Beneficiary D.B. on February 11, 2002 and billed under code 99302 is not covered by Medicare.

22. **Beneficiary F.C.**
    **Date of Service – March 12, 2003**
    **Code – 99302**

The PSC denied coverage finding that the beneficiary had "no complaints" and had been seen on "two other times this month." Additionally, the reviewer was unable to determine the name of the physician who signed the progress note. *See* Master Exh. 10 at 38. The ALJ and the QIC both denied coverage finding the "face-to-face assessment not clearly demonstrated." *See* Dec., Att. at 3; *see also* Master Exh. 49 at 23.

The appellant asserts that, based on the totality of the beneficiary's medical conditions, its physician had fully complied with the coverage criteria for code 99302. The appellant adds that per "Medicare regulations" care plan oversight is to be billed under CPT code 99302. The appellant adds that this service must be covered because it "included Medicare certification/recertification." *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for renal failure, hypertension, peptic ulcer disease, Alzheimer's disease and dementia. *See* Exh. 1 at 8. The beneficiary was admitted to the facility on June 27, 2002. *See id.* at 6.

As the PSC reviewer indicated, the beneficiary was seen two other times in March 2003. However, per the record, those visits were *subsequent* to the date of service at issue. *See* Exh. 1 at 10-11. CPT code 99302 involves evaluation and management of a new patient in a nursing facility requiring - a detailed history, comprehensive examination and medical decision making of moderate to high complexity. Other than identifying the number (1) of medications the beneficiary takes PRN, the March 12th treatment note contains no hand-written substantive medical information supplementing the check-box entries on the

56

form. *See id.* at 7.  Consequently, there is no support of
record for coverage of the beneficiary's claim as billed.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services. *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to
Beneficiary F.C. on March 12, 2003 and billed under code 99302
is not covered by Medicare.

23.  **Beneficiary H.C.**
     **Date of Service – November 19, 2002**
     **Code - 99302**

The PSC denied coverage for the claim as billed, but provided
reimbursement at a down-coded, 99311, level, based on a problem-
focused history, no examination and straight forward decision
making.  The review concluded that the documentation was "not
sufficient to support a comprehensive visit." *See* Master
Exh. 10 at 38.  The ALJ and the QIC both denied coverage finding
the "face-to-face assessment not clearly demonstrated." *See*
Dec., Att. at 3; *see also* Master Exh. 49 at 23.

The appellant asserts that, based on the totality of the
beneficiary's medical conditions, its physician had fully
complied with the coverage criteria for code 99302.  The
appellant adds that per "Medicare regulations" care plan
oversight is to be billed under CPT code 99302.  The appellant
adds that this service must be covered because it "included
Medicare certification/recertification." *See* Exh. MAC-3,
Att. D.

The beneficiary was admitted to the facility on April 13, 2001
with no complaints, but a medical history significant for COPD
and dementia with behavioral issues. *See* Exh. 1 at 6.

As noted above, the PSC recast this claim as a code 99311 E&M
service.  However, the QIC and ALJ assessed the service as
originally billed under code 99302.  CPT code 99302 involves
evaluation and management of a *new* patient in a nursing facility
requiring - a detailed history, comprehensive examination and
medical decision making of moderate to high complexity.  CPT
code 99311 involves evaluation and management of a *new or
established* patient in a nursing facility requiring at least two

of the following:  a problem-focused interval history, problem-focused examination and medical decision making which is straightforward or of low complexity.

Other than identifying the number (2) of medications the beneficiary takes PRN, the November 19th treatment note contains only minimal hand-written substantive medical information supplementing the check-box entries on the form.  *See* Exh. 1 at 8-9.  Consequently, there is no support of record for coverage of the appellant's claim as billed.  However, there is merit in the PSC's assessment of this service.  The beneficiary, an established resident was, contrary to the QIC's and ALJ's findings, examined.  The elements of that examination were compatible with a billing for E&M services under CPT code 99311.

The appellant's claim for E&M services provided to Beneficiary H.C. on November 19, 2002 was properly down-coded and is only reimbursable under the rate paid for code 99311.

24.   **Beneficiary L.C.(1)**
      **Date of Service - April 21, 2003**
      **Code - 99302**

The PSC denied coverage finding that the beneficiary had been seen three times in the preceding seventeen days with "no new complaints."  Additionally, the reviewer was unable to determine the name of the physician who signed the progress note.  *See* Master Exh. 10 at 38.  The ALJ and the QIC both denied coverage finding the "face-to-face assessment not clearly demonstrated." *See* Dec., Att. at 3; *see also* Master Exh. 49 at 23.

The appellant asserts that, based on the totality of the beneficiary's medical conditions, its physician had fully complied with the coverage criteria for code 99302.  The appellant maintains that per "Medicare regulations" care plan oversight is to be billed under CPT code 99302.  The appellant adds that this service must be covered because it "included Medicare certification/recertification."  *See* Exh. MAC-3, Att. D.

The beneficiary was admitted to the facility in April 1999 and had a medical history significant for hypertension, arthritis, dementia and cancer.  *See* Exh. 1 at 9 and 13.

58

CPT code 99302 involves evaluation and management of a new
patient in a nursing facility requiring - a detailed history,
comprehensive examination and medical decision making of
moderate to high complexity.  Other than identifying the number
(5) of medications the beneficiary takes PRN, the April 21st
assessment contains almost no hand-written substantive medical
information supplementing the check-box entries on the form.
*See* Exh. 1 at 12-13.  Consequently, there is no support of
record for coverage of the beneficiary's claim as billed.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to
Beneficiary L.C.(1) on April 21, 2003 and billed under
code 99302 is not covered by Medicare.

25.  **Beneficiary J.C.(1)**
     **Date of Service - March 11, 2002**
     **Code - 99302**

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 38.  The ALJ and QIC denied
coverage for this reason.  *See* Dec., Att. at 3; *see also* Master
Exh. 49 at 23.

The appellant asserts that the facility "did not furnish
Medicare with a complete chart for this patient."  The appellant
maintains that, for a single patient, other facilities "can have
numerous boxes of medical records for one year alone."  The
appellant maintains that its physician completed a physical
assessment and plan of care review on this date of service.  *See*
Exh. MAC-3, Att. D.

There is no medical documentation in the record for this
beneficiary.  *See generally* Exh. 1.  The appellant has not met
its burden of establishing the medical necessity of the services
at issue, nor its entitlement to Medicare reimbursement for
those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to
Beneficiary J.C.(1) on March 11, 2002 and billed under code
99302 is not covered by Medicare.

59

26.  Beneficiary J.C.(2)
     Date of Service – July 19, 2002
     Code – 99312

The PSC denied coverage finding that because there was "no
documentation by the physician" the claim did "not meet the
incident to guidelines." *See* Master Exh. 10 at 38.  Generally
referencing the "regulations," the ALJ and the QIC both denied
coverage for failure to meet the incident to guidelines.  *See*
Dec., Att. at 4; *see also* Master Exh. 49 at 22.

The appellant asserts that its documentation evidences its
compliance with Medicare's "incident to" criteria in providing
these services.  The appellant adds that its evidence plainly
demonstrates collaboration and consultation between the Nurse
Practitioner and treating physician, as well as the physician's
oversight.  *See* Exh. MAC-3, Att. D.

The treatment note for this date of service indicates that the
beneficiary's medical history was significant for COPD and a
UTI.  *See* Exh. 1 at 12.  CPT code 99312 requires at least two of
the following three elements:  an expanded, problem focused
history and examination and medical decision making of moderate
to high complexity.  The treatment note does reflect at least
two of those components and indicates that the substantive
content was provided to the physician who concurred in it.  *See*
*id.*  Moreover, a lab report, for urinalysis, was generated off
this review.  *See id.* at 13.

However, as discussed above, by regulation, "incident to"
services "must be furnished in a non-institutional setting to
non-institutional patients."  *See* 42 C.F.R. 410.26(b)(1).  Thus,
these services cannot be billed to Medicare under the
circumstances of this claim.

The appellant's claim for E&M services provided to Beneficiary
J.C.(2) on July 19, 2002 and billed under code 99312 is not
covered by Medicare.

27.  Beneficiary M.C.(1)
     Dates of Service – June 19 & July 3, 2002
     Codes – 99302 & 99312

The PSC denied coverage for the 99302 service finding that the
beneficiary had been seen three times in the preceding three
weeks with "no new complaints."  *See* Master Exh. 10 at 38.  The

60

ALJ and the QIC both denied coverage finding the "face-to-face assessment not clearly demonstrated." *See* Dec., Att. at 4; *see also* Master Exh. 49 at 22.

For the July 3rd claim, the PSC denied coverage for what it identified as a "99313" service finding that the beneficiary was stable with "no complaints" and noting that the beneficiary had been seen "4 other visits this month." *See* Master Exh. 10 at 38. The ALJ and the QIC both down-coded this service, finding reimbursement appropriate at the 99311 level. *See* Dec., Att. at 4; *see also* Master Exh. 49 at 22.

Relative to the June 19th date of service, the appellant asserts that, based on the totality of the beneficiary's medical conditions, its physician had fully complied with the coverage criteria for code 99302. The appellant adds that per "Medicare regulations" care plan oversight is to be billed under CPT code 99302. The appellant adds that this service must be covered because it "included Medicare certification/recertification." *See* Exh. MAC-3, Att. D.

Relative to the July 3rd date of service, the appellant disagrees with the ALJ's decision to down-code, from what the appellant framed as a "99312" claim, to a 99311 claim. The appellant asserts coverage as a 99312 E&M service is warranted because the physician provided an expanded, problem focused interval history and examination, as well as engaging in "decision making . . . of moderate complexity . . . ." *See* Exh. MAC-3, Att. D.

The beneficiary was admitted to the facility on June 27, 2000 with a medical history significant for hypertension, diabetes, dementia, psychosis with dementia, bipolar arthroplasty and anemia. *See* Exh. 1 at 73.

CPT code 99302 involves evaluation and management of a new patient in a nursing facility requiring - a detailed history, comprehensive examination and medical decision making of moderate to high complexity. Other than identifying the number (1) of medications the beneficiary takes PRN, the June 19th assessment contains little hand-written substantive medical information supplementing the check-box entries on the form. *See* Exh. 1 at 65-64. Consequently, there is no support of record for coverage of the beneficiary's claim as billed. The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to

61

Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

Relative to the July 3ʳᵈ claim, we note that the appellant's physician examined the beneficiary weekly between May 29 and July 31, 2002. Each of those eight treatment notes contains significant, and varying, hand-written detail, supplementing the check-box information. *See* Exh. 1 at 63-56. The treatment note reflects at least two of those components and indicates that substantive content was provided to the physician, who reviewed and concurred in it. *See id.* Moreover, a lab report, for urinalysis, was generated off this review. *See id.* at 60. A claim for coverage of service billed under CPT code 99312 requires at least two of the following elements - an expanded, problem focused history and examination; medical decision making of moderate to high complexity. The appellant's documentation for its July 3, 2002 claim satisfies these criteria.

The appellant's claim for E&M services provided to Beneficiary M.C.(1) on June 19, 2002 and billed under code 99302 is not covered by Medicare.

**The appellant's claim for E&M services provided to Beneficiary M.C.(1) on July 3, 2002 and billed under code 99312 is covered by Medicare.**

28. **Beneficiary L.C.(2)**
    **Date of Service - May 20, 2003**
    **Code - 99312**

The PSC denied coverage for the claim as billed, but provided reimbursement at the rate associated with code 99311, finding a problem-focused history, an expanded problem focused examination and "straight forward decisions." *See* Master Exh. 10 at 38. The ALJ and the QIC both affirmed the PSC's down-coding. *See* Dec., Att. at 4; *see also* Master Exh. 49 at 22.

The appellant asserts that this claim should have been reimbursed as billed because the physician engaged in an expanded problem focused examination and history. Moreover, the physician's decision making was of "moderate complexity" because the beneficiary "experienced a hypoglycemic episode the night before which resulted in a fall. . . ." Therefore, the physician had to adjust the beneficiary's diabetes-based medication. *See* Exh. MAC-3, Att. D.

62

Nursing notes indicate that the beneficiary normally utilized a "slow & shuffling gait" holding on to walls and furniture for support.  The beneficiary's history was significant for falls, not all of which were necessarily related to hypoglycemic episodes.  *See* Exh. 1 at 3-1.  The beneficiary experienced a fall at 1 a.m. on the morning of May 19th which was, based on a blood glucose reading, attributed to hypoglycemia.  The beneficiary also experienced a fall early evening May 20th, without exhibiting signs of hypoglycemia.  *See id.* at 3-2.  The addendum to the May 20th treatment note indicates the beneficiary was a Type 2 diabetic, reports the prior day's hypoglycemic episode, decreases the "PM" dosage of NPH insulin and advises monitoring of the beneficiary's blood glucose.  *See id.* at 13.  Overall however, the note does not reflect at least two of the three components, - expanded, problem focused history and examination; medical decision making of moderate to high complexity, necessary to warrant coverage for code 99312.

The appellant's claim for E&M services provided to Beneficiary L.C.(2) on May 20, 2003 was properly down-coded and is only reimbursable under the rate paid for code 99311.

29.  **Beneficiary M.C.(2)**
     **Date of Service - August 6, 2002**
     **Code - 99303**

The PSC denied coverage for this service as billed, finding that reimbursement at a down-coded "99301" rate was warranted.  The reviewer determined that the services provided included a detailed history, comprehensive examination and low complexity decision-making.  *See* Master Exh. 10 at 38.  (We note that the standards referenced by the PSC were, in fact, those utilized for assessing coverage for code "99311.")  The ALJ and the QIC both reimbursed for coverage at the rate applicable to a billing under code 99311.  *See* Dec., Att. at 4; *see also* Master Exh. 49 at 22.

The appellant asserts that coverage is warranted because the physician engaged in a comprehensive history and examination, as well as medical decision making of moderate to high complexity. The appellant adds that the physician also treated the beneficiary, "who was alert but disoriented during the visit due to dementia," for conjunctivitis.  *See* Exh. MAC-3, Att. D.

The treatment note for this date of service is extensively supplemented, over and above, the check-box entries.  *See* Exh. 1

63

at 23-22.  However, there is no evidence of medical decision making of moderate to high complexity.  The physician directs the continuation of the beneficiary's ongoing conjunctivitis treatment.  The physician is otherwise incapable of meaningful interaction with the beneficiary who the physician indicates is disoriented.  *See id.*  Coverage under CPT code 99303 requires the three "key" elements identified by the appellant in its request for review.  The physician's examination did not demonstrate the provision of those three elements.  *See id.*

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to Beneficiary M.C.(2) on August 6, 2002 is not covered as originally billed, under code 99303.  The appellant's claim is reimbursable under the rate available for CPT code 99311.

30.  **Beneficiary G.C.**
     **Date of Service – February 11, 2002**
     **Code - 99302**

The PSC denied coverage finding that the beneficiary had been seen twice in the prior week with "no new complaints." Additionally, the reviewer was unable to determine the name of the physician who signed the progress note.  *See* Master Exh. 10 at 37.  The ALJ and the QIC both denied coverage finding a "face-to-face assessment not clearly demonstrated."  *See* Dec., Att. at 4; *see also* Master Exh. 49 at 22.

The appellant asserts that, based on the totality of the beneficiary's medical condition, its physician fully complied with the coverage criteria for code 99302.  The appellant adds that per "Medicare regulations" care plan oversight is to be billed under CPT code 99302.  The appellant argues that this service must be covered because it "included Medicare certification/recertification."  *See* Exh. MAC-3, Att. D.

The beneficiary was admitted to the facility in September 1997 with a medical history significant for schizoaffective disorder, generalized anxiety, amenorrhea, anemia and obstipation.  *See* Exh. 1 at 5.

64

CPT code 99302 involves evaluation and management of a new patient in a nursing facility requiring - a detailed history, comprehensive examination and medical decision making of moderate to high complexity.  Other than identifying the number (2) of medications the beneficiary takes PRN, the February 3rd assessment contains no hand-written substantive medical information supplementing the check-box entries on the form. *See* Exh. 1 at 8-9.  Consequently, there is no support of record for coverage of the appellant's claim as billed.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to Beneficiary G.C. on February 11, 2002 and billed under code 99302 is not covered by Medicare.

31.  **Beneficiary L.D.(1)**
     **Dates of Service — July 23, 2002 & December 2, 2003**
     **Codes - 99312 & 99313**

The PSC denied coverage for the 99312 service finding that the beneficiary had been seen three times in the preceding three weeks with "no new complaints."  The reviewer noted that while the beneficiary's hypertension medication had been changed at a July 19th examination, that issue was not addressed here. *See* Master Exh. 10 at 37.  The PSC denied coverage for the 99313 service finding that the beneficiary had no complaints this visit and had been "seen 4 other times this month." *See id.* The ALJ and the QIC down-coded both claims, finding coverage warranted under CPT code 99311. *See* Dec., Att. at 4; *see also* Master Exh. 49 at 22.

The appellant asserts that, based on the totality of the beneficiary's medical conditions, its physician fully complied with the higher standard coverage criteria for code 99312 and 99313 on the respective dates of service.  The appellant adds that the physician reviewed labs for the July 2002 date of service and had to ensure the beneficiary did not require medication changes in December 2003. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history is significant for Alzheimer's disease, dementia other than Alzheimer's disease, hypertension,

Parkinson's disease and constipation.  *See* Exh. 1 at 12.  The
treatment notes for each date of service reflect at least two of
the following elements – a problem focused interval history; a
problem focused examination or medical decision making that is
straightforward or low complexity.  *See id.* at 28 and 33.  The
treatment notes do not, however, reflect the higher standards
necessary for coverage of claims billed under CPT codes 99312 or
99313.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claims for the E&M services provided to
Beneficiary G.C. on July 23, 2002 (code 99312) and December 2,
2003 (code 99313), are not covered as billed.  However, both
claims are covered under the reimbursement rate associated with
CPT code 99311.

32.  **Beneficiary M.D.**
     **Dates of Service – November 7, 2002 & July 7, 2003**
     **Codes – 99312 & 99316**

Finding that the physician had engaged in a problem focused
history, examination and straight forward decision making, the
PSC down-coded the appellant's November 7th claim, allowing
reimbursement at the 99311 level.  The PSC denied coverage for
the July 7, 2003 date of service (99316) based on the absence of
supporting documentation.  *See* Master Exh. 10 at 37.  The ALJ
and the QIC took similar actions.  *See* Dec., Att. at 4; *see also*
Master Exh. 49 at 22.

The appellant asserts that the November 7, 2002 E&M services
were fully compliant with the coverage criteria for CPT
code 99312.  Attributing the lack of documentation for the
July 7, 2003 services to the facility's poor record maintenance,
the appellant maintains that its physician performed, and should
be reimbursed for, the discharge management service (99316)
billed.  *See* Exh. MAC-3, Att. D.

The beneficiary was initially admitted to the facility on
September 1, 2001 and readmitted on July 26, 2002.  The
beneficiary's medical history was significant for "right heart
failure" and, upon readmission, an anaphylactic reaction to
peanuts, pneumonia, hypercholesterol, diabetes and left pleural

66

effusion. *See* Exh. 1 at 10. The physician's November 7th
examination reported that the beneficiary presented without pain
or discomfort and, per staff, was "going to vending machines"
for nuts in spite of her awareness of the allergy and previous
allergic reactions. *See id.* at 62. The physician's E&M
services on this date do not reflect an expanded, problem
focused history, examination or medical decision making of
moderate to high complexity; the PSC properly down-coded this
claim.

Relative to the July 7, 2003 claim, we note that the record is
replete with year 2003 treatment notes both preceding and post-
dating that of service, in spite of the fact that the 99316 code
billed is to be used for discharge day E&M services. *See
generally* Exh. 1 at 66-78. However, as the appellant concedes,
there is no documentation for the July 7th day of service; thus,
there is no viable basis for the coverage. *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to
Beneficiary M.D. on November 7, 2002 is not reimbursable as
billed (99312), but was properly down-coded for reimbursement as
a 99311 service. The E&M services provided to Beneficiary M.D.
on July 7, 2003 (99316) are not covered by Medicare.

33. **Beneficiary L.D.(2)**
    **Date of Service – April 30, 2002**
    **Code – 99312**

Finding that the physician had engaged in a problem focused
history, examination and straight forward decision making, the
PSC down-coded the appellant's claim; allowing reimbursement at
the 99311 level. *See* Master Exh. 10 at 37. The ALJ and the QIC
took similar action. *See* Dec., Att. at 5; *see also* Master
Exh. 49 at 21.

The appellant asserts that the treating physician fully complied
with the standards for coverage of CPT code 99312. The
appellant maintains that the physician completed an expanded
problem focused interval history and examination and, based on
review of lab reports and ensuing medication changes, engaged in
decision making of moderate complexity. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for pneumonia,
dysphagia, congestive heart failure, peripheral vascular
disease, degenerative joint disease and pernicious anemia. *See*

67

Exh. 1 at 24.  The associated treatment note does not support a
finding that the physician engaged in at least two of the
following elements – an expanded, problem focused history and
examination; medical decision making of moderate to high
complexity.  The physician conducted a "monthly med review" with
no indication that the beneficiary presented with new issues or
complaints.  *See id.* at 16.  At best, the physician's report
evidences a problem focused examination and medical decision
making that is straightforward or low complexity.

The appellant's claim for the E&M services provided to
Beneficiary L.D.(2) on April 30, 2002 is not reimbursable as
billed (99312), but was properly down-coded for reimbursement as
a 99311 service.

34.   Beneficiary I.D.
      Dates of Service – March 6, 2002 & March 17, 2004
      Codes – 99303 & 99302

The PSC denied coverage for the 99303 service but reimbursed the
claim at a down-coded (99301) rate, finding a detailed history,
comprehensive examination and moderate decision making.
*See* Master Exh. 10 at 37.  The PSC denied coverage for the 99302
service, finding that the beneficiary had no complaints at this
visit and had been seen on March 3rd and 10th.  *See id.*  The ALJ
and QIC agreed with the down-coding of the March 6th service, but
denied coverage for the March 17th service based on the absence
of documentation.  *See* Dec., Att. at 5; *see also* Master Exh. 49
at 21.

Relative to the March 6, 2002 claim, the appellant asserts that
the treating physician fully complied with the standards for
coverage of CPT code 99303, including a comprehensive history
and examination.  The appellant notes that the beneficiary "was
a transfer . . . [and] required a complete physical."  Relative
to the March 17, 2004 claim the appellant contends that the
physician's E&M service is documented in the record and
demonstrates compliance with the 99302 coverage criteria,
particularly in the context of the beneficiary's physical and
mental conditions.  *See* Exh. MAC-3, Att. D.

The beneficiary was admitted to the facility on March 5, 2002,
with a medical history significant for senile dementia,
osteoarthritis and hypertension.  *See* Exh. 1 at 10.  Code 99303
is billed for E&M services provided to a new patient involving a
comprehensive history and examination and medical decision

68

making of moderate to high complexity.  The appellant's claim
for this date of service reflects the provision of E&M services
consistent with a billing under CPT code 99303.  *See id.*
at 11-12.

Contrary to the ALJ's and the QIC's finding, the record does
contain documentation associated with the appellant's March 17,
2004 claim.  *See* Exh. 1 at 15-16.  However, that documentation
does not support coverage for a claim billed under CPT code
99302.  Other than identifying the number (4) of medications the
beneficiary takes PRN, this assessment contains no hand-written
substantive medical information supplementing the check-box
entries on the form, other than a notation of the presence of
squamous cell cancer.  Approximately one-third of the first page
has been left blank with no checkmarks.  *See id.*  This
documentation does not demonstrate a detailed history,
comprehensive examination and medical decision making of
moderate to high complexity.  The appellant has not met its
burden of establishing the medical necessity of the service at
issue, nor its entitlement to Medicare reimbursement for that
service.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
I.D. on March 17, 2004 and billed under code 99302 is not
covered by Medicare.

The appellant's claim for E&M services provided to Beneficiary
I.D. on March 6, 2002 and billed under code 99303 is covered by
Medicare.

35.  Beneficiary V.D.
     Dates of Service - May 30 & December 31, 2003
     Code - 99302

For each date of service, the PSC denied coverage finding that
the beneficiary had been seen three times earlier in each month
and had presented "with no complaints or issues this visit."
*See* Master Exh. 10 at 37.  The ALJ and the QIC denied coverage,
finding, for both claims, that a "face-to-face assessment [was]
not clearly demonstrated.  *See* Dec., Att. at 5; *see also* Master
Exh. 49 at 21.

The appellant asserts that, for each claim, the treating
physician fully complied with the standards for coverage of CPT
code 99302.  The appellant notes that the beneficiary had a
number of physical and psycho-social conditions and maintains

that the physician's notes evidence a comprehensive history and examination as well as high complexity decision making. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for pernicious anemia, COPD, a fractured wrist, joint stiffness, hepatic encephalopathy, hypoxia, back pain and disorders of urea cycle metabolism. *See* Exh. 1 at 16. The purported documentation for each date of service are each two-page reports. Of these four pages, one is dated "12/31/03" with the preceding page dated "12/31/." The May report is date "5/30/[notation more closely resembling the physician's signature]" and "5/30/" *See* Exh. 1 at 22-25. This incomplete or illegible record dating is repeated throughout numerous other treatment notes in the beneficiary's file. *See id.* at 68-91. On that fact alone, the Council would find the appellant's documentation unsatisfactory. Pursuant to the documentation requirements established by the Act and implementing regulations, a reviewer at any level cannot be put in a position of having to guess if and when a service has been provided. Even if we were to accept that these records properly reflected the E&M services provided on the dates in issue, the content of those records do not reflect a detailed history, comprehensive examination and medical decision making of moderate to high complexity.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claims for E&M services provided to Beneficiary V.D. on May 30 and December 31, 2003 and billed under code 99302 are not covered by Medicare.

36. **Beneficiary L.D.(3)**
    **Date of Service - October 7, 2003**
    **Code - 99313**

The PSC denied coverage finding that the beneficiary had been seen on five other dates in October (each subsequent to the date of service) without new complaints. *See* Master Exh. 10 at 37. The ALJ and the QIC denied coverage for the claim as billed but down-coded to allow reimbursement at the 99311 level. *See* Dec., Att. at 5; *see also* Master Exh. 49 at 21.

70

The appellant asserts that, consistent with a 99313 billing
instructions, the treating physician's services satisfied at
least two of the three coverage criteria.  The appellant
maintains that the physician conducted a comprehensive
examination and history.  The appellant adds that the
physician's engaged in high complexity decision making.  *See*
Exh. MAC-3, Att. D.

As we have noted in earlier claim reviews above, standing alone
the fact that a beneficiary was seen on multiple occasions *after*
*a date of service* has no bearing on the question of coverage for
that earlier date.  The beneficiary's medical history was
significant for diabetes, dementia, arteriosclerotic heart
disease and arthritis.  *See* Exh. 1 at 9.  The addenda to the
pertinent treatment note, which are somewhat illegible, do not
demonstrate that the coverage criteria for code 99313 have been
satisfied as they do not support the appellant's assertion that
the physician engaged in some combination of comprehensive
history and examination or medical decision making of moderate
to high complexity.  *See id.* at 16.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services, as billed.  *See* Act,
§ 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to
Beneficiary L.D.(3) on October 7, 2003 is not reimbursable as
billed (99313), but was properly down-coded for reimbursement as
a 99311 service.

37.  **Beneficiary E.D.**
     **Date of Service - June 16, 2003**
     **Code - 99316**

The PSC denied coverage finding that the beneficiary had been
seen three times in the ten days prior to this date of service
with no new complaints.  The reviewer added that he was unable
to determine the name of the physician signing the progress
note.  *See* Master Exh. 10 at 36.  The ALJ and the QIC denied
coverage for the claim as billed but down-coded to allow
reimbursement at the 99311 level.  *See* Dec., Att. at 5; *see also*
Master Exh. 49 at 21.

The appellant asserts that the 99316 billing code represents a
physician's E&M services expended in the course of a

71

beneficiary's discharge from a nursing facility.  Consequently, this service should be reimbursed as billed.  *See* Exh. MAC-3, Att. D.

While the appellant has correctly characterized the 99316 code criteria, it has not demonstrated its applicability to the services in issue.  Billing under CPT code 99316 entails "nursing facility discharge day management; more than 30 minutes."  There is no evidence in the record that the beneficiary was discharged from the facility on June 16th.  Rather, it is apparent from other orders and subsequent nursing notes that the beneficiary remained in the facility after June 16, 2003.  *See* Exh. 1 at 16 and 21.  On June 13, 2003 the beneficiary's care was transferred to another physician's [not in the appellant's practice group] "care at the responsible party['s] request."  *See id.* at 16; *see also* Exh. MAC-3 at 13.

The appellant has cited no law or guidance supporting a 99316 billing for the transfer of care for a facility-bound beneficiary between physicians.  Providing background on code 99316 (as well as 99315), the CPT manual instructs that this code is to be utilized "to report the total duration of time spent by a physician for the *final nursing facility discharge* of a patient." (emphasis added).  The instruction continues to further emphasize that the code is intended for a patient leaving a nursing facility.  The general instruction offers no discussion of the transfer of care between physicians in different medical practices.  The June 16th treatment note acknowledges transfer of the beneficiary's care to another physician, but does not address transfer from the facility.  *See id.* at 20.  The substantive content of the note does not reflect the elements of the 99316 coverage criteria.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services, as billed.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to Beneficiary E.D. on June 16, 2003 is not reimbursable as billed (99316), but was properly down-coded for reimbursement as a 99311 service.

000073

72

38.   Beneficiary F.E.
      Date of Service – November 4, 2002
      Code – 99303

The PSC denied coverage based on the absence of supporting
documentation.  *See* Master Exh. 10 at 36.  The ALJ and the QIC
denied coverage for the claim as billed but down-coded to allow
reimbursement at the 99302 level.  *See* Dec., Att. at 5; *see also*
Master Exh. 49 at 21.

The appellant asserts that the treating physician's services
satisfied the coverage criteria for a 99303 billing.  The
appellant adds that the beneficiary had "just arrived back from
an acute care facility and required a complete physical
examination of all symptoms."  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for renal
cancer, secondary malignant neoplasm of the brain and spinal
cord, parietal cerebral abscess, atrial fibrillation, seizure
disorder and hemiparesis.  See Exh. 1 at 10.  The record
supports the appellant's position on the timing of the
beneficiary's admission to the facility.  *See id.* at 10 and 35.
The November 4th treatment note reflects a comprehensive history
and examination as well as medical decision making of moderate
to high complexity.  *See id.* at 11-12.

**The appellant's claim for E&M services provided to Beneficiary
F.E. on November 4, 2002 and billed under code 99303 is covered
by Medicare.**

39.   Beneficiary H.E.
      Dates of Service – January 24 & December 16, 2002
      Code – 99302

For each date of service, the PSC denied coverage finding that
the beneficiary had been seen on earlier occasions in the
respective months of service and had presented "with no
complaints or issues this visit."  *See* Master Exh. 10 at 36.
The ALJ and the QIC denied coverage after finding, for both
claims, that a "face-to-face assessment [was] not clearly
demonstrated.  *See* Dec., Att. at 5; *see also* Master Exh. 49
at 21.

The appellant asserts that, for each claim, the treating
physician fully complied with the standards for coverage of CPT
code 99302.  The appellant notes that the beneficiary had a

73

number of physical and psycho-social conditions and maintains that the physician's notes evidence a comprehensive history and examination as well as high complexity decision making.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for schizophrenia, coronary arteriosclerosis, arthropathy with infection and transient insomnia.  *See* Exh. 1 at 9.  Other than identifying the number (1) of medications the beneficiary takes PRN, the treatment note for each date of service contains no hand-written substantive medical information supplementing the check-box entries on the respective forms or otherwise defining the scope of the E&M services provided.  *See* Exh. 1 at 12-15. Consequently, there is no support of record for coverage of the appellant's claims as billed.

The appellant has not met its burden of establishing the medical necessity of the service at issue, nor its entitlement to Medicare reimbursement for that service.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claims for E&M services provided to Beneficiary H.E on January 24 and December 16, 2002 and billed under code 99302 are not covered by Medicare.

40.  **Beneficiary R.E.(1)**
     **Dates of Service – March 1 & April 5, 2002**
     **Codes – 99313 & 99302**

The PSC denied coverage for these dates of service finding that the beneficiary had been seen four additional times during March and three additional times in April, all subsequent to the respective dates of service, "with no complaints" on the visit at issue.  The reviewer added that he was unable to determine the name of the individual signing the progress note.  *See* Master Exh. 10 at 36.  The ALJ and the QIC down-coded the March 1st (99313) claim finding reimbursement warranted at the 99311 rate.  Both entities denied coverage for the April 5th (99302) claim finding that a "face-to-face assessment [was] not clearly demonstrated.  *See* Dec., Att. at 5-6; *see also* Master Exh. 49 at 21-20.

Relative to the March 1 claim, the appellant maintains that the physician completed at least two of the three coverage elements associated with code 99313.  The appellant asserts that, for the April 5th claim, the treating physician fully complied with the

74

standards for coverage of CPT code 99302.  The appellant notes that the beneficiary had a number of physical and psycho-social conditions and maintains that the physician's notes evidence a comprehensive history and examination as well as high complexity decision making.  *See* Exh. MAC-3, Att. D.

The beneficiary was admitted to the facility in June 1999 with a medical history significant for major depressive disorder, anxiety disorder, agitation, urinary incontinence, severe psychosis and gastritis.  *See* Exh. 1 at 7.  We reiterate that, standing alone the fact that a beneficiary was seen on multiple occasions *after a date of service* has no bearing on the question of coverage for that earlier date.

The March 1st treatment note does not support a finding that, as required by CPT code 99313, the physician engaged in some combination of comprehensive history and examination, medical decision making of moderate to high complexity.  The physician identified this visit as a routine monthly examination with no changes in the beneficiary's overall condition, nor was there evidence of moderate to high complexity decision making.  *See* Exh. 1 at 30.

Other than identifying the number (6) of medications the beneficiary takes PRN, the April 5th treatment note contains no hand-written substantive medical information supplementing the check-box entries on the form.  *See* Exh. 1 at 13. Consequently, there is no support of record for coverage of the appellant's claim as billed.  Thus, this note cannot reasonably be interpreted as supporting E&M services billed under CPT code 99302.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services as billed.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary R.E.(1) on March 1, 2002 and billed under code 99313 is not covered by Medicare, but is reimbursable at the rate available for CPT code 99311.

The appellant's claim for E&M services provided to Beneficiary R.E.(1) on April 5, 2002 and billed under code 99302 is not covered by Medicare.

75

41.  Beneficiary R.E.(2)
     Date of Service – January 18, 2002
     Code – 99312

Finding that the physician engaged in a problem focused history,
examination and straight forward decision making, the PSC down-
coded the appellant's claim, allowing reimbursement at the 99311
level.  Additionally, the reviewer could not determine the name
of the physician signing the progress note.  *See* Master Exh. 10
at 36.  The ALJ and the QIC took similar action.  *See* Dec., Att.
at 6; *see also* Master Exh. 49 at 20.

The appellant asserts that the treating physician fully complied
with the standards for coverage of CPT code 99312.  The
appellant maintains that the physician completed an expanded
problem focused interval history and examination.  The appellant
added that this visit included decision making of moderate
complexity, as it was a follow-up to treat the beneficiary's
pneumonia and aspiration.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for aspiration
pneumonia, dysphagia, borderline hypertension, a left hip
fracture and use of a PEG Tube.  *See* Exh. 1 at 79.  The
pertinent treatment note supports a finding that the physician
engaged in at least two of the following coverage elements – an
expanded, problem focused history and examination or medical
decision making of moderate to high complexity.  *See id.* at 38.

**The appellant's claim for E&M services provided to Beneficiary
R.E.(2) on January 18, 2002 and billed under code 99312 is
covered by Medicare.**

42.  Beneficiary I.E.
     Dates of Service – March 21, 2002 & April 1, 2003
     Codes – 99312 & 99311

Finding that the physician had engaged in a problem focused
history, examination and straight forward decision making, the
PSC down-coded the appellant's March 21, 2002 claim (99312), but
allowed reimbursement at the 99311 level.  Additionally, the
reviewer could not determine the name of the physician signing
the progress note.  *See* Master Exh. 10 at 36.  The ALJ and the
QIC took similar action.  *See* Dec., Att. at 6; *see also* Master
Exh. 49 at 20.

76

The PSC denied coverage for the April 1st date of service finding
that the beneficiary had been seen five additional times in
April, subsequent to this date of service, and reported "no
complaints" on the visit at issue.  The reviewer added that he
was unable to determine the name of the individual signing the
progress note.  *See* Master Exh. 10 at 36.  The ALJ and the QIC
denied coverage for this date of service based on the absence of
supporting documentation.  *See* Dec., Att. at 6; *see also* Master
Exh. 49 at 20.

Relative to the March 21st date of service, the appellant asserts
that the treating physician fully complied with the standards
for coverage of CPT code 99312.  The appellant maintains that
the physician completed an expanded problem focused interval
history and examination.  The appellant *added* that this visit
also included decision making of moderate complexity, as it was
a follow-up for a beneficiary at high risk for CVA, who required
constant monitoring and treatment by the physician.  *See* Exh.
MAC-3, Att. D.  Relative to the April 1, 2003 date of service,
the appellant maintains there is a treatment note in the record
supporting coverage for this claim.  *See id.*

The beneficiary's medical history was significant for a
fractured left shoulder, diabetes, dementia with behavioral
problems, depression, anxiety and a CVA.  *See* Exh. 1 at 143.
Relative to the March 21st E&M, the information in the note does
not establish that the physician engaged in some combination of
an expanded, problem focused history and examination; medical
decision making of moderate to high complexity as required for
code 99312.  The Council has found the treatment note for the
April 1, 2003 date of service.  *See id.* at 16.  This note
demonstrates compliance with the coverage elements of CPT code
99311.

The appellant's claim for E&M services provided to Beneficiary
I.E. on March 21, 2002 is not covered by Medicare as originally
billed (99312), but is reimbursable at the rate available for
CPT code 99311.

The appellant's claim for E&M services provided to Beneficiary
I.E. on April 1, 2003 and billed under code 99311 is covered by
Medicare.

000078

77

43.  Beneficiary V.E.
     Date of Service — May 3, 2002
     Code — 99312

The PSC denied coverage finding no documentation for this date of service. *See* Master Exh. 10 at 36.  The ALJ and QIC also denied coverage for this reason.  *See* Dec., Att. at 6; *see also* Master Exh. 49 at 20.

The appellant attributes this non-coverage determination to the facility which, it asserts, "did not furnish Medicare with a case file for this patient."  Regardless, the appellant maintains that its physician fully complied with the 99312 coverage criteria and reimbursement is warranted.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for arthritis, pre-senile depression and polymyalgia rheumatic.  *See* Exh. 1 at 1.  There are no medical records pertinent to the date of service at issue.  *See generally* Exh. 1

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary V.E. on May 3, 2002 and billed under code 99312 is not covered by Medicare.

44.  Beneficiary D.E.
     Date of Service — January 22, 2002
     Code — 99302

The PSC denied coverage finding no documentation for this date of service.  *See* Master Exh. 10 at 36.  The ALJ and QIC denied coverage for this reason.  *See* Dec., Att. at 6; *see also* Master Exh. 49 at 20.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records. Referencing "signed physician orders and labs," the appellant asserts that its physician fully complied with the 99312 coverage criteria and reimbursement is warranted.  *See* Exh. MAC-3, Att. D.

78

The beneficiary's medical history was significant for
hyperkalemia, acute respiratory failure, COPD, personality
change secondary to medication and unspecified substance abuse.
*See* Exh. 1 at 6.   There are no clinical records evidencing an
examination on this date of service.   *See generally* Exh. 1.

"Signed physician orders and labs" aside, the appellant's claims
involve E&M services provided to the beneficiary on January 22,
2002.   The record contains no clinical medical documentation
supporting the appellant's claim that E&M services were, in
fact, provided on that date, let alone at the level of
reimbursement billed by the appellant.   The appellant has not
met its burden of establishing the medical necessity of the
services at issue, nor its entitlement to Medicare reimbursement
for those services.   *See* Act, § 1833(e) and 42 C.F.R.
§ 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
D.E. on January 22, 2002 and billed under code 99302 is not
covered by Medicare.

45.   Beneficiary O.E.
      Date of Service — April 24, 2002
      Code — 99302

The PSC denied coverage finding that the beneficiary had been
seen on April 10th and presented no new complaints on the date of
service at issue.   Additionally, the reviewer could not
determine the name of the physician who signed the treatment
note.   *See* Master Exh. 10 at 36.   The ALJ and QIC denied
coverage finding that the appellant had "not clearly
demonstrated" a face-to-face assessment.   *See* Dec., Att. at 6;
*see also* Master Exh. 49 at 20.

The appellant asserts that, based on the beneficiary's medical
history, its physician had fully complied with the coverage
criteria for code 99302.   The appellant adds that per "Medicare
regulations this date of service shall be paid due to the fact
that it is a required . . . service and . . . included Medicare
certification/recertification."   *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for senile
purpura, ulcers of the lower limbs, food/vomit pneumonitis,
asphyxia and use of a PEG Tube.   *See* Exh. 1 at 33.

The beneficiary was initially admitted to the facility in

April 1991.  Other than identifying the number (3) of
medications the beneficiary takes PRN, the April 24, 2002
assessment contains no hand-written substantive medical
information supplementing the form's check-box entries.  *See*
Exh. 1 at 29.  Consequently, there is *no support of record for*
coverage of the appellant's claim as billed.  The appellant has
not met its burden of establishing the medical necessity of the
services at issue, nor its entitlement to Medicare reimbursement
for those services.  *See* Act, § 1833(e) and 42 C.F.R.
§ 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
O.E. on April 24, 2002 and billed under code 99302 is not
covered by Medicare.

46.   Beneficiary L.F.
      Date of Service – January 20, 2003
      Code – 99302

The PSC denied coverage finding that the beneficiary had been
seen twice in the preceding five days and presented no new
complaints on the date of service at issue.  *See* Master Exh. 10
at 36.  The ALJ and QIC denied coverage finding that the
appellant had "not clearly demonstrated" a face-to-face
assessment.  *See* Dec., Att. at 6; *see also* Master Exh. 49 at 20.

The appellant asserts that, based on the beneficiary's medical
history, its physician had fully complied with the coverage
criteria for code 99302.  The appellant adds that per "Medicare
regulations this date of service shall be paid due to the fact
that it is a required . . . service and . . . included Medicare
certification/recertification."  *See* Exh. MAC-3, Att. D.

The beneficiary was first admitted to the facility in July 1999
with a medical history significant for diabetes (with an
associated foot ulcer), hypoglycemia, peripheral neuropathy,
CVA-related hemiparesis, and hypertension.  *See* Exh. 1 at 6.
Other than identifying the number (1) of medications the
beneficiary takes PRN, the January 20, 2003 assessment contains
no hand-written substantive medical information supplementing
the form's check-box entries.  *See id.* at 16.  Consequently,
there is no support of record for coverage of the appellant's
claim as billed.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to

80

Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R.§ 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary L.F. on January 20, 2003 and billed under code 99302 is not covered by Medicare.

47.  Beneficiary C.F.
     Date of Service – June 5, 2003
     Code – 99302

The PSC denied coverage finding no documentation for this date of service.  *See* Master Exh. 10 at 35.  The ALJ and QIC also denied coverage for this reason.  *See* Dec., Att. at 6; *see also* Master Exh. 49 at 20.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records.  The appellant otherwise asserts that its physician fully complied with the 99302 coverage criteria and reimbursement is warranted. *See* Exh.  MAC-3, Att. D.

The beneficiary's medical history was significant for colon cancer, diabetes, hemiparesis, osteoporosis, and congestive heart failure.  *See* Exh. 1 at 9.  There are no medical records pertinent to the date of service at issue.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary C.F. on June 5, 2003 and billed under code 99302 is not covered by Medicare.

48.  Beneficiary T.F.
     Date of Service – April 4, 2002
     Code – 99313

The PSC denied coverage finding that the beneficiary had been seen "3 times this month" with no complaints on the date of service.  Additionally, the reviewer was unable to determine the name of the physician who signed the treatment note.  *See* Master Exh. 10 at 35.  The ALJ and the QIC denied coverage for the

000082

81

claim as billed but down-coded to allow reimbursement at the
99311 level.  *See* Dec., Att. at 6; *see also* Master Exh. 49
at 20.

The appellant asserts that, consistent with a 99313 billing
instructions, the treating physician's services satisfied at
least two of the three coverage criteria.  The appellant
maintains that the physician conducted a comprehensive
examination and history.  The appellant adds that the physician
engaged in decision making of high complexity due to the need to
order labs to address the beneficiary's weight loss, as well as
completing a monthly medication review.  *See* Exh. MAC-3, Att. D.

As we have noted in earlier claim reviews, standing alone the
fact that a beneficiary was seen *after a date of service* has no
bearing on the question of coverage for the earlier date.  The
beneficiary's medical history was significant for asphyxia,
dysphagia, acute respiratory failure and food/vomit pneumonitis.
*See* Exh. 1 at 6.  The addenda to the pertinent treatment note
does not demonstrate that the coverage criteria for code 99313
has been satisfied as it does not support the appellant's
assertion that the physician engaged in some combination of
comprehensive history and examination or medical decision making
of moderate to high complexity.  While, the addenda, to a
degree, indicate actions which need to be taken, they provide
only a bare minimum of the bases for those actions.  *See id.*
at 19.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services, as billed.  *See* Act,
§ 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to
Beneficiary T.F. on April 4, 2002 is not reimbursable as billed
(99313), but was properly down-coded for reimbursement as a
99311 service.

49.   **Beneficiary R.F.**
      **Date of Service – July 29, 2002**
      **Code – 99311**

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 35.  The ALJ and QIC also
denied coverage for this reason.  *See* Dec., Att. at 6; *see also*
Master Exh. 49 at 20.

82

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records.  The appellant otherwise asserts that its physician fully complied with the 99311 coverage criteria and reimbursement is warranted.  *See* Exh. MAC-3, Att. D.

There are no medical records of any nature for this beneficiary.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary R.F. on July 29, 2002 and billed under code 99311 is not covered by Medicare.

50.  **Beneficiary P.F.**
     **Date of Service – March 17, 2003**
     **Code – 99302**

The PSC denied coverage finding that the beneficiary had been seen five times in the preceding thirteen days and presented no new complaints on the date of service.  The PSC added that the reviewer was unable to determine the name of the physician who signed the treatment note.  *See* Master Exh. 10 at 35.  The ALJ and QIC denied coverage finding that the appellant had "not clearly demonstrated" a face-to-face assessment.  *See* Dec., Att. at 7; *see also* Master Exh. 49 at 19.

The appellant asserts that, based on the beneficiary's medical history, its physician fully complied with the coverage criteria for code 99302.  The appellant adds that per "Medicare regulations this date of service shall be paid due to the fact that it is a required . . . service and . . . included Medicare certification/recertification."  *See* Exh. MAC-3, Att. D.

The beneficiary was admitted to the facility on January 8, 2003 with a medical history significant for senile dementia, cataracts, hypertension and UTI.  *See* Exh. 1 at 6-8.  Other than identifying the number (2) of medications the beneficiary takes PRN, the March 17, 2003 assessment contains little hand-written substantive medical information supplementing the form's check-

box entries. *See id.* at 9. Consequently, there is no support of record for coverage of the appellant's claim as billed.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary P.F. on March 17, 2003 and billed under code 99302 is not covered by Medicare.

51. **Beneficiary S.F.**
    **Date of Service – June 19, 2002**
    **Code – 99311**

The PSC denied coverage finding no documentation for this beneficiary. *See* Master Exh. 10 at 35. The ALJ and QIC also denied coverage for this reason. *See* Dec., Att. at 7; *see also* Master Exh. 49 at 19.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records. Noting that the physician also completed a visit on July 29, 2002, the appellant asserts that, for the date of service at issue, the physician fully complied with the 99311 coverage criteria and reimbursement is warranted. *See* Exh. MAC-3, Att. D.

As in the context of the PSC's reliance on visits post-dating a date of service serving as a basis for the denial of coverage for that date, we similarly find no particular relevance in the fact that a physician may have conducted a valid examination subsequent to the date of service under review. Moreover, there are no medical records of any nature for this beneficiary. *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary S.F. on June 19, 2002 and billed under code 99311 is not covered by Medicare.

84

52.  Beneficiary D.F.
     Date of Service - February 4, 2004
     Code - 99313

The PSC denied coverage finding that the beneficiary had no
complaint on the date of service and been seen on three
subsequent dates in February.  Additionally, the reviewer was
unable to determine the name of the physician who signed the
treatment note.  *See* Master Exh. 10 at 35.  The ALJ and the QIC
denied coverage for the claim as billed but down-coded to allow
reimbursement at the 99312 level.  *See* Dec., Att. at 7; *see also*
Master Exh. 49 at 19.

The appellant asserts that, consistent with the 99313 coverage
requirements, the treating physician's services satisfied at
least two of the three coverage criteria.  The appellant
maintains that the physician conducted a comprehensive
examination and history.  The appellant adds that the physician
engaged in decision making of high complexity due to the
clinician's need to review the beneficiary's medications.  *See*
Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for hernia,
psychosis, paranoid-schizophrenia, convulsions, depression,
diabetes asphyxia, dysphagia, acute respiratory failure and
chronic ischemic heart disease.  *See* Exh. 1 at 7.  The addenda
to the pertinent treatment note does not demonstrate that the
coverage criteria for code 99313 has been satisfied as it does
not support the appellant's assertion that the physician engaged
in some combination of comprehensive history and examination or
medical decision making of moderate to high complexity.  *See id.*
at 16.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services, as billed.  *See* Act,
§ 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to
Beneficiary D.F. on February 4, 2004 is not reimbursable as
billed (99313), but was properly down-coded for reimbursement as
a 99312 service.

85

53.  Beneficiary A.F.
     Date of Service – July 21, 2003
     Code – 99302

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 35.  The ALJ and QIC also
denied coverage for this reason.  *See* Dec., Att. at 7; *see also*
Master Exh. 49 at 19.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  Noting
that the physician "completed a subsequent care . . . visit on
07/21/03," the appellant asserts that, for the date of service
at issue, the physician fully complied with the 99311 coverage
criteria and reimbursement is warranted.  *See* Exh. MAC-3,
Att. D.

The beneficiary's medical history was significant for
hypertension, arthritis and dementia.  *See* Exh. 1 at 14.
However, as found at the earlier levels of review, there are no
pertinent medical records particular to this date of service in
the beneficiary's record.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
A.F. on July 21, 2003 and billed under code 99302 is not covered
by Medicare.

54.  Beneficiary W.F.
     Dates of Service – March 6, 2002 & March 6, 2003
     Codes – 99302 & 99313

For each date of service, the PSC denied coverage finding that
the beneficiary had been seen on subsequent dates in the
respective months of service and, for all, had presented "with
no complaints."  The PSC added that the reviewer was unable to
identify the physician who had signed the progress notes.  *See*
Master Exh. 10 at 35.  Relative to the March 6, 2002 date of
service, the ALJ and the QIC denied coverage, finding no
supporting documentation specific to that date.  The ALJ and QIC
denied coverage for the March 6, 2003 date of service as billed,

86

but found reimbursement warranted for a 99311 service. *See* Dec., Att. at 7; *see also* Master Exh. 49 at 19.

Relative to the March 6, 2002 claim, the appellant maintains that the beneficiary's claim file contains a corresponding treatment note. On the question of coverage for each date, the appellant asserts that the physician performed a level of E&M service commensurate with the corresponding billing. The appellant notes that the beneficiary had a complex medical history, which necessarily required the level of service provided on each date. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for cardiovascular disease, MRSA, renal failure, anemia and anxiety. *See* Exh. 1 at 8. As the appellant explains, the record does, in fact, contain the physician's assessment relative to the March 6, 2002 claim. *See id.* at 14-15. However, other than identifying the number (1) of medications the beneficiary takes PRN, the treatment note provides very little hand-written information to support the appellant's claim; the most notable addendum being that the beneficiary's weight had stabilized. *See id.* at 14. This note does not report a detailed history, comprehensive examination and medical decision making of moderate to high complexity necessary for coverage of a claim under CPT code 99302.

Relative to the March 6, 2003 date of service, the addendum to the treatment note indicates little more than the fact that certain conditions were reviewed. Here too, the note does not support a finding that some combination of the coverage elements for CPT code 99313 (comprehensive history and examination, medical decision making of moderate to high complexity) were satisfied. *See* Exh. 1 at 30.

The appellant has not met its burden of establishing the medical necessity of the services as billed, nor its entitlement to Medicare reimbursement for that service. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary W.F. on March 6, 2002 and billed under code 99302 is not covered by Medicare.

The appellant's claim for E&M services provided to Beneficiary W.F. on March 6, 2003 is not covered as billed (99313), but may be reimbursed at the rate applicable to code 99311.

87

55.  Beneficiary J.G.
     Date of Service – October 15, 2002
     Code – 99302

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 35.  The ALJ and QIC also
denied coverage for this reason.  *See* Dec., Att. at 7; *see also*
Master Exh. 49 at 19.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  Noting
that the physician also "completed a subsequent care . . . visit
on 10/15/02," the appellant asserts that the physician fully
complied with the 99302 coverage criteria and reimbursement is
warranted.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for bowel
obstruction, CVA and unspecified glaucoma.  *See* Exh. 1 at 8.  As
the PSC review found, the beneficiary's medical record contains
no clinical medical documentation pertinent to this date of
service.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
J.G. on October 15, 2002 and billed under code 99302 is not
covered by Medicare.

56.  Beneficiary D.G.(1)
     Date of Service – January 5, 2004
     Code – 99303

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 35.  The ALJ and QIC also
denied coverage for this reason.  *See* Dec., Att. at 7; *see also*
Master Exh. 49 at 19.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that "signed physician orders" for this date of
service reflect that the physician saw the beneficiary and is
entitled to reimbursement.  *See* Exh. MAC-3, Att. D.

88

The beneficiary's medical history was significant for mental status change, agitated dementia with psychosis, organic hallucinations, coronary artery disease, congestive heart failure, hypertension and osteoarthritis. *See* Exh. 1 at 7. As is obvious from the variety of E&M codes at issue in this case, in the absence of pertinent supporting documentation, the simple fact that a physician saw a beneficiary on a given date cannot entitle the physician to a particular level of reimbursement which the physician believes is warranted. Consistent with the PSC's finding, the beneficiary's medical record contains no clinical medical documentation pertinent to this date of service. *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary D.G.(1) on January 5, 2004 and billed under code 99303 is not covered by Medicare.

57.   **Beneficiary C.G.(1)**
      **Date of Service - August 15, 2003**
      **Code - 99302**

The PSC denied coverage finding that the beneficiary had been seen five times in August, both before and after the date of service, and presented no complaints on any occasion. The PSC added that the reviewer was unable to determine the name of the physician who signed the treatment note. *See* Master Exh. 10 at 35. The ALJ and QIC denied coverage for the claim as billed, but allowed reimbursement at the rate attributable to code 99301. *See* Dec., Att. at 7; *see also* Master Exh. 49 at 19.

The appellant asserts that, based on the beneficiary's medical history, its physician had fully complied with the coverage criteria for code 99302. The appellant adds that per "Medicare regulations this date of service shall be paid due to the fact that it is a required . . . service and . . . included Medicare certification/recertification." *See* Exh. MAC-3, Att. D.

The beneficiary was admitted to the facility in July 1998 January 8, 2003 with a medical history significant for senile dementia, Alzheimer's disease and cardiovascular disease. *See* Exh. 1 at 7. Other than identifying the number (0) of

medications the beneficiary takes PRN, the August 15, 2003 assessment contains no hand-written substantive medical information supplementing the form's check-box entries. *See id.* at 8-9. Consequently, there is no support of record for coverage of the appellant's claim as billed.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary C.G.(1) on August 15, 2003 and billed under code 99302 is not covered by Medicare.

58. **Beneficiary G.G.**
    **Date of Service – March 3, 2004**
    **Code – 99313**

The PSC denied coverage finding that the beneficiary had no complaint on the date of service and had been seen on four subsequent dates in March. Additionally, the reviewer was unable to determine the name of the physician who signed the treatment note. *See* Master Exh. 10 at 35. The ALJ and the QIC denied coverage for the claim as billed but down-coded to allow reimbursement at the 99312 level. *See* Dec., Att. at 7; *see also* Master Exh. 49 at 19.

The appellant asserts that, consistent with the 99313 coverage requirements, the treating physician's services satisfied at least two of the three coverage criteria. The appellant maintains that the physician conducted a comprehensive examination and history. The appellant adds that the physician engaged in decision making of high complexity due to the need to the clinician's need to review the beneficiary's medications. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for dementia, with the potential for aggressiveness and acute urinary retention. *See* Exh. 1 at 7. The addenda to the pertinent treatment note do not demonstrate that the coverage criteria for code 99313 has been satisfied as they does not support the appellant's assertion that the physician engaged in some combination of comprehensive history and examination or medical decision making of moderate to high complexity. *See id.* at 19.

90

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services, as billed. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to Beneficiary G.G. on March 3, 2004 is not reimbursable as billed (99313), but was properly down-coded for reimbursement as a 99312 service.

59. Beneficiary C.G.(2)
    Date of Service – February 3, 2003
    Code – 99303

The PSC denied coverage finding "no documentation for this patient." *See* Master Exh. 10 at 35. The ALJ and QIC also denied coverage for this reason. *See* Dec., Att. at 7; *see also* Master Exh. 49 at 19.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records. The appellant adds that the physician completed a history and examination on this date of service and should be reimbursed accordingly. *See* Exh. MAC-3, Att. D.

There is no clinical medical documentation in the beneficiary's file. *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary C.G.(2) on February 3, 2003 and billed under code 99303 is not covered by Medicare.

60. Beneficiary A.G.
    Date of Service – October 14, 2002
    Code – 99313

The PSC denied coverage finding that the beneficiary had no complaint on the date of service and been seen on two subsequent dates in October. Additionally, the reviewer was unable to determine the name of the physician who signed the treatment note. *See* Master Exh. 10 at 34. The ALJ and the QIC denied

91

coverage for the claim as billed but down-coded to allow reimbursement at the 99311 level. *See* Dec., Att. at 7; *see also* Master Exh. 49 at 19.

The appellant asserts that, consistent with the 99313 coverage requirements, the treating physician's services satisfied at least two of the three coverage criteria. The appellant maintains that the physician conducted a comprehensive examination and history. The appellant adds that the physician engaged in *decision making of high complexity* due to the clinician's need to review the beneficiary's medication and ensure there was no need for any changes. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for osteomyelitis of the left foot, peripheral vascular disease, diabetes, hypertension, cardiac hypertrophy dementia and an ulcer on the right foot. *See* Exh. 1 at 6. The addenda to the pertinent treatment note does not demonstrate that the coverage criteria for code 99313 has been satisfied as it does not support the appellant's assertion that the physician engaged in some combination of comprehensive history *and* examination or medical decision making of moderate to high complexity. While the note identifies the various conditions reviewed it does not detail any elements of those specific reviews, simply referencing a "nursing sheet." *See id.* at 18.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services, as billed. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to Beneficiary A.G. on October 14, 2002 is not reimbursable as billed (99313), but was properly down-coded for reimbursement as a 99311 service.

61.   Beneficiary D.G.(2)
      Date of Service – October 1, 2002
      Code – 99313

The PSC denied coverage as billed (99313) but allowed coverage at a down-coded, 99311 level based upon evidence of a problem focused history, comprehensive examination and low-complexity medical decision making. Additionally, the reviewer was unable to determine the name of the physician who signed the treatment

92

note.  *See* Master Exh. 10 at 34.  The ALJ and the QIC also
denied coverage for the claim as billed, but found coverage
warranted at the 99312 level.  *See* Dec., Att. at 7; *see also*
Master Exh. 49 at 19.

The appellant asserts that the treating physician's services
satisfied at least two of the three coverage criteria necessary
for a 99313 billing.  The appellant maintains that the physician
conducted a comprehensive examination and history.  The
appellant adds that the physician engaged in decision making of
high complexity because the beneficiary was a readmission to the
facility and the physician was required to check "for status
post above knee amputation."  *See* Exh. MAC-3, Att. D.

The record indicates that the beneficiary was originally
admitted to the facility on December 10, 2001 and discharged on
October 8, 2002.  The beneficiary's medical history was
significant for diabetes and "other disorders of the muscle
ligament and fascia."  *See* Exh. 1 at 6.  The addenda to the
pertinent treatment note do not demonstrate that the coverage
criteria for code 99313 have been satisfied as they do not
support the appellant's assertion that the physician engaged in
*some combination of comprehensive history and examination or
medical decision making of moderate to high complexity*.  While
the note identifies the conditions reviewed, it does not detail
any elements of those specific reviews, but recounts the
beneficiary to be a poor historian and identifies "hospice" in
the beneficiary's "overall prognosis."  The note does not
support the appellant's specific position regarding an
examination of the beneficiary's stump.  *See id*. at 20.  We note
however, direction to an LPN to clean and bandage the stump *PRN*.
*See id*. at 14.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services, as billed.  *See* Act,
§ 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to
Beneficiary D.G.(2) on October 1, 2002 is not reimbursable as
billed (99313), but was properly down-coded for reimbursement as
a 99312 service.

62.  **Beneficiary I.G.**
     Date of Service - October 10, 2002
     Code - 99302

The PSC denied coverage finding that the beneficiary had been
seen a total of five times in October, both before and after the
date of service and presented no complaints on any occasion.
The PSC added that the reviewer was unable to determine the name
of the physician who signed the treatment note. *See* Master
Exh. 10 at 34.  The ALJ and QIC denied coverage, each finding no
evidence of a "face-to-face assessment. *See* Dec., Att. at 7;
*see also* Master Exh. 49 at 19.

The appellant asserts that the beneficiary's medical history was
replete with conditions requiring the physician's treatment and
observation.  Consequently, the physician had fully complied
with the coverage criteria for code 99302.  The appellant adds
that per "Medicare regulations this date of service shall be
paid due to the fact that it is a required . . . service and
. . . included Medicare certification/recertification." *See*
Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for pneumonia,
hypotension, dementia with depression, congestive heart failure
and alcohol dependency. *See* Exh. 1 at 6.  Other than
identifying the number (2) of medications the beneficiary takes
PRN, the October 10, 2002 assessment contains no hand-written
substantive medical information supplementing the form's check-
box entries. *See id.* at 9-10.  Consequently, there is no
support of record for coverage of the appellant's claim as
billed.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services. *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
I.G. on October 10, 2002 and billed under code 99302 is not
covered by Medicare.

63.   Beneficiary R.G.
      Date of Service - December 20, 2002
      Code - 99302

The PSC denied coverage finding that the beneficiary had been
seen a total of four times in December and presented no
complaints on any occasion.  The PSC added that the reviewer was
unable to determine the name of the physician who signed the

treatment note.  *See* Master Exh. 10 at 34.  The ALJ and QIC
denied coverage, each finding no evidence of a "face-to-face
assessment.  *See* Dec., Att. at 8; *see also* Master Exh. 49 at 18.

The appellant asserts that the beneficiary's medical history was
replete with conditions requiring the physician's treatment and
observation.  Consequently, the physician had fully complied
with the coverage criteria for code 99302.  The appellant adds
that per "Medicare regulations this date of service shall be
paid due to the fact that *it is a required . . . service* and
*. . . included Medicare certification/recertification.*"  *See*
Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for
osteoarthritis of the shoulder and right knee, lack of
coordination, depressive disorder, Alzheimer's type dementia,
anemia and delusional behavior.  *See* Exh. 1 at 6.  Other than
identifying the number (2) of medications the beneficiary takes
PRN, the December 20, 2002 assessment contains little hand-
written substantive medical information supplementing the form's
check-box entries.  *See id.* at 7-8.  Consequently, there is no
support of record for coverage of the appellant's claim as
billed.  The appellant has not met its burden of establishing
the medical necessity of the services at issue, nor its
entitlement to Medicare reimbursement for those services.  *See*
Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
R.G. on December 20, 2002 and billed under code 99302 is not
covered by Medicare.

64.    **Beneficiary L.H.**
       **Date of Service – April 17, 2002**
       **Code – 99312**

The PSC denied coverage finding "no documentation for this
patient."  *See* Master Exh. 10 at 34.  The ALJ and QIC also
denied coverage for this reason.  *See* Dec., Att. at 8; *see also*
Master Exh. 49 at 18.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records   The
appellant adds that the physician completed a history and
examination on this date of service and should be reimbursed
accordingly.  *See* Exh. MAC-3, Att. D.

95

There is no clinical medical documentation in the beneficiary's
file.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
L.H. on April 17, 2002 and billed under code 99312 is not
covered by Medicare.

65.  **Beneficiary A.H.**
     **Dates of Service – August 18 & September 2, 2003**
     **Codes – 99302 & 99313**

For each date of service, the PSC denied coverage finding that
the beneficiary had been seen on numerous dates, pre- and post-
date of service, in the respective months of service, and
routinely presented "with no complaints."  For the August 18th
date, the PSC reviewer was unable to identify the physician who
had signed the progress note.  *See* Master Exh. 10 at 34.
Relative to the August 18th date of service, the ALJ and the QIC
denied coverage, finding "a face-to-face assessment not clearly
demonstrated."  The ALJ and QIC denied coverage for the
September 2nd date of service as billed, but found reimbursement
warranted at the rate associated with code 99311 service.  *See*
Dec., Att. at 8; *see also* Master Exh. 49 at 18.

Relative to the August 18th date of service, the appellant
maintains that its medical documentation fully satisfies the
coverage criteria established for CPT code 99302.  The appellant
adds that this claim should be covered because it is a required
service and "included Medicare certification/recertification."
Similarly, the appellant maintains that its documentation for
the September 2nd date of service satisfies the coverage criteria
for a 99313 billing.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for
hypertension, arthritis, Alzheimer's disease and seizure
disorder.  *See* Exh. 1 at 13.  Relative to the August 18th date of
service, other than identifying the number (4) of medications
the beneficiary takes PRN, the assessment provides no hand-
written information to support the appellant's claim for
coverage.  *See id.* at 12-13.  This note does not evidence a
detailed history, comprehensive examination and medical decision

96

making of moderate to high complexity necessary for coverage of
a claim under CPT code 99302.  Relative to the September 2nd
date, the physician's treatment note does not support a finding
that some combination of the coverage elements for CPT
code 99313 (comprehensive history and examination, medical
decision making of moderate to high complexity) were satisfied.
*See id.* at 24.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
A.H. on August 18, 2003 and billed under code 99302 is not
covered by Medicare.

The appellant's claim for E&M services provided to Beneficiary
A.H. on September 2, 2003 is not covered as billed (99313), but
may be reimbursed at the rate applicable to code 99311.

66.   Beneficiary T.H.
      Date of Service – June 13, 2003
      Code – 99302

The PSC denied coverage finding that the beneficiary had been
seen a total of five times in June and presented no complaints
on any occasion.  The PSC added that the reviewer was unable to
determine the name of the physician who signed the treatment
note.  *See* Master Exh. 10 at 34.  The ALJ and QIC denied
coverage, each finding no evidence of a "face-to-face
assessment.  *See* Dec., Att. at 8; *see also* Master Exh. 49 at 18.

The appellant asserts that the beneficiary's medical history was
replete with conditions requiring the physician's treatment and
observation.  Consequently, the physician had fully complied
with the coverage criteria for code 99302.  The appellant adds
that per "Medicare regulations this date of service shall be
paid due to the fact that it is a required . . . service and
. . . included Medicare certification/recertification."  *See*
Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for
hypertension, peptic ulcer disease, arthritis, dementia, cancer
and spinal stenosis.  *See* Exh. 1 at 9.  Other than identifying
the number (2) of medications the beneficiary takes PRN and the

97

use of a PEG Tube, the June 13, 2003 treatment note contains no hand-written substantive medical information supplementing the form's check-box entries. *See id.* at 8-9. Consequently, there is no support of record for coverage of the appellant's claim as billed.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R.§ 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary T.H. on June 13, 2003 and billed under code 99302 is not covered by Medicare.

67.  **Beneficiary E.H.**
     **Date of Service – June 25, 2002**
     **Code – 99313**

The PSC denied coverage finding that the beneficiary had also been seen on "5/30 and 6/27" with no complaints on any visit. Additionally, the reviewer was unable to determine the name of the physician who signed the treatment note. *See* Master Exh. 10 at 34. The ALJ and the QIC also denied coverage for the claim as billed, but found coverage warranted at the 99311 level. *See* Dec., Att. at 8; *see also* Master Exh. 49 at 18.

The appellant asserts that, consistent with the 99313 coverage requirements, the treating physician's services satisfied at least two of the three coverage criteria. The appellant maintains that the physician conducted a comprehensive examination and history. The appellant adds that the physician engaged in decision making of high complexity based on the need to complete a monthly medication review. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for chronic paranoid schizophrenia, depressive disorder, osteoporosis and abnormality of gait. *See* Exh. 1 at 5. The addenda to the treatment note does not demonstrate that the coverage criteria for code 99313 have been satisfied as they do not support the appellant's assertion that the physician engaged in some combination of comprehensive history and examination or medical decision making of moderate to high complexity. While the note identifies the conditions reviewed, it does not detail any elements of those reviews. *See id.* at 27.

98

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services, as billed.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for the E&M services provided to Beneficiary E.H. on June 25, 2002 is not reimbursable as billed (99313), but was properly down-coded for reimbursement as a 99311 service.

68.  **Beneficiary F.H.**
     **Date of Service – April 5, 2002**
     **Code – 99313**

The PSC denied coverage finding no "documentation for this date of service by this provider." *See* Master Exh. 10 at 34.  The ALJ and QIC also denied coverage for this reason. *See* Dec., Att. at 8; *see also* Master Exh. 49 at 18.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records.  The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history is significant for an above the right knee amputation, joint pain, COPD and hypertension. *See* Exh. 1 at 5.  There is neither a treatment note nor related physician's orders relative to this date of service. *See generally* Exh. 1.  The corresponding nursing note entries reflect notification of "significant weight loss" and indicate that the beneficiary was "resting quietly in bed." *See id.* at 21-22.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary F.H. on April 5, 2002 and billed under code 99313 is not covered by Medicare.

000100

99

69.  Beneficiary M.H.(1)
     Date of Service – March 29, 2002
     Code – 99312

The PSC denied coverage finding no "documentation for this date
of service by this provider." *See* Master Exh. 10 at 34.  The
ALJ and QIC also denied coverage for this reason.  *See* Dec.,
Att. at 8; *see also* Master Exh. 49 at 18.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for fecal
impaction, depression, arthritis, osteoporosis, atherosclerosis,
congestive heart failure and atrial fibrillation.  *See* Exh. 1
at 18-19 and 31.  There is no clinical medical documentation of
record relative to the date of service is issue.  *See generally*
Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
M.H.(1) on March 29, 2002 and billed under code 99312 is not
covered by Medicare.

70.  Beneficiary J.H.(1)
     Date of Service – August 26, 2003
     Code – 99313

The PSC denied coverage as billed, but allowed coverage at a
down-coded (99312) level finding evidence of an expanded,
problem focused history, comprehensive examination "with
straight forward medical decisions." *See* Master Exh. 10 at 34.
Similarly, the ALJ and the QIC also denied coverage for the
claim as billed, but found coverage warranted at the 99312
level.  *See* Dec., Att. at 8; *see also* Master Exh. 49 at 18.

The appellant asserts that, consistent with the 99313 coverage
requirements, the treating physician's services satisfied at
least two of the three coverage criteria.  The appellant

100

maintains that the physician conducted a comprehensive examination and history. The appellant adds that the physician had engaged in decision making of high complexity due to the beneficiary's medical history and the physician's need "to check the patient's status post surgery to ensure everything is going smoothly . . . and ordered medication . . . as well." *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for COPD, hypertension, congestive heart failure and diabetes. *See* Exh. 1 at 7. The pertinent treatment note supports a finding that the appellant's physician satisfied the coverage criteria for an E&M billing under CPT code 99313. In sum, the note supports the appellant's contentions to the Council and, in sufficient detail, demonstrates how the billed coverage criteria have been satisfied. *See id.* at 29.

**The appellant's claim for the E&M services provided to Beneficiary J.H.(1) on August 26, 2003 is reimbursable by Medicare as originally billed (99313).**

71.    **Beneficiary I.H.**
       **Date of Service – April 11, 2002**
       **Code – 99302**

The PSC denied coverage finding no "documentation for this date of service by this provider." *See* Master Exh. 10 at 33. The ALJ and QIC also denied coverage for this reason. *See* Dec., Att. at 8; *see also* Master Exh. 49 at 18.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records. The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for Parkinson's disease, schizophrenia, psychosomatic personality, organic brain syndrome, extrapyramidal symptoms and hypertension. *See* Exh. 1 at 5. There is no clinical medical documentation of record relative to the date of service is issue. *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to

101

Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary I.H. on April 11, 2002 and billed under code 99312 is not covered by Medicare.

72.   **Beneficiary J.H.(2)**
      **Date of Service – December 30, 2002**
      **Code – 99312**

The PSC denied coverage finding no "documentation for this patient." *See* Master Exh. 10 at 33.  The ALJ and QIC also denied coverage for this reason.  *See* Dec., Att. at 9; *see also* Master Exh. 49 at 17.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records.  The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

There is no medical documentation for this beneficiary.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary J.H.(2) on December 30, 2002 and billed under code 99312 is not covered by Medicare.

73.   **Beneficiary M.H.(2)**
      **Dates of Service – January 14, February 22, March 8**
      **                     & April 2, 2002**
      **Code – 99312**

The PSC denied coverage for each date of service, finding that on a sequential monthly basis, the beneficiary had been seen seven, eight, nine and sixteen times with no complaints. Moreover, the PSC reviewer was unable to determine the name of the physician who signed the progress notes.  *See* Master Exh. 10 at 33.  Uniformly, the ALJ and the QIC denied coverage as originally billed, but allowed reimbursement at the rate

102

applicable to CPT code 99311. *See* Dec., Att. at 9; *see also*
Master Exh. 49 at 17.

The appellant's arguments regarding each date of service are
consistent. The appellant challenges the ALJ's decisions to
down-code noting that its documentation supports a finding that,
in the context of the beneficiary's condition, the physician
conducted an expanded, problem focused history and examination
and engaged in decision making of moderate complexity. *See* Exh.
MAC-3, Att. D.

The beneficiary's medical history was significant for coronary
artery disease, tachycardia, embolic CVAs, congestive heart
failure and dementia. *See* Exh. 1 at 26. The record is replete
with treatment notes demonstrating the care provided to the
beneficiary from January through April and during June 2002.
*See id.* at 18-25 and 50-99. Additionally, there are numerous
nursing notes, physician & medication orders supporting this
care. *See generally* Exh. 1.

The pertinent treatment notes support the appellant's position
that these E&M services were properly under CPT code 99312.
Each note demonstrates that, in some combination, the physician
conducted an expanded, problem focused history and examination;
and engaged in medical decision making of moderate to high
complexity. *See* Exh. 1 at 54, 61, 69 and 75.

**The appellant's claims for the E&M services provided to
Beneficiary M.H.(2) on January 14, February 22, March 8 and
April 2, 2002 are reimbursable by Medicare as originally billed
(99312).**

74.   **Beneficiary G.H.**
      **Date of Service - August 22, 2002**
      **Code - 99312**

The PSC denied coverage finding no "documentation for this date
of service." *See* Master Exh. 10 at 33. The ALJ and QIC also
denied coverage for this reason. *See* Dec., Att. at 9; *see also*
Master Exh. 49 at 17.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records. The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly. *See* Exh. MAC-3, Att. D.

103

The beneficiary's medical history is significant for pneumonia,
dysphagia, COPD, congestive heart failure and Type II diabetes.
*See* Exh. 1 at 5.  There is, however, no clinical medical
documentation supporting the appellant's claim for this date of
service.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
G.H. on August 22, 2002 and billed under code 99312 is not
covered by Medicare.

75.  **Beneficiary M.H.(3)**
     **Dates of Service – March 7, 2002; March 12 & May 26, 2003**
     **Codes – 99312, 99313 & 99302**

*For each date of service, regardless of code billed, the PSC*
denied coverage finding that the beneficiary had been seen on
various dates in the month of service and had no complaints.
The reviewer was also unable to determine the name of the
physician who signed the treatment note.  *See* Master Exh. 10
at 33.  The ALJ and the QIC denied coverage for the 99312 and
99313 claims, as originally billed, but found reimbursement
warranted at the rate applicable to a 99311 service.  Both
entities denied coverage for the 99302 billing finding that a
face-to-face "was not clearly demonstrated."  *See* Dec., Att.
at 9; *see also* Master Exh. 49 at 17.

Relative to the 99312 and 99313 billings, the appellant asserts
that, in the context of the beneficiary's condition, the
documentation demonstrates that the physician satisfied the
pertinent coverage criteria for each claim.  Similarly, the
appellant maintains that the physician had fully complied with
the 99302 coverage criteria.  Pertinent to that billing, the
appellant adds that per "Medicare regulations this date of
service shall be paid due to the fact that it is a
required . . . service and . . . included Medicare
certification/recertification."  *See* Exh. MAC-3, Att. D.

Admitted to the facility on January 7, 1992, the beneficiary's
medical history was significant for organic brain damage, legal

104

blindness, osteoporosis, degenerative joint disease, pernicious anemia and cervical cancer. *See* Exh. 1 at 14.

*March 7, 2002 claim (99312)* - The appellant's documentation does not support the medical necessity of a 99312 E&M service. The hand-written addenda to the treatment note do not demonstrate that the physician engaged in some combination of an expanded, problem focused history and examination or medical decision making of moderate to high complexity. *See* Exh. 1 at 73.

*March 12, 2003 claim (99313)* - The appellant's documentation does not support the medical necessity of a 99313 E&M service. The hand-written addenda to the treatment note, is slightly less informative than that of the 99312 claim discussed above. In total that information does not demonstrate that the physician engaged in some combination of a comprehensive history and examination with medical decision making of moderate to high complexity. *See* Exh. 1 at 84; *see also id.* at 73.

*May 26, 2003 (99302)* - Other than identifying the number (1) of medications the beneficiary takes PRN and the use of a PEG Tube, this assessment contains no hand-written substantive medical information supplementing the form's check-box entries. *See* Exh. 1 at 27. Consequently, there is no support of record for coverage of the appellant's claim as billed.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services as billed. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary M.H.(3) on March 7, 2002 is not covered as billed (99312), but may be reimbursed at the rate applicable to code 99311.

The appellant's claim for E&M services provided to Beneficiary M.H.(3) on March 12, 2003 is not covered as billed (99313), but may be reimbursed at the rate applicable to code 99311.

The appellant's claim for E&M services provided to Beneficiary M.H.(3) on May 26, 2003 and billed under code 99302 is not covered by Medicare.

76. Beneficiary R.H.
    Date of Service – November 7, 2003
    Code – 99313

The PSC denied coverage finding that the beneficiary had been seen three times "this month" and had no complaints.  The reviewer was also unable to determine the name of the physician who signed the treatment note.  *See* Master Exh. 10 at 32.  The ALJ and the QIC denied coverage for the service as billed, but found reimbursement coverage warranted at the rate applicable to a 99311 billing.  *See* Dec., Att. at 9; *see also* Master Exh. 49 at 17.

The appellant asserts that, in the context of the beneficiary's condition, its documentation demonstrates that the physician satisfied the pertinent cover criteria, including engaging in decision making of high complexity based upon the need to review the beneficiary's medications.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for schizophrenia.  *See* Exh. 1 at 8.  The treatment note does not support the appellant's claim.  The note does not demonstrate that the treating physician engaged in some combination of a comprehensive history and examination or medical decision making of moderate to high complexity.  *See id.* at 16.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R.§ 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary R.H. on November 7, 2003 is not covered as billed (99313), but may be reimbursed at the rate applicable to code 99311.

77. Beneficiary W.H.
    Date of Service – June 3, 2003
    Code – 99313

The PSC denied coverage finding that the beneficiary had been seen five times "this month" and had no complaints.  The reviewer was also unable to determine the name of the physician who signed the treatment form.  *See* Master Exh. 10 at 32.  The ALJ and the QIC denied coverage for the service as billed, but found reimbursement coverage warranted at the rate applicable to

106

a 99311 billing. *See Dec.*, Att. at 9; *see also* Master Exh. 49 at 17.

The appellant asserts that, in the context of the beneficiary's condition, its documentation demonstrates that the physician satisfied the pertinent cover criteria, including engaging in decision making of high complexity based upon the need to review the beneficiary's medications. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for dysphagia, hypertension, dementia, depression and emphysema. *See* Exh. 1 at 8. The treatment note does not support the appellant's claim. The note's addendum adds little substantive content, simply indicating that the beneficiary was "stable not in pain" and noting use of a PEG Tube. However, the note does demonstrate that the treating physician engaged in some combination of a comprehensive history and examination or medical decision making of moderate to high complexity. *See id.* at 12.

The appellant has not met its burden of establishing the medical necessity of the services at issue as billed, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary W.H. on June 3, 2003 is not covered as billed (99313), but may be reimbursed at the rate applicable to code 99311.

78. **Beneficiary D.J.**
    **Date of Service - April 1, 2002**
    **Code - 99312**

The PSC denied coverage finding that the beneficiary had been seen seven times "this month" and had no complaints. The reviewer was also unable to determine the name of the physician who signed the treatment form. *See* Master Exh. 10 at 32. The ALJ and the QIC denied coverage for the service as billed, but found reimbursement coverage warranted at the rate applicable to a 99311 billing. *See* Dec., Att. at 9; *see also* Master Exh. 49 at 17.

The appellant asserts that, in the context of the beneficiary's condition, its documentation demonstrates that the physician satisfied the pertinent cover criteria, including engaging in

107

decision making of high complexity based upon the need to review the beneficiary's medications.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for COPD, congestive heart failure, coronary artery disease, hypertension, severe GERD and diabetes.  *See* Exh. 1 at 6.  The treatment note demonstrates that, in some combination, the physician conducted an expanded, problem focused history and examination; and engaged in medical decision making of moderate to high complexity.  *See id.* at 18.

**The appellant's claim for the E&M services provided to Beneficiary D.J. on April 1, 2002 is reimbursable by Medicare as originally billed (99312).**

79.   Beneficiary L.J.(1)
      Dates of Service - June 19 & November 22, 2002
      Codes - 99312 & 99302

The PSC denied coverage for the June 19 date of service as billed (99312), but found reimbursement warranted for a 99311 E&M service.  The review noted the presence of a problem focused history, an expanded problem focused examination and medical decision making of low complexity.  The reviewer was also unable to determine the name of the physician who signed the treatment form.  The PSC denied coverage for the November 22 (99302) claim based on the absence of medical documentation.  *See* Master Exh. 10 at 32.  The ALJ and the QIC denied coverage for the 99312 service as billed, but found reimbursement warranted at the rate applicable to a 99311 billing.  Those entities also denied coverage for the November 22, service based on the absence of medical documentation.  *See* Dec., Att. at 10; *see also* Master Exh. 49 at 16.

Relative to the June 19th claim, the appellant maintains that the physician completed at least two of the three coverage elements associated with code 99312.  The appellant asserts that the denial of coverage for the November 22nd claim was attributable to the facility's poor record maintenance.  The appellant maintains that, even without records, the physician fully complied with the CPT code 99302 coverage criteria.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for a CVA (with various side effects), use of a PEG Tube, a gastric ulcer, colon cancer, depression, diabetes and an upper GI bleed.  *See*

108

Exh. 1 at 8.  The June 19, 2002 treatment note demonstrates
that, in some combination, the physician conducted an expanded,
problem focused history and examination; and engaged in medical
decision making of moderate to high complexity.  *See id.* at 29.
There is, however, no clinical medical documentation pertinent
to the November 22nd date of service.  *See generally* Exh. 1.

**The appellant's claim for the E&M services provided to
Beneficiary L.J.(1) on June 19, 2002 is reimbursable by Medicare
as originally billed (99312).**

The appellant's claim for the E&M services provided to
Beneficiary L.J.(1) on November 22, 2002 and billed under code
99302 is not covered by Medicare.

80.   Beneficiary L.J.(2)
      Date of Service – December 18, 2002
      Code – 99311

The PSC denied coverage finding no "documentation for this
patient."  *See* Master Exh. 10 at 32.  The ALJ and QIC also
denied coverage for this reason.  *See* Dec., Att. at 10; *see also*
Master Exh. 49 at 16.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

As has been found at all earlier levels of review, there is no
clinical medical documentation of record for this beneficiary.
*See generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
L.J.(2) on December 18, 2002 and billed under code 99311 is not
covered by Medicare.

109

81.  Beneficiary B.J.
     Date of Service – February 4, 2002
     Code – 99312

The PSC denied coverage finding no "documentation for this date
of service." *See* Master Exh. 10 at 32.  The ALJ and QIC also
denied coverage for this reason. *See* Dec., Att. at 10; *see also*
Master Exh. 49 at 16.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for dementia,
tardive dyskinesia, cerebral atrophy, seizure disorder, organic
personality disorder, psychotic reaction with agitation and
diabetes.  See Exh. 1 at 6.  However, as has been found at all
earlier levels of review, there is no clinical medical
documentation of record for the date of service at issue. *See
generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services. *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
B.J. on February 4, 2002 and billed under code 99312 is not
covered by Medicare.

82.  Beneficiary M.J.
     Date of Service – April 23, 2002
     Code – 99302

The PSC denied coverage finding that the beneficiary had been
seen a total of five times in April and presented no complaints
on any occasion.  The PSC added that the reviewer was unable to
determine the name of the physician who signed the treatment
note. *See* Master Exh. 10 at 32.  The ALJ and QIC denied
coverage, each finding no evidence of a "face-to-face
assessment." *See* Dec., Att. at 10; *see also* Master Exh. 49
at 16.

000111

110

The appellant asserts that the beneficiary's medical history was replete with conditions requiring the physician's treatment and observation. Consequently, the physician had fully complied with the coverage criteria for code 99302. The appellant adds that per "Medicare regulations this date of service shall be paid due to the fact that it is a required . . . service and . . . included Medicare certification/recertification." *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for congestive heart failure, schizophrenia, arteriosclerosis, hypertension and depression. *See* Exh. 1 at 19. Other than identifying the number (1) of medications the beneficiary takes PRN, the assessment for this date of service contains no hand-written substantive medical information supplementing the form's check-box entries. *See id.* at 20-21. Consequently, there is no support of record for the appellant's essential position that the physician engaged in comprehensive examination a detailed history and medical decision making of moderate to high complexity.

The appellant has not met its burden of establishing the medical necessity of the services at issue, as billed, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary M.J. on April 23, 2002 and billed under code 99302 is not covered by Medicare.

83. **Beneficiary M.K.(1)**
    **Dates of Service – July 17 & December 24, 2003**
    **Codes – 99311 & 99302**

The PSC denied coverage finding no documentation for either date of service. *See* Master Exh. 10 at 31. The ALJ and QIC also denied coverage, for both dates of service, for this reason. *See* Dec., Att. at 10; *see also* Master Exh. 49 at 16.

The appellant question's the reviewer's findings relative to the July 17, 2002 date of service, asserting that a dated progress note and medication orders fully support its claim. The appellant attributes the December 24th non-coverage determination to the facility's failure to properly maintain its records. *See* Exh. MAC-3, Att. D.

111

The beneficiary's medical history was significant for dementia, degenerative joint disease, anxiety, metabolic disorder, seizure disorder and H/O sepsis. *See* Exh. 1 at 11. Having, thoroughly reviewed the appellant's documentation we find that the record does contain a medication order dated, "7/17/03." *See id.* at 16. However, contrary to the appellant's argument, we do not find a progress/treatment note for the July 17th date of service. The physician appears to have a unique written form of the number seven – "7." *See id.* However, many treatment notes of record reflect stylistic variety of written date entries. *See id.* at 24-28. The treatment note to which we presume the appellant's argument refers is dated "7/12/  ." *See id.* at 26. Even if we were to assume for the sake of argument that this is a 2003 note, it clearly is not a July 17th note. Relative to the December 24th date of service there is no clinical medical documentation of record supporting the appellant's claim. *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claims for E&M services provided to Beneficiary M.K.(1) on July 17 and December 24, 2003 billed under codes 99311 and 99302 are not covered by Medicare.

**84.  Beneficiary D.K.**
       **Date of Service – June 20, 2002**
       **Code – 99312**

The PSC denied coverage finding no "documentation for this date of service." *See* Master Exh. 10 at 31. The ALJ and QIC also denied coverage for this reason. *See* Dec., Att. at 10; *see also* Master Exh. 49 at 16.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records. The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for a CVA. *See* Exh. 1 at 6. However, as has been found at all earlier levels of review, there is no clinical medical documentation of record for the date of service at issue. *See generally* Exh. 1.

112

While there does appear to be a treatment note indicating a
visit may have occurred between 6/19/02 and 6/24/02, the date on
that treatment note is illegible and cannot be presumed to have
occurred on 6/20/02.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
D.K. on June 20, 2002 and billed under code 99312 is not covered
by Medicare.

85.   Beneficiary C.K.
      Dates of Service - March 6 & September 8, 2003
      Codes - 99313 & 99302

For each date of service, regardless of code billed, the PSC
denied coverage finding that the beneficiary had been seen on
various dates in the month of service and had no complaints.
The reviewer was also unable to determine the name of the
physician who signed the treatment form.  *See* Master Exh. 10
at 31.  The ALJ and the QIC denied coverage for the 99313 claim,
as originally billed, but found reimbursement warranted at the
rate applicable to a 99311 service.  Both entities denied
coverage for the 99302 billing finding that a face-to-face "was
not clearly demonstrated."  *See* Dec., Att. at 11; *see also*
Master Exh. 49 at 15.

Relative to the 99313 billing, the appellant asserts that, in
the context of the beneficiary's condition, its documentation
fully supports a finding that the physician satisfied the 99313
cover criteria.  Similarly, the appellant maintains that, the
physician had fully complied with the coverage criteria for the
code 99302 service.  Pertinent to that billing, the appellant
adds that per "Medicare regulations this date of service shall
be paid due to the fact that it is a required . . . service and
. . . included Medicare certification/recertification."  *See*
Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for blindness,
hypertension and Alzheimer's type dementia.  *See* Exh. 1 at 17.
Taken together, the check-box entries and addenda on the
March 6th treatment note do not support a finding that the
physician engaged in a comprehensive history and examination as

113

well as medical decision making of moderate to high complexity.
*See id.* at 47.  Relative to the September 8th date of service,
other than identifying the number (7) of medications the
beneficiary takes PRN, the assessment contains no hand-written
substantive medical information supplementing the check-box
entries on the form.  *See id.* at 27.  Consequently, there is no
support of record for coverage of the appellant's claims as
billed.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
C.K on March 6, 2003 is not covered as billed (99313), but may
be reimbursed at the rate applicable to code 99311.

The appellant's claim for the E&M services provided to
Beneficiary C.K. on September 8, 2003 and billed under code
99302 is not covered by Medicare.

86.  **Beneficiary M.K.(2)**
     **Date of Service - July 12, 2002**
     **Code - 99311**

The PSC denied coverage finding no "documentation for this date
of service."  *See* Master Exh. 10 at 31.  The ALJ and QIC also
denied coverage for this reason.  *See* Dec., Att. at 11; *see also*
Master Exh. 49 at 15.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for right hip
fracture, degenerative osteoarthritis, hypothyroidism,
pancreatitis and peptic ulcer disease.  *See* Exh. 1 at 5.
However, as has been found at all earlier levels of review,
there is no clinical medical documentation of record for the
date of service at issue.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to

114

Medicare reimbursement for those services. *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
M.K.(2) on July 12, 2002 and billed under code 99311 is not
covered by Medicare.

87. **Beneficiary A.K.**
    **Date of Service – May 10, 2002**
    **Code – 99302**

The PSC denied coverage finding no "documentation for this date
of service." *See* Master Exh. 10 at 31. The ALJ and QIC also
denied coverage for this reason. *See* Dec., Att. at 11; *see also*
Master Exh. 49 at 15.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records. The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for
neurocardiogenic syncope, CVA, left hemiparesis, cervical spinal
stenosis, coronary artery disease and depression. *See* Exh. 1
at 6. However, as has been found at all earlier levels of
review, there is no clinical medical documentation of record for
the date of service at issue. *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services. *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
A.K. on May 10, 2002 and billed under code 99302 is not covered
by Medicare.

88. **Beneficiary R.K.**
    **Date of Service – February 22, 2002**
    **Code – 99311**

The PSC denied coverage finding no "documentation for this date
of service." *See* Master Exh. 10 at 31. The ALJ and QIC also
denied coverage for this reason. *See* Dec., Att. at 11; *see also*
Master Exh. 49 at 15.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records.  The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for brain atrophy with dementia, CVA, anemia, a right heel ulcer and cellulitis of the left leg.  *See* Exh. 1 at 5.  However, as has been found at all earlier levels of review, there is no clinical medical documentation of record for the date of service at issue.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary R.K. on February 22, 2002 and billed under code 99311 is not covered by Medicare.

89.  **Beneficiary B.K.**
     **Date of Service - May 29, 2002**
     **Code - 99311**

The PSC denied coverage finding no "documentation for this date of service."  *See* Master Exh. 10 at 31.  The ALJ and QIC also denied coverage for this reason.  *See* Dec., Att. at 11; *see also* Master Exh. 49 at 15.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records.  The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

While the lower levels of review have found no documentation for this date of service, there is, in fact, no medical documentation of any nature in the beneficiary's file.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to

116

Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary B.K. on May 29, 2002 and billed under code 99311 is not covered by Medicare.

90. **Beneficiary M.L.**
    **Dates of Service – March 11 & August 5, 2002**
    **Code – 99312**

The PSC denied coverage finding, for both claims, no "documentation for this date of service." *See* Master Exh. 10 at 31-30. The ALJ and QIC also denied coverage for both claims for this reason. *See* Dec., Att. at 11; *see also* Master Exh. 49 at 15.

The appellant attributes these non-coverage determinations to the facility's failure to properly maintain its records. The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly. *See* Exh. MAC-3, Att. D.

While the lower levels of review have found no documentation for these dates of service, there is, in fact, no medical documentation of any nature in the beneficiary's file. *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary M.L. on March 11 and August 5, 2002 and billed under code 99312 is not covered by Medicare.

91. **Beneficiary T.L.**
    **Date of Service – January 16, 2002**
    **Code – 99302**

The PSC denied coverage finding no "documentation for this date of service." *See* Master Exh. 10 at 30. The ALJ and QIC also denied coverage for this reason. *See* Dec., Att. at 11; *see also* Master Exh. 49 at 15.

117

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for congestive
heart failure, asthma, COPD, dementia, osteoarthritis and
hypertension.  *See* Exh. 1 at 5.  However, as has been found at
all earlier levels of review, there is no clinical medical
documentation of record for the date of service at issue.  *See
generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
T.L. on January 16, 2002 and billed under code 99302 is not
covered by Medicare.

92.   **Beneficiary I.L.**
      **Date of Service – February 5, 2002**
      **Code - 99313**

The PSC denied coverage for this claim finding that the
beneficiary had been seen twice in February, subsequent to the
date of service, without complaint.  Moreover, the reviewer was
unable to identify the physician who signed the treatment note.
*See* Master Exh. 10 at 30.  The ALJ and the QIC denied coverage
for the claim as billed but found reimbursement warranted at the
lower, 99312, level.  *See* Dec., Att. at 11; *see also* Master
Exh. 49 at 15.

The appellant disagrees with the decision to down-code this
claim.  The appellant asserts that, per the 99313 coverage
criteria, its documentation supports a finding that the
physician's examination included some combination of a
comprehensive history and examination or medical decision making
of moderate to high complexity.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for heart
disease, arthritis, congestive heart failure, legal blindness
and hypothyroidism.  *See* Exh. 1 at 9.  Having thoroughly
reviewed the pertinent treatment note, the Council find that the

118

information in that document satisfies the coverage criteria for services billed under CPT code 99313.  *See id.* at 20.

The appellant's claim for the E&M services provided to Beneficiary I.L. on February 5, 2002 is reimbursable by Medicare as originally billed (99313).

93.  Beneficiary W.L.
     Date of Service – July 7, 2003
     Code – 99312

The PSC denied coverage finding no "documentation for this date of service."  *See* Master Exh. 10 at 30.  The ALJ and QIC also denied coverage for this reason.  *See* Dec., Att. at 12; *see also* Master Exh. 49 at 14.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records.  The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for right heart failure, asthma, COPD, colon cancer, dementia and anemia. *See* Exh. 1 at 8-9.  However, as has been found at all earlier levels of review, there is no clinical medical documentation of record for the date of service at issue.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary W.L. on July 7, 2003 and billed under code 99312 is not covered by Medicare.

94.  Beneficiary L.L.
     Date of Service – April 24, 2002
     Code – 99302

The PSC denied coverage finding no "documentation for this date of service."  *See* Master Exh. 10 at 30.  The ALJ and QIC also denied coverage for this reason.  *See* Dec., Att. at 12; *see also* Master Exh. 49 at 14.

119

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records.  The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for diabetes, UTI, anemia and grief reaction.  *See* Exh. 1 at 6.  However, as has been found at all earlier levels of review, there is no clinical medical documentation of record for the date of service at issue.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary L.L. on April 24, 2002 and billed under code 99302 is not covered by Medicare.

95.  **Beneficiary J.M.(1)**
     **Date of Service – November 11, 2002**
     **Code – 99312**

The PSC denied coverage finding no "documentation for this patient."  *See* Master Exh. 10 at 30.  The ALJ and QIC also denied coverage finding no documentation for this date of service.  *See* Dec., Att. at 12; *see also* Master Exh. 49 at 14.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records.  The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

There are no medical records in the beneficiary's claim file.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

000121

The appellant's claim for E&M services provided to Beneficiary
J.M.(1) on November 11, 2002 and billed under code 99312 is not
covered by Medicare.

96.  Beneficiary M.M.(1)
     Date of Service ~ July 14, 2003
     Code – 99312

The PSC denied coverage finding that the beneficiary had been
seen on multiple occasions in July with no new complaints.
However, the reviewer also found that this service had been
provided by a nurse practitioner and that "there was no
documentation by the physician" attesting to the physician's
review of the NP's examination.  Accordingly, the reviewer
determined that this claim did not satisfy the "incident to"
coverage criteria.  See Master Exh. 10 at 30.  The ALJ and QIC
also denied coverage based on a failure to meet incident to
criteria.  See Dec., Att. at 12; see also Master Exh. 49 at 14.

The appellant asserts that its documentation evidences its
compliance with Medicare's "incident to" criteria in providing
these services.  The appellant adds that the Nurse Practitioner
plainly indicated, and the physician affirmed, that she had
timely and affirmatively discussed the beneficiary's care with
the physician.  See Exh. MAC-3, Att. D.

The beneficiary's medical history is significant for depression,
CVA, hypertension, high cholesterol, aphasia and UTI.  See
Exh. 1 at 12.  The pertinent treatment note indicates that a
physician reviewed and discussed the beneficiary's examination
results and treatment plan with the nurse practitioner.  See id.
at 32.

However, having reviewed the substance of the treatment note we
find that it does not support coverage for a 99312 billing.
Under code 99312, a physician must demonstrate compliance with
some combination of an expanded, problem focused history and
examination or medical decision making of moderate to high
complexity.  Here, the treatment note affirmatively indicates
that the decision making was of low complexity.  See id.  Thus,
the note would have to demonstrate that the nurse practitioner
engaged in an expanded, problem focused history and an expanded,
problem focused examination.  Satisfaction of both of those
criteria is not evident from the record.

121

Moreover, as discussed above, by regulation, "incident to" services "must be furnished in a non-institutional setting to non-institutional patients." *See* 42 C.F.R. 410.26(b)(1). Thus, regardless of the CPT code utilized, these services cannot be billed to Medicare under the circumstances of this claim.

The appellant's claim for E&M services provided to Beneficiary M.M.(1) on July 14, 2003 and billed under CPT code 99312 is not covered by Medicare.

97.  **Beneficiary E.M.(1)**
     **Date of Service – August 2, 2002**
     **Code – 99302**

The PSC denied coverage finding that the beneficiary had been seen a total of four times in August and presented no complaints on any occasion.  The PSC added that the reviewer was unable to determine the name of the physician who signed the treatment note.  *See* Master Exh. 10 at 30.  The ALJ and QIC denied coverage, each finding no evidence of a "face-to-face assessment."  *See* Dec., Att. at 12; *see also* Master Exh. 49 at 14.

The appellant asserts that the beneficiary's medical history was replete with conditions requiring the physician's treatment and observation.  Consequently, the physician had fully complied with the coverage criteria for code 99302.  The appellant adds that per "Medicare regulations this date of service shall be paid due to the fact that it is a required . . . service and . . . included Medicare certification/recertification." *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for congestive heart failure, deep vein thrombosis, falls, arteriosclerotic dementia and hypertension.  *See* Exh. 1 at 5.  Other than identifying the number (2) of medications the beneficiary takes PRN, the assessment for this date of service contains little hand-written substantive medical information supplementing the form's check-box entries.  *See id.* at 8.  Consequently, there is no support of record for the appellant's essential position that the physician engaged in a comprehensive examination, a detailed history and medical decision making of moderate to high complexity.

The appellant has not met its burden of establishing the medical necessity of the services at issue, as billed, nor its

122

entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary E.M.(1) on August 2, 2002 and billed under code 99302 is not covered by Medicare.

98.   Beneficiary L.M.(1)
      Date of Service - November 11, 2002
      Code - 99302

The PSC denied coverage finding that the beneficiary had been seen two other times in November and presented with no complaints on any occasion.  The PSC added that the reviewer was unable to determine the name of the physician who signed the treatment note.  *See* Master Exh. 10 at 29.  The ALJ and QIC denied coverage, each finding no evidence of a "face-to-face assessment."  *See* Dec., Att. at 12; *see also* Master Exh. 49 at 14.

The appellant asserts that the beneficiary's medical history was significant for medical conditions requiring the physician's treatment and observation.  Consequently, the physician had fully complied with the coverage criteria for code 99302.  The appellant adds that per "Medicare regulations this date of service shall be paid due to the fact that it is a required . . . service and . . . included Medicare certification/ recertification."  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for aspiration pneumonia, generalized weakness, dysphagia, a hypopharyngeal mass, congestive heart failure, depression, diabetes and presenile dementia.  *See* Exh. 1 at 6.  Other than identifying the number (3) of medications the beneficiary takes PRN, the assessment for this date of service contains little hand-written substantive medical information supplementing the form's check-box entries.  *See id.* at 8.  Consequently, there is no support of record for the appellant's essential position that the physician engaged in a comprehensive examination, a detailed history, and medical decision making of moderate to high complexity.

The appellant has not met its burden of establishing the medical necessity of the services at issue, as billed, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary L.M.(1) on November 11, 2002 and billed under code 99302 is not covered by Medicare.

99.   Beneficiary J.M.(2)
      Date of Service - May 13, 2002
      Code - 99302

The PSC denied coverage finding that the beneficiary had been seen a total of three times in May and presented with no complaints on any occasion.  The PSC added that the reviewer was unable to determine the name of the physician who signed the treatment note.  *See* Master Exh. 10 at 29.  The ALJ and QIC denied coverage, each finding no evidence of a "face-to-face assessment."  *See* Dec., Att. at 12; *see also* Master Exh. 49 at 14.

The appellant asserts that the beneficiary's medical history was significant for medical conditions requiring the physician's treatment and observation.  Consequently, the physician had fully complied with the coverage criteria for code 99302.  The appellant adds that per "Medicare regulations this date of service shall be paid due to the fact that it is a required . . . service and . . . included Medicare certification/recertification."  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for urosepsis, bipolar affective disorder, COPD, recurrent aspiration pneumonia, dysphagia and Parkinson's disease.  *See* Exh. 1 at 6. Other than identifying the number (5) of medications the beneficiary takes PRN, the assessment for this date of service contains little or no hand-written substantive medical information supplementing the form's check-box entries.  *See id.* at 8.  Consequently, there is no support of record for the appellant's essential position that the physician engaged in a comprehensive examination, a detailed history and medical decision making of moderate to high complexity.

The appellant has not met its burden of establishing the medical necessity of the services at issue, as billed, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

124

The appellant's claim for E&M services provided to Beneficiary
J.M.(2) on May 13, 2002 and billed under code 99302 is not
covered by Medicare.

100.  **Beneficiary G.M.(1)**
      **Dates of Service - April 4, 2003 & March 9, 2004**
      **Code - 99313**

The PSC denied coverage for both claims finding that the
beneficiary had been seen multiple times in each service month
and had presented with no complaints on any occasion.  The PSC
added that the reviewer was unable to determine the name of the
physician who signed the treatment note.  *See* Master Exh. 10
at 29.  The ALJ and QIC down-coded the claims, finding the
April 4, 2003 service reimbursable under CPT code 99312 and the
March 9, 2004 service under CPT code 99311.  *See* Dec., Att.
at 13; *see also* Master Exh. 49 at 13.

The appellant challenges the ALJ's decision to down-code these
claims.  Relative to both, the appellant asserts that the
beneficiary's medical history was significant for medical
conditions requiring some combination of a comprehensive history
and examination or medical decision making of moderate to high
complexity, including review of medications and ordering lab
work.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for diabetes,
congestive heart failure, hypertension, chronic airway
obstruction and schizophrenia.  *See* Exh. 1 at 13.

The Council has found and reviewed the April 4, 2003 and
March 9, 2004 treatment notes.  Our review is *de novo*.  *See* 42
C.F.R. § 405.1108(a).  In terms of both the check-box entries
and hand-written addenda, the form and substantive information
in the two notes is largely identical.  *See* Exh. 1 at 23
and 22b.  Based on that review, we find that neither note
contains information supporting a finding that the physician
engaged in some combination of a comprehensive history and
examination or medical decision making of moderate to high
complexity, the coverage criteria necessary for a claim billed
under CPT code 99313.  Moreover, contrary to the ALJ's finding,
the April 4, 2003 note does not support a finding that the
physician satisfied the elements of coverage necessary to bill
those E&M services under CPT code 99312 (some combination of an
expanded, problem focused history and examination; medical
decision making of moderate to high complexity).

000126

The appellant has not met its burden of establishing the medical necessity of the services at issue, as billed, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claims for E&M services provided to Beneficiary G.M.(1) on April 4, 2003 and March 9, 2004 are not covered by Medicare as originally billed (99313), but may be reimbursed at the rate associated with CPT code 99311.

101.   Beneficiary E.M.(2)
       Date of Service – November 19, 2002
       Code – 99312

The PSC denied coverage finding that the beneficiary had been seen on five earlier dates in November with no new complaints. Additionally, the reviewer was unable to identify the physician who signed the treatment note. *See* Master Exh. 10 at 29.   The ALJ and QIC denied coverage for the claim as originally billed but down-coded reimbursement to the rate available for code 99311. *See* Dec., Att. at 13; *see also* Master Exh. 49 at 13.

The appellant asserts that the treating physician fully complied with the standards for coverage of CPT code 99312.   The appellant maintains that the physician completed an expanded problem focused interval history and examination and, based on review of lab reports and ensuing medication changes, engaged in decision making of moderate complexity. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history is significant for acute respiratory failure, diabetes, cellulitis, chronic renal failure, grand mal status, tracheotomy and respiratory dependence. *See* Exh. 1 at 6.   The pertinent treatment note does not support coverage of a 99312 service.   In sum, the note does not reflect that the physician engaged in some combination of an expanded, problem focused history and examination or medical decision making of moderate to high complexity. *See* Exh. 1 at 18.

The appellant's claim for the E&M services provided to Beneficiary E.M.(2) on November 19, 2002 is not reimbursable as billed (99312), but was properly down-coded for reimbursement as a 99311 service.

126

102.   Beneficiary M.M.(2)
       Date of Service - June 9, 2003
       Code - 99302

The PSC denied coverage finding that the beneficiary had been
seen two previous times in June and presented with no complaints
on any occasion.   The PSC added that the reviewer was unable to
determine the name of the physician who signed the treatment
note.   *See* Master Exh. 10 at 29.   The ALJ and QIC denied
coverage, each finding no evidence of a "face-to-face
assessment."   *See* Dec., Att. at 13; *see also* Master Exh. 49
at 13.

The appellant *asserts* that the beneficiary's medical history was
significant for medical conditions requiring the physician's
treatment and observation.   Consequently, the physician had
fully complied with the coverage criteria for code 99302.   The
appellant adds that per "Medicare regulations this date of
service shall be paid due to the fact that it is a
required . . . service and . . . included Medicare
certification/recertification."   *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for heart
failure, epistaxis, cellulitis, decreased functional activity,
asthma and obstructive sleep apnea.   *See* Exh. 1 at 7.   Other
than identifying the number (3) of medications the beneficiary
takes PRN, the assessment for this date of service contains no
hand-written substantive medical information supplementing the
form's check-box entries.   *See id.* at 12-13.   Consequently,
there is no support of record for the appellant's essential
position that the physician engaged in a comprehensive
examination, a detailed history and medical decision making of
moderate to high complexity.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, as billed, nor its
entitlement to Medicare reimbursement for those services.   *See*
Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
M.M.(2) on June 9, 2003 and billed under code 99302 is not
covered by Medicare.

127

103.  Beneficiary D.M.(1)
      Date of Service – December 7, 2002
      Code – 99312

The PSC denied coverage finding that the beneficiary had also
been seen on two subsequent dates in December with no new
complaints.  Additionally, the reviewer was unable to identify
the physician who signed the treatment note.  *See* Master Exh. 10
at 29.  The ALJ and QIC denied coverage for the claim as
originally billed but down-coded reimbursement to the rate
available for code 99311.  *See* Dec., Att. at 13; *see also* Master
Exh. 49 at 13.

The appellant asserts that the treating physician fully complied
with the standards for coverage of CPT code 99312.  The
appellant maintains that the physician completed an expanded
problem focused interval history and examination and, based on
review of lab reports and ensuing medication changes, engaged in
decision making of moderate complexity.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history is significant for cardiac
dysrhythmia, congestive heart failure, hypertension, Alzheimer's
disease and depression.  *See* Exh. 1 at 36.  The pertinent
treatment note does not support coverage of a 99312 service.  In
sum, the note does not reflect that the physician engaged in
some combination of an expanded, problem focused history and
examination or medical decision making of moderate to high
complexity.  *See* Exh. 1 at 15.

The appellant's claim for the E&M services provided to
Beneficiary D.M.(1) on December 7, 2002 is not reimbursable as
billed (99312), but was properly down-coded for reimbursement as
a 99311 service.

104.  Beneficiary R.M.(1)
      Date of Service – October 21, 2002
      Code – 99302

The PSC denied coverage finding that the beneficiary had been
seen twice previously in October and presented with no
complaints on any occasion.  The PSC added that the reviewer was
unable to determine the name of the physician who signed the
treatment note.  *See* Master Exh. 10 at 10.  (The PSC's results
for Beneficiaries 104-115 are taken directly from the PSC
reviewers' working spreadsheet.  This is necessary because the

pertinent page from the PSC's formal spreadsheet (spreadsheet page 13) is missing from the record.  *See* Master Exh. 10 at 29-28.)  The ALJ and QIC denied coverage, each finding no evidence of a "face-to-face assessment."  *See* Dec., Att. at 13; *see also* Master Exh. 49 at 13.

The appellant asserts that the beneficiary's medical history was significant for medical conditions requiring the physician's treatment and observation.  Consequently, the physician had fully complied with the coverage criteria for code 99302.  The appellant adds that per "Medicare regulations this date of service shall be paid due to the fact that it is a required . . . service and . . . included Medicare certification/recertification."  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for alcoholism, hypovolemia, nicotine addiction, seizure disorder and Dilantin toxicity.  *See* Exh. 1 at 6.  Other than identifying the number (2) of medications the beneficiary takes PRN, the assessment for this date of service contains little or no hand-written substantive medical information supplementing the form's check-box entries.  *See id.* at 13-14.  Consequently, there is no support of record for the appellant's essential position that the physician engaged in a comprehensive examination, a detailed history and medical decision making of moderate to high complexity.

The appellant has not met its burden of establishing the medical necessity of the services at issue, as billed, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary R.M.(1) on October 21, 2002 and billed under code 99302 is not covered by Medicare.

105.  **Beneficiary A.M.**
       **Dates of Service – January 21 & October 28, 2002**
       **Codes – 99302 & 99312**

The PSC denied coverage for both dates of service finding no "documentation for this patient."  *See* Master Exh. 10 at 10. The ALJ and QIC denied coverage, for both dates, for this reason.  *See* Dec., Att. at 13; *see also* Master Exh. 49 at 13.

129

The appellant attributes these non-coverage determinations to
the facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

There are no medical records in the beneficiary's claim file.
*See generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claims for E&M services provided to Beneficiary
A.M. on January 21 and October 28, 2002 and billed under
codes 99302 and 99312 are not covered by Medicare.

106.   Beneficiary R.M.(2)
       Date of Service – January 29, 2003
       Code – 99302

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 10.  The ALJ and QIC denied
coverage for this reason.  *See* Dec., Att. at 13; *see also* Master
Exh. 49 at 13.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for personal
injuries of the slip and fall variety, anxiety, dehydration, UTI
osteoporosis, psychosis and Alzheimer's dementia.  *See* Exh. 1
at 6.  As found at the earlier levels of review, there are no
pertinent medical records for this date of service.  *See*
*generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

130

The appellant's claim for E&M services provided to Beneficiary R.M.(2) on January 29, 2003 and billed under code 99302 is not covered by Medicare.

107.   Beneficiary M.M.(3)
       Date of Service - July 12, 2002
       Code - 99313

The PSC denied coverage for this claim finding that the beneficiary had been seen four times in July, subsequent to the date of service, without complaint.  Moreover, the reviewer was unable to identify the physician who signed the treatment note. *See* Master Exh. 10 at 10.  The ALJ and the QIC denied coverage for the claim as billed but found reimbursement warranted at the lower, 99311, level.  *See* Dec., Att. at 13; *see also* Master Exh. 49 at 13.

The appellant disagrees with the decision to down-code this claim.  The appellant asserts that, per the 99313 coverage criteria, its documentation supports a finding that the physician's examination included some combination of a comprehensive history and examination *or* medical decision making of moderate to high complexity.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for intestinal obstruction, convulsions, dementia and hypertension.  *See* Exh. 1 at 5.  The pertinent treatment note and addenda do not demonstrate that the physician engaged in some combination of a comprehensive history and examination or medical decision making of moderate to high complexity.  *See id.* at 22.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary M.M.(3) on July 12, 2002 and billed under code 99313 is not covered by Medicare, but was properly down-coded for reimbursement as a 99311 service.

131

108.  Beneficiary G.M.(2)
      Date of Service - June 4, 2002
      Code - 99313

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 10.  The ALJ and QIC denied
coverage for this reason.  *See* Dec., Att. at 13; *see also* Master
Exh. 49 at 13.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for an altered
mental state, pneumonia, frequent falls, hypertension, cervical
spine disease, anxiety, depression, lupus, T-cell leukemia and
osteoporosis.  *See* Exh. 1 at 6.  As found at the earlier levels
of review, there are no pertinent medical records for this date
of service (though there is one undated, comprehensive treatment
note that may have been intended for the June 4, 2002 visit.)
*See generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
G.M.(2) on June 4, 2002 and billed under code 99313 is not
*covered by Medicare.*

109.  Beneficiary I.M.
      Dates of Service - February 26, March 11 & April 8, 2002
      Codes - 99311, 99311 & 99312

The PSC denied coverage for each claim finding no documentation
for any of these dates of service.  *See* Master Exh. 10 at 10.
The ALJ and QIC denied coverage for this reasons.  *See* Dec.,
Att. at 13-14, *see also* Master Exh. 49 at 13-12.

The appellant attributes these non-coverage determinations to
the facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care

132

nursing home visit" on the February 26, 2002 date of service and should be reimbursed accordingly. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for depression and sadness. *See* Exh. 1 at 11. As found at the earlier levels of review, there are no pertinent medical records for these dates of service. *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claims for E&M services provided to Beneficiary I.M. on February 26, March 11 & April 8, 2002 and billed under code 99311 (February and March) and 99312 (April) are not covered by Medicare.

110.   **Beneficiary V.M.**
       **Date of Service - November 14, 2003**
       **Code - 99313**

The PSC denied coverage for this claim as originally billed, but determined that reimbursement was warranted under the rate applicable to code 99311 based on a problem focused history, comprehensive examination and straight forward decision making. Moreover, the reviewer was unable to identify the physician who signed the treatment note. *See* Master Exh. 10 at 9. The ALJ and the QIC also found reimbursement warranted at the 99311, level. *See* Dec., Att. at 14; *see also* Master Exh. 49 at 12.

The appellant disagrees with the decision to down-code this claim. The appellant asserts that, per the 99313 coverage criteria, its documentation supports a finding that the physician's examination included some combination of a comprehensive history and examination as well as medical decision making of high complexity. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for arteriosclerotic heart disease, staph aureus septicemia and depressive disorder. *See* Exh. 1 at 6-8. The pertinent treatment note and addenda do not demonstrate that the physician engaged in some combination of a comprehensive history and examination or medical decision making of moderate to high complexity. *See id.* at 27.

133

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services. *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
V.M. on November 14, 2003 is not covered by Medicare as
originally billed (99313), but was properly down-coded for
reimbursement as a 99311 service.

111.   Beneficiary C.M.(1)
       Date of Service - August 13, 2002
       Code - 99313

The PSC denied coverage finding that the beneficiary had been
seen on four occasions in August with no new complaints.
However, the reviewer also found that this service had been
provided by a nurse practitioner and that "there was no
documentation by the physician" attesting to the physician's
review of the NP's examination.  Accordingly, the reviewer
determined that this claim did not satisfy the "incident to"
coverage criteria. *See* Master Exh. 10 at 9.  The ALJ and QIC
also denied coverage based on the failure to meet the incident
to criteria. *See* Dec., Att. at 14; *see also* Master Exh. 49
at 12.

The appellant asserts that its documentation evidences its
compliance with Medicare's "incident to" criteria in providing
these services.  The appellant adds that the Nurse Practitioner
plainly indicated, and the physician affirmed, that she had
timely and affirmatively discussed the beneficiary's care with
the physician. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history is significant for paranoid
schizophrenia, hyposmolality and a fractured hip. *See* Exh. 1
at 5.  The pertinent treatment note reflects that a physician
reviewed and discussed the beneficiary's examination results and
treatment plan with the Nurse Practitioner. *See id.* at 14.

However, as discussed above, by regulation, "incident to"
services "must be furnished in a non-institutional setting to
non-institutional patients."  See 42 C.F.R. 410.26(b)(1).  Thus,
these services cannot be billed to Medicare under the
circumstances of this claim.

000135

134

The appellant's claim for E&M services provided to Beneficiary C.M.(1) on August 13, 2003 and billed under CPT code 99313 is not covered by Medicare.

112.   Beneficiary E.M.(3)
       Date of Service – January 27, 2004
       Code – 99302

The PSC denied coverage finding that the beneficiary had been seen on one earlier occasion in January and had "no complaints at this visit."  The PSC added that the reviewer was unable to determine the name of the physician who signed the treatment note.  *See* Master Exh. 10 at 9.  The ALJ and QIC denied coverage, each finding no evidence of a "face-to-face assessment."  *See* Dec., Att. at 14; *see also* Master Exh. 49 at 12.

The appellant asserts that the beneficiary's medical history was significant for medical conditions requiring the physician's treatment and observation.  Consequently, the physician had fully complied with the coverage criteria for code 99302.  The appellant adds that per "Medicare regulations this date of service shall be paid due to the fact that it is a required . . . service and . . . included Medicare certification/recertification."  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for Bipolar disorder.  *See* Exh. 1 at 10.  Other than identifying the number (3) of medications the beneficiary takes PRN, the assessment for this date of service contains little or no hand-written substantive medical information supplementing the form's check-box entries.  *See id.* at 9-10.  Consequently, there is no support of record for the appellant's essential position that the physician engaged in comprehensive examination a detailed history and medical decision making of moderate to high complexity.

The appellant has not met its burden of establishing the medical necessity of the services at issue, as billed, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary E.M.(1) on January 27, 2004 and billed under code 99302 is not covered by Medicare.

113.   Beneficiary D.M.(2)
       Date of Service - July 1, 2002
       Code - 99303

The PSC denied coverage for the claim as billed finding that the
appellant's documentation did "not meet the minimal E/M criteria
for a comprehensive visit."  However, the PSC found coverage
warranted at the rate available for a claim billed under CPT
code 99312.  *See* Master Exh. 10 at 9.  The ALJ and QIC down-
coded the claim, finding reimbursement warranted at the 99302
level.  *See* Dec., Att. at 14; *see also* Master Exh. 49 at 12.

The appellant disagrees with the ALJ's decision to down-code,
asserting that its documentation fully supports a coverage
determination for a 99303 service.  Additionally, the appellant
notes that the beneficiary was a "new admit and required a
complete physical examination of all symptoms.  *See* Exh. MAC-3,
Att. D.

The beneficiary's medical history was significant for
hypertension in addition to hip and back pain.  *See* Exh. 1 at 5.
A billing under CPT code 99303 requires a comprehensive history,
comprehensive examination and medical decision making of
moderate to high complexity.  The treatment note, *i.e.*, the
"Admission History and Physical," for this date of service does
not evidence all three of these necessary elements.
Specifically, we cannot discern medical decision making of
moderate to high complexity.  *See id.* at 6-7.

The appellant's claim for the E&M services provided to
Beneficiary D.M.(2) on July 1, 2002 is not reimbursable as
billed (99303), but was properly down-coded for reimbursement as
a 99302 service.

114.   Beneficiary C.M.(2)
       Date of Service - November 12, 2002
       Code - 99311

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 9.  The ALJ and QIC denied
coverage for this reason.  *See* Dec., Att. at 14; *see also* Master
Exh. 49 at 12.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care

136

nursing home visit" on this date of service and should be
reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for diabetes,
Alzheimer's disease, dementia, depression, emphysema/COPD and
renal failure.  *See* Exh. 1 at 10.  As found at the earlier
levels of review, there are no pertinent medical records for
this date of service.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
C.M.(2) on November 12, 2002 and billed under code 99311 is not
covered by Medicare.

115.  Beneficiary L.M.(2)
      Date of Service - June 17, 2002
      Code - 99302

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 9.  The ALJ and QIC denied
coverage for this reason.  *See* Dec., Att. at 14; *see also* Master
Exh. 49 at 12.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for pneumonia,
dementia with delusions, seizure disorder, Parkinson's and
osteoporosis.  *See* Exh. 1 at 15.  As found at the earlier levels
of review, there are no pertinent medical records for this date
of service.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

137

The appellant's claim for E&M services provided to Beneficiary
L.M.(2) on June 17, 2002 and billed under code 99302 is not
covered by Medicare.

116.   Beneficiary S.N.
       Dates of Service - February 19 & May 14, 2003
       Code - 99302

The PSC denied coverage finding that the beneficiary had been
seen on multiple occasions in each month of service with "no
complaints." The PSC added that, relative to both claims, the
reviewer was unable to determine the name of the physician who
signed the treatment note. *See* Master Exh. 10 at 28. The ALJ
and QIC denied coverage for both claims, each finding no
evidence of a "face-to-face assessment." *See* Dec., Att. at 14;
*see also* Master Exh. 49 at 12.

The appellant asserts that the beneficiary's medical history was
significant for medical conditions requiring the physician's
treatment and observation. Consequently, the physician had
fully complied with the coverage criteria for code 99302. For
each claim, the appellant adds that per "Medicare regulations
this date of service shall be paid due to the fact that it is a
required . . . service and . . . included Medicare
certification/recertification." *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for
Alzheimer's disease, hypothyroidism, hypertension, dementia,
schizophrenia and arteriosclerotic heart disease. *See* Exh. 1
at 56. Relative to each claim, other than identifying the
number (5 and 4 chronologically) of medications the beneficiary
takes PRN, the assessments for these dates of service contain no
hand-written substantive medical information supplementing the
forms' check-box entries. *See id.* at 59-56. Consequently,
there is no support of record for the appellant's essential
position that the physician engaged in comprehensive
examinations, detailed histories and medical decision making of
moderate to high complexity.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, as billed, nor its
entitlement to Medicare reimbursement for those services. *See*
Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

000139

138

The appellant's claims for E&M services provided to Beneficiary S.N. on February 19 and May 14, 2003 and billed under code 99302 are not covered by Medicare.

117.   **Beneficiary M.N.**
       **Dates of Service – October 19 & 22, 2002**
       **Codes – 99311 & 99302**

The PSC denied coverage finding no documentation for either date of service. *See* Master Exh. 10 at 28.  The ALJ and QIC denied coverage for the October 19th claim for this reason.  However, the ALJ and the QIC denied coverage for the October 22nd claim based on the absence of evidence of a "face-to-face assessment. *See* Dec., Att., at 15; *see also* Master Exh. 49 at 11.

The appellant attributes the October 19th non-coverage determination to the facility's failure to properly maintain its records.  The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly.  *See* Exh. MAC-3, Att. D. Relative to the October 22nd claim, the appellant asserts that the physician fully satisfied each element of the coverage criteria for an E&M service billed under CPT code 99302.  *See id.*

The beneficiary's medical history was significant for congestive heart failure, hypertension, peripheral vascular disease, arthritis, dementia and Parkinson's disease.  *See* Exh. 1 at 14. As found at the earlier levels of review, there are no pertinent medical records for the October 19, 2002 date of service.  *See generally* Exh. 1.  Relative the October 22nd claim, other than identifying the number (0) of medications the beneficiary takes PRN, the assessment for this date of service contains only minimal hand-written substantive medical information supplementing the form's check-box entries.  *See id.* at 13-14. Consequently, there is no support of record for the appellant's essential position that, on this date, the physician engaged in a comprehensive examination, detailed history and medical decision making of moderate to high complexity.

The appellant has not met its burden of establishing the medical necessity of the services at issue, as billed, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claims for E&M services provided to Beneficiary M.N. on October 19 and 22, 2002 and billed under codes 99311 and 99302 are not covered by Medicare.

118.   **Beneficiary L.N.**
        Date of Service – August 9, 2002
        Code – 99302

The PSC denied coverage finding that the beneficiary had been seen a total of three times throughout the month "with no complaints." The PSC added that the reviewer was unable to identify the physician who signed the treatment form. *See* Master Exh. 10 at 28. The ALJ and the QIC denied coverage based on the absence of evidence of a "face-to-Face assessment. *See* Dec., Att. at 15; *see also* Master Exh. 49 at 11.

The appellant asserts that the beneficiary's medical history was significant for medical conditions requiring the physician's treatment and observation. Consequently, the physician had fully complied with the coverage criteria for code 99302. The appellant adds that per "Medicare regulations this date of service shall be paid due to the fact that it is a required . . . service and . . . included Medicare certification/recertification." *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for schizophrenia, dementia, hypertension, CVA and left-sided paralysis. *See* Exh. 1 at 14. Other than identifying the number (1) of medications the beneficiary takes PRN, the assessment does not contain hand-written substantive medical information supplementing the form's check-box entries. *See id.* at 17. Consequently, there is no support of record for the appellant's essential position that the physician engaged in a comprehensive examination, detailed history, and medical decision making of moderate to high complexity.

The appellant has not met its burden of establishing the medical necessity of the services at issue, as billed, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary L.N. on August 9, 2002 and billed under code 99302 is not covered by Medicare.

140

119.   Beneficiary M.O.
       Date of Service — March 5, 2003
       Code - 99313

The PSC denied coverage finding that the beneficiary had been
seen on two other occasions in March with no new complaints.
Additionally, the PSC indicated that the reviewer was unable to
identify the physician who signed the treatment note.  *See*
Master Exh. 10 at 28.  The ALJ and QIC denied coverage as the
claim was originally billed, but found coverage warranted under
the reimbursement rate for a 99311 service level.  *See* Dec.,
Att. at 15; *see also* Master Exh. 49 at 11.

The appellant asserts that its documentation evidences the
physician's complete compliance with the coverage criteria
necessary for reimbursement of E&M services billed as a 99313
claim.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history is significant for rheumatoid
arthritis, depressive disorder, dementia and hypertension.  *See*
Exh. 1 at 5.  Under code 99313, a physician must demonstrate
compliance with some combination of a comprehensive history and
examination or medical decision making of moderate to high
complexity.  We find that the information in the pertinent
treatment note does not support a finding coverage for a 99313
billing.  Simply put, there is little or no substantive hand-
written information demonstrating the necessary coverage
elements.  *See id.* at 11.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, as billed, nor its
entitlement to Medicare reimbursement for those services.  *See*
Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
M.O. on March 5, 2003 and billed under code 99313 is not covered
by Medicare, but may be reimbursed under the rate applicable to
a 99311 service.

120.   Beneficiary S.P.
       Date of Service — September 2, 2003
       Code - 99313

The PSC denied coverage finding that the beneficiary had been
seen a total of six times in September with no new complaints.
Additionally, the PSC indicated that the reviewer was unable to

141

identify the physician who signed the treatment note.  *See*
Master Exh. 10 at 28.  The ALJ and QIC denied coverage for the
claim as originally billed, but found coverage warranted under
the reimbursement rate for a 99311 level service.  *See* Dec.,
Att. at 15; *see also* Master Exh. 49 at 11.

The appellant asserts that its documentation evidences the
physician's complete compliance with the coverage criteria
necessary for reimbursement of E&M services billed as a 99313
claim.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history is significant for diabetes,
arthritis, osteoporosis, dementia, schizophrenia, deep vein
thrombosis and hypertension.  *See* Exh. 1 at 6.  Under
code 99313, a physician must demonstrate compliance with some
combination of a comprehensive history and examination or
medical decision making of moderate to high complexity.  The
information in the pertinent treatment note does not demonstrate
that the physician's examination met the qualifying standards
for a 99313 billing.  *See id.* at 13.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, as billed, nor its
entitlement to Medicare reimbursement for those services.  *See*
Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
S.P. on September 2, 2003 is not covered by Medicare as
originally billed (99313), but may be reimbursed under the rate
applicable to code 99311.

121.   **Beneficiary L.P**
       **Date of Service - May 15, 2003**
       **Code - 99312**

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 28.  The ALJ and QIC denied
coverage for this reason.  *See* Dec., Att. at 15; *see also* Master
Exh. 49 at 11.

The appellant explains that the "medical documentation has the
wrong date of service on the record. . . . [We] *did not bill for
date of service May 17, 2003, we did however bill for date of
service May 15, 2003* and therefore payment is entitled for this
claim."  *See* Exh. MAC-3, Att. D (emphasis added).

142

The record does not support the appellant's position regarding a
confusion of dates of service.  Having reviewed the billing and
preliminary review-related (*i.e.*, claim identification)
documents in the beneficiary's file, we find that they
consistently identify a May 15, 2003 claim (ICN 020314790070)
for review and payment.  *See* Exh. 2 at 3 and 7.  Similarly, the
PSC determination, QIC reconsideration and ALJ decision
referenced in the first paragraph above also identify a May 15,
2003 claim.  We note also that the beneficiary's medical record
does, in fact, identify a March 17, 2003 examination.  *See*
Exh. 1 at 42.  However, in view of the appellant's affirmative
argument and the billing information of record, we are compelled
to consider the claim as billed.  There is no supporting
documentation for a May 15, 2003 claim.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
L.P. on May 15, 2003 and billed under code 99312 is not covered
by Medicare.

122.   Beneficiary J.P.
       Date of Service - January 4, 2002
       Code - 99313

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 27.  The ALJ and QIC denied
coverage for this same reason.  *See* Dec., Att. at 15; *see also*
Master Exh. 49 at 11.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for atypical
psychosis, a fractured tibia, osteoporosis, anxiety, cellulitis,
depressive disorder and dementia.  *See* Exh. 1 at 6.  As found at
the earlier levels of review, there are no pertinent medical
records for this date of service.  *See generally* Exh. 1.

143

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary J.P. on January 4, 2002 and billed under code 99313 is not covered by Medicare.

**123.  Beneficiary F.P.**
      **Date of Service – July 18, 2002**
      **Code – 99302**

The PSC denied coverage finding that the beneficiary had been seen a total of six times throughout July "with no complaints." The PSC added that the reviewer was unable to identify the physician who signed the treatment form. *See* Master Exh. 10 at 27.  The ALJ and the QIC denied coverage based on the absence of evidence of a "face-to-face assessment. *See* Dec., Att. at 16; *see also* Master Exh. 49 at 10.

The appellant asserts that the beneficiary's medical history was significant for medical conditions requiring the physician's treatment and observation.  Consequently, the physician had fully complied with the coverage criteria for code 99302.  The appellant adds that per "Medicare regulations this date of service shall be paid due to the fact that it is a required . . . service and . . . included Medicare certification/recertification." *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for dementia, hypertension, anemia and failure to thrive.  See Exh. 1 at 5. Other than identifying the number (0) of medications the beneficiary takes PRN, the assessment does not contain hand-written substantive medical information supplementing the forms' check-box entries. *See id.* at 6-7.  Consequently, there is no support of record for the appellant's essential position that the physician engaged in a comprehensive examination, detailed history and medical decision making of moderate to high complexity.

The appellant has not met its burden of establishing the medical necessity of the services at issue, as billed, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

144

The appellant's claim for E&M services provided to Beneficiary F.P. on July 18, 2002 and billed under code 99302 is not covered by Medicare.

**124.   Beneficiary T.P.**
        **Date of Service – February 14, 2002**
        **Code - 99313**

The PSC denied coverage finding that the beneficiary had also been seen on February 26 and had offered "no new complaints" on either visit.  Additionally, the PSC indicated that the reviewer was unable to identify the physician who signed the treatment note.  *See* Master Exh. 10 at 27.  The ALJ and QIC denied coverage as the claim was originally billed, but found coverage warranted under the reimbursement rate associated with a 99311 billing.  *See* Dec., Att. at 16; *see also* Master Exh. 49 at 10.

The appellant asserts that its documentation evidences the physician's complete compliance with the coverage criteria necessary for reimbursement of E&M services billed as a 99313 claim.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for peripheral vascular disease, CVA, senile dementia and a persistent vegetative state.  *See* Exh. 1 at 8.  Under code 99313, a physician must demonstrate compliance with some combination of a comprehensive history and examination or medical decision making of moderate to high complexity.  The information in the pertinent treatment note does not demonstrate that the physician's examination met the qualifying standards for a 99313 billing.  *See id.* at 13.

The appellant has not met its burden of establishing the medical necessity of the services at issue, as billed, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary T.P. on February 14, 2002 is not covered by Medicare as originally billed (99313), but may be reimbursed under the rate applicable to code 99311.

000146

145

125.   Beneficiary M.P.
       Date of Service - February 6, 2002
       Code - 99312

The PSC denied coverage finding that the beneficiary had also
been seen on two subsequent dates in February with no new
complaints.  Additionally, the reviewer was unable to identify
the physician who signed the treatment note.  *See* Master Exh. 10
at 27.  The ALJ and QIC denied coverage for the claim as
originally billed but down-coded reimbursement to the rate
available for code 99311.  *See* Dec., Att. at 16; *see also* Master
Exh. 49 at 10.

The appellant asserts that the treating physician fully complied
with the standards for coverage of CPT code 99312.  The
appellant maintains that the physician completed an expanded
problem focused interval history and examination and, based on
review of lab reports and ensuing medication changes, engaged in
decision making of moderate complexity.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history is significant for severe
osteoporosis, diabetes, anxiety, arthritis, atrial fibrillation,
cardiomyopathy, mild renal insufficiency, depression and chronic
pains.  *See* Exh. 1 at 8.  The pertinent treatment supports
coverage of a 99312 service.  In total, the note reflects that
the physician engaged in some combination of an expanded,
problem focused history and examination or medical decision
making of moderate to high complexity.  *See* Exh. 1 at 24.

**The appellant's claim for E&M services provided to Beneficiary
M.P. on February 6, 2002 and billed under CPT code 99312 is
covered by Medicare.**

126.   Beneficiary D.R.(1)
       Date of Service - March 12, 2003
       Code - 99312

The PSC denied coverage for the claim as billed, but determined
that reimbursement was warranted at the level associated with
CPT code 99311.  The PSC found that the physician had conducted
a problem focused history and examination and engaged in low
complexity decision making.  Additionally, the reviewer was
unable to identify the physician who signed the treatment note.
*See* Master Exh. 10 at 27.  The ALJ and QIC also down-coded the
claim allowing reimbursement at the rate available for code
99311.  *See* Dec., Att. at 16; *see also* Master Exh. 49 at 10.

The appellant disagrees with the down-coding and asserts that
the treating physician fully complied with the standards for
coverage of CPT code 99312.  The appellant maintains that the
physician completed an expanded problem focused interval history
and examination and, based on written orders for medication
changes and review of the beneficiary's plan, engaged in
decision making of moderate complexity.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history is significant for breast
cancer with mastectomy and metastasis to digestive organs and
brain injury.  *See* Exh. 1 at 6.  The pertinent treatment note
supports coverage of a 99312 service.  In total, the note
reflects that the physician engaged in some combination of an
expanded, problem focused history and examination or medical
decision making of moderate to high complexity.  *See* Exh. 1
at 20.

**The appellant's claim for E&M services provided to Beneficiary
D.R.(1) on March 12, 2003 and billed under CPT code 99312 is
covered by Medicare.**

127.  **Beneficiary D.R.(2)**
      **Date of Service – March 14, 2002**
      **Code – 99303**

The PSC denied Medicare coverage for the claim as originally
billed, but found reimbursement warranted at the rate associated
with CPT code 99301.  The PSC determined that the physician had
conducted a detailed history, comprehensive examination and
engaged in moderate complexity decision making.  Additionally,
the reviewer was unable to identify the physician *who signed the
treatment note.  See* Master Exh. 10 at 26.  The ALJ and QIC also
down-coded this claim; allowing reimbursement at the rate
available for code *99301.  See* Dec., Att. at 16; *see also* Master
Exh. 49 at 10 (emphasis added).

The appellant disagrees with the ALJ's "decision to down-code
the claim . . . *to a 99302 CPT code*."  The appellant asserts
that the physician had *fully complied* with the coverage criteria
for code 99303.  The appellant explains that the beneficiary's
admission "from an acute care facility" inherently required an
E&M service involving a comprehensive history and examination
and medical decision making of high complexity.  *See* Exh. MAC-3,
Att. D (emphasis added).

147

The beneficiary was admitted to the facility on March 13, 2002 with a medical history significant for COPD, a broken left leg, carotid stenosis, osteoarthritis, degenerative spondylosis, multiple contusion and chronic malnutrition. See Exh. 1 at 6. The March 14th "treatment note" is, in fact, an Admission History and Physical Report. See id. at 7-8. Coverage of E&M services billed under code 99303 requires a comprehensive history, comprehensive examination and medical decision making of moderate to high complexity. Based upon our review of the pertinent treatment note we find that this claim satisfies the code 99303 coverage criteria.

**The appellant's claim for E&M services provided to Beneficiary D.R.(2) on March 14, 2002 and billed under CPT code 99303 is covered by Medicare.**

128.   Beneficiary A.R.
       Date of Service - December 13, 2002
       Code - 99303

The PSC denied coverage for the claim as billed finding that the appellant's documentation did "not meet the criteria for a comprehensive visit." However, the PSC found coverage warranted at the rate available for a claim billed under CPT code 99312. Additionally, the reviewer was unable to determine the name of the physician who signed the progress note. See Master Exh. 10 at 26 (emphasis added). The ALJ and QIC denied coverage for the claim as billed, but down-coded it finding reimbursement warranted at the 99302 level. See Dec., Att. at 16; see also Master Exh. 49 at 10.

The appellant disagrees with the ALJ's decision to down-code, asserting that its documentation fully supports a coverage determination for a 99303 service. Additionally, the appellant notes that the beneficiary "was admitted from the hospital and required a complete physical examination of all symptoms." See Exh. MAC-3, Att. D.

The beneficiary was originally admitted to the facility on January 12, 2002, with a medical history significant for schizophrenia, diabetes and hypertension. See Exh. 1 at 6. There is no facility-based documentation of the beneficiary's readmission to the facility. However, Nursing Notes indicate that, on December 9, 2002, per instructions from the appellant's physician (Dr. M.K.), the beneficiary was sent to an Emergency Room for evaluation and readmitted to the facility on the

148

afternoon of December 12, 2002, at which point at least a
general examination of the beneficiary occurred. *See id.*
at 24-25. The claim-specific treatment note is inherently
deficient on multiple levels and precludes Medicare
reimbursement at any level. Based on our familiarity with Dr.
M.K.'s signature in this and other records reviewed in this
case, the December 13th treatment note is plainly signed by an
individual other than Dr. M.K. and does not otherwise satisfy
the "incident to" coverage criteria. Additionally, although
varying by degree, both CPT codes 99303 and 99302 require
satisfaction of each of three coverage criteria, including
medical decision making of moderate to high complexity. Even if
we were to have found the December 13th treatment note inherently
valid, there is no indication, even at the minimum level of a
circled identification, of the nature of medical decision making
involved in this examination. *See id.* at 29.

Moreover, as discussed above, by regulation, "incident to"
services "must be furnished in a non-institutional setting to
non-institutional patients." See 42 C.F.R. 410.26(b)(1). Thus,
these services cannot be billed to Medicare under the
circumstances of this claim.

The appellant's claim for E&M services provided to Beneficiary
A.R. on December 13, 2002 and billed under CPT code 99303 is not
covered by Medicare as billed or at the down-coded level
assigned by the ALJ.

129.   **Beneficiary J.R.**
       **Date of Service – August 23, 2002**
       **Code – 99313**

The PSC denied coverage for this claim as billed, but found
reimbursement warranted at the level associated with CPT code
99312. *See* Master Exh. 10 at 26. Upon redetermination, the
Medicare contractor down-coded reimbursement for the claim at
the level associated with CPT code 99312. *See* Master Exh. 15
at 25. The QIC did not issue a reconsideration action on this
claim for this beneficiary. *See generally* Master Exh. 49. The
ALJ issued a favorable decision on this claim finding that the
appellant's documentation "supports the need for the evaluation
at the level billed." *See* Dec., Att. at 16.

As part of its request for review, the appellant provided a
roster of beneficiaries and associated dates of service for
which it was seeking review. Included on that roster was this

149

now paid date of service for Beneficiary J.R. *See* Exh. MAC-3 at 4. However, the appellant offered no beneficiary or claim-specific argument. *See generally* Exh. MAC-3. Att. D. The appellant included this beneficiary and claim in its roster of claims for which, on September 16, 2009, it initially sought an ALJ hearing. *See* Master Exh. 50 at 65. However, in his initial decision, the ALJ did not rule on this beneficiary or claim. *See* Master Exh. 78 at 14b. CMS did not include this beneficiary or claim in its request for own motion review; nor did the Council in its ensuing Order of Remand. *See* Master Exh. 79 at 20 and Master Exh. 82 at 23.

Even though the appellant sought an ALJ hearing for this claim, in the absence of a QIC reconsideration, the appellant did not have a right to an ALJ hearing on the merits of the claim. *See* 42 C.F.R. §§ 405.1000; 405.1002 and 405.1032(a).

The Council will dismiss a request for hearing for any reason that the ALJ could have dismissed the request for hearing. 42 C.F.R. § 405.1108(c). Accordingly, we dismiss the appellant's request for hearing as it applies to the August 23, 2002 claim for Beneficiary J.R.

The Medicare contractor's redetermination, providing Medicare reimbursement, for the August 23, 2002 E&M services administered to Beneficiary J.R., at the level associated with CPT Code 99312, stands as the final decision of the Secretary. *See* 42 C.F.R. § 405.958(a).

130.  **Beneficiary B.R.(1)**
      **Date of Service – April 13, 2003**
      **Code – 99316**

The PSC denied coverage finding no documentation for this date of service. *See* Master Exh. 10 at 26. The ALJ and QIC denied coverage for this same reason. *See* Dec., Att. at 16; *see also* Master Exh. 49 at 10.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records. The appellant adds that the physician completed a "discharge from the nursing home" on this date of service and should be reimbursed accordingly. *See* Exh. MAC-3, Att. D.

As found at all earlier levels of review, there are no physician-related medical records pertinent to this date of

service which support the appellant's claim for coverage. *See generally* Exh. 1.  A Nursing Note at 10:45 p.m. on this date of service indicates that a nurse "entering the room on rounds . . . found [the beneficiary] absent of vital signs" and notified the appellant's physician and the beneficiary was "pronounced deceased." *See id*. at 12.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary B.R.(1) on April 13, 2003 and billed under code 99316 is not covered by Medicare.

131.  Beneficiary B.R.(2)
      Date of Service — November 6, 2002
      Code — 99312

The PSC denied coverage finding that the beneficiary had been seen four times in November with no complaints.  The reviewer was also unable to identify the physician who signed the treatment note. *See* Master Exh. 10 at 26.  The ALJ and QIC denied coverage for the claim as originally billed, but found reimbursement warranted at the rate available for code 99311. *See* Dec., Att. at 16; *see also* Master Exh. 49 at 10.

The appellant disagrees with the down-coding and asserts that the treating physician fully complied with the standards for coverage of CPT code 99312.  The appellant maintains that the physician completed an expanded problem focused interval history and examination and, based written orders for medication changes and review of the beneficiary's plan, engaged in decision making of moderate complexity. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history is significant for Alzheimer's disease with depression, Parkinson's disease, emphysema and degenerative joint disease. *See* Exh. 1 at 6.  The pertinent treatment note contains little substantive hand-written addenda supporting the appellant's claim.  The note does not show that the physician engaged in some combination of an expanded, problem focused history and examination or medical decision making of moderate to high complexity. *See id*. at 17.

151

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary B.R.(2) on November 6, 2002 and billed under code 99312 is not covered by Medicare, but may be reimbursed under the rate applicable to a 99311 level of service.

132.   **Beneficiary M.R.(1)**
       **Date of Service – February 18, 2003**
       **Code – 99302**

The PSC denied coverage finding that the beneficiary had been seen a total of five times throughout February "with no new complaints." The PSC added that the reviewer was unable to identify the physician who signed the treatment form. *See* Master Exh. 10 at 25.  The ALJ and the QIC denied coverage based on the absence of evidence of a "face-to-face assessment. *See* Dec., Att. at 17; *see also* Master Exh. 49 at 9.

The appellant asserts that this "severely impaired" beneficiary's medical history was significant for medical conditions requiring the physician's treatment and observation. Consequently, the physician had fully complied with the coverage criteria for code 99302.  The appellant adds that per "Medicare regulations this date of service shall be paid due to the fact that it is a required . . . service and . . . included Medicare certification/recertification." *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for diabetes, dementia, hypertension, GI bleed and Alzheimer's disease. *See* Exh. 1 at 22.  Other than identifying the number (3) of medications the beneficiary takes PRN, the assessment does not contain hand-written substantive medical information supplementing the forms' check-box entries. *See id.* at 27-28.

Consequently, there is no support of record for the appellant's essential position that the physician engaged in a comprehensive examination, detailed history and medical decision making of moderate to high complexity.

The appellant has not met its burden of establishing the medical necessity of the services at issue, as billed, nor its

152

entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary M.R.(1) on February 18, 2003 and billed under code 99302 is not covered by Medicare.

133. **Beneficiary M.R.(2)**
     **Date of Service - July 22, 2002**
     **Code - 99311**

The PSC denied coverage for this claim finding that, including this date of service, the beneficiary had been seen eight times in July with no complaints.  Moreover, the reviewer was unable to identify the physician who signed the treatment note.  *See* Master Exh. 10 at 25.  The ALJ and the QIC denied coverage for the claim finding no documentation for this date of service. *See* Dec., Att. at 17; *see also* Master Exh. 49 at 9.

The appellant attributes the ALJ's non-coverage determination to the facility's failure to properly maintain its records.  The appellant adds that the physician completed a "discharge from the nursing home" on this date of service and should be reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for Bipolar disorder, schizophrenia, seizures and hypertension.  *See* Exh. 1 at 9.  As the ALJ found, the record does not contain any clinical medical records created by the physician pertinent to this claim.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary M.R.(2) on July 22, 2002 and billed under code 99311 is not covered by Medicare.

153

134.  Beneficiary H.S.
      Date of Service - April 19, 2002
      Code - 99302

The PSC denied coverage finding that the beneficiary had been
seen a total of five times throughout the month "with no
complaints." *See* Master Exh. 10 at 25.  The ALJ and the QIC
denied coverage based on the absence of evidence of a "face-to-
face assessment. *See* Dec., Att. at 17; *see also* Master Exh. 49
at 9.

The appellant asserts that this "severely impaired"
beneficiary's medical history was significant for medical
conditions requiring the physician's treatment and observation.
Consequently, the physician had fully complied with the coverage
criteria for code 99302.  The appellant adds that per "Medicare
regulations this date of service shall be paid due to the fact
that it is a required . . . service and . . . included Medicare
certification/recertification." *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for diabetes,
dementia, hypertension, coronary artery disease, GI bleed,
arthritis, stroke, depression, anemia and breast cancer. *See*
Exh. 1 at 8.  Other than identifying the number (2) of
medications the beneficiary takes PRN and recording her weight,
the assessment contains no hand-written substantive medical
information supplementing the forms' check-box entries. *See id.*
at 7-8.  Consequently, there is no support of record for the
appellant's essential position that the physician engaged in a
comprehensive examination, detailed history and medical decision
making of moderate to high complexity.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, as billed, nor its
entitlement to Medicare reimbursement for those services. *See*
Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
H.S. on April 19, 2002 and billed under code 99302 is not
covered by Medicare.

154

135.  Beneficiary E.S.(1)
      Date of Service - April 1, 2002
      Code - 99311

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 25.  The ALJ and QIC denied
coverage for this reason.  *See* Dec., Att. at 17; *see also* Master
Exh. 49 at 9.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for UTI,
seizure disorder, hyponatremia, contracture (multiple sights),
major depressive disorder and a PEG Tube.  *See* Exh. 1 at 5-7.
As found at the earlier levels of review, there are no pertinent
medical records for this date of service.  *See generally* Exh. 1.
Additionally, the one treatment note of record is incomplete,
identifying only the month and year ("3/ /02") of the purported
service.  *See id.* at 8-9.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
E.S.(1) on April 1, 2002 and billed under code 99311 is not
covered by Medicare.

136.  Beneficiary L.S.(1)
      Date of Service - August 19, 2002
      Code - 99302

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 25.  The ALJ and QIC denied
coverage for this reason.  *See* Dec., Att. at 17; *see also* Master
Exh. 49 at 9.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care

155

nursing home visit" on this date of service and should be reimbursed accordingly. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for acute respiratory failure, congestive heart failure, pneumonia, emphysema, cardiomyopathy, osteoporosis, venous insufficiency, dementia and coronary artery disease. *See* Exh. 1 at 5. As found at the earlier levels of review, there are no pertinent medical records for this date of service. *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary L.S.(1) on August 19, 2002 and billed under code 99302 is not covered by Medicare.

137. **Beneficiary R.S.**
     **Date of Service – July 16, 2002**
     **Code – 99302**

The PSC denied coverage finding that the beneficiary had been seen a total of eight times in July "with no complaints." Additionally, the reviewer was unable to identify the physician who signed the treatment note. *See* Master Exh. 10 at 25. The ALJ and the QIC directed that the claim be reimbursed at the rate attributable to a 99312 E&M service. *See* Dec., Att. at 18; *see also* Master Exh. 49 at 9.

The appellant asserts that the physician's examination fully complied with the coverage criteria for code 99302. The appellant adds that the beneficiary "was a transfer . . . from [a] hospital so [the] clinician was required to develop a new plan of care . . . ." *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for hypothyroidism, arthritis and schizophrenia. *See* Exh. 1 at 11. Coverage of a 99302 service (E&M of a new patient in a nursing facility) requires a detailed history, comprehensive examination and medical decision making of moderate to high complexity. There is no facility-generated document identifying the circumstance of the beneficiary's purported transfer. *See generally* Exh. 1. However, the fact of the transfer can be derived from the history set out in contemporaneous Nursing

156

Notes. *See id.* at 25-26. The "treatment note" for this date of service is a form titled "Admission History and Physical." *See id.* at 6-7. The content of this form satisfies the coverage criteria for CPT code 99302. *See id.*

The appellant's claim for E&M services provided to Beneficiary R.S. on July 16, 2002 and billed under code 99302 is covered by Medicare as originally billed.

138.   Beneficiary E.S.(2)
       Date of Service - July 9, 2002
       Code - 99302

The PSC denied coverage finding that the beneficiary had been seen a total of seven times in July "with no complaints." Additionally, the reviewer was unable to identify the physician who signed the treatment note. *See* Master Exh. 10 at 25. The ALJ and the QIC denied coverage finding that a "face-to-face assessment was "not clearly demonstrated." *See* Dec., Att. at 18; *see also* Master Exh. 49 at 8.

The appellant asserts that, in view of the beneficiary's "several medical diagnoses" and "psych-social problems," the physician's examination fully complied with the coverage criteria for code 99302. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for dementia, psychosis, combativeness and Parkinson's disease. *See* Exh. 1 at 7. Other than identifying the number (3) of medications the beneficiary takes PRN, the July 9th assessment contains only minimal hand-written substantive medical information supplementing the check-box entries on the form. *See id.* at 6-7. Consequently, there is no support of record for coverage of the appellant's claim as billed.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary E.S.(2) on July 9, 2002 and billed under code 99302 is not covered by Medicare.

157

139.  Beneficiary C.S.
      Date of Service — March 10, 2003
      Code — 99311

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 25.  The ALJ and QIC denied
coverage for this reason.  *See* Dec., Att. at 18; *see also* Master
Exh. 49 at 8.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's record is wholly without medical documentation
of any nature.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
C.S. on March 10, 2003 and billed under code 99311 is not
covered by Medicare.

140.  Beneficiary L.S.(2)
      Date of Service — April 15, 2003
      Code — 99302

The PSC denied coverage finding that the beneficiary had been
"seen 5 times this month with no complaints this visit."  *See*
Master Exh. 10 at 25.  The ALJ and the QIC denied coverage
finding no clear evidence of a face-to-face assessment."  *See*
Dec., Att. at 18; *see also* Master Exh. 49 at 8.

The appellant asserts that the beneficiary's medical history was
significant for medical conditions requiring the physician's
treatment and observation.  Consequently, the physician had
fully complied with the coverage criteria for code 99302.  The
appellant adds that per "Medicare regulations this date of
service shall be paid due to the fact that it is a
required . . . service and . . . included Medicare
certification/recertification."  *See* Exh. MAC-3, Att. D.

158

The beneficiary's medical history was significant for hypertension, GERD, arthritis, dementia, stroke, anxiety disorder and depression. *See* Exh. 1 at 8. Other than identifying the number (3) of medications the beneficiary takes PRN, the July 9th assessment contains only minimal hand-written substantive medical information supplementing the check-box entries on the form. *See id.* at 7-8. Consequently, there is no support of record for coverage of the appellant's claim as billed.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary L.S.(2) on April 15, 2003 and billed under code 99302 is not covered by Medicare.

141.  **Beneficiary A.S.(1)**
      **Date of Service – December 17, 2002**
      **Code – 99316**

The PSC denied coverage for this claim as billed, but directed reimbursement at the rate available for a 99311 service, finding that the physician had engaged in a problem focused history, expanded, problem focused examination and low complexity medical decision making. *See* Master Exh. 10 at 25. The Medicare contractor denied coverage for the claim as billed, but found reimbursement warranted under the rate associated with CPT code 99312. *See* Master Exh. 15 at 27. The record demonstrates that the appellant did not request reconsideration for this beneficiary or the related claim. *See* Master Exh. 17 at 41-42. There is no evidence that the QIC issued a reconsideration specific to this claim for this beneficiary. *See generally* Master Exh. 49. (We note however, that there is a beneficiary with an identical last name and a first name also beginning with an "A" for whom the QIC did issue an action on a claim billed under CPT code 99302. *See id.* at 8; *see also* Beneficiary (#142) A.S.(2) *infra*.) However, the appellant did include this beneficiary and claim in its roster of claims for which, on September 16, 2009, it initially sought an ALJ hearing. *See* Master Exh. 50 at 65. The ALJ denied coverage for the claim as billed finding that the documentation "does not support the level billed. There was no facility discharge documented." The

ALJ did, however, allow reimbursement at the level associated
with CPT code 99312. *See* Dec., Att. at 18.

The appellant disagrees with the ALJ's "decision to down-code
the claim . . . to a 99311 CPT code." The appellant asserts
that this claim was properly billed utilizing a "discharge code"
because the beneficiary's care was being transferred to another
physician. *See* Exh. MAC-3, Att. D.

The QIC did not issue a reconsideration action on this claim or
beneficiary. As discussed above (Beneficiary #129), in the
absence of a QIC reconsideration, the appellant did not have a
right to an ALJ hearing on this claim. *See* 42 C.F.R.
§§ 405.1000; 405.1002 and 405.1032(a).

The Council will dismiss a request for hearing for any reason
that the ALJ could have dismissed the request for hearing. 42
C.F.R. § 405.1108(c). Accordingly, we dismiss the appellant's
request for hearing as it applies to the December 17, 2002
service for Beneficiary A.S.(1).

The Medicare contractor's redetermination, denying Medicare
coverage for the December 17, 2002 claim, associated with
Beneficiary A.S.(1), as originally billed (CPT code 99316), but
allowing reimbursement at the level associated with CPT
code 99312 stands as the final decision of the Secretary. *See*
42 C.F.R. § 405.958(a); *see also* Master Exh. 15 at 27.

142.   **Beneficiary A.S.(2)**
       **Date of Service – October 23, 2003**
       **Code – 99302**

The PSC denied coverage finding no documentation for this date
of service. *See* Master Exh. 10 at 25. The ALJ and QIC also
denied coverage for this reason. *See* Dec., Att. at 18; *see also*
Master Exh. 49 at 8.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records. The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for CVA,
seizure disorder, COPD, scoliosis, anemia and emphysema. *See*
Exh. 1 at 6. As found at the earlier levels of review, there is

160

no pertinent medical documentation for this date of service. *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary A.S.(2) on October 23, 2003 and billed under code 99302 is not covered by Medicare.

143.   Beneficiary E.S.(3)
       Date of Service - May 1, 2002
       Code - 99312

The PSC denied coverage finding no documentation for this date of service. *See* Master Exh. 10 at 25.  The ALJ and QIC denied coverage for this reason. *See* Dec., Att. at 18; *see also* Master Exh. 49 at 8.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records.  The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly. *See* Exh. MAC-3, Att. D.

There are no medical records of any nature in this beneficiary's file. *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary E.S.(3) on May 1, 2002 and billed under code 99312 is not covered by Medicare.

161

144.   Beneficiary M.S.(1)
       Date of Service - April 8, 2003
       Code - 99302

The PSC denied coverage finding that the beneficiary had been
seen a total of four times in April "with no complaints this
visit." *See* Master Exh. 10 at 24.  The ALJ and the QIC denied
coverage, each finding no clear evidence of a face-to-face
assessment." *See* Dec., Att. at 18; *see also* Master Exh. 49
at 8.

Although listing this beneficiary's claim on its roster of
claims for which it was seeking review, the appellant has
offered the Council no argument challenging the ALJ's findings.
*See generally* Exh. MAC-3, Att. D; *see also* Exh. MAC-3 at 5.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
M.S.(1) on April 8, 2003 and billed under code 99302 is not
covered by Medicare.

145.   Beneficiary M.S.(2)
       Date of Service - May 6, 2002
       Code - 99302

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 24.  The ALJ and QIC denied
coverage for this reason.  *See* Dec., Att. at 18; *see also* Master
Exh. 49 at 8.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for
osteoarthritis, hypertension, chronic back pain, cancer,
diabetes and generalized weakness.  *See* Exh. 1 at 6.  As found
at the earlier levels of review, there are no pertinent medical
records associated with this date of service.  *See generally*
Exh. 1.

162

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary M.S.(2) on May 6, 2002 and billed under code 99302 is not covered by Medicare.

146. **Beneficiary L.S.(3)**
     **Date of Service – February 4, 2004**
     **Code – 99313**

The PSC denied coverage finding that the beneficiary had been seen five times in February "with no complaints." Additionally, the PSC noted that the reviewer was unable to determine the name of the physician signing the treatment note. *See* Master Exh. 10 at 24. Both the ALJ and the QIC, denied coverage for the claim as billed, but found reimbursement warranted at the down-coded level associated with CPT code 99312. *See* Dec., Att. at 18; *see also* Master Exh. 49 at 8.

The appellant asserts that in the context of the beneficiary's condition, its documentation fully supports a coverage finding for code 99313 E&M services. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for schizophrenia, diabetes, hypertension, osteoarthrosis and explosive personality. *See* Exh. 1 at 9-10. The pertinent treatment note, while informative, does not support a finding that the physician's E&M services involved some combination of a comprehensive history and examination or medical decision making of moderate to high complexity. *See id.* at 31.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary L.S.(3) on February 4, 2004 and originally billed under CPT code 99313 was properly down-coded and is only reimbursable under the rate paid for code 99312.

000164

163

147.  Beneficiary L.S.(4)
      Date of Service - November 20, 2002
      Code - 99311

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 24.  The ALJ and QIC denied
coverage for this reason.  *See* Dec., Att. at 19; *see also* Master
Exh. 49 at 7.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for
schizophrenia, hypertension, depressive disorder, cervical
spondylosis and generalized weakness.  *See* Exh. 1 at 6.  As
found at the earlier levels of review, there are no pertinent
medical records associated with this date of service.  *See
generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
L.S.(4) on November 20, 2002 and billed under code 99311 is not
covered by Medicare.

148.  Beneficiary P.S.
      Date of Service - March 1, 2004
      Code - 99312

The PSC denied coverage finding no documentation for this date
of service.  *See* Master Exh. 10 at 24.  The ALJ and QIC denied
coverage for this reason.  *See* Dec., Att. at 19; *see also* Master
Exh. 49 at 7.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for pneumonia, COPD, dementia, dysphagia, CVA, hyperlipidemia, hypopotassemia, and aortic aneurysm. *See* Exh. 1 at 6. As found at the earlier levels of review, there are no pertinent medical records associated with this date of service. *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary P.S.(4) on March 1, 2004 and billed under code 99312 is not covered by Medicare.

149. **Beneficiary M.S.(3)**
     **Date of Service – June 5, 2003**
     **Code – 99313**

The PSC denied coverage finding no documentation for this date of service. *See* Master Exh. 10 at 24. The ALJ and QIC denied coverage for this reason. *See* Dec., Att. at 19; *see also* Master Exh. 49 at 7.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records. The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for UTI, CVA, sepsis, diabetes and hypertension. *See* Exh. 1 at 6. As found at the earlier levels of review, there are no pertinent medical records associated with this date of service. *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary M.S.(3) on June 5, 2003 and billed under code 99313 is not covered by Medicare.

165

150.  Beneficiary J.S.(1)
      Date of Service – November 3, 2003
      Code – 99313

The PSC denied coverage finding that the beneficiary had been
seen five times in November "with no complaints." Additionally,
the PSC noted that the reviewer was unable to determine the name
of the physician signing the treatment note. *See* Master Exh. 10
at 24. Both the ALJ and the QIC, denied coverage for the claim
as originally billed, but found reimbursement warranted at the
down-coded level associated with CPT code 99311. *See* Dec., Att.
at 19; *see also* Master Exh. 49 at 7.

The appellant asserts that, in the context of the beneficiary's
condition, its documentation fully supports a coverage finding
for code 99313 E&M services. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for
arteriosclerotic heart disease, hypertension, arthritis,
Alzheimer's disease and depression. *See* Exh. 1 at 10. The
pertinent treatment note does not support a finding that the
physician's E&M services involved some combination of a
comprehensive history and examination or medical decision making
of moderate to high complexity. *See id.* at 25.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services. *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
J.S.(1) on November 3, 2003 and originally billed under CPT code
99313 was properly down-coded and is only reimbursable under the
rate paid for code 99311.

151.  Beneficiary B.S.(1)
      Date of Service – February 26, 2002
      Code – 99312

The PSC denied coverage finding that the beneficiary had been
seen three times in February "with no complaints." The PSC also
noted that the reviewer was unable to determine the name of the
physician who signed the treatment note. *See* Master Exh. 10
at 24. Both the ALJ and the QIC denied coverage for the claim
as originally billed, but found reimbursement warranted at the

166

down-coded level associated with CPT code 99311. *See* Dec., Att. at 19; *see also* Master Exh. 49 at 7.

The appellant asserts that, in the context of the beneficiary's condition, its documentation fully supports a coverage finding for code 99312 E&M services. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for dementia, CVA, anemia, asthmatic bronchitis and UTI. *See* Exh. 1 at 5. The pertinent treatment note provides very little substantive information supplementing the check-box entries. *See id.* at 17. Consequently, the appellant's documentation does not support a finding that the physician's E&M services involved some combination of expanded, problem focused history and examination or medical decision making of moderate to high complexity.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary B.S.(1) on February 26, 2002 and originally billed under CPT code 99312 was properly down-coded and is only reimbursable under the rate paid for code 99311.

152.   Beneficiary D.S.(1)
       Date of Service - July 31, 2002
       Code - 99312

The PSC denied coverage finding that the beneficiary had been seen five times in July "with no complaints." Additionally, the PSC noted that the reviewer was unable to determine the name of the physician signing the treatment note. *See* Master Exh. 10 at 24. Both the ALJ and the QIC denied coverage for the claim as originally billed, but found reimbursement warranted at the down-coded level associated with CPT code 99311. *See* Dec., Att. at 19; *see also* Master Exh. 49 at 7.

The appellant asserts that, in the context of the beneficiary's condition, its documentation fully supports a coverage finding for code 99312 E&M services. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for Lupus. *See* Exh. 1 at 4. The pertinent treatment note provides very little substantive information supplementing the check-box

entries. *See id.* at 21.  Consequently, the appellant's
documentation does not support a finding that the physician's
E&M services involved some combination of expanded, problem
focused history and examination or medical decision making of
moderate to high complexity.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
D.S.(1) on July 31, 2002 and originally billed under CPT code
99312 was properly down-coded and is only reimbursable under the
rate paid for code 99311.

153.   Beneficiary G.S.(1)
       Date of Service - January 11, 2002
       Code - 99302

The PSC denied coverage finding that the beneficiary had been
seen three times in January "with no complaints."  Additionally,
the reviewer was unable to discern the name of the physician who
signed the progress note.  *See* Master Exh. 10 at 23.  The ALJ
and the QIC denied coverage finding no clear evidence of a face-
to-face assessment."  *See* Dec., Att. at 19; *see also* Master
Exh. 49 at 9.

The appellant asserts that the beneficiary's medical history was
significant for medical conditions requiring the physician's
treatment and observation.  Consequently, the physician had
fully complied with the coverage criteria for code 99302.  The
appellant adds that per "Medicare regulations this date of
service shall be paid due to the fact that it is a required
. . . service and . . . included Medicare certification/
recertification."  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for
hypertension, peptic ulcer disease, dementia, stroke and seizure
disorder.  *See* Exh. 1 at 9.  Other than identifying the number
(3) of medications the beneficiary takes PRN, the January 11th
assessment contains only minimal hand-written substantive
medical information supplementing the check-box entries on the
form.  *See id.* at 8-9.  Consequently, there is no support of
record for coverage of the appellant's claim as billed.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
G.S.(1) on January 11, 2002 and billed under code 99302 is not
covered by Medicare.

    154.  Beneficiary J.S.(2)
          Dates of Service – January 9 & December 16, 2002
          Codes – 99302 & 99312

The PSC denied coverage for both dates of service finding that
the beneficiary had been seen multiple times in January and
December with no complaints.  Further, the reviewer was unable
to identify the physician who had signed the treatment notes.
*See* Master Exh. 10 at 23.  The ALJ and QIC denied coverage for
the January 9th claim based on the absence of evidence of a
"face-to-face assessment.  The ALJ and the QIC denied coverage
for the December 16th claim as billed but found reimbursement
warranted at the down-coded rate associated with CPT code 99311.
*See* Dec., Att., at 19; *see also* Master Exh. 49 at 7.

Recounting the beneficiary's medical history, the appellant
asserts that its documentation satisfies the specific coverage
criteria for each claim as originally billed.  With respect to
the January 9, 2002 claim, the appellant adds that the claim
involved "a required Medicare service and also included Medicare
certification/recertification."  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for COPD,
aortic aneurysm, dysphagia, dementia, use of a PEG Tube and
peripheral vascular disease.  *See* Exh. 1 at 8-9.  Relative to
the January 9th claim, other than identifying the number (2) of
medications the beneficiary takes PRN, the January 9th assessment
contains minimal hand-written substantive medical information
supplementing the *check-box entries* on the form and supporting
reimbursement of a 99302 billing.  *See id.* at 13-14.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, as billed, nor its
entitlement to Medicare reimbursement for those services.  *See*
Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

Relative to the December 16th claim, the appellant's documentation supports a finding that the physician performed E&M services involving some combination of an expanded, problem focused history and examination; medical decision making of moderate to high complexity.  *See* Exh. 1 at 36.

The appellant's claim for E&M services provided to Beneficiary J.S.(2) on January 9, 2002 and billed under code 99302 is not covered by Medicare.

**The appellant's claim for E&M services provided to Beneficiary J.S.(2) on December 16, 2002 and billed under code 99312 is covered by Medicare as originally billed.**

155.   Beneficiary M.S.(4)
       Date of Service – November 4, 2002
       Code – 99312

The PSC denied coverage finding that the beneficiary had been seen a total of five times in November with no complaints. Further, the reviewer was unable to identify the physician who had signed the treatment notes.  *See* Master Exh. 10 at 23.   The ALJ and the QIC denied coverage for the claim as originally billed, but found reimbursement warranted at the down-coded rate associated with CPT code 99311.  *See* Dec., Att., at 19; *see also* Master Exh. 49 at 7.

The appellant asserts that its documentation fully satisfies the coverage criteria for a billing under CPT code 99312.   The appellant recounts the beneficiary's medical history and maintains that the physician's services involved some combination of expanded, problem focused history and examination or medical decision making of moderate complexity.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for obesity, bacteremia, diabetes and schizophrenia.  *See* Exh. 1 at 6.   The November 4th treatment note does not support a finding that the physician engaged in some combination of an expanded, problem focused history and examination; medical decision making of moderate to high complexity.  *See id.* at 16.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary M.S.(4) on November 4, 2002 and originally billed under CPT code 99312 was properly down-coded and is only reimbursable under the rate paid for code 99311.

156.   Beneficiary M.S.(5)
       Date of Service – April 22, 2003
       Code – 99302

The PSC denied coverage finding that the beneficiary had been seen a total of seven times in April with no complaints. Further, the reviewer was unable to identify the physician who had signed the treatment note. *See* Master Exh. 10 at 23.   The ALJ and QIC denied coverage, finding no evidence of a face-to-face assessment.  *See* Dec., Att., at 20; *see also* Master Exh. 49 at 7.

The appellant asserts that, based on the beneficiary's medical history, its physician had fully complied with the coverage criteria for code 99302.  The appellant adds that per "Medicare regulations," care plan oversight is to be billed under CPT code 99302.  The appellant adds that covered is warranted because this service "included Medicare certification/recertification."  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for congestive heart failure, hypertension, peripheral vascular disease, dementia and depression.  *See* Exh. 1 at 11.  Other than identifying the number (2) of medications the beneficiary takes PRN, the January 9th assessment contains little hand-written substantive medical information supplementing the check-box entries on the form and supporting reimbursement of a 99302 billing.  *See id.* at 10-11.  Consequently, there is no support of record for coverage of the beneficiary's claim as billed.

The appellant has not met its burden of establishing the medical necessity of the services at issue, as billed, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary M.S.(5) on April 22, 2003 and billed under code 99302 is not covered by Medicare.

171

157.   Beneficiary M.S.(6)
       Date of Service - January 23, 2002
       Code - 99312

The PSC denied coverage finding no "documentation for this patient." *See* Master Exh. 10 at 23.  The ALJ and QIC denied coverage for this reason. *See* Dec., Att. at 20; *see also* Master Exh. 49 at 6.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records.  The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly. *See* Exh. MAC-3, Att. D.

As found at all levels of review, there is no medical documentation of any nature in the beneficiary's file. *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary M.S.(6) on January 23, 2002 and billed under code 99312 is not covered by Medicare.

158.   Beneficiary J.S.(3)
       Date of Service - March 14, 2003
       Code - 99302

The PSC denied coverage finding that the beneficiary had been seen a total of six times in March with no complaints.  Further, the reviewer was unable to identify the physician who had signed the treatment notes. *See* Master Exh. 10 at 23.  The ALJ and QIC denied coverage, finding no evidence of a face-to-face assessment. *See* Dec., Att., at 20; *see also* Master Exh. 49 at 6.

The appellant asserts that, based on the beneficiary's medical history, its physician had fully complied with the coverage criteria for code 99302.  The appellant adds that per "Medicare regulations" care plan oversight is to be billed under CPT code 99302.  The appellant adds that covered is

172

warranted because this service "included Medicare
certification/recertification."  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for diabetes,
arteriosclerotic heart disease, hypertension, dysphagia, GI
bleed, Alzheimer's disease and depression.  *See* Exh. 1 at 12.
Other than identifying the number (3) of medications the
beneficiary takes PRN, the March 14th assessment contains no
hand-written substantive medical information supplementing the
check-box entries on the form and supporting reimbursement of
a 99302 billing.  *See id.* at 11-12.  Consequently, there is no
support of record for coverage of the beneficiary's claim as
billed.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, as billed, nor its
entitlement to Medicare reimbursement for those services.  *See*
Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
J.S.(3) on March 14, 2003 and billed under code 99302 is not
covered by Medicare.

159.  **Beneficiary J.S.(4)**
      **Date of Service – October 18, 2002**
      **Code – 99302**

The PSC denied coverage finding that the beneficiary had been
seen a total of six times in October with no complaints.
Further, the reviewer was unable to identify the physician who
had signed the treatment notes.  *See* Master Exh. 10 at 23.  The
ALJ and QIC denied coverage finding no evidence of a face-to-
face assessment.  *See* Dec., Att., at 20; *see also* Master Exh. 49
at 6.

The appellant asserts that, based on the beneficiary's medical
history, its physician had fully complied with the coverage
criteria for code 99302.  The appellant adds that per "Medicare
regulations" care plan oversight is to be billed under CPT
code 99302.  The appellant adds that covered is
warranted because this service "included Medicare
certification/recertification."  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for
hypertension, aphasia, stroke (impacting the right side) and

173

seizure disorder. *See* Exh. 1 at 13. Other than identifying the
number (2) of medications the beneficiary takes PRN, the
October 18th assessment contains no hand-written substantive
medical information supplementing the check-box entries on the
form and supporting reimbursement of a 99302 billing. *See id.*
at 12-13. Consequently, there is no support of record for
coverage of the beneficiary's claim as billed.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, as billed, nor its
entitlement to Medicare reimbursement for those services. *See*
Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
J.S.(4) on October 18, 2002 and billed under code 99302 is not
covered by Medicare.

160.   **Beneficiary A.S.(3)**
       **Date of Service – December 16, 2003**
       **Code – 99302**

The PSC denied coverage finding that the beneficiary had been
"seen 8 times this month with no complaints this visit."
Further, the reviewer was unable to identify the physician who
had signed the treatment notes. *See* Master Exh. 10 at 22. The
ALJ and QIC denied coverage finding no evidence of a face-to-
face assessment. *See* Dec., Att., at 20; *see also* Master Exh. 49
at 6.

The appellant asserts that, based on the beneficiary's medical
history, its physician had fully complied with the coverage
criteria for code 99302. The appellant adds that per "Medicare
regulations" care plan oversight is to be billed under CPT
code 99302. The appellant adds that coverage is warranted
because this service "included Medicare certification/
recertification." *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for diabetes,
hypertension and Alzheimer's disease. *See* Exh. 1 at 12. Other
than identifying the number (3) of medications the beneficiary
takes PRN, the December 16th assessment contains little hand-
written substantive medical information supplementing the check-
box entries on the form and supporting reimbursement of a 99302
billing. *See id.* at 15-16. Consequently, there is no support
of record for coverage of the beneficiary's claim as billed.

The appellant has not met its burden of establishing the medical necessity of the services at issue, as billed, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary A.S.(3) on December 16, 2003 and billed under code 99302 is not covered by Medicare.

161.   **Beneficiary G.S.(2)**
       **Dates of Service – July 2, 2002 & January 20, 2003**
       **Codes – 99313 & 99302**

The PSC denied coverage for both dates of service finding that the beneficiary had been seen multiple times in July and January with no complaints.  Further, the reviewer was unable to identify the physician who had signed the treatment notes. *See* Master Exh. 10 at 22.  The ALJ and the QIC denied coverage for the July 2nd claim as billed, but found reimbursement warranted at the down-coded rate associated with CPT code 99311.  The ALJ and QIC denied coverage for the January 20th claim based on the absence of evidence of a "face-to-face assessment. *See* Dec., Att., at 20; *see also* Master Exh. 49 at 6.

Recounting the beneficiary's medical history, the appellant asserts that its documentation satisfies the specific coverage criteria for each claim as originally billed.  With respect to the January 20, 2003 claim, the appellant adds that the claim involved "a required Medicare service" and also included Medicare certification/recertification. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for arteriosclerotic heart disease, cardiac dysrhythmia, congestive heart failure, hypertension, arthritis, hip fracture and dementia. *See* Exh. 1 at 10.  Relative to the July 2nd claim, the appellant's documentation does not support a finding that the physician performed E&M services involving some combination of an expanded, problem focused history and examination; medical decision making of moderate to high complexity. *See id.* at 21. Relative to the January 20, 2003 claim, other than identifying the number (2) of medications the beneficiary takes PRN, the January 20th assessment contains no hand-written substantive medical information supplementing the check-box entries on the form and supporting reimbursement of a 99302 billing. *See id.* at 11-12.  Consequently, there is no support of record for coverage of the beneficiary's claim as billed.

175

The appellant has not met its burden of establishing the medical
necessity of the services at issue, as billed, nor its
entitlement to Medicare reimbursement for those services. *See*
Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
G.S.(2) on July 2, 2002 is not covered as originally billed
(99313) but may be reimbursed by Medicare at the rate applicable
to CPT code 99311.

The appellant's claim for E&M services provided to Beneficiary
G.S.(2) on January 20, 2003 and billed under code 99302 *is* not
covered by Medicare.

162.   Beneficiary V.S.
       Date of Service – December 20, 2002
       Code – 99312

The PSC denied coverage finding no "documentation for this date
of service." *See* Master Exh. 10 at 22.  The ALJ and QIC denied
coverage for this reason.  *See* Dec., Att. at 20; *see also* Master
Exh. 49 at 6.

The appellant attributes this non-coverage determination to the
facility's failure to properly maintain its records.  The
appellant adds that the physician completed a "subsequent care
nursing home visit" on this date of service and should be
reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for
hypothyroidism, congestive heart failure, hypertension,
arthritis, dementia, seizure disorder, anemia, schizophrenia and
depression.  *See* Exh. 1 at 51.  As found at all earlier levels
of review, there is no medical documentation in the
beneficiary's file pertinent to this date of service.  *See*
*generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
V.S. on December 20, 2002 and billed under code 99312 is not
covered by Medicare.

176

163. Beneficiary B.S.(2)
     Date of Service – March 6, 2003
     Code – 99313

The PSC denied coverage finding that the beneficiary had been
seen a total of four times in March with no complaints.
Further, the reviewer was unable to identify the physician who
signed the treatment note. *See* Master Exh. 10 at 22.  The ALJ
and the QIC denied coverage for the claim as originally billed,
but found reimbursement warranted at the down-coded rate
associated with CPT code 99311.  *See* Dec., Att., at 21; *see also*
Master Exh. 49 at 6.

The appellant asserts that its documentation fully satisfies the
coverage criteria for a billing under CPT code 99313.  The
appellant recounts the beneficiary's medical history and
maintains that the physician's services involved some
combination of comprehensive history and examination or medical
decision making of high complexity.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for
hypertension and dehydration.  *See* Exh. 1 at 6.  The March 6th
treatment note does not support a finding that the physician
engaged in some combination of a comprehensive history and
examination, medical decision making of moderate to high
complexity.  *See id.* at 13.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
B.S.(2) on March 6, 2003 and originally billed under CPT code
99313 was properly down-coded and is only reimbursable under the
rate paid for code 99311.

164. Beneficiary M.S.(7)
     Dates of Service – August 8 & December 2, 2002
     Codes – 99302 & 99312

The PSC denied coverage for both dates of service finding that
the beneficiary had been seen multiple times in each month of
service with no complaints on any visit.  Further, the reviewer
was unable to identify the physician who had signed the
treatment notes.  *See* Master Exh. 10 at 22.  The ALJ and QIC

denied coverage for the August 8th claim (99302) based on the absence of evidence of a "face-to-face assessment. The ALJ and the QIC denied coverage for the December 2nd claim as billed, but found reimbursement warranted at the down-coded rate associated with CPT code 99311. *See* Dec., Att., at 21; *see also* Master Exh. 49 at 5.

Recounting the beneficiary's medical history, the appellant asserts that its documentation satisfies the specific coverage criteria for each claim as billed. Contrary to the ALJ's findings, the appellant asserts that its physician clearly examined the beneficiary as documented and, within the context of the beneficiary's medical history, coverage for each claim is warranted. With respect to the August 8th claim, the appellant adds that the claim involved "a required Medicare service and also included Medicare certification/recertification. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for hypothyroidism, dysphagia, osteoporosis, dementia (with possible seizure disorder and transient ischemic attack). *See* Exh. 1 at 74. The appellant billed its August 8, 2002 claim under CPT code 99302 which involves E&M services administered to a "new patient" in a facility. The assessment for this claim is found at pages 73-72 of Exhibit 1. However, the record shows that the beneficiary was initially admitted to the facility in September 1994. *See id.* at 76. There is no documentation of record supporting a finding that the beneficiary had been recently readmitted to the facility in the interim. *See generally id.* Moreover, the record also contains treatment notes for June 27, August 1 and July 27, 2002, supporting a finding that the beneficiary's residency was ongoing. *See id.* at 74-75, 60 and 59. Relative to the December 2nd claim, the associated treatment note does not support a finding that the E&M services provided to the beneficiary involved some combination of an expanded, problem focused history and examination or medical decision making of moderate to high complexity. *See id.* at 55.

The appellant has not met its burden of establishing the medical necessity of the services at issue, as billed, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary M.S.(7) on August 8, 2002 and billed under code 99302 is not covered by Medicare.

178

The appellant's claim for E&M services provided to Beneficiary
M.S.(7) on December 2, 2002 is not covered as originally billed
(99312) but may be reimbursed by Medicare at the rate applicable
to CPT code 99311.

165.  Beneficiary G.T.
      Date of Service - March 24, 2004
      Code - 99312

The PSC denied coverage finding that the beneficiary had been
seen a total of six times in March with no complaints.  Further,
the reviewer was unable to identify the physician who had signed
the treatment notes.  *See* Master Exh. 10 at 22.  The ALJ and the
QIC denied coverage for the claim as originally billed, but
found reimbursement warranted at the down-coded rate associated
with CPT code 99311.  *See* Dec., Att., at 21; *see also* Master
Exh. 49 at 5.

The appellant asserts that its documentation fully satisfies the
coverage criteria for a billing under CPT code 99312.  The
appellant recounts the beneficiary's medical history and
maintains that the physician's services involved some
combination of expanded, problem focused history and examination
or medical decision making of moderate complexity.  *See* Exh.
MAC-3, Att. D.

The beneficiary's medical history was significant for congestive
heart failure, hypertension, gout, osteoarthritis, depressive
disorder, anemia and renal insufficiency.  *See* Exh. 1 at 5-6.
The March 24th treatment supports a finding that the physician
engaged in some combination of an expanded, problem focused
history and examination; medical decision making of moderate to
high complexity.  *See id.* at 32.

The appellant's claim for E&M services provided to Beneficiary
G.T. on March 24, 2004 and billed under code 99312 is covered by
Medicare as originally billed.

166.  Beneficiary B.T.
      Date of Service - January 23, 2003
      Code - 99312

000180

The PSC denied coverage finding that the service in issue had been performed by a Nurse Practitioner "without documentation by the physician to support the incident to criteria." *See* Master Exh. 10 at 22. Generally referencing the "regulations," the ALJ and the QIC both denied coverage for failure to meet the incident to guidelines. *See* Dec., Att. at 21; *see also* Master Exh. 49 at 5.

The appellant asserts that its documentation evidences its compliance with Medicare's "incident to" criteria in providing these services. The appellant adds that the Nurse Practitioner plainly indicated, and the physician affirmed, that she had timely and affirmatively discussed the beneficiary's care with the physician. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for seizure disorder, dehydration, hyperglycemia and peripheral vascular disease. *See* Exh. 1 at 6. The January 23, 2003 treatment note supports the performance of at least two of the following coverage elements - an expanded, problem focused history and examination with medical decision making of moderate to high complexity. *See id.* at 16. Additionally, the note indicates that it was reviewed and agreed with by one of the appellant's physicians involved in this review. *See id.; see also* Exh. MAC-3 at 13.

However, as discussed above, by regulation, "incident to" services "must be furnished in a non-institutional setting to non-institutional patients." *See* 42 C.F.R. 410.26(b)(1). Thus, these services cannot be billed to Medicare under the circumstances of this claim.

The appellant's claim for E&M services provided to Beneficiary B.T. on January 23, 2003 and billed under code 99312 is not covered by Medicare.

167. **Beneficiary J.T.**
     **Dates of Service - November 18, 2002 & January 23, 2003**
     **Code - 99302**

For each date of service, the PSC denied coverage finding that the beneficiary had been seen multiple times in each month with "no complaints." The PSC also noted the reviewer's uncertainty as to the names of the physicians signing the respective treatment notes. *See* Master Exh. 10 at 22-21. The ALJ and the

180

QIC denied coverage, finding for both claims, that a "face-to-face assessment [was] not clearly demonstrated. *See* Dec., Att. at 21; *see also* Master Exh. 49 at 5.

The appellant asserts that, for each claim, the treating physician fully complied with the standards for coverage of CPT code 99302. The appellant clarifies the names of the distinct physicians who signed the respective treatment notes. The appellant otherwise contends that, in the context of the beneficiary's multiple medical conditions, the physicians' notes evidence the conduct of a comprehensive history and examination as well as high complexity decision making. The appellant adds that coverage is warranted because this service "included Medicare certification/recertification." *See* Exh. MAC-3, Att. D.

The beneficiary was admitted to the facility in June 1995 with a medical history significant for GERD, stroke, left hemiparesis, hypertension and simple schizophrenia. *See* Exh. 1 at 9. Other than identifying the number (3) of medications the beneficiary takes PRN and, on the November 18th note, the beneficiary's use of a glass eye, neither assessment contains hand-written, substantive medical information supplementing the check-box entries on the respective forms. *See id.* at 12-14. Consequently, there is no support of record for coverage of the beneficiary's claim as billed.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claims for E&M services provided to Beneficiary J.T. on November 18, 2002 and January 23, 2003 both of which were billed under code 99302 are not covered by Medicare.

168.  **Beneficiary W.T.**
       **Date of Service – January 18, 2002**
       **Code – 99312**

The PSC denied coverage finding that the beneficiary had been seen a total of thirteen times in January with no complaints. Further, the reviewer was unable to identify the physician who had signed the treatment notes. *See* Master Exh. 10 at 21. The ALJ and the QIC denied coverage for the claim as originally billed, but found reimbursement warranted at the down-coded rate

000182

181

associated with CPT code 99311.  *See* Dec., Att., at 21; *see also* Master Exh. 49 at 5.

The appellant asserts that its documentation fully satisfies the coverage criteria for a billing under CPT code 99312.  The appellant recounts the beneficiary's medical history and maintains that the physician's services involved some combination of an expanded, problem focused history and examination or medical decision making of moderate complexity. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for hyperthyroidism, arteriosclerotic heart disease, cardiac dysrhythmia, hypertension, arthritis, dementia, depression and pneumonia.  *See* Exh. 1 at 74.  The January 18th treatment supports a finding that the physician engaged in some combination of an expanded, problem focused history and examination; medical decision making of moderate to high complexity.  Among other elements of care supporting coverage, the note plainly records a follow-up visit addressing the beneficiary's pneumonia infection.  *See id*. at 21.

**The appellant's claim for E&M services provided to Beneficiary W.T. on January 18, 2002 and billed under code 99312 is covered by Medicare as originally billed.**

169.   Beneficiary L.T.
       Date of Service ~ May 7, 2002
       Code - 99312

The PSC denied coverage finding that the beneficiary had been seen one other time in May, subsequent to the date of service, with no complaints.  Further, the reviewer was unable to identify the physician who had signed the treatment notes.  *See* Master Exh. 10 at 21.  The ALJ and the QIC denied coverage for the claim as originally billed, but found reimbursement warranted at the down-coded rate associated with CPT code 99311. *See* Dec., Att., at 21; *see also* Master Exh. 49 at 5.

The appellant asserts that its documentation fully satisfies the coverage criteria for a billing under CPT code 99312.  The appellant recounts the beneficiary's medical history and maintains that the physician's services involved some combination of expanded, problem focused history and examination or medical decision making of moderate complexity.  *See* Exh. MAC-3, Att. D.

182

The beneficiary's medical history was significant for acute renal failure, UTI, diabetes, CVA, left hemiparesis, congestive heart failure, COPD and dementia with behavioral issues. *See* Exh. 1 at 29.  The May 7th treatment note does not support a finding that the physician engaged in some combination of an expanded, problem focused history and examination or medical decision making of moderate to high complexity. *See id*. at 13.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary L.T. on May 7, 2002 billed under code 99312 is not covered by Medicare, but may be properly reimbursed at the rate applicable to a 99311 service.

170.  **Beneficiary M.T.**
      **Date of Service - October 14, 2002**
      **Code - 99312**

The PSC denied coverage finding no "documentation for this patient." *See* Master Exh. 10 at 21.  The ALJ and QIC denied coverage finding no documentation for this date of service. *See* Dec., Att. at 21; *see also* Master Exh. 49 at 5.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records.  The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly. *See* Exh. MAC-3, Att. D.

As the PSC found, there is no medical documentation of any nature in the beneficiary's file. *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary M.T. on October 14, 2002 and billed under code 99312 is not covered by Medicare.

000184

171.  Beneficiary G.V.
      Dates of Service - March 1, 2002 & January 9, 2003
      Code - 99312 & 99302

The PSC denied coverage finding that the beneficiary had been
seen on numerous occasions in each month of service with no
complaints.  Further, for both dates, the reviewer was unable to
identify the physician who had signed the treatment note.  *See*
Master Exh. 10 at 21.  The ALJ and the QIC denied coverage for
the March 1, 2002 claim as originally billed, but found
reimbursement warranted at the down-coded rate associated with
CPT code 99311.  Relative to the January 9, 2003 date of
service, both entities denied coverage based on the absence of
evidence of a face-to-face assessment.  *See* Dec., Att., at 22;
*see also* Master Exh. 49 at 5-4.

Recounting the beneficiary's medical history, the appellant
asserts that its documentation satisfies the specific coverage
criteria for each claim as billed.  Contrary to the ALJ's
findings, the appellant asserts that its physician clearly
examined the beneficiary as documented and, within the context
of the beneficiary's medical history, coverage for each claim is
warranted.  With respect to the January 9th claim, the appellant
adds that the claim involved "a required Medicare service and
also included Medicare certification/recertification."  *See* Exh.
MAC-3, Att. D.

The beneficiary's medical history was significant for
paraplegia, severe spinal stenosis, hyperlipidemia and
quadriparesis.  *See* Exh. 1 at 74.  The content of the treatment
note for the March 1, 2002 date of service supports a finding
that, as required by code 99312, the physician engaged in some
combination of an expanded, problem focused history, problem
focused examination or medical decision making of moderate
complexity.  The note addresses both physical and social-
behavioral issues.  *See id*. at 30.

However, treatment note for the January 9, 2003 claim does not
demonstrate compliance with the elements of coverage associated
with a 99302 claim.  The basic note is in check-box entry form
and, to our interpretation, is approximately one-third
incomplete.  *See* Exh. 1 at 13.

The appellant has not met its burden of establishing the medical
necessity of the January 9, 2003 services, as billed, nor its

184

entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

**The appellant's claim for E&M services provided to Beneficiary G.V. on March 1, 2002 and billed under code 99312 is covered by Medicare as originally billed.**

The appellant's claim for E&M services provided to Beneficiary G.V on January 9, 2003 and billed under CPT code 99302 is not covered by Medicare.

172.   Beneficiary J.V.
       Date of Service - November 7, 2002
       Code - 99313

The PSC denied coverage for this claim as originally billed but allowed reimbursement at the rate associated with a 99312 service.   The PSC found that the services provided evidenced a problem focused history and examination and medical decision making of moderate complexity. *See* Master Exh. 10 at 21.   The ALJ and the QIC also denied coverage for the claim as originally billed, but further down-coded reimbursement to the rate associated with CPT code 99311. *See* Dec., Att., at 24; *see also* Master Exh. 49 at 4.

The appellant asserts that in the context of the beneficiary's medical history, its documentation fully satisfies the coverage criteria for a billing under CPT code 99313.   The appellant recounts the beneficiary's medical history and maintains that the physician's services involved some combination of a comprehensive history and examination or medical decision making of high complexity. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for cardiovascular disease, arthritis, dementia, depression and anemia. *See* Exh. 1 at 39.   Contrary to the results at the earlier levels of review, we find that the November 7th treatment note supports a finding that the physician engaged in some combination of a comprehensive history and examination or medical decision making of high complexity. *See id.* at 26.

**The appellant's claim for E&M services provided to Beneficiary J.V. on November 7, 2002 billed under code 99313 is covered by Medicare as originally billed.**

173.   Beneficiary J.W.(1)

185

Date of Service - March 12, 2004
Code - 99302

The PSC denied coverage finding that the beneficiary had been
seen four times in March with "no complaints." The PSC also
noted that the reviewer was unable to identify the physician who
signed the treatment note. *See* Master Exh. 10 at 21. The ALJ
and the QIC denied coverage, finding no evidence that a "face-
to-face assessment" was clearly demonstrated. *See* Dec., Att.
at 22; *see also* Master Exh. 49 at 4.

The appellant asserts that the treating physician fully complied
with the standards for coverage of CPT code 99302. The
appellant contends that, in the context of the beneficiary's
physical and psycho-social conditions, the physician's note
evidences conduct of a comprehensive history and examination as
well as high complexity decision making. The appellant adds
that coverage is warranted because this service "included
Medicare certification/recertification." *See* Exh. MAC-3,
Att. D.

The beneficiary was admitted to the facility on January 23, 2004
with a medical history significant for diabetes, hypertension,
Alzheimer's disease and depression. *See* Exh. 1 at 6 and 8.
Other than identifying the number (3) of medications the
beneficiary takes PRN, the assessment contains no hand-written
substantive medical information supplementing the note's check-
box entries, nor are those entries entirely completed. *See id.*
Exh. 1 at 7. Consequently, there is no support of record for
coverage of the beneficiary's claim as billed.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services. *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
J.W.(1) on March 12, 2004 billed under code 99302 is not covered
by Medicare.

174. Beneficiary M.W.
     Dates of Service - April 17, 2002 & October 1, 2003
     Codes - 99302 & 99313

186

For each date of service, the PSC denied coverage finding that
the beneficiary had been seen on numerous dates during the
months of service and had presented "with no complaints."
Additionally, the PSC indicated that the reviewer was unable to
identify the physician who had signed the progress notes. *See*
Master Exh. 10 at 20. Relative to the April 17th date of
service, the ALJ and the QIC denied coverage, finding a "face-
to-face assessment not clearly demonstrated." The ALJ and QIC
denied coverage for the October 1st date of service as billed,
but found reimbursement warranted for a 99311 service. *See*
Dec., Att. at 22; *see also* Master Exh. 49 at 4.

Relative to the April 17, 2002 date of service, the appellant
maintains that its medical documentation fully satisfies the
coverage criteria established for CPT code 99302. The appellant
adds that this claim should be covered because it is a required
service and "included Medicare certification/recertification."
Similarly, the appellant maintains that its documentation for
the October 1, 2003 date of service satisfies the coverage
criteria for a 99313 code billing. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for
Alzheimer's disease with agitation, coronary artery disease,
peripheral vascular disease and anemia. *See* Exh. 1 at 11.
Relative to the April 17, 2002 date of service, other than
identifying the number (1) of medications the beneficiary takes
PRN, the assessment provides no hand-written information to
support the appellant's claim for coverage. *See id.* at 17.
This form does not report a the detailed history, comprehensive
examination and medical decision making of moderate to high
complexity necessary for coverage of a claim under CPT code
99302. Relative to the October 1, 2003 claim, the physician's
treatment note does not support a finding that some combination
of the coverage elements for CPT code 99313 (comprehensive
history and examination, medical decision making of moderate to
high complexity) were satisfied. *See id.* at 48.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services. *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
M.W. on April 17, 2002 and billed under code 99302 is not
covered by Medicare.

000188

187

The appellant's claim for E&M services provided to Beneficiary M.W. on October 1, 2003 is not covered as billed (99313), but may be reimbursed at the rate applicable to code 99311.

175. Beneficiary B.W.
     Date of Service - September 4, 2003
     Code - 99313

The PSC denied coverage finding that the beneficiary had been seen on five occasions in September with no complaints. Additionally, the PSC noted that the reviewer was unable to identify the physician who signed the treatment note. *See* Master Exh. 10 at 20. The ALJ and the QIC also denied coverage for the claim as originally billed, but down-coded reimbursement to the rate associated with CPT code 99311. *See* Dec., Att., at 22; *see also* Master Exh. 49 at 4.

The appellant asserts that, in the context of the beneficiary's medical history, its documentation fully satisfies the coverage criteria for a billing under CPT code 99313. The appellant recounts the beneficiary's medical history and maintains that the physician's services involved some combination of a comprehensive history and examination or medical decision making of high complexity. *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for dementia. *See* Exh. 1 at 8. The treatment note for this date of service contains very little hand-written addenda supplementing the note's check-box entries. *See id.* at 29. Taken together, this information does not demonstrate that the physician's services involved some combination of comprehensive history and examination or medical decision making of, in the appellant's characterization, high complexity.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary B.W. on September 4, 2003 is not covered as billed (99313), but may be reimbursed at the rate applicable to code 99311.

176. Beneficiary J.W.(2)
     Date of Service - January 29, 2002
     Code - 99303

000189

188

The PSC denied coverage finding no "documentation for this date of service." *See* Master Exh. 10 at 20.  The ALJ and QIC denied coverage also finding no documentation for this date of service. *See* Dec., Att. at 22; *see also* Master Exh. 49 at 4.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records.  The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for intractable knee pain, arthritis, congestive heart failure, hypothyroidism, hypertension and obesity.  *See* Exh. 1 at 6.  As found at the earlier levels of review, there is no medical documentation in the beneficiary's file for the date of service at issue.  *See generally* Exh. 1.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary J.W.(2) on January 29, 2002 and billed under code 99303 is not covered by Medicare.

177. **Beneficiary I.W.**
     **Date of Service — March 13, 2002**
     **Code — 99312**

The PSC denied coverage finding no "documentation for this date of service." *See* Master Exh. 10 at 20.  The ALJ and QIC denied coverage also finding no documentation for this date of service. *See* Dec., Att. at 22; *see also* Master Exh. 49 at 4.

The appellant attributes this non-coverage determination to the facility's failure to properly maintain its records.  The appellant adds that the physician completed a "subsequent care nursing home visit" on this date of service and should be reimbursed accordingly.  *See* Exh. MAC-3, Att. D.

The beneficiary's medical history was significant for senile delusion, general incontinence, cardiac arrhythmia, atrial fibrillation and cellulitis.  *See* Exh. 1 at 5.  As found at the

189

earlier levels of review, there is no medical documentation in
the beneficiary's file for this date of service. *See generally*
Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services. *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
I.W. on March 13, 2002 and billed under code 99312 is not
covered by Medicare.

178.  Beneficiary J.W.(3)
      Dates of Service – May 17 & June 13, 2002
      Codes – 99312 & 99302

The PSC denied coverage finding that the beneficiary had been
seen fifteen times in May and twelve times in June "with no
complaints this visit." Further, for both dates, the reviewer
was unable to identify the physician who had signed the
treatment note. *See* Master Exh. 10 at 20. The ALJ and the QIC
denied coverage for the May 17th claim as originally billed, but
found reimbursement warranted at the down-coded rate associated
with CPT code 99311. Relative to the June 13th date of service,
both entities denied coverage based on the absence of evidence
of a face-to-face assessment. *See* Dec., Att., at 23; *see also*
Master Exh. 49 at 4.

Recounting the beneficiary's medical history, the appellant
asserts that its documentation satisfies the specific coverage
criteria for each claim as billed. Contrary to the ALJ's
findings, the appellant asserts that its physician clearly
examined the beneficiary as documented and, within the context
of the beneficiary's medical history, coverage for each claim is
warranted. With respect to the June 13th claim, the appellant
adds that the claim involved "a required Medicare service and
also included Medicare certification/recertification. *See* Exh.
MAC-3, Att. D.

The beneficiary's medical history was significant for
hypertension, double amputation (right leg above the knee; left
leg below the knee) and anemia. *See* Exh. 1 at 11. The content
of the May 17th treatment note supports a finding that, as
required by code 99312, the physician engaged in some
combination of an expanded, problem focused history, problem

000191

190

focused examination or medical decision making of moderate complexity. *See id.* at 44.

However, the assessment for the June 13th claim does not demonstrate compliance with the elements of coverage associated with a 99302 claim. Other than identifying the number (4) of medications the beneficiary takes PRN, this note contains very little hand-written substantive medical information supplementing the check-box entries on the form. *See* Exh. 1 at 16-17. Consequently, there is no support of record for coverage of the beneficiary's claim as billed.

The appellant has not met its burden of establishing the medical necessity of the June 13, 2002 services, as billed, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

**The appellant's claim for E&M services provided to Beneficiary J.W.(3) on May 17, 2002 and billed under code 99312 is covered by Medicare as originally billed.**

The appellant's claim for E&M services provided to Beneficiary G.V on June 13, 2002 and billed under CPT code 99302 is not covered by Medicare.

179. **Beneficiary E.W.**
     **Date of Service - October 21, 2002**
     **Code - 99313**

The PSC denied coverage finding that the beneficiary had been seen on three occasions in October with no complaints. Additionally, the PSC noted that the reviewer was unable to identify the physician who signed the treatment note. *See* Master Exh. 10 at 20. The ALJ and the QIC also denied coverage for the claim as originally billed, but down-coded reimbursement to the rate associated with CPT code 99311. *See* Dec., Att., at 23; *see also* Master Exh. 49 at 3.

The appellant asserts that in the context of the beneficiary's medical history, its documentation fully satisfies the coverage criteria for a billing under CPT code 99313. The appellant recounts the beneficiary's medical history and maintains that the physician's services involved some combination of a comprehensive history and examination or medical decision making of high complexity. *See* Exh. MAC-3, Att. D.

191

The beneficiary's medical history was significant for attention to gastrostomy and acute respiratory failure. *See* Exh. 1 at 6. The treatment note for this date of service contains little to no hand-written addenda supplementing the note's check-box entries. For the most part, the addenda simply identify the beneficiary's conditions, uniformly characterizing them as stable. *See id.* at 31. Taken together this information does not demonstrate that the physician's services involved some combination of comprehensive history and examination or medical decision making of, in the appellant's characterization, high complexity.

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services. *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary E.W. on October 21, 2002 is not covered as billed (99313), but may be reimbursed at the rate applicable to code 99311.

180.   Beneficiary J.W.(4)
       Date of Service - August 20, 2003
       Code - 99302

The PSC denied coverage finding that the beneficiary had been seen four times in August with "no complaints." The PSC also noted that the reviewer was unable to identify the physician who signed the treatment note. *See* Master Exh. 10 at 20. The ALJ and the QIC denied coverage, finding no evidence that a "face-to-face assessment" was clearly demonstrated. *See* Dec., Att. at 23; *see also* Master Exh. 49 at 3.

The appellant asserts that the treating physician fully complied with the standards for coverage of CPT code 99302. The appellant contends that, in the context of the beneficiary's physical condition, the physician's note evidences conduct of a comprehensive history and examination as well as high complexity decision making. The appellant adds that coverage is warranted because this service "included Medicare certification/recertification." *See* Exh. MAC-3, Att. D.

The beneficiary was admitted to the facility in September 1999 with a medical history significant for congestive heart failure, club foot, cellulitis (left foot), osteopenia and hypokalemia. *See* Exh. 1 at 6-7. Other than identifying the number (1) of

192

medications the beneficiary takes PRN, the assessment contains
no hand-written substantive medical information supplementing
the note's check-box entries, nor are those entries entirely
completed.  *See id.* at 12-13.  Consequently, there is no support
of record for coverage of the beneficiary's claim as billed. *See
generally* Exh. 1.

The appellant has not met its burden of establishing the medical
necessity of the services at issue, nor its entitlement to
Medicare reimbursement for those services.  *See* Act, § 1833(e)
and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary
J.W.(4) on August 20, 2003 billed under code 99302 is not
covered by Medicare.

181.   Beneficiary T.W.
       Date of Service — October 31, 2003
       Code - 99302

The PSC denied coverage finding that the beneficiary had been
seen three times in October with "no complaints."  The PSC also
noted that the reviewer was unable to identify the physician who
signed the treatment note.  *See* Master Exh. 10 at 20.  The ALJ
and the QIC denied coverage, finding no evidence that a "face-
to-face assessment" was clearly demonstrated.  *See* Dec., Att.
at 23; *see also* Master Exh. 49 at 3.

*The appellant asserts that the treating physician fully complied*
with the standards for coverage of CPT code 99302.  The
appellant contends that, in the context of the beneficiary's
physical condition, the physician's note evidences conduct of a
comprehensive history and examination as well as high complexity
decision making.  The appellant adds that coverage is warranted
because this service "included Medicare
certification/recertification." *See* Exh. MAC-3, Att. D.

The beneficiary was admitted to the facility in June 2003 with a
medical history significant for paraplegia, schizophrenia,
neurogenic bladder, psychosis, depression, agitation and UTI.
*See* Exh. 1 at 6-7.  Other than identifying the number (2) of
medications the beneficiary takes PRN, the assessment contains
no hand-written substantive medical information supplementing
the note's check-box entries, nor are those entries entirely
completed.  *See id.* at 8-9.  Consequently, there is no support
of record for coverage of the beneficiary's claim as billed.

000194

The appellant has not met its burden of establishing the medical necessity of the services at issue, nor its entitlement to Medicare reimbursement for those services.  *See* Act, § 1833(e) and 42 C.F.R. § 424.5(a)(6).

The appellant's claim for E&M services provided to Beneficiary T.W. on October 31, 2003 billed under code 99302 is not covered by Medicare.

Having found that certain of the appellant's claims were not covered by Medicare, and thus properly identified as overpayments, the Council next addresses the appellant's liability for the associated non-covered costs and its eligibility for waiver of recoupment of the remaining overpayment.

### *Liability for Non-Covered Costs*

Under section 1879(a) of the Act, a beneficiary or provider may be liable for the cost of an item or service that is not medically "reasonable and necessary" based upon prior knowledge of non-coverage. *See also* 42 C.F.R. §§ 411.400, 411.404 and 411.406; MCPM, Ch. 30, §§ 10-40. A beneficiary is deemed to have knowledge of non-coverage based upon prior written notice from the provider containing specific information. 42 C.F.R. § 411.408(f). This notice is sometimes referred to as an Advance Beneficiary Notice or ABN. 42 C.F.R. § 411.404(b); MCPM, Ch. 30, § 40.3. A provider has actual or constructive knowledge of non-coverage based upon "[i]ts receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from . . . [Medicare Contractors] . . ." and "[i]ts knowledge of what are considered acceptable standards of practice by the local medical community." 42 C.F.R. §§ 411.406(e)(1) and 411.406(e)(3).

There is no evidence that these beneficiaries knew, or could have reasonably been expected to know, that the services in issue would not be covered by Medicare. Therefore, the beneficiaries are not liable for the non-covered charges.

However, the appellant had constructive knowledge of the requirements and the specific criteria for coverage of the various E&M services at issue. As a Medicare provider the appellant knew or should have known that Medicare would not

194

cover these services.  Accordingly, the appellant is liable for
the non-covered services at issue under section 1879 of the Act.

*Waiver of Recoupment of Overpayment*

Section 1870 of the Act governs the recovery of overpayments,
based upon provider or beneficiary fault.  Section 1870(b)
allows for a waiver of recovery of an overpayment to a provider
if it is without fault in incurring the overpayment.  Section
1870(b) of the Act effectively presumes no fault on a provider's
part where an overpayment determination is made "subsequent to
the third year following the year in which notice was sent to
such individual that such amount had been paid" in the absence
of evidence to the contrary.  The Medicare Financial Management
Manual (MFMM) (CMS Pub. 100-06) provides guidance on this issue.
For overpayments found after the third calendar year after the
year of payment, the MFMM indicates –

> There are special rules that apply when an overpayment
> is discovered subsequent to the third year following
> the year in which notice was sent that the amount was
> paid.  Ordinarily, the provider or beneficiary will be
> considered without fault unless there is evidence to
> the contrary.  In the absence of evidence to the
> contrary, . . . [the Contractor] will not recover the
> . . . overpayment.

MFMM, Ch. 3 at § 80.

In essence, section 1870(b) of the Act and the MFMM create a
rebuttable presumption that providers are "without fault" with
regard to overpayments discovered more than three calendar years
after the year in which the initial determination was made.  *See
also* 42 C.F.R. § 403.350(c).

Section 1870(b) does not define the meaning of the term "without
fault."  However, a provider is without fault if it exercised
reasonable care in billing and accepting Medicare payment.
MFMM, Ch. 3, § 90.  A provider is considered not "without fault"
if, *e.g.*, it billed, or Medicare paid, for services the provider
should have known were not covered.  *Id.* at § 90.1.H.  The MFMM
explains that the provider should have known about a policy or
rule if the policy or rule is in the provider manual or in the
regulations.  *Id.*

195

The "should have known standard" employed here is essentially identical to that found in the limitation on liability provision in section 1879 of the Act.  Thus, if an appellant's liability could not be limited under section 1879 because the appellant knew or should have known that an item or service was not covered, then the appellant generally will not be found "without fault" in creating the overpayment.

The Council finds that the appellant was not without fault in creating the overpayment.  Generally, a provider's allegation that it was not at fault with respect to payment for noncovered services is not a basis for finding it without fault if, as here, the appellant is liable under section 1879 of the Act for medically unnecessary service because it should have known that services were not covered.  MFMM, Ch. 3, § 90.1.H.2.  The presumption is thus rebutted in this case.  As the appellant was not "without fault" in creating the overpayments, no waiver of recoupment of the overpayments is warranted.

DECISION

As set out above, the Council finds that the PSC utilized a valid sampling methodology in arriving at this extrapolated overpayment.  The Council upholds the ALJ's findings in the majority of claims appealed to the Council.  However, the Council reverses certain beneficiary-specific coverage determinations, reinstituting Medicare reimbursement at the rate originally billed by the appellant or otherwise adjusting (up-coding, down-coding or denying the ALJ's coverage finding entirely) the reimbursement rate ultimately arrived at by the ALJ.  Additionally, the requests for ALJ hearing specific to several claims are dismissed.

Consequently, the Medicare contractor must recalculate the overpayment to reflect the Council's findings and conclusions.  However, in the Beneficiary List below, the Council has highlighted (with bolding) *only those claims or specific claim lines it has found reimbursable as originally billed*.  In the recalculation of the overpayment it will be incumbent upon the Medicare contractor to review the Council's beneficiary-specific analysis to identify those claims involving coding changes other than reinstitution of coverage of the claim as originally billed.  In order to account for the three claims that should not have been included in the frame, the contractor will extrapolate the overpayment to 41,815 (instead of 41,818) claims.

196

The appellant remains financially liable for the non-covered costs and ineligible for waiver of recoupment of the ultimate overpayment amount.

MEDICARE APPEALS COUNCIL


Gilde Morrisson
Administrative Appeals Judge


Deborah S. Samenow
Administrative Appeals Judge


Date:     JUN 2 1 2017

7

Case 3:22-cv-00651-SMY   Document 22   Filed 07/07/22   Page 383 of 405   Page ID #569
Hutton v. City of Chicago, Slip Copy (2021)
2021 WL 809731

2021 WL 809731
Only the Westlaw citation is currently available
United States District Court, N D Illinois, Eastern Division

Joshua HUTTON, Plaintiff,

v

CITY OF CHICAGO, et al , Defendants

No 20-cv-03997
|
Signed 03/03/2021

**Attorneys and Law Firms**

Jeffrey J Kroll, Kaveny + Kroll, LLC, Chicago, IL, for Plaintiff

Emily Elizabeth Dory, Jessica L. Griff, Jessica D. Ziswa, City of Chicago, Federal Civil Rights Litigation, Chicago, IL, for Defendant Thomas Ray Barnes, Jr

Andrea Lindsey Campbell, Marion Claire Moore, City of Chicago Department of Law, Chicago, IL, for Defendant City of Chicago, a municipal corporation

**MEMORANDUM OPINION AND ORDER**

Franklin U Valderrama, United States District Judge

*1 Plaintiff Joshua Hutton (Hutton) alleges that while riding his bicycle in the bicycle lane southbound on Clark Street, in the City of Chicago (the City), off-duty Chicago Police Officer Thomas Ray Barnes, Jr (Barnes), who was operating a motor vehicle southbound on Clark Street in and out of the bicycle lane, began harassing Hutton Hutton claims that at a stoplight, Barnes exited his vehicle and struck and beat Hutton Hutton subsequently filed this action against Barnes and the City, asserting the following counts Battery against Barnes (Count I), Battery against the City based on agency (Count II), Assault against Barnes (Count III), Assault against the City, based on agency (Count IV), a Section 1983 Fourth Amendment claim against Barnes based on excessive force (Count V), and an Unlawful Policy and Procedure claim against the City (Monell claim) (Count VI) R 1-1, Second Amended Complaint (SAC) [1] Before the Court is the City's Motion to Dismiss Count VI of Hutton's SAC pursuant to Federal Rule of Civil Procedure 12(b)(6) R 15, Mot

Dismiss For the reasons that follow, the City's motion is granted

**Background**

On the morning of November 21, 2017, Hutton was riding his bicycle southbound in a designated bicycle lane on Clark Street in the City SAC ¶ 6 [2] At that time, Barnes was driving his motor vehicle southbound on Clark Street, directly in front of Hutton. Id ¶ 7 Barnes' vehicle was in the designated bicycle lane, obstructing Hutton's ability to proceed in the designated bicycle lane Id ¶ 8 Hutton, at that point, attempted to pass Barnes' vehicle on the left side so he could continue riding his bicycle in the designated bicycle lane ¶ 9 After meeting at a stoplight, Hutton asked Barnes to move out of the designated bicycle lane Id ¶ 10 Barnes did not comply with the request, but instead began to weave his vehicle in and out of the bicycle lane, as well as increase and decrease the speed of his vehicle, all the while obstructing Hutton's path in the bicycle lane Id ¶ 11 Hutton and Barnes met again at a stoplight, at which point, Barnes exited his vehicle and beat and injured Hutton Id ¶¶ 12, 23

At some point following the incident, a call was made to the Chicago Police Department to report to the scene SAC ¶ 14 An ambulance arrived shortly after the incident to assess and/or treat Hutton Id ¶ 15 After the ambulance arrived, Chicago Police Officers Hakeem Qazi and Brian Galvan responded to the scene Id ¶ 16 Officer Galvan took Hutton's statement while Hutton was being evaluated and/or treated in the ambulance Id ¶ 17 Meanwhile, Officer Quazi took Barnes' statement Id ¶ 18 After learning that Barnes was a Chicago Police Officer, Officers Quazi and/or Galvan requested a sergeant report to the scene Id ¶ 56 Sergeant Thomas Polick then arrived upon the scene Id ¶ 57. After Hutton gave his initial statement to Officer Galvan, Hutton was taken by ambulance to the hospital Id ¶ 19

*2 Hutton subsequently filed this action against Barnes, alleging state law claims for battery and assault, and a claim for excessive force pursuant to ⌐ 42 U S C § 1983 (Counts I, III, and V), and the City, seeking to hold the City responsible for Barnes' conduct based on the theory of respondeat superior (Counts II, IV) and alleging a Monell claim SAC The City now moves to dismiss Count VI of the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6) Mot Dismiss.

Hutton v. City of Chicago, Slip Copy (2021)

2021 WL 809731

## Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009) Under Rule 8(a)(2), a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To survive a motion to dismiss, a complaint need only contain factual allegations, accepted as true, sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556) The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79

## Analysis

In Count VI, Hutton asserts a *Monell* claim against the City of Chicago. Specifically, Hutton alleges that the City has an unwritten custom, policy, or practice whereby investigating Chicago Police Officers refused or declined to, among other things, adequately investigate and/or arrest Chicago Police Officers implicated in criminal conduct SAC ¶¶ 60–64

A municipality may be held liable under Section 1983 only "when execution of a government's policy or custom inflicts the injury that the government as an entity is responsible for under § 1983." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978) Under *Monell*, "[a] municipality is a 'person' under § 1983 and may be held liable for its own violations of the federal Constitution and laws." *First Midwest Bank, Guardian of the Estate of Michael D. LaPorta v. City of Chi.*, 2021 WL 684365, at *4 (7th Cir. Feb. 23, 2021) (citing *Monell*, 436 U.S. at 690–91) "[A] municipality cannot be held liable for the constitutional torts

of its employees and agents" under the doctrine of *respondeat superior. Id.* (citing *Monell*, 436 U.S. at 690–91) For a plaintiff to prevail on a Section 1983 claim under *Monell*, he "must challenge conduct that is properly attributable to the municipality itself." *Id.* (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04 (1997))

To state a *Monell* claim, a plaintiff must allege that his or her constitutional injury was caused by "(1) an express policy that would cause a constitutional deprivation if enforced, (2) a common practice that is so widespread and well-settled that it constitutes a custom or usage with the force of law even though it is not authorized by written law or express policy, or (3) an allegation that a person with final policy-making authority caused a constitutional injury." *Rossi v. City of Chi.*, 790 F.3d 729, 737 (7th Cir. 2015) (internal citations omitted), *Mack v. City of Chi.*, 2020 WL 7027649, *5 (N.D. Ill. Nov. 30, 2020) The plaintiff must also plead that the policy or custom is the "moving force of the constitutional violation." *Monell*, 436 U.S. at 694–95

**\*3** The City moves to dismiss Count VI on the basis that Hutton's claim falls under the second category of *Monell* claims but that Hutton fails to allege sufficient facts to support a claim that the City maintains widespread policies or practices that violated his constitutional rights Mot. Dismiss at 2, 4 According to the City, Hutton has not alleged any facts, other than his own single incident, that show a widespread custom or policy of investigating Chicago Police Officers refusing or declining to adequately investigate, discipline, charge, report, or arrest fellow Officers *Id.* at 5. Courts in this District, submits the City, dismiss *Monell* claims where a plaintiff alleges only his own incident as an example of a policy or custom without alleging multiple such incidents *Id.* (citing *Alcorn v. City of Chi.*, 2018 WL 3614010, at *17 (N.D. Ill. July 27, 2018), *Jordan v. Klamenrus*, 2020 WL 4547879, at *5 (N.D. Ill. Aug. 6, 2020), *Turner v. City of Chi.*, 2020 WL 1548957 at *2–3 (N.D. Ill. Mar. 31, 2020), *Jones v. Hunt*, 2020 WL 814912, at *2 (N.D. Ill. Feb. 19, 2020), *Bishop v. White*, 2019 WL 5550576, at *5 (N.D. Ill. Oct. 28, 2019), *Carmona v. City of Chi.*, 2018 WL 1468995, at *3 (N.D. Ill. Mar. 26, 2018)) In short, the City argues that because Hutton fails to allege more than one incident from which the Court can infer that the City has a widespread policy or practice that contributed to the violation of Hutton's constitutional rights, Hutton's claim fails *Id.* at 6

Hutton retorts[3] that while courts sometimes consider allegations of other similar instances of misconduct in determining the sufficiency of a *Monell* claim, that is not a requirement R. 18, Resp at 4 Indeed, asserts Hutton, a plaintiff need not "identify every other *or even one other individual*" whose rights were violated because of the same misconduct at the pleading stage *Id* at 4 (emphasis in original) (quoting *Jones v Hunt*, 2020 WL 814912, at *2 (N D Ill Feb 19, 2020)) Moreover, argues Hutton, the fact that a plaintiff's complaint fails to point to "a specific, articulated policy of the city is not fatal to a plaintiff's claim " *Id* at 5 Instead, Hutton submits that the inquiry is whether the facts alleged in a complaint, together with reasonable inferences to be drawn from them, could lead a reasonable factfinder to conclude that the actions of the City and its employees, by which a plaintiff was constitutionally deprived of his right to bodily integrity, were the product of some policy or custom of the municipal entity *Id* (citing 🔗*Powe v City of Chi* , 664 F 2d 639, 650 (7th Cir 1981))

Hutton is correct that "there is no blanket rule that *Monell* plaintiffs must always allege multiple instances of unconstitutional conduct in order to show that a policy exists " *Jackson v Vill of Justice*, 2020 WL 1530734, *3 (N D Ill Mar 31, 2020) The central issue then is as follows how many, if any, other instances, must a plaintiff plead for a *Monell* claim based on widespread policy to survive a 12(b)(6) motion to dismiss? The SAC identifies no express policy or injury at the hand of a final policymaker, and Hutton does not argue in his Response that he relies on either theory As such, the Court agrees with the City that his *Monell* claim is of the second type, and is based upon an informal policy that is so widespread, though unwritten, that it carries the force of policy *See* 🔗*Rossi*, 790 F 3d at 737.

   *4 In 🔗*White v City of Chicago*, 829 F 3d 837, 840–41 (7th Cir 2016) the plaintiff alleged, under *Monell*, that the City of Chicago's widespread practice of securing arrest warrants on the basis of conclusory forms resulted in one officer falsely arresting the plaintiff without probable cause The District Court granted the City of Chicago's 12(b)(6) motion to dismiss, finding that the *Monell* claim was based solely on his allegation that the arresting officer "acted in accordance with a widespread practice of the police department of the City of Chicago when seeking a warrant " 🔗*Id* at 843 (citing *White v City of Chi* , 2014 WL 958714 at *2 (N D Ill

Mar 12, 2014)) The Seventh Circuit disagreed, stating that federal courts may not apply a heightened pleading standard to *Monell* claims 🔗*Id* at 843–44 (citing 🔗*Leatherman v Tarrant Cnty Narcotics Intel and Coordination Unit*, 507 U S 163, 164 (1993)) The Seventh Circuit held that the plaintiff was not required "to identify every other or even one other individual who had been arrested pursuant to a warrant obtained through the complained-of process " 🔗*Id* at 844. It found that the allegation in the plaintiff's complaint referring to the specific incident, together with the individual claim against the police officer and the standard printed form for an arrest warrant application was enough to satisfy Rule 8(a)'s "short and plain statement of the claim" requirement *Id* "Since *White*, many courts have declined to grant motions to dismiss that are premised on the argument that the complaint does not contain allegations beyond those relating to the plaintiff " *Mack*, 2020 WL 7027649, *5 (collecting cases)

Since *White*, however, courts in this District, as noted by the City, have generally concluded that to properly state a *Monell* claim based on a custom or policy—absent context creating an inference of a widespread policy or custom, as in *White*— a plaintiff must allege *more* than his own single occurrence Reply at 2 (citing 🔗*Alcorn*, 2018 WL 3614010, among other cases) (emphasis added) The rationale underpinning these decisions is that to adequately plead a *Monell* claim, a plaintiff "must identify other instances of misconduct similar to what he has experienced in order to show that there is a true municipal policy at issue, and not a random event." *Mack*, 2020 WL 7027649, at *5 (internal quotations and citations omitted) No bright line exists as to how many violations it takes to make out a *Monell* claim, but as noted above, generally "one instance is not enough " *Slabon v Sanchez*, 2020 WL 5763760, at *11 (N D Ill Sept. 28, 2020) (citing 🔗*Thomas v Cook Cnty Sheriff's Dep't*, 604 F 3d 293. 303 (7th Cir 2010)) The Court finds *Jackson*, 2020 WL 1530734, instructive.

In *Jackson*, the plaintiff brought a civil rights action against the defendant Village and several police officers, alleging excessive force by the officers 2020 WL 1530734, at *1 He alleged a claim under *Monell*'s second category, asserting that the Village had failed to properly train its officers, lacked adequate policies related to training, and maintained a code of silence, which ratified officer misconduct *Id* at *3 The Village moved to dismiss the plaintiff's *Monell* claim, arguing that the plaintiff failed to allege any other instance of unconstitutional conduct in which police offers were not

Case 3:22-cv-00651-SMY   Document 22   Filed 07/07/22   Page 386 of 405   Page ID #572
Hutton v. City of Chicago, Slip Copy (2021)
2021 WL 809731

reprimanded or disciplined, or that supported the existence of a code of silence. In granting the motion to dismiss, the District Court pointed out that "there is no blanket rule that *Monell* plaintiffs must always allege multiple instances of unconstitutional conduct in order to show that a policy exists." *Id.* Context matters, and context sometimes allows for a single instance of misconduct to support a *Monell* claim where it supports an inference that a systemic policy or custom exists. *Id.* at *3–4. However, in *Jackson*, the court noted that the plaintiff's allegations were specific to the plaintiff and did not suggest a custom or practice. *Id.* at *4. Rather, the plaintiff "essentially argu[ed] that because he was subjected to excessive force" by the defendant police officer, the Village as a whole had a widespread policy or custom. The court found that this was "too large of a logical leap to make." *Id.*

Like *Jackson*, in this case more than one instance must be alleged to make out a plausible inference of the existence of a widespread but unwritten policy or custom of Chicago Police Officers failing to investigate the criminal conduct of off-duty Police Officers like Barnes. Hutton alleges that the investigating Police Officers failed to adequately investigate and/or arrest Barnes because of his status as an off-duty Chicago Police Officer. SAC ¶ 63. Hutton, however, does not point to any other similar misconduct that might suggest the

existence of such a custom or policy. That is, Hutton "must set forth some facts that his incident was not an isolated or random occurrence." *Turner*, 2020 WL 1548957 at *2. Hutton has not pled "enough facts to nudge his claim across the line from conceivable to plausible." *Jones*, 2020 WL 814912, at *3 (citing *Twombly*, 550 U.S. at 570). The Court cannot make the logical leap to infer that there is a widespread custom or policy.

### Conclusion

**\*5**  For the foregoing reasons, Defendant City of Chicago's Motion to Dismiss Count VI of Plaintiff's Second Amended Complaint [15] is granted, and the Court dismisses Count VI without prejudice. Plaintiff is granted leave to file an Amended Complaint on or before 03/24/2021. A status hearing is set for 04/01/2021 at 9:30 a.m., but to track the case only (no appearance is required, the case will not be called).

### All Citations

Slip Copy, 2021 WL 809731

---

### Footnotes

1     Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

2     The Court accepts as true all of the well-pleaded facts in the complaint and draws all reasonable inferences in favor of the plaintiff. *Platt v. Brown*, 872 F.3d 848, 851 (7th Cir. 2017).

3     Hutton, in his Response, also argues that discovery has revealed a coordinated cover-up of Barnes' conduct based on the fact that he was a Chicago Police Officer. Resp. at 6. In its Reply, the City urges the Court to disregard this argument, as Hutton seeks to amend his complaint via his Response, which is improper. R. 20, Reply at 2–3. The Court agrees and does not consider this argument in resolution of the City's motion. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011) (holding that it is an axiomatic rule that a "plaintiff may not amend his complaint in his response brief.")

---

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

8

State Farm Mutual Automobile Insurance Company v. .., Not Reported in Fed....

2008 WL 11337326

⚐ KeyCite Yellow Flag - Negative Treatment
Distinguished by   State Farm Mutual Automobile Insurance Company v
Health and Wellness Services, Inc     S D Fla ,   March 5, 2020

2008 WL 11337326
Only the Westlaw citation is currently available
United States District Court, M D Florida,
Orlando Division

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, State Farm
Fire & Casualty Company, Plaintiffs,

v

PHYSICIANS INJURY CARE CENTER, INC ,
M D Irving L Colvin, Robert Colvin, Defendants

Case No 6:06-cv-1757-Orl-GJK
|
Signed 12/18/2008

**Attorneys and Law Firms**

Charles Chejfec, Kathy P Josephson, Ross O Silverman, Katten Muchin Rosenman, LLP, Chicago, IL, Kenneth P Hazouri, DeBeaubien, Knight, Simmons, Mantzaris & Neal, LLP, Orlando, FL, Philip Joseph Landau, Shraiberg, Ferrara, Landau & Page, PA, Boca Raton, FL, for Plaintiffs

Joseph A Frein, Joseph A Frein, PA, William Finn, Morgan & Morgan, PA, Orlando, FL, for Defendants

**ORDER**

GREGORY J KELLY, UNITED STATES MAGISTRATE JUDGE

**\*1 THIS CAUSE** came on for oral argument on December 3, 2008 on Plaintiffs' Dispositive Motion for Summary Judgment as to Defendants Physicians Injury Care Center, Inc , Irving L Colvin, M D , and Robert Colvin, and Incorporated Memorandum of Law (the "Motion"). Doc. No. 363 For the reasons set forth below, Plaintiffs' Motion is **DENIED**

**I. BACKGROUND**

A Undisputed Facts [1]

Plaintiffs, State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (herein, referred to as the "Plaintiffs" or "State Farm"), are Illinois corporations with their principal place of business in Bloomington, Illinois Doc No 269 at 15 Defendant, Physicians Injury Care Center, Inc ("PICC"), is a Florida corporation formed in 1996 with its principal place of business in Orlando, Florida Doc Nos 269 at 15, 363 PICC is owned by Defendants Irving Colvin, M D ("Dr Colvin") and Robert Colvin ("Robert Colvin") who are both residents of Florida (herein, sometimes collectively referred to as "Defendants" or to the individuals as the "Colvins") Doc No 363

Under Florida's Motor Vehicle No-Fault Law, ⌐Sections 627 730–⌐627 7405, Florida Statutes, (herein the "PIP Statute") automobile insurers are required to provide personal injury protection benefits (herein "No-Fault Benefits" or "PIP Benefits") to insureds The PIP Statute provides for medical, surgical, funeral and disability insurance benefits without regard to fault with respect to motor vehicle accidents ⌐Fla. Stat § 627 736 It prescribes billing requirements for a medical provider and the methodology of payment to the medical provider Insureds are entitled to a minimum of $10,000 00 of PIP Benefits for losses sustained arising out of the ownership, maintenance or use of a motor vehicle *Id*

Insureds can assign their PIP Benefits to their medical care providers by executing an assignment of benefits ("Assignment of Benefits") PICC followed that procedure, enabling it to submit claims directly to State Farm and receive payment for those claims Doc. No 359 at 5, ⌐Fla Stat § 627 736(4) PICC submitted claims to State Farm on insurance claim forms previously promulgated by the Healthcare Finance Administration (a "HCFA 1500 form") and presently promulgated by the Centers for Medicare and Medicaid Services (a "CMS 1500 form") Doc No 359 at 5-6 Between October 1, 2007 and January 1, 2008, the PIP Statute was not in effect in Florida Ch 2007-234, § 21(8), Laws of Fla

PICC was incorporated in 1996 by Dr Colvin and Robert Colvin. Doc No 359-2 Robert Colvin is the business manager of PICC. Doc. No. 360-2 Dr. Colvin is a board certified surgeon who primarily treats patients with soft tissue injuries and has developed a treatment protocol (the "Protocol") for these types of injuries Doc No 359-2 at 1-2 The Protocol consists of a combination of

passive treatment modalities and active muscle stretching and strengthening. *Id* Specifically, the Protocol entails massages, applications of electrical stimulation and ultrasound, synergy (herein "Synergy") physical therapy sessions and physician examinations Doc No 363 at 8 Dr Colvin has been practicing this Protocol over the past twelve (12) years, and the Protocol has been modified slightly over the years *Id* According to Dr. Colvin, as a result of his Protocol, PICC has expanded its practice to include nine clinics throughout Central Florida *Id*

### B  The Complaint

**\*2**  On November 14, 2006, Plaintiffs instituted this action by filing a nine-count Complaint (as amended at Doc. No. 269, the "Amended Complaint") against the Defendants [2] The Amended Complaint contains the following counts  1) Common Law Fraud (Count I), 2) Conspiracy to Defraud (Count II), 3) Unjust Enrichment (Count III), 4) Florida Unfair and Deceptive Trade Practices Act ("FDUTPA") (Count IV), 5) Declaratory Judgment (Count V), 6) Negligent Misrepresentation (Count VI), 7) Negligent Billing (Count VII), 8) Breach of Implied-in-Fact Contract (Count VIII), and 9) Fraud in the Inducement (Count IX) *Id* Plaintiffs allege that the Defendants have violated the PIP Statute by improperly and unlawfully obtaining money from Plaintiffs by implementing a scheme in which the Defendants "push State Farm's insureds through a sham course of treatment and evaluation designed specifically to exhaust the patients' insurance benefits." *Id* at 1-2 Plaintiffs state that the Defendants have submitted improper, inaccurate, misleading, unfair and fraudulent bills to Plaintiffs for medical services allegedly rendered *Id* Plaintiffs maintain that PICC "submitted bills to State Farm for medical services that they allege to have rendered that were not reasonable, necessary and related to the subject accidents, were not lawfully rendered, and not actually rendered as billed " *Id* at 28, ¶ 90  Plaintiffs also claim that PICC has failed to meet and intentionally violated the minimal record keeping standards for medical doctors, physical therapists and licensed massage therapists pursuant to Florida law *Id* at 10, *See* Fla Stat § 817 234  After filing this lawsuit, Plaintiffs have not paid PICC for services rendered to State Farm's insureds  Doc No 359-3 at 2, ¶ 11

Plaintiffs take issue with the propriety of the Defendants' business practices, including the following

- Whether PICC accurately completed the CMS/HCFA 1500 forms,

- Whether the proper Current Procedural Terminology ("CPT") codes were used when submitting the CMS/HCFA 1500 forms (specifically for new patient evaluations, established patient evaluations, Synergy, and PICC's physical therapy modalities and massage codes),

- Whether the Defendants submitted bills for services that they did not perform,

- Whether the services performed were medically necessary for the patient,

- Whether licensed massage therapists should be permitted to conduct the Synergy program without supervision of a medical doctor or physical therapist, and

- Whether PICC maintained sufficient and accurate medical records

Doc No 363  Plaintiffs also challenge the adequacy of the Defendants' record keeping practice  Initially, when seeing a patient, a PICC therapist completes a handwritten record ("Handwritten Record(s)")  Thereafter, a PICC transcriptionist dictates the information contained on those Handwritten Records into a progress note ("Progress Note(s)")  In doing so, the transcriptionist selects pre-existing text or template phrases located in a macro ("Template Macros") that reflect the information contained in the Handwritten Records  The Template Macros were formulated by Dr Colvin  Plaintiffs maintain that the Progress Notes are not an accurate and complete record of what is contained in the Handwritten Records  *See generally* Doc No 294  Plaintiffs argue that Defendants' conduct violates Florida's minimum record keeping standards  Fla Stat § 458 331, F A C § 64B8-9 003

Plaintiffs allege Defendants have defrauded State Farm and, as a result, have been unjustly enriched  Plaintiffs' fraud claim rests on certain alleged misrepresentations of fact which arise in connection with the submission of claims governed by the PIP Statute  Doc No 269  Plaintiffs request that the Court grant declaratory relief finding that State Farm is not responsible for the claims submitted by PICC prior to and during the pendency of this litigation  *Id*

State Farm Mutual Automobile Insurance Company v...., Not Reported in Fed....
2008 WL 11337326

On June 2, 2008, the Defendants answered the Plaintiffs' Amended Complaint denying all allegations raised therein and asserting twenty-four affirmative defenses (the "Answer") Doc No. 296.

C  Plaintiffs' Motion for Summary Judgment
On August 15, 2008, Plaintiffs filed the present Motion for summary judgment against the Defendants. Doc No 363 Plaintiffs state that the undisputed evidence will establish that billed medical services were not lawfully rendered and that PICC maintained a routine business practice of billing for services not rendered  Id  at 2  Plaintiffs assert the following

> **\*3**  The undisputed evidence is that Defendants  1) Submitted bills to State Farm containing [CPT] Codes that constituted a misrepresentation of the services actually performed, 2) Created a system of pseudo-medical records that did not comply with Florida's minimum record keeping standards, thus rendering the entirety of Defendants' services to State Farm's insureds "unlawful," and therefore non-compensable, and 3) Knowingly submitted false and misleading statements relating to the claims and charges

*Id*  On September 18, 2008, Defendants filed their response in opposition to Plaintiffs' Motion ("Response") Doc No. 424  Defendants maintain that Plaintiffs' Motion must be denied because  1) genuine issues of material fact exist as to Plaintiffs' claim, 2) Plaintiffs are not entitled to judgment as a matter of law, and 3) Plaintiffs failed to address Defendants' applicable affirmative defenses  *Id*  at 2

## II. SUMMARY JUDGMENT STANDARD
Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"  FED  R  CIV  P  56(c)  Whether a fact is material depends on the substantive law of the case  *Anderson v  Liberty*

*Lobby, Inc*, 477 U S  242, 248 (1986)  If there is an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof, that party must "go beyond the pleadings and by   affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial "  *Celotex Corp  v  Catrett*, 477 U S  317, 324-25 (1986) (internal quotations and citation omitted)  Summary judgment is mandated against the non-moving party who thereafter fails to present sufficient evidence to establish a genuine issue of fact for trial  *Id*  at 322, 324-25

In this review, the Court must consider all inferences drawn from the underlying facts in a light most favorable to the non-moving party, and resolve all reasonable doubts against the moving party  *Anderson*, 477 U S  at 255  If an issue of material fact exists, the court must not decide it, but rather, must deny summary judgment and proceed to trial  *Environmental Def Fund v  Marsh*, 651 F 2d 983, 991 (5th Cir  1981) [3]  Generally, a fraud claim is not appropriate for summary judgment and better suited for trial because the questions of intent, knowledge and reliance depend on factual determinations  *State Farm Mut  Auto  Ins  v  Weiss*, 410 F  Supp  2d 1146, 1159 (M D  Fla  2006)

A plaintiff must address the undisputed facts regarding affirmative defenses asserted in the defendant's answer, and a failure to do so should result in denial of the motion for summary judgment  FED  R  CIV  P  56(c),  *Stillman v  Travelers Insurance Company*, 88 F 3d 911, 913 (11th Cir  1996)

## III. APPLICABLE LAW

A  The PIP Statute

As previously noted, under Florida's PIP Statute,  Section 627 736, Florida Statutes, automobile insurers are required to provide PIP Benefits to insureds.  Fla  Stat  § 627.736  Section 627 736(4)(b) states that PIP Benefits are overdue if not paid within thirty (30) days after the insurer is furnished written notice of a covered loss  *Id*  "However, notwithstanding the fact that written notice has been furnished to the insurer, any payment shall not be deemed overdue when the insurer has <u>reasonable proof</u> to establish that the insurer is not responsible for the payment "  *Id*  (emphasis added)

The Florida Supreme Court has held that "Nothing in the statute provides that once a payment becomes overdue the insurer is forever barred from contesting the claim." *United Automobile Ins Co v Rodriguez*, 808 So 2d 82, 87 (Fla 2001) Furthermore, Subsection (4)(b) "does not preclude or limit" the insurer's ability to declare that the claim was not medically necessary[4] or was unreasonable Fla. Stat 627 736(4)(b).[5] Although an insurer can still contest an overdue claim, if it is unsuccessful the insurer is liable for interest and attorneys' fees *See* Fla Stat §§ 627 736(4) (c) (explaining all overdue claims bear interest at 10%), 627 736(8) (attorney's fees provision), *Rodriguez*, 808 So 2d at 86

**\*4** Pursuant to Section 627 736(5)(b), an insurer or insured is not required to pay a claim or charges

1 for any service or treatment that was <u>not lawful</u> at the time rendered,

2 to any person who <u>knowingly</u> submits a false or misleading statement relating to the claim or charges,

3 with respect to a bill or statement that does not substantially meet the applicable requirements of paragraph (d),

4 for any treatment or service that is <u>upcoded, or that is unbundled</u> "

Fla Stat § 627 736(5)(b) (emphasis added).[6] Paragraph (d) of Section 627 736(5) states the following.

All statements and bills for medical services rendered by any physician, hospital, clinic, or other person or institution shall be submitted to the insurer on a <u>properly completed</u> Centers for Medicare and Medicaid Services (CMS) 1500 form, UB 92 forms, or any other standard form approved by the office or adopted by the commission for purposes of this paragraph All billings for such services rendered by providers shall, to the extent applicable, follow the Physicians' Current Procedural

Terminology (CPT) or Healthcare Correct Procedural Coding System (HCPCS), or ICD-9 in effect for the year in which services are rendered and comply with the Centers for Medicare and Medicaid Services (CMS) 1500 form instructions and the American Medical Association Current Procedural Terminology (CPT) Editorial Panel and Healthcare Correct Procedural Coding System (HCPCS)

*Id* (emphasis added)[7] This Subsection goes on to state that guidance can be found by the Physicians' Current Procedural Coding Terminology ("CPT") in effect for the year in which the services were rendered *Id* Subsection (5) of Section 627 736, Florida Statutes, applies to treatment and services occurring on or after October 1, 2003 *Id*

**\*5** Section 627 736(7)(a) states "Whenever the <u>mental or physical condition</u> of an injured person covered by personal injury protection <u>is material to any claim</u> that has been or may be made for past or future personal injury protection insurance benefits, such person shall, upon request of an insurer, submit to mental or physical examination by a physician or physicians " Fla Stat § 627 736(7) (a) (emphasis added) Subsection (7)(a) further states "An insurer may not <u>withdraw</u> payment of a treating physician without the consent of the insured person covered by the personal injury protection, unless the insurer first obtains a valid report by a Florida physician licensed under the same chapter as the treating physician <u>whose treatment authorization is sought to be withdrawn</u>, stating that treatment was not reasonable, related, or necessary " *Id* (emphasis added)

Finally, Subsection (12) of the PIP Statute states an "insurer shall have a cause of action against any person convicted of, or who, regardless of adjudication of guilt, pleads guilty or nolo contendere to insurance fraud under [Section] 817 234 " Fla Stat § 627 736(12)

B Florida's Minimum Record Keeping Standards

**Case 3:22-cv-00651-SMY   Document 22   Filed 07/07/22   Page 392 of 405   Page ID #578**

State Farm Mutual Automobile Insurance Company v...., Not Reported in Fed....

2008 WL 11337326

Pursuant to ⬛Section 458 331, Florida Statutes, failing to keep legible medical records that identify the licensed physician or the supervising physician by name and professional title who is responsible for rendering, ordering, supervising, or billing for each diagnostic or treatment procedure constitutes grounds for denial of a license or disciplinary action ⬛Fla Stat § 458 331(1)(m) This includes identification of the patient histories, examination results, test results, records of drugs prescribed, dispensed, or administered, and reports of consultations and hospitalizations *Id* The Florida Administrative Code § 64B8-9 003 states.

(1) Medical records are maintained for the following purposes

  a To serve as a basis for planning patient care and for continuity in the evaluation of the patient's condition and treatment

  b To furnish documentary evidence of the course of the patient's medical evaluation, treatment, and change in condition.

  c To document communication between the practitioner responsible for the patient and any other health care professional who contributes to the patient's care

  d To assist in protecting the legal interest of the patient, the hospital, and the practitioner responsible for the patient

(2) A licensed physician shall maintain patient medical records in English, in a legible manner and with sufficient detail to clearly demonstrate why the course of treatment was undertaken

(3) The medical record shall contain sufficient information to identify the patient, support the diagnosis, justify the treatment and document the course and results of treatment accurately

F A C § 64B8-9 003

C  Physical Therapy Laws

Chapter 458, Florida Statutes (2007), governs "Medical Practice" and the medical assistant profession ⬛Section 458 3485, Florida Statutes, states that a "medical assistant" is "a professional multiskilled person dedicated to assisting in

*all aspects* of medical practice under the direct supervision and responsibility of a physician", which includes the operation of office medical equipment ⬛Fla Stat § 458 3485 (emphasis added)

Section 486 021(11), Florida Statutes, defines the "practice of physical therapy" as follows in pertinent part

> [T]he performance of physical therapy assessments and the treatment of any disability, injury, disease, or other health condition of human beings, or the prevention of such disability, injury, disease, or other condition of health, and rehabilitation as related thereto by the use of the physical, chemical, and other properties of air, electricity; exercise, massage, the use of radiant energy, including ultraviolet, visible, and infrared rays, ultrasound, water, the use of apparatus and equipment in the application of the foregoing or related thereto

*6  Fla Stat. § 486 021(11) [8]  Under Section 486 151, Florida Statutes, it is unlawful for any person to practice or attempt to practice physical therapy without an active license Fla Stat. § 486 151  Section 486 161 entitled "Exemptions" provides: "No provision of this chapter shall be construed to prohibit any person licensed in this state from using any physical agent as a part of, or incidental to, the lawful practice of her or his profession under the statutes applicable to the profession of chiropractic physician, podiatric physician, doctor of medicine, massage therapist, nurse, osteopathic physician or surgeon, occupational therapist, or naturopath " Fla Stat § 486 161(1) (emphasis added)

In ⬛*State Farm Mutual Automobile Ins Co v Universal Medical Center of South Florida, Inc* , 881 So 2d 557 (Fla 3d DCA 2004), Florida's Third District Court of Appeals addressed whether a person defined as a medical assistant under ⬛Section 458 3485, but not licensed as a physical therapist under chapter 486, may "lawfully" render physical therapy modalities enumerated in Section 486 021(11) for purposes of qualifying for payment of assigned PIP benefits

under Section 627 736(5)(a) of the PIP Statute  The Third District answered the certified question in the affirmative  Id at 561  The Third District held that the physical therapy performed by medical assistants in that case was incidental to the licensed practice of medicine by a medical doctor who was present and provided supervision  Id at 559-60. In addressing the issue, the Third District noted that physical therapy modalities often fall within the common practice of massage therapists  Id at 560. Furthermore "[T]he application of hot packs, electrical muscle stimulators, ultrasound therapy devices, and mechanical massage, all [involve] either relatively simple modalities performed to assist the physician with patient treatments or the use of standard medical equipment " Id [9]  Thus, under Section 486 161(1), surgeons and massage therapists are allowed to perform physical therapy incidental to their practice and supervised medical assistants may also perform certain modalities  Id

**D**  Common Law Fraud Claim
Under Florida law, common law fraud requires proof of 1) a false statement concerning a material fact, 2) knowledge by the person making the statement that the representation is false, 3) the intent by the person making the statement that the representation will induce another to act on it, and 4) injury sustained by a person acting in justifiable or reasonable reliance on the fraudulent statement  Conseco Ins Co v Clark, 2006 WL 2024401, *3 (M D  Fla  2006)

**E**  The FDUTPA
**\*7**  In order to prevail on a FDUTPA claim, a party must establish the following  1) a deceptive act or unfair practice, 2) causation, and 3) actual damages  Beale v Biomet, Inc, 492 F  Supp 2d 1360, 1373 (S D  Fla  2007)  "Deception" occurs under FDUPTA if there is a "representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment "  Merrill Lynch Bus Fin Svcs, Inc v Performance Machine Sys U S A, 2005 WL 975773, *8 (S D  Fla  2005)  Prior to an amendment effective July 1, 2001, FDUTPA provided "In any individual action brought by a consumer who suffered a loss as a result of a violation of this part, such consumer may recover actual damages, plus attorney's fees and court costs "  Fla  Stat  § 501 211(2) (2000), Advanced Protection Tech v Square D Co, 390 F

Supp 2d 1155, 116 (M D  Fla  2005)  A consumer was defined as "an individual, child, by and through its parent or legal guardian, firm, association, joint venture, partnership, estate, trust, business trust, syndicate, fiduciary, corporation, or any other group or combination " Fla  Stat  § 501 203(7)

**F**  Unjust Enrichment
The elements of a claim for unjust enrichment are  1) a benefit conferred upon a defendant by the plaintiff, 2) the defendant's appreciation of the benefit, and 3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof  Florida Power Corp v city of Winter Park, 887 So 2d 1237, 1242 (Fla  2004)

**G**  Declaratory Judgment
"Any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought "  28 U S C  § 2201(a)  The Declaratory Judgment Act gives federal courts the ability to make a declaration of rights, but it does not impose a duty to do so  Brillhart v Excess Ins Co of Am, 316 U S  491, 494 (1942)

**IV.**  **ANALYSIS**
Plaintiffs have moved for summary judgment on the following counts  a) Count I, Common Law Fraud, b) Count III, Unjust Enrichment, c) Count IV, FDUTPA, and d) Count V, Declaratory Judgment

**A**  Alleged Unlawful Billing Due to Violation of Florida's Minimum Record Keeping Standard
Plaintiffs maintain that it is an undisputed fact that the Defendants' medical records violate the minimum record keeping standards  Doc No 363 at 12  Plaintiffs state that the daily Progress Notes generated by PICC "are not actually medical records, but are simply documents designed to create the illusion of medical records " Id at 13  Plaintiffs maintain that because PICC's "treatment notes" do not contain a signature of the treating physician, as a matter of law, the Defendants' treatments are not lawful and, thus, not compensable  Id at 16-7 [10]  Plaintiffs argue that PICC's

failure to maintain accurate records renders the service or treatment "unlawful" under ⌐⌐Section 627 736(5)(b)(1)

As mentioned above, ⌐⌐Section 627 736(5)(b)(1) provides that an insurer need not pay a claim "for any services or treatment not lawful at the time it was rendered". ⌐⌐Fla Stat § 627 736(5)(b)(1) The PIP Statute defines "lawful" as "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment " ⌐⌐Fla Stat § 627.732(10) (emphasis added) Thus, Plaintiffs interpret the PIP Statute to mean that services or treatments are unlawful at the time they are rendered unless the provider complies with Florida's minimum record keeping statute and related administrative code provisions because they are related to the provision of medical services or treatment Even accepting Plaintiffs' interpretation of the PIP Statute, summary judgment is not appropriate because genuine issues of material fact exist as to whether the Defendants *substantially complied* with the statute.

B Alleged Misleading Statements Regarding Patient Progress
*8 Plaintiffs argue "As a matter of law, the statement that the patient's 'progress toward recovery is satisfactory' is a misleading statement under 627 756(5)(b), and none of the claims containing that statement were payable " Doc No 363 at 13-14 Whether such statements are false or misleading is a genuine issue of material fact that is not appropriate for summary judgment

C Fraud
In Section V of Plaintiffs' Motion they maintain that "Defendants Knowingly Submitted Bills Containing Inaccurate and Misleading Current Procedural Terminology " Doc. No. 363 at 17. Whether the Defendants acted "knowingly" is a question of material fact and not appropriate for summary judgment

Plaintiffs state that Defendants used CPT codes that did not properly represent the service provided, thus it is undisputed that Defendants billed for services that were not rendered *Id* Specifically, Plaintiffs maintain that improper CPT codes were used in the following instances 1) new patient evaluations, 2) established patient evaluations, 3) Synergy, and 4) physical therapy modalities and massage codes *Id* at

17-37 Plaintiffs contend that Defendants' billing for Synergy is improper in a number of ways For example, Plaintiffs claim PICC's Synergy is essentially group therapy but was billed as one-on-one therapy, PICC did not provide pre-service, intra-service, and post-service components required by the CPT codes, PICC did not comply with Florida's minimum record keeping requirements regarding Synergy, and PICC used licensed massage therapists rather than licensed physical therapists to provide Synergy.

In regard to CPT coding, pursuant to ⌐⌐Section 627 736(5)(d), all statements and bills for medical services rendered by a physician or clinic must be submitted to the insurer on a *properly completed* CMS 1500 form Billings for such services must, "to the extent applicable," follow CPT ⌐⌐Fla Stat § 627 736(5)(d) According to the PIP Statute, "properly completed" means providing truthful, *substantially complete*, and *substantially* accurate responses ⌐⌐Fla Stat § 627 732(13) (emphasis added) The Southern District of Florida has recognized CPT coding "is complex, voluminous, and subject to expert interpretation " *United State v Maharaj*, 2007 WL 2254559, *8 (S D Fla 2007) Genuine issues of material fact exist as to whether the Defendants furnished substantially complete or accurate responses as to the CPT codes [11]

This Court has already addressed whether summary judgment is appropriate as to the alleged violations of Florida's minimum record keeping standards With respect to State Farm's argument that PICC wrongfully used licensed massage therapists as opposed to licensed physical therapists, the Court finds that genuine issues of material fact exist as to whether the use of physical therapy modalities are "incidental to" the lawful practice of Dr Colvin's profession under the statutes applicable to the profession of a surgeon A genuine issue of material fact also exists regarding whether the licensed massage therapists were acting as "medical assistants" and were supervised as required by ⌐⌐Section 458 3485

D FDUTPA
*9 Plaintiffs state that as a matter of law, Defendants have violated FDUTPA by 1) the submission of bills containing CPT codes that misrepresented the service provided, and 2) the submission of pseudo-medical records that contain misrepresentations and that fail to comply with Florida's minimum records keeping standards Doc No 363 at 38 Plaintiffs maintain that "the business practice of the

State Farm Mutual Automobile Insurance Company v... , Not Reported in Fed....
2008 WL 11337326

Defendants is the source of State Farm's loss " *Id* at 39 Whether the documentation submitted by the Defendants contains material misrepresentations is a genuine issue of material fact not appropriate for summary judgment

E   Unjust Enrichment

Plaintiffs maintain that as a matter of law, Defendants were unjustly enriched and State Farm is entitled to recover damages related thereto Doc No 363 at 43 Plaintiffs state that undisputedly, "Defendants retained an appreciated benefit of millions of dollars for the sham course of treatment implemented upon State Farm's insureds " *Id* Plaintiffs also state that Defendants were "consistently billing for services not rendered " *Id* Before this Court can determine whether or not the Defendants have been unjustly enriched, Plaintiffs must establish that Defendants implemented a sham course of treatment and improperly billed for services As already discussed, there are genuine issues of material fact that preclude this Court from granting summary judgment on those subjects

F   Declaratory Judgment

Plaintiffs seek summary judgment on their claim for declaratory relief Doc No 363 at 44 Specifically, Plaintiffs state that the "Court should enter a declaratory judgment finding that none of the Defendants' 'claims or charges' are payable pursuant to ⌐627.736(5)(b), Florida Statutes " *Id* Plaintiffs base their request on the following

> Defendants submitted claims. 1) for services and treatments that were not lawful at the time rendered, as they violated Florida's minimum record keeping standards and promulgated the unlicensed and unsupervised

> practice of physical therapy, 2) which contained "knowing" false **or** misleading statements relating to the claims or charges in the form of the pseudo-medical records and the bills, which contained CPT codes for services that were not rendered, 3) that did not comply with ⌐§ 627 736(5)(d), in that they did not follow the rules for proper CPT coding, and 4) that contained upcoded charges

*Id* at 45 (emphasis in original) However, the Court has previously addressed each of these issues of fact and concluded that they are material and disputed.

G   Failure to Address Defendants' Affirmative Defenses

Finally, the Court notes that Plaintiffs failed to address the affirmative defenses asserted in the Defendants' Answer, which alone requires denial of Plaintiffs' Motion FED. R CIV P 56(c), ⌐*Stillman v Travelers Insurance Company*, 88 F 3d 911, 913 (11th Cir 1996)

**V. CONCLUSION**

In consideration of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the Plaintiffs' Motion for Summary Judgment (Doc No 363) filed by State Farm is **DENIED**

**DONE** and **ORDERED** in Chambers, Orlando, Florida on December 18, 2008

**All Citations**

Not Reported in Fed Supp , 2008 WL 11337326

**Footnotes**

1    The facts set forth in this subsection are taken from each of the parties' statement of undisputed material facts (Doc Nos 359, 363), except where disputed facts are specifically identified

2    This Court allowed Intervenor Defendants Reidy Williams, Earl Byers, Carmen Berdicia, Marguerite Everidge, Elyse Cottle, Rose Cummings, Jerlean Reed and Andrita King-Fenn (herein, the "Intervenor(s)"), to intervene in this litigation  Doc Nos  83, 228, 483

3    All decisions of the Fifth Circuit prior to October 1, 1981 are binding precedent on this Court  ⊟🅰*Bonner v  City of Prichard*, 661 F 2d 1206, 1209 (11th Cir  1981) (*en banc*)

4    *Medically necessary* "refers to a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is a) in accordance with generally accepted standards of medical practice, b) clinically appropriate in terms of type, frequency, extent, site, and duration, and c) not primarily for the convenience of the patient, physician, or other health care provider "

5    For purposes of paragraph (4)(b), "an insurer shall not be considered to have been furnished with notice of the amount of covered loss or medical bills due unless the statements or bills comply with this paragraph, and unless the statements or bills are properly completed in their entirety as to all material provisions, with all relevant information being provided therein " ⊟Fla  Stat  § 627 736(5)(d)

6    *Lawful* or *lawfully* "means in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment. ⊟Fla  Stat  § 627 732(10) " *Knowingly* "means that a person, with respect to information, has actual knowledge of the information, acts in deliberate ignorance of the truth or falsity of the information, or acts in reckless disregard of the information, and proof of specific intent to defraud is not required " ⊟Fla. Stat § 627 732(11)  *Upcoding* "means an action that submits a billing code that would result in payment greater in amount than would be made using a billing code that accurately describes the services performed " ⊟Fla. Stat. § 627 732(14)  *Unbundling* "means an action that submits a billing code that is properly billed under one billing code, but that has been separated into two or more billing codes, and would result in payment greater in amount than would be paid using one billing code " ⊟Fla  Stat  § 627.732(15)

7    *Properly completed* "means providing truthful, substantially complete, and substantially accurate responses as to all material elements to each applicable request for information or statement by a means that may lawfully be provided and that complies with this section, or as agreed by parties " ⊟Fla  Stat  § 627.732(13)

8    Under Section 486 021(6), Florida Statutes, a "physical therapist assistant" is a licensed person whose activities are supervised by a physical therapist, but those activities performed for a board-certified orthopedic physician or physiatrist do not require onsite supervision by the physical therapist  Fla  Stat  § 486 021(6)

9    The Third District also noted that  1) "whether or not the physical therapy the medical assistants perform[ ] [falls] within the scope of the supervising physician's practice is a determination properly left for the respective licensing boards of medicine that discipline physicians for the physician's improper delegation of duties", 2) because the case is basically a coverage issue, the Court "may look to the custom and usage in the industry", and 3) "for years the insurance companies in this state have been paying for the modalities rendered by medical assistants under [PIP] benefits "  *Id*  at 560.

10    "Treatment notes" is not defined by Plaintiffs

11    The Court notes that the evidence presented by the Plaintiffs as to PICC's medical records and CPT coding, including portions of the testimony of PICC's own expert witness, Robert Weatherford, may be viewed as

**State Farm Mutual Automobile Insurance Company v...., Not Reported in Fed...**

2008 WL 11337326

circumstantial evidence of certain indicia of fraud, but that is insufficient to support entry of a summary judgment  *See* Doc  No. 363-5 at 10, 11, 39

---

**End of Document**                                    © 2022 Thomson Reuters  No claim to original U S  Government Works

9

Government Employees Insurance Co. v. Right Spinal Clinic, Inc., Slip Copy (2022)

2022 WL 743800

2022 WL 743800
Only the Westlaw citation is currently available
United States District Court, M.D. Florida,
Tampa Division

GOVERNMENT EMPLOYEES
INSURANCE CO., et al., Plaintiffs,
v.
The RIGHT SPINAL CLINIC, INC., et al., Defendants

Case No. 8.20-cv-0802-KKM-AAS
|
Signed 03/11/2022

**Attorneys and Law Firms**

John Patrick Marino, Kristen Lindsay Wenger, Lindsey R. Trowell, Smith, Gambrell & Russell, LLP, Jacksonville, FL, Yonatan M. Bernstein, Pro Hac Vice, Rivkin Radler, LLP, Uniondale, NY, for Plaintiffs

Kenneth Brian Schurr, Law Offices of Kenneth B. Schurr, P.A., Coral Gables, FL, Andrew P. Baratta, Baratta, Russell & Baratta, Huntingdon Valley, PA, Kelly Michelle Arias, The Evolution Law Group, P.A., Weston, FL, for Defendants The Right Spinal Clinic, Inc., Yunied Mora-Jimenez, Kendrick Eugene Duldulao, Victor Silva, Stephen Diamantides, Yulieta Perez Rodriguez, Alexis Garcia-Gamez, Mignelis Veliz Sosa.

Kenneth Brian Schurr, Law Offices of Kenneth B. Schurr, P.A., Coral Gables, FL, for Defendant Lianny Jimenez-Urdanivia

**ORDER**

Kathryn Kimball Mizelle, United States District Judge

*1 Defendants, a medical clinic and several of its doctors and employees,[1] engaged Michael Miscoe to give expert testimony on coding and billing practices for insurance reimbursement under Florida's No-Fault Law. GEICO, which sued the clinic for allegedly submitting fraudulent billing and receiving unwarranted repayment, moves to exclude three opinions from Miscoe's expert report (Doc. 229.)

Specifically, GEICO seeks to exclude Miscoe's opinion that (1) a mere error on a form is immaterial to GEICO's obligation to pay the claim, (2) that coding insurance claims is a subjective inquiry, and (3) that GEICO cannot show that Defendants' billing was fraudulent or reckless. The Court agrees with GEICO in part. The Court excludes the first opinion as unreliable and the third as an improper and unhelpful legal conclusion. Miscoe may testify as to his second opinion.

**I. BACKGROUND**

Florida's Motor Vehicle No-Fault Law requires that automobile insurers provide personal injury protection (PIP) benefits to insureds when they are injured in a motor vehicle accident. See §§ 627.730–627.7405, Fla. Stat. Healthcare providers may submit PIP claims directly to insurance companies to receive reimbursement for qualifying medical services. See Gov't Emps. Ins. Co. v. Quality Diagnostic Health Care, Inc., 2021 WL 5157535, at *1 (11th Cir. Nov. 5, 2021) (per curiam). The No-Fault Law requires that providers submit PIP claims on standard forms that are properly completed. See § 627.736(5)(d). One such form is the Health Care Financing Administration, or "HCFA-1500," form. Along with other information, the HCFA-1500 form identifies the performing or supervising physician and a current procedural terminology (CPT) code that denotes the treatment provided.

The No-Fault Act creates several exceptions to the insurer's general obligation to pay. For example, a claim is not reimbursable if the provider knowingly made a false statement, exaggerated the extent of the service provided ("upcoding"[2]), or did not properly complete the billing form. See § 627.736(5)(b), (d), Fla. Stat. The provider must also comply with the Clinic Act, which requires that medical clinics appoint a medical director to oversee the clinic's operations. See Gov't Emps. Ins. Co. v. Mas, No. 19-21183, 2020 WL 9604436, at *1 (S.D. Fla. Mar. 31, 2020) (citing § 400.9935, Fla. Stat.)

GEICO's operative Complaint alleges that The Right Spinal Clinic and several of its doctors, officers, and employees submitted fraudulent insurance charges to GEICO for reimbursement. (Doc. 249 ¶¶ 1–2.) According to GEICO, these PIP charges were not reimbursable because Right Spinal did not comply with the Clinic Act and violated the No-Fault Law.

**II. LEGAL STANDARD**

**\*2** Federal Rule of Evidence 702 governs expert testimony. The Rule permits a qualified witness to give opinions as an expert, provided that the opinions have a sufficient basis in facts or data, are derived from reliable principles or methods, and are helpful to the jury. *See* Fed. R. Evid. 702. Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," the "courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004). Thus, federal courts are the "gatekeepers" of expert testimony, screening out unreliable opinions. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 n.13 (1993)).

The inquiry simplifies into three "basic requirements—qualification, reliability, and helpfulness." *Frazier*, 387 F.3d at 1260. The proponent of the expert's opinion must establish that (1) the expert is qualified, (2) his methods are reliable, and (3) his testimony assists the trier of fact by applying specialized expertise. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998), *Frazier*, 387 F.3d at 1260.

### III. ANALYSIS

GEICO alleges that it was not legally obligated to pay the PIP insurance charges that Right Spinal submitted on its HCFA-1500 forms. Two of GEICO's asserted justifications are relevant here. First, GEICO claims that the forms falsely reported that Dr. Luis Merced performed or supervised the services. Second, GEICO claims that Defendants upcoded the PIP charges, nullifying GEICO's obligation to pay.

Defendants hired Michael Miscoe to give expert testimony on coding and billing practices for patient examinations. GEICO does not dispute Miscoe's qualifications or his extensive experience with coding and regulatory compliance. (Doc. 229-1 at 1, Doc. 243-1.) GEICO moves to exclude three of Miscoe's opinions based on their reliability and helpfulness to the jury. (Doc. 229.)

### A. Miscoe's Opinion That Right
### Spinal's Claim Errors are Immaterial

Box 31 of a HCFA-1500 form requires the provider to identify the name of the doctor who performed or supervised the services. Miscoe submits that entering the wrong doctor's name in box 31 would not alter GEICO's obligation to pay for PIP benefits.

For purposes of his opinion, Miscoe makes several assumptions. (Doc. 229-1 at 3.) Miscoe assumes that the patients and injuries were covered under the insurance plan, that the services were related to covered injuries, that the services were performed and were consistent with the CPT codes on the claim forms, that a licensed doctor was always present to supervise the services, and that the performing provider was licensed. (*Id.*)

In sum, Miscoe assumes that Right Spinal's claim forms were perfect, except as to box 31, which identifies the doctor's name. Under Miscoe's assumptions, box 31 contains the wrong doctor's name, but a doctor was present to supervise the services. So, again, the error with Right Spinal's claims or practices in this hypothetical is that the form only inadvertently names the wrong doctor. It is Miscoe's opinion that, in this situation, GEICO would be obliged to pay the bills and the amount of the bills would be unchanged.

GEICO objects to this opinion on two grounds. First, GEICO argues that Miscoe's opinion is a legal conclusion that should be excluded because it is not helpful to the jury. Second, it presses for exclusion because the opinion lacks a proper basis and is unreliable.

### 1. Miscoe's Opinion is Not an
### Improper Legal Conclusion

**\*3** An expert may not offer an ultimate legal conclusion. *See United States v. Delatorre*, 308 F. App'x 380, 383 (11th Cir. 2009) (per curiam), *accord Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005). But "whether challenged testimony is either an admissible factual opinion or an inadmissible legal conclusion is not always easy to perceive." *Hanson v. Waller*, 888 F.2d 806, 811 (11th Cir. 1989). That said, an expert may not give an opinion that trespasses on a court's providence to declare the law, *see Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013), *Freund v. Butterworth*, 165 F.3d 839, 863 n.34 (11th Cir. 1999), nor on the jury's domain to decide the facts in the light of the law that the court provides,

2022 WL 743800

*see* ⌐Montgomery v Aetna Cas & Sur Co , 898 F 2d 1537, 1541 (11th Cir 1990) But experts may opine on ultimate issues *See* Fed R Evid 704 If they do, the opinion "must be helpful to the jury and also must be based on adequately explored legal criteria " ⌐*Haney v Mizell Mem'l Hosp* , 744 F 2d 1467, 1474 (11th Cir 1984)

GEICO argues that Miscoe's opinion that an unintentional error on the HCFA-1500 form is "immaterial" to an insurer's obligation to pay is an ultimate legal conclusion that should be excluded The Court agrees in part

Miscoe may not opine that a mere error in the doctor's name who supervised the service is "immaterial" to GEICO's obligation to pay PIP benefits under the No-Fault Law While Miscoe may testify on what errors are common or are taken seriously in the industry, he may not instruct the jury on what Florida law means when it requires that HCFA-1500 forms be "properly completed in their entirety as to all material provisions " ⌐§ 627 736(5)(d), Fla Stat That is a task for the Court *See* ⌐*Montgomery*, 898 F 2d at 1541 Nor may he testify on whether a legal standard has been satisfied *See Cordoves v Miami-Dade Cnty* , 104 F Supp 3d 1350, 1365 (S.D Fla 2015) (Altonaga, J.) (citing ⌐*Burkhart v Wash Metro Area Transit Auth* , 112 F 3d 1207, 1212–13 (D C. Cir 1997)) That is a task for the jury

Not only would the opinion be out of Miscoe's purview as an expert, but there is also no basis for that opinion in Miscoe's report The express basis for Miscoe's opinion that the error is immaterial is only the practical result under the claim correction process In announcing his opinion, Miscoe simply does not refer to the No-Fault Law or its exceptions to an insurer's obligation to pay PIP benefits Nor does he "adequately explore [that] legal criteria " ⌐*Haney*, 744 F 2d at 1474

Defendants disagree They claim Miscoe relied on Florida's No-Fault Law in reaching his opinion that the error would be immaterial (Doc 243 at 5 ) They argue that ⌐§ 627 736(5)(d) requires only a "properly completed" HCFA-1500 form, which in turn means that it must be "substantially complete" in its "material elements " (Doc 243 at 5 (quoting ⌐§§ 627 736(5)(d), ⌐627 732(13), Fla Stat ) ) Substituting one doctor's name for another, Defendants conclude, is a minor

error that does not render the claim unpayable The Court expresses no opinion on Defendants' reading of the statute, but its reading of Miscoe's report is erroneous [3]

*4 While Miscoe cites ⌐§ 627 736(5), he does so twenty-six pages before announcing the opinion that Right Spinal's error is immaterial (Doc 229-1 at 8, 34 ) When he cites it, he quotes a substantial portion of subsection (d) But he does not quote the "properly completed" language Defendants rely upon in attempting to admit his opinion Nor does he cite to the definitional section from whence Defendants summon the "substantially complete" term So, whatever the merits of Defendants' argument that GEICO must pay a claim made on a substantially complete form, that is not the basis for Miscoe's opinion And if it was, it lacked any analysis of the No-Fault Law and thus would not have been founded upon "adequately explored legal criteria " ⌐*Haney*, 744 F 2d at 1474 Either way, Miscoe does not support his opinion in his expert report with the No-Fault Law [4]

Instead, Miscoe grounds his opinion in the claim correction process (Doc 229-1 at 34 ) Despite Miscoe's reference to it in his report and in his deposition, GEICO does not argue that reliance upon the claim correction process results in an improper legal opinion Accordingly, the Court need not consider whether it is As presented in his expert report and his deposition, it appears Miscoe's knowledge of the claim correction process comes from his industry knowledge and experience, not from a source of law or interpretation of the No-Fault Act Since Miscoe's opinion is not based on the No-Fault Act, the Court will not exclude it as an improper legal opinion

## 2. Miscoe's Opinion is Unreliable

An expert's opinion must be reliable and based on sufficient data *See* ⌐*Kumho Tire Co v Carmichael*, 526 U S 137, 149 (1999), Fed. R Evid 702(b) Experts relying on experience must explain "how that experience is reliably applied to the facts " ⌐*Frazier*, 387 F 3d at 1261 (quotation omitted) The opinion must also be helpful to the jury *See* Fed R Evid 702 An opinion is often helpful if it explains "matters that are beyond the understanding of the average lay person " ⌐*Frazier*, 387 F 3d at 1262. But it does not help the trier of

2022 WL 743800

fact if the opinion "offers nothing more than what lawyers for the parties can argue." 🔲 *Id* at 1262–63

GEICO argues that Miscoe's opinion should be excluded because it is "baseless and unreliable." (Doc. 229 at 10.) GEICO claims that Miscoe failed to support his opinion that mere "administrative claim errors," like a misstatement of the performing or supervising physician, are immaterial. GEICO is correct, partly. Miscoe's opinion is not baseless, but it is unreliable.

Miscoe's opinion is not baseless. Miscoe concludes that an error in the supervising doctor's name would not change GEICO's obligation to pay for the services. Miscoe bases this opinion on the claim correction process. (Doc 229-1 at 34.) As Miscoe explains in his deposition, an insurer like GEICO may challenge inaccuracies in a provider's claim form for PIP reimbursement. (Doc 229-2 at 20.) The provider may then correct the form and resubmit it (*Id* at 21.) Requiring a provider to resubmit a corrected claim is worth doing only if the amount payable differs between the original claim and corrected form. (*Id*.)

**\*5** Under Miscoe's assumptions, the single correction to Right Spinal's form necessary for complete accuracy is to swap Dr. Merced's name for that of another doctor who supervised the services. Otherwise, the forms are correct and payable. Miscoe then explains that "it's not the identity of the provider that changes [the insurer's] obligation to pay." (*Id* at 16.) That is so because the amount due is determined by the CPT code, not by a characteristic of the doctor. Thus, provided that the correct name is that of a physician (a fact that Miscoe assumes), the amount GEICO owes would not change from the incorrect form to the corrected form. (*Id* at 21.) Rendering, in Miscoe's words, that "reporting error immaterial," (*id* at 20), because the claim correction process would take no notice of it.

Miscoe's opinion is unreliable. Miscoe's report references the claim correction process only once. (Doc 229-1 at 34.) Miscoe asserts that "the mis-identification of the supervising provider is ultimately an immaterial error since *correction of the claims* to identify the correct supervising provider would have no impact on GEICO's obligation to pay." (*Id* (emphasis added).) The reference is so opaque that neither GEICO nor Defendants mention it expressly in their briefing. During his deposition, Miscoe explains the concept in greater detail. But even there, Miscoe provides no sources to support his explanation of the process or his conclusions on the results

it would yield in this case. When pressed for sources or citations at his deposition, Miscoe did not give them. He instead explained that "it's a practical reality." (Doc. 229-2 at 12.)

Without sources or data, the Court cannot "ensur[e] that [his] testimony ... rests on a reliable foundation." 🔲 *Daubert*, 509 U.S. at 597. Perhaps Miscoe knows by experience and industry familiarity. If so, Miscoe has not explained "*how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, [or] how that experience is reliably applied to the facts." 🔲 *Frazier*, 387 F.3d at 1261 (quotation omitted). As is, the Court would simply have to take his word for it. Though GEICO does not challenge Miscoe's qualifications, the Court "must still determine the reliability of the opinion, not merely the qualifications of the expert who offers it." 🔲 *Kilpatrick*, 613 F.3d at 1336, see 🔲 *Frazier*, 387 F.3d at 1261 (explaining that reliability is not "established merely by the *ipse dixit* of an admittedly qualified expert"). Since Miscoe provides insufficient foundation to test the reliability of his opinion, the Court excludes it.

### B. Miscoe's Opinion That Coding is Subjective

When Right Spinal submitted HCFA-1500 forms to GEICO it identified the level of treatment it provided the patients using a CPT code. In turn, the CPT code dictates the level of reimbursement due to Right Spinal. GEICO alleges that Right Spinal selected incorrect CPT codes to inflate its reimbursement. The No-Fault Law prohibits such "upcoding" and references several sources that provide standards for coding. *See* 🔲 § 627.736(5)(d), Fla. Stat.

After reviewing the sources that the statute references, Miscoe opines that the standards are so subjective that coding amounts to "pure guesswork." (Doc. 229-1 at 36.) He claims that the authoritative sources and guidance documents do not sufficiently define key coding terms. Instead, these sources leave a range of permissible codes for any given patient examination. In Miscoe's view, the ambiguity is so great that "no objective and repeatable opinion can be expressed as to whether the level of [patient] services reported was accurate or not." (*Id*.) Without an objective criterion, "GEICO is precluded from objectively demonstrating" that the coding for "any particular encounter was actual[ly] wrong." (*Id*.)

GEICO argues that this opinion should be excluded because it is legally inaccurate, would defeat the purpose of the No-Fault Law, and is not helpful to the jury

### 1. Inaccurate Legal Opinion

**\*6**  Pointing to the language of the No-Fault Law, GEICO asserts that the CPT Assistant Newsletter is an authoritative source that renders the coding process more objective (Doc 229 at 13–15 ) And GEICO points to caselaw concluding that the CPT Assistant is binding (*Id* at 13 (citing *State Farm Mut Auto Ins Co v Nu-Best Whiplash Inj Ctr, Inc*, No 09-19125, 2014 WL 12744728, at \*4 (Fla 6th Cir Ct Dec. 2, 2014).) Miscoe, meanwhile, submits that the CPT Assistant is, "at best, a secondary source " (Doc. 229-1 at 34 ) GEICO argues that Miscoe's view of the CPT Assistant is an incorrect legal opinion that is the basis of his broader opinion that CPT coding is too subjective to allow GEICO to prove that Right Spinal's codes were incorrect (Doc 229 at 13–14 )

GEICO is correct that experts "are not permitted to explain to the jury what the applicable legal standards are " *See Cordoves*, 104 F Supp 3d at 1364 And the Court expresses no opinion on GEICO's reading of the No-Fault Law. But even if GEICO were also correct that the CPT Assistant is binding, Miscoe's opinion stands Miscoe opines that, even if the CPT Assistant binds Right Spinal, the coding inquiry still would not be objective (Doc 229-1 at 34 ) In other words, Miscoe's opinion on authority is independent of his view on subjectivity Accordingly, even if Miscoe is wrong on the former, it does not change his opinion on the latter

### 2. Statutory Interpretation

GEICO argues that Miscoe's opinion should be excluded because it "tends to nullify" portions of the No-Fault Statute, specifically the portion that prohibits upcoding (Doc. 229 at 17 ) As a practical matter, GEICO may be correct But this Court is not aware of any authority suggesting that an expert's opinion may be excluded because it rejects purposivism or violates the superfluity canon of statutory interpretation

### 3. Helpfulness to the Jury

Finally, GEICO argues that Miscoe's opinion on the subjectivity of coding is not helpful to the jury Miscoe's

position is that, given the lack of objective criteria, "a declaration of error" is "an impossible task " (Doc 229-1 at 34 ) If that's so, GEICO argues, then Miscoe cannot offer an opinion on whether Right Spinal's bills were upcoded, and thus his opinion is not helpful (Doc 229 at 18 ) GEICO is mistaken

Miscoe's opinion is helpful to the jury CPT coding is "complex, voluminous, and subject to expert interpretation " *State Farm Mut Auto Ins Co v Physicians Inj Care Ctr, Inc*, No 6 06-cv-1757, 2008 WL 11337326, at \*8 (M D Fla Dec 18, 2008) (Kelly, Mag J ) (quotation omitted) After reviewing coding manuals and regulatory guidelines in the light of his CPT auditing experience, Miscoe concluded that selecting a CPT code for a treatment session is not a simple task Nor is it an exact science Instead, it requires dozens of subjective decisions For example, a provider selecting a code must decide if an examination was "detailed" or "comprehensive" and if the medical decision was of "low" or "moderate" complexity (Doc 229-1 at 36–37 ) These terms —and many like them—are difficult to apply in practice

Of course, an expert may not instruct the jury on what sources are legally binding or on the meaning of statutory terms *R W v Bd of Regents of the Univ Sys of Ga*, 114 F Supp 3d 1260, 1274 (N D. Ga 2015) (May, J ) (explaining that "all witnesses 'are prohibited from testifying as to questions of law regarding the interpretation of a statute, the meaning of terms in a statute, or the legality of conduct' " (quotation omitted)), *accord Cordoves*, 104 F. Supp 3d at 1364 But Miscoe's experience in coding and CPT auditing equips him to testify on the complexity of applying these terms in a treatment setting and on the practices auditors use to verify CPT codes *See Thomas v Auto-Owners Ins Co*, No 1 16-cv-542, 2022 WL 210134, at \*6 (M.D Ala Jan 24, 2022) (Huffaker, J ) (explaining that an expert may testify on insurance industry practices and relevant facts, but not as to whether a legal standard has been met) Because the "average juror is not likely to be familiar with the practices and procedures involved in insurance claims handling," *Camacho v Nationwide Mut Ins Co*, 13 F Supp 3d 1343, 1366 (N D. Ga 2014) (Totenberg, J ), Miscoe's opinion may help the jury decide if Right Spinal upcoded its CPT billing, *see Frazier*, 387 F 3d at 1262 (reasoning that expert opinion is helpful if it "concerns matters that are beyond the understanding of the average lay person") The Court declines to exclude Miscoe's opinion that coding is subjective

**Government Employees Insurance Co. v. Right Spinal Clinic, Inc., Slip Copy (2022)**

2022 WL 743800

**\*7** Miscoe's opinion is not immune from criticism But a "district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury' " 🔲*Maiz v Virani*, 253 F 3d 641, 666 (11th Cir. 2001) (quotation omitted). GEICO may draw out any limitations or errors it sees in his opinion in its briefing and its questioning. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence " 🔲*Daubert*, 509 U S at 596 That said, the Court "will not permit a party to cloak its legal arguments in the garb of an expert witness " *Domercant v State Farm Fire & Cas Co*, No 1 11-cv-02655, 2013 WL 11904719, at \*2 (N D Ga May 15, 2013) (Forrester, J )

**C. Miscoe's Opinion That GEICO Cannot Prove Fraud**

GEICO takes issue with a third opinion Miscoe says that GEICO cannot prove that Right Spinal acted fraudulently or recklessly in its billing practices because billing is a subjective inquiry (Doc 229-1 at 36, 42–43 ) GEICO argues that this opinion should be excluded because it is an improper legal conclusion (Doc 229 at 19–20 ) The Court agrees

Miscoe may testify as to the difficulty of coding and his view that it is a subjective inquiry However, he may not testify that it is impossible for GEICO to prove its case or what evidence it would need to show that Right Spinal acted fraudulently or with the intent to deceive *See Clarke v Healthsouth Corp*, No 8 14-cv-778, 2021 WL 129821, at \*6 (M D Fla Jan 14, 2021) (Covington, J ) (excluding expert opinion that a party acted fraudulently as an improper legal opinion)

An expert may testify on ultimate issues But it must be helpful to the jury *See* 🔲*Haney*, 744 F 2d at 1474 The Court provides the law to the jury, including the elements of claims and burdens of proof *See* 🔲*Montgomery*, 898 F 2d at 1541 Duplicative and potentially conflicting instructions would in no way help the jury *See* 🔲*Camacho*, 13 F Supp 3d at 1365

("An expert may not testify regarding the legal implications of conduct because the court must be the jury's only source of law ")

Once the Court explains the law and the experts testify on the coding process, a "conclusory statement" on an ultimate issue from Miscoe would not help since the "inferences to be drawn from [his] testimony [are] manifest." *Acrement v S Vac Transp Co*, 517 F 2d 729, 732 (5th Cir 1975) It would do no more than "tell the jury what result to reach," 🔲*Montgomery*, 898 F 2d at 1541, and "offer[ ] nothing more than what lawyers for the parties can argue in closing arguments " 🔲*Frazier*, 387 F 3d at 1262–63

In sum, Miscoe cannot opine that "GEICO is precluded from objectively demonstrating that the level of [patient] services  were fraudulent," or that GEICO cannot show that Right Spinal acted recklessly (Doc 229-1 at 36, 43 ) Allowing the opinion would undermine the Court's role as the jury's sole source of law and the jury's role as the ultimate factfinders

**IV. CONCLUSION**

GEICO is correct that Miscoe's first and third opinion should be excluded The first is unreliable and the third is a legal opinion that would not help the jury The Court declines to exclude the second opinion, however, because Miscoe's perspective on the subjectivity of coding may prove useful to a jury, provided that it is not expressed as a conclusion on the meaning or application of legal terms

**\*8** Accordingly, GEICO's Motion to Exclude Expert Testimony is **GRANTED in part** and **DENIED in part** (Doc 229 ) Miscoe's opinions are excluded to the extent stated above

**ORDERED** in Tampa, Florida, on March 11, 2022

**All Citations**

Slip Copy, 2022 WL 743800

**Footnotes**

1    The Defendants are The Right Spinal Clinic, Inc , Lianny Jimenez-Urdanivia, Yunied Mora-Jimenez, Kendrick Eugene Duldulao, Victor Silva, Stephen Diamantides, Yulieta Perez Rodriquez, Alexis Garcia-Gamez, and Mignelis Veliz Sosa

2    Upcoding is as "an action that submits a billing code that would result in payment greater in amount than would be paid using a billing code that accurately describes the services performed " ⊓§ 627 732(14), Fla Stat

3    If Defendants were correct, it would likely be an impermissible legal opinion  See ⊓Morgan v  N  Miss  Med Ctr , Inc , 458 F  Supp  2d 1341, 1355 n 21 (S D  Ala  2006) (Steele, J ) ("It is the function of this Court, not [of an] expert witness, to construe, interpret, and apply [the law] to these facts, therefore, [an] opinion on the strictly legal question of whether the record facts amount to [a statutory] violation is entitled to no weight."), Day v  Sarasota Drs  Hosp , Inc , No. 8 19-cv-1522, 2020 WL 7310757, at *5 (M D  Fla  Dec  11, 2020) (Covington, J ) (explaining that expert testimony on whether the No-Fault Law was violated "constitutes an impermissible legal conclusion")

4    To Defendants' credit, it is true that Miscoe arguably explained his opinion in relation to the No-Fault Act during his deposition  But an expert may not provide a new basis for his opinion in a deposition  See Fed  R  Civ  P  26(a)(2)(B)(i) (requiring that an expert's Rule 26 report contain "a complete statement of all opinions the witness will express and the basis and reasons for them"). Thus, "subsequent deposition testimony cannot resuscitate an otherwise deficient expert report " Jackson v  Johnson & Johnson, No. 1 11-cv-3903, 2022 WL 110422, at *3 (N D  Ga  Jan. 12, 2022) (Thrash, J ) (citing ⊓Ciomber v. Coop  Plus, Inc , 527 F 3d 635, 642 (7th Cir  2008))

---

**End of Document** © 2022 Thomson Reuters  No claim to original U S  Government Works