**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    Case No. 22-cv-651-SMY |
| | ) |
| GENERAL MEDICINE, P.C., et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**YANDLE, Chief District Judge:**

The United States of America brings this action under the False Claims Act, 31 U.S.C. § 3729, *et seq*. ("FCA") and common law theories of fraud, payment by mistake, and unjust enrichment against General Medicine, P.C.; General Medicine of Illinois Physicians, P.C.; General Medicine of North Carolina, P.C.; Advanced Medical Haggerty Partners, P.A.; Borough Medical Partners, P.A.; Centro Medical Partners, P.A; City Medical Partners, P.A.; Integrated Medical Partners, P.A.; Metro Medical Haggerty Partners, P.A.; Metropolis Medical Partners, P.A.; National Medical Partners, P.A.; New Castle Haggerty Medical Partners, P.A.; Regional Medical Partners, P.A.; Sigma Haggerty Medical, P.A.; Silverton Medical Partners, P.A.; Statewide Medical Partners, P.A.; Vicinity Medical Partners, P.A.; Westco Haggerty Medical Partners, P.A.; and Thomas M. Prose (collectively, "GM").  The Government alleges GM engaged in wide-ranging health care fraud involving billing Medicare for thousands of false claims to the Medicare Program for visits with residents of nursing and assisted living facilities in multiple states.

This matter is now before the Court on GM's Motion for Summary Judgment (Doc. 153), which the Government opposes (Doc. 168).  For the following reasons, the motion is **DENIED**.

**Facts**

Construed in the light most favorable to the nonmoving party, the evidence and reasonable inferences establish the following facts relevant to the pending summary judgment motion:

GM employs physicians and nurse practitioners that provide care exclusively for patients in nursing homes, skilled nursing, rehabilitation, assisted living, and other long-term care facilities. GM's sole shareholder and officer is Defendant Thomas M. Prose.

**Medicare Coverage in Nursing Homes and Assisted Living Facilities**

Medicare is a federally funded health insurance program for individuals over age 65 and people with certain disabilities. *See* 42 U.S.C. § 1395k. The program is administered by the Centers for Medicare and Medicaid Services ("CMS"), a component of the United States Department of Health and Human Services ("HHS"). Providers enrolled in Medicare are eligible to receive "reimbursement," or payment, for services provided to Medicare beneficiaries. To receive reimbursement, providers submit claims to Medicare through Medicare administrative contractors ("MACs") (Doc. 168-1, at ¶ 3).

A claim contains a variety of information, including a billing code identifying the procedure or service performed. *Id.* These billing codes are called Current Procedural Terminology or "CPT" codes. *Id.* CPT codes are maintained and updated by the CPT Editorial Panel, which is appointed by the American Medical Association ("AMA") Board of Trustees. HHS has adopted the codes in the CPT-4 Manual as one of its "standard medical data code sets." 45 C.F.R. § 162.1002(a)(5), (b)(1), (c)(1).

The overarching criterion for Medicare coverage is that the services must be "reasonable and necessary for the diagnosis or treatment of illness or injury...." 42 U.S.C. §1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1); 42 C.F.R. § 424.5(a)(1)(i). Medicare explicitly excludes coverage for

"routine physical checkups such as ... [e]xaminations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury," unless the service was one of several specialized tests and exams specifically allowed.  42 C.F.R. § 411.15(a).

After a nursing home resident receives an initial visit from a physician upon admission to the facility, any additional visits by a physician or nurse practitioner are categorized as "subsequent" nursing facility visits (Doc. 168-2 at 3).  In the nursing facility setting, subsequent nursing facility visits were billed at CPT codes 99307 through 99310.  *Id*.  In the assisted living facility setting, visits with established patients are billed at CPT codes 99334 through 99337 (Doc. 168-3 at 2).  The CPT codes at issue all required that certain elements be met to receive reimbursement under that code (Docs. 168-2; 168-3).  They also provided additional descriptions of the services to be billed for each code.  *Id*.  As part of those descriptions, each CPT code listed the "typical" time a provider would spend performing the services billed under the CPT code and examples of the types of problems that may be treated in visits billed under the applicable code. *Id*.

In the nursing facility setting, Medicare does not pay for additional visits that might be required by state law or to satisfy facility or other administrative purposes (Doc. 168-4 at § 30.6.13.B).  To qualify for Medicare reimbursement, the health care provider must ensure services were "provided economically and only when, and to the extent, medically necessary."  42 U.S.C. § 1320c-5(a)(1), (3).

### GM'S Medicare Claims

GM submitted claims electronically by sending the electronic equivalent of a CMS Form 1500 to the appropriate Medicare contractor who on behalf of CMS, paid a portion of the claim (Doc. 94 at ¶ 91).  In CMS Form 1500, the provider certifies among other things, that the

information on the form is true, accurate, and complete and that the claim complies with applicable law and instructions. The physician also certifies that "the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare." *See* CMS Form 1500 at 2.

GM established visits that it claimed were required by Medicare regulations or guidance, including care plan reviews ("CPRs"), monthly medication reconciliations/reviews ("MMRs"), physician quality reporting system ("PQRS") visits, and PHQ-9 visits (Doc. 168-9 at pp. 5-15). GM directed clinicians to perform visits with residents every time a form required a signature and for other routine events, such as after every normal lab test result (Doc. 168-5; Doc. 168-10). GM required clinicians to perform CPRs and MMRs at specified intervals, such as monthly or quarterly. *Id.* The frequency and number of visits performed depended on whether the resident was insured by Medicare or Medicaid (Doc. 168-5). For Medicare patients, GM performed a separate CPR visit and MMR visit each month, but combined CPR and MMR services into one visit each month for Medicaid patients. *Id.*

GM management closely tracked the number and type of visits reported by clinicians (Doc. 168-6). GM tied clinician compensation to the number of visits they reported (Doc. 168-11). GM also monitored how many of GM's CPRs and MMRs had been performed (Doc. 168-6). To determine the number of visits to complete each month, GM management obtained the number of Medicare and Medicaid residents in each facility they serviced (*i.e.*, the census) and then tracked how many visits had been reported in each facility. *Id.* The goal was to complete separate CPR and MMR visits for all Medicare residents plus other required visits, and one CPR/MMR combined visit for all Medicaid residents each month. *Id.* GM's management closely monitored this metric,

and clinical coordinators directed clinicians to complete these required visits by the end of the month. *Id*. By the end of the month, there were often hundreds of CPRs and MMRs left to complete, and GM management required clinicians to perform those remaining visits before the next month began (Doc. 168-7; Doc. 168-8).

On June 27, 2016, GM Director of Clinical Operations Rebecca Coccia emailed the Southern Illinois Clinical Coordinators to ask for assistance in "completing the monthly required visits" listed in an attached spreadsheet (Doc. 168-7). The spreadsheet calculated 943 CPR and MMR visits to be completed by Southern Illinois clinicians in the last three days of June. *Id*. at 3. Coccia offered to grant clinicians extra time off "if each clinician could average 40 visits a day in the next 3 days." *Id*. at 1. Nurse practitioner Jami Mayhew reported performing nearly 30 hours of estimated services on each of the next three days; June 28, June 29, and June 30, 2016 (Doc. 168-12). Other similar emails from GM management required clinicians to perform hundreds of visits over the course of a few days (Doc. 168-6; Doc. 168-8).

GM managers called "Clinical Coordinators" and "Directors of Clinical Operations" trained clinicians on how to perform services such as care plan reviews and provided education on documentation (Doc. 168-15 at 62). Those managers used GM guidance or manuals in the training, and all clinicians followed GM's corporate manuals and policies (Doc. 94 at ¶ 33). Managers also scheduled the clinicians to visit certain facilities on certain days (Doc. 168-15 at 76; Doc. 168-31). This was in part so that clinicians would complete the various visits required by GM management. *Id*.; Doc. 168-17 at 3. GM management provided directions to clinicians on other visits to perform and when (Doc. 168-10). When numbers were low, Dr. Prose and management directed clinicians to perform more visits (Doc. 168-6; Doc. 168-8; Doc. 168-19).

GM provided directions to clinicians on how to code their visits (Doc. 168-21).  GM management instructed clinicians to record CPRs and MMRs as CPT code 99310, the highest code for nursing facility visits, and CPT cod 99337, the highest code for assisted living facility visits (Doc. 168-17).  For example, on July 1, 2016, Coccia instructed Dr. Greene to use CPT code 99310X for MMRs and submit CPT code 99310M for CPRs (Doc. 168-16).  On July 18, 2016, Coccia instructed several other clinicians that for MMR visits, "[t]he CPT code you submit should . . . be **99310M**" and for CPR visits, "[t]he CPT code you submit should be **99310C**" (Doc. 168-22 (emphasis in original)).

In April 2025, U.S. Department of Health and Human Services Office of Inspector General (HHS-OIG) Special Agent Emily Kelleher completed two reports regarding GM's time spent with patients (Doc. 168-12; Doc. 168-23; Doc. 168-26).  Kelleher documented her review of evidence demonstrating the amount of time certain GM providers spent at nursing facilities on 34 days, including witness interviews, documentation, visual surveillance, and tracking device data (Doc. 168-12; Doc. 168-23).  She referred to this analysis as "Time Analysis I" (Doc. 168-23).

In Time Analysis I, Kelleher compared the amount of time GM providers spent at nursing facilities on those days with the claims billed by GM (Doc. 168-23).  Kelleher concluded that GM providers spent less than five minutes per patient visit on the days reviewed (Doc. 168-12).  She also compared the time spent by GM providers with the typical time spent performing those services according to the CPT codes billed to Medicare (Doc. 168-23).  Kelleher's report included a spreadsheet identifying the rendering provider, the date of service, and the place of service for each of the 34 days (Doc. 168-12 at 1).  She also attached a spreadsheet containing the specific claims she reviewed (Doc. 168-23 at 7).

According to Time Analysis I, on September 1, 2017, Mayhew spent two hours and sixteen minutes in the Elmwood facility. GM billed for thirty-five visits by Mayhew with residents of Elmwood (Doc. 168-12; Doc. 168-24 at 25). Mayhew's time with residents averaged less than 4 minutes per patient. *Id*. GM billed twenty-two visits at CPT 99310 (the highest-level code for comprehensive visits), ten at CPT 99309, one at CPT 99306, and two at CPT 99318 – the code representing an annual assessment. *Id*. Based on the CPT code time estimates used by CMS, a typical provider would spend seventeen hours performing these services (Doc. 168-12).

Kelleher provided additional information on the alleged false claims resulting from billing over 24 hours of services in a day in her analysis, "Time Analysis II" (Doc. 168-12 at 2; Doc. 168-26). Using the CPT code's estimated times to complete each service as determined by the AMA and CMS, Kelleher calculated the time it would take a typical provider to perform the services billed by GM providers on 32 specific days. *Id*. Kelleher's concluded that GM billed between 24 and 33 hours of services by a single provider on those 32 days. *Id*. at 4.

One of the days reviewed by Kelleher was May 26, 2020. *Id*. GM billed for 65 visits allegedly performed by Christiane Weimken at two separate facilities on that day, including 41 visits under comprehensive visit CPT code 99310 (Doc. 168-12). Forty-seven of these visits were billed to Medicare Part B, with the remaining 18 visits billed to other federal and private health plans (Doc. 168-27 at 32). Based upon the CPT codes' estimated times, it would take a typical provider nearly 34 hours to complete the 65 visits as billed (Doc. 168-12 at 2).

GM submitted Medicare Enrollment Applications to CMS and were enrolled in the Medicare Program (Doc. 94 at ¶ 86). As part of the Medicare enrollment process, GM certified they were aware of all applicable statutes, regulations, and program instructions, Section 1862 of

the Social Security Act and Title 42 of the Code of Federal Regulations (42 C.F.R. § 424.510(d)(3)).

**Medicare/Medicaid Audits**

While several Medicare contractors performed isolated post-payment reviews of GM's claims, in June 2015, Medicare contractor Novitas Solutions, Inc. ("Novitas") placed GM on a pre-payment review of certain claims billed at CPT code 99310 because of the high rate of billing errors in previous audits (Doc. 168-28).  Novitas downcoded or denied most of GM's 99310 claims it reviewed, with many denials due to the frequency of GM's visits and lack of medical necessity (Doc. 168-28).

Medicare contractor Wisconsin Physicians Services Insurance Corporation (WPS) also conducted several audits of GM's claims and denied or downcoded nearly all claims reviewed (Doc. 168-29; Doc. 168-35).

Medicare contractor National Government Services (NGS) conducted additional audits of GM and specifically reviewed claims from Mayhew (Doc. 168-31 at 3).  In an internal GM email documenting a conversation with NGS, GM states NGS advised that the "the biggest reason for denial or down codes is 'very, very high frequency of visits with no change in chronic conditions, status, or plan of care'" and the "record not supporting such a high level." *Id.*

The Medicare Appeals Council, the highest level of administrative review within the Office of Medicare Hearings and Appeals, issued two decisions finding many of GM's services medically unnecessary and upcoded (Doc. 153-39; Doc. 153-40).  The first Council decision was issued on November 17, 2016 (Doc. 153-39).  The Council issued a second decision regarding GM's services on June 21, 2017 (Doc. 153-40).

In October 2016, Missouri Medicaid Audit and Compliance ("MMAC") initiated an action to terminate GM's Missouri Medicaid enrollment (Doc. 168-32).  In an October 24, 2016 letter addressed to Prose, the MMAC explained it had completed a post-payment review of GM's Medicaid claims and found the documentation was inadequate to support the CPT codes billed. *Id.* at 2.  The letter further noted patient records were created after the MMAC requested them for review.  *Id.*  The MMAC's October 24, 2016 letter informed Prose its investigation had revealed several concerning results, including: (1) 100% of the initial nursing facility visits were billed by GM using the highest possible code; (2) subsequent nursing facility visits were billed by GM at a rate 14 times that of its peer group; (3) nurse practitioners received commission-based payments from GM depending upon the number of patients seen per day; and (4) the billing indicated providers spent an unlikely number of hours per day providing services based on the average time CPT assigns to the codes.  *Id.*  MMAC concluded the facts "clearly show[ed] that serious abuse or harm may result from [GM's] continued participation in the Medicaid program."  *Id.* at 4.  On January 10, 2017, in lieu of sanction by the State of Missouri, GM agreed to voluntarily surrender its Title XIX Missouri HealthNet provider agreement, effectively terminating its ability to receive payments from Missouri Medicaid (Doc. 168-33 at 3).

Multiple patients' family members contacted GM with concerns about GM's billing, frequently visiting their family member when the patient was stable, and the amount of time spent with patients (Doc. 168-38 to Doc. 168-43).

### Creation of New Entities

In early 2016, Dr. Prose and GM began billing claims to Medicare for services by clinicians under audits through other companies owned by Dr. Prose (Doc. 168-46).  GM was organized such that there were entities in several states where GM operated, including separate entities in Illinois,

Louisiana, Michigan, Missouri, Ohio, and Kansas (Doc. 168-45).  Dr. Prose and GM first began dispersing GM, P.C.'s claims through these entities that were already in place to determine whether that would reduce the number of Medicare audits (Doc. 168-44; Doc. 168-46).

This strategy was described in an email string between Dr. Prose and Sandy Wrona on February 12, 2016 (Doc. 168-46).  Wrona recounted the results from Louisiana, which is covered by Novitas.  *Id*.  Wrona stated: "We took 2 providers . . . that are under 100% audit for 99310.  We sent out a mixture of claims . . . for these two providers through our General Medicine of Illinois Physicians entity."  *Id*.  Wrona noted the "Results" of this tactic showed 317 transmitted claims and 317 claims paid in full with "[a]nother 755 claims transmitted on 1-29-2016."  *Id*.  She then compared these results to when they billed claims through GM, noting that 61 claims were transmitted through GM, with 41 of those claims receiving an audit request.  *Id*.

Wrona also described similar results for Michigan, noting that they "took 3 providers . . . that are under high audit . . . and sent out a mixture of claims through General Medicine of Ohio Nurse Practitioner."  *Id*.  The results were 747 claims transmitted with 724 claims paid in full.  *Id*. Wrona asks Dr. Prose: "I think we still need to decide how many additional entities we want??" *Id*. at 3.  Dr. Prose responded to Wrona's question stating, "We need 15 corps[.]" *Id*.

On February 26, 2016, Dr. Prose organized 15 new legal entities under Delaware law (the "2016 Entities") (Doc. 94 at ¶ 10-24).  The principal place of business for the 2016 Entities was GM's corporate headquarters at 21333 Haggerty Road, Suite 150, Novi, Michigan.  Dr. Prose was the sole shareholder, officer, and registered agent of all 2016 Entities.  Each of the entities were enrolled in the Medicare Program (Doc. 86, ¶ 399).  Each enrollment identified Dr. Prose as the owner of the entity (Doc. 168-22 at 33).  The Government approved the enrollment application recognizing Dr. Prose as the "authorized official" (Doc. 168-23 at 2).

Dr. Prose testified with respect to several reasons for setting up numerous corporate entities in 2016, including to comply with the Federal Express tax case regarding companies that owned their own malpractice company, marketing in various states, and to comply with the corporate practice of medicine requirements in various states (Doc. 168-6 at 207, 209). Accountant Neil Kahn explained the accounting reasons for creation and use of the entities (Doc. 153-7 at 33-34). One reason was to spread the risk of malpractice claims. *Id*.

GM and Dr. Prose began billing claims through the 2016 Entities and continued moving claims from General Medicine, P.C. through these entities into 2017 because the plan was successful (Doc. 168-47). On April 24, 2017, GM employee Ryanne Fahnestock (f/k/a Thomas) asked Prose if they should think about moving the remaining four Louisiana facilities and bill them under different entities because they were "having good luck with audits billing under the other entities." *Id*. Prose instructed her to do so. *Id*. Fahnestock testified that "the reason the entities were created was to bill under them and I assume the reason was because of the audits. So we were billing under other entities so that Medicare would not audit them." (Doc. 168-48 at 60-61).

### Government and GM Experts

Government expert Dr. Richard Baer was retained to offer opinions regarding GM billing practices. Dr. Baer opined that the billed visits listed in his report could not have been performed because the patients were deceased or hospitalized (Doc. 168-15). Dr. Baer's report lists 179 specific claims that were not payable because the service could not have been provided as billed. *Id.* at 22-41.

Government expert Dr. Charles Crecelius offered opinions that the absolute minimum amount of time to complete the review of systems and physical exam portions of a visit was five minutes, and that the minimum time reported in an AMA survey of physician time spent for CPT

codes 99309 and 99310 was ten minutes (Doc. 168-10 at 15).  According to Dr. Crecelius, patients in skilled nursing facilities are seen, on average, twice a week (Doc. 153-4, at 108-110, 116, 117, 138).  If the visit is medically necessary, the frequency of the visit, by itself, does not determine whether the claim should be paid.  *Id*. 127.  Dr. Crecelius opined that a comprehensive visit "on the easiest patient imaginable would be about ten minutes" and that "most are going to take longer than that."  *Id*. at 244.  However, this would be "an unusual person or an unusual circumstance" and that this is not his average, by any means.  *Id* at 247.

GM's coding expert, Richelle Marting, testified that time is a factor or consideration in coding (Doc. 168-57 at 88).  In her review of GM's services in this case, she looked at the duration of time documented in the records and "compared that to the duration of typical times for [the codes at issue]."  *Id*.  This was consistent with the Medicare Claims Processing Manual, which states "[t]he duration of the visit is an ancillary factor and does not control the level of the service to be billed unless more than 50 percent of the . . . time is spent providing counseling or coordination of care" (Doc. Ex. 4 at § 30.6.1).

### Medicare Contractor Witnesses

Peterson-Kincaid, a Medical Review Quality Assurance Supervisor at CoventBridge, testified that CoventBridge does not determine whether a claim is false but can identify documentation that could support potential for fraud, waste, and abuse (Doc. 153-7 at 88).  Linda Oliver, the Director of Clinical Management at Wisconsin Physician Services, testified that a Medicare contractor does not determine if claims are fraudulent or false claims (Doc. 153-8 at 38-39).  She also testified that a claim is false, as in untrue, if the claim was not supported as medically necessary or supported as billed.  *Id*. at 38, 17-21.  Jim Burke, the Program Integrity Manager at CoventBridge, testified that a claim that is not reasonable and medically necessary contains false

or misleading information, but it is not the role of the Medicare contractor to make a determination of the falsity of the claim in terms of the False Claims Act (Doc. 153-10 at 105). Tanya Ickes, a Manager of Medical Review at a Medicare contractor, testified that it was not within the scope of her work to determine if a claim is falsified (Doc. 153-12 at 83).

## Discussion

### Legal Standards

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the nonmoving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The court views the record in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).

The court's role in deciding a motion for summary judgment is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 922 (7th Cir. 1994). It cannot weigh evidence or make credibility determinations because those tasks are left to the factfinder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). Rather, the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.

The FCA imposes liability on any person who (1) "knowingly presents, or causes to be presented, to the United States Government a false or fraudulent claim for payment or approval" or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement to get a

false or fraudulent claim paid or approved by the Government." 31 U.S.C. §§ 3729(a)(1)(A), (B).
Thus, an FCA case requires proof of falsity, knowledge, materiality (meaning whether the alleged
misrepresentations had the natural tendency to influence the payment or receipt of funds), and the
involvement of federal funds. *United States ex rel. Heath v. Wisconsin Bell, Inc.,* 92 F.4th 654,
659 (7th Cir.), *cert. granted sub nom. Wisconsin Bell, Inc. v. United States*, 144 S. Ct. 2657, 219
L. Ed. 2d 1283 (2024), and *aff'd and remanded,* 604 U.S. 140, 145 S. Ct. 498, 221 L. Ed. 2d 24
(2025). GM's motion asserts that summary judgment is warranted in this case because the
Government cannot prove falsity or knowledge.

## Analysis

### *Falsity*

GM maintains the Government has failed to produce any evidence of false claims.
Specifically, GM asserts that none of the Government's witnesses or experts have used the phrase
"false claim" when referring to the evidence in this case.

The FCA is not limited to claims that are facially false. *United States v. Molina Healthcare
of Illinois, Inc.,* 17 F.4th 732, 740 (7th Cir. 2021). It covers a defendant's more general decision
to fraudulently procure payment from the government. *Id*. And, while the archetypical claim is
one in which a "claim for payment is itself literally false and fraudulent," courts have identified
particular theories that support FCA claims, including (1) false certification to the government that
the party has complied with a statute, regulation, or condition of payment; (2) promissory fraud,
or fraud in the inducement, and (3) implied false certification. *United States ex rel. Hendow v.
Univ. of Phoenix*, 461 F.3d 1166, 1170-73 (9th Cir. 2006). In other words, if the service provided
does not meet the elements of the code represented to Medicare, the claim is factually or literally
false. Additionally, a claim that certifies a service is reasonable and necessary is false under the

FCA's falsity element if the service is not in fact reasonable and necessary. *See* 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 440.230(d) (2011) (Medicare and Medicaid will compensate providers only for services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member").

Here, the Government alleges three groups of false claims made by GM: (1) false claims for services not rendered; (2) false claims for services that did not meet billing code requirements; and (3) false claims for services that were not reasonable and necessary. For the first group, the Government alleges that GM submitted false claims for services not rendered because the patients were either deceased or hospitalized on the dates of GM's purported nursing home visits. Directly relevant to this allegation, Dr. Richard Baer's report lists 179 specific claims that were not payable because the service could not have been provided or billed due to the patients being deceased or hospitalized at the time of the alleged service.

As for the second group of claims, the Government contends GM submitted claims to Medicare for services that did not meet the requirements of the CPT codes included on the claims ("upcoded claims"). These alleged upcoded claims include claims where the provider spent insufficient time with the patient to complete the required elements of the visit and claims for services that did not meet billing code requirements based on the medical records. Government expert Dr. Charles Crecelius opines regarding the estimated times to complete a service that are contained within the CPT codes. Specifically, he testified that a comprehensive visit "on the easiest patient imaginable would be about ten minutes" and that "most are going to take longer than that." In his opinion, this would be "an unusual person or an unusual circumstance" and that this is not his average, by any means.

HHS-OIG Special Agent Emily Kelleher completed two reports regarding GM's time spent with patients at nursing facilities on 34 days, including evidence of witness interviews, visual surveillance, and tracking device data. Kelleher compared the amount of time GM's providers spent at nursing facilities on those days with the claims billed by GM and concluded that GM's providers spent less than five minutes per patient visit on the days reviewed. She also compared the time spent by GM's providers with the typical time to perform those services according to the CPT codes billed to Medicare. Kelleher's report included a spreadsheet identifying the rendering provider, the date of service, and the place of service for each of the 34 days. Kelleher's report provided additional information on the false claims resulting from billing over 24 hours of services in a day. For example, Kelleher reviewed claims by GM on May 26, 2020 performed by Christiane Weimken at two separate facilities. GM billed 65 visits that day performed by Weimken, including 41 visits under comprehensive visit CPT code 99310. Forty-seven of these visits were billed to Medicare Part B, with the remaining 18 visits billed to other federal and private health plans. Based upon the CPT codes' estimated times, it would take a typical provider nearly 34 hours to complete the 65 visits billed.

For the third group of claims, Dr. Crecelius identified claims in his report that billed for services that in his opinion, were not medically necessary as required by Medicare. These claims are identified by patient name, rendering provider, and date of service.

GM does not dispute this evidence but argues, "at best, some the Government's witnesses have identified what they contend to be claims that are not medically necessary or not coded at the appropriate level" which does not make the claim false. The Court disagrees. A defendant who performs and submits claims for services which were not medically necessary and certifies that such procedures were medically necessary can be liable under the FCA. *See Universal Health*

*Servs., Inc. v. U.S. ex rel. Escobar,* 579 U.S. 176, 180 (2016). Here, based on this evidence, a reasonable jury could find the Government has proven falsity under the FCA. Accordingly, summary judgment is denied on the issue of falsity.

### *Scienter*

The FCA imposes liability for the knowing submission of false claims. The Act provides that a person acts "knowingly" if that person "with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

To show that GM acted knowingly, the Government is not required to prove "specific intent to defraud." *Id.* Actual knowledge "refers to whether a person is aware of information" about the claim's falsity. *United States ex rel. Schutte v. SuperValu, Inc.*, 598 U.S. 739, 751 (2023) (cleaned up). Deliberate ignorance "encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity." *Id.* And reckless disregard "similarly captures defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *Id.* The Government is also permitted to rely on circumstantial evidence to prove scienter under the FCA.

The Government has offered evidence that could support a reasonable inference of scienter. Specifically, material issues of fact preclude summary judgment as to whether GM and Dr. Prose were aware of the false claims submitted. GM management closely tracked the visits performed by clinicians and required them to complete minimum numbers of CPRs, MMRs, and other visits mandated by GM each month. When numbers were low, Dr. Prose and management directed clinicians to perform more visits. GM also provided directions to clinicians on how to code their

Page **17** of **19**

visits.  GM management repeatedly instructed clinicians to record CPRs and MMRs as 99310, the

highest code for nursing facility visits, and 99337, the highest code for assisted living facility visits.

When providers were not meeting those numbers established by management, GM and Dr. Prose

pushed them to complete more visits.

Government expert, Dr. Baer, found there were no records for some of GM's services, and

when a progress note existed, the progress note did not mention that the beneficiary was dying or

seriously ill before a hospitalization.  The progress notes also documented reviews of systems and

physical examinations that could not have been performed on the date of service.  Other evidence

supporting a finding of scienter includes Dr. Prose and GM's knowledge that multiple Medicare

contractors and the Medicare Appeals Council repeatedly denying and down coding GM's claims

as not medically necessary or supported under the CPT codes.

GM maintains that it cannot be held responsible for the actions of some of its clinicians.

But corporations "know" what their employees know when the employees acquire knowledge

within the scope of their employment and are in a position to do something about that knowledge.

*United States v. Anchor Mortg. Corp.,* 711 F.3d 745, 747–48 (7th Cir. 2013).  Moreover, a

defendant such a GM can be held vicariously liable for its employee's fraud.  *See United States v.*

*Anchor Mortg. Corp.*, 2010 WL 3184210, at *6 (N.D. Ill. Aug. 11, 2020), *rev'd on other grounds*,

711 F.3d 745 (7th Cir. 2013).  Accordingly, GM is not entitled to summary judgment on the issue

of scienter.

### *State Law Claims*

The Government also brings common law claims of fraud, payment by mistake, and unjust

enrichment claims against GM.  In a footnote, GM argues these claims fail "because the

Government's false claims action fails."  That argument is underdeveloped.  That said, the record

before the Court does not establish as a matter of law that the Government's false claims action

fail.  Accordingly, summary judgment on the state law claims is also denied.

**Conclusion**

For the foregoing reasons, Defendant GM's Motion for Summary Judgment (Doc. 153) is

**DENIED in its entirety**.

        **IT IS SO ORDERED.**

        **DATED:  March 10, 2026**

                                              **STACI M. YANDLE**
                                              **Chief United States District Judge**